| | |
|---|---|
| RETHINK35, SAVE OUR SPRINGS ALLIANCE, AUSTIN JUSTICE COALITION, PEOPLE ORGANIZED IN DEFENSE OF EARTH AND HER RESOURCES (PODER), DOWNTOWN AUSTIN NEIGHBORHOOD ASSOCIATION, PARENTS' CLIMATE COMMUNITY, EAST TOWN LAKE CITIZENS NEIGHBORHOOD ASSOCIATION, SOUTHEAST AUSTIN NEIGHBORS AND RESIDENTS ORGANIZED FOR ENVIRONMENTAL JUSTICE (SANAR), HANCOCK NEIGHBORHOOD ASSOCIATION, MUELLER NEIGHBORHOOD ASSOCIATION, FRIENDS OF AUSTIN NEIGHBORHOODS, FRIENDS OF HYDE PARK, SUNRISE MOVEMENT AUSTIN, ENVIRONMENT TEXAS, TEXAS PUBLIC INFORMATION RESEARCH GROUP, and CELIA ISRAEL, | Civ. Case No. 1:24-CV-00092 |

**Plaintiffs,**

v.

TEXAS DEPARTMENT OF TRANSPORTATION (TXDOT), MARC WILLIAMS, in his official capacity as Executive Director of TXDOT, UNITED STATES DEPARTMENT OF TRANSPORTATION (USDOT), PETE BUTTIGIEG, in his official capacity as Secretary of USDOT, UNITED STATES FEDERAL HIGHWAY ADMINISTRATION (FHWA), and SHAILEN BHATT, in his official capacity as Administrator of FHWA,

**Defendants.**

**PLAINTIFFS' ORIGINAL COMPLAINT**
**FOR DECLARATORY AND INJUNCTIVE RELIEF**

**INTRODUCTION**

1.      This action challenges the failure of the Texas Department of Transportation ("TxDOT"), acting under delegated authority from the United States Department of Transportation ("USDOT") and the Federal Highway Administration ("FHWA"), to comply with federal law, in its approval of the I-35 Capital Express Central Project from US 290 East to US 290 West/SH71 ("Project"), which will reconstruct and expand a section of Interstate Highway 35 ("I-35") that runs through downtown Austin. Defendants violated the National Environmental Policy Act ("NEPA") by failing to properly consider the environmental consequences and environmental injustice impacts of the Project.

2.      The widening of I-35 will reinforce and exacerbate a century of racial inequity. In 1928, the City of Austin approved a comprehensive plan (the "1928 Plan") used to intentionally discriminate against communities of color, which established a "negro district," segregating and isolating communities of color to East Austin.[1] The "Negro District" included historically Black neighborhoods, like Chestnut and Rosewood, whose populations remain predominantly Black today and are within the airshed of I-35.

3.      Following the City of Austin's establishment of the Negro District, generations of segregationist practices, such as "redlining," followed intentionally excluding Black families from white neighborhoods. When these practices were declared unconstitutional, segregationists used the nation's interstate system to install physical barriers to enforce the segregation of Black, Latino, and other communities of color.

---

[1]      Austin, Tex. Resolution Adopting the "A City Plan for Austin, Texas" ("1928 Plan") Reflected in the Minutes of the Austin City Council Meeting Occurring on March 22, 1928, *available at* https://services.austintexas.gov/edims/document.cfm?id=89795.

4.     For over sixty years, I-35 has cut a line through Austin, with disproportionately negative impacts on marginalized communities in communities along I-35, especially East Austin—the vast majority of which are Black and Latino. Decades of discrimination, caused and reinforced by the construction of I-35, have brought widespread social, health, and economic disparities to these communities. These communities (predominantly Black and Latino neighborhoods) have suffered from health disparities associated with long-term exposure to car emissions and harmful pollutants by living in the neighborhoods along I-35 and are more likely to experience chronic health issues, including respiratory issues, such as asthma.

5.     Comprehensive proposals for alternative project designs were submitted by community members. Defendants violated National Environmental Policy Act ("NEPA") by failing to rigorously explore and objectively evaluate these reasonable alternatives.

6.     Defendants further failed to comply with NEPA by neglecting to take a hard look at environmental impacts associated with human health, air quality, and water resources; by failing to allow public comment on modifications made to the adopted Project, despite expanding the Project area by 1.2 miles; and by failing to properly engage in interagency collaboration.

7.     The Project will directly impact and convert public parkland and other public outdoor recreation spaces throughout the project area, including critical species habitat at the Colorado River Park Wildlife Sanctuary and other public parkland along the Colorado River and Lady Bird Lake. Such impacts include disruption and serious risk of contamination from lead dust and other particles of a historic pecan grove and community gardens planted on public land that provide food sources to local residents. Defendants have failed to identify any proposed replacement property, in violation of Section 6(f) of the Land and Water Conservation Fund Act ("LWCF Act").

**JURISDICTION**

8.      This Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 (federal question jurisdiction); 5 U.S.C. § 702 (Administrative Procedure Act); and may issue a declaratory judgment and further relief pursuant to 28 U.S.C. § 2202 (declaratory and injunctive relief).

9.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because it is the location of the regional headquarters of the Defendant agency TxDOT, which approved the Project, and it is the location of the Project.

10.      Plaintiffs have no adequate remedy at law. Unless this Court grants the requested relief, the Defendants' actions will cause irreparable harm to the environment, to Plaintiffs, and to the public in violation of federal law and the public interest. No monetary damages or other legal remedy could adequately compensate Plaintiffs or the public for these harms. Plaintiffs are persons adversely affected or aggrieved by federal agency action within the meaning of section 702 of the Administrative Procedure Act.

**PARTIES**

**A.      PLAINTIFFS**

11.      Rethink35, Save Our Springs Alliance, Austin Justice Coalition, People Organized in Defense of Earth and Her Resources (PODER), Parents' Climate Community, Downtown Austin Neighborhood Association (DANA), East Town Lake Citizens NA, Southeast Austin Neighbors and Residents Organized for Environmental Justice (SANAR), Hancock Neighborhood Association, Mueller Neighborhood Association, Friends of Austin Neighborhoods (FAN), Friends of Hyde Park, Sunrise Movement Austin, Environment Texas, TexPIRG, and Celia Israel, an individual, (collectively, the "Plaintiffs") represent a broad—somewhat unique—coalition of plaintiffs seeking relief under this Complaint. Plaintiffs bring this action collectively on behalf of themselves and their respective members, donors, supporters, and interests, which include individuals, organizations, and businesses who will suffer irreparable harm by the expansion of I-35 and the failure of TxDOT to adequately complete its delegated

responsibility of environmental review in compliance with the National Environmental Policy Act in its selection of the Project.

12.     Plaintiffs' members include many who live, work, attend school, and worship in the vicinity of the proposed Project or use the Project area for recreational, professional, or aesthetic use, and who will suffer injuries from the construction and widening of I-35. Also, Plaintiffs and their members suffer informational and procedural injuries from the failure of the Defendants to comply with NEPA and the failure to generate the required information on the environmental effects of the Project.

13.     Numerous members of these organizations live, work, attend school, worship, or recreate in the area. The expansion and widening of I-35 will subject these people to increased air pollution, will displace residences, places of business, recreation areas, and services that residents and visitors depend upon, use, and enjoy, and will diminish the aesthetic, recreational, and professional use and enjoyment of community spaces within East Austin, the Colorado River/Lady Bird Lake, and local parks, such as Waller Beach.

14.     Plaintiff Rethink35 is a volunteer-led, nonprofit organization advocating for more humane, equitable, economically, and environmentally sustainable, and effective mobility and land use in the Austin area and opposes the expansion of I-35 under the I-35 Capital Express Central Project. Its donors and supporters include businesses, residents, and other organizations of residents who live within the I-35 corridor.

15.     Plaintiff Austin Justice Coalition is a Black-led nonprofit organization that serves Austin residents who are historically and systemically impacted by gentrification, segregation, over policing, a lack of education and employment opportunities, and other institutional forms of racism in Austin. Austin Justice Coalition advocates for, elevates, and celebrates Black culture, while mobilizing people to boldly fight racist systems.

