EXHIBIT C

# Environmental Justice

## Guidance Under the National Environmental Policy Act



**Council on Environmental Quality**



Front cover photograph of John Heinz National Wildlife Refuge at Tinicum by John and Karen Hollingsworth

Front cover photograph of school bus and children by Sam Kittner.

# *ENVIRONMENTAL JUSTICE*
## *Guidance Under the*
## *National Environmental Policy Act*



**Council on Environmental Quality**
**Executive Office of the President**
**Old Executive Office Building, Room 360**
**Washington, D.C. 20502**
**(202)395-5750**
**http://www.whitehouse.gov/CEQ/**
**December 10, 1997**

# Table of Contents

I.  Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

II.  Executive Order 12898 and the Presidential Memorandum  . . . . . . . . .  3

III. Executive Order 12898 and NEPA  . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

    A.  *NEPA Generally* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

    B.  *Principles for Considering Environmental Justice under NEPA* . . . . . . . . . .  8
        1.  **General Principles** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8
        2.  **Additional Considerations**  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    C.  *Considering Environmental Justice in Specific Phases of the NEPA Process*   10
        1.  **Scoping** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10
        2.  **Public Participation** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13
        3.  **Determining the Affected Environment** . . . . . . . . . . . . . . . . . . . .  14
        4.  **Analysis** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14
        5.  **Alternatives** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15
        6.  **Record of Decision** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15
        7.  **Mitigation** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

    D.  *Where No EIS or EA is Prepared* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

IV.  Regulatory Changes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

V.  Effect of this Guidance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21

    **Appendix:** *Guidance for Agencies on Key Terms in Executive Order 12898* .  23

# I.

## Introduction

Executive Order 12898, "Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations,"[1] provides that "each Federal agency shall make achieving environmental justice part of its mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations." The Executive Order makes clear that its provisions apply fully to programs involving Native Americans.

In the memorandum to heads of departments and agencies that accompanied Executive Order 12898, the President specifically recognized the importance of procedures under the National Environmental Policy Act (NEPA)[2] for identifying and addressing environmental justice concerns. The memorandum states that "each Federal agency shall analyze the environmental effects, including human health, economic and social effects, of Federal actions, including effects on minority communities and low-income communities, when such analysis is required by [NEPA]." The memorandum particularly emphasizes the importance of NEPA's public participation process, directing that "each Federal agency shall provide opportunities for community input in the NEPA process." Agencies are further directed to "identify potential effects and mitigation measures in consultation with affected communities, and improve the accessibility of meetings, crucial documents, and notices."

The Council on Environmental Quality (CEQ) has oversight of the Federal government's compliance with Executive Order 12898 and NEPA.[3] CEQ, in consultation with EPA and other affected agencies, has developed this guidance to further assist Federal agencies with their NEPA procedures so that environmental justice concerns are effectively identified and addressed. To the extent practicable and permitted by law, agencies may supplement this guidance with more specific procedures tailored to particular programs or activities of an individual department, agency, or office.

---

[1]  59 Fed. Reg. 7629 (1994).

[2]  42 U.S.C. §4321 et seq.

[3]  Certain oversight functions in the Executive Order are delegated to the Deputy Assistant to the President for Environmental Policy. Following the merger of the White House Office on Environmental Policy with CEQ, the Chair of CEQ assumed those functions. The Environmental Protection Agency (EPA) has lead responsibility for implementation of the Executive Order as Chair of the Interagency Working Group (IWG) on Environmental Justice.

# II.

## Executive Order 12898 and the Presidential Memorandum

In addition to the general directive in Executive Order 12898 that each agency identify and address, as appropriate, "disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations,"[4] there are several provisions of the Executive Order and a number of supporting documents to which agencies should refer when identifying and addressing environmental justice concerns in the NEPA process.

First, the Executive Order itself contains particular emphasis on four issues that are pertinent to the NEPA process:

- The Executive Order requires the development of agency-specific environmental justice strategies.[5] Thus, agencies have developed and should periodically revise their strategies providing guidance concerning the types of programs, policies, and activities that may, or historically have, raised environmental justice concerns at the particular agency. These guidances may suggest possible approaches to addressing such concerns in the agency's NEPA analyses, as appropriate.

- The Executive Order recognizes the importance of research, data collection, and analysis, particularly with respect to multiple and cumulative exposures to environmental hazards for low-income populations, minority populations, and Indian tribes.[6] Thus, data on these exposure issues should be incorporated into NEPA analyses as appropriate.[7]

- The Executive Order provides for agencies to collect, maintain, and analyze information on patterns of subsistence consumption of fish, vegetation, or wildlife.[8] Where an agency action may affect fish, vegetation, or wildlife, that agency action may

---

[4] Executive Order No. 12898, 59 Fed. Reg. at 7630 (Section 1-101).

[5] *Id.* at 7630 (Section 1-103).

[6] *Id.* at 7631 (Section 3-3).

[7] For further information on considering cumulative effects, see Considering Cumulative Effects Under The National Environmental Policy Act (Council on Environmental Quality, Executive Office of the President, Jan. 1997)

[8] *Id.* at 7631 (Section 4-401).

also affect subsistence patterns of consumption and indicate the potential for disproportionately high and adverse human health or environmental effects on low-income populations, minority populations, and Indian tribes.

● The Executive Order requires agencies to work to ensure effective public participation and access to information.[9] Thus, within its NEPA process and through other appropriate mechanisms, each Federal agency shall, "wherever practicable and appropriate, translate crucial public documents, notices and hearings, relating to human health or the environment for limited English speaking populations." In addition, each agency should work to "ensure that public documents, notices, and hearings relating to human health or the environment are concise, understandable, and readily accessible to the public."[10]

Second, the memorandum accompanying the Executive Order identifies four important ways to consider environmental justice under NEPA.

