- **Displacement of Freedom Colonies:** Communities such as Clarksville, Wheatville, Kincheonville, Masontown, and Gregorytown were established by formerly enslaved people after the Civil War and interspersed throughout the city and its outskirts. To enforce racial segregation and the relocation of Black families to East Austin, the City denied them the public services enjoyed by the surrounding neighborhoods, such as paved streets, sidewalks, street lighting, sewers, and flood control measures. At the same time, because of local policies like the adoption of the 1928 City Plan for Austin and banking discriminatory practices coupled with institutional racism, Freedom Colony residents struggled to maintain or improve their homes.

- **Removal of Mexican Americans:** Parts of Austin's old First Ward and settlements along Shoal Creek were predominantly Mexican and Mexican American. The increased land value resulting from stabilization of the Colorado River and the rise of "downtown" Austin's business district pushed out Mexican American residents, businesses, and churches.

- **The 1928 City Plan for Austin and creation of a segregated "Negro District"**: Through early 20th century zoning and planning policy, the City established a "Negro District" designed to keep Black people separated from whites. City Planners were aware of the fact that they could not legally zone neighborhoods across racial lines, but they recommended the creation of a "Negro District" because the largest Black population was already located in East Austin. They wrote in the plan:

> There has been considerable talk in Austin, as well as other cities, in regard to the race segregation problem. This problem cannot be solved legally under any zoning law known to us at present. In our studies in Austin, we have found that the negroes are present in small numbers, in practically all sections of the city, excepting the area just east of East Avenue and south of the City Cemetery. This area seems to be all negro population. It is our recommendation that the nearest approach to the solution of the race segregation problem will be the recommendation of this district as a negro district...[14]

This district was the only part of the city where Black people could access schools, public utilities, and other public services. However, the City underfunded public services in the district, and private developers refused to provide utilities as an alternative option for residents, as was common in white neighborhoods. Streets in some parts of the district were not paved until the 1960s and 1970s. The district was also the area with the fewest zoning restrictions.

- **Redlining:** The segregation and concentration of people and industrial uses in Austin was further perpetuated by the Home Owners' Loan Corporation (HOLC), established in 1933 by the U.S Congress to refinance mortgages in default and prevent foreclosures. In 1935 the corporation created residential security maps for 239 cities to indicate the level of security for government-backed mortgages and other loans. The maps graded

---

[14] A City Plan for Austin, Texas.

areas considered "Best" for lending as Type A. These areas were primarily wealthy suburbs on the outskirts of town. "Still Desirable" neighborhoods were given a Type B grade, and older neighborhoods were given a Type C grade and considered "Declining." Type D neighborhoods were labeled "Hazardous" and regarded as most risky for loans. Austin's Type D areas closely followed the boundaries of the "Negro District." It meant that families seeking to purchase property in the area—most often Black families— could not access loans with favorable terms. Families that did purchase property had to go through white intermediary buyers or purchase small houses and add on later as they saved more money. Redlining also limited Black property owners in maintaining, repairing, and adding to their buildings; as only personal funds were available; and contributed to the later perception of these neighborhoods as "slums."

- **Racially restrictive covenants and segregated public housing:** A form of tri-racial segregation that used "caucasian only" or "white only" in private deeds and covenants emerged. This marked a shift from the previously used language of "no people of African descent" and was a direct response to the increased numbers of people from Mexico or of "Mexican descent". This tri-racial system prohibited both Black and Latinx people from buying or renting homes in many neighborhoods outside of East Austin.[15] These deed restrictions were often required by the Federal Housing Administration to even secure financing for the construction of housing.

  In the 1930s, the City Council also voted to build racially segregated public housing, Santa Rita Courts (for Mexican Americans), Rosewood Courts (for African Americans) and Chalmers Courts (for whites), the first federal public housing projects in the nation, all of which were located in East Austin.

