EXHIBIT P



LEGEND
BUSINESS PROPERTY
WHITE RESIDENTIAL PROPERTY
MISCELLANEOUS RESIDENTIAL
PROPERTY

# AUSTIN

## TEXAS

Progressivism, Zoning,
Private Racial Covenants,
and the Making of a Segregated City

**Eliot M. Tretter**



Institute for Urban Policy
Research & Analysis



Department of Geography and the
Environment



The University of Texas at
Austin - College of Liberal Arts

# Austin Restricted: Progressivism, Zoning, Private Racial Covenants, and the Making of a Segregated City

Final Report Prepared and Submitted by Eliot M. Tretter to the Institute for Urban Policy Research and Analysis

Appendix with Maps and Charts Prepared by M. Anwar Sounny-Slitine

Eliot M. Tretter
Lecturer
etretter@austin.utexas.edu
512-471-5116
Department of Geography and the Environment
305 E. 23rd Street Mailcode: A3100
Austin, TX 78712

M.Anwar Sounny-Slitine
Instructor and GIS Lab Manager
sounny@southwestern.edu
512-863-1646
Enivronmental Studies Program
1001 E. University Avenue
Georgetown, TX 78626

*Introduction: Monroe Shipe*          *1*

*The Segregation of Austin: The Argument*      *4*

*Southern Progressivism: Urban Reforms, Planning, and Jim Crow 8*

*Progressivism in Austin: City Manager Government, the Comprehensive Plan,*

*and the Redlining of East Austin*          *15*

*Private Zoning: Restrictive Covenants and Land Use in Texas*        *21*

*Fixing Space: Race, Covenants, and Land Values in the United States*    *25*

*Restricting Austin: Private Covenants, Partially White People, and Segregation*   *30*

*Pathways to More Inclusion*          *35*

*Archival Research Methods*          *39*

*Maps 43*

*Examples of Plats and Deeds*      *64*

*Charts*          *75*

*Historical Maps*      *85*

*Neighborhood Advertisements*     *98*

*Annotated Bibliography*     *109*

# Acknowledgements

We would like to thank the support of Professor King Davis and financial assistance of the Institute for Urban Policy Research & Analysis at the University of Texas at Austin.  Also, we are grateful to the time and assistance provided by Servando Hernandez, Louis Limon, and Gretchen Nagy from the Recording Division of the Travis County Clerk's Office.  Eliot would like to thank Stanley Fanaras of the Records Division of the National Archives in Washington, DC.  for getting the information on the Housing and Loan Corporation documents about Austin as well as the many librarians at the Austin History Center. Additionally, Eliot thanks Thomas Christiansen, for his willingness to do an initial round research on racial covenants in Austin and map these results.   Anwar would like to thank the students in his Environmental GIS course at Southwestern University for contributing to the creation of the datasets: Hannah Barrueta, Anne Bransford, Jase Carr, Brandee Knight, Kyle Mathis, Emily Pawelek, Darick Pennel, Jeffrey Romine, Kavita Singh, and  Vanessa Toro.



HYDE PARK IS EXCLUSIVELY FOR WHITE PEOPLE.

# Introduction: Monroe Shipe

In 1889 Colonel Monroe Shipe arrived in Austin from Kansas and over the next thirty years or so, until his death in 1924, he played a major role in how the city developed. Among his many financial ventures, one, the construction of a neighborhood called Hyde Park by the M. K. & T. Land and Town Company, would shape Austin's residential geography for generations. Shortly after arriving in Austin, he acquired a large tract of land about two miles north of the Texas State Capitol and the University of Texas' main campus. Here in 1891 Shipe platted and then later built Austin's first planned upscale suburb, which would be "select and entirely free from nuisances and an objectionable class of

people, proper restrictions being taken to guard against undesirable occupants" (Austin Board of Trade 1894 pg. 36). About two miles from Austin's central business district, the neighborhood would be connected to the city's nerve center by a private street car that Shipe had also designed and built (Sitton 1991 pg. 17). Within the first decade after its founding, however, land sales were slack and Shipe was forced to create smaller subdivisions and lots and cater to a more moderately resourced community. Advertisements at the time discussed the many amenities of the neighborhood, such as free mail service, the scenic nature of the area, good streets, rapid transit, electricity, city water, its safety from floods, the prohibition of saloons, and, most significantly, that it was "exclusively for white people" (Colorado Lake Chautauqua Association 1893 pg. 15; Tretter and Adams 2012 pg. 196). Shipe was not alone in creating areas only for whites, a fast-developing fashionable neighborhood just south of Hyde Park, called Alridge Place, also advertised its racial purity. It, however, was dwarfed in size by Hyde Park's 206 acres and its planned subdivision of 400 blocks, most of which was built in the late 1920s, much of it after Shipe's death.

Shipe was a strong proponent of Progressive municipal reform in Austin. In Texas, such reform efforts were generally led by the business community, which was opposed to ward politics because of its potential for corruption and tendency to support more populist elements in government (Rice 1977). Stuart McCorkle described how "a group of citizens headed by M. M. Shipe spent the greater part of 1908 attempting to convince the Austin voters that a change in the city charter providing for commission government would assist in finding solution to their many municipal difficulties" (MacCorkle 1973 pg. 35). These reformers were successful. In 1909, Austin adopted a new municipal charter, one that was essentially written by Shipe, which changed the structure of its local government from an alderman (or ward) system to a commission system (Staniszewski 1977 pg. 55). Shipe had been a strong advocate of this new form of government because it was believed to be more efficient at delivering government services, and in 1908, he wrote in an editorial in the local newspaper, "So long as a town is divided by wards and controlled by politics the growth of the town will be retarded" (Shipe 1908). Shipe was attacked in some quarters, especially by Mayor Maddox, for "wanting to improve streets so he could sell lots in his private interests [Hyde Park]," but such attacks proved ineffective at stopping Shipe and his fellow reformers, such as Alexander Woodbridge; in 1909 a slate of reform candidates won a landslide election and took control of the newly organized commission government (Austin Daily Statesman 1908; Staniszewski 1977 pgs. 27-29). Soon after entering office, the new administration undertook an effort to finance a host of public works programs designed to encourage residential and commercial growth in Austin, such as building sewers and a new dam for electricity (Stone, Price, and Stone 1939 pg. 5 ).

Shipe's story illustrates the way the dynamics of urban development and municipal reforms in Austin, and more generally in the South and Southwest, largely ran together in the early portion of 20th century. Shipe was a land developer, an important businessman in the community, who was trying to profit from his financial land speculations. He saw the need for a stronger local government that would help the city

grow, and he knew this was essential for him to get a profitable return on his investment.  He also knew that people like him had to control the government in order to dictate how public revenues were spent on public works.  Shipe, therefore, acted and created a new "businessmen's government," which would help fuel the city's growth through public expenditure and discourage the vast majority of people from meddling in politics, particularly poor and non-white people (Bridges 1997 pgs. 74-75; Stone, Price, and Stone 1939 pg. 5).  Moreover, his antipathy toward non-whites became embedded in the very way Austin grew.  For generations, Shipe's planned development, the first planned subdivision in Austin, excluded certain people from some of the best real estate opportunities in the city for no other reason than their lack of perceived similarity to a social group called the 'white race.'

Introduction: Monroe Shipe



# The Segregation of Austin: The Argument

In many respects, the story of racial segregation in Austin, Texas, is not unique.  It is the story of nearly every major city in the United States, especially those in the South and all major cities in Texas (Massey and Denton 1993 pgs. 17-58; Wade 1971).  In the latter portion of the 19th century, non-whites, especially African-Americans (but not Hispanics), could be found in most neighborhoods in Austin.  However, by 1940, African-Americans and Hispanics were overwhelmingly spatially segregated in an isolated section of the city known as East Austin.  As Sara Lucy observed in 1939, "The city's Negro population is not large compared to many other populous Texas cites, nor is its Mexican

population. Both races, through natural choice, are largely segregated in their sections of the city" (Lucy 1938). The segregation of non-whites was far from voluntary, as I will show, and for more than 60 years, until about the 2000 census, the patterns of race and housing that had been locked in during the early period of the 20th century remained largely unchanged; only recently have these geographies become undone by private urban revitalization efforts broadly classified as gentrification (Tretter Forthcoming).

The forces that led Austin toward becoming a more residentially segregated city are complex and multifaceted. For sure, changing modes of transportation and the development of new techniques for communication made segregated housing easier, as did the refinement of customs and laws barring different forms of social intercourse (McDonald 2007 pgs. 146-147). Also, differential exposure to environmental hazards, namely flooding, played a part in where and how people settled (Tretter and Adams 2012). Exposure to humanly created risks also played a role in city's patterns of segregation. After 1928 a central train depot was built and the area around it was zoned for industrial activity (Wilson et al. 2007 pg. 5). Although Austin did not have a large industrial base, there was some light industry, and in subsequent years, the area around the industrial zone became increasingly occupied by only Hispanics and African-Americans. Nevertheless, in terms of residential land-use, and the segregation of the city's housing in terms of race and class, the foundation was laid in how both public and private forms of zoning worked together and interacted in a cumulative way to reinforce and reproduce general spatial patterns.

As this paper shows, private land-use restrictions, the city's zoning laws, and federal policy all worked together to shape the patterns of residential segregation found in Austin during most of the 20th century. The outlines of the pattern were set by restrictive covenants, which existed before the city's first local comprehensive plan was adopted in 1928 but were used with increasing regularity after its adoption. To a large extent, in fact, public zoning ordinances in the late 1920s helped to enshrine in a different legal arena the patterns of development — i.e., the features of housing segregation — that had been set in motion by limitations in deeds. Later, this pattern of segregation was reaffirmed by the federal government through the Housing and Loan Corporations' city survey conducted in 1934. The "residential security map" created for the HOLC redlined most of the areas in Austin that did not have racial or other types of restrictive covenants. Moreover, zoning rules identified areas of the city for commercial and later industrial development the relied on past geographical distribution of covenants, which had restricted noxious land-uses in some parts of the city, but their absence in other parts made those areas available for more non-residential development. These patterns would be reinforced in 1955, when another round of zoning rules was adopted under the Austin Plan, rezoning an even larger area of East Austin for commercial and industrial uses (Busch Forthcoming). Between 1935 and 1955, however, private restrictions on residential land-uses had become more refined, developed, and widespread, and while public zoning was important, if not essential, deed limitations proved to be a potent force in generating future patterns of housing segregation. By 1949, around the time the Supreme Court ruled in Shelley v. Kramer that certain racially restrictive provisions in covenants were

unenforceable, a large portion of Austin's land was under a host of other private rules that regulated land-use, regulations that remain largely in force today.

The research, both popular and academic, that has examined the evolution of segregation in Austin has focused squarely on the role of the local government (Humphrey 1997; McDonald 2012; Orum 1987; Straubhaar et al. 2012). The reason for this, which I will explore in more detail later, is that the city's first comprehensive plan, adopted in 1928, stressed creating a "Negro district" and the possibility of providing social services exclusively to blacks in that area as a way to draw them there from other parts of the city. Such a recommendation would allow the city to work around the constitutional limitations placed on imposing a system of racial apartheid through zoning that had begun with the Buchanan v. Warley decision of Supreme Court. While the local government's policies were important, a fortiori essential, the research I have undertaken in Austin shows how, as Jones-Correa has aptly noted, "In the South, racial restrictive covenants predated zoning and when zoning appeared, ran concurrently with them" (Jones-Correa 2000 pg. 551). Stressing how these private means of discrimination helped produce a racially segregated city gives a much richer account of how market and public forces worked in tandem. Moreover, because private practices had such an impact on the residential geography of cities, policy efforts to foster more racially and economic diverse neighborhoods that focus only on public zoning may always have limited results.

Within the broader literature on the development of segregation in cities throughout the United States, the police powers of the state to enforce segregation by local zoning are emphasized as the primary means to explain residential land-use patterns. While some recent scholarship has attempted to address this oversight, the majority of our understanding of private restrictions on land use is limited to legal scholarship (Gotham 2002; Pietila 2010). Moreover, such a focus on public zoning regulations has limited application in Texas, where much of the land-use practice is governed at least as much by private regulations as public. Scholarship on Houston, a city where land-use is controlled only by private zoning regulations, has shown how there are virtually identical patterns of land-use and, consequently, racial and class segregation as there are in Dallas, which is governed by public zoning ordinances (Berry 2001). In Texas, private land-use controls have a significant and lasting effect on residential and commercial development; this may make the results of this report difficult to compare to other states. In terms of its potential policy recommendations for promoting more inclusive residential patterns in Texas this research is very important because it suggests that calls to reform the state's public zoning regulations may be as important as reforming the statutes that legalize the barriers imposed by the system of private zoning.

Moreover, the research from this project shows an important trend that has never, to my knowledge, been discussed in the larger academic literature on the use of race as a means to promote spatial segregation, and that is what the changing language of race in racially exclusive covenants tells us about the changing textures of 'whiteness.' In Austin, there was a noticeable shift away from using the phrase no people of "African descent" could buy or occupy land (except, in many cases, as domestic servants) in

particular neighborhoods to stating a subdivision or a property could only be inhabited by "Caucasian" or "white" persons (although again, often, with the an exception for blacks as domestic servants). The changing language included in the racial covenants, I suggest, reflects the development of new forms of exclusion for partially white groups during this time period. Perhaps the absence of such a trend in other cities is due to the fact that in places like Austin and Texas, the boundaries of whiteness remained unsettled because of the large number of Hispanics. During the 1930s, there was an elaborate discussion about the racial classification of so-called "Mexicans," or people from Mexico or of Mexican descent, who were "white" by law but considered something else by custom. I contend that in residential land-use, the increasing use of the restrictive language "white" or "Caucasian" only, while perhaps legally unenforceable, was by custom used to forbid Hispanics from certain neighborhoods, and that is why the shift in deed language parallels the demographic growth trends of Hispanics in Austin.

The following paper is laid out in five sections. The first outlines the broad historical, geographical, and social contexts in which the initial phases of land-use controls arose in Austin; in it I discuss the political movement known as Southern Progressivism and especially its impact on urban city planning, zoning, and the organization of local government. Next, I discuss how local government reorganization, planning, and zoning were implemented in Austin. I then discuss land covenants, their history, law, and use in the United States, with a focus on Texas. This is followed by a section providing a brief and general overview of racial and non-racial covenants, their dissemination, their use in the private housing market, and the impact

of explicitly non-racial restrictions on race. In the penultimate section, I offer an interpretation of how private covenants shaped racial segregation in Austin, and in the final section I offer some suggestions on the potential policy implications of this research and make some recommendations. There is also a long appendix, written by Moulay Anwar Sounny-Slitine, that provides a detailed explanation of the research methods used to locate housing deeds and plats and a description of GIS methods.



# Southern Progressivism: Urban Reforms, Planning, and Jim Crow

During the early portion of the 20th century, urban elites throughout the United States demanded more efficient government, organized cities, and an educated and civilized populous.  In meeting these demands, there was the shared belief among these reformers that the responsibility to reshape the existing social order fell on these same ruling elites; it was a kind of noblesse oblige.  While there was a strong commitment among social reformers to programs that helped to alleviate poverty or support education, there was still a widely held belief that all social groups had their place and certain inequalities should not be corrected.  Existing social hierarchies,

whether caused by economic differences or supposed biological inheritances, could not be eliminated; social systems could merely be reformed to facilitate more efficient and productive exchanges among social groups. Not only would this lead to the general improvement of the society, eliminating slums and poverty that were caused by poor management or corruption, it would help to extend the sphere of democracy by uplifting the "masses" by giving them tools to rationally participate in the governing of society. These were the basic tenets of Progressivism, which would change the quality and content of both government and planning in cities across the United States during the 20th century.

However, many historians have suggested there were distinctive features associated with Southern Progressivism. Not a single movement, Southern Progressivism was a range of responses to specific changes in the "social landscape of the region, particularly the coming of industry, increasing urbanization, and the growing importance of a new middle class made up of business and professional groups" (Grantham 1981 pg. 1036). These changes had fundamentally upended social relations in the South, which has been rooted in an agrarian economy that had its centers of power in smaller towns. C. Wann Woodward's characterization of Southern Progressives is particularly helpful: ''urban and middle class in nature, and the typical leader was a city professional man or businessman, rather than a farmer" (Woodward 1974 pg. 371). Although Woodward's description is too simplistic, it does point to how many of the features associated with Progressivism in the South were represented in a new urban order. Cities were becoming new centers

of power and so too were urbanized professionals, a core part of Southern Progressivism, becoming a significantly powerful social class in the South. Moreover, many of the reform ideas that were embodied in Progressivism had much longer staying power in the South than in the North, in part because of how these reforms were championed by urban business elites as tools for modernization (Tindall 1967 pgs. 219-253). Therefore, although the term "Progressive Era" is often used to characterize the period from about 1890-1920, it is also helpful in characterizing many of the municipal changes that occurred throughout the South into the early 1930s.