16.     Plaintiff Celia Israel is an individual and community leader who lives in South Austin, at 7107 Tawny Cir. Austin, TX 78745. She is a frequent commuter on I-35

and will be injured by construction noise, delays, air quality changes, and other environmental injuries related to the construction and expansion of the highway. She frequently enjoys visiting the parks and recreational spaces in the Project area, including Waller Beach and Fiesta Gardens.

17.     Plaintiff Downtown Austin Neighborhood Association ("DANA") is a neighborhood association officially registered with the City of Ausitn that includes 2,500 households who will be directly impacted by the environmental consequences from the expansion of I-35. DANA is located in Downtown Austin, with boundaries extending from Lamar Blvd. (west) to I-35 (east) and from Martin Luther King, Jr. Blvd. (north) to Lady Bird Lake (south). Its members frequent parks, historical, and civic spaces in the Project area, including Waller Beach.

18.     Plaintiff East Town Lake Citizens Neighborhood Association ("East Town Lake Citizens NA") is a neighborhood association officially registered with the City of Austin that includes 5,000 households who will be directly impacted by the environmental consequences from the expansion of I-35.  East Town Lake Citizens NA is located in East Austin, with boundaries extending from I-35 (west) to Longhorn Bridge (east) and from East Cesar Chavez St. (north) to Lady Bird Lake (south). The boundaries of the neighborhood association include Edward Rendon Sr. Park at Festival Beach, and its members include families and individuals who frequently use and enjoy the park and who are otherwise visitors, growers, or patrons at the Festival Beach Food Forest and the Festival Beach Community Garden. Its members own or live in houses, operate businesses, or otherwise use community services within the project area for I-35 Capital Express Central. The East Town Lake Citizens NA includes areas that have been historically—and continue to be—critical parts of Austin's Latino and Black communities.

19.     Plaintiff Environment Texas is an environmental organization that works for clean air, clean water, clean energy, wildlife and open spaces, and a livable climate. The organization, which has many members that live in the City of Austin and along the

I-35 corridor, works towards protecting places where nature can thrive and offer families great opportunities to live healthier. Its members frequently enjoy the natural, environmental, and aesthetic value of the parks, wildlife areas, and open spaces within the Project area, which will be harmed by the Project's expansion.

20.     Plaintiff Friends of Austin Neighborhoods is a neighborhood association officially registered with the City of Austin that includes over 500,000 households, many of which will be directly impacted by the environmental consequences from the expansion of I-35. Friend of Austin Neighborhoods, which was founded in 2015, consists of member neighborhood associations representing hundreds of thousands of individual residents all across Austin. The organization is divided among sectors, including the following sectors that will be directly impacted by I-35: North Central, North East, Central, East, South Central, and Far South Central.

21.     Plaintiff Friends of Hyde Park is a neighborhood association officially registered with the City of Austin that includes 2,000 households which will be directly impacted by the environmental consequences from the expansion of I-35. Friends of Hyde Park is located in West Austin, with boundaries extending to the west of I-35. Its mission statement includes the promotion of an inclusive and friendly environment and policies that encourage diversity.

22.     Plaintiff Hancock Neighborhood Association ("Hancock NA") is a neighborhood association officially registered with the City of Austin. Its boundaries overlap with I-35, immediately to the west of the highway. Its boundaries are from Duval Road (west) to I-35 (east) and 45th Street (north) to 32nd Street (south). Its members frequent businesses and rely on services that will be displaced by the Project, including Star Café and Escuelita Del Alma.

23.     Plaintiff Mueller Neighborhood Association is a neighborhood association officially registered with the City of Austin that includes 8,700 households which will be directly impacted by the environmental consequences from the expansion of I-35. Mueller Neighborhood Association is located in East Austin, with boundaries

overlapping I-35 and extending eastward. The Mueller NA encompasses a community that has specifically dedicated 25% of the total housing units (for-sale and for-rent) to affordable, income-restricted housing.

24.     Plaintiff The Parents' Climate Community is a nonprofit organization formed in 2019 to engage Austin parents, families, and allies in doable, meaningful action on climate change. Parents' Climate Community's work includes raising awareness around kids' public health and rights and how infrastructure projects—like the I-35 expansion—impact youth, from higher rates of respiratory illness in children living near major roadways to the physical and emotional tolls of climate inaction.

25.     Plaintiff People Organized in Defense of Earth and Her Resources ("PODER") is a women-led, people of color, grassroots, social justice organization formed in 1991 to increase the participation of residents of East Austin in decisions related to the economic development and environmental protection of our communities. PODER's mission includes addressing environmental issues as social and economic justice issues and as basic human rights.

26.     Plaintiff Save Our Springs Alliance, Inc. ("SOS Alliance") is a membership-based association, a Texas nonprofit corporation, and a registered environmental organization with the City of Austin. On behalf of its members, SOS Alliance provides educational outreach and scientific research concerning issues that affect water quality, water quantity, and other natural resources throughout the Texas Hill Country, including Austin, Texas. SOS Alliance provides its members a legal voice in protecting their interests in the use and enjoyment of these natural resources and works to safeguard their rights to a participatory democracy and fair, open government. SOS Alliance includes approximately 3,000 members who live within cities and counties throughout the Texas Hill Country, including Austin. Many SOS members live near or along the Colorado River, Lady Bird Lake, or otherwise within their watersheds. These SOS members frequently enjoy the parks, trails, and civic amenities along the shorelines of these water bodies, and many of these members frequently engage in water-based

activities on Lady Bird Lake and the Colorado River, including kayaking, boating, canoeing, and paddling.

27.     Plaintiff Southeast Austin Neighbors and Residents Organized for Environmental Justice ("SANAR") is a non-profit corporation based in Austin, Texas, whose mission is to protect public health, the environment, and the quality of life for the residents of southeast Travis County. The residents that it supports will be injured by their enjoyment of parks along the Colorado River, including the Colorado River Park Wildlife Sanctuary, Guerrero Park, and changes in air and water quality resulting from the highway's expansion.

28.     Plaintiff Sunrise Movement Austin ("Sunrise Movement") is a nonprofit organization that works to address issues of environmental justice, especially the impacts of fossil fuels and climate change on Black, Brown, and working-class communities. Its members include families that live within the Project area who will be directly harmed by environmental injustices and environmental harms related to the highway's expansion.

29.     Plaintiff Texas Public Information Research Group ("TexPIRG") is an organization that works as an advocate for the public interest, speaking out for the public and addressing issues that affect the public's health, safety, and wellbeing in Texas. TexPIRG has members who live along the I-35 corridor and would be directly impacted by the environmental harms attributable to the highway's expansion.

**B.      DEFENDANTS**

30.     Defendant Texas Department of Transportation ("TxDOT") is a state agency with its principal executive offices at 125 East 11th Street, Austin, TX 78701. The Surface Transportation Project Delivery Program provides Congressional authorization to the Secretary of the United States Department of Transportation ("USDOT") to assign some of its responsibilities under the National Environmental Policy Act ("NEPA") to a state's transportation authority. *See* 23 U.S. § 327. TxDOT assumed such responsibilities of the Secretary for environmental review, consultation, and other delineated responsibilities pursuant to a memorandum of understanding

("MOU") between the United States Federal Highway Administration ("FHWA") and TxDOT, effective December 9, 2014.[2] This MOU was renewed in 2019 and expires at the end of 2024.[3]

31. TxDOT is considered a federal agency through its delegation under the executed MOUs and is directly responsible for the federal activity of environmental review under NEPA. Because TxDOT assumed the responsibilities of the Secretary of Transportation for NEPA compliance, TxDOT is subject to the same environmental and administrative law standards that would apply to federal agencies. *See Fath v. Tex. DOT*, 924 F.3d 132, 135 n.1 (5th Cir. 2018).

32. Defendant Marc Williams is the Director of TxDOT, and is sued in his official capacity, as the head of TxDOT, which is the project proponent and designer, chose the preferred alternative, and will oversee the construction.