● Each Federal agency should analyze the environmental effects, including human health, economic, and social effects of Federal actions, including effects on minority populations, low-income populations, and Indian tribes, when such analysis is required by NEPA.[11]

● Mitigation measures identified as part of an environmental assessment (EA), a finding of no significant impact (FONSI), an environmental impact statement (EIS), or a record of decision (ROD), should, whenever feasible, address significant and adverse environmental effects of proposed federal actions on minority populations, low-income populations, and Indian tribes.[12]

● Each Federal agency must provide opportunities for effective community participation in the NEPA process, including identifying potential effects and mitigation measures in consultation with affected communities and improving the accessibility of public meetings, crucial documents, and notices.[13]

● Review of NEPA compliance (such as EPA's review under § 309 of the Clean Air Act)

---

[9]  *Id.* at 7632 (Section 5-5).

[10]  *Id.* at 7632 (Section 5-5).

[11]  Memorandum from the President to the Heads of Departments and Agencies. Comprehensive Presidential Documents No. 279. (Feb. 11, 1994).

[12]  *Id.*

[13]  *Id.*

must ensure that the lead agency preparing NEPA analyses and documentation has appropriately analyzed environmental effects on minority populations, low-income populations, or Indian tribes, including human health, social, and economic effects.[14]

Third, the Interagency Working Group (IWG), established by the Executive Order to implement the order's requirements, has developed guidance on key terms in the Executive Order. The guidance, reproduced as Appendix A, reflects a general consensus based on Federal agencies' experience and understanding of the issues presented. Agencies should apply the guidance with flexibility, and may consider its terms a point of departure rather than conclusive direction in applying the terms of the Executive Order.

---

[14] *Id.*

**5**

# III.

# Executive Order 12898 and NEPA

## A. *NEPA Generally*

NEPA's fundamental policy is to "encourage productive and enjoyable harmony between man and his environment."[15] In the statute, Congress "recognizes that each person should enjoy a healthful environment and that each person has a responsibility to contribute to the preservation and enhancement of the environment."[16] The following goals, set forth in NEPA, make clear that attainment of environmental justice is wholly consistent with the purposes and policies of NEPA[17]:

- to "assure for all Americans safe, healthful, productive, and aesthetically and culturally pleasing surroundings"[18];

- to "attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences";[19]

- to "preserve important historic, cultural, and natural aspects of our natural heritage, and maintain, wherever possible, an environment which supports diversity and variety of individual choice"[20]; and

- to "achieve a balance between population and resource use which will permit high standards of living and a wide sharing of life's amenities."[21]

These goals are promoted through the requirement that all agencies of the Federal government shall include in every recommendation or report on proposals for legislation and other

---

[15]   42 U.S.C. § 4321.

[16]   42 U.S.C. § 4331(c).

[17]   42 U.S.C. § 4331(b).

[18]   42 U.S.C. § 4331(b)(2).

[19]   42 U.S.C. § 4331(b)(3).

[20]   42 U.S.C. § 4331(b)(4).

[21]   42 U.S.C. § 4331(b)(5).

major Federal actions significantly affecting the quality of the human environment, a "detailed statement by the responsible official" on:  the environmental impacts of the proposed action; adverse environmental effects that cannot be avoided should the proposal be implemented; alternatives to the proposed action; the relationship between local, short-term uses of man's environment and long-term productivity; and any irreversible or irretrievable commitments of resources involved in the proposed action itself.[22]

Preparation of an EA may precede preparation of an EIS, to determine whether a proposed action may "significantly affect" the quality of the human environment.  The EA either will support a finding of no significant impact (FONSI), or will document the need for an EIS. Agency procedure at each step of this process should be guided by the agency's own NEPA regulations and by the CEQ regulations found at 40 C.F.R. Parts 1500-1508.

## B.  *Principles for Considering Environmental Justice under NEPA*

Environmental justice issues may arise at any step of the NEPA process and agencies should consider these issues at each and every step of the process, as appropriate.  Environmental justice issues encompass a broad range of impacts covered by NEPA, including impacts on the natural or physical environment and interrelated social, cultural and economic effects.[23]  In preparing an EIS or an EA, agencies must consider both impacts on the natural or physical environment and related social, cultural, and economic impacts.[24]  Environmental justice concerns may arise from impacts on the natural and physical environment, such as human health or ecological impacts on minority populations, low-income populations, and Indian tribes, or from related social or economic impacts.

### 1. General Principles

Agencies should recognize that the question of whether agency action raises environmental justice issues is highly sensitive to the history or circumstances of a particular community or population, the particular type of environmental or human health impact, and the nature of the proposed action itself.  There is not a standard formula for how environmental justice issues should be identified or addressed.  However, the following six principles provide general guidance.

---

[22]    42 U.S.C. § 4332(c).

[23]  The CEQ implementing regulations define "effects" or "impacts" to include "ecological...aesthetic, historic, cultural, economic, social or health, whether direct, indirect or cumulative."  40 C.F.R. 1508.8.

[24] 40 C.F.R. 1508.14.

● Agencies should consider the composition of the affected area, to determine whether minority populations, low-income populations, or Indian tribes are present in the area affected by the proposed action, and if so whether there may be disproportionately high and adverse human health or environmental effects on minority populations, low-income populations, or Indian tribes.