- **Early Chinese immigrants to Austin were prohibited from owning property:** Discriminatory laws denied Chinese immigrants (who were prohibited from citizenship under federal law) the right to own property in Austin. The spouses of these immigrants could be stripped of their U.S. citizenship and its benefits.

- **In 1957 large swaths of East Austin were designated as an industrial zone:** The Industrial Development Plan of 1957 guaranteed that polluting industries were located in primarily communities of color and resulted in hazardous living conditions, lowered property values, and the construction of toxic properties like the Tank Farm and Holly Street Power Plant. Lower property values meant that property owners lost wealth, made it difficult to get loans to maintain and expand their buildings, and opened the door to predatory buying practices in later years.

- **The building of I-35 and Mopac:** In the middle of the twentieth century, the federal government heavily subsidized the construction of the Interstate Highway System. In cities across the country, transportation agencies selected routes that demolished established central neighborhoods, often where communities of color resided, to make room for the new highways with little or no input from affected communities.

---

[15] Austin Restricted: Progressivism, Zoning, Private Racial Covenants, and the Making of a Segregated City

On August 21, 1958, City Council approved the land acquisition for the widening of I-35 to expand East Avenue into I-35, seizing property from predominantly Black and Latinx households.[16] While racial segregation in Austin predated the construction of I-35, when it was completed in the early 1960s the new highway physically divided the city and continues to harm surrounding communities' health. In 1971, the construction of the MoPac Expressway destroyed nearly one-third of the homes in the historic Clarksville Freedom Colony, which caused the displacement of many Black families. When the Crosstown Expressway project threatened to wipe out the other half of the neighborhood, Clarksville residents took the City to court, got the neighborhood removed from the freeway plans, and won state and federal historic designations for the neighborhood.

- **Urban renewal or "urban removal":** This federally funded program subsidized the acquisition and clearing of sites for redevelopment by tearing down slums and "blighted" areas. Less than 1% of funding went to assisting residents with relocation. Austin's urban renewal efforts focused primarily on areas with majority Black and Latinx populations such as Brackenridge (1969), University East (1968), Kealing (1966), and Blackshear (1969). The projects displaced people of color from large areas and turned formerly residential land into parks and schools without providing adequate opportunities for displaced households to return. The program therefore became known by many people of color as "urban removal."

- **Environmental policies and ordinances focused exclusively on West Austin, directing more intensive development to East Austin**: In the early 1990s, primarily white West Austin homeowners successfully advocated for stricter development-control ordinances like the Drinking Water Protection Zone over the Edwards Aquifer. By the late 1990s, the City established the Desired Development Zone (DDZ) to steer development and redevelopment away from environmentally sensitive areas in West Austin to East Austin, which led to gentrification and displacement of Black and Latinx people. These plans are still actively referenced to target East Austin to this day.

- **City-supported zoning and economic development activities to diversify Austin's economy as a hub of innovation and technology that have not brought equal prosperity to all parts of town:** From the 1950s to today, business leaders have led an economic development effort to expand the city's economic base with the tech industry (a primarily white workforce). As the explosive local economy and cultural sheen draws 150 new residents per day and pushes up the cost of living, older houses and apartment buildings in East Austin's residential neighborhoods have been purchased by higher-income, often white, households and developers better able to compete in a hot real estate market.

---

[16] Not in the Plan: Silencing Communities of Color in Austin's Planning History

# History Is Still with Us: Impacts of Red and Yellow Lining

Many of Project Connect's investments are being made in areas with a long history of racially motivated disinvestment. The current-day impacts of this history are still experienced by households and businesses that experience barriers to capital, intergenerational wealth, and political power, to name a few. This history and its legacy makes these areas ripe for real estate speculation and displacement that could be fueled by new transit investments.