While many Southern Progressives shared a concern for a broader social reform agenda and even advocated using public facilities to promote more social equality, a concern for social justice never dominated the rationale for why reforms were implemented as public policy in cities, particularly in the 1920s. Instead, in the South, Progressive reforms became subordinated into what some have called "business progressivism," which, in cities, advocated the expansion and efficiency of public services to facilitate urban and economic growth more than programs to enhance public welfare (Brown 1984 pg. 7; Tindall 1967 pg. 254). Promoted by business leaders, Progressive reforms quickly became a means to remake cities in the image of this "white commercial-civic elite," as Brownell so fittingly characterized them. From comprehensive planning and road improvement to education, growing municipal services was nearly always emphasized to modernize cities and support economic growth and development (Brownell 1975 pgs. 157-189).

Moreover, all aspects of the social reform agenda of Southern Progressivism operated within a framework of white supremacy and anti-black racism. Inheriting a longtime system of white racial hegemony, the benefits of Southern Progressivism, as Woodward once again so astutely characterized it, were for "whites only." Instead of improving the situations of non-white people, the overwhelming results of Progressive reform in the South was implemented to improve the situation for 'whites,' largely at the expense of non-whites, and to solidify white domination over non-whites by legal means (Kirby 1972 pgs. 178-181; Woodward 1974 pg.s 91-93). Progressive era reforms, therefore, helped to create and harden the boundaries of white racial identity, and when improvements for non-whites were made, they tended to be coincidental and selective, often merely designed to reinforce the hierarchy and barriers that had been constructed between whites and non-whites (Colten 2005 pgs. 77-107; Hale 1998 pgs. 121-197; Tindall 1967 pgs. 254-284).

One unique aspect of Southern Progressivism and Post-Progressive reforms in Texas was their impact on the growing population of Hispanics in the state after the 1920s (Gould 1973 pg. 297; McDonald 2012 pg. 228-229). As the rules of Jim Crow were gradually extended and codified to officially segregate 'white' and 'blacks' in education, transportation, public facilities, party primaries, etc., its impact on Hispanics was much more uneven and much more a matter of custom rather than law. Hispanics had been considered legally 'white' since at least 1897, when a federal court in Texas ruled they could be naturalized as 'free white persons.' Moreover, Jim Crow laws in the state of Texas established in 1893

defined 'colored,' i.e., the people that could legally segregated, as only those people with some 'African descent' (Foley 2004 pgs. 128-130; Martinez 1997 pgs. 326-328). During the early portion of the 20th century, therefore, Hispanics enjoyed some benefits from this 'white' legal status. They were not excluded from, among other things, white-only political primaries, their segregation in schools was not legally sanctioned on the basis of a racial difference, they could sit with whites on street cars, and they could use white-only public facilities (Orozco 2009 pg. 35). Nevertheless, as I will discuss later, as the 20th century wore on and their numbers grew not just in the small towns of Texas but in its cities, such as Dallas, Houston, and San Antonio, underlying prejudices and bigotry emerged with force against migrants from Mexico and helped to create a kind of de facto standard for spatial and social segregation that removed many of these privileges (De Leon 2001 pgs. 10-42 ; Mason 1998 pgs. 32-33; Phillips 2006 pg. 69). While Mexicans were white, as Montejano noted, "in political and sociological terms, Negroes and Mexicans were basically seen as different aspects of the same 'race' problem" (Montejano 1987 pg. 262).

Another more general tenet of Southern Progressivism was the attempt to modernize the administration of cities to make them suitable for industrial and commercial development and less susceptible to corruption and waste (Rice 1977 pg. xvii). To achieve these goals, reforms were instituted that were supposed to streamline government action and service delivery but that also had the effect of limiting political participation and, generally, empowering the business community's control over public investment. Central to this agenda was the

elimination of the alderman and ward system in city politics because it was thought to favor powerful politicians, political machines, and partisan politics and allow the desires and interests of neighborhoods or political groups such as unions to have too much influence over government. Throughout the South and Southwest, different coalitions of business leaders and social reformers helped to redesign political institutions that would be, on the one hand, less accountable to individual areas or constituencies and more concerned with the city's general interest, and, on the other, run more like modern businesses to help promote a strong growth agenda (Bridges 1997 pgs. 28-29).

Unlike earlier reform efforts, this reform movement relied on the creation of new forms of civic administration known as the commissioner and city manager forms of government. The commission form of government, first enacted in Galveston, Texas, in 1901, following a devastating hurricane, quickly spread out over the country during the next two decades (Rice 1977 pgs. 3-18). Characterized as a system of government led by several representatives elected at large, there was no formal mayor, but instead the legislative and executive power was held in a single body. Later, and growing partly out of failures of the commission government, a new group of reformers increasingly pressed for a council-city manager form of government, where legislative functions were still controlled by representatives elected at-large but executive functions were handled by an independent manager (Bridges 1997 pgs. 104-118). Here, the organization would be even more business-like because executive power would be centralized in an independent city manager, who

would make appointments and oversee the workings of the government but be largely shielded from day-to-day politics. The commission government, some maintained, had not done enough to insulate the people that ran the administration of the city's bureaucracy from the problems of the alderman system. "Failing to halt the collusion of city officials and interests groups, the courting of constituent interests, or patronage employment," observed Bridges, "the commission form also failed to provide for centralization or leadership encouraging entrepreneurship among the commissioners" (Bridges 1997 pg. 80). Although initially a very controversial reform with large sections of the electorate, the city-manager system proved very popular, particularly with the business community, and by the mid-portion of the 20th century many of the biggest cities in the south and southwest had adopted it.

Underlying much of the reform in local government was deep hostility toward the influence uneducated, working-class, and poor people had on public policy. Local government reforms, along with state laws such as the poll tax limiting suffrage, negatively affected political participation, and everywhere these reforms were enacted, taxes remained low on the wealthy, minimal social services were provided, and the government remained committed to using its service to promote growth (Bridges 1997 pg. 212). However, antipathy toward non-whites played the most important role in prefiguring these reforms. As Bridges noted:

> Race figured into the motivations of reformers in the rules they wrote, in the policies they pursued. Race, as variously

understood in different generations, was at times a leitmotif and at other times a dominant theme among the motivations of municipal reformers (Bridges 1997 pg. 20).

Opponents of municipal reforms, particularly those who did not support the at-large system for choosing elected officials that was part of both the commission and the city-manager charters, argued that this system gave overwhelming influence to the business community over how city bureaucracy organizes its priorities and the City Council agenda. No other group but the business community could mobilize resources across the city to elect a councilperson, and few interest groups had a singularly strong power base. If the point of reform was to make government run more like a business, it had also made business the core mission of government. But many of the reforms also affected the kinds of people that were represented in government. From the earliest days of these reforms, non-white representatives were effectively expunged from elected office, and in many cities that have kept the reform system of government, even those that have large non-white populations, elected leaders have been overwhelming white and from the business community (Bridges 1997 pgs. 73-75, pg. 219; Rice 1977 pg. 3).

Additionally, reforms to urban design, not just political administration, reinforced the system of white supremacy over non-whites. Cities throughout the South adopted comprehensive zoning ordinances because they were thought to support growth, but while "northern Progressives were enacting zoning as a mechanism for protecting and enhancing property values," Rabin noted, "southern Progressives were

testing its effectiveness as a means of enforcing racial segregation" (Brownell 1975 pgs. 171-189; Rabin 1989 pg. 106). However, the use of zoning as a means to force racial apartheid in housing became stymied by Supreme Court decisions. Beginning with the Buchanan v. Warley decision in 1917, the Supreme Court, ruled over and over that racial zoning was not constitutionally permissible because it was an illegal infringement on a property owners' right to dispose of their land to whomever they chose (Klarman 2004 pgs. 79-85, pgs. 90-93). Nevertheless, as Silver has shown, anti-black racism continued to guide comprehensive planning after 1917, and the "1920s brought continued efforts to fashion a legally defensible racial zoning system in tandem with comprehensive city planning" (Silver 1997 pg. 33). One mechanism to do this was to create and restrict "Negroes" to certain districts. Cities such as Atlanta, New Orleans, Charleston, Roanoke, and Kingsport, as Silver shows, all hired professional planners who drew up comprehensive plans that relied on "race-based" zoning.

Plans for the residential segregation of cities were lent support by the increasing involvement of the federal government in housing in the 1930s. The federal government's Housing and Loan Corporation, and later the Federal Housing Administration, supported efforts to racially segregate housing in cites throughout the United States, particularly through recommendations for lending practices and underwriting guidelines created in the mid-1930s (Gotham 2000). The HOLC was established by the federal government in 1933 to help "reinvigorate the homeowner financial market," which had collapsed due to rate delinquencies and foreclosures (Crossney

and Bartelt 2005 pg. 708). In the 1930s, the agency provided financial assistance, mainly via self-amortizing mortgages at low interest, to millions of homeowners (Jackson 1985 pgs. 196-197). As part of this process, the HOLC undertook the massive enterprise of rating the neighborhoods in hundreds of cities for their mortgage risk. Amy Hillier noted:

> As HOLC was nearing completion of its original lending in 1935, HOLC's parent organization, the Federal Home Loan Bank Board (FHLBB), established a program that used HOLC staff and local realtors and lenders to appraise real estate risk levels in 239 cities. This City Survey Program produced detailed reports for each city along with a series of now infamous security maps that assigned residential areas a grade from one to four. Areas with African Americans, as well as those with older housing and poorer households, were consistently given a fourth grade, or "hazardous," rating and colored red (Hillier 2003 pgs. 707-708).

There is much debate on the effect these reports and maps had on the origination of mortgages and on the process known as "redlining" (the practice of capriciously refusing financial services to specific communities because of their perceived similarity to a social group), but it's clear that these maps show a latent prejudice that would have influenced the lending practices of real estate and financial professionals and their capacity to keep entire areas of a city from the capital needed for reinvestment.

Much of the thinking about why an area would

be risky for financial investment, represented in the so-called "residential security maps" created by the HOLC, did not come from actual rates of foreclosures or delinquencies in neighborhoods. Instead, it revealed a bias, common among bankers and real estate professionals, that connected the financial hazardousness of investments to areas that contained non-white people or people from many different ethnicities and of many different financial means (Gotham 2000 pgs. 621-622). These ideas would be enshrined in the Federal Housing Administrations Underwriting Manual of 1936, the book that established the "techniques used ... to determine whether or not mortgages are eligible for insurance" by the federal government (United States Federal Housing Administration 1936 Preface). In the process of ensuring good loans, a premium was put on preserving the resale value of homes. "[A]ll residential property will decline in desirability ... and therefore in value, with the passage of substantial periods of time," the report noted. "The important thing, however, is to discover if, during the mortgage loan period, the property involved will be subject to unusual, extraordinary, and excessive loss of desirability ..." (United States Federal Housing Administration 1936 Part 1: 306) . Strict zoning and private restrictions were suggested as the primary means to protect "against adverse influences," particularly "the infiltration of business and industrial uses, lower-class occupancy, and inharmonious racial groups" (United States Federal Housing Administration 1936 Part 2: 226-229). The report goes on to recommend:

> The Valuator should investigate areas surrounding the location to determine whether or not incompatible racial and

social groups are present, to the end that
an intelligent prediction may be made
regarding the possibility or probability of
the location being invaded by such groups.
If a neighborhood is to retain stability it
is necessary that properties shall continue
to be occupied by the same social and
racial classes. A change in social or racial
occupancy generally leads to instability
and a reduction in values. The protection
offered against adverse changes should
be found adequate before a high rating is
given to this feature (United States Federal
Housing Administration 1936 Part 2: 233).

These federal guidelines formed the basis for how
mortgage risk was determined, and the underwriting
standards largely came from bankers and real estate
professionals. What they reveal is how significant
the perception of the 'white racial' purity of an area
was in determining loan risk. Importantly, and I will
return to this at the end of the paper, risk and private
restrictions were understood to work together, as the
grades of risk represented in HOLC security maps
largely reflected the existing geographical patterns of
private covenants.



LEGEND

A - Best

B - Still desirable

C - Definitely declining

D - Hazardous

# Progressivism in Austin: City Manager Government, the Comprehensive Plan, and the Redlining of East Austin

In 1933, Roscoe Martin undertook a study on political participation and municipal politics in Austin, and as Bridges notes, "his findings demonstrate that reformers had succeeded in shaping the electorate" (Bridges 1997 pg. 75). The results of Martin's study, as he said, "should give pause to any thoughtful student of democracy" (Martin 1933 pg. 197). Only 23 percent of the city's total population was eligible to vote, and less than half of this small percentage, about 37 percent, actually voted. For the previous 30 years or so, since 1902, Progressive-era attempts to limit suffrage in Texas through the poll tax had generally been successful; in Austin, Martin

found, even among white men, only a slim majority were qualified to vote in Austin (Davidson 1990 pgs. 21-24). Moreover, the whites-only primary system meant that non-whites would never be able to hold elected office even in local government (McDonald 2007 pg. 146). But municipal reforms, particularly the at-large system of choosing elected officials adopted in Austin in 1909, seems, at least in part, to have institutionalized low voter participation by limiting voter interest in local government actions. Martin observed that those who did vote tended to come from certain neighborhoods, professions, economic positions, and races. In term of class, Martin observed, "It is evident ... the city's government is controlled ... by property owners, for non-taxpayers do not qualify so universally nor, having qualified, do they vote enthusiastically as taxpayers" (Martin 1933 pg. 212). Race, too, was one of the most important variables in voter turnout. The vast majority of African-American and Hispanic men and women were not eligible to vote — nearly 95% of non-white women could not vote. Yet there was enthusiasm among African-American males, nearly 56% of those that could vote did vote (a turnout not much lower than the turnout of white men that were qualified to vote), but overall, the number of African-American male voters was too small to be a significant voting block because nearly 85% of African-American males were not eligible to vote. In contrast, while a smaller percentage of Hispanic men could not vote, 77%, a mere 17% of those allowed to vote actually turned out.

Austin, like other cities in Texas, had been quick to embrace Progressive-era municipal reforms and adopted a commissioner charter in 1909 and then a city-manager one in 1924; the city, was in fact, the first large city to adopt a city-manager charter. Around 1908 a campaign was launched by the Business League, a group that consisted of reformers and businessmen, to have the city's government adopt a commission charter, and about year later, in 1909, that charter successfully passed in local referendum. Unsatisfied with the reforms, members of the Chamber of Commerce, in an effort spearheaded by longtime manager of the Chamber of Commerce Walter Long, in 1917, began pushing for a change to the city's charter again, this time to adopt a city manager form of government (MacCorkle 1973 pgs. 48-49; Stone, Price, and Stone 1939 pgs. 16-17, pg. 19). The reason given for this push was primarily the inability of the city's government to continue to maintain or expand its municipal services because of the inability of the city's commissioners to secure a new bond package for the city, although many also complained that ward politics still played too much of a role in the local government's decision-making (Stone, Price, and Stone 1939 pgs. 5-6, pgs 14-15). "This educational work was a non-political activity started by the Chamber of Commerce in 1917 and completed on April 24, 1924," Long wrote. "Following this program the Council-Manager Club organized and directed a campaign until the charter was changed on August 9, 1924 by a margin of 40-odd votes" (Austin Chamber of Commerce and Long 1948 pg. 26). Although there was substantial opposition to changing the form of Austin's administration (after all, the move barely passed by the referendum vote), only four years after the change was finalized, in 1928, the city was able to pass a large bond issue by referendum. Much of the support for this bond package came from the two wealthiest areas of the

city and the "Black ward, which for the first time was finally promised street improvements and sewers by the city's business leaders" (Stone, Price, and Stone 1939 pg. 20, pg. 27; Staniszewski 1977 pg. 33).