33. Defendant USDOT is the federal department with ultimate authority over the federal highway system.

34. Defendant USDOT has engaged in improper oversight of its delegation to TxDOT.

35. Defendant Secretary Pete Buttigieg is the head of the USDOT and is sued in his official capacity.

36. Defendant FHWA is an agency within the Department of Transportation that oversees the federal highway system.

---

[2]   Memorandum of Understanding Between the Federal Highway Administration and the Texas Department of Transportation Concerning State of Texas' Participation in the Project Delivery Program Pursuant to 23 U.S.C. § 327, dated effective December 9, 2014 (the "MOU"), *available at*  https://ftp.txdot.gov/pub/txdot-info/env/nepa-assign-ment/txdot-fhwa-nepa-assignment-mou.pdf.

[3]   First Renewed Memorandum of Understanding Between the Federal Highway Administration and the Texas Department of Transportation Concerning Texas' Participation in the Project Delivery Program Pursuant to 23 U.S.C. § 327, dated December 9, 2019 ("First Renewed MOU"), *available at*  https://ftp.txdot.gov/pub/txdot-info/env/nepa-assignment/2019-nepa-assignment-mou.pdf.

37. Defendant FHWA has engaged in improper oversight of its delegation to TxDOT.

38. Defendant Shailen Bhatt is the Administrator of FHWA and is sued in his official capacity capacity.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

39. Plaintiffs and/or members of the public submitted comments on the relevant Project. Among other matters, Plaintiffs commented on issues related to the Project's impacts on marginalized communities, air quality, water, and Waller Beach Park. Plaintiffs also commented on TxDOT's failure to adequately consider alternatives to the Project.

40. Plaintiffs have exhausted administrative remedies.

## LEGAL FRAMEWORK AND FACTS GIVING RISE TO PLAINTIFF'S CLAIMS FOR RELIEF

### A. NATIONAL ENVIRONMENTAL POLICY ACT

41. Congress enacted NEPA "to promote efforts which will prevent or eliminate damage to the environment" and to "stimulate [human] health and welfare." 42 U.S.C. § 4321. Recognizing the "profound influences" of "industrial expansion" and other intensive human activity on the natural environment and on human health and welfare, NEPA requires the federal government to use all practical means to improve and coordinate federal plans, functions, programs, and resources to "assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings." 42 U.S.C. § 4331.

42. NEPA is intended to ensure that all federal agencies consider the environmental impacts of their actions in their decision-making processes, thereby making environmental protection part of the mandate of every federal agency. *See* 40 C.F.R. § 1500.1(a); *Calvert Cliffs' Coordinating Committee v. United States Atomic Energy Commission*, 449 F.2d 1109, 1112 (D.C. Cir. 1971). NEPA fulfills this purpose by requiring that agencies take a "hard look" at environmental impacts of federal action

before the action occurs and by ensuring that "relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349-50 (1989).

43.     NEPA requires that the public be allowed to comment on projects that may have potentially significant impacts on the environment. The public comment period is "intended to help agencies assess an action's environmental impact." *Earth Island Inst. V. United States Forest Serv.*, No. 22-16751, 2023 U.S. App. LEXIS 32337, at *23-24 (9th Cir. 2023). Although an agency is not required to repeat the public comment process when the analysis "is only slightly modified" following the publishing of a draft, "an agency is required to repeat the public comment process when the EA includes substantial changes relevant to environmental concerns." *Id.* (citing *Mid States Coal. For Progress v. Surface Transp. Bd.*, 345 F.3d 520, 548 (8th Cir. 2003).

44.     NEPA and the regulations promulgated thereunder by the Council on Environmental Quality[4] require preparation of a detailed statement, referred to as an Environmental Impact Statement ("EIS"), for all "major Federal actions significantly affecting the quality of the human environment." 40 C.F.R. § 1502.3; 42 U.S.C. § 4332(c). The EIS must provide a full and fair discussion of (1) the "environmental impact of the proposed action," (2) any "adverse environmental effects which cannot be avoided should the proposal be implemented," (3) any "alternatives to the proposed action," and (4) any "irreversible or irretrievable commitment of resources which would be involved

---

[4]     In 2020, the Trump administration promulgated changes to the original regulations. *See* 85 C.F.R. § 43304 (July 16, 2020). In 2022, the Biden administration issued a "phase 1" restoration of some of the original rules "to enhance clarity on NEPA implementation, to better effectuate NEPA's statutory requirements and purposes, to ensure that Federal decisions are guided by science, to better protect and enhance the quality of the human environment, and to provide full and fair processes that inform the public about the environmental effects of government actions and enable public participation." 86 C.F.R. 55757, 55759. Additional rule change is ongoing. *See id.* Additionally, the Fiscal Responsibility Act of 2023 (FRA, Public Law 118-5), enacted on June 3, 2023, codifies some original CEQ regulatory provisions. The U.S. Department of Transportation's regulations pertaining to NEPA are found at 23 C.F.R. Part 771.

in the proposed action should it be implemented." 42 U.S.C. § 4332; *see also* 40 C.F.R. § 1502.1.

45.     "Consideration of alternatives 'is the heart of the [EIS]' and agencies should 'rigorously explore and objectively evaluate all reasonable alternatives.'" *City of L.A. v. FAA*, 63 F.4th 835, 843 (9th Cir. 2023), *quoting* 40 C.F.R. § 1502.14. An EIS is rendered inadequate by the existence of a viable but unexamined alternative. *See Nw. Coal. for Alts. to Pesticides (NCAP) v. Lyng*, 844 F.2d 588, 591-92 (9th Cir. 1988).

46.     The purpose of the requirement to consider alternatives is "to insist that no major federal project should be undertaken without intense consideration of other more ecologically sound courses of action, including shelving the entire project, or of accomplishing the same result by entirely different means." *Environmental Defense Fund v. Corps of Engineers*, 492 F.2d 1123, 1135 (5th Cir. 1974).

47.     "No decision is more important than delimiting what these 'reasonable alternatives' are [since] [o]ne obvious way for an agency to slip past the strictures of NEPA is to contrive a purpose so slender as to define competing 'reasonable alternatives' out of consideration (and even out of existence)." *Simmons v. United States Army Corps of Engineers*, 120 F.3d 664, 666 (7th Cir. 1997).

48.     Where an alternative is eliminated for detailed examination, the EIS must discuss the reasons for elimination. *See City of L.A.*, 63 F.4th at 843.

49.     An agency violates NEPA when it considers "essentially identical" alternatives. *See Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024, 1039 (9th Cir. 2008); *W. Org. of Res. Councils v. United States BLM*, No. CV 16-21-GF-BMM, 2018 U.S. Dist. LEXIS 49635, at *20-22 (D. Mont. Mar. 26, 2018).

50.     The existence of a viable but unexamined alternative renders the environmental review conducted under NEPA inadequate. *See Envtl. Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 877 (9th Cir. 2022).

51.     In preparing an EIS, agencies must consider environmental justice ("EJ") issues, which "encompass a broad range of impacts covered by NEPA, including impacts

on the natural or physical environment and interrelated social, cultural and economic effects." *Council on Environmental Quality, Environmental Justice- Guidance Under the National Environmental Policy Act* (Dec. 10, 1997).

52.     NEPA's "hard look" requirement requires that an agency's consideration of EJ issues not be done in a cursory or unreasonable manner. *See Coliseum Square Ass'n v. Jackson*, 465 F.3d 215, 232 (5th Cir. 2006); *Trenton Threatened Skies, Inc. v. FAA*, 2024 U.S. App. LEXIS 194 at *27 (3rd Cir. 2024); *Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321, 1330 (D.C. Cir. 2021); *Sierra Club v. FERC*, 867 F.3d 1357, 1368-69 (D.C. Cir. 2017); *Cmtys. Against Runway Expansion, Inc. v. FAA*, 355 F.3d 678, 689 (D.C. Cir. 2004); *NAACP Erie Unit 2262 v. FHA*, 648 F.Supp. 3d 576, 591 (W.D. Pa. 2022).

53.     Claimed violations of NEPA are reviewed under the Administrative Procedure Act, 5 U.S.C. §§ 701-706 ("APA"). The APA confers a right of judicial review on any person that is adversely affected by agency action. *See* 5 U.S.C. § 702. Under the APA, a reviewing court must "hold unlawful and set aside agency action, findings, and conclusions" found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;" "contrary to constitutional right, power, privilege, or immunity;" or "unsupported by substantial evidence" in the record, as well as those found to be "without observance of procedure required by law." 5 U.S.C. § 706(2).