● Agencies should consider relevant public health data and industry data concerning the potential for multiple or cumulative exposure to human health or environmental hazards in the affected population and historical patterns of exposure to environmental hazards, to the extent such information is reasonably available. For example, data may suggest there are disproportionately high and adverse human health or environmental effects on a minority population, low-income population, or Indian tribe from the agency action. Agencies should consider these multiple, or cumulative effects, even if certain effects are not within the control or subject to the discretion of the agency proposing the action.

● Agencies should recognize the interrelated cultural, social, occupational, historical, or economic factors that may amplify the natural and physical environmental effects of the proposed agency action. These factors should include the physical sensitivity of the community or population to particular impacts; the effect of any disruption on the community structure associated with the proposed action; and the nature and degree of impact on the physical and social structure of the community.

● Agencies should develop effective public participation strategies. Agencies should, as appropriate, acknowledge and seek to overcome linguistic, cultural, institutional, geographic, and other barriers to meaningful participation, and should incorporate active outreach to affected groups.

● Agencies should assure meaningful community representation in the process. Agencies should be aware of the diverse constituencies within any particular community when they seek community representation and should endeavor to have complete representation of the community as a whole. Agencies also should be aware that community participation must occur as early as possible if it is to be meaningful.

● Agencies should seek tribal representation in the process in a manner that is consistent with the government-to-government relationship between the United States and tribal governments, the federal government's trust responsibility to federally-recognized tribes, and any treaty rights.

## 2. Additional Considerations

The preceding principles must be applied in light of these further considerations that are

pertinent to any analysis of environmental justice under NEPA.

● The Executive Order does not change the prevailing legal thresholds and statutory interpretations under NEPA and existing case law.  For example, for an EIS to be required, there must be a sufficient impact on the physical or natural environment to be "significant" within the meaning of NEPA.  Agency consideration of impacts on low-income populations,  minority populations, or Indian tribes  may lead to the identification of disproportionately high and adverse human health or environmental effects that are significant and that otherwise would be overlooked.[25]

● Under NEPA, the identification of a disproportionately high  and adverse human health or environmental effect on a low-income population,  minority population, or Indian tribe does not preclude a proposed agency action from going forward, nor does it necessarily compel a conclusion that a proposed action is environmentally unsatisfactory.  Rather, the identification of such an effect should heighten agency attention to alternatives (including alternative sites), mitigation strategies, monitoring needs, and preferences expressed by the affected community or population.

● Neither the Executive Order nor this guidance prescribes any specific format for examining environmental justice, such as designating a specific chapter or section in an EIS or EA on environmental justice issues.  Agencies should integrate analyses of environmental justice concerns in an appropriate manner so as to be clear, concise, and comprehensible within the general format suggested by 40 C.F.R. § 1502.10.

## C.  *Considering Environmental Justice in Specific Phases of the NEPA Process*

While appropriate consideration of environmental justice issues is highly dependent upon the particular facts and circumstances of the proposed action, the affected environment, and the affected populations, there are opportunities and strategies that are useful at particular stages of the NEPA process.

### 1.  Scoping

During the scoping process, an agency should preliminarily determine whether

---

[25] Title VI of the Civil Rights Act of 1964, U.S.C. 2000d *et seq.*, and agency implementing regulations, prohibit recipients of federal financial assistance from taking actions that discriminate on the basis of race, sex, color, national origin, or religion.  If an agency is aware that a recipient of federal funds may be taking action that is causing a racially discriminatory impact, the agency should consider using Title VI as a means to prevent or eliminate that discrimination.

an area potentially affected by a proposed agency action may include low-income populations, minority populations, or Indian tribes, and seek input accordingly. When the scoping process is used to develop an EIS or EA, an agency should seek input from low income populations, minority populations, or Indian tribes as early in the process as information becomes available.[26]  Any such determination, as well as the basis for the determination, should be more substantively addressed in the appropriate NEPA documents and communicated as appropriate during the NEPA process.

If an agency identifies any potentially affected minority populations, low-income populations, or Indian tribes, the agency should develop a strategy for effective public involvement in the agency's determination of the scope of the NEPA analysis. Customary agency practices for notifying the public of a proposed action and subsequent scoping and public events may be enhanced through better use of local resources, community and other nongovernmental organizations, and locally targeted media.

---

**Agencies should consider enhancing their outreach through the following means:**

- Religious organizations (e.g., churches, temples, ministerial associations);

- Newspapers, radio and other media, particularly media targeted to low-income populations, minority populations, or Indian tribes;

- Civic associations;

- Minority business associations;

- Environmental and environmental justice organizations;

- Legal aid providers;

- Homeowners', tenants', and neighborhood watch groups;

- Federal, state, local, and tribal governments;

- Rural cooperatives;

- Business and trade organizations;

- Community and social service organizations;

- Universities, colleges, vocational and other schools;

- Labor organizations;

- Civil rights organizations;

- Local schools and libraries;

- Senior citizens' groups;

- Public health agencies and clinics; and

- The Internet and other electronic media.

---

[26]  For more information on scoping, see Memorandum from Nicolas C. Yost, Scoping Guidance (Council on Environmental Quality, Executive Office of the President, April 30, 1981).

The participation of diverse groups in the scoping process is necessary for full consideration of the potential environmental impacts of a proposed agency action and any alternatives. By discussing and informing the public of the emerging issues related to the proposed action, agencies may reduce misunderstandings, build cooperative working relationships, educate the public and decisionmakers, and avoid potential conflicts. Agencies should recognize that the identity of the relevant "public" may evolve during the process and may include different constituencies or groups of individuals at different stages of the NEPA process. This may also be the appropriate juncture to begin government-to-government consultation with affected Indian tribes and to seek their participation as cooperating agencies. For this participation to be meaningful, the public should have access to enough information so that it is well informed and can provide constructive input.