The practice of redlining, described on page 40, is a good example of this history. As the map below indicates, the largest Type D area closely followed the boundaries of the "Negro District" as defined by the 1928 City Plan. Type D and C areas were underinvested by the public and the private sector due to governmental policy. As a result of the disinvestment, these areas have lower property values and are therefore home to people with low incomes and low-revenue businesses that are particularly susceptible to displacement.



*Figure 11.* Left -  Image of original HOLC Investment Grade Map from 1934. (Credit: Mapping Inequality Project, University of Richmond)
*Figure 12.*Right - Image from the Project Connect Racial Equity Anti-Displacement Map showing the HOLC Investment Grades from 1934 and Project Connect lines (link to online map)

## Displacement Risk and Inequities Today

In Austin's current context of rapid growth and escalating cost of living, market forces alone will not be able to produce equitable growth. Displacement risk exists for priority populations and will worsen without community-led and government-supported action to create the conditions for community stability and economic mobility. Too often, studies do not examine the psychological and emotional factors that are part of the equation during and after displacement. Displacement is a traumatic experience that can have long-lasting effects: not only mental but physical. A scan of key determinants of social, physical, and economic well-being indicates they are not equitably distributed and that many communities already do not have the means to flourish.



**This chapter is paired with an online map series that allows users to view geographic information in an interactive map format.**

## Displacement Risk

*Uprooted: Residential Displacement in Austin's Gentrifying Neighborhoods and What Can Be Done About It* is a joint initiative of faculty with The University of Texas School of Law and the Community and Regional Planning Program at The University of Texas at Austin (2018).[17] The project identified gentrifying neighborhoods where residents are at the highest risk of displacement. Researchers conducted a three-part analysis: the presence of vulnerable populations, residential market appreciation, and demographic change. To determine vulnerable populations, the Uprooted authors used indicators to identify residents who, according to academic research, are least able to absorb housing costs. Catalysts pointed out that this is not a complete list, and there are several other groups that should be considered such as: retirees of color unable or struggling to pay rising taxes, people who are medically fragile, people with disabilities, and people exiting foster care or the penal system, to name a few.



*Figure 13.* Uprooted Report graphic

---

[17] Uprooted: Residential Displacement in Austin's Gentrifying Neighborhoods and What Can Be Done About It

City of Austin Housing and Planning staff updated the data in 2019 and simplified the categories below.

1. **Vulnerable:** Vulnerable populations present, no significant demographic change, some tracts are near high-value and high-appreciation areas.

2. **Active Displacement Risk:** Vulnerable populations present, active demographic change, accelerating or appreciating housing market.

3. **Chronic Displacement Risk:** Vulnerable populations have been displaced, significant demographic change has occurred, housing market is high value and appreciated.

4. **Historical Exclusion:** These areas have historically excluded vulnerable populations and are not subject to gentrification and displacement in the same ways.

As the map indicates, the areas of highest risk of displacement—those defined as Vulnerable, Active and Chronic displacement risk—effectively follow what has come to be known as the Eastern Crescent.



*Figure 14.* Image from the Project Connect Racial Equity Anti-Displacement Map showing displacement risk categories and Project Connect lines (Link to online map)

The displacement risk categories are used in the Tool to quantifiably affirm the Catalysts, experience with neighborhoods in the Eastern Crescent where displacement is the biggest threat. It validates these areas as the priority for anti-displacement funds to be invested.

The three categories of Vulnerable, Active, and Chronic Displacement also show the temporal nature of the displacement process that Catalysts reported. They know when displacement is coming, what it looks like in real time, and the lasting effects of displacement after the fact. The displacement risk categories can be used in the Tool to evaluate whether Project Connect decisions, specifically funding decisions, account for this temporal process. For example, investments in areas of chronic displacement should be designed to help displaced communities re-establish roots.[18] Investments in areas of heightened vulnerability can prioritize securing land for community-led projects in advance of escalating land costs. Areas of active displacement may need more stabilizing investments for existing residents such as tenant and homeowner rights or acquisition and preservation of low-cost market rate housing.