The funds raised by the bond issue that passed in 1928 were largely used to finance improvements that had been outlined and suggested in Austin's 1927 comprehensive plan. Like other 'business progressives,' members of Austin's business community believed that zoning was a means to modernize the city and make Austin a more suitable place for investment and opportunity, and, therefore, they had been active in getting the city government to embrace zoning and a comprehensive plan for about a decade (Long 1928). In a letter to Dallas planner John Surrett about the Chamber of Commerce's success getting zoning ordinances implemented in the city, Walter Long wrote that between 1917 and 1925 "the Austin Chamber of Commerce has been securing data of all kinds and planting propaganda of the City Plan in the minds of the citizenship of Austin" (Long 1927). Notwithstanding support for such a plan, the state of Texas lacked the necessary enabling legislation to permit local authorities to enact zoning standards, and therefore efforts to create a system of comprehensive zoning in Austin were unsuccessful. When — after years of pushing from Long and other significant figures in cities throughout Texas — the state legislature finally passed a comprehensive zoning statute in 1927 (largely modeled on the Standard Zoning Enabling Act), Austin was one of the first Texas cities to adopt a comprehensive zoning ordinance (Mixon 1991 pg. Part 1:6-7 ; United States National Bureau of Standards and Chase 1932 pg. 42).

In addition to its more general support of state legislation that would enable city zoning legislation, the Austin Chamber of Commerce had been a strong advocate for a specific Texas zoning law that would have permitted the use of zoning to forcibly segregate cities by race (McDonald 2012 pgs. 108-109). Working hard for a series of bills that would have made planning state law, most put together by the Kessler Plan Association of Dallas, the Chamber supported a bill introduced in the State Legislature by Senator Love that would have allowed cities to address the "negro problem" through comprehensive planning (Surrett 1927). When the legislature approved a group of bills giving cities the power to zone in early 1927, it included a bill that provided for "the segregation or separation of the white and negro race and ... the conferring power and authority upon cities to pass suitable ordinance controlling the same" (Glasrud 1974 pg. 55; Love and Purl 1927)

The Texas racial zoning law was largely modeled on the latest effort to find a legal means to zone racial apartheid, a Louisiana statute adopted in 1924 and put into effect as a zoning ordinance in New Orleans. A main proponent of the law in Texas was Dallas Planner Major E. A. Wood, with whom Long had a personal correspondence during the creation of Austin's comprehensive plan (Long 1928; Wood 1926; Long 1926).Wood wrote a lecture, most assuredly read by members of the Chamber of Commerce and planning community in Austin, titled City Planning, Zoning, and Race Segregation; two copies of the lecture are found in Long's extensive personal papers on Austin's city planning efforts in the 1920s. There is nothing particularly unique about Wood's

comments on the need for cities to zone and plan, save its recommendation about how races should be segregated in a city's comprehensive plan. "Any plan that is prepared should provide districts for negroes and Mexicans, giving them the same facilities as the whites, that is, wide paved streets, standard sized lots, and all of the public utilities" (Wood No Date). Although largely echoing the Louisiana law, and other efforts throughout the South to find a constitutionally protected way to use race-based zoning as a means to secure racial segregation, two things are notable about Wood's suggestion. First, it offers a program that, as I will discuss below, mainly mirrors Austin's comprehensive plan solution regarding segregation. Second, the prescription opens up the possibility of segregating not two but three different classes of persons. Later, I will discuss how race segregation in Texas and Austin can only be understood in a 'tri-racial' context, but I think it is important here to point out the concern among urban planners in Texas that it was as important to use planning tools to separate whites from African-Americans as it was to separate them from Hispanics.

The Louisiana law, and by extension the Texas statute, were, in late 1927, ruled unconstitutional by the Supreme Count in the Harmon v. Tyler ruling; at nearly this exact moment Austin adopted its comprehensive zoning plan. Like other cities, the plan relied on "race-based" zoning and borrowed the widespread idea that there should be racial districts with comparable municipal services. An infamous section in the plan on the creation of a "Negro District" reads as follows:

> There has been considerable talk in Austin, as well as other cities, in regard to the race segregation problem. This problem cannot be solved legally under any zoning law known to us at present. Practically all attempts of such have been proven unconstitutional. In our studies in Austin we have found that the Negroes are present in small numbers, in practically all sections of the city, excepting the area just east of East Avenue and south of the City Cemetery. This area seems to be all Negro population. It is our recommendation that the nearest approach to the solution of the race segregation problem will be the recommendation of this district as a Negro district; and that all facilities and conveniences be provided the negroes in this district, as an incentive to draw the negro population to this area. This will eliminate the necessity of duplication of white and black schools, white and black parks, and other duplicate facilities for this area. We are recommending that sufficient land be acquired adjoining the negro high school to provide adequate space for a complete negro play-field in connection with the negro high school. We further recommend that the negro schools to this area be provided with ample and adequate play ground space and facilities similar to the white schools of the city (Koch and Fowler [Firm] 1928 pg. 57).

Recognizing the limits of exclusionary racial zoning, the plan offered a different mechanism to arrive at a racially segregated city: the legal zoning of segregated municipal services. Not only, the theory went, would such a strategy save the municipality

money by avoiding duplication of other segregated facilities such as schools, parks, etc., it would also encourage the spatial separation of African-Americans from whites. The plan, written by Dallas Planners Koch and Fowler, was extensively reviewed and commented on by leading members of the Chamber of Commerce, who later endorsed its recommendations before the City Council voted to make it law. Soon after the comprehensive plan was adopted, and following the release of money raised from the bonds that had been issued to pay for the improvements, Rosewood Park and Anderson High School were built in the district as the only park and high school African-Americans could use, and sewer service was extended to African-American homes in the East Austin area but denied to other African-Americans in other areas of the city (Kraus 1973 pgs. 150-152; Orum 1987 pg. 176; McDonald 2012 pgs. 101-143).

A similar, albeit not as extensive, pattern of segregated zoning of municipal services was pursued for Hispanics (McDonald 2012). While neither their housing patterns nor their use of municipal services was mentioned as a problem in the comprehensive plan, Hispanics were increasingly segregated into a distinct district in East Austin during the 1930s that ran along the southern border of the African-American area (Tretter and Adams 2012 pgs. 198-199). Multiple forces drove the spatial segregation of Hispanics into this area of Austin, but their overwhelming concentration in one area was, in part, due to their limited access to public services, particularly schools but also parks, playgrounds, public housing projects, etc., outside of this district (Humphrey 1997 pg. 42; McDonald 2005 pg. 4;

Montejano 1987 pg. 265).

Moreover, the segregation of Austin into at least three districts was, less than subtly, reaffirmed by an HOLC survey of housing of Austin and the accompanying residential security and race maps. Based on interviews with 17 professionals, the report reveals that the city "suffered little" from the national economic decline, particularly in home values, and that "the greatest drop in values" was in "negro and inferior white sections in the southern part of the city" (Home Owners' Loan Corporation and Olson 1935 pgs. 8-9). However, the "Realty Area Map," which "represent[ed] the composite judgment of seven well-informed real estate and mortgage men of Austin," shows all areas where Hispanics and African-Americans resided in large numbers, mostly East Austin. These areas were marked in red, meaning they were "dangerous" for investment (Home Owners' Loan Corporation and Olson 1935). While the city was not as segregated as it would later become, the HOLC map may have driven out financial opportunities for non-white peoples in these areas, encouraged spatial segregation, and even undermined the capacity of East Austin to maintain the quality of its housing stock (Home Owners' Loan Corporation and Olson 1935 pg. 9). The report read:

> The negro population is scattered in five sections of the city. However, the heavy concentration is in the eastern part. All of the portion north of "1" street [now Cesar Chavez] to Manor Road and the east of East Avenue is occupied by negroes, Mexicans intermingling with the colored in the Southern part of this area.
> It will be observed that there are three

small negro residential sections in the best areas of the city. Real estate men explained that the negroes had occupied these sections for many decades and because of the superiority of the residential sections surrounding them. There has been no blighting of the areas surrounding the colored sections (Home Owners' Loan Corporation and Olson 1935 pg. 3).

The security map and report were created with input from Austin's leading financial and real estate professionals, and while it may have been used as a template in making loans, providing insurance or other financial assistance, the report highlights how these professionals believed that almost all of east Austin, as well as other sections of the city occupied by non-whites, was too hazardous for any kind of investment. Moreover, the accompanying race map outlines a more clearly defined 'Mexican district.' When taken in conjunction with the residential security map, this map suggests Hispanics were treated as something other than white and were largely believed to be a risk for no other reason than their perceived similarity to a different social group. Perhaps, this, at least, suggests another reason for their housing segregation in Austin, although areas in Austin with poor "whites" were also labeled as hazardous.

The research on racism and city administration, planning, and zoning during the Progressive Era in the South has done a lot to contextualize our understanding of the forces that shaped modern Austin. Nevertheless, it is limited in its scope because it focuses primarily on public tools and

bodies. The impact of the market and private forces remains rather obscure. In the following sections, I examine how the way in which private property was organized plays a significant yet overlooked role in shaping residential housing patterns, and suggest why such research may provide different avenues for policy recommendations. It is particularly important to stress the private means of segregation because the use of covenants is what originally divided much of the north and west of the city, its white from its non-white sections in the eastern areas. Marked in the 1928 plan as "white residential," these western sections were later designated as the areas trending best for mortgage risk in the HOLC residential security map. It is worth noting, too, that the section marked "best" on Austin's residential security map is also the section in 1950 where the greatest percentage of racial and other forms of private land-use restrictions were found in our sample.

# Private Zoning: Restrictive Covenants and Land Use in Texas

It is not clear exactly where or when restrictive covenants began to be used in cities in the United States, but their "use has represented a kind of private zoning" (Delaney 1998 pg. 153).  In Boston, for instance, they had been used since at least the 17th century, but only by the mid-portion of the 19th century had their use become more widespread (Holleran 1998 pg. 67).  Chicago, later to develop, followed a similar pattern, and by the late 19th century deed restrictions were also widely used, but they would not be a near-ubiquitous feature of the urban morphology until the beginning of the 20th century (Monchow 1928 pg. 2).  While racially

restrictive covenants were certainly important, they were not the only, or even the primary, use of private zoning. Instead, the original function of deed restrictions was to limit the types of "performances" that could take place on the land to promote "uniformity or stability" in land use (Holleran 1998 pg. 69). Hence, their earliest application concerned restricting nuisances such as animal husbandry and restrictions or stipulations on uniform building standards, types, and form, primarily for aesthetic or health-related reasons (Holleran 1998 pg. 67). These motivations continued to inform the widespread use of private land covenants in communities throughout the United States, but by the end 19th century, as with zoning ordinances, control of land-use by covenants increasingly became justified on the grounds that they helped preserve property values. (McKenzie 1994; Monchow 1928 pg. 5).

The use of covenants as a tool for land-use control is a unique feature of modern urban planning. Legally, the justification for use of covenants is said to derive from English common law. English courts, in Spencer's case in the 16th century, had recognized that a private contract of equitable servitude (a promise) concerning a use that touched or concerned the land among two or more parties with privity of estate (a legally binding interest in the land) could run with the land for a period of time (Consigny and Zile 1958 pgs. 612-613). While land covenants "as a tool of urban planning" really began in the mid-18th century, it was only in the late-19th and early-20th centuries, after their adoption by the developers of residential subdivisions, that they became such a widely used tool for land-use control (Ascher 1953 pgs. 228-234). Developers liked their specificity and

capacity to permanently exclude certain practices and/or enforce uniform rules over a large geography (Weiss 1987). Over time, covenants became one of the more important tools for producing housing segregation and locking down the uneven urban geographies of class and race in cities, in part because they can be applied in perpetuity and in part because through specific design and land-use standards they help ensure a continuity between the present and future makeup of high-end planned residential communities.

Beginning in the 1930s the federal government had a hand in the dissemination of the idea that deed restrictions were valuable and necessary for the maintenance of home values. For instance, beginning in 1936 the Federal Housing Administration underwriting manuals read, "Deed restrictions are apt to prove more effective than a zoning ordinance in providing protection from adverse influences" (United States Federal Housing Administration 1936 Part 2: 228). Moreover, this underwriting manual offered the first set of uniform guidelines for evaluating mortgage risk and suggested that the presence of covenants in subdivisions played an essential part in lowering the possibility of mortgage defaults and maintaining steady property values. These same principles were repeated in future underwriting manuals and even carried over into less formal publications like a 1940 FHA pamphlet titled Successful Subdivisions, which was widely distributed to developers. "Protective covenants," the pamphlet read, "rigorously enforced, are an absolute necessity if good neighborhoods and stable property values are to be maintained" (United States Federal Housing Administration 1941 pg. 9). But

private developers, independent of federal support, also found that there was a premium on exclusivity and increasingly imposed stricter and stricter rules in covenants than zoning would permit (McKenzie 1994 pgs. 29-55).

The Supreme Court has on several occasions ruled on the enforceability of private land covenants, but state statutes and case law largely determine "which covenants are enforceable ... and the manner of their enforcement" (Lundberg 1973 pg. 199). From the earliest codification of the Texas' laws in 1879, legislative statutes, under the rules of conveyance, had followed common law rules and allowed for the general enforcement of land covenants. In the 20th century, courts, following the legislature, generally held up the rights of property owners or developers to regulate land-uses, although with strict limitations that allowed for the reasonable autonomy of future land-owners or -users (Johnson 2000). However, when it came to conflicts between private restrictions on land-use and police powers of the state such as zoning, courts held that private rules, when reasonable, could not be voided by public regulations. For example, in 1941, Texas Courts ruled that "Where private restrictive covenants have been placed upon lots or land by agreement of parties, they are controlling, and city zoning ordinances cannot override or destroy such private restrictive covenants"(Texas Civil Appeals Reports 1941 pg. 825).

In Texas, the uses of deed restrictions and zoning have often shared parallel tracks. Both involve the regulation of land-use, but one is a private contract among individuals concerning a specified area while the other involves the imposition of some kind of public authority, such as a municipality, over a territory. Therefore, covenants, historically, have been enforceable only as a tort and by getting an injunction from a court after an affected party sues. In contrast, zoning is an exercise of the government's police powers to protect a community's health, safety, and welfare. Moreover, zoning is in some respects more prospective, as it exerts more control over future land-use than covenants because zoning rules apply to undeveloped land or land that is changing purposes, not just land platted and planned for development (Platt 1991 pgs. 181-183). While cities had regulated land-use for centuries, even in the United States, the legality of zoning as a non-compensatory legal exercise of the state's policy power to segregate and standardize land-uses, particularly excluding 'nuisances' created by apartments or commercial uses from residential districts, was first upheld by the U.S. Supreme Court as constitutional only in 1914 in the Euclid decision (Wolf 1989 pgs. 252-254). Later, in 1934, the Texas Supreme Court affirmed the rights of municipalities in Texas to enforce Euclidian zoning standards. While safety had been a significant motivation for zoning in the late 19th century, like covenants, the rapid rise in zoning as a means to regulate land-use in cites is strongly connected to the need to create barriers to land-use changes in order to protect the value of homes (Fischel 2004 pgs. 317-340).

Unlike deed restrictions, the implementation and enforcement of zoning also requires the empowering of the institutions of a state to create and enforce zoning standards. In large part in Texas this burden has fallen almost exclusively on municipalities. As

creatures of the states, municipalities can be granted a degree of autonomy in matters of local governance and taxation for the specific purposes enumerated by the state's legislatures.   In Texas, municipalities had existed for some time and had the capacity to pass and implement ordinances, but in 1913, in a Progressive-era reform known as "home rule," their power was vastly extended.   Here, cities with populations larger than 5,000 were granted certain powers by the legislature, particularly the right to adopt their own city charter and choose from three forms of city administration --   an alderman, commissioner, or city-manager form of government (Texas Urban Development Commission 1971 pg. 24).   Zoning was not originally a power given under home rule in 1913, and it was only in 1927 that Texas authorized zoning powers for cities, largely because of efforts from planners and representatives of business communities from around the state (Mixon 1991 pg. Part 1-6 ).



# Fixing Space: Race, Covenants, and Land Values in the United States

Covenants are not a form of zoning enforced by the police powers of the state, but their effect in regulating the land-use patterns of many cities has been substantial.  Like zoning, covenants, as an instrument for land-use control, formed as a means to ensure that the uses of property, the performances on land, would remain constant in an area.  Despite the unenforceability of some restrictive covenants like racial exclusions, most deed restrictions remain enforceable.  In fact, the case law and statutes that surround the use of deed restrictions in the United States have tended to give broader, not narrower, authority to developers in determining the pattern of

future practices that can be found in an area.