**B.      SECTION 6(f) OF LAND AND WATER CONSERVATION FUND ACT**

54.     Section 6(f) of the LWCF Act provides that property acquired or developed with LWCF assistance shall be retained and used for public outdoor recreation. Any property so acquired and/or developed shall not be wholly or partly converted to other than public outdoor recreation uses unless the National Park Service ("NPS") approves substitution property. *See* 54 U.S.C. § 200305(f)(3); 36 C.F.R. § 59.3.

55.     Although a formal conversion proposal cannot be submitted until after NEPA review is complete, an EIS should include a Section 6(f) section that identifies the proposed replacement property. A NEPA review of the conversion and replacement are

required prior to the NPS's formal approval of the conversion. *See* TxDOT, *Environmental Handbook* – Section 6(f) Land and Water Conservation Fund Act Compliance (Mar. 2022).

## FACTS

56.     On August 18, 2023, the TxDOT issued its FEIS/ROD for the Project.

57.     Despite concerns raised by over 75% of the 6,000+ public comments received, including leaders at the City of Austin and Travis County, TxDOT has decided to expand I-35 for approximately eight miles from US 290 East through downtown Austin across Lady Bird Lake to SH 71/Ben White Boulevard.

58.     The ROD adopted "modified" alternative 3. The I-35 expansion will include the addition of four non-tolled high occupancy-vehicle ("HOV") lanes, as well as new frontage roads and ramps. At its widest, I-35 will be 25 lanes across, and the expansion more than doubles this section of the interstate's total number of lane miles from 115 to 262. The Project also requires approximately 54.1 acres of additional right-of-way, resulting in the displacement of residences and business in areas with environmental justice concerns.

59.     Despite modifying the Project and expanding the project area by 1.2 miles after public notification and the close of time for public comment, TxDOT did not provide the public an opportunity to comment on any of the modifications as part of the NEPA process.

### A.     IMPACTS ON MARGINALIZED COMMUNITIES

60.     It is widely recognized and accepted that the Interstate Highway System has caused devastating and disparate impacts to marginalized communities, especially poor and minority communities. The siting and construction of highways has too often cut the heart and soul out of thriving communities, divided people, and contributed to widespread social, health, and economic inequities.

61.     For over sixty years, I-35 has cut a line through Austin, with similar disproportionately negative impacts on marginalized communities. In many respects, I-35

remains as a prominent ode to the blatant racism and systemic segregation that created the Austin we know today. Decades of discrimination, caused and reinforced by the construction of I-35, will be again reinforced and exacerbated by the widening of I-35, as envisioned by the approved Project.

62.     Austin has a long history of structural racism which has had substantial, long-term effects for people of color in the city. In 1928, the City of Austin approved a comprehensive plan called "A City Plan for Austin, Texas" (the "1928 Plan").[5] This 1928 Plan was used to intentionally discriminate against communities of color, establishing a "Negro District," where "all the facilities and conveniences be provided the negroes in this district, as an incentive to draw the negro population to this area."[6] This "Negro District" included neighborhoods in central East Austin, such as Chestnut and Rosewood.

63.     Former Council Member Ora Houston, the first council member to represent Austin's only Black opportunity district (District 1), which overlaps many parts of the racist and discriminatory "Negro District," explained, the 1928 Plan was designed by the Austin City Council to provide "land for the growing city center and a city without minorities."[7]

64.     In the 1930s, the entirety of the "Negro District" was "redlined," so its minority population was denied access to government-backed mortgages. As a result African Americans and Hispanics were not able to access housing and benefit from the increased wealth that comes with home ownership. Deed restrictions and covenants resulted in further segregation.

65.     When these methods of intentional discrimination were ruled unconstitutional in decisions like *Shelley v. Kraemer*, 334 U.S. 1 (1948), the nation's

---

[5]     *See* Austin City Council Regular Meeting Minutes (Mar. 22, 1928), *available at* https://services.austin texas.gov/edims/document.cfm?id=89795.

[6]     *See id.* at p. 377.

[7]     Speech Prepared for Ora Houston, "Austin's '1928 Master Plan' Unleashed Forces Which Still Shape Austin Today" (2018), *available at* https://www.aus-tintexas.gov/sites/ default/files/files/City-Council/Houston/CM_OH_1928_Op-Ed.pdf.

interstate system was built to install physical barriers, intentionally segregating Black, Latino and other communities of color.

66. Two years after *Shelly*, the City of Austin created plans to designate East Avenue as a regional highway. East Avenue was the boundary separating Black residents to the east of Austin.

67. At the time of the 1928 Plan, East Avenue was approximately 200 feet in width, with a well-landscaped median, similar to other major streets in predominantly white, West Austin.[8] However, unlike those western streets, East Avenue was expanded into one of the most traveled interstates in the entire nation.

68. It is indisputable that the placement of I-35 through Austin physically isolated the East Austin neighborhoods already subjected to segregation by discrimination.
The construction of I-35 in 1962 predated the scrutiny accompanying the requirements of the Civil Rights Act enacted two years later. Thus, the negative consequences to communities of color along the I-35 corridor were not considered and mitigation of social, economic, and environmental impacts was not done; nor were these communities given a proper opportunity to have their voices heard in the process.

69. The interstate system is facing change as aging highways around the country are crumbling or found insufficient to meet growing demand. Some communities are using this opportunity to address the harm caused by urban freeways on marginalized communities, while others continue to rely on traditional patterns of highway politics and policy that fail to address income and racial equity. Austin falls into this latter group.

70. To address the inequities caused by the Interstate Highway System, many cities are considering removing and/or re-locating urban highways to create green space, reduce pollution and noise, and build wealth among residents.[9]

---

[8] *See* Austin City Council Regular Meeting Minutes (Mar. 22, 1928) at p. 365.

[9] *See* fn. 4.

71.     Executive Order 12898, Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations, instructs agencies to consider the environmental justice impacts of their actions. *See* 59 Fed. Reg. 7629 § 6-609 (1994). EJ analysis helps decision makers look at the often superficially invisible historical influences, systemic inequalities, structures, and institutions that interact to create and maintain inequities for low-income and minority populations. Such analysis should consider a project's impact on education, housing, economic development, social cohesion, and health in affected marginalized communities.[10]

72.     In evaluating the I-35 Project, the TxDOT's NEPA analysis ostensibly included analysis of EJ impacts; but the analysis was bare-boned in nature, failing to address important health and social consequences, such as the serious health risks associated with increase in mobile source air toxics. The Project was approved despite disparate severe negative impacts to marginalized communities.

73.     The EJ analysis focused on the "Community Study Area," which encompasses approximately 40 square miles along I-35. The boundaries of this area "were chosen to accurately assess the populations that would be directly and indirectly impacted by the proposed project." Approximately 58 percent of the population within the Community Study Area identifies as a racial or ethnic minority, with the vast majority

---

[10]     *See* Deborah Archer, *"White Men's Roads Through Black Men's Homes": Advancing Racial Equity Through Highway* Reconstruction, Vanderbilt L. Rev. (V. 73:5/Oct. 2020), *available at* https://scholarship. law.vanderbilt.edu/vlr/vol73/iss5/1/; Federal Interagency Working Group on Environmental Justice & NEPA Committee, Community Guide to Environmental Justice and NEPA Methods (Mar. 2019), *available at* https://www.energy. gov/sites/default/files/2019/05/f63/NEPA%20 Community%20Guide%202019.pdf; Federal Interagency Working Group on Environmental Justice & NEPA Committee, Promising Practices for EJ Methodologies I NEPA Reviews (Mar. 2016), *available at* https://www.epa.gov/sites/default/files/ 2016-08/documents/nepa_promising_practices_ document _2016.pdf; US EPA, Final Guidance for Consideration of Environmental Justice in Clean Air Act 309 Reviews (Jul. 1999), *available at* https://www. epa.gov/ sites/default/files/2014-08/documents/enviro_justice_309review.pdf; Council on Environmental Quality, Environmental Justice – Guidance Under the National Environmental Policy Act (Dec. 10, 1997), *available at* https://www.epa.gov/sites/ default/files/2015-02/documents/ej_guidance_nepa_ceq1297.pdf.

in East Austin. Approximately 35 percent of the census tracts in the Community Study Area had at or greater than a 21.8 percent poverty rate, which is twice the poverty rate of Travis County.