**The following information may help inform the public during the scoping process:**

- A description of the proposed action;

- An outline of the anticipated schedule for completing the NEPA process, with key milestones;

- An initial list of alternatives (including alternative sites, if possible) and potential impacts;

- An initial list of other existing or proposed actions, Federal and non-Federal, that may have cumulative impacts;

- Maps, drawings, and any other appropriate material or references;

- An agency point of contact;

- Timely notice of locations where comments will be received or public meetings held;

- Any telephone number or locations where further information can be obtained;

- Examples of past public comments on similar agency actions.

Thorough scoping is the foundation for the analytical process and provides an early opportunity for the public to participate in the design of alternatives for achieving the goals and objectives of the proposed agency action.

## 2. Public Participation

Early and meaningful public participation in the federal agency decision making process is a paramount goal of NEPA. CEQ's regulations require agencies to make diligent efforts to involve the public throughout the NEPA process. Participation of low-income populations, minority populations, or tribal populations may require adaptive or innovative approaches to overcome linguistic, institutional, cultural, economic, historical, or other potential barriers to effective participation in the decision-making processes of Federal agencies under customary NEPA procedures. These barriers may range from agency failure to provide translation of documents to the scheduling of meetings at times and in places that are not convenient to working families.

---

**The following steps may be considered, as appropriate, in developing an innovative strategy for effective public participation:**

- Coordination with individuals, institutions, or organizations in the affected community to educate the public about potential health and environmental impacts and enhance public involvement;

- Translation of major documents (or summaries thereof), provision of translators at meetings, or other efforts as appropriate to ensure that limited-English speakers potentially affected by a proposed action have an understanding of the proposed action and its potential impacts;

- Provision of opportunities for limited-English speaking members of the affected public to provide comments throughout the NEPA process;

- Provision of opportunities for public participation through means other than written communication, such as personal interviews or use of audio or video recording devices to capture oral comments;

- Use of periodic newsletters or summaries to provide updates on the NEPA process to keep the public informed;

- Use of different meeting sizes or formats, or variation on the type and number of media used, so that communications are tailored to the particular community or population;

- Circulation or creation of specialized materials that reflect the concerns and sensitivities of particular populations such as information about risks specific to subsistence consumers of fish, vegetation, or wildlife;

- Use of locations and facilities that are local, convenient, and accessible to the disabled, low-income and minority communities, and Indian tribes; and

- Assistance to hearing-impaired or sight-impaired individuals.

---

### 3. Determining the Affected Environment

In order to determine whether a proposed action is likely to have disproportionately high and adverse human health or environmental effects on low-income populations, minority populations, or Indian tribes, agencies should identify a geographic scale for which they will obtain demographic information on the potential impact area. Agencies may use demographic data available from the Bureau of the Census (BOC) to identify the composition of the potentially affected population. Geographic distribution by race, ethnicity, and income, as well as a delineation of tribal lands and resources, should be examined. Census data are available in published formats, and on CD-ROM available through the BOC. This data also is available from a number of local, college, and university libraries, and the World Wide Web. Agencies may also find that Federal, tribal, state and local health, environmental, and economic agencies have useful demographic information and studies, such as the Landview II system, which is used by the BOC to assist in utilizing data from a geographic information system (GIS). Landview II has proven to be a low-cost, readily available means of graphically accessing environmental justice data. These approaches already should be incorporated into current NEPA compliance.

Agencies should recognize that the impacts within minority populations, low-income populations, or Indian tribes may be different from impacts on the general population due to a community's distinct cultural practices. For example, data on different patterns of living, such as subsistence fish, vegetation, or wildlife consumption and the use of well water in rural communities may be relevant to the analysis. Where a proposed agency action would not cause any adverse environmental impacts, and therefore would not cause any disproportionately high and adverse human health or environmental impacts, specific demographic analysis may not be warranted. Where environments of Indian tribes may be affected, agencies must consider pertinent treaty, statutory, or executive order rights and consult with tribal governments in a manner consistent with the government-to-government relationship.

### 4. Analysis

When a disproportionately high and adverse human health or environmental effect on a low-income population, minority population, or Indian tribe has been identified, agencies should analyze how environmental and health effects are distributed within the affected community. Displaying available data spatially, through a GIS, can provide the agency and the public with an effective visualization of the distribution of health and environmental impacts among demographic populations. This type of data should be analyzed in light of any additional qualitative or quantitative information gathered through the public participation process.

Where a potential environmental justice issue has been identified by an agency, the agency should state clearly in the EIS or EA whether, in light of all of the facts and circumstances, a disproportionately high and adverse human health or environmental impact on minority populations, low-income populations, or Indian tribe is likely to result from the proposed action and any alternatives. This statement should be supported by sufficient information for the public to understand the rationale for the conclusion. The underlying analysis should be presented as concisely as possible, using language that is understandable to the public and that minimizes use of acronyms or jargon.

## 5. Alternatives

Agencies should encourage the members of the communities that may suffer a disproportionately high and adverse human health or environmental effect from a proposed agency action to help develop and comment on possible alternatives to the proposed agency action as early as possible in the process.

Where an EIS is prepared, CEQ regulations require agencies to identify an environmentally preferable alternative in the record of decision (ROD).[27] When the agency has identified a disproportionately high and adverse human health or environmental effect on low-income populations, minority populations, or Indian tribes from either the proposed action or alternatives, the distribution as well as the magnitude of the disproportionate impacts in these communities should be a factor in determining the environmentally preferable alternative. In weighing this factor, the agency should consider the views it has received from the affected communities, and the magnitude of environmental impacts associated with alternatives that have a less disproportionate and adverse effect on low-income populations, minority populations, or Indian tribes.