The data used in the displacement risk categories are insufficient to prescribe solutions for specific neighborhoods. Government staff and leaders should not be tempted to use it this way. Anti-displacement place-based strategies and projects must be developed by communities at risk of displacement through engagement and partnership with the City. The categories provide a starting point for these planning processes but cannot be a substitute.

## Access to Opportunity

Access to opportunity refers to the ability to attain the amenities that are key determinants of social, economic, and physical well-being. These are also critical components of preventing displacement.

The Tool asks if policies and anti-displacement investments fill a gap in opportunity identified by communities or leverage an existing amenity. The City of Austin has mapped some of the amenities that Catalysts identified and research has confirmed are essential components of a high-quality of life.

Additional data points should be mapped throughout the life of the Tool. An Opportunity Index should also be created to pair with the displacement risk categories to more easily track progress toward an equitable distribution of opportunity throughout the city and to facilitate design of solutions tailored to those most at risk of displacement in a specific location.

---

[18] City of Portland Preference Policy

## Proximity to Healthy, Affordable Food

This map of healthy food retailers illustrates access to healthy, affordable food. It is acknowledged that most of these locations are based not on culturally referenced food, but on "legitimated" retailers. The map below shows the areas within a 5, 10, 15 and 20-minute walk to healthy food stores that accept SNAP benefits. The majority of healthy food retailers are located outside of the Eastern Crescent.



*Figure 15. Image from the Project Connect Racial Equity Anti-Displacement Map showing proximity to healthy food stores that accept SNAP and Project Connect lines (Link to online map). (Credit: Data from City of Austin Office of Sustainability)*

## Proximity to a Public Library

Libraries are public facilities maintained by the City that serve educational, political, social, and civic functions. The map below shows the areas within a 5, 10, 15 and 20-minute walk to a library.



*Figure 16. Image from the Project Connect Racial Equity Anti-Displacement Map showing proximity to public libraries and Project Connect lines (Link to* online map*)*

## Proximity to a Public School

Public schools are public facilities maintained by the Austin Independent School District (AISD) and other school districts that serve educational, political, social, and civic functions. The map below shows the areas within a 5, 10, 15 and 20-minute walk to an AISD public school. In 2017, shortly following voter approval of $1.1 billion school bond,[19] AISD proposed consolidation of six East Austin elementary schools—Brooke, Norman, Sims, Metz, Sanchez and Zavala—effectively shifting funds out of the Eastern Crescent.[20] In 2019, the district approved the closures of Pease, Brook, Metz, and Sims elementary schools three out of which are located in the Eastern Crescent. It is acknowledged that the 2017 AISD school bond closed multiple schools in the Eastern Crescent in favor of preserving educational opportunities in West Austin.[21] Stephanie Hawley, the district's chief equity officer, emphasized that the District's school closure plan perpetuates longstanding policies of racial and economic segregation.[22]



*Figure 17. Image from the Project Connect Racial Equity Anti-Displacement Map showing proximity to public schools, the four public schools that were closed for the 2019-2020 school year, and Project Connect lines (Link to online map)*

---

[19] Voters approve $1.1B Austin ISD bond, largest in Central Texas history

[20] AISD's plan to close, consolidate schools strains public trust

[21] 2017 Bond Summary Table

[22] Austin school closures further district's racist history, report says

## Proximity to a Community Recreation Center

Community recreation centers are public facilities maintained by the City of Austin that offer a variety of programs for youth and teens, adults, and 50+ seniors. It is acknowledged that the St. John and Kealing pools were dismantled based on racial preferences for swimming within the City of Austin.[23] The map below shows the areas within a 5, 10, 15 and 20-minute walk to a Community recreation center.