Racial covenants were a particular form of deed restriction that became widely used in the United States at some point in the late 19th century, and wherever they appeared, these covenants were used to exclude and subjugate less powerful social groups deemed to be dangerous to property values. While deed restrictions were nearly always used in the 20th century to prohibit African-Americans from land tenure and/or occupancy in an area, African-Americans do not appear to be the original targets of racial exclusions. For instance, there is evidence that by 1860 they were being used in Massachusetts to restrict people of "Irish" decent from some houses in West Roxbury, and in 1886 a covenant appeared that was used to prevent "Chinamen" from using property in Ventura, California (Holleran 1998 pg. 291; Jones-Correa 2000 pgs. 548-550). Later, however, particularly in cities that were the recipients of the waves of African-Americans emigrating from the south during the early portion of the 20th century, their principle use was to stop "black penetration" into "white neighborhoods" (Delaney 1998 pgs. 168-171). As their origin and later prolific use in non-southern cities demonstrates, the purpose of covenants was always about preserving white hegemony over non-whites, however that group was defined, and enforcing a physical line of difference, although the association of 'white racial purity' with high 'property values' does standout as the primary reason for exclusion before the 20th century.

Racial restrictions can be found in deeds in the 19th century, but their use became more common in the 1920s as a means of enforcing racial segregation.

There are probably several interrelated reasons that their use increased, but one of the most important is the Buchanan v. Warley decision the Supreme Court handed down in 1917. In this case, the court held that an ordinance in Louisville, Kentucky, that forcibly zoned racial apartheid was unconstitutional. Buchanan was, in fact, part of a longer series of rulings during the 1910s and 20s that held different forms of racial zoning were illegal because they were an unconstitutional infringement on an owner's private property right of alienation and/or the leasing of their land (Klarman 2004 pgs. 79-83, pgs. 142-143). While these cases were often brought on the grounds that they were civil rights violations, the courts consistently limited their rulings to public means of segregation and the undue influence of the government in constraining private property rights. Therefore, private means of segregation, such as private restrictive covenants, were left open as legally permissible forms of racial exclusion. Hence, during the 1920s, their use did become more widespread, nearly ubiquitous, in many cities, and when people challenged their legality in state courts, these courts consistently upheld their validity. Finally in 1924, in Corrigan v. Buckley, the Supreme Court largely settled, at least temporary, the issue and affirmed the decisions of state courts, ruling that racially restrictive covenants were constitutionally protected because there was no action taken on the part of the government in the enforcement of the contract.

The support for restrictive covenants by both the federal government and private interest groups such as the National Association of Real Estate Boards, and the case law that validated their enforceability, concerned the right, even the responsibility, of

developers, to preserve the stability of residential home values (Stach 1988 pg. 46; Gotham 2002 pgs. 33-40). Excluding noxious uses or alcohol sales or limiting commercial development would ensure the continuation of a pure residential community and limit the potential encroachment of non-conforming uses that might depreciate the area's worth. Other covenants, such as restrictions on architectural features or lot size, would also guarantee that an area would be aesthetically clean and maintain its appeal. By putting so much emphasis on the need to exclude certain kinds of land-uses for the preservation of home values, covenants would become a significant force in naturalizing economic and social inequalities in cites as features of neighborhoods.

But anti-black racism, as a system of valuation that puts a premium on white racial purity, was inextricably connected to why all the different kinds of deed restrictions became such a widespread and fundamental fixture of the uneven development of the urban landscape. Not merely coincidental to the development of the use of other private land-use restrictions in the 20th century, racial restrictions were at the center of the bundle of land-use limitations imposed on residential subdivisions by developers. What the presence of racially restrictive covenants reveals is the interconnected way that preserving land values by excluding undesirable uses also meant excluding groups of undesirable people: people who, for no other reason than their perceived similarity to a social group, were deemed to be worth less than other people. It is not that non-white people could never meet any future financial obligations responsibly, although this may have been a common sentiment held among real estate professionals. Instead,

developers, banks, government officials, and other real estate professionals held to a belief system that assigned value to people based upon their perceived similarity to social groups, and they projected that value system onto the production of residential geographies. Such a value system prescribed that the presence of non-white people in an area signified — irrespective of design standards, although often along with them — that the neighborhood was less valuable. The underlying assumption being that there was as much value in white racial purity as there was in a having a pleasant home and that both should be preserved by all legal means (Delaney 1998 pg. 170).

In many cases, however, any non-conforming use was to be avoided, and so strict measures were increasingly taken to ensure the racial purity and continuity of an area, and this often involved excluding groups of people that were considered something other than white, although not necessarily non-white. In different places, Jews, Asians, Hispanics, Italians, and many other peoples would be targets for exclusion from a neighborhood, and as their possibilities for intermingling undetectably among 'whites' became more of a possibility, it became more important to exclude the presence of specific social groups by deed (Kiang 1949). Certainly hatred and bigotry toward these sometimes 'non-white' groups were important reasons why they were targeted for exclusion. Nevertheless, such a simple explanation misses the geographical complexity of how different groups of people in different places, while eager to embrace of privileges of whiteness and the wage it paid, were also forced to police its boundaries to ensure their own position in the racial hierarchy. It appears to have been common to hold negative views

about these 'partially white' groups and suggest they were bad for property values because they did not maintain their lots or had cultural habits contrary to good neighborhoods; see, for instance, Homer Hoyt's study on the relationship between ethnic groups and land value in Chicago written in 1936 (Hoyt 1933 pgs. 314-316). However, more often than not, the stated rationale for needing to exclude these 'other European' peoples was that they were non-conforming to the neighborhood's plan and therefore detrimental to the value of the land. While such ideas may have been couched in such language to avoid the appearance of overt prejudice, it is important to note that it is not merely the class position of these people that made them subject to additional exclusions but rather a concern that the white racial purity of the neighborhood would be tainted. When trying to account for the differing spatial segregation of people in different places during the early 20th century this fact becomes all the more important because of what racial exclusions in covenants may say about how the boundaries of 'whiteness' were established, decomposed, reinforced, extended, and policed. Therefore, studying how covenants were actually deployed may reveal much more than was originally thought about how the limits of being white were established.

Much could be said about the relationship between racial covenants and the growing concern during the early portion of the 20th century among some academics and political leaders about maintaining the purity of races, particularly the 'white race,' at a time when cities were increasingly filled with all different types of people from all over the world (Jacobson 1998; Barrett and Roediger 1997). So-called scientific racism, the practice of sorting and classifying people into natural racial hierarchies, reached a high-water mark during the 1920s, and to a large extent, these notions bled over into the understanding of real estate values (Pietila 2010 pgs. 32-60). The mixing of races was to be avoided because it diminished the natural talents embodied in each race, and areas of a city where this might occur were considered dangerous, unstable, and poor places for investment. Some writers have suggested racial restrictions appeared most strongly in places where 'race mixing' would be most likely to occur, i.e., in neighborhoods that were on the border between 'white' and 'non-white' areas or in areas, particularly in Northern cities, where people who were almost 'white' believed their position in the racial hierarchy was threatened by the entrance of African-Africans into their neighborhoods (Sugrue 2005 pg. 45). Whether this was characteristic of the use of racially restrictive covenants in Southern cities is not borne out by the empirical research in Austin because, as the maps show, west Austin, the area with the greatest percentage of restrictions, had the least risk of being a place where integration was likely to occur. In fact, only one neighborhood in Austin, the area just north of Manor Road and east of East Avenue, resembles this pattern. Nevertheless, it is important to stress that as waves of new migrants, particularly non-protestants, came into U.S. cities from other countries, whether these were from overseas or not, deed restrictions were used with increasing frequency to restrict their movement, exclude them from occupying certain urban areas, and police the boundaries of whiteness.

As the 20th century unfolded, covenants became a primary means to enforce the color line and create

relatively permanent residential geographies for whites and non-whites.   However, this boundary of whiteness and non-whiteness, which was the precondition for these exclusions, was seemingly fluid.   Nearly all covenants barred African-Americans outright (except in many case, with the limited exemption as domestic servants) or used more expansive language of white only to exclude them altogether, and this marked the outer limits of the residential color line that no African-American, save those who were able to pass for white, could cross.  But many social groups were excluded, often by specific exclusions in deeds in different cities, and the particular groups that were targeted for exclusion tended to change with geography.   Nevertheless, there is a lot of ambiguity in terms like 'whites' and 'Caucasians.' Such terms would certainly have barred all African-American from buying or using property in an area, but what about other social groups such as Hispanics, Jews, Italians, South Asians, Middle Easterners, etc., which were often white by law but not in custom?  Here, I want to suggest that such exclusive language may have barred them for a time or only in particular places, but the same language may not have prevented them from buying or leasing land in a neighborhood in all times and places.  Many of these groups academic scholarship has come to consider 'partially white' in some cases or 'tenuously non-white' at other times, and their exclusions or inclusions into the folds of white privilege were much more unsettled.   Little to no academic scholarship has explored this possible fissure in terms of racial restrictions in deeds, but in the next section, I will discuss such a case.  In terms of Hispanics in Texas, the ambiguity of the phrase 'white only' seems to have been very important because of the  effects it

had on private housing discrimination in Austin during the 1930s and 40s.  While we tend today to imagine Hispanics as a separate social or even racial group, as far as Texas was concerned, Hispanics were considered white by law, at least since the 1890s, but in practice, the dominant white power structure tended to treat people with a perceived similarity to the Hispanic social group as something other than 'white' and subjected them to tremendous amounts of discrimination (Foley 2004). Nevertheless, did 'white only' covenants affect the residential geographies of this partially white group?

## JOE C. KERBEY & COMPANY

826 CONGRESS AVENUE

### Announce the opening for sale of lots in

# COLLEGE COURT

Austin's Coolest, Highest, Greenest, Prettiest    :    :    :    :    :    :    :

## RESTRICTED,   IMPROVED   ADDITION

Nearest the University, Capitol and Country Club.   All comforts and conveniences. On Duval Street car line, 12 minutes from 6th Street.   Let your children play in Sidon Harris Park.

# Restricting Austin: Private Covenants, Partially White People, and Segregation

The maps and empirical research for this project suggest that racial covenants played an important role in shaping Austin's demographic distribution. Municipal forms of segregation were important and have been noted elsewhere as a primary mechanism of promoting residential segregation in Austin. However, as the historical maps we have created show, private forces of discrimination also ran alongside municipal efforts and seemed to have had a critical role in restricting the residential mobility of non-white minorities.  Municipal zoning, in fact, largely locked in the exclusions that had already been laid down by private racial covenants beginning in 1893.

Both the 1928 and 1955 comprehensive plans that created industrial and commercial districts relied on pre-existing private restrictions that shaped the patterns of land-use restrictions as well as residential racial geographies. African-Americans, therefore, were denied the right to use or occupy land (except in many cases as domestic servants to particular households) by private means and denied access to social services by public means. Their mobility was, in understated terms, greatly curtailed in many parts of Austin for much of the 20th century. Public and private restriction also greatly influenced where alcohol could be sold and where non-residential land-uses and noxious uses could take place. As these were also the areas exclusively reserved for non-white residences, it is no surprise then that the area where the majority of African-American lived was in a 1941 described as "one of the city's worst slum areas, a place of high disease and death rate, and of much juvenile delinquency" (University of Texas. Bureau of Research in the Social Sciences 1941 pg. 21).

Additionally, and perhaps more important as an academic contribution, the evidence, I believe, suggests that 'white-' and 'Caucasian-'only restrictions in covenants were used to enforce a system of tri-racial exclusion before 1950. I believe that the broader yet more exclusive language of racial covenants in Austin (the shift from 'no people of African descent' to 'Caucasian only') was a response to shifting demographic conditions, particularly the entrance of large numbers of people from Mexico or of 'Mexican descent.' In this respect, the changing language in the covenants tells us as much about the borders of 'blackness' as it does about the changing textures of 'whiteness.' The boundaries of 'whiteness,'

it appears, were becoming increasingly policed, as the implementation of a broader language, designed to enforce purer forms of racial exclusion, particularly against Hispanics, was used. Moreover, what this research points to is the role private market forces, particularly developers, perhaps in response to homeowner concern, played in helping to create and reinforce the tri-racial system of spatial apartheid.

As a caveat, I should mention that the following argument is speculative. It is based primarily on inferring the effects of private deeds on the demographic patterns of residential segregation that emerged during the 1930s and 40s as well as other historical sources that point to an increasing insistence within Texas that Hispanics were something other than white. The problem, simply, is that there are not any legal challenges or even good historical records about who was excluded, i.e., whether Hispanics were prohibited by 'white only' deed restrictions. No Hispanic seems to have filed a case suing for entrance into an area designated for only whites or Caucasians, nor did any member of a neighborhood seek an injunction against any attempt to buy or lease land from a person with a perceived similarity to Hispanics. There are court challenges to deed restrictions that specifically mention barring "Mexicans" from neighborhoods, but these became moot because of the Supreme Court's 1949 Shelley decision that made racially restrictive covenants unenforceable, and these cases largely mirrored the experiences of other peoples such as Jewish people in cities like Baltimore and New York. Nevertheless, based on patterns of segregation that emerged in Austin, it appears that the more inclusive legal standard of being 'white' found in state statute and

case law, where Hispanics were judged to be legally 'white,' was not the standard for how the practice of racial exclusion through 'white only' covenants was applied in the private housing market. If this had been true, it would have been in contravention to state law. Texas courts, the state legislature, and the governor had repeatedly affirmed that Hispanics were 'white' by law, or conversely, they had stipulated that there were only two legal classes of persons, 'whites' and 'colored' (people of 'African' descent) and that all forms of legally sanctioned public racial segregation in transportation, schools, election primaries, etc., could be applied only to separate these two groups. It appears a different standard for being 'white' was applied in the private market.

Any understanding of the patterns of racial segregation in Austin's neighborhoods as they emerged during the first half of the 20th century must take into account the 'tri-racial' system that began to exist with greater intensity in Texas cities. Between 1890 and 1930, the demographics of Austin changed dramatically. First, the city's population grew at a phenomenal rate; in 1890 the population of the city was about 15,000; 40 years later it exceeded 50,000. Additionally, a growing percentage of Austin's population after 1920 were people who came from or were to considered to be from Mexico. Before 1920, there was a sizeable population of African-Americans, mostly ex-slaves, in Austin, but a very small Hispanic community. By 1930, driven more by immigration than natural increases, these demographic patterns had changed drastically as Hispanics had become a considerably sized community, probably numbering around 5,000, or about 9% of Austin's population; African-Americans, in contrast, went from about

25% of the population to about 19% (McDonald 2005 pg. 11).

The immigration of people from Mexico is intertwined with the patterns of emigration of African-Americans from the south. Because of internal unrest, economic dislocation, and decades of instability resulting from the Mexican Revolution, between 1910 and 1930, an estimated 10% of Mexico's total population emigrated, many to Texas (McDonald 1993 pg. 15). Moreover, lots of people were drawn to Texas from Mexico to solve the problem of labor scarcity, especially in agriculture, which had been caused by the emigration of large numbers of African-Americans during World War I to northern industrial areas (Foley 1997 pgs. 40-63). Between 1916 and 1920, large numbers of American-Americans left the south; while migration from Mexico was not as noticeable, between 1921-1929, when African-American emigration slowed, migration from Mexico continued to increase at a steady pace (McDonald 1993 pg. 66). In Austin, the total African-American population between 1910-1920, McDonald estimated, fell from about 7,500 to about 7,000, and then rose again to about 10,000 by 1930, while the population of Hispanics over the same period increased from around 500 to 5,000 (McDonald 2005 pg. 11).

The position of Hispanics within the 'racial' system found in Texas was never clear. After World War I, when African-Americans were increasingly subjected to more refined methods of subordination and segregation through legal and extra-legal means, primarily based upon the constitutionally sanctioned separate-but-equal standard, no such standards

existed for Hispanics (Montejano 1987 pgs. 260-263). Violent discrimination and exclusion had been characteristics of the Hispanic experience in Texas — Frederick Omsted describes this at great length in his travelogue A Journey Through Texas (Olmsted 1978 [1857]). Yet since at least 1893, 'colored' people in Texas were, legally speaking, only persons with "mixed blood descended from negro ancestry," and only these persons could be legally subjected to de jure forms of racial discrimination and disenfranchisement (Foley 2004 pg. 129). Very adept at remaining legally on the white side of the colorline, many Hispanics benefited from this classification, sometimes earning 'acceptance as whites,' and, most importantly, they aggressively defended their legal status as 'white' persons when it was threatened (McDonald 2007 pg. 159). For instance, an attempt in 1936 by city officials in El Paso to have 'Mexicans' legally reclassified as something other than white failed, in part because of a fierce campaign against such action by Hispanic Texans. After this effort, Foley noted, "Mexicans ... began to insist they belonged ... 'to the Caucasian race'" (Foley 2004 pg. 131). Similarly, in 1943, after a long campaign to shield them from Jim Crow prejudice, Hispanics in Texas successfully pressured the Texas legislature to officially deem them members of the "Caucasian race" (Guglielmo 2006 pg. 1212). Moreover, Hispanics fought back against attempts by the federal government to classify Hispanics as something other than white. In the 1930 census, the category of "Mexican" appeared, alongside those of black and white, something that El Paso officials said provided the legal justification for them to change how Hispanics were classified in local records (Garcia 1984 pg. 192). By 1940, the category had been removed, in part because of protests from the Mexican government and Hispanic organizations (Foley 2004 pg. 130).