74.     The FEIS analysis concluded that the Project would disproportionally impact marginalized communities by displacing homes and businesses in the expanded corridor. If the displaced businesses did not relocate within the Community Study Area, approximately 585 jobs will be lost.

75.     As the City of Austin commented in its response to TxDOT's initial scoping for the project, "Multiple expansions of I-35 main lanes and frontage roads throughout the twentieth century directly displaced communities of color in Austin through the use of eminent domain."[11] The following aerial, available at the Austin History Center,



Aerial photograph of Austin in 1951, showing East Ave. in its pre-I-35 configuration

Displaced Communities

Location of Current I-35 Bridge over Lady Bird Lake

---

[11]     *See* City of Austin Comments on I-35 Capital Express Central (Dec. 29, 2020), *available at* https://www.austintexas.gov/sites/default/files/files/2%20-%20COA%20 Department%20Comments %20for%20I-35%20Central%20Express%20 Scoping%2012-29-20.pdf

shows the destruction that the highway's construction had on the predominately Latino neighborhoods to the north and south of the Colorado River. The Project continues this history of displacement.

76.     The I-35 expansion displaces two federally qualified health care centers that provide healthcare for people enrolled in Medicaid and who are uninsured, the David Powell Health Center and the Community Care Hancock Walk-In Clinic. Escuelita Del Alma, a childcare center serving Spanish-speaking populations and offering Spanish im-mersion for children, is also targeted for displacement. Neither the federally qualified health care centers nor Escuelita Del Alma have mitigation plans to keep these services in the area.

77.     The Project also will cause disparate impacts associated with construction and traffic-related pollutants, vehicle emissions, and dictating development patterns. Additionally, the local human health impacts of highway air pollution are staggering and well documented, including in dozens of studies submitted by commenters through the NEPA process.

78.     As correctly noted in the comments of one local resident, "[l]ong-term air pollution significantly increases the risk of pediatric asthma."[12] The Environmental Protection Agency has issued concern to federal agencies that extensive evidence demonstrates that long-term exposure to $PM_{2.5}$ increases the risk for individuals to experience health issues, such as respiratory and cardiovascular diseases.[13] These risks are enhanced for populations, like the neighborhoods in East Austin, where asthma rates are in the 70-90[th] percentiles nationwide.[14] A mother writing in opposition to the I-35 widening further conveyed:

---

[12]     This commenter was citing the American Lung Association at https://www.lung.org/ clean-air/outdoors/who-is-at-risk/highways.

[13]     *Id*.; *see also*, 88 Fed. Reg. 5558 (Jan. 23, 2023) (proposing standards specifically recommending that permitting agencies assess impacts to communities with environmen-tal justice concerns).

[14]     *Id.* at 5673.

I am a mother of 2 young children. My daughter Natalia has
asthma. Asthma is a terrible condition to suffer through because
EVERY breath you take can be a struggle. It's a horrible
experience. I speak from personal experience. I work very hard to
try to keep Natalia as healthy as possible. This highway expansion
could make her situation worse. I fear for her and I feel heartache
knowing how much she is going to struggle with her respiratory
health.

79.     TxDOT simply ignored human health impacts of common motor vehicle

and construction pollutants, including particulates, sulfur dioxide and nitrogen oxide in

its analysis. Its analysis did not look at the EJ implications of the disparate impact of such

pollution on the minority communities in the Community Study Area.

80.     TxDOT also failed to account for impacts to EJ populations associated

with water-related impacts for the Project, failed to examine disparate impacts related to

marginalized communities use and enjoyment of recreational activities and wildlife

sanctuaries, and failed to analyze the disproportionately negative effects associated with

noise and community disruption due to construction activities.

81.     Prior to the filing of this petition, a coalition of local residents,

neighborhood associations, civil rights groups, and environmental justice organizations,

submitted and continue to gather signatures for a petition, based upon violations of the

Civil Rights Act of 1964 and pursuant to the APA, requesting that the delegation of

authority for administering compliance with federal laws to TxDOT be withdrawn for

this Project due to the environmental justice and civil rights implications.

    **A.     AIR QUALITY IMPACTS**

82.     During the scoping process and following release of the draft

environmental impact statement, the public repeatedly commented that the Project would

increase air pollution, causing significant environmental and health impacts. Following

adoption of the Project, the City of Austin issued a resolution stating that the Project

should not be finalized so as to allow time for government agencies to further address

mobile emissions and greenhouse gas ("GHG") emissions through city and regional planning initiatives.[15]

83.     In their assessment of whether the Project will adversely affect air quality, TxDOT failed to properly analyze the Project's impact on criteria pollutants, air toxics, volatile organic compounds ("VOC"), and nitrous oxides ("$NO_x$").

### 1.     Criteria Pollutants

84.     The EPA, acting under authority of the Clean Air Act, has set National Ambient Air Quality Standards ("NAAQS") for six criteria pollutants: carbon monoxide ("CO"), lead, nitrogen dioxide ("$NO_2$"), ozone ("$O_3$"), particulate matter ("PM"), and sulfur dioxide ("$SO_2$"). Exposure to pollutant concentrations in excess of the NAAQS has been shown to have a detrimental impact on human health and the environment.

85.     As regards PM, the EPA has announced a proposal to strengthen the NAAQS for fine particle matter pollution (also known as $PM_{2.5}$), changing the primary (health-based) annual $PM_{2.5}$ standard from a level of 12 micrograms per cubic meter to a level between 9 and 10 micrograms per cubic meter.[16] This anticipated change was known to Defendants prior to issuing the Final Environmental Impact Statement and Record of Decision on the I-35 Capital Express Central Project.[17]

_____

[15]     *See* Austin, Tex. Resolution 202310-045 (October 19, 2023), *available at* https://services.austintexas.gov/edims/document.cfm?id= 417815; Travis County, Commissioners Court-Approved Letter to Texas Department of Transportation (Sept. 26, 2023), *available at* https://traviscotx.portal.civicclerk.com/event/2832/files/10558.

[16]     U.S. EPA, *EPA Proposes to Strengthen Air Quality Standards to Protect the Public from Harmful Effects of Soot* (January 6, 2023), *available at* https://www.epa.gov/newsreleases/epa-proposes-strengthen-air-quality-standards-protect-public-harmful-effects-soot; U.S. EPA, Proposed Decision for the Reconsideration of the National Ambient Air Quality Standards for Particulate Matter (last updated February 3, 2023), *available at* https://www.epa.gov/pm-pollution/proposed-decision-reconsideration-national-ambient-air-quality-standards-particulate#:~:text=On%20January%206%2C %20%202023%.

[17]     City of Austin Environmental Commission, *Austin and the EPA's $PM_{2.5}$ NAAQS* (June 7, 2023), *available at* chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://services.austintexas.gov/edims/document. cfm?id=409664.

86.     Based on recent data, the three-year mean for $PM_{2.5}$ in Austin exceeds 9 micrograms per cubic meter. This mean measurement does not take into account anticipated impacts specific to the Capital Express Central Project.

87.     The EPA's proposed change to the $PM_{2.5}$ standard is designed to better protect communities, including those most overburdened by pollution. $PM_{2.5}$ can penetrate deep into the lungs and result in serious health effects that include asthma attacks, heart attacks, and premature death – disproportionately affecting vulnerable populations including children, older adults, those with heart or lung conditions, as well as communities of color and low-income communities throughout the United States. These particles may be emitted directly from a source, such as construction sites or unpaved roads; others result from friction of tires and brakes on the road; other particles form in the atmosphere as a result of complex reactions of chemicals such as sulfur dioxide and nitrogen oxides, which are pollutants emitted from vehicles.

88.     TxDOT's analysis of the Project's impact on air quality addressed expected CO concentrations, but the analysis failed to address $NO_2$, $O_3$, PM, or $SO_2$. It failed to address projected non-attainment status for $PM_{2.5}$.