## 6. Record of Decision

When an agency reaches a decision on an action for which an EIS was prepared, a public record of decision (ROD) must be prepared that provides information on the alternatives considered and the factors weighed in the decision-making process. Disproportionately high and adverse human health or environmental effects on a low-income population, minority population, or Indian tribe should be among those factors explicitly discussed in the ROD, and should also be addressed in any discussion of whether all practicable means to avoid or minimize environmental and other interrelated effects were adopted. Where relevant, the agency should discuss how these issues are addressed

---

[27] 40 C.F.R. § 1505.2(b)

in any monitoring and enforcement program summarized in the ROD.[28]

Dissemination of the information in the ROD may provide an effective means to inform the public of the extent to which environmental justice concerns were considered in the decision-making process, and where appropriate, whether the agency intends to mitigate any disproportionately high and adverse human health or environmental effects within the constraints of NEPA and other existing laws. In addition to translating crucial portions of the EIS where appropriate, agencies should provide translation, where practicable and appropriate, of the ROD in non-technical, plain language for limited-English speakers. Agencies should also consider translating documents into languages other than English where appropriate and practical.

### 7. Mitigation

Mitigation measures include steps to avoid, mitigate, minimize, rectify, reduce, or eliminate the impact associated with a proposed agency action.[29] Throughout the process of public participation, agencies should elicit the views of the affected populations on measures to mitigate a disproportionately high and adverse human health or environmental effect on a low-income population, minority population, or Indian tribe and should carefully consider community views in developing and implementing mitigation strategies. Mitigation measures identified in an EIS or developed as part of a FONSI should reflect the needs and preferences of affected low-income populations, minority populations, or Indian tribes to the extent practicable.

### D. *Where no EIS or EA is prepared*

There are certain circumstances in which the policies of NEPA apply, and a disproportionately high and adverse human health or environmental impact on low-income populations, minority populations, or Indian tribes may exist, but where the specific statutory requirement to prepare an EIS or EA does not apply. These circumstances may arise because of an exemption from the requirement, a categorical exclusion of specific activities by regulation, or a claim by an agency that another environmental statute establishes the "functional equivalent" of an EIS or EA. For example, neither an EIS nor an EA is prepared for certain hazardous waste facility permits.

In circumstances in which an EIS or EA will not be prepared and a disproportionately high and adverse human health or environmental impact on low-income

---

[28] See 40 C.F.R. § 1505.2(c).

[29] See 40 C.F.R. § 1508.20.

populations,  minority populations, or Indian tribes  may exist, agencies should augment their procedures as appropriate to ensure that the otherwise applicable process or procedure for a federal action addresses environmental justice concerns. Agencies should ensure that the goals for public participation outlined in this guidance are satisfied to the fullest extent possible.  Agencies also should fully develop and consider alternatives to the proposed action whenever possible, as would be required  by NEPA.

# IV.

## Regulatory Changes

Consistent with the obligation of all agencies to promote consideration of environmental justice under NEPA and in all of their programs and activities, agencies that promulgate or revise regulations, policies, and guidances under NEPA or under any other statutory scheme should consult with CEQ and EPA to ensure that the principles and approaches presented in this guidance are fully incorporated into any new or revised regulations, policies, and guidances.

# V.

## Effect of this Guidance

Agencies should apply, and comply with, this guidance prospectively.  If an agency has made substantial investments in NEPA compliance, or public participation with respect to a particular agency action, prior to issuance of this guidance, the agency should ensure that application of this guidance does not result in additional delays or costs of compliance.

This guidance is intended to improve the internal management of the Executive Branch with respect to environmental justice under NEPA.  The guidance interprets NEPA as implemented through the CEQ regulations in light of Executive Order 12898.  It does not create any rights, benefits, or trust obligations, either substantive or procedural, enforceable by any person, or entity in any court against the United States, its agencies, its officers, or any other person.

# APPENDIX A

## *GUIDANCE*
## *FOR FEDERAL AGENCIES ON KEY TERMS IN*
## *EXECUTIVE ORDER 12898*

### INTRODUCTION

Pursuant to Executive Order 12898 on Environmental Justice, Federal agencies are to make the achievement of environmental justice part of their mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of their programs, policies, and activities on minority populations, low-income populations, and Indian tribes and allowing all portions of the population a meaningful opportunity to participate in the development of, compliance with, and enforcement of Federal laws, regulations, and policies affecting human health or the environment regardless of race, color, national origin, or income.  To that end, set forth below is guidance for Federal agencies on key terms contained in Executive Order 12898.

This guidance is intended only to improve the internal management of the Executive Branch.  It shall not be deemed to create any right, benefit, or trust obligation, either substantive or procedural, enforceable by any person, or entity in any court against the United States, its agencies, its officers, or any other person.  Consequently, neither this Guidance nor the deliberative processes or products resulting from the implementation of this Guidance shall be treated as establishing standards or criteria that constitute any basis for review of the actions of the Executive Branch.  Compliance with this Guidance shall not be justiciable in any proceeding for judicial review of Agency action.