*Figure 18. Image from the Project Connect Racial Equity Anti-Displacement Map showing proximity to community recreation centers and Project Connect lines (Link to* online map*)*

---

23 City of Austin Aquatics Master Plan; City of Austin Aquatics Master Plan site suitability ratings and map; City of Austin Aquatic Facility Overview; Parks and Recreation Department Report Card



# Chapter 4: Racial Equity Anti-Displacement Tool

**A framework to evaluate Project Connect's investment, policy, planning, and program decisions**

## Informing and Evaluating Project Connect Decisions

The City has an opportunity and an obligation to reverse deep-rooted institutional inequities and make community-driven investment decisions specifically to close racial and economic disparities. This must be done in a manner that supports the communities most at risk of displacement so that they can fully participate in the economy and thrive. If successful in areas with gaps in opportunity, investments that are intentionally designed to support priority populations will improve opportunity as well as decrease displacement risk.

In Austin's current context of rapid growth and escalating house prices, market forces alone will not produce equitable growth. Displacement risk exists for priority populations and will worsen without government action to create community stability and economic mobility. The limited access to resources that some people face will persist without government intervention to fill gaps and leverage market strength to create equitable access to all neighborhoods. Therefore, the City is taking the initiative to standardize decision-making in a way that de-emphasizes or excludes input from those who see no problems with displacement and racial inequity.

The purpose of The Racial Equity Anti-Displacement Tool is to drive racial equity and anti-displacement in Project Connect decisions. It is designed to be used by a broad audience, including Austin Transit Partnership, Capital Metro, the City of Austin, partner institutions, and community members, especially those most impacted by displacement. It is to be used to score Anti-Displacement Fund proposals and to inform policy, planning, and program decisions. The Tool design incorporates Racial Equity Anti-Displacement Principles and the Racial Equity Drivers within the central components developed by the Racial Equity Catalysts:

   I.  **Community-Driven:** Depth of Relationship and Accountability

  II.  **Community Priorities:** Advance Racial Equity

 III.  **Community Guardrails:** Prevent Displacement Harm

## Proposal Eligibility

The Tool is intended to support anti-displacement strategies and promote economic development opportunities by supporting community-initiated solutions that are designed and implemented by communities that are subject to displacement as the region grows. As such, the Tool will prioritize proposals that are able to demonstrate a thorough organizational commitment to equitable development as both practice and outcome in the relationship between the proposal and the community whose interests they seek to represent. Successful proposals will be those that best articulate a connection between their proposal and their ability to impact the Racial Equity Drivers. Proposals must also be able to explain how they propose to monitor the project's effectiveness, or face rejection.

## Decision Criteria

Proposals that best meet the objectives of the Racial Equity Anti-Displacement Tool will be prioritized. Proposals are scored on how well they address Racial Equity Drivers and Priorities. Proposals are encouraged to address root causes and to coordinate multiple Equity Drivers and Priorities to increase impact. Applications will be reviewed based on a system adapted for the Seattle Equitable Development Initiative Fund and pioneered by the work of Social Justice Fund NW.[24]

- Decisions prioritize organizations/coalitions led by impacted communities that are working on advancing economic and racial equity in communities at high risk of displacement.

- Decisions are intended to target support to communities that are experiencing, or are at highest risk of experiencing, displacement pressures. Additionally, priority goes to communities that have historically experienced specific policies that limit the opportunity of people of color.

- Decisions are intended to complement other policies, plans, programs, and existing funding sources to address gaps identified by communities.

---

[24] Seattle Equitable Development Initiative Fund

## Recommended Eligible Uses

The Anti-Displacement Fund can support the following for Priority Populations within Priority Places:

- [Purpose Priorities for the Anti-Displacement Fund](#)
- [Community Capacity-Building Fund](#)
- **Development funds** include predevelopment, acquisition, and construction for projects that decrease displacement pressures and close opportunity gaps for those most at risk of displacement as articulated in the Tool. The Anti-Displacement Funds are intended to complement existing funding sources and may require covenants and deed restrictions to be placed on the property to ensure that the site is used for the proposed public benefits.