Regardless of these efforts, Hispanics under the prevailing racial system in Texas during the Progressive Era were regarded as something other than white and increasingly subjected to harsher forms of discriminatory practices very similar to those faced by African-Americans (McDonald 2012 pgs. 31-54). In 1930, for example, Handman called Hispanics a 'party colored race' and concluded, "We have a place for the Negro and a place for the white man: the Mexican is not a Negro, and the white man refuses him an equal status" (Handman 1930 pg. 610). Hispanics, regardless of their time spent in the United States, were nearly always labeled as unwanted 'aliens' and members of a separate race (Meeks 2007 pgs. 114-115; Foley 1997 pg. 57). Moreover, Hispanics were increasingly occupying the same social station as American-Americans in 1920s, particularly as large numbers of immigrants from Mexico replaced African-Americans as a significant population of exploitable agricultural labor (Handman 1926). In cities the subordinate social position of Hispanics was especially clear. "No matter where we find Mexicans they occupy about the same type of physical surroundings," Connell observed in 1925 in reference to Austin. "They live in the poorest houses, near the railroads, with no paved streets or sidewalks, in the business slum districts or on the creeks" (Connell 1925 pg 6; Hamilton 1915 pgs 57-60). In practice, therefore, Hispanics were considered something other than white. Relegated to the lowest economic station, Hispanics had to contend with widespread de facto segregation in housing, schools, and other public facilities; obstacles to voting; and other forms

of extra-legal violence (Garcia 1984; Montejano 1987 pgs. 167-169). In Austin, this was particularly stark. "By the late 1920s," MacDonald noted, "about 90 per cent or more of the city's ethnic-Mexican population was concentrated in two ethnic clusters, the largest being in East Austin and immediately adjacent to the city's main African-American neighbourhood" (McDonald 2007 pg. 168).

Covenants were another way to enforce the exclusion of Hispanics from many parts of Austin, in part because private means of discrimination could offer a more pliable notion of whiteness than one available in public law. Martinez's review of the case law on Hispanic-American civil rights litigation does not discuss any rulings on covenants that designated an area for 'whites' or 'Caucasians' only. He does, nonetheless, describe two cases, both involving swimming pools: (1) In 1937 Texas courts upheld the exclusion of Hispanics from a private swimming pool that was designated for "whites only" because it was legal for private entities to discriminate based upon perceived racial differences; (2) in 1944 the rights of a private swimming pool operator to deny Hispanics entrance was upheld on similar grounds (Martinez 1993 pgs. 560-565). Moreover, Hispanics were subjected to specific exclusions by covenants in Austin: Two deeds were found that barred "Mexicans" from a neighborhood, but without access to a specific case it is hard to determine whether a Hispanic could have bought or occupied property in areas that were exclusively for 'white people.' Nevertheless, I believe the research supports the conclusion that the rise in covenants that specified Caucasian or white only acted as a quasi-legal means to exclude Hispanics as much as African-Americans. A 1941 report on

Austin, for instance, lists three classes of people — whites, blacks, and Mexicans — and this 'tri-racial' classification, while not legally enforceable, was very common, and in this respect, people with a perceived similarity to the Hispanic social group were nearly always considered, in custom, something other than 'white' or 'Caucasian' (University of Texas. Bureau of Research in the Social Sciences 1941). Therefore a deed restriction that stipulated 'white' or 'Caucasian' was more than likely intended to restrict access to Hispanics as well as African-Africans, and this partly explains why the language 'only white' and 'only Caucasian' eclipsed the phrase 'no African descent' as the dominant language of racial exclusion found in deeds in Austin in the 1930s. After all, this was the time when the real impact of migration from Mexico was being experienced in cities. Also, judging from the spatial distribution of Hispanics during the 1940s and the geographical distribution of deed restrictions, racially restrictive covenants did limit the settlement patterns of Hispanics in Austin. Perhaps the failure of the effort in El Paso to reclassify people from Mexico or Mexican descent as legally something other than white became enshrined in private land-use practice in a way that was similar to that of racial zoning. Here, private markets and private developers could pick up the slack of the public sector and accomplish the twin goals of excluding of Hispanics from neighborhoods as well as expelling them from the 'white race.'



# Pathways to More Inclusion: Policy Implications and Recommendations for Private Land-Use Controls

The research in this project suggests, based on census data, that racial restrictive covenants continued to have a lingering effect on the racial patterns of residential Austin into the 21st century. Non-whites remained overwhelmingly concentrated in East Austin. While there were many influences that affected residential housing patterns, it appears private racial restrictions played an important role, although I would suggest this was much more in a substantive than prospective sense, because deeds could only lock in land-uses after land was developed. The patterns are, nevertheless, path-dependent because once the geographies of racial and class differences began to

be relatively fixed by deed restrictions, future zoning plans nearly always relied on past actions that limited the types of performances that could happen on the land as the way to foreground the manner in which the city developed.

Nevertheless, racially restrictive deeds were only one part of a cluster of private restrictions that was meant to create zones of exclusivity in cities. Most other restrictions, such as lot or house size, type of residency, number of residence, type of land-use, etc., that limited access to areas remain in force today, and these other covenants may have been more significant in shaping the patterns of segregation found in the city today. In this respect, while racial covenants stood at the center of the development of private land-use controls, other seemingly non-racially inflected limitations may have played a greater role in influencing residential geographies because of their longevity. While it is not completely possible to separate and isolate the long-term effects of different deed restrictions, it is evident that these other covenants have provided significant barriers of entry, especially financially, to the residential mobility of non-white minorities. Nearly all of Austin's northwestern side, which developed with restrictive covenants, remains overwhelming white. Perhaps fair-housing advocates could point out the power of these covenants to prevent more integrated residential housing patterns in the city and argue, as the research in this paper has suggested, that such private restrictions on land use do act in place of racially explicit covenants to segregate a city.

In Texas the significance and power of restrictive covenants increased dramatically in the latter half of the 20th century. After the 1940s, homeowners' associations, and later common-interest developments, proliferated across the United States, and both relied on new legal mechanisms to enforce broader restrictive covenants across subdivisions. Beginning in the 1980s, the Texas legislature, following these trends in housing and in opposition to several court decisions that had limited private controls on land use, began to centralize all the rules on restrictive covenants into the general property code. As part of this process, in 1987 legislators took the unorthodox step of writing a new law into the property codes on covenants that ran counter to courts decisions (Johnson 2000 pgs. 365-372). Among other changes, the new law stated that the "restrictive covenant shall be liberally construed to give effect to its purposes and intent" (Texas Property Code 1987). Here the legislature overturned hundreds of years of common-law tradition that had held that there must be a strict and rigid standard in the interpretation of covenants for them to be enforceable among property. Instead the legislature gave covenants an unusually broad and loose authority in controlling land use. Moreover, the legislature wrote additional new statutes, all of which "granted a great deal of power to the property owners' associations and representatives of property owners" (Johnson 2000 pg. 369). The impact of these changes is not yet well understood, but they could have significant impacts on the future of urban policy throughout the state. In Houston, a city that lacks municipal zoning authority, private zoning is the primary means to control land use. Legislative statutes that specify in such detail the legal justification and framework for restrictive covenants, therefore, have largely been the tools for zoning the largest city in Texas (and one of the largest in the U.S.), rather

than municipal ordinances. In many suburban areas around Austin, as well, private covenants are the main planning tool. In fact, because of the power of private land-use controls in Texas, courts and the legislature now permit local authorities to enforce, to a limited degree, deed restrictions (Johnson 2000 pg. 360).

In 2005, the Texas legislature passed a law, strongly backed by the real estate lobby, prohibiting all forms of mandatory inclusionary zoning ordinances by local governments (Mueller 2010 pg. 138). Although the statute creates a significant barrier to efforts that promote more inclusive residential housing, even if inclusionary zoning ordinances were made possible under state law, the results, this project suggests, would have minimal impact because of restrictive covenants — assuming, of course, that the empirical patterns found in Austin are similar to those in other cities in Texas. In Austin, at least, in areas that are highly exclusive, so many of the available performances on the real estate that could promote more inclusion are already limited by exclusive deed restrictions. So, even if zoning laws were changed, since more specific private restrictions govern land use (if they come into conflict with a zoning ordinance), zoning for more apartments or lower-income housing would most likely have a negligible effect. The situation, it appears, is even more daunting in a city like Houston, where private restrictions are essentially the only means to control land use. As Berry concluded, "Changes to exclusionary zoning laws, by themselves, are not likely to reduce residential segregation significantly. Private covenants, with appropriate mechanisms, appear to be sufficient for maintaining residential segregation with or without zoning" (Berry 2001 pgs. 271-272). Nevertheless, since the power of enforcement does

come from state statutes, there could be an effort made by fair-housing advocates to challenge or call for changes the statutes that permit the enforceability of some exclusionary private-zoning restrictions. Such an effort, while seemingly impossible in the present political climate, might at least raise the issue and highlight the significance and limitations created by private zoning on land-use decisions, segregation, and exclusion.

The problems of exclusion created by private-zoning are largely the result of how free-market forces puts a premium on the "rigid intertemporal structure of regulation" that comes from deed restrictions (Hughes and Turnbull 1996 pg. 14; Speyrer 1989 pgs. 126-127). Investors, particularly homeowners, covet covenants because they believe they create a kind of value: Places that are more restricted are less subject to change and, therefore, a more stable financial investment. Changes in the characteristics of a neighborhood, for instance, from the development of more affordable housing to other types of 'non-conforming' uses, can have potentially negative effects on home values; therefore, homeowners perceive them as a threat and tend to resist their construction, regardless of their actual future effect on home prices. Several authors, with differing twists, have suggested that a market-based home-equity insurance (assurance) market, by reducing possible financial risks of the devaluation of property, particularly to single family homes, associated with potentially adverse changes in land-use in area — i.e. the development of multifamily houses, low income houses, small commercial areas, etc. — might assuage homeowners' insistence on the enforcement of exclusionary public zoning (Fischel 2001; Fischel

2004; Goetzmann et al. 2003; Shiller and Weiss 1999). While it is has not been explored in terms of private deed restrictions, such a system might be one way to gradually weaken the power of restrictive covenants, particularly in certain neighborhoods, and, at least in Texas, such a proposal may prove to be a more politically fruitful way to promote more inclusive development. Fischel's idea is particularly apropos. He suggests that a system could be set up to financially compensate homeowners for any financial declines in home values associated with new developments that do not conform with locally unwanted land uses (Fischel 2001 pgs. 168-169). By managing the risk, such an assurance scheme could loosen the intertemporal rigidity of covenants, potentially opening up new avenues for changes in land-use and encouraging more experimentation with inclusionary development.



# Archival Research Methods

Archival research was performed in the Travis County Clerk Public Access Archive Office from February to August 2012. Real property records were retrieved for the dates January 28, 1890 to December 15, 1950. These property records were then interpreted and coded to establish if restrictive covenants (restrictions) were present or absent on individual subdivisions. The following five categories were surveyed:

- Racial Restrictions
- Improvements Restrictions
- Nuisance Restrictions
- Land-Use Restrictions
- Alcohol-Outlet Restrictions

Racial Restrictions prevent people of particular races from owning or inhabiting a property. Examples of Racial Restrictions:

"No persons of any race other than the white race shall use or occupy any building or any lot, except that this covenant shall not prevent occupancy by domestic servants of different race domiciled with an owner or tenant."

"No lot shall be sold or leased to any Mexican or person of Negro blood to any corporation or firm composed of Negros or Mexicans."

"No part of the property comprising said Resubdivision shall ever be conveyed or in any way transferred, leased or rented to any person or persons of African descent, or ever be held in any way by or for such persons, provided, however, that this restriction shall not be construed to prevent the employment of such persons as domestic servants and providing customary accommodations for them."

"No race or nationality other that the Caucasian race shall use or occupy any building on any lot, except that this convent shall not prevent occupancy of servant's quarters by domestic servants of a different race or nationality employed by an owner or tenant."

Examples of Improvement Restrictions:

"No residential structure shall be erected or placed on any building plot, which plot has an area of less than 5750 square feet or a width of less than 50 ft. at the front building setback lines as shown on the recorded plat."

"Expect upon the written consent of the company, no residence shall be erected to cost less than three times the selling price at which the company sells the lost or less then on thousand dollars."

"No building shall be erected on any building plot unless such building has been designed by a licensed architect, or until the external design and location thereof has been approved in writing by the subdivider or by a committee appointed by the owner of a majority of the lots which are subject to the covenant herein set forth; provided, however that if the subdivider or such committee, if in existence, fails to approve or disapprove such design and location within three days such plans have been submitted for approval, or, if no suit to enjoin the erection of such building has been commenced prior to the completion thereof such approval will not be required."

Examples of Nuisance Restrictions:

"No noxious or offensive trade or activity shall be carried on upon any lot, nor shall anything be done thereon which may be or become an annoyance or nuisance to the neighborhood."

Land-Use Restrictions are restrictions that prevent the use of a property by a business or only allow residential use. Examples of Land-Use Restrictions:

"All lots in the tract shall be known and described as Residential Lots."

"No structure shall be erected, altered, placed, or permitted to remain on any residential building plot other than one detached single family dwelling."

"All lots shown on the recorded plat shall be used for residential purpose only and no part thereof shall be used for business purpose, provided that with the consent of the City of Austin Zoning Board, a Sales Office may be maintained by the owners of the unsold lots in this tract."

Alcohol-Outlet Restrictions outlaw the sale of intoxicating substances, but often extend to other "immoral" activities as well. Examples of Alcohol Outlet Restrictions:

"No lot or park thereof shall be used for illegal or immoral purposes, or for the sale of spirituous, vinous, malt, or other intoxicating liquors."

"No vinous, spirituous or malt liquors shall ever be manufactured or sold or exposed for sale, not any trade, manufacturing or mercantile business of any kind, shall ever be carried on or be permitted to be carried on, on any property in the resubdivision."

Property restrictions can exist at three different scales. The subdivision plat map is the largest scale dictating individual parcels of land in the subdivision. Restric-

tions can be found on these maps that pertain to the entire subdivision. The next scale is the master deed record, which is the deed record that pertains to all land sold in the subdivision. The final scale is individual properties. These are restrictions that pertain to individual properties and are only found on individual deeds or amendments to deeds.

For this research only plat maps and master deed records were considered, as they are generated at a community level and require an organized effort. Individual properties may contain additional covenants, but the amount of work required to pull deed records for every parcel of land in the city was beyond the scope of this project.

Research was conducted by pulling plat maps and consulting engineering notes to find master deed records and other documents related to the properties. Both plat maps and master deed records for each of the subdivisions in the study area were checked, minus areas outside Austin city limits. The Central Business District was also not taken into account because many properties there were subdivided before 1890 and used mostly for commercial activities.

General Steps for research:
1. Obtain plat map
2. Search plat map for restrictive covenants
3. Read engineer's notes on plat map for references to deed records
4. Obtain deed records
5. Search deed records for restrictive covenants
6. Cross reference Travis County Public Records Index Database for additional deed records not noted on plat map's engineering notes

7. Obtain cross-referenced deed records

Resubdivisions of plats were treated as individual subdivisions in which the original restrictions and the resubdivision restrictions both applied to the land.

Archival work was not exhaustive and the possibility for more restrictive convents does exist.  The archival work followed the typical deed-restriction-research protocol practiced by the Travis County Clerk's office when pulling restrictive covenants.  Records can go missing or may not be included in the reference data-base system developed by Travis County.  In this case the record may still exist but the reference to where the record can be found may not exist.