89.     According to the FEIS, "[t]he proposed project is located in an area designated by the [EPA] in attainment or unclassifiable for all [NAAQS]; therefore transportation conformity rules do not apply."

90.     Transportation conformity rules are mandated by the Clean Air Act – not NEPA. The fact that an area is currently designated as being in attainment by the EPA does not excuse the Defendants from NEPA's mandate to analyze future impacts associated with criteria pollutants.

91.     Austin City council members commented that the Project's air quality analysis should be "based on projected non-attainment status for particulate matter, and commit to mitigation that includes treating emissions via caps."[18]

---

[18]     Austin City Council Members Zo Qadri, Chito Vela and Ryan Alter, *Joint Statement on I-35 Update* (July 31, 2023), *available at*  https://austincouncil-forum.org/viewtopic.php?p =4124&sid=96946e28db7d989562200852bce88a49#p4124.

92.     TxDOT's air quality analysis does not constitute a "hard look" because TxDOT needs to analyze the Project's impact on all criteria pollutants (and not just for CO), TxDOT needs to consider the EPA's proposed change to the primary (health-based) annual $PM_{2.5}$ standard, and TxDOT's analysis of CO concentrations was methodologically flawed.

93.     TxDOT failed to account for the higher concentrations of criteria pollutants that will impact people in the Community Study Area as a result of roadways necessarily being moved closer to residences and other buildings; failed to address the accumulation and dispersion of air pollutants as a result of constructing decks over portions of the roadway; and improperly relied on model CAL3QHC to analyze CO concentrations.

### 2.     Air Toxics

94.     In addition to the six criteria pollutants for which there are NAAQS, EPA also regulates 188 air toxics defined by the Clean Air Act. Air toxics are pollutants known or suspected to cause cancer or other serious health or environmental effects. Mobile Source Air Toxics ("MSATs") are a subset of these toxics, consisting of 93 compounds emitted from highway vehicles and non-road equipment. The Federal Highway Administration gives priority to nine MSATs: 1,3-butadiene, acetaldehyde, acrolein, benzene, diesel particulate matter ("DPM"), ethylbenzene, formaldehyde, naphthalene, and polycyclic organic matter.

95.     For the Draft EIS, TxDOT relied on a qualitative analysis to model MSAT emissions for the nine priority MSATs, concluding that emissions would decrease with time as a result of EPA's improved standards for vehicles and fuel regulations.

96.     TxDOT used a qualitative analysis rather than a quantitative analysis. The qualitative analysis showed that for the adopted alternative all the MSATs analyzed would increase by large percentages when compared to the No-Build alternative. Under NEPA, the analysis should have focused on the difference in MSAT emissions *between* the alternatives.

97.     In August 2023, TxDOT published a study that contained a quantitative analysis for the nine priority MSATs. This study was not made available for public comment.

98.     TxDOT claims that information is incomplete or unavailable to credibly predict the Project-specific health impacts due to changes in MSAT emissions associated with the Project, despite the fact that other state agencies have managed to conduct health risk assessments related to MSAT emissions.

### 3.     VOC and NOx

99.     Carbon dioxide, VOCs, and $NO_x$ are precursors of Ozone. Austin has a history of violating Ozone standards, and thus, TxDOT's analysis needed to address not only Ozone but also VOC and $NO_x$.

100.     The Project is located in an area designated as being in attainment or unclassifiable for $O_3$ NAAQS, although TxDOT acknowledges that Ozone is currently near the nonattainment standard.

101.     Nevertheless, TxDOT refused to analyze VOC and $NO_x$ because the Clean Air Act's transportation conformity rules do not *presently* apply to the Project.

102.     Transportation conformity rules are mandated by the Clean Air Act – not NEPA. The fact that an area is *currently* designated as being in attainment by the EPA does not mean that an agency can forego NEPA analysis of *future* impacts associated with $O_3$.

103.     As regards carbon dioxide concentrations, the Project will result in more than 50,000 metric tons of carbon dioxide equivalent per year for the 20-year project lifecycle.

104.     Projected vehicle-miles traveled ("VMT") was the primary factor used to calculate VOC and $NO_x$ emissions. Despite the Project more than doubling existing lane miles, TxDOT stated VMT will only be increased annually by 1.7%. This modeling was undoubtedly inaccurate because the underlying assumptions regarding VMT were flawed.

The City of Austin noted that "an increase in lane miles should be expected to multiplicatively increase VMT."[19]

### B.     WATER-RELATED IMPACTS

105.    The Project is in an urbanized area within the Colorado River watershed.

106.    Many members of the public commented on the significant environmental impacts of the Project on water and related resources.

107.    The Project area includes floodplains. The NEPA analysis states that the Project bisects two 100-year floodplains at Tannehill Branch and at Lady Bird Lake but does not address the component of the project that reaches into the areas east (downriver) of Lady Bird Lake.

108.    In March 2023, after the Draft EIS for the Project was released and after the February 9, 2023, public hearing for the Project, TxDOT modified the Project to alter the location of the proposed stormwater outflow. The public was not officially informed of these changes until the release of the FEIS/ROD on August 18, 2023.

109.    These modifications moved the stormwater outflow 1.2 miles to the east, further into environmental justice communities, impacting one of the floodplains and a free-flowing section of the Colorado River. Through the Project, stormwater will now be conveyed to a newly constructed stormwater outfall location on the Colorado River via a tunnel system running from I-35 underneath E. Cesar Chavez Street.

110.    The new tunnel is designed primarily to benefit stormflow reduction in, and trash removal from, Waller Creek in the eastern part of Downtown Austin, an area of extreme wealth. It coincides with years of improvements to Waller Creek that have benefited downtown property owners, raising land values to the range of over $8 million per acre.[20] While allegedly benefiting the downtown Waller Creek Tunnel, the resulting

---

[19]    *See* Austin, Tex. Resolution 202310-045 (October 19, 2023), *available at* https://services.austintexas.gov/edims/document.cfm?id= 417815; Travis County, Commissioners Court-Approved Letter to Texas Department of Transportation (Sept. 26, 2023) *available at* https://traviscotx.portal.civicclerk.com/event/2832/files/10558.

[20]    At 88.4 acres in size, the Waller Creek TIF which includes properties in Down-town Austin around Waller Creek had a total 2017 taxable value of $779,553,282. This

change has negative consequences on East Austin water resources, such as Boggy Creek and the downstream Colorado River.[21] The new, unexamined, impacts will be felt in water resources that provide nature access to environmental justice populations, where the stormwater will be discharged into the Colorado River.

111.    TxDOT fails to account for or commit stormwater pollutants that will degrade the Colorado River from the stormwater modification, committing only to removing total suspended solids (TSS) through the construction of ponds.  The stormwater analysis is replete of discussion of pollutants likely to be discharged into the Colorado River. It assumes, conclusively, that the removal of TTS, along with blanket regulatory compliance, is sufficient without taking a hard look at the multitude of other pollutants that accompany contaminated highway stormwater runoff.  The FEIS assumes "[b]ecause the stormwater will be discharged in compliance with a TCEQ-approved permit and controlled to the maximum extent practicable, the proposed stormwater outfall is not expected to have any substantial impact on water quality in the Colorado River." For example, TxDOT fails to analyze known highway stormwater pollutant contaminants such as microparticles and nanoparticles from rubber tires, as well as chemicals that leach from tires as they break down.

112.    The new location of the outfall is immediately adjacent to a recently improved public recreation area and trailhead connected and the Colorado River Park Wildlife Sanctuary, a rare, low-human-impact nature preserve in an otherwise urban environment. The trailhead is never considered in the FEIS/ROD, and TxDOT declares that there is no constructive use of the Wildlife Sanctuary, a determination that TxDOT has no authority to make without prior consultation and consent of the FHWA.[22] TxDOT

---

equates to $8,818,476/acre. Austin, Tex. Amendment #2 to Amendment No. 2 to Final Project Plan and Reinvestment Zone Financing Plan, *available at*  https://services.aus-tintexas.gov/ edims/document.cfm?id=298792.