TEXT OF EXECUTIVE ORDER 12898,
"FEDERAL ACTIONS TO ADDRESS ENVIRONMENTAL JUSTICE IN
MINORITY POPULATIONS AND LOW-INCOME POPULATIONS,"
ANNOTATED
WITH PROPOSED GUIDANCE ON TERMS IN THE EXECUTIVE ORDER[30]

## Section 1-1.  IMPLEMENTATION.

1-101.  *Agency Responsibilities*.  To the greatest extent practicable and permitted by law, and consistent with the principles set forth in the report on the National Performance Review, each Federal agency shall make achieving environmental justice part of its mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations in the United States and its territories and possessions, the District of Columbia, the Commonwealth of Puerto Rico, and the Commonwealth of the Marianas Islands.

**Low-income population: Low-income populations in an affected area should be identified with the annual statistical poverty thresholds from the Bureau of the Census' Current Population Reports, Series P-60 on Income and Poverty.  In identifying low-income populations, agencies may consider as a community either a group of individuals living in geographic proximity to one another, or a set of individuals (such as migrant workers or Native Americans), where either type of group experiences common conditions of environmental exposure or effect.**

**Minority:  Individual(s) who are members of the following population groups: American Indian or Alaskan Native; Asian or Pacific Islander; Black, not of Hispanic origin; or Hispanic.**

**Minority population:  Minority populations should be identified where either: (a) the minority population of the affected area exceeds 50 percent or (b) the minority population percentage of the affected area is meaningfully greater than the minority population percentage in the general population or other appropriate unit of geographic analysis.  In identifying minority communities, agencies may consider as a community either a group of individuals living in**

---

[30] Executive Order provisions are in standard font. Guidance is in **bold** font.

geographic proximity to one another, or a geographically dispersed/transient set of individuals (such as migrant workers or Native American ), where either type of group experiences common conditions of environmental exposure or effect.  The selection of the appropriate unit of geographic analysis may be a governing body's jurisdiction, a neighborhood, census tract, or other similar unit that is to be chosen so as to not artificially dilute or inflate the affected minority population.  A minority population also exists if there is more than one minority group present and the minority percentage, as calculated by aggregating all minority persons, meets one of the above-stated thresholds.

<u>Disproportionately high and adverse human health effects:</u>  When determining whether human health effects are disproportionately high and adverse, agencies are to consider the following three factors to the extent practicable:

> (a) Whether the health effects, which may be measured in risks and rates, are significant (as employed by NEPA), or above generally accepted norms. Adverse health effects may include bodily impairment, infirmity, illness, or death; and

> (b)  Whether the risk or rate of hazard exposure by a minority population, low-income population, or Indian tribe to an environmental hazard is significant (as employed by NEPA) and appreciably exceeds or is likely to appreciably exceed the risk or rate to the general population or other appropriate comparison group; and

> (c)  Whether health effects occur in a minority population,  low-income population, or Indian tribe affected by cumulative or multiple adverse exposures from  environmental hazards.

<u>Disproportionately high and adverse environmental effects:</u> When determining whether environmental effects are disproportionately high and adverse, agencies are to consider the following three factors to the extent practicable:

> (a)  Whether there is or will be an impact on the natural or physical environment that significantly (as employed by NEPA) and adversely affects a minority population,  low-income population, or Indian tribe.  Such effects may include ecological, cultural, human health, economic, or social impacts on minority communities,  low-income communities, or Indian tribes when those impacts are interrelated to impacts on the natural or physical environment; and

**(b)  Whether environmental effects are significant (as employed by NEPA) and are or may be having an adverse impact on minority populations, low-income populations, or Indian tribes that appreciably exceeds or is likely to appreciably exceed those on the general population or other appropriate comparison group; and**

**(c)  Whether the environmental effects occur or would occur in a minority population, low-income population, or Indian tribe affected by cumulative or multiple adverse exposures from environmental hazards.**

*1-102.  Creation of an Interagency Working Group on Environmental Justice.* (a) Within 3 months of the date of this order, the Administrator of the Environmental Protection Agency ("Administrator") or the Administrator's designee shall convene an interagency Federal Working Group on Environmental Justice ("Working Group"). The Working Group shall comprise the heads of the following executive agencies and offices, or their designees: (a) Department of Defense; (b) Department of Health and Human Services; (c) Department of Housing and Urban Development; (d) Department of Labor; (e) Department of Agriculture; (f) Department of Transportation; (g) Department of Justice; (h) Department of the Interior; (I) Department of Commerce; (j) Department of Energy; (k) Environmental Protection Agency; (1) Office of Management and Budget; (m) Office of Science and Technology Policy; (n) Office of the Deputy Assistant to the President for Environmental Policy; (o) Office of the Assistant to the President for Domestic Policy; (p) National Economic Council; (q) Council of Economic Advisers; and (r) such other Government officials as the President may designate.  The Working Group shall report to the President through the Deputy Assistant to the President for Environmental Policy and the Assistant to the President for Domestic Policy.

(b)  The Working Group shall:

(1) provide guidance to Federal agencies on criteria for identifying disproportionately high and adverse human health or environmental effects on minority populations and low-income populations.

(2) coordinate with, provide guidance to, and serve as a clearinghouse for, each Federal agency as it develops an environmental justice strategy as required by section 1-103 of this order, in order to ensure that the administration, interpretation and enforcement of programs, activities and policies are undertaken in a consistent manner;

(3) assist in coordinating research by, and stimulating cooperation among, the Environmental Protection Agency, the Department of Health and Human Services, the

Department of Housing and Urban Development, and other agencies conducting research or other activities in accordance with section 3-3 of this order;

    (4) assist in coordinating data collection, required by this order;

    (5) examine existing data and studies on environmental justice;

    (6) hold public meetings as required in section 5-502(d) of this order; and

    (7) develop interagency model projects on environmental justice that evidence cooperation among Federal agencies.