## Underwriting Recommendations[25]

1. Multiple applicants may apply for the same geography. Applicants may be asked to work together on shared interests and priorities.

2. Awards not spent within a two-year period will be re-evaluated annually to determine whether the award should remain active.

3. Capital requests should be in line with cost per unit and/or cost per square foot underwriting standards from other funders involved in the project budget.

4. Coordinate with other private and public funders to ensure that proposals are not seeking duplicative funding for the same deliverables.

5. Approvals and final contracts may include conditions on funding to ensure the project meets legal requirements and adequately addresses potential risks to public funds.

6. Contracts may impose restrictions on consultant expenses for capacity-building grants in cases where the applicant may be over-reliant over a long period on outside expertise.

7. Funding may be restricted or declined where risks and rewards in development partnerships are not equitably shared between partner organizations.

---

[25] Adapted from the Seattle Equitable Development Initiative Fund Guidelines

## How to Use the Tool

The Tool includes five sections. Scoring criteria for each section informs project design and funding awards. Scored on a continuum, each criterion can earn a maximum of 5 points for a strong response, while an absent or weak response can earn 0 points.

- **For policy, planning and program decisions,** complete sections I-III.
- **For Anti-Displacement Fund capacity-building proposals**, complete Sections I-III.
- **For Anti-Displacement Fund projects**, complete sections I-IV. Questions I.1-3, II.A1-3, II.B1, II.C1-3, and IV.1-2 must each achieve at least 4 points for the proposal to be considered for funding.
- Section V should be used before each round of Anti-Displacement Fund award decisions is finalized.



**Policy, planning, and program decisions**
Complete sections I-III

**Anti-Displacement Fund capacity-building proposals**
Complete sections I-III

**Anti-Displacement Fund projects**
Complete sections I-IV. Questions I.1-3, II.A1-A3, B1, C1-3, and IV. 1-2 must each achieve at least 4 points for the proposal to be considered for funding.

**Anti-Displacement Fund allocations**
Complete section V before each round of funding award decisions are finalized.

*Figure 19. How to Use the Tool*

# Racial Equity Anti-Displacement Tool

## I. Community-Driven: Depth of Relationship and Accountability

To advance racial equity and growth without displacement, successful proposals must:

A. Be generated by communities at high risk of displacement through an established, accountable, and inclusive community process;

B. Seek to achieve goals established by communities at high risk of displacement;

C. Include community members at high risk of displacement in paid decision-making leadership during the design and implementation of the proposal; and

D. Demonstrate accountability to communities at high risk of displacement.

| Strong (deserves 5) | | | | Weak (deserves 0) | |
|---|---|---|---|---|---|
| **Does this proposal....** | | | | *Scoring Criteria* | **SCORE** |
| 1. Advance the Vision of the Racial Equity Anti-Displacement Tool? | ........or....... | | | Was the vision created without any consultation with those most impacted by displacement? | |
| 2. Use a collaborative or deferential model of community partnership between the institutions and those most at risk of displacement to make future decisions? | ........or....... | | | Ignore or only inform those most at risk of displacement of decisions that are already made? | |
| 3. Use data disaggregated by race for transparency and decision-making and accountability to those most impacted by displacement? | ........or....... | | | Is it not explicit about how data and decision-making are transparent and accountable to those most impacted? | |
| 4. Reflect the result of previously established and inclusive community efforts that included those most impacted by displacement? | ........or....... | | | Does the proposal bear no resemblance to such previously created work? | |
| 5. Include a budget that adequately and equitably resources all community partners and participants and supports community coalition building? | ........or....... | | | Does the collaboration rely on the unreimbursed or underpaid work of community partners and participants? | |
| **I. Community-Driven - Total Score 25 points maximum** | | | | | |

**FOR ANTI-DISPLACEMENT FUND PROPOSALS** Criteria 1-3 must EACH achieve a score of 4 or higher for the proposal to be considered.