# Maps

**Map 1 -Racial Identification in 1940**

**Map 2 -Racial Identification in 1950**

**Map 3 -Racial Identification in 1960**

**Map 4 -Racial Identification in 1970**

**Map 5 -Racial Identification in 1980**

**Map 6 -Racial Identification in 1990**

**Map 7 -Racial Identification in 2000**

**Map 8 -Racial Identification in 2010**

Map 9 - Alcohol outlet restrictive covenants in Austin, Texas

Map 10 - Improvement restrictive Covenants in Austin, Texas

**Map 11 – Land-use restrictive covenants in Austin, Texas**

**Map 12 - Nuisance restrictive covenants in Austin, Texas**

**Map 13 - Racial restrictive covenants in Austin, Texas**

Map 14 - Restrictive covenants in Austin, Texas from 1890-1950

Map 15 - Racial restrictive covenants in Austin, Texas from 1890-1950

Map 16 - Overlay of racial restrictive covenants in Austin, Texas from 1890-1950 **and Home Owners' Loan Corporation 1935 Risk Map**

Map 17 - Overlay of racial restrictive covenants in Austin, Texas from 1890-1928 **and Koch and Fowler 1928Land Use Map**

Map 18 - Overlay of racial restrictive covenants in Austin, Texas from 1890-1950 **and Koch and Fowler 1928 Zoning Map**

Map 19 - Overlay of Home Owners' Loan Corporation 1935 Risk **Map and Koch and Fowler 1928 Zoning Map**



**Map 1 -Racial Identification in 1940**

Dot density map of racial identification in Austin, Texas based on 1940 United States Census: Population & Housing Data.  Data is derived from census tracts, this lead to dots density representation within some blocks.  Census tracts were highest resolution of data available. Two racial identifications are mapped based on the census: White and Black (Negro).



**Map 2 -Racial Identification in 1950**

Dot density map of racial identification in Austin, Texas based on 1950 United States Census: Population & Housing Data.  Data is derived from ceneus tracts, this lead to dots density representation within some blocks.  Census tracts were highest resolution of data available. Two racial identifications are mapped based on the census: White and Negro.



**Map 3 -Racial Identification in 1960**

Dot density map of racial identification in Austin, Texas based on 1960 United States Census: Population & Housing Data. Data is derived from census tracts, this lead to dots density representation within some blocks. Census tracts were highest resolution of data available. Two racial identifications are mapped based on the census: White and Negro.



**Map 4 -Racial Identification in 1970**

Dot density map of racial identification in Austin, Texas based on 1970 United States Census: Based Population Data. Data is derived from census tracts, this lead to dots density representation within some blocks. Census tracts were highest resolution of data available. Two racial identifications are mapped based on the census: White and Negro.



**Map 5 -Racial Identification in 1980**

Dot density map of racial identification in Austin, Texas based on 1980 United States Census: Summary Tape File. Data is derived from census tracts, this lead to dots density representation within some blocks. Census tracts were highest resolution of data available. Three racial identifications are mapped based on the census: White, Black, and Other. There were four major racial groups in the 1980 census leading to the following categories: White, Black, American Indian, Asian/Pacific Islander, and Other. Hispanic was not considered a racial category. Analysis on 1990 Census revealed that 98% of respondents who checked other also marked themselves as Hispanic (Gaboda, Tsikiwa, Warner, & Guarnaccia, 2000). For this reason this dot density map included 'other' as a category to help in identifying Hispanic distribution in Austin.



**Map 6 - Racial Identification in 1990**

Dot density map of racial identification in Austin, Texas based on 1990 United States Census: Summary Tape File. Data is derived from census blocks, this lead to some block having no populations and appearing uninhabited in the map. Census blocks were highest resolution of data available. Three racial identifications are mapped based on the census: White, Black, and Other. There were four major racial group in the 1990 census leading to the following categories: White, Black, American Indian, Asian/Pacific Islander, and Other. Hispanic was not considered a racial category but an ethnicity in the 1990 census, meaning that Hispanic respondent can be white, black or other. Analysis after the census was conducted revealed that 98% of the 1990 Census respondents who checked other also marked themselves as Hispanic (Gaboda, Tsikiwa, Warner, & Guarnaccia, 2000). For this reason this dot density map included 'other' as a category to help in identifying Hispanic distribution in Austin.



**Map 7 -Racial Identification in 2000**

Dot density map of racial identification in Austin, Texas based on 2000 United States Census: Redistricting Summary File.  Data is derived from census blocks, this lead to some block having no populations and appearing uninhabited in the map.  Census blocks were highest resolution of data available. Three racial identifications are mapped based on the census: White, Black, and Hispanic.



**Map 8 -Racial Identification in 2010**

Dot density map of racial identification in Austin, Texas based on 2010 United States Census: Redistricting Summary File.  Data is derived from census blocks, this lead to some block having no populations and appearing uninhabited in the map.  Census blocks were highest resolution of data available. Three racial identifications are mapped based on the census: White, Black, and Hispanic.



**Map 9 - Alcohol outlet restrictive covenants in Austin, Texas**



**Map 10 - Improvement restrictive Covenants in Austin, Texas**



**Map 11 – Land-use restrictive covenants in Austin, Texas**



**Map 12 - Nuisance restrictive covenants in Austin, Texas**



**Map 13 - Racial restrictive covenants in Austin, Texas**



**Map 14 - Restrictive covenants in Austin, Texas from 1890-1950**



**Map 15 - Racial restrictive covenants in Austin, Texas from 1890-1950**



**Map 16 - Overlay of racial restrictive covenants in Austin, Texas from 1890-1950 and Home Owners' Loan Corporation 1935 Risk Map**



**Map 17 - Overlay of racial restrictive covenants in Austin, Texas from 1890-1928 and Koch and Fowler 1928Land Use Map**



**Map 18 - Overlay of racial restrictive covenants in Austin, Texas from 1890-1950 and Koch and Fowler 1928 Zoning Map**



**Map 19 - Overlay of Home Owners' Loan Corporation 1935 Risk Map
and Koch and Fowler 1928 Zoning Map**



# Examples of Plats and Deeds

**Plat 1** - **Example of handwritten note on plat map indicating restrictions on the deed record. (Source: Volume 4 Page 282 of Travis County Property Records for Delwood Section 2 Platted on 9/7/1946)**

**Plat 2** - **Example of a racial covenant explicitly prohibiting people other than whites from occupying property. Covenant found on plat map of Royal Oak Section 2 (Source: Travis County Real Property Records Volume 4 Page 344)**

**Plat 3** - **Example of a plat map with hand written notes denoting the restrictions that exist in the deed records. (Source: Travis County Real Property Records Volume 1 Page 105 Date 3/7/1896)**

**Plat 4 - Restriction note on plat map: Date: 7/23/1910 (Source: Travis County Real Property Records, Volume 2 Page 211)**

**Plat 5 - Example of restrictions note on the margins of the plat map hand written on the plat. There is a note for restrictions on individual deed records. (Source: Volume 5 Page 86 of the Travis County Real Property Records)**

**Plat 6 -** **Plat map from 1913 showing that plats are restricted to whites. (Source: Travis County Real Property Records, 1913, Volume 2 Page 240)**

**Plat 7 -** **Racial covenant preventing anyone of negro or Mexican blood. (Source: Travis Heights, Travis County Plat Records, Volume 3 Page 15 3/31/1913)**

**Plat 8 -** **Example of restriction on subdivision without racial covenants (Source: Travis County Real Property Record Volume 5 Page 25. 3/31/1948 for Sunnydale Subdivision)**

**Plat 9 –** **Racial covenants including Africans, Mongolians, and Mexicans.  (Source: Travis County Real Property Record Volume 4 Page 156.)**



**Plat 1** - **Example of handwritten note on plat map indicating restrictions on the deed record. (Volume 4 Page 282 of Travis County Property Records for Delwood Section 2 Platted on 9/7/1946)**



**Plat 2** - **Example of a racial covenant explicitly prohibiting people other than whites from occupying property.** Covenant found on plat map of Royal Oak Section 2 (Source: Travis County Real Property Records Volume 4 Page 344)



**Plat 3** - **Example of a plat map with hand written notes denoting the restrictions that exist in the deed records. (Source: Travis County Real Property Records Volume 1 Page 105 Date 3/7/1896)**



**Plat 4 - Restriction note on plat map: Date: 7/23/1910 (Source: Travis County Real Property Records, Volume 2 Page 211)**



**Plat 5 - Example of restrictions note on the margins of the plat map hand written on the plat. There is a note for restrictions on individual deed records. (Source: Volume 5 Page 86 of the Travis County Real Property Records)**



**Plat 6 - Plat map from 1913 showing that plats are restricted to whites. (Source: Travis County Real Property Records, 1913, Volume 2 Page 240)**



**Plat 7 - Racial covenant preventing anyone of negro or Mexican blood. (Source: Travis Heights, Travis County Plat Records, Volume 3 Page 15 3/31/1913)**

Restriction 3a: No lot shall be sold or leased to any Mexican or person of Negro blood or to any corporation or firm composed of Negros or Mexicans.

Restriction 3b: Expect upon the written consent of the company, no residence shall be erected to cost less than three times the selling price at which the company sells the lost or less then on thousand dollars.

Restriction 3c: No lot or park thereof shall be used for illegal or immoral purposes, or for the sale of spirituous, vinous, malt, or other intoxicating liquors.

Restriction 3d: Expect for written consent of the company, no building shall be erected nearer than twenty-five feet of any street upon which said lot may [find], and all lane stables and stable yards erected on said premise shall be next to the alley and not closer than twenty five feet to any street line.



RESTRICTIONS

1 All lots [illegible] described as Residential lots. [illegible] structures shall be erected, altered, placed or permitted to remain on any residential building plot other than one detached single family residence, or one duplex [illegible], except that private garages for not more than [illegible] cars may be constructed and may be attached to or detached from the main residence structure, and servants quarters [illegible] garage [illegible] may be constructed only after the main residence structure is completed.
2 No building shall be located on any residential building plot nearer than 25 feet to the front lot line.
3 No residential structure shall be erected or placed on any building plot, which plot has an area of less than 5750 square feet, or a width of less than 50 feet at the front building setback line as shown on the recorded plat.
4 No noxious or offensive trade or activity shall be carried on upon any lot, nor shall anything be done thereon which may be or become an annoyance or nuisance to the neighborhood.
5 No trailer, basement, tent, shack, garage, barn or other outbuilding erected in the tract shall at any time be used as a residence temporarily or permanently, nor shall any structure of a temporary character be used as a residence.
6 The ground floor area of the main residence structure erected on any building plot shall be not less than 850 square feet for a one story single family residence; 1200 square feet for a one story duplex apartment and 1800 square feet for a [illegible] story structure, each being exclusive of one story open porches and garages.
7 These covenants are to run with the land and shall be binding on all parties and all persons claiming under them until Jan 1, 1968 at which time said covenants shall be automatically extended for successive periods of ten years unless by a vote of the majority of the then owners of the lots it is agreed to change the said covenants in whole or in part.
8 If the parties hereto, or any of them, or their heirs or assigns, shall violate or attempt to violate any of the covenants herein, it shall be lawful for any other person or persons owning any real property situated in said development or subdivision to prosecute any proceedings at law or in equity against the person or persons violating or attempting to violate any such covenant and whether to prevent him or them from so doing or to recover damages or other dues for such violations.
9 Invalidation of any one of these covenants by judgement or court order shall in no wise affect any of the other provisions which shall remain in full force and effect.

**Plat 8 - Example of restriction on subdivision without racial covenants (Source: Travis County Real Property Record Volume 5 Page 25. 3/31/1948 for Sunnydale Subdivision)**



**Plat 9 – Racial covenants including Africans, Mongolians, and Mexicans.  (Source: Travis County Real Property Record Volume 4 Page 156.)**

# Charts

**Chart 1** - **The interaction of different levels of housing regulations: federal housing policy, municipal zoning, and private deed restrictions**

**Chart 2** - **The engine of segregation**

**Chart 3** - **Growth of racial restrictions in Austin, Texas, over time**

**Chart 4** - Growth of racial restrictions in Austin, Texas, by area and over time

**Chart 4** - Location of racial restrictive covenatnts by Home Owners' Loan Corporation **Zone**

**Chart 5** – Area of land under racial restrictive covenants established between 1890-1950 in **Austin Texas.**

**Chart 6** - Association of restrictions to racial restrictions.

**Chart 7**- Actors involved in Austin's development.

**Chart 8** - Racial Composition of the Population of Austin, Texas 1890-1930



**Chart 1 - The interaction of different levels of housing regulations: federal housing policy, municipal zoning, and private deed restrictions**

The relationship between federal housing policy, municipal zoning, and private deed restrictions are interrelated and work in tandem amplifying the effects of each. Each level of regulation was influenced by existing regulations when created, and amplified their influence by influencing any future policy. For example private deed restrictions influenced heavily the HOLC maps, which in turn lead to guidelines for developers promoting the use of private deed restrictions.



## Chart 2 - The engine of segregation

Although racial deed restrictions are no longer enforceable, the segregation engines created continue to influence the modern city. Deed restrictions were instrumental to creating the engine of segregation, which still runs today through the other policies enacted in accordance to racial restrictions.



**Chart 3 - Growth of racial restrictions in Austin, Texas, over time**

There are four phases in the growth of racial restrictive covenants. During the first phase, between 1910 and 1915, these covenants were introduced, but growth was slow. Between 1915 and 1931, there was a steady increase in covenants, with restrictions on African-Americans being preferred. From 1931 to 1941 there was growth in the number of both African- and Caucasian-only covenants. After 1945, Caucasian covenants increased rapidly, surpassing African-American restrictions as the preferred covenant.



**Chart 4 - Growth of racial restrictions in Austin, Texas, by area and over time**



**Chart 4 - Location of racial restrictive covenatnts by Home Owners' Loan Corporation zone**

This chart breaks down the location of racial restrictive covenants into the Home Owner's Loan Corporation (HOLC) Zones. Easily noted is that most racial covenants are located in HOLC Zones classified as 'Best' of 'Desirable'.



**Chart 5 – Area of land under racial restrictive covenants established between 1890-1950 in Austin Texas**



**Chart 6 - Association of restrictions to racial restrictions**

This chart shows that covenants were bundled, meaning that racial covenants were more often than not associated with other types of covenants when compared to Austin subdivisions. Furthermore, restrictions on alcohol outlets were associated predominately with restrictions on African-Americans. Building restrictions were the most common, which in many cases greatly reduced the ability to have multiple Covenants that restricted the number of families on a property, restricted the building of smaller housing on land, and reduced the usefulness of land in trade and business, were the most common.

### Table of Name Frequency in Property Database

| Name | Frequency |
|------|-----------|
| Hofheinz | 116 |
| Henry | 73 |
| Harper | 61 |
| Hoffman | 54 |
| Swisher | 52 |
| Bouldin | 52 |
| Smith | 49 |
| Chernosky | 42 |
| Graham | 42 |
| Hancock | 41 |
| Wendlandt | 39 |
| Lewis | 38 |
| Dawson | 38 |
| Steck | 36 |
| Wilson | 33 |
| Anderson | 32 |
| Moore | 30 |
| Brown | 30 |
| Cook | 29 |

## Chart 7- Actors involved in Austin's development

A word-count analysis of plats was conducted to determine how often the parties involved in the development of Austin were mentioned. When land is subdivided into plats there are two parties involved in its creation, the grantor and the grantee. At this point covenants can be introduced to dictate the land's development. By performing a word count analysis of the grantors and grantees involved in a particular transaction, major actors in Austin's development were determined ranging in dates from 1890-1950. This analysis does not result in the largest land developers, but a list of developers who had the most transactions of land in Austin.