[21]    Boggy Creek is listed as an impaired waterway that has a continuous surface connection to the Colorado River. The FEIS notes that base flows "may have a negative impact on aquatic life within Boggy Creek.".

[22]    *See* First Renewed MOU at §3.2.8 ("TxDOT will not make any determination that an action constitutes a constructive use of a publicly owned park, public recreation area,

self-determined, without FHWA consultation, that Colorado River Park Wildlife Sanctuary resulted in "no constructive use."

113.    Despite the significant change in the Project location, there was no field study of this area. The last field delineation work occurred in July 2021, well before the change in Project area. The new and modified alternative impacts different riparian areas and has different potential wetlands impacts, but TxDOT did not revise and resubmit for interagency review the Surface Water Analysis form (CSJ(s): 0015-13-388), originally completed on December 15, 2022.[23]

114.    Neither did TxDOT reconsult with the Texas Parks & Wildlife Services Department (TPWD).[24] TPWD approved the Aquatic Resource Mitigation Plan based upon the *prior* location of the outfall, including the relocation area for freshwater mussels, on August 10, 2022. TPWD last made comments on the Project on February 10, 2023, based upon the DEIS, addressing concerns about impacts and lack of mitigation for effects to the Colorado River. The record does not reflect further consultation or approval of a revised Aquatic Resource Mitigation Plan.

115.    The section of the Colorado River into which the stormwater will be directed is a pristine stream; it is one of the few areas in an urbanized environment in Texas with such a characteristic. It is rated for "high water quality," with "exceptional aquatic life," "high aesthetic value," and "exception aquatic life use." It is habitat for a diverse range of species and a potential habitat for the "American eel, Guadalupe bass, silverband shiner, Texas shiner, caddis fly, and Texas map turtle." In this stretch of the

---

wildlife refuge, waterfowl refuge, or historic site under 49 U.S.C. 303/ 23 U.S.C. 138 (Section 4(f)) without first consulting with FHWA ***and*** obtaining FHWA's approval of such determination.").

[23]    The appendix attached to the form was replaced, but the analysis required by the form was never completed or resubmitted for interagency review.

[24]    NEPA demands that TxDOT participate in interagency review *prior* to making a detailed statement on every component of a project subject to NEPA. *See* 42 U.S.C. § 4332(2)(D). The Texas Administration Code § 2.203 also mandates coordination and reevaluation after the occurrence of a project modification. *See* Tex. Admin. Code §2.203(c).

river, it is free-flowing, with relatively shallow and slow-moving water, which is ideal for ecological life.

116.    The Colorado River is known to be habitat for four mussel species: the false spike (*Fusconaia mitchelli*), Texas fatmucket (*Lampsilis bracteata*), Texas pimpleback (*Cyclonaias petrina*), and Texas fawnsfoot (*Truncilla macrodon*). The Texas fatmucket is listed as a threatened species on the USFWS IPaC Official Species List, and the habitat range for the Texas fatmucket goes well to the east of the project area.[25] The false spike and the Texas pimpleback are both federally proposed endangered species, and the Texas fawnsfoot is a federally proposed threatened species.

117.    TxDOT declares that there is no "critical habitat . . . identified within the project area," however, the information TxDOT claims to rely upon is vastly outdated. The last time that a survey was performed for live or shell material in the location of the new outfall was 13 years ago, in 2011, for an unrelated project. The FEIS, published on September 1, 2023, asserts that a new survey "will be performed in summer 2023."  The record has not been supplemented. Surveys by the City of Austin in 2018 found mussels in the tributaries of the Colorado River downstream of the Longhorn Dam.[26]

118.    The Project area also includes extensive populations of bats. The cave myotis bat occurs under concrete culverts and bridges. The big brown bat, eastern red bad, hoary bat, and swamp rabbit all potentially occur within the wildlife sanctuary and areas around the outfall structure along the Colorado River. The FEIS/ROD does not consider the Project's impact for these species in the area of the new outfall.

---

[25]     *See also* U.S. Fish & Wildlife Services, *Interactive Map* (showing potential habitat for the Texas fatmucket), *available at*  https://www.fws.gov/species/texas-fatmucket-lampsilis-bracteata/map.

[26]     *Native freshwater mussel distribution in tributaries of the Colorado River downstream of Longhorn Dam near Austin, Texas, USA*, Bianca J. Perez, City of Austin, TX 78704, Ashley Seagroves Ruppel, U.S. Fish and Wildlife Service, Liz Johnston, City of Austin, Andrew Clamann, City of Austin, Aaron Richter, Lower Colorado River Authority, Mateo Scoggins, City of Austin.

119.    Immediately downriver from the new outfall location is a unique habitat for the state-listed, threatened species, the blue sucker (*Cycleptus elongatus*), a species that is depleted throughout its natural range. No analysis was conducted by TxDOT on the Project's impact for this species, considering only species listed for Travis County and not downriver communities of species. On May 5, 2023, TxDOT responded to TPWD concerns regarding the Draft EIS but neglected to inform TPWD that it had changed the Project area. Further, TxDOT did not update any field research or surveys, did not consider, or disclose any potential impacts to species (including those outside the arbitrary Travis County boundary), and did not reassess impacts to wetlands.

120.    Because no fieldwork occurred, only desktop data was used to determine the presence of wetlands. And, because the Surface Water Analysis Form was not redone, the reliance by TxDOT to support its findings is arbitrary. City of Austin data demonstrates the Project is located in an area of the Colorado River that has abundant wetlands. Further, National Wetlands Inventory (NWI) clearly delineates the area of the new stormwater tunnel as a wetland. At a minimum, the information readily available on the U.S. Fish & Wildlife Services Website should indicate the need for additional field studies of the site, which did not occur and are not included in the FEIS. The area is identified as a Riverine Wetland, "R2UBH, Riverine, Lower Perennial, Unconsolidated Bottom, Permanently Flooded." As a federal agency, TxDOT is mandated to comply with Executive Order 11990, protecting federal wetlands. 42 Fed. Reg. 26931.

### C.    IMPACT TO WALLER BEACH PARK

121.    The Project requires conversion of approximately 1.30 acres of parkland in Waller Beach Park for the use of construction on the I-35 bridge.

122.    TxDOT has not proposed any potential replacement property or properties that are at least equal in fair market value and reasonably equivalent in usefulness and location to compensate for this conversion. Instead, TxDOT noted that it must still work with the City of Austin to identify such land. This presumes, without evidence, some yet-

to-be-identified replacement land is available to compensate for the loss of highly valued and utilized public parkland adjacent to the rapidly developing downtown Austin.

123. No NEPA analysis of the conversion and replacement of the parkland has been conducted.

### D. REASONABLE ALTERNATIVES TO THE PROJECT

124. State highway departments across this Nation are responding to the needs of their cities and restoring communities divided by ill-conceived highways that run through city centers, yet for the Capital of the State of Texas, TxDOT declined to fully consider reasonable alternatives put forth by the community through to the final stages of analysis.

125. Defendants only provided detailed review for two, essentially identical, build alternatives (designated as "Build Alternative 2" and "Modified Build Alternative 3") in its environmental review, as well as a "No Build Alternative," which was included solely "as a baseline for comparison." The "No Build Alternative" projected unrealistic traffic increases upon a highway that is considered to be at capacity, with traffic patterns that do not demonstrate historic growth. The reality is that TxDOT had a predetermined notion to expand the roadway.

126. Defendants so constrained the alternatives given full consideration that it was able to label the agency's overall "preferred alternative"–a substantial widening of a massive highway cutting through the heart of Austin–as the "environmentally preferred alternative."

127. Community members and organizations proposed numerous alternatives to the Project, all of which were either completely ignored or improperly dismissed as unfeasible.

128. The overwhelming sentiment of the community was that I-35 should be made no wider and no higher, and many community members wanted I-35 to be removed.

129.     Community members also proposed a long-desired alternative, suggested as far back as 2011 in the I-35 Corridor Advisory Committee Plan, to create a true interstate highway bypass around Austin by removing tolls from State Highway 130 and reclassifying it as an interstate, to relieve pressure and traffic on the I-35 corridor and to mitigate the current road's impacts on Austin's most disadvantaged neighborhoods.