1-103.  *Development of Agency Strategies.*

(a) Except as provided in section 6-605 of this order, each Federal agency shall develop an agency-wide environmental justice strategy, as set forth in subsections (b)-(e) of this section that identifies and addresses disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations.  The environmental justice strategy shall list programs, policies, planning and public participation processes, enforcement, and/or rulemakings related to human health or the environment that should be revised to, at a minimum:  (1) promote enforcement of all health and environmental statutes in areas with minority populations and low-income populations; (2) ensure greater public participation; (3) improve research and data collection relating to the health of and environment of minority populations and low-income populations; and (4) identify differential patterns of consumption of natural resources among minority populations and low-income populations.  In addition, the environmental justice strategy shall include, where appropriate, a timetable for undertaking identified revisions and consideration of economic and social implications of the revisions.

**<u>Differential patterns of consumption of natural resources</u>:  The term "differential patterns of consumption of natural resources" relates to subsistence and differential patterns of subsistence, and means differences in rates and/or patterns of fish, water, vegetation and/or wildlife consumption among minority populations,  low-income populations, or Indian tribes, as compared to the general population.**

(b) Within 4 months of the date of this order, each Federal agency shall identify an internal administrative process for developing its environmental justice strategy, and shall inform this Working Group of the process.

**28**

(c) Within 6 months of the date of this order, each Federal agency shall provide the Working Group with an outline of its proposed environmental justice strategy.

(d) Within 10 months of the date of this order, each Federal agency shall provide the Working Group with its proposed environmental justice strategy.

(e) Within 12 months of the date of this order, each Federal agency shall finalize its environmental justice strategy and provide a copy and written description of its strategy to the Working Group. During the 12 month period from the date of this order, each Federal agency, as part of its environmental justice strategy, shall identify several specific projects that can be promptly undertaken to address particular concerns identified during the development of the proposed environmental justice strategy, and a schedule for implementing those projects.

(f) Within 24 months of the date of this order, each Federal agency shall report to the Working Group on its progress in implementing its agency-wide environmental justice strategy.

(g) Federal agencies shall provide additional periodic reports to the Working Group as requested by the Working Group.

1-104. *Reports to the President.* Within 14 months of the date of this order, the Working Group shall submit to the President, through the Office of the Deputy Assistant to the President for Environmental Policy and the Office of the Assistant to the President for Domestic Policy, a report that describes the implementation of this order, and includes the final environmental justice strategies described in section 1-103(e) of this order.

Sec. 2-2.  FEDERAL AGENCY RESPONSIBILITIES FOR FEDERAL PROGRAMS.

Each Federal agency shall conduct its programs, policies, and activities that substantially affect human health or the environment, in a manner that ensures that such programs, policies, and activities do not have the effect of excluding persons (including populations) from participation in, denying persons (including populations) the benefits of, or subjecting persons (including populations) to discrimination under, such programs, policies, and activities, because of their race, color, or national origin.

Sec. 3-3.  RESEARCH, DATA COLLECTION, AND ANALYSIS.

3-301.  *Human Health and Environmental Research and Analysis.*

(a) Environmental human health research, whenever practicable and appropriate, shall include diverse segments of the population in epidemiological and clinical studies, including segments at high risk from environmental hazards, such as minority populations, low-income populations and workers who may be exposed to substantial environmental hazards.

**Environmental hazard and substantial environmental hazard:  For purposes of research, data collection, and analysis under Section 3-3 of the Executive Order, the term "environmental hazard" means a chemical, biological, physical or radiological agent, situation or source that has the potential for deleterious effects to the environment and/or human health.  Among the factors that may be important in defining a substantial environmental hazard are:  the likelihood, seriousness, and magnitude of the impact.**

(b) Environmental human health analyses, whenever practical and appropriate, shall identify multiple and cumulative exposures.

**Environmental Exposure:  For purposes of research, data collection, and analysis under Section 3-3 of the Executive Order, the term "environmental exposure" means contact with a chemical (e.g., asbestos, radon), biological (e.g., Legionella),  physical (e.g., noise), or radiological agent.**

**Multiple Environmental Exposure:  For purposes of research, data collection, and analysis under Section 3-3 of the Executive Order, the term "multiple environmental exposure" means exposure to any combination of two or more chemical, biological, physical or radiological agents (or two or more agents from two or more of these categories) from single or multiple sources that have the potential for deleterious effects to the environment and/or human health.**

**Cumulative Environmental Exposure: For purposes of research, data collection, and analysis under Section 3-3 of the Executive Order, the term "cumulative environmental exposure" means exposure to one or more chemical, biological, physical, or radiological agents across environmental media (e.g., air, water, soil) from single or multiple sources, over time in one or more locations, that have the potential for deleterious effects to the environment and/or human health.**

(c) Federal agencies shall provide minority populations and low-income populations the opportunity to comment on the development and design of research strategies undertaken pursuant to this order.