## II. Community Priorities: Advance Racial Equity

To advance racial equity and growth without displacement, successful proposals must:

A. Meaningfully decrease displacement pressure and fill opportunity gaps for those most at risk of displacement: BIPOC households, BIPOC-owned businesses, and BIPOC-led cultural anchors (People);

B. Meaningfully decrease displacement pressures and close opportunity gaps in Eastern Crescent locations that are critical to communities, businesses, and cultural anchors at risk of displacement (Place); and

C. Meaningfully close opportunity gaps for communities, businesses, and cultural anchors at risk of displacement (Purpose).

### A. People

| Strong (deserves 5) | | | | Weak (deserves 0) | |
|---|---|---|---|---|---|
| **Does this proposal....** | | | | *Scoring Criteria* | SCORE |
| FOR ANTI-DISPLACEMENT FUND PROPOSALS Criteria 1-3 must EACH achieve a score of 4 or higher for the proposal to be considered. | A1. Explicitly describe how it decreases displacement pressures for BIPOC households who are at risk of displacement? | ........or....... | Does it not consider how its unintended consequences may increase displacement pressures on BIPOC households? | | |
| | A2. Explicitly describe how it decreases displacement pressures for BIPOC business owners at risk of displacement? | ........or....... | Does it not consider how its unintended consequences may increase displacement pressures on BIPOC business owners at risk of displacement? | | |
| | A3. Explicitly describe how it decreases displacement pressures for BIPOC-led organizations at risk of displacement? | ........or....... | Does it not consider how its unintended consequences may increase displacement pressures on BIPOC-led organizations at risk of displacement? | | |
| | A4. Explicitly describe how it decreases displacement pressures for Priority Populations? | ........or....... | Does it not consider how its unintended consequences may increase displacement pressures on Priority Populations? | | |
| | A5. Explicitly describe how it has a beneficial impact for BIPOC residents, businesses, or community-based organizations in the Eastern Crescent? | ........or....... | Does it not consider that it may have an adverse impact on BIPOC people and entities in the Eastern Crescent? | | |
| | A6. Explicitly specify what racial, income, and location quantitative and qualitative data informs this proposal? | ........or....... | Was the proposal developed with no consideration of racial, income, or location data or with a pretense of racial neutrality? | | |
| | A7. Explicitly specify which racial disparities the proposal aims to narrow or close? | ........or....... | Does it not consider how its unintended consequences may increase racial disparities? | | |
| **II. Community Priorities: A. People - Total Score (35 points maximum)** | | | | | |

**B. Place**

| | Strong (deserves 5) | | | | Weak (deserves 0) | |
|---|---|---|---|---|---|---|
| | **Is this proposal...** | | | | *Scoring Criteria* | SCORE |
| **FOR ANTI-DISPLACEMENT FUND PROPOSALS** Criterion 1 must achieve a score of 4 or higher for the proposal to be considered. | B1. Located within 1 mile of any Project Connect station in the Eastern Crescent to leverage transit investments and mitigate their displacement pressures? | | ........or....... | | Is the proposal not located within 1 mile of a Project Connect station in the Eastern Crescent? | |
| | B2. Leveraging City or other publicly owned, previously developed, and developable land and properties to decrease anti-displacement pressures and close opportunity gaps? | | ........or....... | | Does it propose to use publicly owned and developable land for purposes other than to decrease anti-displacement pressures and close opportunity gaps? | |
| | B3. Explicitly explaining how it aligns with the characteristics of the displacement risk categories to either address whether BIPOC communities and low-income people are vulnerable to displacement, actively experiencing displacement, experiencing chronic historic displacement, or are excluded from an area. | | ........or....... | | Was the proposal developed with no consideration of the characteristics of displacement that communities in the target area experience? | |
| | **II. Community Priorities: B. Place - Total Score (15 points maximum)** | | | | | |