Source: McDonald, J. J. Race relations in Austin, Texas, c. 1917-1929, University of Southampton, 1993

**Chart 8 - Racial Composition of the Population of Austin, Texas 1890-1930**



# Historical Maps

Map 1 - 1928 property use (Koch and Fowler, 1928)

Map 2 - 1928 zone use districts (Koch and Fowler, 1928)

Map 3 - HOLC Residential Security Map (Home Owners' Loan Corporation, 1935)

Map 4 - HOLC Race Map (Home Owners' Loan Corporation, 1935)

Map 5 - Black Households 1880 (City of Austin Human Relations Commission, 1979)

Map 6 - Black Households 1910 (City of Austin Human Relations Commission, 1979)

Map 7 - Black Households 1940 (City of Austin Human Relations Commission, 1979)

Map 8 - Black Households 1970 (City of Austin Human Relations Commission, 1979)

Map 9 - Mexican-American Households 1880 (City of Austin Human Relations Commission, 1979)

Map 10 - Mexican-American Households 1910(City of Austin Human Relations Commission, 1979)

Map 11 - Mexican-American Households 1940 (City of Austin Human Relations Commission, 1979)

Map 12 - Mexican-American Households 1976 (City of Austin Human Relations Commission, 1979)



**Map 1 - 1928 property use (Koch and Fowler, 1928)**



**Map 2 - 1928 zone use districts (Koch and Fowler, 1928)**



**Map 3 - HOLC Residential Security Map (Home Owners' Loan Corporation, 1935)**



**Map 4 - HOLC Race Map (Home Owners' Loan Corporation, 1935)**



Map 1.1

BLACK HOUSEHOLDS, 1880

**Map 5 - Black Households 1880 (City of Austin Human Relations Commission, 1979)**

Map I.2



UT

96 Blacks in
South Austin

BLACK HOUSEHOLDS, 1910

**Map 6 - Black Households 1910 (City of Austin Human Relations Commission, 1979)**

Map 1.3



# BLACK HOUSEHOLDS, 1940

**Map 7 - Black Households 1940 (City of Austin Human Relations Commission, 1979)**

Map 1.4



# BLACK HOUSEHOLDS, 1970

**Map 8 - Black Households 1970 (City of Austin Human Relations Commission, 1979)**



Map 1.5

MEXICAN-AMERICAN HOUSEHOLDS, 1880

**Map 9 - Mexican-American Households 1880 (City of Austin Human Relations Commission, 1979)**



Map I.6

UT

MEXICAN-AMERICAN HOUSEHOLDS, 1910

**Map 10 - Mexican-American Households 1910(City of Austin Human Relations Commission, 1979)**

Map 1.7



# MEXICAN-AMERICAN HOUSEHOLDS, 1940

**Map 11 - Mexican-American Households 1940 (City of Austin Human Relations Commission, 1979)**

Map 1.8



# MEXICAN-AMERICAN HOUSEHOLDS, 1976

**Map 12 - Mexican-American Households 1976 (City of Austin Human Relations Commission, 1979)**

# Neighborhood Advertisements

Ad 1 - Hyde Park, 1892, Austin Daily Statesman

Ad 2 - Hyde Park, 1893, Austin Daily Statesman

Ad 3 - Hyde Park, 1894, The Industrial Advantages of Austin, Texas, or Austin Up To Date

Ad 4 - Hyde Park, 1898, Austin Daily Statesman

Ad 5 - Hyde Park, 1899, Austin Daily Statesman

Ad 6 - Hyde Park, 1904, Comet

Ad 7 - Aldridge Place, 1912, Austin Daily Statesman

Ad 8 - College Court, 1912, Austin Daily Statesman

Ad 9 - Lake Austin Addition, 1912, Austin Daily Statesman

Ad 10 - Hyde Park, Circa 1915, Austin Daily Statesman



AF-S6200. Subdivisions: Hyde Park- 18-1892
orig of this is filed in AF dup - it is torn + very fragile

# HYDE PARK,

## THE PRIDE OF AUSTIN

The highest point in the Sixth ward, 150 feet above the center of the city. Here are water mains, electric lights, gas, electric cars, the finest drives in the city, the most beautiful groves and two elegant lakes. On the banks of one is a magnificent opera house, the resort of the refined and cultured society of Austin, on the banks of the other will soon be erected a sculptor's studio by Elisabet Ney, the celebrated German sculpturess, grand niece of Marshal Ney, who will also erect for herself a magnificent winter home. Her genius and artistic taste will make this little lake and that part of Hyde Park addition especially attractive to the scholar and lover of art.

Hyde Park property will always command a good price because it will be the fashionable part of the wealthiest and most aristocratic ward in the city. Here is the opportunity of a lifetime; until July 30 you can buy a lot in Hyde Park at a reasonable price by paying $10 down and $5 per month, and if within 60 days you commence the erection of a good residence we will, as soon as completed, throw off all deferred payments on two lots.

Secure your site for a home in this coolest, healthiest and most popular part of Austin before July 30 if you want these terms. Lots will enhance 100 per cent within one year.

# M., K. & T. L. & T. CO.,

M. M. SHIPE, President.

St. 7-13-1892

Austin Daily Statesman

**Ad 1 - Hyde Park, 1892, Austin Daily Statesman**

# HYDE PARK.

The successful completion of the GREAT DAM gives Austin commercial advantages which, grouped with her many other resources, puts her surely in the front rank for rapid growth to a great city. Property will advance all over the city, and the most rapid increase in value may naturally be expected, where property is the *most beautiful, healthful, convenient of access;* where there are *fine drives, rapid transit, city water, gas, electric lights,* and *good schools;* where property is *cheapest in price* and a *united effort to beautify.* Such a place is HYDE PARK. It has all these advantages, no lot in this beautiful addition being more than 800 ft. from the Rapid Transit Line, (with a car each way every 15 minutes), and three fourths of the lots very much nearer. Drainage is perfect; the balmy Gulf breeze is salubrious; *the temperature in summer is from 5 to 10 degrees cooler than in any other part of the city,* and there is no dust. No saloon is allowed in HYDE PARK and never can be. The class of investors in HYDE PARK are among the best citizens in Austin. The present price of lots in HYDE PARK ranges from $125 to $200— terms of payment $10 cash and $5 per month— 10 per cent discount for all cash. For full particulars and a beautiful BIRD'S EYE VIEW of Austin and HYDE PARK, call on or address

### SHIPE & LEBOLD,
#### Rooms 3 and 4 Masonic Temple,

AGENTS FOR THE M. K. & T. LAND AND TOWN CO.,
OWNERS OF HYDE PARK.

**Ad 2 - Hyde Park, 1893, Austin Daily Statesman**

36                              THE CITY OF AUSTIN.

ble for its vast and valuable stores of mineral wealth, including a particularly useful variety of iron ore. The industry of obtaining this ore from its native bed is being actively developed, a shaft having been sunk recently which is known as the Olive Mine. This ore is particularly well suited for the making of Bessemer steel, this product being manufactured direct from the ore, without expensive manipulation. Graphite, lead, and other minerals, also, are found here; and altogether there is no doubt but that this region will become well known in a few years as an important manufacturing district, and that it has a future before it which well qualifies it for its name of "the treasure house." Nor is this all that can be truthfully said in regard to advantages along the line of the Austin and Northwestern Railroad. The most important factor in our everyday pursuits is health. To the resident we have not much to say, as you have an abundance of fresh air and health in and about Austin. To those who wish to seek an open air camping life, we would say, come to Austin, rest up, and then take the train to Burnet, Granite Mountain, Marble Falls, or Llano, where you can find good hotel accommodations; and in the event of your wishing to go into camp life, you can find all that is needful to enable you to do so. Burnet commands an elevation of 900 feet above Austin, 1500 feet above the Gulf, and will furnish you with the benefits of good and skilled physicians, good schools, and churches of the different denominations, telegraph, and a daily mail by rail. The executive officers of the Austin and Northwestern Railroad are: Thos. H. Hubbard, of New York, president; A. Leitnaker, of Austin, vice-president and general superintendent; and P. J. Lawless, of Austin, secretary. That the road has been well and ably managed is evidenced in the increase of its influence and importance. It certainly has proved itself a strong link in the chain of events which is rapidly elevating Texas to a place at the head of the sisterhood of States which together make up the greatness and power of the Union. That the measure of its usefulness will yet further grow and expand is beyond a doubt, and it should be a matter of pride with all business men of this city and section to do all that they can accomplish to advance its interests and growth in the future.

## M. K. & T. LAND AND TOWN COMPANY.
### Shipe & Lebold, Agents, Office, 101 West Seventh Street.

We desire here to devote a brief space to the organization known as the M. K. & T. Land Company, which to-day is in a position to offer advantages of value to those who wish to secure a really profitable investment, not merely for speculative purposes, but in order to secure a desirable site for a home where pleasant surroundings and a healthful locality combine to make life happy and enjoyable. The M. K. & T. Land Company are the owners of a tract of land known as Hyde Park, located about a mile and a half north of the Capitol building. It comprises 206 acres, which have been suitably subdivided into building lots for residential purposes. They are now offered for sale under the most favorable conditions, the lots varying in price from $125 to $200 each. The property is 185 feet higher than the city, affording a delightful view of the surroundings, and also making it eminently healthful and cool in the midsummer season. The addition is provided with fine graded streets, a free school, city water, gas, electric lights, free mail delivery, etc., and the electric street car system places it in immediate, rapid contact with all parts of the city. That the property will steadily grow in value is a foregone conclusion, as desirable sites for residences are more difficult to obtain every day, and the growth of population must be accommodated. There are already many attractive and comfortable residences erected on the tract and more are going up in the near future. It is intended that the locality shall be select and entirely free from nuisances and an objectionable class of people, proper restrictions being taken to guard against undesirable occupants. Taking value and prospective advancement into consideration, the property is offered at a low price, and payments will be adjusted to suit the convenience of purchasers. The usual terms are $5 per month until the whole of the purchase money is paid, thus enabling persons of the most limited means easily to become the owners and occupants of their own home. Special terms and inducements are held out to those who will at once build on the property, which are fully worthy of investigation. The management of the affairs of the company is in the hands of gentlemen of experienced ability and standing. The agents, Messrs. M. M. Shipe and C. B. Lebold, are thoroughly experienced real estate men, who devote their full time and attention to the care and sale of this property. These gentlemen are originally from Kansas, but they are now bound up with the best interests of this city, and have adopted it as their home. This firm constructed the street car system of Austin and sold it to the company who now operate it. Mr. Lebold is one of the directors of the Austin Board of Trade. The firm are prepared to give their time and attention to all who may wish to investigate what we have above stated with regard to the desirable Hyde Park Addition, and we are assured that a half hour spent with them will result in profit and advantage.

**Ad 3 - Hyde Park, 1894, The Industrial Advantages of Austin, Texas, or Austin Up To Date**



**Ad 4 - Hyde Park, 1898, Austin Daily Statesman**



**Ad 5 - Hyde Park, 1899, Austin Daily Statesman**



# THE M. K. & T.

LAND COMPANY

*Bird's-eye View in Hyde Park Addition.*

OWNERS of the best residence portion of Austin, Texas.

WE OFFER, for a short time, most remarkable opportunities to investors or home-seekers.

READ

$60,000 to loan to home builders in

## Hyde Park and Hyde Park Annex

Low interest, long time, monthly or annual payments, or all payable sooner if you wish it. There are no charges except interest.

NO BONUS, PREMIUM, DISCOUNT OR ATTORNEY'S FEES TO PAY.

The RENT you pay would almost meet the payments on a new home as good as you are living in.

NOW is your opportunity. Our prices and terms should appeal to every man or woman of modest income.

PRICE of lots range from $50 to $150 each; 10 CENTS a day, or $3 per month, will pay for a lot.

THINK OF IT. The price of TWO BEERS each day will pay for a lot.

INVEST a part of your earnings each month. It will help you to save your money. This is good advice for the average man or woman who works for wages.

NO INTEREST if paid in full in one year.

TERMS of payment will not always be so easy. ACT NOW, or you may regret it.

We sell only to WHITE PEOPLE.

RAILROAD fare paid by us for any person wishing to invest who lives within 200 miles of Austin.

**M. K. & T. LAND COMPANY**

Office 103 East Sixth Street. Austin, Texas.

M. M. SHIPE, General Manager.

from Comet Mar. 1904

**Ad 6 - Hyde Park, 1904, Comet**



THE AUSTIN DAILY STATESMAN, SUNDAY MORNING, MAY 12, 1912 ← Austin Daily Statesman May 12, 1912

AF - Subdivisions - S6010

# The Lewis Hancock Addition to Be Known Now as Aldridge Place

# "The Suburb Beautiful"

## Where Suburban Life and City Luxuries Are Delightfully Combined

AUSTIN has heretofore been conspicuously backward in providing sufficient high class properly restricted residential districts, where her best citizens could build without the fear of being encroached upon by inferior surroundings. Look back over the city's history. See the little groups of handsome homes being steadily surrounded by boarding houses or thickly settled cottage communities. Take the country over and you will find the best residence sections of every city lie in the picturesque outskirts, properly restricted and highly developed, where the environment is all that the word "suburban" implies.

"Aldridge Place" is a high class residential district distinctively different from any other property surrounding, or in Austin. With many acres subdivided, restricted and developed for lovers of the artistic and beautiful in their home surroundings, with modern improvements brought inside the curb of each lot.

The restrictions as to the character of building, the cost, etc., insures not only the attractive and high class homes and the companionship of refined neighbors, but also adds to the permanency of the investment.

Don't ever buy property, whether for a home or as an investment, that is not properly restricted. In Aldridge Place nothing can ever be built but dwellings and out buildings, the minimum cost of houses ranging from [illegible] to [illegible]. A uniform building line is established, ensuring beautiful and symmetrical streets when they are built up with homes.

## PRICE AND TERMS

Opening prices on Aldridge Place are very low, considering the high character of the property, ranging from One Thousand to [illegible] Hundred and Fifty Dollars, these prices to [illegible]. Prices are based on cash, or terms when desired.

The title is absolutely perfect and a complete abstract is furnished with each lot.

Automobiles at your service to show the property.

# K. C. MILLER, Agent

107 East Sixth Street

NOTE—Lots on Sale May 15

**Ad 7 - Aldridge Place, 1912, Austin Daily Statesman**



**Ad 8 - College Court, 1912, Austin Daily Statesman**



**Ad 9 - Lake Austin Addition, 1912, Austin Daily Statesman**



# HYDE PARK

The most beautiful, healthful, and practical place for homes in the city of Austin. It's the safest place for investment. The terms offered are remarkably easy. The prices are very reasonable. Any person buying two lots WILL BE GIVEN ONE LOT FREE OF COST. There are six miles of beautiful graded streets in HYDE PARK, and a magnificent

## SPEEDWAY FROM THE PARK TO THE CITY.

### THE FINEST DRIVE IN TEXAS.



## HYDE PARK IS EXCLUSIVELY FOR WHITE PEOPLE.

The main line of Electric Street Cars run into and around a belt in the Park. Free Mail Delivery twice a day. There is no limestone dust. The soil is the best for Fruits, Flowers and Lawns. No one thinks of taking a carriage drive without going to Hyde Park. The drives are free from mud and dust. The scenery is interesting. The altitude of Hyde Park is 185 feet above the river. Hyde Park is Cool, Clean and Restful. Invest while YOU CAN SELECT, and SECURE ONE LOT FREE. If you wish to buy on the installment plan the terms are $3.00 per month on each lot. If you pay all cash a discount of 8 per cent will be allowed. If you wish to invest and do not live in Austin, we will pay your fare both ways, if the distance is not over 300 miles. Strangers who wish to see the city can have a Free Carriage by calling at our office.

### Extraordinary Inducements Are Offered

To persons who will agree to erect good houses. If parties wish to build in Hyde Park we will trade lots for other Austin property on a fair basis, and DONATE ONE LOT as a Premium. Beautiful Views of Hyde Park, and of THE SPEEDWAY sent free upon application. Write to us, or call at
**721 CONGRESS AVENUE, AUSTIN, TEXAS.**

# M. K. & T. LAND AND TOWN CO.

## M. M. SHIPE, General Manager

**Ad 10 - Hyde Park, Circa 1915, Austin Daily Statesman**

# Annotated Bibliography

Ascher, Charles S. 1953. Private Covenants in Urban Redevelopment. In Urban redevelopment problems and practices, edited by C. Woodbury. Chicago: University of Chicago.

Austin Board of Trade. 1894. The Industrial Advantages of Austin, Texas, or Austin Up To Date. Digital images, (http://texashistory.unt.edu/ark:/67531/metapth38097/ : accessed August 19, 2012): University of North Texas Libraries, The Portal to Texas History, http://texashistory.unt.edu; crediting Austin History Center, Austin Public Library, Austin, Texas.

Austin Chamber of Commerce, and Walter Long. 1948. Something made Austin grow. Austin: Austin Chamber of Commerce.

Austin Daily Statesman. 1908. Chartered Discussed. Austin Daily Statesman.

Barrett, J.R., and D. Roediger. 1997. Inbetween peoples: Race, nationality and the" new immigrant" working class. Journal of American Ethnic History 16 (3):3-44.

Berry, C. 2001. Land use regulation and residential segregation: does zoning matter? American Law and Economics Review 3 (2):251-274.