130.     Austin is the only major city in Texas that lacks a true interstate bypass. The trend in recent years has been to use by-passes to avoid funneling traffic through city centers, resulting in cities that are more livable and avoiding the societal costs of people having to move further away from their jobs. Without by-passes, people move farther away, triggering a feedback loop where an increase in traffic occurs, leading to the need for more roads, leading to livability being degraded further, leading to more people moving further away.

131.     Many community members proposed extensive capping of I-35, which would mean the construction of deck plazas that cover the freeway. Others supported fully burying I-35 under an urban boulevard. As adopted, the Project *allows* for the possibility of *select areas* (primarily around downtown and the University) being capped, but these caps are not part of the Project itself.

132.     Prior to issuing the draft environmental impact statement for this Project, TxDOT improperly constrained the range of alternatives given any in depth considered. TxDOT conducted a perfunctory evaluation of other alternatives, all of which were found to not be feasible and, thus, to not be reviewed for environmental impacts. The alternatives considered and eliminated from detailed study in the EIS include: Build Alternative 1, Build Alternative 3, three community-provided alternatives – those from Reconnect Austin, Rethink35, and Downtown Austin Alliance (DAA)/Urban Land Institute (ULI), the Transit Only Alternative, and the Transportation System Management and Transportation Demand Management alternatives.

133.     The most detailed community-provided alternative was proposed by Reconnect Austin. TxDOT described the design as follows:

The Reconnect Austin concept proposes to depress the highway and cover it with a six-lane boulevard throughout the entire section from MLK, Jr. Boulevard to Holly Street. This design would support a number of strategies designed to humanize the city around the corridor. On the surface level, the urban boulevard would replace the highway, functioning to reconnect downtown with east Austin, which could increase east-west connectivity. Moving the boulevard into the middle of the right of way (ROW) would provide reclaimed land on the edge of the existing TxDOT ROW. The proposal envisions that reclaimed land could allow construction of offices, shops, markets, and housing, which, as taxable land, would generate revenue. Creating more downtown housing could help eliminate the commutes of some of downtown Austin's workers if they could move close to their jobs, and within the authority of the City of Austin, some of that housing could be built as affordable housing. The design includes flood control, noise mitigation, and air-cleaning features. Removing high-speed roads from the surface, the proposal aims to bring down the number of roadway injuries and fatalities, making walkable new districts safer for pedestrians and other vulnerable road users.

This alternative should have been evaluated for environmental impacts under NEPA.

134.    TxDOT's 2021 evaluation was flawed in that many of its "conclusions" were based on comparisons for which data was either not yet available or available only in a preliminary form; the foundation and methodology for posited traffic volume impacts was not disclosed; TxDOT found feasibility to be impeded for Project elements where uncertainty exists as regards third party funding; TxDOT refused to consider design elements not directly within their jurisdiction. In addition, the initial evaluation was narrowly construed and did not include consideration of such factors as economic development opportunities or effect on historic, systemic patterns of racial/ethnic inequality.

135.    NEPA does not require the selection of the environmentally preferred alternative. Indeed, the drafters of NEPA clearly understood that the majority of NEPA processes would result in the selection of something other than the environmentally preferred alternative. Instead, the purpose of the requirement to study a reasonable range of alternatives through the NEPA process is "to **insist** that no major federal project should be undertaken **without intense consideration** of **other more ecologically sound**

courses of action, **including shelving the entire project**, or of **accomplishing the same result by entirely different means**." *Environmental Defense Fund v. Corps of Engineers*, 492 F.2d 1123, 1135 (5th Cir. 1974) (emphasis added).

136.    Both the City of Austin and Travis County, the two local jurisdictions significantly affected by the Project, have taken formal action requesting changes in Project scope, additional environmental analysis, and Project modifications to address historic inequities and the Project's impact to air and water quality.[27] These concerns were never addressed by TxDOT. TxDOT also received over 6,000 comments (the vast majority of which opposed or express concerns) throughout the NEPA review process, but TxDOT gave original responses to less than 0.4% of them.[28] This is because TxDOT had a pre-determined outcome to expand I-35. TxDOT has simply ***never*** shown any sincere interest in, let alone ***intense consideration of*** alternatives to their planned highways designs in the Austin area, despite repeated and sustained efforts by citizens of Austin to put forward comprehensive proposals for alternative designs that mirror successful efforts at improving quality of life implemented across the United States in recent decades.

## CLAIMS FOR RELIEF

### CLAIM I – NEPA and APA

137.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs into the claim set forth below.

138.    In failing to consider a reasonable range of alternatives; failing to adequately document, analyze and consider substantial environmental harms pertaining to environmental justice, air quality, human health, water and related resources, and other

---

[27]    Austin, Tex. Resolution 202310-045 (October 19, 2023), *available at*  https://services.austintexas.gov/edims/document.cfm?id=417815; Travis County, Commissioners Court-Approved Letter to Texas Department of Transportation, dated September 26, 2023, *available at*  https://traviscotx.portal.civicclerk.com/event/2832/ files/10558

[28]    An analysis of the published comments found that 6,143 total comments were submitted from 3,421 commenters. TxDOT only directly responded to 49 comments. Less than 0.4% of comments received a response.

aspects of the human and natural environment; and failing to adequately provide for public opportunity for comment, particularly pertaining to the changed location for the pollutant-laden stormwater outfall, Defendants have acted in a manner that is arbitrary and capricious and otherwise not in accordance with law in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2) and the National Environmental Policy Act 42 U.S.C. §4321 et seq.

**CLAIM II – LWCF Act and APA**

139.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs into the claim set forth below.

140.    In failing to identify any potential replacement property or properties for the conversion of a portion of Waller Beach Park, Defendants have acted in a manner that is arbitrary and capricious or otherwise not in accordance with law, and further, without observance of procedure required by law in violation of the Administrative Procedure Act 5 U.S.C. § 706(2) and Section 6(f) of the LWCF Act 54 U.S.C. § 200305(f)(3); 36 C.F.R. § 59.3.

**PRAYER FOR RELIEF**

*WHEREFORE, Plaintiffs prays for relief as follows:*

1. For a declaratory judgment that Defendants' decision to widen I-35 is arbitrary, capricious, and otherwise not in accordance with law in violation of the Administrative Procedure Act and the National Environmental Policy Act;

2. For a declaratory judgment that Defendants' decision not to identify any potential replacement property for the conversion of portions of Waller Beach Park is arbitrary and capricious or otherwise not in accordance with law, and further, without observance of procedure required by law in violation of the Administrative Procedure Act and the Land and Water Conservation Fund Act;

3. For an order setting aside the decision to widen I-35 announced by Defendant Texas Department of Transportation by Record of Decision dated August 18, 2023, and

accepted by federal Defendants by Federal Register Notice dated Sept. 1, 2023. 88 FR 60530 (Sept. 1, 2023).

4. For an order enjoining all Defendants from undertaking any activities in furtherance of the widening of I-35, including acquisition of properties and construction activities;

5. For the Court to retain continuing jurisdiction to review Defendants' compliance with all judgments and orders entered herein;

6. For an award of Plaintiffs' costs of litigation, including reasonable attorney's fees; and

7. For such other and further relief as the Court may deem just and proper to effectuate a complete resolution of the legal disputes between Plaintiffs and Defendants.

DATED:        January 26, 2023                    Respectfully Submitted,

/s/  Robert Levinski
Robert J. Levinski
State Bar No. 24097993
bobby@sosalliance.org
*Admission to This Court Pending*

/s/ Victoria Rose
Victoria Rose
Texas Bar No. 24131088
Victoria@sosalliance.org

/s/  William Bunch
William G. Bunch
Texas Bar No. 0334520
bill@sosalliance.org

SAVE OUR SPRINGS ALLIANCE
4701 Westgate Blvd, Ste. D-401
Austin, Texas 78745

/s/  Rachel S. Doughty
GREENFIRE LAW, PC
2748 Adeline Street, Suite A
Berkeley, CA 94703
T: 510.900.9502 x 706

F: 510.900.9502
rdoughty@greenfirelaw.com
*Admission to This Court Pending*

*Attorneys for Plaintiffs*