3-302. *Human Health and Environmental Data Collection and Analysis.* To the extent permitted by existing law, including the Privacy Act, as amended (5 U.S.C. § 552a):

(a) each Federal agency, whenever practicable and appropriate, shall collect, maintain, and analyze information assessing and comparing environmental and human health risks borne by populations identified by race, national origin, or income. To the extent practical and appropriate, Federal agencies shall use this information to determine whether their programs, policies, and activities have disproportionately high and adverse human health or environmental effects on minority populations and low-income populations;

(b) In connection with the development and implementation of agency strategies in section 1-103 of this order, each Federal agency, whenever practicable and appropriate, shall collect, maintain and analyze information on the race, national origin, income level, and other readily accessible and appropriate information for areas surrounding facilities or sites expected to have a substantial environmental, human health, or economic effect on the surrounding populations, when such facilities or sites become the subject of a substantial Federal environmental administrative or judicial action. Such information shall be made available to the public unless prohibited by law; and

**Federal environmental administrative or judicial action** **includes any administrative enforcement action, civil enforcement action, or criminal enforcement action initiated by, or permitting or licensing determination undertaken by, a Federal agency to enforce or execute a Federal law intended, in whole or in part, to protect human health or the environment.**

(c) Each Federal agency, whenever practicable and appropriate, shall collect, maintain, and analyze information on the race, national origin, income level, and other readily accessible and appropriate information for areas surrounding Federal facilities that are: (1) subject to the reporting requirements under the Emergency Planning and Community Right-to-Know Act, 42 U.S.C. section 11001-11050 as mandated in Executive Order No. 12856; and (2) expected to have a substantial environmental, human health, or economic effect on surrounding populations. Such information shall be made available to the public, unless prohibited by law.

(d) In carrying out the responsibilities in this section, each Federal agency, whenever practicable and appropriate, shall share information and eliminate unnecessary duplication of efforts through the use of existing data systems and cooperative agreements among Federal agencies and with State, local, and tribal governments.

Sec. 4-4. SUBSISTENCE CONSUMPTION OF FISH AND WILDLIFE.

4-401. *Consumption Patterns.* In order to assist in identifying the need for ensuring protection of populations with differential patterns of subsistence consumption of fish and wildlife, Federal agencies, whenever practicable and appropriate, shall collect, maintain, and analyze information on the consumption patterns of populations who principally rely on fish and/or wildlife for subsistence. Federal agencies shall communicate to the public the risks of those consumption patterns.

**Subsistence consumption of fish and wildlife: Dependence by a minority population, low-income population, Indian tribe or subgroup of such populations on indigenous fish, vegetation and/or wildlife, as the principal portion of their diet.**

**Differential patterns of subsistence consumption: Differences in rates and/or patterns of subsistence consumption by minority populations, low-income populations, and Indian tribes as compared to rates and patterns of consumption of the general population.**

4-402. *Guidance.* Federal agencies, whenever practicable and appropriate, shall work in a coordinated manner to publish guidance reflecting the latest scientific information available concerning methods for evaluating the human health risks associated with the consumption of pollutant-bearing fish or wildlife. Agencies shall consider such guidance in developing their policies and rules.

Sec. 5-5. PUBLIC PARTICIPATION AND ACCESS TO INFORMATION.

(a) The public may submit recommendations to Federal agencies relating to the incorporation of environmental justice principles into Federal agency programs or policies. Each Federal agency shall convey such recommendations to the Working Group.

(b) Each Federal agency may, whenever practicable and appropriate, translate crucial public documents, notices, and hearings relating to human health or the environment for limited English speaking populations.

(c) Each Federal agency shall work to ensure that public documents, notices, and hearings relating to human health or the environment are concise, understandable, and readily accessible to the public.

(d) The Working Group shall hold public meetings, as appropriate, for the purpose of fact-finding, receiving public comments, and conducting inquiries concerning environmental justice.  The Working Group shall prepare for public review a summary of the comments and recommendations discussed at the public meetings.

Sec. 6-6.  GENERAL PROVISIONS.

6-601.  *Responsibility for Agency Implementation*.  The head of each Federal agency shall be responsible for ensuring compliance with this order.  Each Federal agency shall conduct internal reviews and take such other steps as may be necessary to monitor compliance with this order.

6-602.  *Executive Order No. 12250*.  This Executive order is intended to supplement but not supersede Executive Order No. 12250, which requires consistent and effective implementation of various laws prohibiting discriminatory practices in programs receiving Federal financial assistance.  Nothing herein shall limit the effect or mandate of Executive Order No. 12250.

6-603.  *Executive Order No. 12875*.  This Executive order is not intended to limit the effect or mandate of Executive Order No. 12875.

6-604.  *Scope*.  For purposes of this order, Federal agency means any agency on the Working Group, and such other agencies as may be designated by the President, that conducts any Federal program or activity that substantially affects human health or the environment.  Independent agencies are requested to comply with the provisions of this order.

6-605.  *Petitions for Exemptions*.  The head of a Federal agency may petition the President for an exemption from the requirements of this order on the grounds that all or some of the petitioning agency's programs or activities should not be subject to the requirements of this order.

6-606.  *Native American Programs*.  Each Federal agency responsibility set forth under this order shall apply equally to Native American programs.  In addition, the Department of the Interior, in coordination with the Working Group, and, after consultation with tribal leaders, shall coordinate steps to be taken pursuant to this order that address Federally-recognized Indian Tribes.

**Native American programs:  Native American programs include those Federal programs designed to serve Indian Tribes or individual Indians, recognizing that such programs are to be guided, as appropriate, by the government-to-government relationship, the Federal trust responsibility, and the role of tribes as governments within the Federal system.**

6-607.  *Costs.*  Unless otherwise provided by law, Federal agencies shall assume the financial costs of complying with this order.

6-608.  *General.*  Federal agencies shall implement this order consistent with, and to the extent permitted by, existing law.

6-609.  *Judicial Review.*  This order is intended only to improve the internal management of the executive branch and is not intended to, nor does it create any right, benefit, or trust responsibility, substantive or procedural, enforceable at law or equity by a party against the United States, its agencies, its officers, or any person. This order shall not be construed to create any right to judicial review involving the compliance or noncompliance of the United States, its agencies, its officers, or any other person with this order.