Bridges, Amy. 1997. Morning glories : municipal reform in the Southwest, Princeton studies in American politics. Princeton: Princeton University.

Brown, N.D. 1984. Hood, bonnet, and little brown jug: Texas politics, 1921-1928. College Station: Texas A&M University.

Brownell, Blaine A. 1975. The urban ethos in the South, 1920-1930. Baton Rouge: Louisiana State University.

Busch, Andrew. Forthcoming. Building "A City of Upper-Middle Class Citizens": Labor Markets, Segregation, and Growth in Austin, Texas, 1950-1973. Journal of Urban History.

Colorado Lake Chautauqua Association. 1893. Prospectus of the Colorado Lake Chautauqua Association at Austin, Texas, For the Season of 1893. Digital images, (http://texashistory.unt.edu/ark:/67531/metapth38123/): accessed August 19, 2012, University of North Texas Libraries The Portal to Texas History, http://texashistory.unt.edu: crediting Austin History Center, Austin Public Library, Austin, Texas.

Colten, Craig E. 2005. An unnatural metropolis : wresting New Orleans from nature. Baton Rouge: Louisiana State University Press.

Connell, Earl Monroe. 1925. The mexican population of Austin, Texas. Thesis (M.A.), University of Texas., Austin.

Consigny, R.H., and Z.L. Zile. 1958. Part I: Use of Restrictive Covenants in a Rapidly Urbanizing Area. Wis. L. Rev.:612.

Crossney, K.B., and D.W. Bartelt. 2005. Residential security, risk, and race: The home owners' loan corporation and mortgage access in two cities. Urban Geography 26 (8):707-736.

Davidson, Chandler. 1990. Race and class in Texas politics. Princeton, N.J.: Princeton University.

De Leon, A. 2001. Ethnicity in the sunbelt: Mexican Americans in Houston. College Station: Texas A&M University.

Delaney, David. 1998. Race, place, and the law, 1836-1948. Austin: University of Texas.

Fischel, W.A. 2004. An economic history of zoning and a cure for its exclusionary effects. Urban Studies 41 (2):317.

Fischel, William A. 2001. The homevoter hypothesis : how home values influence local government taxation, school finance, and land-use policies. Cambridge: Harvard University.

Foley, Neil. 1997. The white scourge : Mexicans, Blacks, and poor whites in Texas cotton culture, American crossroads. Berkeley: University of California.

———. 2004. Party Colored or Other White. In Beyond black & white : race, ethnicity, and gender in the U.S. South and Southwest, edited by S. Cole, A. M. Parker and L. F. Edwards. College Station: Texas A & M University.

Garcia, M.T. 1984. Mexican Americans and the Politics of Citizenship: The Case of El Paso, 1936. New Mexico Historical Review 59 (2):187-204.

Glasrud, B.A. 1974. jim crow's emergence in texas. American Studies 15 (1):47-60.

Goetzmann, W., A. Caplin, E. Hangen, B. Nalebuff, E. Prentice, J. Rodkin, M. Spiegel, and T. Skinner. 2003. Home equity insurance: A pilot project. In Yale ICF Working Paper No. 03-12. . New Haven: Yale International Center for Finance.

Gotham, K.F. 2000. Racialization and the state: the Housing Act of 1934 and the creation of the Federal Housing Administration. Sociological Perspectives:291-317.

———. 2000. Urban space, restrictive covenants and the origins of racial residential segregation in a US city, 1900‚Äì50. International Journal of Urban and Regional Research 24 (3):616-633.

———. 2002. Race, real estate, and uneven development: The Kansas City experience, 1900-2000: State Univ of New York Pr.

Gould, Lewis L. 1973. Progressives and prohibitionists: Texas Democrats in the Wilson era. Austin,: University of Texas.

Grantham, D.W. 1981. The Contours of Southern Progressivism. The American Historical Review 86 (5):1035-1059.

Guglielmo, T.A. 2006. Fighting for Caucasian Rights: Mexicans, Mexican Americans, and the Transnational Struggle for Civil Rights in World War II Texas. The Journal of American History 92 (4):1212.

Hale, Grace Elizabeth. 1998. Making whiteness : the culture of segregation in the South, 1890-1940. 1st ed. New York: Pantheon.

Hamilton, William Benjamin. 1915. A social survey of Austin: a digest of University of Texas Bulletin no. 273. Austin: University of Texas.

Handman, M.S. 1926. The Mexican Immigrant in Texas. Political and Social Science Quarterly VII:33-41.

———. 1930. Economic Reasons for the Coming of the Mexican Immigrant. American Journal of Sociology:601-611.

Hillier, A.E. 2003. Redlining and the Home Owners' Loan Corporation. Journal of urban history 29 (4):394-420.

Holleran, Michael. 1998. Boston's "changeful times": origins of preservation & planning in America, Creating the North American landscape. Baltimore: Johns Hopkins University.

Home Owners' Loan Corporation, and R.L. Olson. 1935. Confidential Report of a Survey in Austin, Texas. edited by M. R. Division. Washington, D.C.: Record Group 195, Austin Texas Folder.  National Archives.

———. 1935. Residential Security Map. edited by M. R. Division. Washington, D.C.: Record Group 195, Austin Texas Folder.  National Archives.

Hoyt, Homer. 1933. One hundred years of land values in Chicago; the relationship of the growth of Chicago to the rise in its land values, 1830-1933. Chicago: The University of Chicago.

Hughes, W.T., and G.K. Turnbull. 1996. Restrictive land covenants. The Journal of Real Estate Finance and Economics 12 (1):9-21.

Humphrey, David C. 1997. Austin: a history of the capital city. Austin: Texas State Historical Association, in cooperation with the Center for Studies in Texas History at the University of Texas.

Jackson, Kenneth T. 1985. Crabgrass frontier: the suburbanization of the United States. New York: Oxford University.

Jacobson, M.F. 1998. Whiteness of a different color. Cambridge: Harvard University.

Johnson, D.A. 2000. One Step Forward, Two Steps Back: Construction of Restrictive Covenants After the Implementation of Section 202.003 of the Texas Property Code. Texas Tech Law Review 32:355.

Jones-Correa, M. 2000. The origins and diffusion of racial restrictive covenants. Political Science Quarterly 115 (4):541-568.

Kiang, Y.S. 1949. Judicial Enforcement of Restrictive Covenants in the United States. Washington Law Review & State Bar Journal 24:1.

Kirby, Jack Temple. 1972. Darkness at the dawning; race and reform in the progressive South. Philadelphia: Lippincott.

Klarman, Michael J. 2004. From Jim Crow to civil rights : the Supreme Court and the struggle for racial equality. Oxford: Oxford University.

Koch and Fowler [Firm]. 1928. A city plan for Austin, Texas. edited by Department of Planning. Austin History Center.

Kraus, Steven Joseph. 1973. Water, sewers and streets: the acquisition of public utilities in Austin, Texas, 1875-1930, University of Texas at Austin., Austin.

Long, Walter. 1926. Letter December 1, Informs Mead about Status of the City Planning Commission edited by E. A. Wood. Austin History Center: Walter Long Paper Box 19, City Planning 1926-1928.

———. 1927. Letter October 25, Response to Inquiry About Austin's Planning and Government edited by K. P. A. John Surrett. Austin History Center: Walter Long Paper Box 19, City Planning September 1926-1927.

———. 1928. Letter April 13, Regarding City Planning Commission in Austin. edited by D. N. Louis Head. Austin History Center: Walter Long Paper Box 19, City Planning 1926-1928.

Love, Senator Tom B., and Representative George Purl. 1927. SB 275, 40th Regular Session: Relating to providing for the segregation or separation of the white and negro races and providing for the conferring of power and authority upon cities to pass suitable ordinance controlling the same and providing for fixing the penalty. In Acts 1927, 40th R.S.,ch. 103, General and Special Laws of Texas, edited by Texas Legislature.

Lucy, Sara. 1938. Typescript draft for the Federal Writer's Project Guide to Austin. In Sectional Guides and Histories, Travis County: Doplh Briscoe Center for American History, University of Texas at Austin.

Lundberg, W. 1973. Restrictive Covenants and Land Use Control: Private Zoning. Montana Law Review 34:199.

MacCorkle, Stuart Alexander. 1973. Austin's three forms of government. San Antonio: Naylor.

Martin, Roscoe C. 1933. The Municipal Electorate. Southwestern Social Science Quarterly 14 (3):193-237.

Martinez, G.A. 1993. Legal indeterminacy, judicial discretion and the Mexican-American litigation experience: 1930-1980. University of California Davis Law Review 27:555.

———. 1997. The Legal Construction of Race: Mexican-Americans and Whiteness. Harvard Latino Law Review 2:321.

Mason, K. 1998. African Americans and Race Relations in San Antonio, Texas, 1867-1937. New York: Garland.

Massey, Douglas S., and Nancy A. Denton. 1993. American apartheid: segregation and the making of the underclass. Cambridge: Harvard University.

McDonald, J. 1993. Race relations in Austin, Texas, 1917-1929, University of Southhampton.

———. 2005. From bipartite to tripartite society: demographic change and realignments in ethnic stratification in Austin, Texas, 1910-30. Patterns of Prejudice 39 (1):1-24.

———. 2007. Confronting Jim Crow in the "Lone Star" capital: the contrasting strategies of African-American and ethnic-Mexican political leaders in Austin, Texas, 1910-ï1930. Continuity and Change 22 (01):143-169.

McDonald, Jason. 2012. Racial dynamics in early twentieth-century Austin, Texas. Lanham, Md.: Lexington Books.

McKenzie, Evan. 1994. Privatopia: homeowner associations and the rise of residential private government. New Haven: Yale University.

Meeks, Eric V. 2007. Border citizens: the making of Indians, Mexicans, and Anglos in Arizona. 1st ed. Austin: University of Texas.

Mixon, J. 1991. Texas Municipal Zoning Law. Vol. 1. Austin: Butterworth Legal Publishers.

Monchow, Helen Corbin. 1928. The use of deed restrictions in subdivision development. Studies in land economics. Research monograph, no. 1. Chicago: Institute for Research in Land Economics and Public Utilities.

Montejano, David. 1987. Anglos and Mexicans in the making of Texas, 1836-1986. 1st ed. Austin: University of Texas.

Mueller, E.J. 2010. Old apartments and new plans: reconciling planning and housing goals in two Texas cities. Community Development 41 (1):121-140.

Olmsted, Frederick Law. 1978 [1857]. A journey through Texas: or, A saddle-trip on the southwestern frontier, Barker Texas History Center series. Austin: University of Texas.

Orozco, C. 2009. No Mexicans, women, or dogs allowed: the rise of the Mexican American civil rights movement: University of Texas.

Orum, Anthony M. 1987. Power, money & the people: the making of modern Austin. Austin: Texas Monthly.

Phillips, M. 2006. White metropolis: race, ethnicity, and religion in Dallas, 1841-2001: Univ of Texas.

Pietila, Antero. 2010. Not in my neighborhood: how bigotry shaped a great American city. Chicago: Ivan R. Dee.

Platt, Rutherford H. 1991. Land use control: geography, law, and public policy. Englewood Cliffs, N.J.: Prentice Hall.

Rabin, Yale. 1989. Expulsive Zoning: The Inequitable Legacy of Euclid. In Zoning and the American dream: promises still to keep, edited by C. M. Haar and J. S. Kayden. Chicago: Planners Press, American Planning Association in association with the Lincoln Institute of Land Policy.

Rice, Bradley Robert. 1977. Progressive cities: the commission government movement in America, 1901-1920. Austin: University of Texas.

Shiller, R.J., and A.N. Weiss. 1999. Home equity insurance. The Journal of Real Estate Finance and Economics 19 (1):21-47.

Shipe, Monroe. 1908. Government of the City. Austin Daily Statesman.

Silver, Christopher. 1997. The Racial Origins of Zoning in American Cities. In Urban planning and the African American community: in the shadows, edited by J. M. Thomas and M. Ritzdorf. Thousand Oaks: Sage.

Sitton, Sarah. 1991. Austin's Hyde Park: the first fifty years, 1891-1941. Austin: Pecan.

Speyrer, J.F. 1989. The effect of land-use restrictions on market values of single-family homes in Houston. The Journal of Real Estate Finance and Economics 2 (2):117-130.

Stach, P.B. 1988. Deed restrictions and subdivision development in Columbus, Ohio, 1900-1970. Journal of urban history 15 (1):42-68.

Staniszewski, Frank. 1977. Ideology and practice in municipal government reform: a case study of Austin. Austin: University of Texas at Austin.

Stone, Harold A., Don Krasher Price, and Kathryn H. Stone. 1939. City manager government in Austin, Texas. Chicago: Public administration service.

Straubhaar, Joseph D., Jeremiah Spence, Zeynep Tufekci, and Roberta Lentz. 2012. Structuring Race in the Cultural Geography of Austin. In Inequity in the technopolis : race, class, gender, and the digital divide in Austin, edited by J. D. Straubhaar, J. Spence, Z. Tufekci and R. Lentz. Austin: University of Texas Press.

Sugrue, Thomas J. 2005. The origins of the urban crisis: race and inequality in postwar Detroit A Princeton classic edition. Princeton: Princeton University.

Surrett, John. 1927. Letter January 22, Asking Austin Chamber of Commerce to Support Five Legislative Bills. edited by Walter Long Chairman of Austin Chamber of Commerce. Austin History Center: Walter Long Paper Box 18, City Planning September 1926-1927.

Texas Civil Appeals Reports. 1941. Spencer v. Maverick. edited by 146 S.W.2d 819 (San Antonio).

Texas Property Code. 1987. Title 11 Restrictive Covenants Section 202.003 Construction of Restrictive Covenants. Texas Legislature.

Texas Urban Development Commission. 1971. Urban Texas: policies for the future. Arlington: Institute of Urban Studies.

Tindall, George Brown. 1967. The emergence of the new South, 1913-1945, A History of the South. Baton Rouge: Louisiana State University.

Tretter, E.M. Forthcoming. Contesting Sustainability: 'SMART Growth' and the Redevelopment of Austin's Eastside. International Journal of Urban and Regional Research.

Tretter, E.M., and M. Adams. 2012. The Privilege of Staying Dry: The Impact of Flooding and Racism on the Emergence of the "Mexican" Ghetto in Austin's Low-East side, I880-1935. In Cities, Nature and Development: The Politics and Production of Urban Vulnerabilities, edited by S. Dooling and G. Simon. Burlington: Ashgate Publishing.

United States Federal Housing Administration. 1936. Underwriting manual: underwriting and valuation procedure under Title II of the National Housing Act. Rev. ed. Washington, D.C.: US Government Printing Office.

———. 1941. Successful Subdivisions Planned as Neighborhoods for Profitable Investment and Appeal to Home Owners, Land Planning Bulletin No, 1. Washington, D.C.: US Government Printing Office.

United States National Bureau of Standards, and Lester G Chase. 1932. A tabulation of city planning commissions in the United States. [Rev. ed. Washington: Division of Building and Housing, Bureau of Standards.

University of Texas. Bureau of Research in the Social Sciences. 1941. Population mobility in Austin, Texas, 1929-1931. Austin: The University of Texas.

Wade, Richard C. 1971. Residential Segregation in the Antebellum South. In The rise of the ghetto, edited by J. H. Bracey, A. Meier and E. M. Rudwick. Belmont: Wadsworth.

Weiss, Marc A. 1987. The rise of the community builders: the American real estate industry and urban land planning, The Columbia history of urban life. New York: Columbia University.

Wilson, R.H., L. Rhodes, N.J. Glickman, Lyndon B. Johnson School of Public Affairs. Policy Research Project on Business, and Community Development in East Austin. 2007. Community Change in East Austin. Austin: Lyndon B. Johnson School of Public Affairs, University of Texas at Austin.

Wolf, Michael Allan. 1989. The Presence and Centrality of Euclid v. Ambler. In Zoning and the American dream : promises still to keep, edited by C. M. Haar and J. S. Kayden. Chicago: Planners Press, American Planning Association in association with the Lincoln Institute of Land Policy.

Wood, E.A. 1926. Letter November 1, Asking Long about formation of the City Plan Commission and people on the Commission  edited by Walter Long Chairman of Austin Chamber of Commerce. Austin History Center: Walter Long Paper Box 19, City Planning 1926-1928.

———. No Date. City Planning, Zoning, and Race Segregation. In Austin History Center. Walter Long Papers Box 19, City Planning 1926-1928.

Woodward, C. Vann. 1974. The strange career of Jim Crow. 3d rev. ed. New York,: Oxford University.