EXHIBIT  R

# Uprooted:

## Residential Displacement in Austin's Gentrifying Neighborhoods and What Can Be Done About It

**2018**

The University of Texas Center for Sustainable Development in the School of Architecture & the Entrepreneurship and Community Development Clinic in the School of Law

**Heather Way**, Clinical Professor, **The University of Texas School of Law**

**Elizabeth Mueller**, Associate Professor of Community and Regional Planning, **The University of Texas at Austin**

**Jake Wegmann**, Assistant Professor of Community and Regional Planning, **The University of Texas at Austin**

**With Research and Writing Assistance from:**
Amelia Adams, Nicholas Armstrong, Ben Martin, Alex Radtke, and Alice Woods, graduate students in the Community and Regional Planning Program at **The University of Texas at Austin**





This report was commissioned by the City of Austin, via a resolution adopted by the Austin City Council on August 17, 2017. The report reflects the research and opinions of the individual authors only and does not present an official position of the University of Texas.

Uprooted: Residential Displacement in Austin's Gentrifying Neighborhoods and What Can Be Done About It

© 2018 Heather Way, Elizabeth Mueller, and Jake Wegmann
This work is licensed under a Creative Commons Attribution-NonCommercial-ShareAlike 4.0 International License; https://creativecommons.org/licenses/by-nc-sa/4.0/



For electronic access to the report, displacement maps, and other information related to the gentrification and displacement study, visit https://sites.utexas.edu/gentrificationproject

# Table of Contents

**Acknowledgements** .................................................................................................. **1**

**Executive Summary** ................................................................................................. **2**

**Introduction** ............................................................................................................. **11**

**Part 1 Background on Gentrification and Displacement** ........................................ **14**

**Part 2 Identifying and Mapping Gentrifying Neighborhoods in Austin** ............... **18**

    Understanding and Identifying Vulnerability to Displacement ......................... 19

    Summary of Gentrification Mapping Methodology ........................................... 22

    Findings: Where is Gentrification Taking Place in Austin? ............................... 28

        *Vulnerability Map* .......................................................................................... 30

        *Demographic Change Map* ............................................................................ 31

        *Housing Market Change Map* ....................................................................... 32

        *Gentrification Typology Map* ........................................................................ 33

    Neighborhood Drilldowns ................................................................................. 34

        *Introduction* .................................................................................................. 34

        *St. Johns-Coronado Hills Neighborhoods Drilldown* ................................... 37

        *Montopolis Neighborhood Drilldown* .......................................................... 41

**Part 3 Case Studies of Local Efforts to Mitigate Displacement in Gentrifying
Neighborhoods** ....................................................................................................... **47**

    Introduction ...................................................................................................... 48

    Ten Cross-Cutting Lessons for Cities from Three Gentrifying Neighborhoods ... 49

    Columbia Heights, Washington, D.C.: A Case Study of Affordable
    Rental Housing Preservation and Tenant Ownership in the Face of
    Large-Scale Displacement Pressures ............................................................... 54

    Guadalupe Neighborhood, Austin, Texas: A Case Study of Early Intervention
    and Evolving Strategies to Create Permanently Affordable Housing for
    Vulnerable Residents with Historical Ties to the Neighborhood ...................... 56

    Inner North/Northeast Portland, Oregon: A Case Study of Community-Driven
    Strategies to Mitigate and Remediate the Displacement of African-American
    Residents ........................................................................................................... 58

**Part 4 Strategy and Policy Overview: Addressing the Displacement of Vulnerable
Residents in Gentrifying Neighborhoods** ............................................................. **60**

    Introduction ...................................................................................................... 61

    Goal 1: Vulnerable renters in gentrifying neighborhoods are not displaced
    from their current homes and neighborhoods .................................................. 62

    Goal 2: Vulnerable homeowners in gentrifying neighborhoods are not
    displaced from their current homes and neighborhoods .................................. 66

    Goal 3: The existing affordable housing stock (subsidized and non-subsidized)
    in gentrifying neighborhoods is preserved so that the units are in good
    condition and remain affordable to low-income residents ................................ 73

**Goal 4:** City planning and land use decisions incorporate inclusive and equitable anti-displacement strategies, and low-income persons and communities of color are empowered to participate early and meaningfully in land use decisions that shape their homes, neighborhoods, and communities .......................................... 80

**Goal 5:** Vulnerable residents are able to remain in or return to their communities by accessing the affordable housing opportunities in their neighborhoods ..................... 84

**Goal 6:** New affordable housing options are created to serve current and future vulnerable households in gentrifying neighborhoods ....................................... 86

Displacement-Mitigation Tools Off Limits in Texas ...................................................... 91

Local Strategies to Fund Affordable Housing Development ...................................... 93

Table: Strategies and Policies for Addressing the Displacement of Vulnerable Residents in Gentrifying Neighborhoods ................................................................. 97

**Part 5 Policy Drilldown: A Framework for Evaluating Anti-Displacement Policies............ 103**

Introduction to Framework for Evaluating Anti-Displacement Policies ......................... 104

Policy Drilldown Table: Analysis of Anti-Displacement Policies for Austin ..................... 107

Policies ................................................................................................................. 108

*Local Housing Voucher Programs* .......................................................................... 108
*Homestead Preservation Center* ........................................................................... 110
*Neighborhood Stabilization Overlays* .................................................................... 112
*Affordable Housing Preservation Network and Inventory* ....................................... 114
*Neighborhood-Jobs Pipeline Programs* ................................................................. 116
*Preservation Investment Funds* ............................................................................ 118
*Community Capacity Building* ............................................................................... 120
*Adding Internal Accessory Dwelling Units to Existing Homes* ................................ 122

**Appendices *(Online version only, https://sites.utexas.edu/gentrificationproject)***

**Appendix 1. Austin City Council Resolution 20170817-55 ................................................. 126**

**Appendix 2. Prior Austin Reports on Gentrification, Displacement-Mitigation Tools, and the Changing Face of Austin's Neighborhoods ......................... 130**

**Appendix 3. Methodology for Mapping Gentrifying Neighborhoods in Austin and Neighborhood Drilldowns ....................................................... 133**

**Appendix 4. Case Studies of Local Efforts to Mitigate Displacement in Gentrifying Neighborhoods ...................................................................... 149**

Columbia Heights, Washington, D.C.: A Case Study of Affordable Rental Housing Preservation and Tenant Ownership in the Face of Large-Scale Displacement ......................................................................................................... 150

Guadalupe Neighborhood, Austin, Texas: A Case Study of Early Intervention and Evolving Strategies to Create Permanently Affordable Housing for Vulnerable Residents with Historical Ties to the Neighborhood ........................... 166

Inner North/Northeast Portland, Oregon: A Case Study of Community-Driven Strategies to Mitigate and Remediate the Displacement of African-American Residents ............................................................................................................. 183

**Appendix 5. Property Tax Relief Tools for Austin's Vulnerable Homeowners ................. 199**

# Acknowledgments

The authors thank the many graduate students in the Community and Regional Planning Program at The University of Texas at Austin, without whom this report would not have been possible:

- Ben Martin and Nicholas Armstrong for all their tremendous help as members of our policy team and, specifically, to Ben for his co-authorship of the North/Northeast Portland and Columbia Heights case studies, and Nicholas for his assistance with the Guadalupe case study.
- Amelia Adams and Alex Radke, for their assistance with the development of the typologies of vulnerable and gentrifying neighborhoods and all their work calculating z-scores and transposing large batches of census data.
- Alice Woods, for her development of the graphics for the report and the online mapping tool.

We also thank Lauren Loney, the Environmental Justice and Community Development Fellow at The University of Texas School of Law, for her assistance with the multifamily preservation strategies; the City of Austin staff with the Neighborhood Housing and Community Development Department and the Equity Office, for their support of this project; the members of the City of Austin Anti-Displacement Task Force, for sharing their research and experiences with anti-displacement issues and policies; and Katy Byther, for her wonderful work on the report layout and graphics.

Special thanks to the following individuals for sharing so much of their on-the-ground knowledge and experience with the neighborhoods, cities, and anti-displacement strategies we researched for the case studies: Dr. Mark Rogers, Executive Director, Guadalupe Neighborhood Development Corporation; Dr. Kathryn Howell, Assistant Professor, Virginia Commonwealth University; Dr. Steven Holt, Chair, N/NE Portland Neighborhood Housing Strategy Oversight Committee; Leslie Goodlow, Business Operations Manager, Portland Housing Bureau; Amanda Huron, Associate Professor, University of the District of Columbia; Dominic Moulden, Resource Organizer, One DC; and Eric M. Rome, Attorney, Eisen and Rome, PC. We also thank Sarah Wu, at the Center for Sustainable Development, for her help with managing contracting and administrative challenges. Finally, we thank Louisa Brinsmade for starting the conversation about an Austin study.

# Executive Summary

## How to Use this Report

This report provides a framework for 1) identifying and prioritizing gentrifying neighborhoods where residents are at the highest risk of displacement, and 2) matching strategies to the needs of vulnerable residents in these neighborhoods. Rather than recommending the blanket adoption of the tools described in this report, we advocate working with residents to dig deeper into their neighborhood conditions and to craft neighborhood-specific solutions. We have organized the presentation of policy ideas to facilitate a deeper analysis and tailoring of policies to specific neighborhood needs.

## Introduction and Background on Gentrification and Displacement (Part 1)

Since the late 1990s, Austin has seen a dramatic rise in housing costs, shifting the city from among the most affordable in the country to one where a growing share of residents can no longer afford to live. As in many cities around the county, there has been an inversion of previous demographic trends, as affluent residents increasingly move into central neighborhoods and low-income residents are pushed to the outskirts or out of the city altogether. The impacts of Austin's rising housing costs have been particularly dramatic in the city's "eastern crescent," where historically low housing costs, produced in part through the city's history of publicly-supported racial and ethnic segregation, now combine with broader social and economic trends to make these neighborhoods more desirable to higher-income households. Over the past two decades, numerous city and citizen task forces have formed to study and address the impacts of these changes on Austin's communities of color and vulnerable households.

In August 2017, the Austin City Council passed a resolution expressing concern with the ongoing displacement of the city's low- and moderate-income residents, the destabilization of existing communities, and loss of diversity and sense of place for Austin communities. In response, the same resolution authorized the city manager to execute an agreement with the University of Texas to carry out a study of gentrification and displacement in Austin.

### ➤ What is Gentrification?

Gentrification is a process through which higher-income households move into a neighborhood and housing costs rise, changing the character of the neighborhood. This process includes three dimensions: 1) the displacement of lower-income residents; 2) the physical transformation of the neighborhood—mostly through the upgrading of its housing stock and commercial spaces; and 3) the changing cultural character of the neighborhood. While there is disagreement about the potential benefits of rising property values and building upgrades and who receives these benefits, there is broad consensus that displacement is an undesirable side effect.

### ➤ Focus of the Austin Gentrification and Displacement Study

The focus of this study has been two-fold: to identify neighborhoods and groups of residents that are especially vulnerable to displacement as housing costs rise, and to identify potential strategies and polices for preventing their displacement. While rising housing costs are affecting a broad swath of Austinites, our purposes here are to: (1) help city officials understand how rising costs impact certain groups and places within the city more than others; (2) facilitate early interventions in areas at the highest risk of displacement; and (3) help the City target particular anti-displacement policies strategically.

Given the complexity of gentrification, it is important to clarify what is not included in this study.

First, while local businesses and the cultural character of a community are also affected by rising land and property values, our focus here is limited to residential displacement. Second, while creating equitable housing opportunities for displaced low-income residents will necessarily involve opening up neighborhoods that have been historically inaccessible to them, our focus here is on geographically-targeted policies for ensuring that vulnerable residents can stay in their homes and neighborhoods or return to them if they wish to. As a result, we spend relatively little time in the report on land use solutions associated with increasing housing types and choices in other neighborhoods or across the city.

## Mapping Gentrifying Neighborhoods in Austin (Part 2)

Our mapping of Austin's neighborhoods involved a three-part analysis:





- **Vulnerability:** The first part of our analysis involved identifying which neighborhoods in Austin have a concentration of residents who are the most vulnerable to displacement in the face of rising housing costs. For this analysis, we used a short list of indicators to identify residents who, according to research, are the least able to absorb rising housing costs and whose housing choices are especially limited in the wake of displacement.



- **Demographic change:** Understanding whether displacement from gentrification is occurring, and identifying likely points of intervention, requires looking for signs that vulnerable residents are leaving neighborhoods while less vulnerable residents move in, and for changes in the housing market both inside the neighborhood and nearby. In the second part of our analysis, we looked for vulnerable neighborhoods where, over time:
  - ♦ residents' incomes have been increasing at a greater rate than the metro area;
  - ♦ the share of residents of color has been declining compared to the metro area, and

♦ the number of residents with bachelor's degrees has been increasing at a rate greater than the metro area.

All of these changes are considered markers of potential gentrification—of a neighborhood transforming through the loss of its vulnerable residents and influx of wealthier persons.

- **Housing market change:** To then identify whether these changes are connected to a particular stage of gentrification, we looked for signs of rising property values of owner-occupied homes in the neighborhood and adjacent areas.

Building on a methodology developed by Professor Lisa Bates from Portland State and applying our three-part analysis above, we ultimately determined which neighborhoods in Austin are gentrifying and assigned each gentrifying neighborhood to one of five types.

## Categories of Gentrifying Neighborhoods

| Gentrifying tract type | Demographic change (2000 to 2012-16) | Average current residential real estate value (2012-16) | Appreciation | Must touch tract with high value and/ or high recent appreciation |
|---|---|---|---|---|
| **Susceptible** | | Low or moderate | Low or moderate recent (2000 to 2012-16) | √ |
| **Early: Type 1** | | Low or moderate | High recent (2000 to 2012-16) | |
| **Early: Type 2** | √ | Low or moderate | Low or moderate recent (2000 to 2012-16) | √ |
| **Dynamic** | √ | Low or moderate | High recent (2000 to 2012-16) | |
| **Late** | √ | High | High sustained (1990 to 2012-16) | |

## Findings: Where is Gentrification Taking Place in Austin?

The maps we developed of Austin's gentrifying neighborhoods can be found in Part 2 of the full report. An interactive version of the maps, which allows users to access information from each census tract in the city, is available at sites.utexas.edu/gentrificationproject/.

### *Vulnerability*

Our map of areas vulnerable to displacement in Austin closely follows what has come to be known as the "eastern crescent." This is an area shaped like a backward letter "C" that begins north of downtown Austin just outside of U.S. Highway 183, and follows the highway as it heads southeast and then due south before bending to the southwest and mostly ending south of downtown. The eastern crescent has come to be known as the new geographic pattern of social disadvantage in Austin, supplanting to some degree the conception of the city's advantaged and disadvantaged areas as lying strictly to the west and east, respectively, of Interstate 35. It is noteworthy that, in spite of many years of intensive gentrification immediately east of downtown in Central East Austin, disadvantaged populations remain in these areas.

The pockets of deepest disadvantage in Austin lie in and near the Rundberg area in North Austin, Daffin Gin Park in Northeast, Rosewood in East Austin, Montopolis in inner Southeast, and Franklin Park in Southeast just outside of the Ben White freeway and immediately east of I-35. These pockets mostly lie a considerable distance from downtown; aside from Rosewood, which is within three miles of City Hall, the next closest is Montopolis, about four miles

> **"Compared to even 20 or 30 years ago, a higher share of disadvantaged people in Austin are in locations that are distant from the various economic, cultural, and other opportunities offered by Austin's urban core."**

away. These patterns show that while the peripheralization of social disadvantage in Austin is not entirely complete—vulnerable populations can still be found near downtown, to the east—the process is well underway. Compared to even 20 or 30 years ago, a higher share of disadvantaged people in Austin are in locations that are distant from the various economic, cultural, and other opportunities offered by Austin's urban core.

### Demographic change

The spatial pattern of demographic change in Austin is both striking and simple. The neighborhoods that experienced the greatest demographic change are overwhelmingly concentrated in a ring surrounding downtown Austin. This pattern confirms that Austin is a strong example of the "Great Inversion" that has occurred in metro areas throughout the United States, where central neighborhoods are economically ascendant and some outlying areas are gaining disadvantaged residents. Living in and near the urban core has become strikingly sought after by advantaged populations in Austin: homeowners, the educated, the high-income, and whites. The implications for the near future are easy to predict: It seems logical that the next furthest ring of census tracts—surrounding those in the urban core that have already experienced demographic change—will be next to experience such change.

### Housing market change

As with concentrations of vulnerable people, housing market change in Austin has generally followed the eastern crescent spatial pattern. Many of the same neighborhoods that are disproportionately home to vulnerable populations are experiencing or have experienced substantial housing price appreciation, or lie adjacent to a neighborhood that already has appreciated. In keeping with the Great Inversion pattern, the neighborhoods within the crescent that lie closest to downtown generally experienced the greatest price escalation, while the market is gaining steam in the neighborhoods slightly further away.

Despite the demographic change that has occurred on all sides of downtown, including to the west, there has been little housing market appreciation vis-à-vis the rest of the city either immediately north or west of downtown. These neighborhoods, presumably, were already high value in 1990 and 2000, as reflected by their home prices, and whatever price appreciation has occurred in them since then has not altered their fundamental position in the socioeconomic hierarchy. They were elite places then, and remain so today.

### Gentrification typology

The gentrification typology map brings together vulnerability, demographic change, and housing market change to assess which neighborhoods are gentrifying and which stage of gentrification they are in, showing five stages of gentrification, along with a category of "Continued Loss" neighborhoods. Continued Loss neighborhoods have lost enough vulnerable residents that they have passed beyond the last stage of gentrification, although they retain enough such residents that continued housing insecurity deserves attention.

As with the vulnerability and housing market change maps, the location of gentrifying neighborhoods generally follows Austin's eastern crescent: The stages of gentrification ripple out north, east, and south from downtown, with Continued Loss tracts lying immediately to the east and south and, generally, increasingly earlier stages of gentrification as one



Of 200 Austin neighborhoods . . .

**Susceptible** Near high value/ high appreciation areas. Not yet experiencing demographic change.

**Early Type 1** Experiencing appreciation, still with low/moderate home values.

**Dynamic** Exhibit demographic change indicative of gentrification.

**Late** Newly high value areas, still with vulnerable populations

**Continued Loss** High value areas that have experienced demographic change

6 Cont'd Loss

12 Dynamic

23 Susceptible

4 Late

13 Early Type 1

proceeds away from downtown. The Susceptible tracts suggest where gentrification may occur next if it is not yet underway already.

## Neighborhood Drilldowns

Once gentrifying neighborhoods are identified, in order to better understand conditions and needs in particular neighborhoods, additional data was collected. We did so for two areas, Montopolis in Southeast Austin and St. John's-Coronado Hills in Northeast Austin, through "neighborhood drilldowns." Neighborhood drilldowns are intended to be a data-intensive examination of the relevant socioeconomic and housing market conditions affecting various vulnerable subpopulations within a given neighborhood. Whereas our citywide mapping results allow for neighborhoods across the city to be classified based on vulnerability and gentrification stage using widely-available census data, a drilldown is a more nuanced, multifaceted analysis focused on a particular census tract (typically containing between 1,200 and 8,000 residents) and a useful first step before embarking on place-based anti-displacement advocacy or policy development. Ideally, such analyses would be paired with qualitative gathered through on-the-ground engagement efforts, which can include (but are not limited to) direct observations; interviews with neighborhood leaders, residents, and business owners; review of written materials such as media articles and archival materials; and survey work.

Both Montopolis and St. John's-Coronado Hills are predominantly Latino and include elderly households and large families struggling with rising housing costs. In the classification scheme used in this report, they are both classified as Early: Type 1 gentrifying neighborhoods. In both areas, new homeowners are more likely to be white when compared to the existing homeowner population. And both are close to areas where prices are rising sharply and include or lie near recently or soon-to-be improved transportation links, such as widened freeways and upgraded bus service. Montopolis has a large stock of rent-restricted rental housing (53% of the total housing stock), while in St. Johns/Coronado only six percent of units are rent-restricted. Early indicators suggest that housing market activity is heating up sooner in Montopolis than in St. John's-Coronado Hills, but displacement is a cause for concern in both communities.

## Case Studies of Neighborhoods Fighting Displacement (Part 3)

Part 3 presents summaries of the three case studies we developed to examine local efforts to mitigate displacement. These case studies allowed us to better understand how strategies have worked on the ground—including the challenges that cities and communities faced in implementing particular strategies. We also hope to raise awareness of innovative approaches being taken by cities around the country in this policy arena. The full case studies are provided in Appendix 4. The Columbia Heights neighborhood in Washington, D.C., provides a case study of affordable rental housing preservation and tenant ownership in the face of large-scale displacement pressures.

Noteworthy policies include: (1) an ordinance providing tenants with the right to purchase their rental units when they are up for sale; (2) wrap-around support and expansive legal protections for tenants, including $4 million in annual funding (FY 2018) for an Office of Tenant Advocate; (3) a robust rental housing preservation network and database, supported by a new Housing Preservation Officer with the city; and (4) $100 million in annual city funding for affordable housing. Today, close to 3,000 units in Columbia Heights—22 percent of the neighborhood's housing stock—are rent-restricted dwellings protected from market pressures, and close to 400 units are limited equity cooperatives allowing low-income tenants to own their units.

Austin's Guadalupe neighborhood provides a case study of early intervention and evolving strategies to create permanently affordable housing for vulnerable residents with historical ties to the neighborhood. Far-sighted efforts, beginning in the 1980s, on the part of a community-governed nonprofit to acquire and retain control of land for affordable housing now allow for a diverse socioeconomic spectrum of residents to enjoy the neighborhood's central location immediately opposite Austin's booming downtown. In addition to early and strategic land acquisition, other key programs utilized in Guadalupe include addition of rent-restricted accessory dwelling units, a preference policy for families with historical ties to the neighborhood, and the creation of Texas's first community land trust program—ensuring permanent affordability while providing important property tax savings for low-income homeowners.

In Portland, Oregon, an initiative in the Inner North/Northeast area provides an example of a community-driven plan for preventing and providing redress for the displacement of African-American residents, backed with the reallocation of more than $100 million in tax increment financing. The initiative includes a noteworthy "right to return" policy that prioritizes displaced residents with ties to the neighborhood for new affordable housing, and a community oversight committee that oversees the city's implementation of displacement mitigation programs.

From these three case studies we derived cross-cutting lessons for the City of Austin on what it takes to meaningfully reduce residential displacement.

## Cross-Cutting Lessons for Cities from Three Gentrifying Neighborhoods

1. **Put community voices at the center.** Ensure vulnerable residents have a meaningful role in identifying needs, prioritizing the use of resources, and monitoring progress. Support capacity building efforts to ensure participation is meaningful and robust.

2. **Intervene early.** Buy land and incorporate anti-displacement strategies into city plans or revitalization strategies likely to increase property values.

3. **Dedicate substantial resources to anti-displacement efforts.** Provide substantial levels of city funding dedicated to supporting neighborhood-level strategies for mitigating displacement of vulnerable populations.

4. **Match strategies to neighborhood conditions.** Gentrifying neighborhoods need an array of policies and programs to prevent displacement. Strategies should be matched to local conditions and grounded in community planning efforts.

5. **Stay committed for the long haul.** Develop realistic expectations of what constitutes success and the time to achieve displacement-mitigation goals. Long-term progress on mitigating displacement of vulnerable populations requires ongoing support and engagement from elected officials, civic leaders, and residents, including those from impacted communities.

## A Vision Statement and Goals to Frame Discussion of Solutions (Part 4)

The full report (Part 4) provides a summary of many different solutions for addressing displacement of vulnerable residents in gentrifying neighborhoods, grounded by the following vision statement:

> Low-income residents and persons of color, and their children, in historically disadvantaged communities have the opportunity to stay and return to their neighborhoods in the face of rising property values and the influx of more affluent residents. Over time, opportunities remain for new low-income residents to live in the community. Residents have a meaningful role in shaping the future of their neighborhood.

The strategies and policies are organized around a set of six overarching goals. This organizational framework provides a reference point for understanding how certain strategies and policies further different displacement mitigation goals, while not furthering others. The framework also highlights how one type of strategy might advance one goal while actually undermining another. For example, lowering property taxes for homeowners would help low-income homeowners remain in their homes, but also shift more of the property tax burden onto landlords, potentially contributing to increased rents and hurting Austin's vulnerable renters. The discussion of policies in Part 4 does not represent our endorsement or recommendations for policies that the City of Austin should pursue, but is instead intended to provide a range of options for policymakers to consider.

We also include a summary of funding strategies, along with key displacement-mitigation tools that are currently illegal in Texas. For the City of Austin to significantly blunt the force of residential displacement will require a drastic increase in local spending, in the ballpark of hundreds of millions of dollars per year. The City has a limited number of funding tools at its disposal to provide these levels of funding, with the primary sources being general revenue, general obligation bonds, and tax increment financing.

## A Framework for Evaluating Anti-Displacement Policies (Part 5)

In the final part of the report, we present a set of criteria to help policymakers conduct a closer evaluation of particular anti-displacement strategies and policies. To illustrate how these criteria can be used to generate more nuanced evaluations of tools and strategies, matched to particular contexts, we apply them to a review of several of the displacement mitigation tools discussed in Part 4.

No tool or strategy will score well on all measures. The criteria are meant to help policymakers consider which tools best further the city's goals and best match the needs of particular places and groups. The criteria also allow policymakers to weigh the effectiveness and impact of specific tools and which tools the city has the resources to implement and capacity to develop. Our application of these criteria is meant to highlight tradeoffs between tools and to raise issues for consideration when policymakers explore adopting specific strategies aimed at addressing the needs of particular neighborhoods or groups.

1. **Vulnerable populations targeted.** *Which group does this strategy/tool assist the most?*

2. **Stage of gentrification targeted.** *At what stage is this strategy/tool most effective?*

3. **Place-based.** *Does this strategy/tool focus on specific gentrifying neighborhoods?*

4. **Sustainability.** *How long will the effects of this strategy/tool last?*

5. **Inclusivity.** *How will the voices of vulnerable residents be represented?*

6. **Financial resources required.** *What level of funding or foregone revenue will be required?*

7. **Capacity required.** *How well do city and nonprofit staff and community roles match current capacity?*

## Summary

In summary, this report provides a framework for understanding which neighborhoods in Austin are home to large numbers of vulnerable residents being actively displaced from their communities or at the highest risk of displacement. Absent major interventions by the City of Austin and other stakeholders, these residents—who are largely low-income persons of color—will be pushed out farther away from opportunity and dislocated from their communities. In the process, neighborhoods that have historically been home to African-American and Hispanic residents will lose their cultural character and become enclaves for largely white and wealthier residents.

This report makes the case for geographically-targeted measures to reduce residential displacement in the hardest-hit neighborhoods. To make a measurable difference, truly place-based strategies will be required. Efforts that are equally distributed throughout the city will likely fail to operate at a sufficient intensity to meaningfully offset displacement pressures in the neighborhoods that are being swept by a rising tide of gentrification. In many ways, enacting such place-based strategies will be a new way of doing business, so to speak, for the City of Austin. Meaningfully reducing displacement will require an ironclad and sustained concentration of efforts and resources in the places that need them the most.

Making a difference will require a considerable investment of dollars—much more than Austin voters have been accustomed to allocating towards affordable housing and anti-displacement. Other cities seeking to have a major impact are regularly investing tens of millions of dollars in anti-displacement programs and policies. As for which specific strategies the City of Austin should adopt to address displacement in gentrifying neighborhoods, the report's case study research provides the City of Austin with cross-cutting lessons and examples of successful policy interventions. The report also includes a summary of many policies for the City to consider, along with a framework for analyzing these policies. The framework analyzes which policies best further particular goals and the needs of various groups and neighborhoods, their effectiveness and impact, and the need for additional city resources.

We welcome your feedback regarding this report. For electronic access to the report, interactive displacement maps, and other information related to the gentrification and displacement study, visit https://sites.utexas.edu/gentrificationproject.

| Uprooted: Residential Displacement in Austin's Gentrifying Neighborhoods, and What Can Be Done About It

# Introduction

Since the late 1990s, Austin has seen a dramatic rise in housing costs, shifting the city from among the most affordable in the country to one where a growing share of residents can no longer afford to live. As in many cities around the nation, there has been an inversion of previous demographic trends, as affluent residents increasingly move into central neighborhoods and low-income residents move out of the city. There has been both a surge in the production of high-end rental housing and—in certain central neighborhoods—an increase in demolitions as rising land values have spurred demolition of aging rental housing and the replacement of older single-family homes with new, more expensive homes.

The impacts of the city's rising housing costs have been particularly dramatic in the city's "eastern crescent," where historically low housing costs, produced in part through the city's history of publicly-supported racial and ethnic segregation, now combine with broader social and economic trends to make these neighborhoods more desirable to higher-income households. Over the past two decades, numerous city and citizen task forces have formed to study and address the impacts of these changes on Austin's communities of color and vulnerable households. (See Appendix 2.) In August 2017, the Austin City Council passed a resolution expressing concern with the on-going displacement of the city's low- and moderate-income residents, the destabilization of existing communities, and loss of diversity and sense of place for Austin communities. (See Appendix 1.) To respond to these concerns, the same resolution authorized the city manager to execute an agreement with the University of Texas to carry out a study of gentrification and displacement in Austin. As discussed in more detail in the next section, a key element of gentrification is the rise in property values and housing costs, often resulting in displacement of vulnerable residents. While there is disagreement about the potential benefits of rising property values and who receives these benefits, there is consensus that displacement is an undesirable side effect.

The focus of this study has been two-fold: to identify neighborhoods and groups of residents that are especially vulnerable to displacement as housing costs rise, and to identify potential strategies and polices for preventing their displacement. The first phase of the study focused on categorizing and mapping areas of the city by their displacement vulnerability levels. While rising housing costs are affecting a broad swath of Austinites, our purposes here are to: (1) help city officials understand how rising costs impact certain groups and areas of the City more than others; (2) facilitate early interventions in areas at the highest risk of displacement; and (3) help the city target particular displacement mitigation policies strategically.

In the first phase of the study, we began by identifying demographic groups who are the most vulnerable to displacement when confronted with rising housing costs and who face limited housing choices once displaced. We then identified neighborhoods where large concentrations of vulnerable groups live. While residents vulnerable to displacement also live in other areas, mapping and tracking changes in areas with the largest concentrations of vulnerable groups is useful for several reasons. First, this focus highlights the extreme vulnerability of neighborhoods strongly shaped by the city's history of discriminatory planning and real estate practices (discussed further below). Second, this spatial focus allows for consideration of how future city investments in particular locations may spur—or prevent—further large-scale displacement. After identifying and mapping these areas, we next assessed the areas for evidence of whether demographic and housing market changes were already occurring and categorized them on a continuum of neighborhood change based on this evidence.

We also selected two gentrifying areas—St. John's-Coronado Hills and Montopolis—for a more intensive "drilldown" analysis. The drilldowns use a wider variety of data sources beyond U.S. Census data, and allow for a more nuanced quantification of the various vulnerable subpopulations

living within a particular area. We intend for these to be both a useful starting point for further analysis of these two particular vulnerable areas, as well as a replicable template for similar analyses that could later be conducted in other vulnerable or gentrifying areas.

The second phase of the study involved analyzing a broad range of policy tools that the City of Austin might adopt to help prevent displacement of vulnerable residents. This work included in-depth research on three case study neighborhoods that have used a range of strategies to prevent or mitigate displacement; development and review of a list of policy tools that are legal in Texas; and development of a set of criteria to use in assessing which tools to adopt. We describe our methodology for each phase of the study in more detail in subsequent sections and in the appendices.

Given the complexity of gentrification, it is important to clarify what is not included in this study. First, while local businesses and the cultural character of a community are also affected by rising land and property values, our focus here is limited to residential displacement. Second, while creating equitable housing opportunities for displaced, low-income residents will necessarily involve opening up neighborhoods that have been historically inaccessible to these residents, our focus here is on geographically targeted policies for ensuring that vulnerable residents can stay in their homes and neighborhoods or return to them if they wish to. We spend relatively little time in the report on land use solutions associated with increasing housing types and choices in other neighborhoods or across the city.

### Report Overview

The first part of the report lays the groundwork for understanding the problems faced by vulnerable residents and neighborhoods in Austin and assessing potential solutions. We begin by discussing the range of definitions of gentrification put forth in past studies and what elements are most pertinent to our study. In particular, we emphasize the issue of displacement of vulnerable residents and discuss the various forms that displacement can take.

In Part 2, we discuss our approach to identifying vulnerable populations and neighborhoods and our framework for identifying where gentrification is taking place in Austin. We then present the results of our analysis. These results include a map of the neighborhoods we identified as most vulnerable to displacement and another showing the stage of gentrification for each of these vulnerable neighborhoods. We also present more detailed analyses of two gentrifying neighborhoods to illustrate how further study might inform discussion of targeted solutions.

Part 3 presents summaries of the three case studies we developed to examine local efforts to mitigate displacement. We also present ten cross-cutting lessons derived from these studies for the City of Austin to consider as it seeks to improve its anti-displacement strategies. These case studies allowed us to better understand how strategies for mitigating displacement have worked on the ground—including the challenges that cities and communities faced in implementing particular strategies. We also hope to raise awareness of innovative approaches being taken by cities around the country in this policy arena. The full case studies are provided in Appendix 4.

In Part 4, we review specific solutions for addressing displacement of vulnerable residents in gentrifying neighborhoods. We ground this review in the following vision statement, developed based on our review of and participation in previous public discussions on gentrification and displacement in Austin.

### Guiding Vision Statement for Anti-Displacement Solutions

Low-income residents and persons of color (and their children) in historically disadvantaged communities have the opportunity to stay and return to their neighborhoods in the face of rising property values and the influx of more affluent residents. Over time, opportunities remain for new low-income residents to live in the community. Residents have a meaningful role in shaping the future of their neighborhood.

The vision statement is followed by an overview of many possible strategies and policies, organized under six major goals. Each policy contains a short summary, pros and cons, and cities where the policy has been implemented. We only include here tools that are legal in Texas. After this policy overview, we include a summary of key displacement-mitigation tools that are illegal in Texas.

In the final part of the report, we present a set of criteria to help policymakers conduct a closer evaluation of particular anti-displacement strategies and policies and better match them to the needs of particular vulnerable populations and different stages of neighborhood change. The criteria also provide a framework for assessing policies based on a set of criteria aligned with past public discussions and adopted resolutions, and on factors related to implementation. To illustrate how these criteria can be used to generate more nuanced evaluations of tools and strategies, matched to particular contexts, we apply them to a review of several of the displacement mitigation tools discussed in Part 4.

We welcome your feedback regarding this report. For electronic access to the report, interactive displacement maps, and other information related to the gentrification and displacement study, visit https://sites.utexas.edu/gentrificationproject.

# PART 1

## Background on Gentrification and Displacement

# Background: Gentrification and Displacement

**What do we mean by "gentrification?"**

The term gentrification is usually traced back to its first use in London in the 1950s and 1960s to describe the influx of a new "gentry" into low-income neighborhoods.[1] More recently, a Brookings report included this definition:

> "…the process by which higher income households displace low income residents of a neighborhood, changing the essential character…of that neighborhood."[2]

This process includes three dimensions: 1) the displacement of lower income residents; 2) the physical transformation of the neighborhood—mostly through the upgrading of its housing stock and commercial spaces; and 3) the changing cultural character of the neighborhood. In the U.S., gentrification has most often—but not always—been applied to describe changes happening in declining areas characterized by poor physical conditions, concentrated poverty, and the racial segregation of people of color.[3] In communities of color, poor conditions and disinvestment were the result of a history of public policies and private real estate practices that undermined property values and living conditions in these neighborhoods.[4]

More recently, the term "gentrification" has been used more broadly to include any neighborhood that is becoming less affordable to current residents, regardless of the history of the neighborhood or the outcomes for residents. This more recent usage obscures the process underlying neighborhood change and also trivializes the different outcomes for members of nonwhite racial and ethnic groups and for neighborhoods with histories of systematic disinvestment.

**What causes gentrification?**

Disagreements about definitions of gentrification relate to understandings of what drives the process of change, the benefits that such change can produce, and who receives these benefits. The current rise in prices in central neighborhoods is part of a broader inversion of the demographics of U.S. metropolitan areas, whereby the poor are pushed outward while the affluent are moving inward (Figure 1). In general, gentrification is more likely to occur in places where the housing stock is much more affordable than other places in the same city and where something has happened to change perception of the value of that location.

The relative importance of various factors in shaping why particular places are becoming more attractive to investors and to higher income residents is debated. Among the factors considered to be important are: changing preferences for central city living and the amenities that offers, city planning and economic development initiatives fostering redevelopment or new development in or near central neighborhoods, and federal initiatives to redevelop public housing as mixed-income communities.[5] Also debated is whether new development that does not directly displace existing residents is part of the gentrification process or instead is a form of "re-urbanization" that should be viewed more positively.[6]



Source: Edlund, Lena, at al, "Bright minds, big rent: gentrification and the rising returns to skill,"
2015, No. w21729, National Bureau of Economic Research.

**Understanding displacement**

There is no consensus on what gentrification is or even whether it is good or bad. But any reasonable person should be able to recognize that displacement is a matter of concern. This displacement has two dimensions: the stability of a neighborhood's residential community and the harder-to-define culture or character of the neighborhood. We focus in this report on the former.

Several forms of residential displacement have been identified by scholars. *Direct displacement* of current residents occurs when (1) residents can no longer afford to remain in their homes due to rising housing bills (rents or property taxes), or (2) residents are forced out due to causes such as eminent domain, lease non-renewals, and evictions to make way for new development, or physical conditions that render their homes uninhabitable. Deterioration in conditions is often thought to occur mostly in neighborhoods where housing is of very low value. However, conditions can also decline when owners stop maintaining buildings while they wait for the right moment to sell them for redevelopment. While displacement occurs routinely in low-income neighborhoods, when displacement occurs in the context of changes in the physical and social character of the neighborhood, it becomes a characteristic of gentrification.

*Indirect displacement* refers to changes in who is moving into the neighborhood as low-income residents move out. While there is often a lot of movement in and out of rental housing in low-income neighborhoods, indirect displacement occurs when units being vacated by low-income residents are no longer affordable to other low-income households. This is also called *exclusionary displacement* since future low-income residents are excluded from moving into the neighborhood.[7] This process is also sometimes referred to as a process of residential succession, whereby current low-income residents move out of a neighborhood—even if not due to direct displacement as a result of increased housing prices, eviction, or housing conditions—and are replaced with higher-income residents over time.[8] Such changes can also occur due to discrimination against low-income residents (for example, those using vouchers) or changes in land use or zoning that foster a change in the character of residential development.[9]

*Cultural displacement* occurs through changes in the aspects of a neighborhood that have provided long-time residents with a sense of belonging and allowed residents to live their lives in familiar ways. As the scale of residential change advances, and shops and services shift to focus on new residents, remaining residents may feel a sense of dislocation despite physically remaining in the neighborhood.[10] This may also reflect the changing racial or ethnic character of the neighborhood—not just its class composition. This report is focused primarily on strategies for addressing residential displacement, but it is important for new city policies addressing displacement to also address this important cultural dimension of displacement.

**Right to return and forward-looking inclusion**

When understood as a process rooted in the uneven treatment of particular neighborhoods and racial and ethnic groups, addressing gentrification related to displacement requires attention to displaced residents, current residents, and also future residents. As we will discuss in later sections on potential solutions, some cities have attempted to redress displacement over time through "right of return" policies that focus on former residents who have been displaced from a neighborhood or current residents who are at risk of being displaced. At the same time, looking forward, it is important to ensure that in the future other low-income people will also be able to move into gentrifying neighborhoods, and that the scale of change does not erase key cultural aspects of neighborhoods that allow residents to feel like they belong.

# Endnotes

[1] Glass, R.L., London: Aspects of Change, London, UK: MacGibbon & Kee, 1964.

[2] Kennedy, Maureen. and P. Leonard, Dealing with Neighborhood Change: A Primer on Gentrification and Policy Choices, Washington, D.C.: Brookings, 2001, p. 5.

[3] Zuk, M., A. Bierbaum, K. Chapple, K. Gorska, and A. Loukaitou-Sideris, 2017, "Gentrification, Displacement, and the Role of Public Investment," Journal of Planning Literature, 33, 1, p. 2.

[4] Hirsch, A, Making the Second Ghetto: Race and Housing in Chicago 1940-1960, University of Chicago Press, 1998; Sugrue, T., The Origins of the Urban Crisis: Race and Inequality in Postwar Detroit, Princeton University Press, 1996; Rothstein, R., The Color of Law: The forgotten history of how our government segregated America, Liveright, 2017.

[5] Zuk, et al.; Davidson, M. and L. Lees, "New-Build Gentrification: Its histories, trajectories, and critical geographies," Population, Space and Place, 2010, 16: 395-411; Ehrenhalt, A, The Great Inversion and the Future of the American City, Vintage Books, 2012.

[6] Haase, A., Steinfuhrer, A, "Reurbanisation of inner-city areas in European cities," in Society, Economy, Environment—Towards the Sustainable City, Sagan, I, Smith D (eds), 2005, Gdansk: Poznan: 75-91.

[7] Marcuse, P., "Gentrification, Abandonment, and Displacement," Urban Law Annual; Journal of Urban and Contemporary Law, Jan. 1985, 28, 1: 195-240.

[8] Freeman, L., "Displacement or Succession? Residential mobility in gentrifying neighborhoods," Urban Affairs Review, 2005, 40, 4: 463-91.

[9] Zuk, M., et al, "Gentrification, Displacement, and the Role of Public Investment," Journal of Planning Literature, 2017, 33, 1:31-44.

[10] Davidson, M., "Displacement, Space and Dwelling: Placing gentrification debate," Ethics, Place and Environment, 2009, 12, 2: 219-34.

# PART 2

Identifying and Mapping Gentrifying Neighborhoods in Austin

# Understanding and Identifying Vulnerability to Displacement

The first phase of our research involved identifying which neighborhoods in Austin have a concentration of residents who are the most vulnerable to displacement in the face of rising housing costs. For this analysis, we used a short list of indicators to identify residents who, according to research, are the least able to absorb rising housing costs and whose housing choices are especially limited in the wake of displacement. In this section we discuss how we arrived at these indicators.

### Indicators of Vulnerability to Displacement from Rising Housing Costs



Household income
**low-income**

Race and ethnicity [1]
**people of color**

Education
**head of household without a bachelor's degree or higher**

Household composition
**families with children in poverty**

Housing status
**renters**

Social vulnerability refers to the differing ability of members of particular socio-demographic groups to withstand threats to their livelihoods, security, and social, economic, and political networks. Measures of social vulnerability attempt to integrate a set of characteristics of people and places that make them especially likely to be harmed by shocks such as natural disasters or redevelopment and rising housing prices.[2] Similarly, housing researchers have also studied how certain socioeconomic characteristics are intertwined with housing instability.[3]

As described in the next section, to reflect the compounding nature of these markers of vulnerability, we looked for areas where there is strong overlap between these markers. It is important to keep in mind that these indicators cannot really be divorced from each other—poverty overlaps with education, people of color are more likely to be renters than white residents, etc. We discuss the indicators separately here to explain how each impacts vulnerability to displacement, based on existing research.

➤ **Income**

Poverty lies at the center of research on social vulnerability and on housing insecurity. Households with incomes that are low when compared to the regional median—particularly those whose incomes fall below the poverty line—are particularly sensitive to rising housing costs. They are also

less able to find affordable options if forced to move.[4] Those living in poverty have more debt and fewer assets than the non-poor.[5] This leaves them with little to fall back on when faced with rising rents, often resulting in eviction. Living in a poor neighborhood compounds their vulnerability.[6] Although wealth (how many assets a household has at a given moment) is not exactly the same thing as income (how much a household earns within a given period of time), they are highly correlated. Data on income from the U.S. Census is widely available, whereas wealth is much harder to track, and so we rely on income in our analysis.

## ➤ Race and ethnicity

Non-Hispanic Blacks, Hispanics, and Native Americans tend to have fewer resources to draw upon in case of financial shocks than whites.[7] Structural racism in employment and segregation of housing markets result have contributed to great disparities in wealth between these groups and whites.[8] A 2009 Pew Research Center study found the median wealth of white households to be 20 times that of Black households and 18 times that of Hispanic households: the typical Black household had $5,677 in wealth and the typical Hispanic household had $6,325, while the typical White household had $113,149 in wealth. Many households of color (35% of African American and 31% of Hispanic households) had either zero assets or a negative net worth, while only 15% of white households did.[9] This wealth gap was exacerbated by the mortgage crisis and credit crunch that began in around 2007. Hispanic homeowners were particularly hard hit: Between 2005 and 2009, Hispanic homeowners saw a 4 percent drop in homeownership and lost, on average, half of the equity in their homes.[10]   A 2015 study concluded that discriminatory lending practices during the financial crisis will likely widen the black-white wealth gap for the next generation.[11]

The spatial concentration of people of color in low-income communities can have compounding effects on wealth disparities. In addition to the wealth inequities noted above, linked to publicly-shaped segregated housing markets,[12] neighborhood location can also deepen these inequities through unequal access to high performing public schools.

Despite the overturning of legally-sanctioned racial segregation in the mid-twentieth century, low-income residents of color living in predominantly non-white neighborhoods are extra vulnerable to displacement. First, the value of their neighborhoods has been depressed by past discriminatory actions, making them lucrative sites for residential investment associated with gentrification and displacement. Second, they continue to face barriers to living in more affluent, historically white neighborhoods. Once displaced, their housing choices remain limited.[13]

## ➤ Education

Households headed by workers without a college degree are less likely to be employed and more likely to be employed in jobs paying low wages or offering seasonal employment, making them particularly vulnerable to displacement from rising housing costs.[14] Displacement of households without college degrees to areas outside of the city can exacerbate income disparities. Recent research finds that, as the poor move to the suburbs, they are likely to live in "job-poor" suburbs, in part because of exclusionary development patterns in more job-rich suburban areas.[15]

## ➤ Household composition (families with children and seniors)

The types of households present in a neighborhood can also relate to the likelihood of displacement. The presence of large numbers of elderly households or households with children, under certain circumstances, can be markers of vulnerability. On their own, however, they are not consistent predictors. For example, an elderly household can be high income with considerable assets (less vulnerable), or poor with few assets (more vulnerable). For elderly households, researchers find that being elderly, absent other markers of vulnerability (low-income, no bachelor's degree, etc.) does not result in a significant increase in vulnerability from rising housing costs compared to non-

elderly households.[16] While we did not use the presence of elderly households to identify vulnerable neighborhoods, we did map the location of elderly households in Austin, which is available on the interactive mapping website we created, at https://sites.utexas.edu/gentrificationproject. This information is also referenced in our discussion of options for low-income homeowners (see Part 4, goal 2, and Appendix 5).

The relationship between the presence of children and vulnerability also rests heavily on the income and housing tenure of the household. We found the strongest evidence for such a relationship for poor households with children. Matthew Desmond's Milwaukee study of renters facing eviction found that poor families with children were more likely to face eviction than households without children, even taking into account the details of their cases and situations.[17] Once displaced, households with multiple children also face considerable difficulties finding housing that can accommodate them. While the Fair Housing Act includes protections for families with children, the limited enforcement and the paucity of larger rental units undermines its effectiveness. Federal assistance for families with children is also at its lowest level in close to twenty years, further undermining options for these families.[18]

➤ **Housing status**

Urban Institute fellow Rolf Pendall and his coauthors use the phrase "precarious housing" to describe the types of housing that make residents particularly vulnerable to displacement. They examine (1) the physical conditions associated with housing (overcrowding, poor maintenance, or conditions due to age or housing type and construction quality) and (2) the ongoing ability of a household to remain in their home or to benefit in any way from rising home values. The researchers found that renters as a group are the most vulnerable to displacement from their homes. For example, as rental property owners decide to upgrade their units,[19] convert them to condominiums, or replace mobile home parks with more profitable land uses, their renters will be displaced.[20] Homeowners may also be forced to sell due to rising property taxes or the cost of repairs—but as a group they are much less vulnerable to displacement than renters. And homeowners may also be able to capture some of the rising value of their homes to help them stay or relocate, depending on how early in the process of change they are forced to sell.

➤ **Putting the indicators together**

Through the overlap of these five indicators, we see that certain groups of people are more vulnerable to displacement from rising housing costs than others. Generally, the evidence is strongest for the compounding effect of being African-American or Hispanic on other dimensions of vulnerability to displacement. For example, African-Americans are more likely to have other characteristics that increase their vulnerability, such as living in poverty or being renters.[21] Hispanics are also more likely to be renters, or have lower levels of education, or both.[22]



Who is most vulnerable to displacement?

Communities of Color · People 25 and older without a Bachelor's Degree · Renters · People making at or below 80% Median Family Income · Households with children in poverty

**Change Over Time**

Identifying neighborhoods with high concentrations of vulnerable persons is only the starting point. Understanding whether displacement from gentrification is occurring, and identifying likely points of intervention, requires looking for signs of vulnerable residents actually leaving neighborhoods while less vulnerable residents move in, and also looking for signs of changes in the housing market both inside the neighborhood and nearby. Based on our earlier discussion of gentrification and displacement, in our research we looked for vulnerable neighborhoods where, over time, (1) residents' incomes have been increasing at a greater rate than the metro area; (2) the percentage of residents of color has been declining compared to the metro area; (3) the percentage of residents with bachelor's degrees has been increasing at a rate greater than the metro area; and (4) the homeownership rate has gone up faster than the metro area. All of these changes are considered markers of gentrification—of a neighborhood transforming through the loss of its vulnerable residents and influx of wealthier persons. To then identify whether these changes are connected to a particular stage of gentrification, we looked for signs of rising property values in the neighborhood and adjacent areas.

One word of caution on analyzing demographic changes is in order: When we measure change over time, we are effectively taking two snapshots of a neighborhood at different times and comparing them. Census data, which we rely upon in this study, does not allow us to actually track who has moved into or out of a neighborhood, let alone where they have come from or where they have gone. For example, if a neighborhood has a median household income that has increased by 50 percent in inflation-adjusted terms over 10 years, it is impossible to know from that statistic alone whether new, high-income residents have replaced low-income residents, or whether the low-income residents have simply managed to greatly boost their earning power. That is why we examine demographic change as a combination of factors: For instance, if a given neighborhood has recently experienced a sharp increase in the percentage of white, college-educated, and high-income residents, we can infer that a new group of more advantaged people has moved in.

# Summary of Gentrification Mapping Methodology

This section summarizes our methodology for mapping Austin's neighborhoods as either gentrifying or not gentrifying, and for classifying the gentrifying neighborhoods according to their stage of gentrification. Our procedure is an adaptation of a method devised by Dr. Lisa Bates of Portland State University in Oregon, and first applied to Portland.[23] Note that this section provides a high-level overview; full methodological details and a step-by-step procedure can be found in Appendix 3.

### What we analyzed

The basic geographic unit that we used to analyze Austin is the census tract. A census tract is an area defined by the federal government that typically contains between about 2,500 to 8,000 people. It can be thought of as roughly equivalent to a neighborhood, although census tract boundaries do not necessarily line up with neighborhood definitions commonly used in Austin. The geographic size of a tract depends on how many people it contains and how densely populated it is. As one example, Travis County census tract #15.04, which covers the Crestview neighborhood in North Central Austin, is just over a square mile in size.

We began by identifying all of the census tracts that lie either entirely or partially inside Austin's city limits. Next, we eliminated several tracts from the study because they are unusual places not subject to the typical processes of neighborhood change. These included the tracts containing Austin Bergstrom International Airport, the University of Texas (UT) main campus, and Camp Mabry, a military base. We also eliminated two tracts comprising the West Campus neighborhood

immediately west of the UT main campus, since demographic information from student-dominated neighborhoods can lead to misleading conclusions. For instance, a very high proportion of college and graduate students are represented in official data as living in poverty, even though many of them have access to opportunities and resources that are a world away from what predominates in a truly impoverished neighborhood.

After we had eliminated several census tracts from the study, we were left with 200 of them. We assigned names to each of them, which appear on the interactive map interface that we have released alongside this report (https://sites.utexas.edu/gentrificationproject/). The names represent our best attempt to match the various census tracts in Austin with locally meaningful geographic descriptors.

It should be noted that the Census changes its definitions of tracts every ten years (following the release of each new decennial census). We used Census-provided "crosswalk files" to harmonize the boundaries of 1990 and 2000 tracts with 2010 tracts.

**Overall procedure**

Following the Bates methodology, our analysis unfolded in three steps. The ultimate goal behind the procedure was to classify every census tract in Austin as gentrifying or not, and to classify the gentrifying tracts into five categories based on the following stages:

### 5 categories of Gentrifying Neighborhoods



To get to this classification of gentrifying neighborhoods, our first step was to classify each census tract on the basis of *vulnerability*. In general, vulnerability refers to a tract having an above-average share of vulnerable residents—classes of persons who are more likely to be displaced when housing costs rise in an area or an area is subject to increased public and private investment (see the above section for a more detailed description on vulnerability). Each tract was classified as either vulnerable or not vulnerable. The second step was to classify tracts based on *demographic change*: Between the years 2000 and 2016, had the census tract experienced an increased share of residents associated with gentrification (e.g., white, higher-income, highly-educated, homeowner residents)?

Finally, the third step examined *housing market change* from 1990 to 2016 and from 2000 to 2016. For this step, census tracts were classified according to whether they had experienced an above average amount of appreciation since either 1990 or 2000, or whether they were adjacent to a tract that had experienced such change (typically an indication, according to research, that home price appreciation will soon take place). See below, along with Appendix 3, for a more detailed discussion of these three steps.

### *Snapshot:* 3-Part Gentrification Analysis



**1 Vulnerability**
What percent of the population in a neighborhood is vulnerable to displacement?

**2 Demographic Change**
What levels of demographic changes, if any, have been occuring in the neighborhood?

**3 Housing Market Change**
How much housing market appreciation, if any, has taken place in the neighborhood?

After collecting this data, we assigned one of the five gentrification stages to each gentrifying neighborhood. A neighborhood was classified as an *Early: Type 2*, *Dynamic*, or Late stage gentrifying neighborhood, if the census tract met all three of the following conditions: (1) an above-average share of vulnerable residents, (2) experienced significant demographic change, and (3) experienced significant housing market change. If a tract was vulnerable and had experienced appreciation but not yet demographic change, it was classified as *Early: Type 1*. Finally, if a tract was vulnerable and had experienced no demographic change and only moderate housing market change or none at all, but it lay adjacent to a tract with either high real estate values or high recent appreciation or both, then it was classified as *Susceptible*. In such a tract, gentrification is likely imminent (assuming the city's current economic boom continues), or already underway but not yet showing up in official data because of the time that has elapsed since the data was collected. This classification scheme follows the Bates method precisely. The criteria for inclusion in the five gentrification stages are summarized in the table below.

### Categories of Gentrifying Neighborhoods

| Gentrifying tract type | Demographic change (2000 to 2012-16) | Average current residential real estate value (2012-16) | Appreciation | Must touch tract with high value and/ or high recent appreciation |
|---|---|---|---|---|
| **Susceptible** | | Low or moderate | Low or moderate recent (2000 to 2012-16) | √ |
| **Early: Type 1** | | Low or moderate | High recent (2000 to 2012-16) | |
| **Early: Type 2** | √ | Low or moderate | Low or moderate recent (2000 to 2012-16) | √ |
| **Dynamic** | √ | Low or moderate | High recent (2000 to 2012-16) | |
| **Late** | √ | High | High sustained (1990 to 2012-16) | |

*Adapted from Lisa Bates, "Gentrification and displacement study: Implementing an equitable inclusive development strategy in the context of gentrification, 2013, Table 1, page 31, at https://www.portlandoregon.gov/bps/article/454027.*

If a census tract was identified as not vulnerable, it was not classified as a gentrifying neighborhood. It is important to note that simply because a tract is classified as not vulnerable does not imply that it lacks vulnerable people. Rather, such a tract has a lower share of vulnerable people than average. Residential displacement can and does still occur within such areas. One further subcategory recognizes these dynamics: tracts are classified as *Continued Loss* tracts if they (1)



have experienced an above average increase in white and college-educated people from 2000 to 2016, and (2) have housing market values that increased substantially from 1990 to 2016 and are now high. These can be thought of as tracts that have passed beyond the final (Late) stage of gentrification, but that still retain remnant vulnerable populations, many of whose members likely continue to be vulnerable to displacement.

**Using census data to make comparisons**

To assess whether a given census tract had experienced above average vulnerability, demographic change, or housing market change, we compared it against a wider area. In the case of vulnerability and demographic change, we compared various indicators (five for vulnerability, and two for demographic change, detailed below) against the average for the entire five-county Austin-Round Rock Metropolitan Statistical Area (MSA), which consists of Bastrop, Caldwell, Hays, Travis, and Williamson counties. The City of Austin accounts for just under half of the population of this metropolitan area.

Making comparisons to the MSA is a departure from the original Bates method, which only compared census tracts in Portland to city-wide data. Our procedure intended to capture the metropolitan character of neighborhood change, which involves various populations moving to—or being displaced into—a wide variety of different locations, both inside the City of Austin and outside, within the regional job market.

In another departure from the Bates method, we used a statistical measure called Z-scores to quantify the extent to which a given indicator was above or below the MSA average. By contrast, the Bates method used thresholds: a given indicator was assumed to be above average, or not, based on whether it was above or below a certain level. Z-scores, by contrast, take into account not just whether a given indicator is above or below average, but *how much* it lies above or below the average. The details of our methodology are explained in Appendix 3.

Census data measured at the tract level is gathered over five-year intervals as part of the American Community Survey (ACS). The most recent tract-level data available at the time we conducted the analysis in this report was for the years 2012 to 2016. By contrast, earlier tract-level data is available from the 1990 and 2000 decennial censuses.

**Vulnerability**

To assess the vulnerability of neighborhoods to gentrification, we used five variables for measuring the socio-demographics of a given tract as of 2016 (using 2012-16 ACS data):

## Vulnerability Factors

 **People of color**
Percent of residents who identify as anything other than "non-Hispanic white alone."

 **Renters**
Percent of households  who rent, rather than own, their homes.

 **Lack of higher education**
Percent of residents aged 25 or greater lacking a four-year bachelor's degree or higher.

 **Children in poverty**
Share of children who live in households that lie below the official federal poverty line.

 **Low income**
Percent of households with incomes below 80% of the Area Median Income (AMI) for households of the same size within the MSA.

The first four vulnerability factors are used in the original Bates method. We added the fifth—children in poverty—in response to input from Austin city councilmembers and staff. We considered, but did not include, a sixth indicator: the percentage of residents over the age of 65. As discussed in the prior section, research has found that being an elderly person is not a consistent predictor of vulnerability, if not used alongside other markers of vulnerability (renter, low income, etc.).

Tracts were designated as vulnerable if the Z-score for at least three out of the five vulnerability factors exceeded +0.5. For mapping purposes, we further categorized vulnerable tracts into three subcategories, based on the average Z-scores for all five vulnerability factors: *Vulnerable* (average Z score was less than +1.0), *More Vulnerable* (between +1.0 and +1.5), and *Most Vulnerable* (more than +1.5).

### Demographic change

We used four variables to assess *demographic change over time* between the years 2000 and 2016 (using 2012-16 ACS data). Specifically, we looked at whether there was an increase in the share of residents meeting one or more of three demographic factors: homeowners, higher education, and white. We also looked at changes in median income in each tract.



## Demographic Change Factors

**Homeowners**
Percent of households that own, rather than rent, their homes.

**Higher education**
Share of adults aged 25 or greater holding a four-year bachelor's degree or higher.

**White persons**
Percent of the population who identify as non-hispanic White alone.

**Income**
Median household income.

A tract was deemed to have experienced demographic change if at least two of the four demographic variables had Z-scores that exceeded +0.5, and if the average Z-score for the four factors exceeded +0.5.

### Housing market change

Following the Bates methodology, we used three variables to classify tracts on the basis of housing market change. All of them involve median home values reported at the tract level. Note that home value data from the Census and from the ACS is self-reported by respondents and only applies to owner-occupied housing.

Unlike what we did with vulnerability and housing market change, for the housing market analysis we did not compare tracts against the MSA-wide average using Z-scores. Instead, we sorted the 200 tracts within Austin and grouped them into quintiles, i.e., categorized them into five "buckets:" lowest fifth, second lowest fifth, middle fifth, second highest fifth, and top fifth. Because the bulk of recent dramatic home value increases have occurred within the City of Austin, extending this analysis to the entire MSA would have dampened the variation among tracts.

Note that a small number of tracts lack reported median home value data, because they have so few owner-occupied units that the Census cannot release statistically valid estimates for them. In such cases, we benchmarked median rents, rather than median home prices, against the rest of the tracts using quintiles in the same manner.

The three variables we used to classify tracts on the basis of home values were as follows:

- *Present home value:* Median home value (ACS 2012-2016 data).
- *Home value change since 2000:* Percent change in median home value from 2000 to 2016 (using 2012-16 ACS data).
- *Home value change since 1990:* Percent change in median home value from 1990 to 2016 (using 2012-16 ACS data).

Following Bates, we used these variables to identify three types of tracts with notable housing market dynamics:



**Accelerating tracts**
have low or moderate (bottom three quintiles) present home values and experienced high (top two quintiles) appreciation from 2000 to present.

**Appreciated tracts**
had low or moderate 1990 home values, high (top two quintiles) present home values, and high (top two quintiles) appreciation from 1990 to present.

**Adjacent tracts**
had low or moderate (bottom three quintiles) home values in 2000, low or moderate (bottom three quintiles) from 2000 to present, and touch the boundary of at least one tract with high (top two quintiles) present value or high appreciation from 2000 to present.

Intuitively, *accelerating* tracts are places where the housing market has picked up steam since 2000; appreciated tracts are where this process has already occurred; and *adjacent* tracts are where this process seems likely to happen soon. Referring back to the gentrification typology discussed earlier in this section, *Susceptible* tracts have not experienced demographic change, and are in areas adjacent to ones showing signs of housing market appreciation. *Early: Type 1* tracts have not yet experienced demographic change but are experiencing an accelerating market. *Early: Type 2* tracts are the other way around: they have experienced demographic change but are not yet accelerating and instead are next to an accelerating or appreciating tract. *Dynamic* tracts have experienced demographic change and are experiencing accelerating market conditions, whereas Late tracts have also experienced demographic change but are in an appreciated housing market state. Finally, among non-vulnerable tracts, *Continued Loss* tracts, in addition to having recently experienced an increase in their white and college educated populations, are in an appreciated market condition.

# Findings: Where is Gentrification Taking Place in Austin?

In this section, we report the results of our mapping of gentrification in Austin. We present and discuss four maps that align with the three-step process discussed in the previous section: one for vulnerability, one for demographic change, one for housing market change, and finally the overall gentrification typology map. These maps are all included at the end of this section. Note that online versions of these maps can be viewed at https://sites.utexas.edu/gentrificationproject.

## Vulnerability

The vulnerability map (Figure 1) reveals the tracts—drawn in varying shades of red—that are home to unusually high proportions of vulnerable people as measured by the five vulnerability factors described in the previous section (people of color, lack of higher education, low income, renters, and children in poverty). Tracts that are wholly or partially inside the city limits but that were not analyzed (University of Texas, the airport, etc.) are shown in a cross-hatched pattern. Tracts that are wholly or partially inside the city boundary that did not register as having unusually large vulnerable populations are shown in dark grey.

The tracts that are shown as vulnerable are classified as *Vulnerable* (salmon), *More Vulnerable* (pink), and *Most Vulnerable* (dark red). In general, the geographic pattern closely follows what has come to be known as the "eastern crescent." This is an area shaped like a backward letter "C" that begins due north of downtown Austin just outside of U.S. Highway 183, and follows the highway as it heads southeast and then due south before bending to the southwest and mostly ending due south of downtown and Oltorf. The eastern crescent has come to be known as the new geographic pattern of social disadvantage in Austin, supplanting to some degree the conception of the city's advantaged and disadvantaged areas as lying to the west and east, respectively, of Interstate 35. It is noteworthy that in spite of many years of intensive gentrification immediately east of downtown in Central East Austin, disadvantaged populations remain in these areas.

The pockets of deepest disadvantage lie in and near the Rundberg area in North Austin, Daffin Gin Park in Northeast, Rosewood in East Austin, Montopolis in inner Southeast, and Franklin Park in Southeast just south of the Ben White highway and immediately east of Interstate 35. These pockets mostly lie a considerable distance from downtown; aside from Rosewood, which is within three miles of City Hall, the next closest is Montopolis, about four miles away. These patterns show that while the process of social disadvantage in Austin moving to the outskirts is not entirely complete—vulnerable populations can still be found near downtown, to the east—it is well underway. Compared to even 20 or 30 years ago, a higher share of disadvantaged people in Austin are in locations that are distant from the various economic, cultural, and other opportunities offered by Austin's urban core—including the University of Texas, the state capitol, and central business district.

## Demographic change

The spatial pattern of demographic change that can be seen in the demographic change map below is both striking and simple. With a few scattered exceptions, the tracts that experienced demographic change vis-à-vis the MSA as a whole are overwhelmingly concentrated in a ring surrounding downtown Austin. This pattern confirms, for Austin, the "Great Inversion" thesis for the United States as a whole, discussed earlier in the report. Living in and near the urban core has become strikingly sought after by advantaged populations in Austin: homeowners, the educated, the high-income, and whites. The implications for the near future are easy to predict: It seems logical that the next ring out of census tracts, surrounding those in the urban core that have already experienced demographic change, will be next to experience such dramatic change.

**Housing market change**

The housing market change map below shows that housing market change in Austin has also generally followed the eastern crescent spatial pattern. Many of the same neighborhoods that are disproportionately home to vulnerable populations are experiencing or have experienced substantial housing price appreciation, or lie adjacent to a tract that already has experienced such change. In keeping with the Great Inversion thesis, the areas within the crescent that lie closest to downtown are generally likeliest to be Appreciated (i.e., to have already experienced price escalation; tracts shown in pink); while the tracts slightly further away are Accelerating (i.e., where the market is gaining steam; tracts shown in orange), and Adjacent tracts lie the furthest away (yellow).

Despite the demographic change that has occurred on all sides of downtown, including to the west, there has been little housing market appreciation vis-à-vis the rest of the city either immediately north or west of downtown. These neighborhoods, presumably, were already high value in 1990 and 2000, as reflected by their home prices, and whatever price appreciation has occurred in them since then has not altered their fundamental position in the socioeconomic hierarchy. They were elite places then, and remain so today.

**Gentrification typology**

The final map in this section represents the "bottom line" of our gentrification typology analysis combining vulnerability, demographic change, and housing market change. The neighborhoods shown in bright colors are those deemed to be undergoing gentrification, or Continued Loss, under our modified version of the Bates procedure described in the last section. As with vulnerability and housing market change, the general geographical pattern follows the eastern crescent. The stages of gentrification ripple out from downtown Austin, with Continued Loss tracts lying immediately to the east and south, and with (generally) increasingly earlier stages of gentrification as one proceeds away from downtown to the north, east, or south. The yellow, or Susceptible, tracts suggest where gentrification may occur next if it is not yet underway already.[25]



Of 200 Austin neighborhoods . . .

**Susceptible** Near high value/ high appreciation areas. Not yet experiencing demographic change.

**Early Type 1** Experiencing appreciation, still with low/moderate home values.

**Dynamic** Exhibit demographic change indicative of gentrification.

**Late** Newly high value areas, still with vulnerable populations

**Continued Loss** High value areas that have experienced demographic change

6 — Cont'd Loss
12 — Dynamic
23 — Susceptible
4 — Late
13 — Early Type 1

Only two outlier communities are totally disconnected from the swath of Continued Loss and gentrifying tracts in the eastern crescent. One is Brentwood North, northwest from downtown, which registers as Continued Loss. The other is Wood Creek, further northwest from Brentwood North, which is classified as Susceptible. This area contains an unusual pocket of multifamily rental housing, with a high degree of student occupancy—so much so that the University of Texas runs shuttle buses connecting the area to the main campus—in an area otherwise mostly surrounded by high-income, single-family dominated neighborhoods. It is possible that this area resembles student enclaves such as West Campus more than other neighborhoods classified as vulnerable, but further analysis—such as a neighborhood drilldown—would be needed to make such an assessment.

## Most Vulnerable Census Tracts (2016)
Austin, Texas



**Legend**



    Vulnerable (.5 - 1)

    More Vulnerable (1 - 1.5)

    Most Vulnerable (1.5 or greater)

    Study Area

North

0    1.5    3              6 miles

# Demographic Change Tracts (2000 - 2016)
Austin, Texas



**Legend**



# Housing Market Appreciation (2000-2016)
Austin, Texas





**Legend**

| | |
|---|---|
| 🟧 | Accelerating |
| 🟨 | Accelerating (Rent) |
| 🟦 | Adjacent |
| 🔵 | Adjacent (Rent) |
| 🟥 | Appreciated |
| 🟪 | Appreciated (Rent) |
| ⬛ | Missing Home Value Data |
| ⬜ | Study Area |

# Neighborhood Typology (2016)
## Austin, Texas



**Legend**

- Continued Loss
- Late
- Dynamic
- Dynamic (Rent Data)
- Early: Type 1
- Susceptible
- Susceptible (Rent Data)
- Study Area



# Neighorhood Drilldowns

**Introduction**

In this section we present *drilldown analyses* of two gentrifying areas of Austin: the Montopolis neighborhood in near-southeast Austin, and St. John's-Coronado Hills in Northeast Austin (see map below). According to our analysis, both neighborhoods are in relatively early phases of gentrifying.



A drilldown analysis is a technique introduced by Dr. Lisa Bates of Portland State University in her 2013 gentrification and displacement study of Portland. Our analyses of Montopolis and St. John's-Coronado Hills are based heavily on Bates's procedure, albeit with some modifications. A drilldown is intended to be a data-intensive examination of the relevant socioeconomic and housing market conditions affecting various vulnerable subpopulations within a given neighborhood. Whereas our citywide mapping methodology presented in the above section allows for neighborhoods across the city to be classified based on vulnerability and gentrification stage using widely-available census data, a drilldown is a more nuanced, multifaceted analysis focused on a particular census tract (typically containing between 2,500 and 8,000 residents). A drilldown is a useful first step before embarking on place-based anti-displacement advocacy or policy development. It would be relatively straightforward for the City of Austin or another interested party to replicate the drilldown analyses we present here for other tracts that stand in the path of gentrification and displacement pressures.

At this point it is useful to note what a drilldown is not: a drilldown is not a qualitative analysis that allows for deep narrative descriptions of a given neighborhood's unique history, culture, or underlying social dynamics. Both data gathering and detailed descriptions of conditions in impacted communities are valuable, useful, and complementary. The latter requires on-the-ground engagement efforts, which can include (but are not limited to) direct observations; interviews with

neighborhood leaders, residents, and business owners; review of written materials such as media articles and archival materials; and survey work. We do not claim to have conducted such work in Montopolis or St. John's-Coronado Hills; it is beyond the scope of our project. It is almost certain that our drilldown analyses have missed important "ground truths" about the neighborhoods we have examined that could only be obtained from qualitative work. It would be advisable, as time and resources permit, to engage in such studies as a complement to drilldown analyses and other data-intensive methods.

**Data sources**

A drilldown analysis, as we present it here, relies on several separate distinct data sources.

### Neighborhood Drilldown Data Sources

- American Community Survey
- Residential sales data
- Existing affordable housing data
- Public school data
- Comprehensive Housing Affordability Strategy
- Home Mortgage Disclosure Act data
- Vacant address data

➤ **American Community Survey**

American Community Survey (ACS) data is published by the U.S. Census Bureau. Unless otherwise noted, all ACS figures quoted in the drilldown analyses are for 2012-2016. Since 2006, the ACS has released updated data on a yearly basis. For data collected at the level of census tracts, only five-year data (i.e., data collected over a period of five years) is available. The tract-level 2012-2016 data discussed here are the most recent data available at the writing of this report.

Even though 2016 (1-year) ACS data is available for the City of Austin and for the Austin MSA, using that data in juxtaposition with figures taken from the census tract level (which are only available as five-year data) would lead to misleading comparisons. For that reason, we use five-year (2012-2016) ACS data for all recent figures quoted here. Data from 1990 and 2000 are taken from the decennial censuses conducted in those years.

➤ **Comprehensive Housing Affordability Strategy**

Comprehensive Housing Affordability Strategy (CHAS) data are published by the U.S. Department of Housing and Urban Development (HUD) for every local governmental entity, including Austin, that receives federal housing subsidies. It is readily obtainable online. Some amount of effort is required to aggregate CHAS data into the categories that are reported here.

➤ **Residential sales data**

For calculations of residential sales volume and per-square foot prices, we relied on data provided courtesy of the Austin Board of Realtors (ABOR). Such data is not available to the general public without paying a fee to a third-party aggregator. Some amount of work is needed using Geographic Information System (GIS) software to filter sales data down to the level of particular census tracts.

➤ **Home Mortgage Disclosure Act data**

The Home Mortgage Disclosure Act (HMDA) is federal legislation that requires certain federally-regulated mortgage lenders to report information on the rates of mortgage approval and rejection by race and ethnicity of the borrower or would-be borrower, along with other useful information. This data is readily obtainable via the Web and is relatively easy to work with.

### ➤ Existing affordable housing data

Subsidized housing in the United States is delivered via a large, decentralized network of providers, funders, and other participants. A typical development will have multiple funding sources which may be local, state, federal, or philanthropic dollars. As a result, it can be difficult to track exactly what subsidized housing is in place and when its existing affordability restrictions are set to expire. Although there are useful subsidized housing registries, they often contain errors or are otherwise incomplete in their coverage. The best course of action is to review multiple data sources and attempt to resolve inconsistencies as they arise. For our analysis we relied on data provided by the City of Austin; the Texas Department and Community Affairs; National Housing Preservation Database (NHPD), available online; online searches of Travis County Appraisal District (TCAD) ownership and property tax records; internal data sets; and communications with professional contacts.

### ➤ Vacant address data

The United States Postal Service (USPS) makes available vacant address data, which can be a useful gauge of both housing abandonment and the level of intensity of commercial activity. Obtaining the data requires affiliation with a governmental or academic institution and making an online request to the federal government, which can take several weeks to process.

### ➤ Public school data

Data on public school enrollment and demographic composition for every school in Texas can be readily downloaded from School Report Cards maintained by the Texas Education Agency (TEA).

# St. John's-Coronado Hills Neighborhoods Drilldown



Gentrification
Type:
**Early
Type 1**

A vulnerable community
with new connectivity,
change close by

**Summary**

The St. John's and Coronado Hills neighborhoods are located in two adjacent census tracts (18.12 and 18.11, respectively) that we analyze together in this drilldown. St. John's lies to the west of Cameron Road, and is classified as Early Type 1 under the gentrification typology used in this report, and its real estate market is classified as Accelerating. Coronado Hills, to the east of Cameron Road, and slightly more distant from other gentrifying neighborhoods to the west, is at an earlier stage, classified as Susceptible, with real estate market conditions classified as Adjacent (i.e., not yet "hot" but located next to a tract that is).

St. John's-Coronado Hills is overwhelmingly inhabited by people of color, most of whom are Latinos, albeit with a notable African-American population, and renters. Education levels are generally low. Incomes are also low and have dropped in real terms over time. High percentages of families experience linguistic isolation. The particularly vulnerable subpopulations of elderly households and large families are both, not surprisingly, struggling with high housing costs. In short, St. John's-Coronado Hills has a high concentration of vulnerable residents. Meanwhile, although the rent-restricted affordable housing stock that exists appears to be relatively secure for the next decade or more, it represents only a scant six percent of the total housing units in St. John's-Coronado Hills.



**ST. JOHNS-CORONADO HILLS**     **CITY OF AUSTIN**

**81**% people of color     **51**% people of color

**22**% with bachelor's degree     **48**% with bachelor's degree

**80**% renters     **55**% renters

**69**% households earning less than 80% MFI     **39**% households earning less than 80% MFI

According to the U.S. Census, property values, after dropping in the 1990s, have increased relatively modestly since 2000 by recent Austin standards. More timely residential sales data from the Multiple Listing Service does not yet show a major increase in sales volume or prices. However, there are at least three worrying signs that gentrification and accompanying displacement may soon arrive in St. John's-Coronado Hills. First, although the white population has ticked up only slightly, this increase is more notable than it appears at first glance when considered relative to the substantial percentage decrease in white population at the citywide and MSA levels. Furthermore, over half of new mortgage borrowers are white—far out of proportion to the white population's share of current residents in the two neighborhoods. Finally, over the last decade there has been a sharp intensification of commercial and construction activity, although it is unclear if this is connected to present or impending gentrification.[26]



**Commercial and Construction Activity in St. John's-Coronado-Hills**

**677** business addresses in 2018

compared to **320** in 2010

**1,072%** increase in construction permit valuation from 2015 to 2017

St. John's-Coronado Hills appears to lie squarely in the path of possible future gentrification emanating eastward from across I-35, and northward from the successful Mueller redevelopment. The recent rollout of a new high-frequency bus line leading to UT and downtown, as well as current tollway construction on US 183 that in several years will expand freeway accessibility to large numbers of jobs, suggest that these neighborhoods will likely only increase their appeal to homebuyers. Meanwhile, the existing population is vulnerable, and organizing current residents will likely face substantial obstacles owing to very low homeownership rates and high levels of linguistic isolation.

*Note on data calculations:*
All results reported below are blended from figures for the census tracts equating to the St. John's and Coronado Hills neighborhoods. They are computed as weighted averages, weighted by population, number of housing units, or number of business establishment addresses for each tract, as appropriate.

## Gentrification typology assessment

**Vulnerable populations:**
- St. John's-Coronado Hills neighborhoods' residents are 81% people of color, compared to 51% in the City of Austin and 47% in the Austin MSA. Source: American Community Survey (ACS).
- Of St. John's-Coronado Hills households, 80% are renters, compared to 55% in the City of Austin and 42% in the Austin MSA (ACS).
- St. John's-Coronado Hills residents over age 25 are disproportionately unlikely to have a four-year postsecondary degree or higher educational attainment (22% vs. 48% citywide and 42% MSA-wide) (ACS).
- Incomes are low; most (69%) households earn 80% or less of median family income. Source: Comprehensive Housing Affordability Strategy (CHAS).

**Demographic changes (2000 to 2012-2016):**
- St. John's-Coronado Hills' share of non-Hispanic white residents increased +2 percentage points, an amount that is substantial when one considers that the citywide (-4 percentage points) and MSA (-7) shares have decreased to a considerable degree (ACS).
- Homeownership rates essentially remained the same in St. John's-Coronado Hills. Homeownership rates in Austin and the MSA also remained largely unchanged during that time (ACS).

- The share of college-educated residents (i.e., those with a four-year degree or higher) rose by 9 percentage points, which kept pace with Austin (+7) and surpassed the MSA (+5). (ACS).
- In real (inflation-adjusted terms), median household income in St. John's-Coronado Hills drastically decreased, by 23%, to $31k in 2012-2016. This lags far behind Austin ($61k) and the MSA ($66k), which experienced drops of 1% and 6%, respectively (ACS).

**Housing market conditions:**
- Owner-occupants in St. John's-Coronado Hills in 2012-2016 reported home values with a median of $168k, well below the citywide median of $258k and the MSA median of $224k (ACS).
- During the 1990s, reported home values in St. John's-Coronado Hills decreased in real (inflation-adjusted) terms by 14%, while they increased citywide (+31%) and in the MSA (+25%) (ACS).
- From 2000 to 2012-2016, the trend reversed—St. John's-Coronado Hills home values increased in real terms by 11%. Still, this growth lagged far behind the city (+53%) and the MSA (+31%) (ACS).
- More recent Multiple Listing Service (MLS) residential sales data suggests that home sales are slow and decreasing and that housing appreciation is flat: From 2015 to 2017, sales dropped from 27 to 16 (a 41% decrease), and per-square foot prices barely increased from $199 to $205 in 2017 dollars (a 3% increase in real terms). See chart below; note that sales volume data for 2018 is omitted because the year is not yet complete. Source: Multiple Listing Service (MLS) data, courtesy of Austin Board of Realtors (ABOR).



## Housing highlights

**Affordability:**
- Of St. John's-Coronado Hills homeowner households earning less than 80% of median family income (11% of total households), 25% are cost burdened and 37% are severely cost burdened (CHAS).
- Of St. John's-Coronado Hills renter households earning less than 80% of median family income (63% of total households), 36% are cost burdened and 38% are severely cost burdened (CHAS).

**Affordability for seniors and large families:**
- Seniors: Among elderly households earning less than 80% of median family income (484 households, or 10% of all households in St. John's-Coronado Hills), 21% are cost burdened (spending 30% to 50% of income on housing), 39% are severely cost burdened (spending over 50% of income on housing), and 3% report either zero or negative income (CHAS).
- Large families: Of large family (5 or more person) households (304 households, or 12% of all households in St. John's-Coronado Hills) earning less than 80% of median family income, 62% are cost burdened, and 16% are severely cost burdened (CHAS).

**New buyers:**

- In 2016, 89 people applied for a home purchase loan in St. John's-Coronado Hills. Of these, 53% were white non-Hispanic, 3% were Asian non-Hispanic, 13% were Hispanic, 4% were African American non-Hispanic, and 25% were of unknown race and ethnicity. Loans to whites were denied far less often (2% of applications) than loans to Hispanics (33%). Source: Home Mortgage Disclosure Act (HMDA) data.

**Income-restricted affordable housing:**

- There are 290 income-restricted housing units in St. John's-Coronado Hills, or 6% of the total housing stock (including vacant units), in five developments. The earliest known expiration of these assisted units will occur in 2032. Sources: City of Austin subsidized housing inventory; National Housing Preservation Database.

## Development highlights

- According to U.S. Postal Service data, St. John's-Coronado Hills had 667 business addresses in early 2018, a major increase from 320 in 2010. Of these, only 6% were vacant, substantially down from 18% in 2010, at a time when the regional economy was struggling (United States Postal Service vacant address data).

- The number of construction-related permits (residential and commercial, including demolition) issued within St. John's-Coronado Hills increased mostly steadily from 2000 to 2015; as of 2017 it was somewhat below the peak but still relatively high. On the other hand, the total inflation-adjusted value of all permits increased rapidly from 2015 to 2017, exceeding the previous peak in 2005 and nearly equaling the level in 2000 (also at the end of an economic boom period). From 2015 to 2017, total permit valuation increased by 1072%, far more than the robust 81% citywide figure (City of Austin open data on building permits).



## Infrastructure highlights

- Under Capital Metro's "Cap Remap" bus network redesign, implemented in early June 2018, St. John's-Coronado Hills is now served by two high-frequency bus routes: the 10 (to UT and downtown) and the 300 (connecting to the Crestview Red Line station to the west as well as east, southeast, and southwest Austin).

- The 183 South project is currently under construction and will add capacity to existing free lanes and new tolled lanes for U.S. Highway 183 from US 290 (on the edge of Coronado Hills) to Highway 71 in South Austin.

## Racial-ethnic demographic highlights

- By far the dominant group in St. John's-Coronado Hills is Latinos (66% of the total). Whites (19%) and African Americans (13%) are the two other major groups (ACS).

- St. John's-Coronado Hills is highly linguistically isolated; only 36% of people ages 5 and over speak only English at home. Almost all others (61% of the total) speak Spanish (ACS).

## Community institution highlights

- Two public schools are located in St. John's-Coronado Hills: Pickle Elementary (Pre-K-5) and Reagan High School, both AISD public schools. Source: Texas Education Agency (TEA) School Report Card data.

- Pickle Elementary experienced a substantial enrollment decline of 15% from the 2010-2011 to the 2015-2016 school years, while Reagan High experienced a 36% surge in enrollment (TEA).

- Pickle Elementary serves almost exclusively students of color (98%) and mostly economically disadvantaged students (90%), compared to the AISD-wide average of 53% economically disadvantaged students and the statewide average of 59%. The same general pattern holds for Reagan High, with 97% students of color and 81% economically disadvantaged students (TEA).

# Montopolis Neighborhood Drilldown



Gentrification Type:
**Early Type 1**

A vulnerable community with homeownership in decline

**Summary**

Montopolis is classified as an "Early: Type 1" gentrifying neighborhood. Its population falls under the "most vulnerable" category (17 out of 200 neighborhoods citywide fall under that classification). Its housing market conditions are classified as "accelerating." Montopolis stands out in various ways that make it highly vulnerable and in need of anti-displacement intervention. It also has attributes that make intervention there uncommonly promising, if it is pursued vigorously and in a sufficiently timely fashion.

Montopolis is overwhelmingly a community of color home to predominantly Latino residents. Most of its residents have low education levels and incomes. Many Montopolis residents—above all the neighborhood's elderly and large family households—struggle with paying their housing costs.



**MONTOPOLIS**        **CITY OF AUSTIN**

**91%** people of color      **51%** people of color

**12%** with bachelor's degree      **48%** with bachelor's degree

**57%** renters      **55%** renters

**81%** households earning less than 80% MFI      **39%** households earning less than 80% MFI

In Montopolis, the absolute number of homeowners has changed little since 2000. However, there has been a steep drop in the homeownership rate due to the addition of large quantities of rental housing. In general, while organizing renters and especially low-income renters is difficult, it is particularly challenging in Montopolis owing to high levels of linguistic isolation.

U.S. Census data shows home prices that are low and increasing slowly compared to the rest of Austin. However, these figures should be interpreted with caution, as they were collected between 2012 and 2016 (the most recent data available at the time of writing). More timely Multiple Listing Service home sales data shows a considerable uptick both in the pace and price of home sales. Furthermore, a highly disproportionate share of new homebuyers in the neighborhood in 2016 were white, which is strongly suggestive of an incoming wave of gentrification pressure. This is undoubtedly being hastened by Montopolis' proximity to downtown (only 4 miles to the northwest) and by numerous mobility improvements underway or planned for the area.

Notwithstanding these challenges, one bright spot is that 53% of Montopolis' total housing stock is currently income- and rent-restricted—a share that is far higher than in most Austin neighborhoods. Opportunities for mitigating displacement of the neighborhood's vulnerable residents also comes from the still relatively low housing prices in Montopolis. The current activities of Guadalupe Neighborhood Development Corporation (GNDC) to acquire parcels for a new community land trust in the neighborhood are promising and draw on lessons from GNDC's successful activities in Central East Austin's Guadalupe neighborhood (see the case study in Part 3 and in Appendix 4).

## Gentrification typology assessment

### Vulnerable populations:

- The Montopolis neighborhood's residents are 91% people of color, compared to 51% in the City of Austin and 47% in the Austin MSA. Source: American Community Survey (ACS).
- Of Montopolis households, 57% are renters, compared to 55% in the City of Austin and 42% in the Austin MSA (ACS).
- Montopolis residents over age 25 are much less likely to have a four-year postsecondary degree or higher educational attainment (12% vs. 48% citywide and 42% MSA-wide) (ACS).

- Incomes are low; most (81%) households earn 80% or less of median family income. Source: Comprehensive Housing Affordability Strategy (CHAS).

**Demographic changes (2000 to 2012-2016):**
- Montopolis' share of non-Hispanic white residents has barely budged (+1 percentage point), even as the citywide (-4 percentage points) and MSA (-7) shares have decreased substantially (ACS). The slight increase in non-Hispanic white residents in Montopolis, juxtaposed with the decrease in the city and MSA, can be interpreted in relative terms as the beginnings of an influx of white residents into the neighborhood.
- Homeownership has plummeted among Montopolis households, from 67% in 2000 to 43% in 2012-2016, a decrease of fully 24 percentage points. Homeownership rates in Austin and its MSA remained essentially unchanged during that time (ACS).
- The share of college-educated residents (i.e., those with a four-year degree or higher) rose by 4 percentage points, which lagged behind Austin (+7) and the MSA (+5) (ACS).
- In real inflation-adjusted terms, median household income in Montopolis drastically decreased, by 30%, to about $29k in 2012-2016. This lags far behind Austin ($61k) and the MSA ($66k), which experienced drops of 1% and 6%, respectively (ACS).

**Housing market conditions :**
- Owner-occupants in Montopolis in 2012-2016 reported home values with a median of $89k, far below the citywide median of $258k and the MSA median of $224k (ACS).
- During the 1990s, reported home values in Montopolis decreased in real (inflation-adjusted) terms by 33%, while they increased citywide (+31%) and in the MSA (+25%) (ACS).
- From 2000 to 2012-2016, the trend reversed—Montopolis home values increased in real terms by 18%. Still, this growth lagged far behind the city (+53%) and the MSA (+31%) (ACS).



### Montopolis Neighborhood

Decreasing homeownership, increasing rental stock

|  | **2000** | **2012 - 2016** |
|---|---|---|
| **Homeownership** | 67% | 43% |
| **Median Household Income** | $40,768* | $28,701 |
| **Median Home Value** | $75,404 | $88,600 |
| Citywide Median Home Value | $168,387 | $257,800 |

*all values in 2016 inflation-adjusted dollars*

- Recent residential sales data suggests that home values and sales are accelerating: From 2015 to 2017, sales increased from 45 to 87 a year (a 93% increase), and per-square foot prices increased from $159 to $196 in 2017 dollars (a 23% increase in real terms). See chart below; note that sales volume data for 2018 is omitted because the year is not yet complete. Source: Multiple Listing Service (MLS) data, courtesy of Austin Board of Realtors (ABOR).



# Housing highlights

**Affordability:**
- Of Montopolis homeowner households earning less than 80% of median family income (32% of total households), 26% are cost burdened and 14% are severely cost burdened (CHAS).
- Of Montopolis renter households (48% of total households) earning less than 80% of median family income, 35% are cost burdened and 29% are severely cost burdened (CHAS).

**Affordability for Seniors and Large Families:**
- Seniors: Among elderly households earning less than 80% of median family income (255 households, or 12% of all households in Montopolis), 12% are cost burdened (spending 30% to 50% of income on housing), 29% are severely cost burdened (spending over 50% of income on housing), and 12% have either zero or negative income (CHAS).
- Large families: Of large family (5 or more person) households (300 households, or 14% of all households in Montopolis) earning less than 80% of median family income, 47% are cost burdened, and 10% are severely cost burdened (CHAS).

**New buyers:**
- In 2016, 123 people applied for a home purchase loan in Montopolis. Of these, 62% were white non-Hispanic, 9% were Asian non-Hispanic, 14% were Hispanic, and 15% were of unknown race and ethnicity. Loans to whites were denied considerably less often (9% of applications) than loans to Hispanics (25%). Source: Home Mortgage Disclosure Act (HMDA) data.

**Income-restricted affordable housing:**
- There are 1,280 income-restricted rental housing units in Montopolis, or 53% of the total housing stock (including vacant units). Of these, 433 units are in two city-subsidized developments, and the rest are in four non-city-subsidized developments. These six developments appear to be in no near-term danger of subsidy expiration. Sources: City of Austin subsidized housing inventory; National Housing Preservation Database; authors' professional contacts.

# Development highlights
- According to U.S. Postal Service data, Montopolis had 157 business addresses in early 2018, down from 203 in 2010. Of these, just under 20% were vacant, up from about 8% in 2010, at a time when the regional economy was struggling (United States Postal Service vacant address data).



## Montopolis Neighborhood

2015 ——————— Increasing home prices, more construction ——————→ 2017

**$160** average price per square foot
**45** home sales

**$196** average price per square foot
**87** home sales

**406** construction permits issued
**6** of which were demolition permits

**805** construction permits issued
**32** of which were demolition permits

- The number of construction-related permits (residential and commercial, including demolition) issued within Montopolis has increased steadily since 2013 and was greater in 2017 than at any time since 2000. On the other hand, the total inflation-adjusted value of all permits issued was on an upswing in 2017, but well below peak values attained in 2006 and 2014 (see chart below). From 2015 to 2017, total permit valuation increased by a robust 68% in real terms, but less than the 81% citywide figure (City of Austin open data on building permits).



## Infrastructure highlights

- The March 2018 update of the City of Austin and Capital Metro's Project Connect plan shows a high-capacity transit line connecting downtown Austin and Austin Bergstrom International Airport passing through Montopolis with one or more stops in the neighborhood. Implementation plans and funding prospects are uncertain.
- Under Capital Metro's "Cap Remap" bus network redesign, implemented in early June 2018, Montopolis is now served by three high-frequency bus routes: the 17 (to downtown), the 20 (to UT, downtown, and the airport), and the 311 (to southeast, south, and southwest Austin).
- The East Riverside Corridor Master Plan (adopted in February 2010) and Regulation Plan (adopted May 2013) are significantly reshaping the principal east-west roadway through Montopolis.

## Racial-ethnic demographic highlights

- By far the dominant group in Montopolis is Latinos (83% of the total). Whites (9%) and African Americans (8%) are the two other major groups (ACS).
- Montopolis is highly linguistically isolated; only 27% of people ages 5 and over speak only English at home. Almost all others (73% of the total) speak Spanish (ACS).

## Community institution highlights

- Two public schools are located in Montopolis: IDEA Allan College Preparatory (K-11), a charter, and Allison Elementary (Pre K-5), an AISD public school. Source: Texas Education Agency (TEA) School Report Card data.
- Allison Elementary experienced a severe enrollment decline of 21% from the 2010-2011 to the 2015-2016 school years (TEA).
- Allison Elementary serves almost exclusively students of color (99%) and mostly economically disadvantaged students (85%), compared to the AISD-wide average of 53% and the statewide average of 59% (TEA).
- Guadalupe Community Development Corporation, with the help of seed funding, is actively pursuing the creation of a community land trust in the neighborhood.

# Endnotes

[1]  Throughout this report, we define white people as those who identify their race to the US Census as white alone, and who also identify as non-Hispanic. We define people of color as all people who are not white under this definition. We define Hispanic people as those of any race who identify as Hispanic, and African Americans as those who select black for their race and identify as non-Hispanic. These conventions, while imperfect and disputed by many, are standard in social science research and in public policy.

[2]  Mueller, Elizabeth J. and Dooling, Sarah, Sustainability and Vulnerability," Journal of Urbanism, 2011, 4, 3: 201-222.

[3]  Pendall, Rolf, et al., "Vulnerable people, precarious housing, and regional resilience: an exploratory analysis," Housing Policy Debate, 2012, 22:2, 271-296.

[4]  Pendall, Rolf, et al.

[5] Wagmiller, R. "Debt and Assets Among Low-Income Families," NY: National Center for Children in Poverty, 2003.

[6] Smith, Neil, "Toward a Theory of Gentrification: A back to the city movement by capital, not people," Journal of the American Planning Association, 1979, 45, 4: 538-548; Porter, Michael, "The Rent Gap at the Metropolitan Scale: New York City's Land-Value Valleys, 1990-2006," Urban Geography, 2010, 31, 3: 385-405.

[7] Pendall, Rolf, et al., p. 274.

[8] Wolff, Edward N. Recent trends in the United Stats: Rising debt and the middle-class squeeze—an update to 2007. Annandale-on-Hudson: Bard College.

[9] Kochhar, Rakesh; et al., "Wealth Gaps Rise to Record Highs Between Whites, Blacks, Hispanics: Twenty-to-One," Pew Research Center, 2012.

[10] Burd-Sharps, Sarah and Rasch, Rebecca, Impact of the US Housing Crisis on the Racial Wealth Gap Across Generations. The Social Science Research Council and the ACLU, 2015.

[11] Burd-Sharp, Sarah and Rasch, Rebecca, 2015.

[12] Rothstein, Richard, The Color of Money, 2017; Massey, Douglas, & Denton, Nancy, American Apartheid, 1998.

[13] Roscigno, Vincent, et al., "The Complexities and Processes of Racial Housing Discrimination," Social Problems, Feb. 2009, 56, 1: 49-69; Galster, George and Godfrey, Erin, "By Words and Deeds: Racial steering by real estate agents in the U.S. in 2000," Journal of the American Planning Association, 2005, 71, 3: 251-268.

[14] U.S. Bureau of Labor Statistics, Profile of the Labor Force by Educational Attainment, Aug. 2017.

[15] Raphael, Stephen, and Stoll, Michael, "Job Sprawl and the Suburbanization of Poverty," Brookings, Metropolitan Policy Program, 2010.

[16] Pendall, Rolf, et al., p. 290.

[17] Desmond, Matthew, et al., "Evicting Children," Social Forces, 2013, 92: 303-327.

[18] Mazzara, Alicia, et al., "Rental Assistance to Families at Lowest Point in Decade," Center on Budget and Policy Priorities, 2016.

[19]  Freeman, Lance, "Displacement or succession? Residential mobility in gentrifying neighborhoods," Urban Affairs Review, 2005, 40, 4: 463-91.

[20] Pendall, Rolf., et al., pp. 275-277.

[21] Pendall, Rolf, et al., p. 279.

[22] Pendall, Rolf, et al., p. 279.

[23] Bates, Lisa, "Gentrification and displacement study: Implementing an equitable inclusive development strategy in the context of gentrification," May 2013, https://www.portlandoregon.gov/bps/article/454027.

[24] Note that the Census tracks people who live in "group quarters"—facilities such as college dormitories, hospitals, jails, convents, homeless shelters, and the like—that it considers to be neither renter- nor owner-occupied housing. People in group quarters were excluded from our analysis. Our analysis also did not consider people living outdoors.

[25] Note that the cross-hatched tracts with color represent those that our methodology classified as gentrifying, but on the basis of rental data, rather than home price data, as a result of data availability.

[26] In addition, although the local high school is gaining students, the elementary school has sharply decreased in enrollment, suggesting a decrease in families with young children. However, it is unclear whether this decline has been offset by gains in enrollment in nearby charter schools.

# PART 3

Case Studies of Local Efforts to Mitigate Displacement in Gentrifying Neighborhoods




# Case Studies of Local Efforts to Mitigate Displacement in Gentrifying Neighborhoods

To help inform Austin's efforts to mitigate displacement in gentrifying areas, we developed three case studies of historically vulnerable neighborhoods where local efforts have focused on mitigating displacement in the face of rising housing costs and redevelopment pressures. The three areas we studied are the Guadalupe neighborhood in Austin, the Columbia Heights neighborhood in Washington, D.C., and Inner North/Northeast Portland, a group of neighborhoods in Portland, Oregon. Case study research involves understanding both the process of change and efforts to prevent displacement in context. This is particularly important since there is little systemic research on many of the policies that have been adopted. We also hope to raise awareness of innovative approaches being taken by cities around the country in this policy arena.

Two of the neighborhoods studied have multiple decades of experience addressing displacement in the face of gentrification. Through these particular case studies, we specifically sought to examine how efforts to address displacement evolve over time as neighborhoods enter different stages of gentrification. We also looked for approaches that have had the most positive outcomes, which approaches did not turn out as expected, and which approaches could have had more positive outcomes if implemented differently—now that leaders have the benefit of experience and hindsight.

The case studies also highlight what types of outcomes can be expected when concentrated efforts are made to address displacement in a particular neighborhood facing displacement pressures. As we found in our examination of case studies from around the country, no city with a robust job and housing market has eliminated the displacement of vulnerable persons. It is important for cities, advocates, and impacted communities seeking to tackle displacement amidst these larger economic pressures to understand the challenges in this arena and develop their own definition of what success looks like.

To select the neighborhoods to study, we spent several months researching possible candidates, focusing on the following criteria, understanding that not every potential case study candidate would meet all of them. They are neighborhoods:

1. That are in cities with hot job and housing markets and high population growth.
2. That have a historical concentration of persons of color and are undergoing gentrification, regardless of stage.
3. Where there have been on-going efforts concentrated at a neighborhood scale to address displacement.
4. That have utilized a diverse range of strategies and policies for mitigating displacement.
5. Where the majority of key tools utilized to address displacement are legal in Texas, given the Lone Star state's heavy restrictions on city policymaking in this arena.
6. Where we have experience working, have conducted prior research, or have on-the-ground contacts involved in anti-displacement work.
7. Where cities have played a major role in leading or supporting displacement mitigation strategies.

After this review and many discussions among our research team, we eventually settled on the three neighborhoods we present here.

Each case study includes the historical and current context for the displacement mitigation work, an overview of key strategies and tools used to mitigate displacement; key challenges and issues confronted; and key takeaways. Drawing from all three case studies, we also developed a list of ten cross-cutting lessons for the City of Austin as it seeks to increase its efforts to address displacement in Austin neighborhoods.

We present here the ten cross-cutting lessons as well as two-page summary of each case study. The full case studies are available in Appendix 4.

# 10 Cross-Cutting Lessons for Cities from Three Gentrifying Neighborhoods:

## Columbia Heights (Washington, D.C.), Guadalupe Neighborhood (Austin, Texas), Inner North/Northeast Portland (Portland, Oregon)

**1** Make meaningful and robust community participation of those most affected by displacement a priority in the planning, implementation, and on-going oversight of efforts to mitigate displacement.

**2** Develop the capacity of tenants and other vulnerable groups so they can be active participants in implementing displacement mitigation strategies.

**3** Intervene early.

**4** Anticipate and include strategies for addressing displacement as part of public revitalization strategies and major infrastructure projects.

**5** Develop comprehensive, community-driven, neighborhood-level strategies for mitigating displacement of vulnerable populations, with measurable goals and timelines for implementation.

**6** Provide substantial levels of city funding dedicated to supporting neighborhood-level strategies for mitigating displacement of vulnerable populations.

**7** Remove as much land from market pressures as possible, through mechanisms such as community land trusts, long-term affordability restrictions, and nonprofit and public ownership of land.

**8** Develop a network of high capacity organizations to identify, coordinate, and act on opportunities to preserve affordable housing and prevent the displacement of vulnerable populations.

**9** Develop realistic expectations of what constitutes success and the time to achieve your goals.

**10** Long-term progress on mitigating displacement of vulnerable populations requires on-going support and engagement from elected officials, civic leaders, and residents, including those from impacted communities.

# 10 Cross-Cutting Lessons for Cities from Three Gentrifying Neighborhoods:

## Columbia Heights (Washington, D.C.), Guadalupe Neighborhood (Austin, Texas), Inner North/Northeast Portland (Portland, Oregon)

1. **Make meaningful and robust community participation by those most affected by displacement a priority in the planning, implementation, and on-going oversight of efforts to mitigate displacement.**

   Community voices should be incorporated throughout the development and implementation of displacement mitigation plans and strategies to ensure they are aligned with community needs. Effective engagement requires strong city efforts to reduce barriers to participation and to reach out to directly impacted residents, including those who have already been displaced. Active, on-going community oversight of a city's displacement mitigation programs—such as the annual evaluations and routine development reviews conducted by the N/NE Portland Oversight Committee—brings critical transparency and accountability to the process.

2. **Develop the capacity of tenants and other vulnerable groups so they can be active participants in implementing displacement mitigation strategies.**

   Building the capacity of tenants and other vulnerable groups is critical to the implementation of many important displacement mitigation strategies, including resident purchases of mobile home parks and apartment complexes and the creation of community development corporations. City support for capacity building includes funding organizing and technical assistance. Enhanced legal protections for vulnerable tenants—whether at a city or state level—such as strong protections from retaliation, a right to purchase, and a right to organize, are also important.

   D.C.'s strong tenant protections, with enforcement support by the Office of Tenant Advocacy ($820,000 budget), along with city funding for tenant organizing groups and technical assistance providers, have all been critical to the district's preservation of apartments under D.C.'s Tenant Opportunity to Purchase Act. Much of the Guadalupe neighborhood's success in mitigating displacement has arisen from the grassroots mobilization of residents who fought back against redevelopment in the neighborhood and the early support residents received to create a displacement mitigation plan and community development corporation. Both laid the foundation for decades of successful work to mitigate displacement of vulnerable residents in the neighborhood.

3. **Intervene early.**
   As gentrification picks up steam in a neighborhood, it becomes much more difficult to feasibly acquire properties for the preservation and construction of affordable housing. For neighborhoods that are susceptible to gentrification or in the very early stages of gentrifying, it can be hard to envision the rapid rise in property values that will come in later stages of gentrification. But buying land and housing in this early period gives cities, community development organizations, and residents more capacity to mitigate displacement when change does come. For example, Guadalupe neighborhood's affordable housing inventory is almost all located on land that was acquired before gentrification picked up steam in the neighborhood, and a large portion of the affordable housing in Columbia Heights is subsidized housing that was built prior to the neighborhood's gentrification.

**4. Anticipate and include strategies for addressing displacement as part of public revitalization strategies and major infrastructure projects.**

In some neighborhoods, the shift from the need for revitalization to the need for anti-displacement measures can occur quickly. When a city institutes revitalization programs or otherwise makes significant investments in a community, such as new transit infrastructure, it should anticipate displacement and incorporate affordable preservation and other displacement mitigation strategies into those plans up front, rather than reacting to this need later on.

In both Columbia Heights (D.C.) and Inner North/Northeast (Portland), for example, if displacement mitigation strategies had been integrated from the beginning of the cities' revitalization strategies, many more affordable units could have been preserved and fewer vulnerable residents impacted. If a city has not addressed displacement up front, it should engage in active monitoring of how its investments are impacting vulnerable residents and be prepared to act quickly to adapt or revamp its strategies. When displacement accelerated in N/NE Portland, for example, the city redirected its tax increment finance funds from economic development towards a comprehensive anti-displacement strategy.

**5. Develop comprehensive, community-driven, neighborhood-level strategies for mitigating displacement of vulnerable populations, with measurable goals and timelines for implementation.**

Displacement mitigation strategies and outcomes should be in clear alignment with community needs and priorities. Having a plan that includes specific goals and timelines also allows for greater accountability and oversight over a city's progress towards addressing displacement.

Efforts to mitigate displacement in the Guadalupe neighborhood of Austin have been anchored in the community, beginning with a community-generated plan and actionable strategies for addressing displacement and preserving the neighborhood. The N/NE Portland Neighborhood Housing Strategy was likewise developed with robust community input and provides specific targets, strategies, and goals to address displacement in a defined geographical area.

**6. Provide substantial levels of city funding dedicated to supporting neighborhood-level strategies for mitigating displacement of vulnerable populations.**

The implementation of a neighborhood-level displacement mitigation strategy at a scale large enough to have a systemic impact requires levels of financial commitment equivalent to or greater than city investments in transportation and other important civic endeavors. This typically means having access to on-going funds that do not come out of a city's general fund, which is subject to annual budget battles.

Producing and preserving affordable housing at scale, like widening freeways or building regional parks, is an undertaking whose costs are often startling to laypeople. For instance, in the absence of oversubscribed federal subsidies, city contributions in the range of $150,000 to $300,000 or more are required for each new affordable housing unit preserved or built in a gentrifying neighborhood for low-income families, with the exact amount depending on the local housing market, a neighborhood's stage of gentrification, the income levels of families served, and type of housing product. Programs that serve the most vulnerable residents of a community require the greatest levels of investment.

In Columbia Heights, $48 million in investments from the D.C. Housing Production Trust Fund since 2001 has supported the creation and preservation of 321 units, a subsidy of close to $150,000 per unit. The District's current mayor has committed $100 million per year to D.C.'s Housing Production Trust Fund (HPTF)—the largest such commitment by a city in the United

States. The City of Portland is funding implementation of the N/NE Portland Neighborhood Housing Strategy with $100 million in tax increment financing over a six-year period, an average of $17 million a year.

**7. Remove as much land from market pressures as possible, through mechanisms such as community land trusts, long-term affordability restrictions, and nonprofit and public ownership of land.**

Acting early to take land out of the speculative real estate market protects precious public investments in affordable housing and ensures opportunities for future generations of low-Income residents to live in a gentrifying neighborhood. Stewardship of affordable housing investments is best achieved through community and public ownership of affordable housing developments and the land underneath the homes, but long-term deed restrictions also help insure that land remains available for affordable housing for generations.

Guadalupe Neighborhood Development Corporation's (GNDC) early affordable homes were sold with rights of first refusal but without caps on the resale price. After gentrification intensified, GNDC could not afford to exercise its right of refusal on these homes and several were re-sold at market prices far exceeding what a low-income family could afford. Today, GNDC's leaders regret that they did not utilize stronger affordability protections in those earlier home sales, and the organization now uses the community land trust model exclusively for its homeownership units. Another benefit of community ownership of land—such as GNDC's "four corners strategy" of acquiring as many lots as possible on each corner of each neighborhood block—is that the ownership provides residents with stronger control over future redevelopment.

**8. Develop a network of high capacity organizations to identify, coordinate, and act on opportunities to preserve affordable housing and prevent the displacement of vulnerable populations.**

Essential to a robust affordable housing preservation initiative is having a coordinated network of preservation groups and other stakeholders who meet regularly to closely monitor at-risk affordable rental properties and collaborate on proactive preservation interventions. Effective monitoring includes creating and actively updating a database of at-risk properties that incorporates detailed information about properties' expiring subsidies, habitability, and code violations, and other indicators of vulnerability. The D.C. Preservation Network (DCPN), one of the best national models for affordable housing preservation, has become a critical forum for D.C. preservation groups to share information and resources, track at-risk buildings, and coordinate preservation efforts. A comprehensive database should focus not only on properties with expiring subsidies but also those in disrepair.

As an example of what is at stake, Austin is in the process of losing at least three apartment developments in the Low Income Housing Tax Credit program (two of them in or near the gentrifying Montopolis neighborhood), but early tracking and intervention in these properties could have resulted in their preservation. Instead, the properties are on track to convert to market rents or be demolished. Replacing these 740 affordable units will require a bare minimum of $70 million in public funding (for rents at 60 percent of the median income; more subsidy would be required to serve lower-income families).

9. **Develop realistic expectations of what constitutes success and the time to achieve your goals.**

Even with large-scale, concentrated investments in a neighborhood to mitigate residential displacement, it is next to impossible to entirely eliminate displacement in the face of market pressures. Once limited to a select few cities on the coasts, "inversion"—or the increase in demand among the well-off for housing in or near the centers of cities, as distinct from their previous preference for outlying areas—has taken firm hold in most U.S. metropolitan areas. Even long-depressed cities such as Detroit, St. Louis, and Cleveland are now experiencing startling increases in property values and reductions in vacancy rates in their downtowns and certain nearby neighborhoods. In a city such as Austin, which has experienced more economic and job growth over the past 40 years than almost any other city in the U.S., the forces fueling gentrification and displacement are intense and at present show no signs of abating.

The difficult fact is that, unlike in other areas of city planning and management, such as transportation or open space, "model cities" that stand out as clear inspirations to follow in reducing residential displacement in the face of market pressures are difficult to find. This is because the broader forces fueling both inversion at the regional scale and gentrification in particular neighborhoods are largely out of the control of local elected officials.  Success, if it is achieved, will take years of public and private sector focus on comprehensive displacement mitigation strategies—and will likely take the form of reducing and mitigating, rather than altogether halting, residential displacement. Local officials have to set realistic expectations for what can be achieved, the resources that need to be invested to substantially reduce displacement, and how long it will take for real results to manifest themselves.

10. **Long-term progress on mitigating displacement of vulnerable populations requires on-going support and engagement from elected officials, civic leaders, and residents, including those from impacted communities.**

Even though residential displacement that arises as a consequence of inversion and gentrification cannot be entirely eliminated, displacement can be meaningfully mitigated with a multipronged, sustained effort pursued over decades by local stakeholders, as shown by the outcomes in the Guadalupe Neighborhood and Columbia Heights. As with these two neighborhoods, reducing displacement requires a willingness to mix and match a variety of strategies, and to proceed simultaneously on a variety of fronts. And citizens and elected officials have to be willing to support new and unfamiliar approaches, as well as to drastically scale up those that are already achieving results.

To build the political and financial will that are essential to a large-scale displacement mitigation program, elected officials and community leaders also need to invest time and effort in educating the general public on the level of effort and financial commitment required to realize affordable housing production and to enact other anti-displacement measures. Community leaders and residents also have a critical role to play in these efforts by calling attention to the injustices of displacement, holding city leaders accountable at the ballot box, and providing on-going oversight of city investments to ensure they are responsive to community needs.

# Columbia Heights

## WASHINGTON, D.C.

A Case Study of Affordable Rental Housing Preservation and Tenant Ownership in the Face of Large-Scale Displacement Pressures

## Overview

Columbia Heights is a historically African-American neighborhood in Washington, D.C., located near Howard University. The neighborhood suffered heavy damage during the 1968 riots following the death of Martin Luther King, Jr., and experienced disinvestment and population loss that lasted into the 1990s. In 1996, the District of Columbia began to implement a series of economic development projects to transform Columbia Heights, including a new subway stop. While the public investment strategies were a successful catalyst for bringing in new development and residents, the changes led to intense displacement pressures for longtime residents. In 2012, Columbia Heights was named one of the fastest-gentrifying neighborhoods in the country, and today, the bulk of housing in the neighborhood is well beyond the means of low-income residents of color.

Despite the transformation of Columbia Heights, today approximately 22 percent of the housing units in the neighborhood are restricted for low-income renters, as a result of a heavy concentration of subsidized housing that was built before the neighborhood's gentrification, along with several key strategies and tools. Since 2001, hundreds of affordable homes in Columbia Heights have been created and preserved and many buildings are owned by former tenants, thanks to D.C.'s tenant protection laws; robust funding; and a high-capacity network of tenant organizing groups, nonprofit developers, technical assistance providers, and other stakeholders. While displacement pressures are still a threat in the neighborhood, the level of affordable housing preserved—in the face of such rapidly-rising housing costs—is significant.

## Key Strategies & Tools

1.  **The Tenant Opportunity to Purchase Act.** D.C.'s Tenant Opportunity to Purchase Act (TOPA) gives tenants a right to purchase when their landlord attempts to sell their property. TOPA has been a critical legal backstop for the city's preservation efforts, coupled with the strategies below. Many buildings purchased under TOPA have become limited equity cooperatives owned by the former tenants.
2.  **Major dedicated funding.** D.C. dedicates large levels of funding for affordable housing preservation and production. The district's current mayor has committed $100 million per year to the D.C. Housing Production Trust Fund (HPTF)—the largest such commitment by a city in the United States.
3.  **Coordinated tenant organizing & support network.** A proactive, fast-acting housing preservation network has evolved in D.C. since the 1970s, providing robust technical and legal assistance, tenant organizing, and coordination to preserve affordable apartments. The D.C. Preservation Network (DCPN) has become a critical forum for preservation groups to share information and resources, track at-risk buildings, and coordinate preservation efforts.

## Challenges

- Preserving affordable housing for Columbia Heights' lowest-income residents has been an on-going challenge, requiring deep acquisition and operational subsidies.
- Opponents of TOPA have argued that the law contains loopholes enabling tenants to drag out the TOPA process and extract payments from landlords in exchange for waiving their purchase rights.
- African-American residents with historical ties to the neighborhood have voiced concerns about feeling like strangers in their own neighborhood as a result of the type of redevelopment occurring and the changing neighborhood demographics.

## Outcomes

- Close to 3,000 affordable units restricted in Columbia Heights for low-income households (22% of all housing units).
- 318 affordable rental units in 12 multifamily buildings created or preserved in the neighborhood from 2001 to 2016 through D.C.'s Housing Preservation Trust Fund.
- At least 398 housing units in the neighborhood are limited equity cooperatives, allowing low-income tenants to own their units.
- Average trust fund investment per unit in Columbia Heights (2001-2016): $145,000.

## Takeaways

1. **Incorporate residential displacement mitigation strategies into initial redevelopment plans.** In Columbia Heights, the shift from "needing to revitalize" the neighborhood to "needing to preserve affordable housing" happened very quickly. Once gentrification picks up steam, preservation efforts become much more difficult.
2. **Develop a network of high capacity preservation actors.** A coordinated infrastructure of high-capacity preservation groups that can move with agility and speed is essential to preserving existing affordable rental housing.
3. **Invest in tenant organizing.** Organizing and linking tenants with a committed network of support is also crucial. Tenant voice and power is critical to well-targeted policies.
4. **Provide a legal mechanism that supports tenants' ability to purchase their apartment complexes, including adequate notice and time to complete the purchase.** D.C.'s Tenant Opportunity to Purchase Act (TOPA), by providing tenants with a right to purchase their units when sold and adequate time to complete the purchase, shifts power to tenants and provides a critical legal backstop for preventing displacement of current renters and disincentivizing inequitable redevelopment.
5. **City council and municipal leadership is critical.** Elected officials committed to affordability and mitigating displacement are critical for successful preservation of affordable housing. D.C.'s progressive early councils were deeply committed to affordable housing preservation, which led to TOPA, creation of funding streams, and a large roster of tenant support organizations.
6. **Substantial, dedicated funding is necessary.** Preservation at a scale large enough to be meaningful requires large levels of dedicated funding.

# Guadalupe Neighborhood          AUSTIN, TEXAS

A Case Study of Early Intervention and Evolving Strategies to Create Affordable Housing for Vulnerable Residents with Historical Ties to the Neighborhood

## Overview

The Guadalupe neighborhood is located just east of Austin's Central Business District, bounded by Interstate Highway 35. The neighborhood, which comprises less than one-fifth a square mile and approximately 14 blocks, was historically a community of color, with a predominantly Mexican-American population. Through the 1970s and 1980s, the area suffered from rapid deterioration, population loss, and large-scale redevelopment pressures. At that time, of the area's 170 single-family homes, over half were in substandard condition.

In 1979, Austin leaders made plans to expand the French Legation in the neighborhood, which would have displaced at least 11 families. Residents rallied to block the expansion and successfully lobbied the city council to redirect federal block grant funds to support a new community-generated development plan for Guadalupe. To implement the plan, neighborhood leaders formed the Guadalupe Neighborhood Development Corporation (GNDC), which has become a pioneer in its diverse deployment of community-driven strategies over the past 35-plus years to mitigate the displacement of vulnerable residents.

Today, even though Guadalupe is now in the dynamic stage of gentrification, with a growing share of million-dollar homes, neighborhood leaders have successfully preserved the residential character of the neighborhood while creating a legacy of affordable housing that is under long-term community control for low-income residents with ties to the area.

## Key Strategies & Tools

1. **Community development corporation.** The Guadalupe Neighborhood Development Corporation, created and governed by leaders from the neighborhood, has been integral to the success of the neighborhood's displacement mitigation programs.
2. **Early and strategic land acquisition.** In GNDC's early years, the organization purchased vacant properties in strategic locations on as many blocks as possible—for long-term control and to bar assembly for commercial redevelopment. GNDC became a large property owner in the area providing additional clout in zoning battles. Buying lots early was also smart from an affordability perspective: In the 1980s, the average lot price was $5,000; today full lots sell for $500,000 to $650,000.
3. **Preference policy.** Low-income residents and former residents with historical ties to the two zip codes served by GNDC receive priority placement on GNDC's long waiting list for affordable rental and homeownership opportunities.
4. **Community land trust.** GNDC created the first community land trust in Texas to provide for homeownership that is permanently affordable. GNDC maintains ownership of the land, while the family obtains a mortgage to purchase the home. A fixed rate of appreciation ensures that CLT homes can be resold at affordable prices, while allowing owners to recoup their investment and build additional equity.

5. **Property tax breaks for permanently affordable properties.** GNDC has led efforts at the Texas Legislature and the local appraisal district to reduce property taxes on community land trust and other income-restricted homes—ensuring that these homes remain affordable for the low-income families renting or purchasing them.

6. **Creative utilization of infill properties.** Since purchasing lots is no longer feasible in Guadalupe, GNDC has become an innovator in Austin in developing affordable accessory dwelling units on lots that can support a second unit.

## Challenges

Guadalupe neighborhood's initial challenges in mitigating displacement of vulnerable residents included large-scale zoning changes that precipitated the loss of homes in the neighborhood. GNDC and neighborhood association leaders had deep-seated disagreements with African-American leaders in the area over the commercialization of the neighborhood, and the groups worked largely in silos. More recently, high land values have made new lot acquisition for affordable housing infeasible within the neighborhood.

## Outcomes

- 91 long-term affordable units under community control in Guadalupe, including 26 units underway (out of 170 total homes in the neighborhood in 1980, when GNDC's displacement-mitigation work began)
  → Average rent of GNDC units: $583; average income of GNDC renters: $28,700
- 8 affordable homeownership units, including the first CLT home in Texas

## Takeaways

1. **Develop and implement a community-driven, neighborhood-level strategy for mitigating displacement of vulnerable residents.** Efforts to mitigate displacement in Guadalupe have continually been anchored in the community, beginning with a community-generated plan and a community development corporation governed by widely-respected neighborhood leaders with social and political capital.

2. **Intervene early to acquire permanent control of land.** Acquire as much land as possible early on; as gentrification picks up steam in a neighborhood it becomes much more difficult to feasibly acquire properties for affordable housing.

3. **For homeownership units, restrict resale price using a shared equity model to ensure permanent affordability of the units for future generations of residents.** GNDC's earlier homes were sold without caps on the resale price, and several have since been resold at market prices beyond the means of other low-income families.

4. **Invest in capacity building and technical assistance.** Funding for program administration and early technical assistance have been key to GNDC's displacement mitigation work. GNDC's early investment in rental housing with little or no debt has generated a critical stream of income to help fund the organization's administrative operations, allowing the organization to expand its capacity and impact over time.

5. **Adapt strategies to changing conditions in the neighborhood.** The strategies utilized in Guadalupe to address gentrification have evolved over time, in response to neighborhood changes, newly available tools, and lessons learned from prior work.

# Inner North and Northeast  PORTLAND, OREGON

A Case Study of Community-Driven Strategies to Mitigate and Remediate the Displacement of African-American Residents

## Overview

The inner neighborhoods of North and Northeast Portland (N/NE Portland) were once home to 80 percent of Portland's black community. Following decades of disinvestment, subsequent urban renewal, and large-scale public and private investment projects, the area has been rapidly gentrifying, with rising housing costs and large-scale loss of African Americans. Since 2000, the area has lost close to 8,000 black residents—more than half the area's black population.

In 2013, mounting tensions in the community over gentrification and publicly-financed economic development in the area came to a head over the proposed use of prime public land and tax increment financing (TIF) for a development anchored by a Trader Joe's grocery store. Local African-American leaders organized protests of the new development and succeeded in getting the City to revamp its investment strategy in the community, shifting $100 million towards mitigating displacement of low-income residents in Inner N/NE Portland. Responding to the community's concerns, the City of Portland, anchored by ongoing active community involvement and a community-driven plan, has been deploying a number of innovative strategies and tools for addressing displacement in the area.

## Key Strategies & Tools

1. **N/NE Neighborhood Housing Strategy.** A five-year, community-driven plan for expanding affordable housing opportunities and preventing displacement in Inner N/NE Portland. The plan utilizes several different affordable housing strategies including rental repairs, land acquisition, and new homeownership and rental housing, and identifies specific timeframes and measurable goals to track progress.
2. **Dedicated TIF funding.**  Implementation of the N/NE Neighborhood Housing Strategy was originally funded with $20 million in dedicated tax increment financing (TIF). Since then, the City's financial commitment to mitigating displacement in the area has grown to more than $100 million in TIF funds to be invested over a six-year period.
3. **Community Oversight Committee.** The N/NE Portland Oversight Committee oversees the City's implementation of the N/NE Neighborhood Housing Strategy. The committee's work includes providing input on development projects in the area, monitoring the City's progress towards benchmarks in the Housing Strategy, and issuing an annual report to the City Council. The Oversight Committee is meant to represent and be responsive to the community. It is made up of trusted community leaders, topic area experts, and directly impacted community members.
4. **Preference Policy.** The Housing Strategy provides priority placement in subsidized housing units in N/NE Portland to residents with generational ties to N/NE Portland who were displaced or are at risk of displacement from areas where prior city plans had a destabilizing impact on long-term residents. Priority preference is given to households and their descendants who own property lost through urban renewal.

## Challenges

Portland's **Down Payment Assistance Loan Program** for helping low-income, first-time homebuyers in N/NE Portland served only four families from 2015 through 2017, despite a goal of serving 40 households. With market home prices at $400,000, homeownership is out of reach for most low-income households, even with individual assistance of $100,000.

**The Preference Policy** does not create affordable housing, and so its success is dependent on the availability of affordable housing stock. In 2016, 1,000 households applied through the preference policy program for 65 homeownership slots.

The focus on mitigating displacement in N/NE Portland is fairly new, and it is still too early to tell how successful different strategies will be. However, the Oversight Committee already has a successful track record of providing transparency and accountability to the City's anti-displacement programs in N/NE Portland, closely monitoring the City's programs, and identifying barriers and challenges as well as opportunities for improvement.

## Outcomes Since 2015

- New affordable rental housing (on line or in development): 350+ units in 7 multifamily developments
- Average city investment (TIF funds) per new affordable rental unit (2016): $64,755
- Homeownership units repaired: 326+

## Takeaways

1. **Develop a community-driven, comprehensive, neighborhood-level strategy to address residential displacement for vulnerable residents.** Align the strategy with community needs, be clear about goals, and be transparent in assessing outcomes.
2. **Back community strategies with substantial, dedicated funding.** Preservation at a scale large enough to be meaningful requires large levels of dedicated funding.
3. **Prioritize meaningful community participation.** Take it seriously. This requires an assertive effort to reduce barriers to participation and reach out to directly impacted current and former residents. Community voices should be incorporated into every step of the planning process. Strategies and outcomes should be in clear and demonstrable alignment with community needs and priorities.
4. **Incorporate community-responsive oversight into mitigation displacement and affordable housing preservation plans.** An oversight committee provides critical transparency and accountability in strategy implementation and outcomes. Oversight leadership should be trusted and well-respected by the community and responsive to the community's needs.
5. **Affordable homeownership for low-income families is difficult to achieve in hot market neighborhoods.** To make homeownership affordable in markets where median housing prices vastly exceed what households earning the median family income can afford, cities have to be willing to support the units with very large subsidies.

# PART 4

Strategy and Policy Overview: Addressing the Displacement of Vulnerable Residents in Gentrifying Neighborhoods

# Introduction

This part of the report provides an overview of a diverse set of strategies and policies for addressing the displacement of vulnerable residents in gentrifying neighborhoods. The discussion of each strategy and policy is guided by the following vision statement:

> **Low-income residents and persons of color (and their children) in historically disadvantaged communities have the opportunity to stay and return to their neighborhoods in the face of rising property values and an influx of more affluent residents. Over time, opportunities remain for new low-income residents to live in the community. Residents have a meaningful role in shaping the future of their neighborhood.**

The strategies and policies are organized around a set of six overarching goals (see below). This organizational framework provides a reference point for understanding how certain strategies and policies further different displacement mitigation goals, while not furthering others. The framework also highlights how one type of strategy might advance one goal while actually undermining another. For example, lowering property taxes for homeowners would help low-income homeowners remain in their homes, but also shift more of the property tax burden to landlords, potentially contributing to increased rents and hurting Austin's vulnerable renters.

## Goals for addressing displacement in gentrifying neighborhoods

1. Vulnerable renters in gentrifying neighborhoods are not displaced from their current homes and neighborhoods.

2. Vulnerable homeowners in gentrifying neighborhoods are not displaced from their current homes and neighborhoods.

3. The existing affordable housing stock (subsidized and non-subsidized) in gentrifying neighborhoods is preserved so that the units are in good condition while remaining affordable to low-income residents.

4. City planning and land use decisions incorporate inclusive and equitable anti-displacement strategies, and low-income persons and communities of color are empowered to participate early and meaningfully in land use decisions that shape their homes, neighborhoods, and communities.

5. Vulnerable residents are able to remain in or return to their communities by accessing the new affordable housing opportunities in their neighborhoods.

6. New affordable housing options are created to serve current and future vulnerable households in gentrifying neighborhoods.

We do not provide an in-depth analysis of the policies here. Instead, each policy overview includes a one- to two-paragraph summary of how the policy works, some examples of where the policy has been used, if applicable, and a short summary of "pros" and "cons," which consider some of the benefits of the policy as well as considerations that may deter cities from adopting the policy (such as fiscal impacts, political implications, etc.). In Part 5 we provide a deeper discussion of a subset of these policies, using criteria designed to further highlight trade-offs.

This overview is geared towards strategies, policies, and programs that a city can adopt or help incubate, although many require partnerships with nonprofit organizations and other private entities. The focus here is also on strategies and policies that can be targeted to individual neighborhoods facing displacement pressures, although some of the policies are citywide in scope. We did not include in this overview any policies that are illegal in Texas. We have instead summarized those following the policy overview.

The overview does not represent our endorsement or recommendations of policies that the City of Austin should pursue, but is instead intended to provide a range of options for policymakers to consider. Our selection and analysis of the policies were drawn from a review of recent literature, our experience in the field, discussions with local experts and practitioners, and the case studies we developed. The literature we reviewed included local and national studies, reports, and toolkits focused on gentrification and displacement, along with actual ordinances and statutes. We also looked closely at policy recommendations made by local advocacy groups and task forces focused on issues related to gentrification, displacement, racial justice, and affordable housing.

## Summary of Strategies and Policies Available to the City of Austin to Mitigate Displacement of Vulnerable Residents in Gentrifying Neighborhoods

**GOAL #1:** Vulnerable renters in gentrifying neighborhoods are not displaced from their current homes and neighborhoods.

Renters in gentrifying neighborhoods face recurring rent increases, and the most vulnerable groups of renters (low-income renters, persons of color, etc.), are at the highest risk of eviction. The displacement of low-income renters from their homes can lead to homelessness and contributes to lower school performance. The following is a summary of strategies and policy tools that can be used by the City of Austin in gentrifying neighborhoods to help low-income renters stay in their current homes and neighborhoods, with a focus on direct financial assistance, legal protections, and other types of support. Additional strategies related to renters are discussed under Goal #3, related to preserving Austin's existing affordable housing stock for low-income residents.

➤ **Strategy 1a. Provide direct financial relief to vulnerable renters who are at risk of being displaced from their homes in gentrifying neighborhoods.**

**Policy Tools:**

• **Increased local funding for emergency rental assistance.** Emergency rental assistance programs provide short-term, direct relief to residents facing an immediate threat of eviction from their rental homes in gentrifying neighborhoods. In Austin, the Travis County Family Support Services provides a limited amount of rental assistance to tenants at risk of eviction. With additional funding, programs like this could help mitigate the displacement of additional vulnerable renters and target renters in gentrifying neighborhoods.

  o **Examples:** Seattle (Rental Housing Assistance Program; up to six months assistance); New York City (One-Shot Deal Program and Homeless Diversion Unit).

  o **Pros:** Helps vulnerable families weather a financial crisis and reduces homelessness.

  o **Cons:** Short-term solution. Not directed towards helping families who need longer-term assistance to remain in their homes.

- **Neighborhood stabilization voucher program.** A neighborhood stabilization voucher program would provide longer-term relief to renters facing displacement in targeted gentrifying neighborhoods, by funding the gap between market rate rents and what a low-income renter can afford. By using local dollars, a voucher program would act as a supplement to federal Housing Choice Vouchers (commonly referred to as "Section 8"), which are in short supply relative to need and not targeted to particular neighborhoods. The program could target residents whose properties are exiting affordable housing programs, who are unable to pay their current rent, or are living in unsafe conditions and need to move to another property. The program could be tenant-based as well as property-based. For more information on this strategy, see the discussion on vouchers in Part 5.

  - o **Examples:** D.C. (Local Rent Subsidy Program); Denver (Lower Income Voucher Equity Program).

  - o **Pros:** Allows vulnerable families to remain in their community and continue accessing all of their community support networks; reduces student mobility by helping kids stay in their neighborhood schools.

  - o **Cons:** Does not create long-term affordability for future residents. Expensive to provide the on-going rent subsidies in areas with rapidly appreciating property values. Requires cooperation from landlords.

➤ **Strategy 1b.  Increase city legal protections for renters to reduce evictions and other forms of displacement in gentrifying neighborhoods.**

**Policy Tools:**

- **Mandatory tenant protections for all rental properties receiving city support.** The City could require residential properties receiving city support or approval (such as city rental housing development funds and property tax abatements, as well as federal Low Income Housing Tax Credit and tax-exempt bond projects) to provide a designated set of robust tenant protections. Some of these tenant protections could also be extended to properties in the City's Repeat Offender Program for code violations. Tenant protections could include: (1) organizing protections (see also below under strategy 1e), (2) opportunities to cure alleged lease violations, (3) rights of first refusal to purchase (see below under strategy 1d), (4) longer advanced notice of rent increases, (5) lease renewal protections (i.e., barring non-renewals without just cause), and (6) caps on rent increases.

  - o **Pros:** Enhanced legal protections will help reduce displacement of renters living in complexes with rising rents or seeking to redevelop, as well as help protect tenants seeking to advocate against the rent increases or redevelopment. These protections are a critical accessory to any tenant right-to-purchase program (see below under strategy 1d).

  - o **Cons:** Funding for monitoring and enforcing violations of these protections would be required to ensure their effectiveness.

- **Expansion of legal and mediation support for tenants facing eviction.** Research shows that providing legal support to tenants in eviction proceedings dramatically reduces the number of evictions and thus also reduces the negative impacts to both families and communities that flow from evictions. These impacts include shelter costs associated with homelessness, and the harm to students and school districts of moving students to new campuses. Using D.C.'s Office of Tenant Advocate (OTA) and New York City's eviction defense programs as a guide, the City of Austin could fund similar programs locally to provide legal support for vulnerable tenants in gentrifying neighborhoods as well as other areas of the city. D.C.'s OTA receives $2.4 million in annual city funding and has four attorneys on staff who provide legal assistance to tenants and tenant associations and intervene in judicial cases impacting tenants' rights.

- o **Examples:** Washington, D.C. (Office of Tenant Advocate), New York City (Office of Civil Justice); Boston (Office of Housing Stability).

- o **Pros:** Systematizes and strengthens what is at present an incomplete and underfunded network of advocates for renters. Would help redress the under-representation of Austin's majority renter population in city policies.

- o **Cons:** The long-term viability of an eviction support program would require a long-term commitment of general funds.

- • **Improvements to the city's anti-retaliation ordinance and anti-harassment protections for tenants.** Tenants who speak out against rent increases and living conditions in their housing units risk retaliation from their landlords including non-renewals of leases. Austin has an anti-retaliation ordinance, but its provisions are weak and could be strengthened to provide enhanced protections for tenants, including greater protections against harassment. Further research is needed to determine best practices in this area.

  - o **Examples:** Oakland (Tenant Protection Ordinance); San Jose (Tenant Protection Ordinance).

  - o **Pros:** Strengthens the hand of advocates already working to help protect Austin's renters. These protections are a critical accessory to any tenant right-to-purchase program (see below under strategy 1d).

  - o **Cons:** Funding for monitoring and enforcing violations of these protections would be required to ensure their effectiveness.

- • **Eviction notification ordinance/required notice to city.** Under an eviction notification ordinance, landlords would be required to notify the city when they intend to evict a large number of tenants or not renew their leases.

  - o **Example:** Boston (Jim Brooks Stabilization Act).

  - o **Pros:** Improve the ability of the city, tenant associations, tenant advocacy groups, and social service providers to assist the tenants and intervene in mass-displacement actions as well as address impacts on schools.

  - o **Cons:** Funding for monitoring and enforcing violations of the ordinance would be required to ensure its effectiveness.

➤ **Strategy 1c. Assist renters who have been displaced with relocating in their neighborhoods.**

The following tools would help tenants who have been displaced from their rental housing but want to remain in their neighborhoods.

**Policy Tools:**

- • **City expansion and funding for tenant relocation assistance and counseling.** Austin has, on paper at least, a relocation assistance and counseling program for displaced renters, with a notice requirement that covers apartments undergoing demolition. However, the City Council has not yet provided funding for the program and has not yet adopted the fee that is supposed to be paid by apartment redevelopments seeking zoning changes. To better assist tenants who are displaced from their apartments, Austin could amend its relocation ordinance to cover a broader range of redevelopment projects contributing to the displacement of tenants and move forward with adopting a relocation fee.

  - o **Examples:** Boston, Chicago, Seattle, Maryland.

  - o **Pros:** Financial assistance helps tenants afford the cost of moving to a new apartment, but just as important is relocation counseling, which helps tenants navigate the rental market and access housing in their neighborhood and school attendance zone.

- o **Cons:** Requires a nexus study to assess the fee.

- **City relocation assistance requirements tied to increased rents.** Modeled on Portland's new Mandatory Rental Relocation Association Program, the City could adopt an ordinance requiring landlords to provide monetary relocation assistance when landlords increase rents by at least 10 percent a year. The Portland relocation assistance, which ranges from $2,900 to $4,500 a month, depending on the number of bedrooms, is available to renters who end up moving as a result of the increased financial burden from the rent increases.

  - o **Example:** Portland (Mandatory Renter Relocation Assistance Program).

  - o **Pros:** When coupled with relocation counseling (see below), relocation assistance funds provide critical support to help tenants relocate in their neighborhoods and reduce public school mobility, thereby enhancing public school performance. If the costs of assistance are high enough, the assistance program would help shift new market housing development to projects that involve less direct displacement of existing tenants or none at all.

  - o **Cons:** Likely pushback by the Texas Legislature.

### ➤ Strategy 1d. Support tenant acquisitions of their apartment units.

**Policy Tools:**

- **Tenant right-to-purchase program ordinance.** Adopting an ordinance modeled on Washington, D.C.'s Tenant Opportunity to Purchase Act would provide tenant associations in multifamily properties or a tenant-designated nonprofit with a right of first refusal upon the sale of their apartment complex. The ordinance could be city-wide or apply just to subsidized properties. As the D.C. model has shown, to be effective, the right to purchase would need to be coupled with financial support for the acquisitions, technical assistance, capacity building, and tenant organizing.

  - o **Examples:** Washington, D.C. (Tenant Opportunity to Purchase Act and other supporting programs).

  - o **Pros:** A powerful tool for minimizing resident displacement; helps create rare low- and moderate-income homeownership opportunities in gentrifying neighborhoods.

  - o **Cons:** Might attract hostile action from the state legislature. In Washington, D.C., scattered cases of tenants gaming the system to their advantage (e.g., by selling their right to purchase) have been widely publicized and undermined support for an otherwise helpful ordinance. Requires significant funding and capacity-building support from the city and nonprofit technical assistance providers.

### ➤ Strategy 1e. Support tenants to be active participants in advocating for and implementing displacement mitigation strategies.

**Policy Tools:**

- **Financial support for tenant organizing and tenant engagement.** Before a displacement event occurs, renters need to know their rights and options and need organizing support so they can effectively advocate for their interests. Austin provides some financial support for tenant engagement through Building and Strengthening Tenant Action (BASTA), which could be expanded to support tenants in acquiring their units and engaging in other advocacy actions to mitigate displacement.

  - o **Example:** Washington, D.C.

  - o **Pros:** Investing in tenant organizing facilitates the formation of tenants' associations and empowers tenants to make landlords more accountable for their actions. Tenant organizing is critical to the effectiveness of a tenant right-to-purchase program.

   o **Cons:** Requires on-going funding for long-term effectiveness.

- **Tenant right-to-organize ordinance.** Tenants do not currently have the right to organize into tenant associations and engage in organizing activities in their apartment complexes unless they are living in public housing or certain classes of federally-subsidized housing. Austin could adopt an ordinance providing similar protections for all tenants.

   o **Example:** Washington, D.C. (Tenant Right to Organize Act).

   o **Pros:** The right to organize is a critical legal protection for tenants seeking to engage other tenants and form a tenant association to purchase their building under a right to purchase program.

   o **Cons:** None identified.

## GOAL #2: Vulnerable homeowners in gentrifying neighborhoods are not displaced from their current homes and neighborhoods.

As a neighborhood gentrifies, low-income homeowners face mounting financial pressures in the form of recurring property tax increases and inability to cover other housing expenses such as repairs. In Austin, 956 homeowners with a homestead exemption have two or more years of delinquent taxes; one-third of those homeowners are seniors.

While rising property taxes impose a heavy burden on many homeowners in Austin, homeowners who are the most vulnerable to displacement are those with the lowest incomes living in the most rapidly appreciating neighborhoods. In Austin, owners with multiple years of property tax delinquencies are concentrated most heavily in the city's gentrifying zip codes, with the heaviest percentage residing in Central East Austin. While constitutionally-mandated tax savings are available via various homestead exemption policies, many low-income homeowners who qualify for these exemptions do not have one in place.

The following strategies and tools can be adopted by Texas cities in gentrifying neighborhoods to help vulnerable homeowners who want to stay in their current homes, by lowering property taxes, providing direct financial relief and targeted outreach and education, and helping owners access the equity in their homes. See Appendix 5 for a more detailed description of these policies.

➤ **Strategy 2a. Lower the property tax burdens for vulnerable homeowners.**

Texas law heavily restricts what Texas cities can do to provide property tax relief for struggling homeowners, but there are still a number of useful policies they can enact. The first three policy tools (Homestead Preservation Center, homestead exemption enrollment program, and partnership with county tax assessor) would have the lowest fiscal impact on the city and be fairly easy to implement.

**Policy Tools:**
- **Homestead Preservation Center.** By funding a new Homestead Preservation Center, the City of Austin could support education about homestead exemptions and other property rights and responsibilities that come with homeownership, targeting services towards vulnerable households in gentrifying neighborhoods who do not have an exemption or are delinquent on their taxes or mortgages. The center could also provide vulnerable residents with financial counseling to help them reduce debt—and with legal assistance to help eligible owners (such as heirs-property owners and mobile home owners, who often do not have an exemption)

qualify for homestead exemptions. Another function of the center, which the city could operate through a partnership with a nonprofit, could be proactive outreach to help vulnerable owners negotiate payment plans with the tax collector and mortgage modifications with their lenders.

- o **Examples:** Cleveland (ESOP); Oregon (Homeownership Stabilization Initiative); Affordable Housing Centers of Pennsylvania; New York City Financial Empowerment Centers.

- o **Pros:** Relatively low-cost solution to help vulnerable homeowners save hundreds of dollars in property taxes and stay in their homes by accessing constitutionally-mandated exemptions. Cities are able to tailor assistance to low-income homeowners in gentrifying neighborhoods.

- o **Cons:** None.

- **Homestead exemption enrollment program.** Short of creating a Homestead Preservation Center, the City of Austin could provide funding to a community-based nonprofit, such as Meals on Wheels Central Texas, to conduct in-person outreach to homeowners without a tax exemption and provide on-the-spot assistance signing up for the homestead exemptions they qualify for. About a decade ago, the nonprofit PODER partnered with the Travis Central Appraisal District to provide targeted, door-to-door outreach to assist homeowners without homestead exemptions, after close to 800 homeowners were identified as not having an exemption. The City of Austin currently funds income tax and health insurance enrollment programs that could serve as a model for a homestead exemption enrollment program.

  - o **Pros:** Low-cost program that would lower the property tax burden of vulnerable homeowners and help them stay in their homes.

  - o **Cons:** None

- **Partnership with county tax assessor to expand notice of property tax deferrals.** A partnership could provide targeted notices about the property tax deferral option available to seniors, persons with disabilities, and disabled veterans under state law, and make the notices more accessible to homeowners who are not fluent in English. These classes of eligible taxpayers are able to defer part or all of their property taxes until they die or move, with interest of five percent on the taxes owed. The interest and penalties for homeowners not in the deferral program is 24 percent. Providing door-to-door outreach to homeowners by trusted community members would likely have the greatest impact in informing tax delinquent homeowners about the financial benefits of enrolling in the deferral program rather than paying late penalties and interest for delinquent payments.

  - o **Pros:** Low-cost policy that would save vulnerable homeowners up to thousands of dollars a year and help them stay in their homes.

  - o **Cons:** None.

- **Emergency homestead stabilization fund.** An emergency homestead stabilization fund set up and funded by the City of Austin could provide short-term property tax and mortgage assistance to low-income, cost-burdened homeowners at risk of losing their homes because of a financial crisis. The assistance could be provided through the Homestead Preservation Center (see above) or another nonprofit such as the East Austin Conservancy, and could be coupled with financial coaching and other assistance to help stabilize families experiencing a financial crisis. In May 2018, Austin Mayor Pro Tem Kathie Tovo proposed a similar type of stabilization program funded by the City for low-income homeowners, directed towards assistance with mortgages versus property taxes.

  - o **Examples:** Seattle (Foreclosure Prevention Loan Pilot Program); Cleveland, Ohio (ESOP Senior Property Loan Program); Milwaukee (Property Tax Rescue Assistance Program); State of Florida (Elderly Mortgage Assistance Program); Atlanta (Westside Community Retention

Collaborative); Michigan (Step Forward Michigan).

- o **Pros:** Helps families hold onto their homes during a short-term financial crisis.
- o **Cons:** Does not provide long-term relief for vulnerable families unable to afford on-going tax increases or make their mortgage payments.

- **Neighborhood stabilization loan program.** Some of the most vulnerable low-income homeowners need longer-term financial assistance to be able to stay in their homes and pay their mounting property taxes. The City of Austin could create a neighborhood stabilization loan program in gentrifying neighborhoods to provide longer-term, low-interest interest loans to low-income homeowners who are paying more than 30 percent of their income on housing costs. Each loan could be forgivable in exchange for the homeowner agreeing to a longer-term affordability restriction, ensuring that the home would be sold to another low-income owner and remain owner-occupied. The program could also provide forgivable loans for low-income residents whose parents have utilized a property tax deferral under state law and, when their parents die, are suddenly faced with a large property tax bill. The loan could be forgivable only to the extent the family member is income-eligible and agrees to remain in the home. While under state law a household with a homestead exemption is entitled to enter into a property tax payment plan with the tax collector, interest accrues at 12 percent a year, the plan cannot exceed 36 months, and a homeowner can enter into a new plan only after two years. Without a repayment plan, interest and penalties on delinquent taxes accrue at 24 percent a year.
  - o **Pros:** Provides lower interest and longer-term assistance to households than what is available under a payment plan with the tax collector and could cover housing needs beyond property taxes; possible gain for the city in permanently income-restricted affordable housing units for a relatively low cost compared to building new units.
  - o **Cons:** Longer-term and forgivable loan terms carry a larger financial burden for the city.

- **Tax abatement program for homeowners.** The Texas Tax Code provides multiple mechanisms by which a city can grant tax abatements to homeowners and other property owners in a "reinvestment zone." With a tax abatement, the city abates (i.e., waives) the city's property taxes on the increase in the appraised value of a property. A city can provide a partial or full abatement and must adopt guidelines and criteria for awarding the abatements in a reinvestment zone. A city can tailor the abatements to serve the most vulnerable homeowners in gentrifying neighborhoods (such as by pairing abatements with low-income persons participating in a city home repair program), as long as the area meets the definition of a reinvestment zone. Issuing an abatement is contingent on the owner making specific improvements or repairs to the property, but the state statute does not set forth a minimum level of repairs that must be made.[1] Counties and other taxing entities can extend property tax abatements to homeowners by entering into an abatement agreement identical to the city's agreement.
  - o **Examples:** Fort Worth; Philadelphia; Portland (new homes only)
  - o **Pros:** A city is able to tailor tax relief to the most vulnerable homeowners.
  - o **Cons:** Administrative burden on city to process applications and enter into agreements with homeowners; homeowners with abatements may be hit with a sharp increase in property taxes when the abatement agreement expires.

- **Freeze on property taxes for homeowners who are seniors or disabled.** Texas law provides homeowners who have a senior or disability exemption with an automatic tax freeze on the amount paid for school district taxes. With a tax freeze in place, once a homeowner qualifies for a senior or disability exemption, the school district taxes will never increase unless improvements (other than normal repairs or maintenance) are made to the home. The City of Austin has authority to adopt a similar tax ceiling via the City Council or petition and election by the city's citizens.[2]

- o **Examples:** Fort Worth, Tarrant County, Williamson County, Cedar Park.
- o **Pros:** Provides tax relief to many persons on fixed incomes.
- o **Cons:** The tax freeze cannot be limited to low-income seniors and shifts the city's property tax burden onto renters and younger homeowners.

- **Increase in the city's senior homestead exemption.** Each taxing unit in Texas has authority to offer an additional flat dollar exemption for homesteads of seniors and persons with disabilities. In 2017, the City of Austin increased to $85,500 the amount of its exemption for seniors and persons with disabilities. Austin has authority to increase its exemption further.
  - o **Examples:** Houston ($160,000); Dallas ($90,000); San Antonio ($65,000).
  - o **Pros:** Provides tax relief to persons on fixed income and less expensive for a city to adopt than a tax freeze.
  - o **Cons:** Benefits wealthy seniors as well as low-income seniors, although low-income households benefit more from the flat dollar exemption available through the senior homestead exemption than percentage exemptions. Cities are barred by state law from tailoring the tax freeze to low-income seniors, and the freeze shifts the city's property tax burden onto renters and other homeowners.

- **Senior volunteer tax break coupled with a senior volunteer program.** To help low-income seniors cover their property taxes, the City of Austin and Travis County could partner to provide seniors with volunteer opportunities, in exchange for the seniors' property taxes being forgiven. The Texas Tax Code (Section 31.035) allows cities to offset a senior homeowner's property taxes by the current federal minimum wage ($7.25) for each hour of volunteer work for the city or county.
  - o **Pros:** In addition to the tax benefits, the volunteer tax break provides an opportunity for seniors to stay engaged in their community and to connect with other residents.
  - o **Cons:** Unavailable for seniors who do not have the capacity to volunteer as a result of a disability, illness, or other barrier.

➤ **Strategy 2b. Assist vulnerable homeowners in gentrifying neighborhoods with repairs to their homes.**

Rising property taxes mean that low-income homeowners in gentrifying neighborhoods have a harder time paying for repairs to maintain their homes. This can put them at risk of having their homes condemned due to poor condition. Assisting the most vulnerable homeowners with home repairs helps prevent displacement.

**Policy Tool:**

- **Expand Austin's home repair assistance programs in gentrifying neighborhoods.** The City of Austin currently offers two home repair programs: (1) the Home Rehabilitation Loan Program, which provides a partially forgivable, zero percent loan for low-income households to bring their homes up to code; and (2) an Emergency Home Repair Program through the Austin Area Urban League for low-income homeowners facing a life-threatening condition. Both of these programs provide critical repairs to help low-income residents stay in their homes and, with additional funding targeted towards serving low-income residents in gentrifying areas, could help mitigate the displacement of additional vulnerable homeowners.
  - o **Examples:** Milwaukee (Strong Homes Loan Program and Compliance Loan Program).
  - o **Pros:** Repairing existing homes is generally a less expensive method of creating safe, affordable homeowner opportunities than building new affordable homes. In many cases,

home modifications, such as ADA-compliant entry ramps or bathrooms, can help residents remain in their longtime homes rather than undergoing disruptive moves.

o **Cons:** Repair programs typically come with less restrictive resale restrictions than programs such as community land trusts and thus do not provide for long-term affordability. Current home repair programs are not geographically targeted to neighborhoods most at risk of increased displacement due to gentrification pressure. Major home repairs can lead to an increase in property taxes, and thus repair programs in gentrifying neighborhoods would ideally be coupled with a tax abatement program.

➤ **Strategy 2c. Assist low-income homeowners with accessing the equity in their home through non-predatory products.**

For lower-income homeowners in rapidly appreciating areas, the equity in their homes is an asset that can be leveraged to assist with property taxes and other costs of living, but many vulnerable homeowners who tap into their equity are targeted by predatory loan products with excessive interest rates and unnecessary fees. African-American and Hispanic homeowners are the biggest victims of predatory lending products. These products jeopardize the ability of homeowners to stay in their homes and deplete the wealth of black and Hispanic households. The following tools could be deployed by the city to assist low-income homeowners with accessing the equity in their homes while avoiding predatory products.

**Policy Tools:**

• **Enhanced fair lending education and enforcement.** The City of Austin relies largely on federal funding for local fair housing enforcement, but with local dollars the City could enhance local efforts to investigate violations of fair lending laws and bring legal actions against predatory lenders targeting vulnerable homeowners and engaging in redlining. Austin's 2015 Fair Housing Action plan calls for such enhanced funding for fair lending enforcement. The funding could also support financial education to vulnerable homeowners about safe and affordable financial products and help homeowners improve their credit to increase their chances of qualifying for safer lending products.

o **Examples:** New York (Fair Housing Justice Center and Office of Financial Empowerment); San Antonio (Financial Empowerment Center—financial counseling); Nashville (Financial Empowerment Center)

o **Pros:** A focus on fair lending practices could lead to systematic changes in shutting down discriminatory lending and expanding vulnerable homeowners' access to safer lending products.

o **Cons:** Fair lending legal actions are difficult to litigate and can take years to work their way through the courts.

• **Community homeownership loan fund.** Nonprofit, mission-driven community loan funds play a key role in helping low-income households access safe and affordable financing. These funds are typically operated by organizations classified as community development financial institutions (CDFIs) through the U.S. Treasury Department, which in 2013 opened up financing for below-market homeownership through its CDFI Bond Guarantee Program.

o **Examples:** Indianapolis Neighborhood Housing Partnership, Homeownership Center of Charlotte, Homewise (Santa Fe), Chicago Community Loan Fund, Nashville Housing Fund.

o **Pros:** Nonprofits and CDFIs can act as trusted interlocutors in neighborhoods with a long history of distrust stemming from past actions taken by the city government.

o **Cons:** Administrative complexity is somewhat high; city must act in partnership with non-governmental entities.

➤ **Strategy 2d. Increase ability of vulnerable homeowners to cover housing costs by generating income from their homes and lots.**

**Policy Tools:**

- **Allow for creation of internal accessory dwelling units.** Although the City of Austin loosened land use rules that restricted the construction of Accessory Dwelling Units (ADUs) in 2015, the rules mostly only affected external ADUs—ADUS detached from a single-family home. Internal ADUs—separate dwelling units with their own kitchens and entrances carved out from within existing single-family houses—are limited by city requirements that the units be occupied by caretakers or relatives of the homeowner. While a freestanding ADU can easily cost up to $200,000 or more to construct, many internal ADU projects are feasible for under $50,000. This brings them within reach of far more homeowners.

  o **Examples:** Portland, Oregon; Santa Cruz, California; Vancouver, Canada.

  o **Pros:** Internal ADUs help existing homeowners generate income by making use of excess space, a common scenario for empty nester and elderly residents. They involve almost negligible changes to the physical look of the home's exterior. Internal ADUs are also likely the cheapest possible way to add a new housing unit to already developed neighborhoods.

  o **Cons:** Would engender political opposition due to increased unit density.

- **Support ability of low-income homeowners to build an external accessory dwelling unit.** While the City of Austin greatly eased land use restrictions on single-family homeowners adding a detached ADU to their properties, research from other cities, including Seattle and Portland, strongly suggests that without intervention very few low- or moderate-income homeowners will build ADUs. Financing based on the future earning potential of ADUs is largely unavailable. Low- and moderate-income homeowners need viable financing options as well as technical assistance navigating the complex, intimidating, and risky processes of design, financing, construction, and property management for ADUs.

  o **Examples:** Austin Community Design and Development Center (ACDDC); West Denver Renaissance Collaborative (WDRC); Multnomah County, Oregon.

  o **Pros:** An ADU support program would broaden access to the documented benefits of ADUs—extra living space; rental income; the ability to move into a small, modern housing unit while renting out the existing house; etc.—beyond affluent homeowners to low- and moderate-income homeowners.

  o **Cons:** Existing large-scale efforts elsewhere in the U.S. and Canada are nonexistent. Would require policy and program innovation and likely a partnership with local nonprofits and financial institutions.

- **Allow homeowners to subdivide and sell a portion of their lots while remaining in place.** On thousands of parcels in neighborhoods throughout Central Austin, small houses in poor condition built in the 1960s or earlier lie on spacious parcels. Between rising property taxes and deferred maintenance, the economic pressure is high for homeowners to sell to homebuilders, who in most cases will opt to tear down the existing house and replace it with one or two new and far larger houses. One possibility for helping homeowners stay in place while monetizing a portion of the considerable gain in their property values would be to allow them to subdivide their lots. They would then have the ability to sell one of the resulting parcels (perhaps a portion of the backyard) to a homebuilder, who could then build a small house. The policy could be structured to give the city or a nonprofit the right of first refusal to purchase the newly-created parcel.

  o **Examples:** No identified examples of such a policy in the United States.

  o **Pros:** One of very few policies that would allow homeowners to receive a large quantity of

money—perhaps upwards of $100,000 in some cases—at once while remaining in place without using debt to improve and maintain their current home. Participating homeowners' property tax burden would also be reduced via the reduction in lot size and redevelopment potential.

o **Cons:** This idea is admittedly untested in the United States. It would engender controversy because of the resulting physical changes and construction activity in existing neighborhoods. Unknown effects on property values and taxes of parcels that do not subdivide.

> ## ➤ Strategy 2e. Support mobile home residents' acquisition of mobile home parks and ability to stay in their communities.

Mobile home parks are the largest source of unsubsidized affordable homeownership in the United States and also home to some the city's poorest and most vulnerable residents. While the residents typically own their homes, they rent the land their mobile home sits on. Mobile home households face special challenges when they are displaced as a result of rising rents or mobile home conversions, since moving a mobile home costs an average of $5,000 to $10,000, and many homes are in such poor condition they cannot be moved. Austin's declining stock of mobile home parks makes it that much more difficult for the mobile home owners to relocate. The closure of mobile home parks has a particularly heavy impact on Latinos, with Latinos comprising close to 60 percent of Austin's mobile home park population. See also strategy 3b.

**Policy Tools:**

- **Comprehensive mobile home park resident acquisition program.** Around the country, there are many examples of successfully preserving mobile home parks through resident acquisition and governance. In New Hampshire, for example, residents have purchased over 120 mobile home communities, preserving more than 7,200 homes. Public policies to support resident ownership typically include a right to purchase; funding for resident organizing, legal assistance, and technical assistance; and legal protections to allow residents to organize and form associations. Fortunately, financing is already available for qualified resident acquisitions of mobile home parks through groups like ROC USA, a national nonprofit social venture with a proven track record of financing resident ownership of mobile home communities. ROC USA has already financed at least one mobile home resident ownership project in Texas (Pasadena Trails).

  o **Examples:** New Hampshire, Oregon, Boulder.

  o **Pros:** Provides mobile home residents with greater housing security and wealth.

  o **Cons:** Purchases by low-income residents are likely to require public subsidy, especially in areas in the later stages of gentrifying; success more likely with on-going public financial support for technical assistance and tenant organizing.

- **Relocation fee for mobile home parks.** Austin's relocation assistance ordinance requires that developers pay a relocation fee to mobile home parks residents to help cover the costs of relocating when the developer seeks a rezoning or other discretionary land use approval from the City Council that is likely to result in tenant displacement. However, the City has not yet adopted the fee schedule, and a fee is not required if the conversion does not require a rezoning or other city approval.

  o **Pros:** Provides critical assistance to help mobile home owners cover the high costs of transporting their mobile homes to new sites, if a new site can be secured.

  o **Cons:** Costs of performing the nexus study.

- **Designate new sites for mobile home zoning.** When homeowners in mobile home parks are forced out of the park they have little or no alternatives of places to move their mobile homes, since Austin has, overall, very few parcels of land that are zoned for mobile home parks.

  o Pros: Designating new sites across the City for mobile homes parks would open up opportunities for mobile home residents to remain in the city.

  o Cons: This policy would likely not result in new mobile home residents being able to stay in gentrifying neighborhoods unless it were coupled with subsidies to support city, nonprofit, or tenant acquisition of land for a mobile home park with lease rates that remain affordable to lower-income households.

- **Enhanced legal protections and organizing support for mobile home park residents.** To enhance their ability to remain in their mobile home parks, residents of mobile homes, similar to traditional renters, need enhanced legal protections, including a right to organize and form associations and enhanced protections from retaliation and harassment, as well as legal and mediation support and financial support for tenant organizing and engagement. For further discussion of these protections, see strategies 1b and 1e.

## GOAL #3: The existing affordable housing stock (subsidized and non-subsidized) in gentrifying neighborhoods is preserved so that the units are in good condition and remain affordable for low-income residents.

The most cost-effective method of providing affordable housing opportunities in gentrifying neighborhoods is usually to preserve existing affordable housing instead of building new. Austin has more than 16,000 units of privately-owned subsidized housing units with restricted rents and tens of thousands more non-subsidized affordable rental units. Without intervention, many of these rental properties will no longer be affordable over the next ten years. Other units are at risk because of deteriorating property conditions, including those whose owners anticipate future redevelopment on the site.

The largest source of funding for preserving or building new affordable housing in the country and Austin is the federal Low Income Housing Tax Credit (LIHTC) program, which is responsible for close to 17,000 affordable rental units in Austin (including publicly-owned units). Tax credit properties built prior to 2003 have the highest risk of exiting out of their rent restrictions. For example, at least three LIHTC properties in East Austin are currently in the process of phasing out of the LIHTC program, which will result in the loss of close to 750 affordable rental housing units. To subsidize the new development of this many units would require at least $70 million in public funding (for rents at 60 percent of the median income) and more in late stage gentrifying neighborhoods.

➤ **Strategy 3a. Create programs and policies for proactively identifying, monitoring, and preserving at-risk affordable multifamily rental properties in gentrifying neighborhoods.**

The following programs and policies would enhance the City's ability to identify and monitor affordable multifamily properties that are at risk in gentrifying neighborhoods—either because of expiring affordability restrictions or deteriorating physical condition—and facilitate early interventions to safely preserve them. Some funding mechanisms targeted towards preservation— critical components of any preservation program—are discussed below, while general funding mechanisms for affordable housing are discussed in a separate section of the report. Ideally the adoption and implementation of these policies would be guided by a comprehensive preservation

strategy and program. Cities with comprehensive preservation programs include New York City (Proactive Preservation Initiative); Los Angeles (Affordable Housing Preservation Program); and Chicago/Cook County (Preservation Compact).

**Policy Tools:**

- **Affordable rental housing preservation officer.** A city affordable rental housing preservation officer, with support staff, could oversee and coordinate city programming related to the preservation of multifamily affordable housing and mobile home parks, including: (1) implementing a citywide preservation policy; (2) coordinating a preservation network (see below), (3) coordinating preservation interventions; (4) matching apartment owners with preservation-minded buyers; and (5) working with tenants to ensure they are notified and aware of their rights and preservation options.
  - o **Example:** Washington, D.C.
  - o **Pros:** Would enable the City of Austin to move towards a proactive rather than reactive posture regarding rental housing preservation.
  - o **Cons:** None.

- **Affordable housing preservation network.** Modeled on the successful D.C. Preservation Network, an Austin-based preservation group could likewise regularly convene community-based organizations, tenant groups, government agencies, and other stakeholders to identify and monitor at-risk multifamily properties and collaborate on preservation efforts, including engaging with property owners. A network also plays a key role in tracking the city's inventory of at-risk housing (see below).
  - o **Examples:** Washington, D.C. (Housing Preservation Network); Colorado (Housing Preservation Network); Chicago/Cook County (Preservation Compact); Chicago Rehab Network.
  - o **Pros:** Helps mobilize and coordinate preservation interventions among a variety of stakeholders.
  - o **Cons:** On-going costs to hire staff or out-source the coordination of the network.

- **Database to track at-risk properties.** Preservation databases track at-risk properties by incorporating detailed information about properties' expiring subsidies, habitability and code violations, and other indicators of vulnerability, gathering information from on-the-ground resources, including stakeholders in a preservation network (see above). A comprehensive database would focus not only on properties with expiring subsidies but also on those in disrepair and in need of intervention.
  - o **Examples:** Washington, D.C. (D.C. Preservation Catalog); Colorado (Housing Preservation Network); Chicago (Chicago Rehab Network Preservation Database); New York City (Proactive Preservation Initiative).
  - o **Pros:** Would strengthen and reinforce the success of the two policies listed above.
  - o **Cons:** Costs of maintaining and updating the database.

- **Notice requirements.** Model notice ordinances require a subsidized affordable property owner to provide the city and tenants with advance notice when the owner intends to sell the property or convert the property to market-rate rents. Most affordable housing subsidy programs, including the federal Low Income Housing Tax Credit (LIHTC) program, have a notice requirement, but notice is typically only required for the tenants and not the city. And for many LIHTC properties in Texas, the notice requirement for properties exiting the program ends 30 years after the property came online. Several cities and states require notice terms that exceed the minimum notice period required by federal housing programs and expand the

triggers for that notice (e.g, expiration of affordability term, sale, pre-payment, early exit).

- o **Examples:** Denver (one-year notice), Los Angeles (one-year notice); Portland (one-year notice); Massachusetts (two years); Chicago (one-year notice to city and tenants with broad triggers).
- o **Pros:** Notice requirements provide the city with the time to formulate a strategy to minimize the impact of the property's conversion, such as securing financing to purchase the units, locating alternative housing for tenants, and coordinating with the local school district regarding changes in school enrollment.
- o **Cons:** Requires active monitoring by city staff or another organization.

- • **City right of first refusal/right to purchase for rent-restricted properties being sold.** Purchase ordinances provide cities or tenants, or both, with a right to purchase a rental property when the owner decides to sell the property or convert it to market rate. A "right of first refusal (ROFR)" provides a right to match a private offer to purchase the property during a set period of time. A "purchase right" gives the city or tenants the right to purchase the property at fair market value when the property is exiting the affordability program. ROFR and purchase rights can extend to: (1) all subsidized apartments requiring city funding or approval (such as 4% LIHTC/tax-exempt bond projects); (2) all subsidized apartments, regardless of the source of funding; or (3) all apartments, regardless of whether the property is subsidized. See also strategy 1.d.
  - o **Examples:** Washington, D.C. (District Opportunity to Purchase Act and Tenant Opportunity to Purchase Act—all rental properties); Chicago (subsidized rental properties); Denver (subsidized rental properties); Maryland (subsidized rental properties).
  - o **Pros:** A powerful tool for minimizing resident displacement; can be used to create rare low- and moderate-income homeownership opportunities in gentrifying neighborhoods.
  - o **Cons:** Requires significant funding and capacity-building support from the city and technical assistance from nonprofits. In Washington, DC, scattered cases of tenants gaming the system to their advantage (e.g., by selling their right to purchase) have been widely publicized and undermined support for an otherwise helpful ordinance. Close attention would need to be paid to addressing potential loopholes upfront when the ordinance is drafted.

- • **Rental registration and proactive inspection program.** Conducting proactive inspections of rental properties on a rotating schedule is a key tool used by cities around the country to identify rental properties at risk because of deteriorating conditions and, after identifying an at-risk property, to engage in appropriate interventions.
  - o **Examples:** Dallas; Fort Worth; Irving, Texas; Los Angeles; Sacramento; Seattle; San Diego.
  - o **Pros:** Helps cities identify and remediate deteriorating building conditions and engage in enforcement before it is too late to feasibly address the conditions; provides a disincentive for landlords to "milk" properties while awaiting redevelopment opportunities.
  - o **Cons:** To effectively address displacement, inspection programs must be accompanied by adequately-funded programs to help with repairs that landlords are unable or refuse to make. A city may need to incentivize landlords to keep rents low after making extensive repairs, such as by offering tax abatements; otherwise the improvements could lead to increased rents, evictions, and sale of the property.

- • **Small-site acquisition program.** Small-site acquisition programs target preservation of smaller multifamily buildings. As of 2013, more than 95,000 units of rental housing (48 percent of rental units overall) in Austin were in small complexes of between 5 and 49 units. Close to 65,000 of

these units rented for less than $1,000 per month—with the bulk renting for between $700 and $999 per month.[3] In general, small, older rental housing is more likely to be owned by local landlords who manage their own properties. Many of these properties are being purchased by investors who renovate them and raise their rents.[4] Between 2014 and 2016, Austin lost approximately 7,600 of these units.[5]

o **Examples:** San Francisco (Small Sites Program; buildings with 4 to 25 units); Washington, D.C. (Small Properties Preservation and Affordability Program, properties with 5 to 50 units).

o **Pros:** Lowers displacement in central neighborhoods and near transit corridors where many small rental properties are located.

o **Cons:** Most preservation programs, such as Low Income Housing Tax Credits, are geared to larger, contiguous properties, making it harder to leverage outside funds to support preservation of these small properties.

➤ **Strategy 3b. Create infrastructure, programs, and land use policies for proactively identifying, monitoring, and preserving mobile home parks in gentrifying neighborhoods.**

As of 2016, Austin had 50 mobile home parks with nearly 7,500 mobile homes. A number of these parks have since been lost or are at high risk of redeveloping. A recent report by the Latino Research Initiative at the University of Texas at Austin identified 1,299 low-income households living in 16 mobile home parks at risk of being redeveloped in Austin, with several of these parks located in gentrifying neighborhoods.[6] The following bundle of tools would further the preservation of mobile home parks and reduce the displacement of mobile home owners from the city. See also Strategy 2e.

**Policy Tools:**

• **Comprehensive mobile home preservation program.** Comprehensive mobile home preservation programs typically focus on resident and nonprofit acquisition of mobile home parks. For a more extensive discussion of policies supporting resident acquisition of mobile home parks, see strategy 1f. Many of the tools above under Strategy 3a, regarding the preservation of multifamily properties, can also be incorporated into a comprehensive mobile home preservation program. Specific tools to consider as part of a comprehensive program include the following: (1) an inventory and active monitoring of mobile home parks most at risk of redevelopment, which could be done through a city preservation officer and preservation network (see above); (2) a right of first refusal for residents and the city, with a requirement that owners negotiate in good faith; (3) a set aside of acquisition funding for mobile home parks; and (4) city funding to provide support for mobile home resident organizing and capacity building for cooperative ownership. Austin already has an advance notice requirement for mobile home parks, whereby owners must notify the residents at least 270 days before applying for a site plan, change of use permit, or rezoning. The ordinance, however, does not require notice to the city and does not require notice prior to the property being sold. The ordinance also does not provide residents with a right of first refusal or require the owner to negotiate in good faith with the residents.

o **Examples:** New Hampshire (robust acquisition program), Florida (right of first refusal and advance notice), Pennsylvania (good faith negotiation requirements), New York and New Jersey (rights of first refusal).

o **Pros:** Would help stabilize one of the few forms of truly affordable homeownership in Austin and reduce the vulnerability of these frequently overlooked communities. In some cases, mobile home park owners simply want to "cash out" their investment and do not oppose working with residents to acquire their properties if the owners' needs are met; appropriate policies can therefore make "win-win" outcomes more likely than at present.

- o **Cons:** Acquisition of mobile home parks for the benefit of low-income residents are likely to require public subsidy in Austin (although probably much less subsidy than the cost of site acquisition and development of multifamily housing), especially in areas in the later stages of gentrifying; success with this tool is more likely with ongoing public financial support, including funding for technical assistance and tenant organizing.

- **Extend mobile home zoning to all mobile home parks and include mobile home preservation prioritization in Austin's comprehensive plan.** Some of Austin's mobile home parks are not zoned as "MH", Austin's special zoning category for mobile home parks, making these residences especially vulnerable for redevelopment. Rezoning these areas as MH, or adding an overlay designation prohibiting other types of development, would help secure the future of these sites as mobile home parks. The Austin City Council is currently exploring this policy. Amendments to Austin's comprehensive plan calling out the importance of preserving mobile home parks would also help limit any future re-zonings of these sites.

  - o **Examples:** In addition to Austin, many other cities across the country have mobile home zoning districts, including Portland, Oregon; Fort Collins, Colorado; Salt Lake City; and Madison.

  - o **Pros:** Low-cost regulatory solution to restrict redevelopment of mobile home parks.

  - o **Cons:** Costs and time of going through the rezoning process; likely opposition from current mobile home park owners.

> ### Strategy 3c. Enact land-use restrictions that disincentivize redevelopment and demolitions of current affordable homes in gentrifying neighborhoods.

**Policy Tools:**

- **Neighborhood stabilization overlay:** A neighborhood stabilization overlay (NSO), also called a neighborhood conservation district, is deployed at a neighborhood-scale and requires new development to meet standards more stringent than the zoning baseline (such as setbacks, building height, floor-to-ratio, etc.). While communities have many different goals for adopting neighborhood stabilization strategies, some communities have adopted these policies with the specific goal of slowing down displacement of vulnerable residents. For example, in 2012, residents in Dallas's La Bajada neighborhood, a low-income neighborhood in a gentrifying area, voted to adopt an overlay restricting building heights through Dallas's NSO ordinance, with the goal of preserving the affordable single-family homes in the neighborhood that were threatened by redevelopment pressures spreading into West Dallas. The process of creating the overlay, which required community buy-in along with approval by the City Council, enhanced the political capital of the neighborhood.

  - o **Examples:** Dallas (Neighborhood Stabilization overlay), Seattle (Neighborhood Conservation District).

  - o **Pros:** Slows down redevelopment pressures in a neighborhood; helpful as a short-term intervention in neighborhoods with accelerating tear-downs and housing costs. In Dallas's La Bajada neighborhood, the NSO has created a strong political statement that preservation of the low-income neighborhood is a priority and has been used to defeat rezoning requests that threaten existing affordable single-family units.

  - o **Cons:** (1) There is no evidence yet of neighborhood stabilization tools permanently halting displacement of vulnerable residents—as long as the real estate market in a city is hot, market pressures will eventually catch up in a neighborhood where these tools are used. (2) If applied to limit development of denser housing types (duplexes, 4-plexes, etc.) across a city, an NSO will limit citywide supply of housing and exacerbate accelerating housing prices. (3) Depending on how an NSO is structured, the overlay can make it more difficult

to build new rent-restricted affordable housing. (4) Could lead to a reduction in property values for owners of single-family houses.

- **Residential infill project.** A variation of an NSO is the Residential Infill Project, which is under consideration in Portland, Oregon. Portland's proposed Residential Infill Project would restrict the size of new development to avoid super-sized single-family homes, called "McMansions," by lowering the maximum size of a new home from 6,750 to 2,500 square feet. At the same time, the ordinance would loosen restrictions on internal subdivisions and accessory dwelling units (ADUs) with the intention of increasing the number of less expensive housing options in the city. A group of Austin Planning Commissioners recently proposed a variation of this policy. Austin currently has a McMansion ordinance, but it is not tied to loosening of restrictions on building smaller, multiple housing units on a lot, and super-sized homes can still be built on many lots in the city under the ordinance.

  - o **Examples:** Portland (draft rules under consideration).

  - o **Pros:** If coupled with affordability incentives, a residential infill project could have a greater impact on generating long-term affordable housing than a neighborhood stabilization overlay.

  - o **Cons:** Depending on how the policy was structured, it could lead to a reduction in property values, with current homeowners building less wealth through their property.

- **Deconstruction ordinance.** A deconstruction ordinance requires projects seeking a demolition permit to deconstruct the building, meaning the home or other building must be disassembled, rather than simply demolished, in a manner to salvage as much material as possible for reuse.

  - o **Example:** Portland (for houses built prior to 1916 or designated historic).

  - o **Pros:** Beyond its environmental benefits, acts as a brake on demolition of existing housing by effectively increasing the demolition cost.

  - o **Cons:** Unless exceptions are added, would increase costs of new affordable housing development involving housing demolition.

➤ **Strategy 3d. Create a preservation fund to provide private and public capital targeted towards acquiring and rehabilitating at-risk apartments.**

**Policy Tools:**

- **Private preservation investment funds.** In recent years, private investors have become interested in the segment of the housing market serving low-income renters. Investors range from financial Institutions to public sector pension funds, university endowments, wealthy individuals, and foundations. With a private preservation investment fund, investors provide equity investments in a fund that supports the acquisition and rehabilitation of at-risk multifamily properties. Private funds are able to act more quickly to preserve existing affordable housing and have the potential to raise substantial amounts of capital. They typically offer investors between 6 and 12 percent returns on cash investments. A private investment fund backed by Austin's Mayor was recently created locally (Austin Affordable Fund) to preserve multifamily housing and rent the units to households making 60 to 120 percent of the median family income. See Part 5 for a longer discussion of this tool.

  - o **Examples:** Enterprise Multifamily Opportunity Fund, Turner Multifamily Impact Fund, Chicago Opportunity Investment Fund, Austin Housing Conservancy Fund.

  - o **Pros:** Private funds are able to act more quickly than public entities to preserve existing housing; increase funds available for preservation.

  - o **Cons:** Lack of transparency in governance and decision making; the need to produce

adequate returns for private investors makes long-term affordability and deep income targeting much less likely—the desire for private investors to eventually exit from investments can conflict with long affordability periods.

- **Public-private below market debt funds.** Below-market debt funds offer low-cost loans to affordable housing developers or those seeking to purchase and preserve existing affordable housing. They are capitalized with funds from a combination of public, private, and philanthropic institutions. Such funds blend government and foundation dollars in the form of grants or low-interest loans, with conventional debt from financial institutions. The government and foundation capital allow for loans with lower interest rates than would otherwise be possible. Such funds are "revolving," meaning that as loans are repaid, new loans can be made. These funds are most viable in markets with a high-capacity city housing department and where there is interest from a strong local philanthropic community. The loans are typically acquisition loans of five to seven years, at which time the properties are refinanced with other loans or subsidies such as federal Low Income Housing Tax Credits. Their success depends on the availability of permanent financing from other sources. Successful funds focused on preservation of affordable rental housing near transit have been created in the Bay Area and Denver. Both have been in existence for around seven years and began with $10-$13.5 million in capital from public agencies, later expanding to include equity from banks, community development financial institutions, and foundations.

  o **Examples:** Denver Regional Transit-Oriented Development Fund; The Bay Area Transit-Oriented Affordable Housing Fund; New Generation Fund (Los Angeles).

  o **Pros:** Focused on preservation of existing housing targeted to current renters' housing needs, with the ability to target much lower incomes than a private investment fund.

  o **Cons:** Requires significant public investment to seed the fund and strong interest from local foundations. Permanent financing must be available for the fund to revolve. Administration can be complex.

### ➤ Strategy 3e. Utilize property tax relief to preserve rental properties.

Providing property tax breaks is an important strategy for incentivizing private owners of multifamily housing to preserve their units as affordable housing. It is of particular importance in cities in Texas, where property taxes are high and assessed values reset every year. The following are two property tax relief tools that can be used locally to promote preservation of Austin's affordable multifamily housing.

**Policy Tools:**

- **Property tax abatement program for existing affordable multifamily rental properties.** Owners of multifamily properties who make extensive upgrades to their properties are typically hit with increased property bills, making it harder to keep rents affordable. Similar to tax incentive programs enacted in Chicago and New York, the City of Austin has authority under the Texas Tax Code to provide up to 10 years of a property tax abatement for part or all of the increase in property taxes on multifamily rental properties, in exchange for the property owner making repairs to the property and agreeing to continue to rent to low-income renters.

  o **Examples:** Cook County (Chicago) Class 9 Program and Class S Program, New York City (numerous programs including J-51 and UDAAP), Spokane.

  o **Pros:** Incentivizes multifamily property owners to maintain and repair their properties while also incentivizing them to maintain affordable rents.

  o **Cons:** Loss of property tax revenue; cost of monitoring compliance.

- **Property tax exemptions via publicly-owned land.** Another property tax relief tool available to cities in Texas for preserving multifamily rental complexes is the 100 percent exemption that exists for publicly-owned land used for public purposes such as affordable rental housing. As a preservation strategy, the City of Austin, county, and housing authorities—along with public facility corporations owned by a government entity (see Local Government Code, Chapters 303 and 392)—can acquire the land under multifamily buildings and then lease the land back to a third party under a long-term ground lease, which results in the land being 100 percent exempt from all property taxes. The private entity maintains ownership of the buildings. Several public entities across Texas, including the Housing Authority of the City of Austin, have been using this tax break tool.

  o **Examples:** Housing Authority of the City of Austin; San Antonio Housing Public Trust Corporation (created by City of San Antonio).

  o **Pros:** Ability to provide large property tax breaks.

  o **Cons:** Concerns about the transparency and oversight of these deals and impacts on public school finance. There have also been reports of abuses of this tool, with developments providing limited affordable housing in exchange for large tax breaks.

> **GOAL #4:** City planning and land use decisions incorporate inclusive and equitable anti-displacement strategies, and low-income persons and communities of color are empowered to participate early and meaningfully in land use decisions that shape their homes, neighborhoods, and communities.

Paying attention up front to how development plans and land use policies may impact the displacement of existing residents of vulnerable neighborhoods—and including their voices in the process—will produce better outcomes for these residents than reacting to projects or proposals once they are underway. Identifying the particular issues that can trigger displacement—and building in strategies for preventing or mitigating displacement as plans are being adopted or updated—will allow for early and more effective interventions. Identified policies and programs to reduce displacement can also be more easily incorporated into city budgets.

➤ **Strategy 4a. Create and support planning processes that incorporate a focus on mitigating displacement, with ongoing input and oversight by impacted residents.**

**Policy Tool:**

- **Community-driven, neighborhood-scale displacement mitigation plans with dedicated funding and oversight infrastructure.** A displacement mitigation plan covering a neighborhood or collection of neighborhoods, similar to the plans adopted in Guadalupe and North/Northeast Portland discussed in this report's case studies, should incorporate meaningful community participation at every step in the process. Plans should include the identification of annual goals, strategies and priorities, and annual performance assessments. Plans should be based on an inclusive process setting forth strategies and measurable goals with clear timelines for implementation. A community oversight committee like the one used in North/Northeast Portland, which meets regularly to review the programs and outcomes, provides transparency and accountability in the implementation of the plan. The success of a comprehensive displacement mitigation plan is also contingent on dedicating funding towards the implementation of the plan. The dedication of tax increment financing (TIF) funds—such as through a Homestead Preservation Tax Increment Reinvestment Zone or a Chapter 311 TIF—or a set-aside of General Obligation bond monies are two mechanisms available to the

City of Austin for creating an ongoing stream of funding for implementation of neighborhood-level displacement mitigation plans. See the funding tools section in this Part of the report for a longer discussion of these finance tools.

o **Examples:** Portland's North/Northeast Neighborhood Housing Strategy (2014); Guadalupe Community Development Project Plan (Austin, 1980)

o **Pros:** Allows for clear identification of goals, strategies, and tools that are responsive to community needs; sets clear timeframes and geographic targets; and provides a mechanism for ensuring that city investments in the area are responsive to the community. When backed with deep levels of funding, enables cities to have a deep, concentrated impact on mitigating displacement in a neighborhood, in a way that is transparent and responsive to community needs.

o **Cons:** Requires significant city funding and staff resources to develop, oversee, and implement the plan.

- **Community impact analyses.** Community impact analyses require developers and public agencies to analyze how proposed developments, zoning changes, public investments, or infrastructure projects will impact a community. Austin currently requires affordable housing impact statements to determine how "any ordinance, rule, or process impacts housing affordability." Other cities require impact statements that incorporate a racial justice lens. To better assess how Austin's decisions impact vulnerable communities, the City of Austin's impact statement ordinance could be amended to include a broader focus on how city decisions will impact the displacement of vulnerable residents and cover a broader range of city decisions such as large public infrastructure projects in an area. To be effective, the impact statement must include a clear and accepted methodology for assessing impacts. An impact statement should not be a substitute for a city policy delineating what types of developments to support or oppose, but should instead complement such a policy.

o **Examples:** Austin (affordable housing impact statement); Atlanta (affordable housing impact statement); Portland (racial equity toolkit worksheet); King County, Washington (Equity impact review tool); Seattle (Racial equity analysis).

o **Pros:** Community impact analyses raise awareness of how certain city decisions impact vulnerable communities, thus increasing public transparency and increasing potential for elected officials to be more responsive to the needs of vulnerable residents and communities. They can also enhance the ability of stakeholders to identify displacement threats and thus develop and implement strategies for remediating the displacement.

o **Cons:** The analyses do not include enforceable measures for limiting the displacement; they only identify the impact of potential developments or investments. Cities and developers can still proceed with a development even when the community impact statement shows a negative displacement impact.

➤ **Strategy 4b. Strengthen vulnerable residents' ability to have a voice and active role in the development of their neighborhoods.**

**Policy Tool:**

- **Invest in community organizing and legal support to assist tenants and other communities with forming and operating associations, building inclusive neighborhood organizations, and actively participating in planning and redevelopment decisions, including through negotiated agreements.** Community organizing is a process of bringing people together and coordinating efforts to promote their common interests. Community organizing is a critical tool for increasing the participation and impact of vulnerable residents in shaping private and public decisions that affect their homes and communities. It can include popular education regarding planning and local issues and also the negotiation of specific agreements with developers and

property owners that ensure that development projects are more responsive to the needs of the community. Community organizing of vulnerable tenants and other residents has been a critical component of several anti-displacement mitigation efforts in Austin. See also strategy 1e. Effective negotiation and enforcement of agreements typically requires legal counsel (Texas Rio Grande Legal Aid has provided this support for several tenant groups in Austin).

o **Examples:** Washington, D.C., Boston (Boston Tenant Organizing Program), New York City (Partners in Preservation). Strategic Action for a Just Economy (Los Angeles)

o **Pros:** Increases the participation and impact of vulnerable residents in decisions that affect their homes and communities.

o **Cons:** Requires city funding.

➤ **Strategy 4c. Increase resident and community ownership of land.**

As the Guadalupe Neighborhood case study in this report highlights (see Appendix 4), residents who own their land or govern a community organization that owns land have much greater power in influencing land use and redevelopment decisions. In the Guadalupe neighborhood, the Guadalupe Neighborhood Development Corporation strategically acquired as many lots as it could afford to in the neighborhood to limit encroaching large-scale redevelopment, expanding the CDC's and residents' influence at City Hall over land use decisions in the neighborhood. Several of the tools for increasing resident and community ownership are also discussed under strategies 1d and 2e, under the strategies for tenant acquisitions of apartment complexes and mobile home parks.

**Policy Tools:**

• **Capacity building support and incubation of neighborhood-centered community development corporations.** Austin has a small base of neighborhood-centered community development corporations (CDCs) run by community members and could benefit from increasing the number and scope of CDCs. Community development corporations are nonprofit, community-based organizations focused on improving the quality of life in the neighborhoods they serve and are often focused on affordable housing. CDCs such as Guadalupe Neighborhood Development Corporation in Austin are governed by residents of the neighborhoods served by the CDC, empowering residents to shape the future of their community. Establishing a successful CDC requires extensive capacity building and leadership development, which the city could support by: (1) funding local experts to help incubate and provide technical assistance to CDCs, (2) providing seed and on-going administrative funding for CDCs, and (3) funding leadership development programs for residents. City support for community organizing, discussed in other sections of this report, could also be linked to the formation and support of CDCs.

o **Example:** Memphis CDC Capacity Building Fund.

o **Pros:** Community-based CDCs can facilitate anti-displacement planning and provide housing that meets locally-identified needs. They can also help residents build their own capacity to voice their concerns and push for the funds and policies needed to meet them.

o **Cons:** Requires ongoing city funding for operating support to be effective, until the CDC is able to build a reliable stream of revenue, such as from rental income from properties owned by the CDC (if there is limited debt in the property or after the debt is paid off).

➤ **Strategy 4d. Reduce barriers to participating in planning and land use decisions impacting gentrifying neighborhoods and utilize effective community engagement tools to elevate community voices.**

Many community members who are most directly impacted by displacement also have the highest barriers to entry for participation in public planning and decision-making processes. These barriers include childcare obligations, transportation, work obligations, and potential lost income if meetings conflict with work schedules. Beyond reducing barriers, planning processes need to incorporate cultural competence and inclusivity in their outreach and engagement. Cultural competence allows situation-specific barriers, needs, values, and issues to be understood and addressed appropriately, and also serves a longer-term goal of building communication and trust between planners and directly-impacted communities.

Community participation around the issue of displacement presents a further difficulty: Many directly-impacted former residents with historic ties to the area no longer live there, yet still arguably deserve a voice in the planning process. In North/Northeast Portland, the social networks that existed in the local African-American church community were used to connect with former residents. Neighborhoods that were known to contain high numbers of displaced people were also targeted for outreach. Future residents from vulnerable groups are also unrepresented in planning unless tenant advocacy groups and other advocacy organizations are brought to the table to represent their interests.

Balancing between homeowner and renter interests is another concern, and renters are usually underrepresented in participatory planning processes. Tenant advocacy groups can be useful voices to make up for the known difficulty of getting consistent renter participation in these processes.

**Policy Tools:**

• **Comprehensive community engagement strategy.** A comprehensive community engagement strategy should be developed and implemented each time a city seeks to engage residents and should include: (1) understanding who makes up the community and setting clear engagement goals, (2) measuring the effectiveness of engagement efforts by tracking who is and is not participating and adjusting efforts as needed, (3) providing relevant information that is easy to understand; (4) using diverse and accessible forums for participation; (5) understanding and removing barriers to participation; and (6) targeting areas where displaced residents are known to live.

   o **Examples:** Portland's North/Northeast Neighborhood Housing Strategy forums; Diversity and Civic Leadership Program (City of Portland, Oregon); Code for America partnership (Boulder, Colorado); Center for Urban Pedagogy's Making Public Policy collaborations, People's Planning School (SAJE, Los Angeles)

   o **Pros:** Increases accountability and responsiveness to the needs of vulnerable persons and communities and can result in plans that are more effective and innovative. Plans created through community engagement also have stronger community buy-in.

   o **Cons:** Requires additional city resources and time compared to "top down" planning processes. May reveal divisions within the community that require further, in-depth engagement and time.

• **City ordinance requiring mandatory community engagement plans for development project applicants in vulnerable communities.** Mandatory community engagement plans require development project applicants in vulnerable communities to prepare and follow an inclusive plan for how the applicant will actively engage with the community concerning the proposed project. The City of Oakland has a five-step community engagement process

that project applicants are expected to follow, which includes preparation of a community engagement plan, partnership with a community-based organization that has experience working with impacted stakeholders, contacting the stakeholders in multiple languages and different forums, and conducting the actual engagement activities. The applicant must submit the proposed process to the city for review and approval.

o **Examples:** Oakland (Community Engagement Guidelines).

o **Pros:** Improves opportunities for impacted residents to provide input and actively participate in the decision-making process concerning the project.

o **Cons:** Requires city funding and staffing to review and monitor the plans, as well as community organizations with experience working with impacted stakeholders. If there are none, then the city would need to help incubate some.

## GOAL #5: Vulnerable residents are able to remain in or return to their communities by accessing the affordable housing opportunities in their neighborhoods.

To ensure the effectiveness of city programs helping vulnerable residents remain in or return to their communities through the provision of new affordable housing opportunities in gentrifying neighborhoods, it is important to also address the barriers that many residents may face in accessing the new housing. These barriers include lack of access to information about the housing opportunities, application hurdles, and competition with residents from outside the community for the new units. The following are strategies and tools utilized in several cities across the United State to address these barriers.

➤ **Strategy 5a. Give displaced residents and residents at risk of displacement higher priority on waiting lists for affordable housing programs in their community.**

**Policy Tool:**

• **Community Preference Policy.** Several cities and nonprofit organizations across the United States utilize community preference policies for their affordable housing programs to redress prior racial injustices (such as displacement precipitated by urban renewal and freeway construction), further their displacement mitigation goals, and help stabilize communities. These policies are typically created at a neighborhood scale and provide priority placement for affordable units in a neighborhood or group of neighborhoods to low-income applicants who have been displaced from their neighborhood, are current residents at risk of displacement, or are descendants of displaced residents. See, for example, the preference policies discussed in the case studies for the Guadalupe neighborhood in Austin and North/Northeast Portland (Appendix 4). The City of San Francisco has several community preference policies; its HUD-sanctioned preference policy for a federally-funded senior apartment complex gives preference for 40 percent of units to low-income seniors living in census tracts at the greatest risk of displacement.

A preference policy must be carefully crafted to avoid violating the Fair Housing Act by ensuring that the policy does not perpetuate segregation or have a disparate impact on persons of color or other protected classes (such as families with children or persons with disabilities). For example, if a preference policy prioritizes current residents of a neighborhood and the residents who qualify for the affordable housing program are more likely to be white compared to a program serving applicants drawn from a larger geographic area, the policy would have a disparate impact under the Fair Housing Act. To avoid disparate impacts in gentrifying neighborhoods which are becoming predominantly white but were historically communities of

color, a city should consider giving preference to low-income residents who are at the highest risk of displacement (such as renters), have long ties to the community, or have already been displaced—or to applicants whose family members have been displaced. This is how North/ Northeast Portland's and the Guadalupe neighborhood's preference policies are generally structured. But again, to comply with the Fair Housing Act, each policy needs to be carefully tailored to the particular community, and analyses need to be regularly conducted to ensure the policy is not having a disparate impact or perpetuating segregation.

o  **Examples:** Portland, Oregon (N/NE Portland); San Francisco.

o  **Pros:** Community preference policies increase the ability of a city to further its displacement mitigation goals and remediate prior racial injustices such as prior city actions that led to or contributed to the displacement of persons of color from their communities.

o  **Cons:** Preference policies do not actually produce affordable units but instead only provide preference for units that are produced by other means. Preference policies also do not ensure eligibility for the affordable housing programs, which can lead to confusion among program applicants. If structured improperly, a preference policy can illegally restrict housing choices for persons of color or perpetuate segregation and thus be vulnerable to legal attack.

➤  **Strategy 5b. Improve vulnerable residents' access to information about affordable housing opportunities and streamline the application process.**

Residents trying to secure a rent-restricted unit in a particular neighborhood must first identify the available affordable housing opportunities and then navigate a morass of different eligibility requirements, applications, and waitlists. Residents can pour precious time and hundreds of dollars into applications only to find they do not qualify or units are unavailable. The following tool helps vulnerable residents find and secure affordable housing.

**Policy Tool:**

•  **Single-entry, online affordable housing application portal.** Portland, Oregon, recently funded a start-up app, OneAppOregon.com, to help residents identify affordable apartments they qualify for and to streamline the application process. Residents submit one application online and view a listing of all properties they are qualified to rent. New York City also operates a single-entry application process. The City of Austin recently created an online directory listing income-restricted affordable housing funded or incentivized by the City or Austin Housing Finance Corporation. This directory is an important contribution to increasing vulnerable residents' access to information about affordable housing opportunities, but it does not list rent-restricted units funded through other housing programs, and does not include a mechanism for determining eligibility. Residents must still go to each property's website to determine how to qualify, and they must apply individually to each property.

o  **Examples:** Portland, Oregon; New York City.

o  **Pros:** Increases vulnerable residents' access to information about affordable properties they qualify for and cuts down on burdensome application processes.

o  **Cons:** Costs to start up and operate the software and to maintain the portal.

## GOAL 6: New affordable housing options are created to serve current and future vulnerable households in gentrifying neighborhoods.

The following overview focuses on strategies and tools related to creating new affordable housing options that are specifically tailored to the opportunities and challenges presented by gentrifying neighborhoods. Specifically, these tools are focused on creating housing that remains affordable for both current and future vulnerable households.

➤ **Strategy 6a. Intervene early to acquire control of land in strategic locations of gentrifying neighborhoods.**

For neighborhoods that are vulnerable or in the early stages of gentrifying, a city should support the acquisition of as much land as possible in strategic areas of the neighborhood. As gentrification picks up steam in a neighborhood, it becomes much more difficult to feasibly acquire properties for affordable housing. For neighborhoods that are susceptible to gentrification or in the very early stages of gentrifying, it can be hard to envision the kind of rapid rise in property values that often comes in later stages of gentrification. But buying land in this early period gives cities, community groups, and residents more capacity to mitigate displacement when change does come.

**Policy Tools:**

- **Acquisition and land banking of property for future affordable housing development.** Even if plans or funds are not yet in place to build a new affordable housing development, the city can acquire parcels of land of varying sizes in neighborhoods that are at risk or in the early stages of gentrifying, while prices are still relatively affordable, and bank that land for future affordable housing development. The land is then made available to developers for construction of affordable housing and other community amenities. A land bank best serves the needs of gentrifying neighborhoods when it works in tandem with a community land trust, making the land available via a 99-year lease to ensure permanent affordability of the land. The Urban Land Conservancy in Denver focuses on acquiring properties near current and future transit stations—areas where large increases in property values are anticipated. The Conservancy banks the sites for up to five years while funds and plans are assembled for new affordable housing and other community uses on the site and then leases the land via 99-year leases.

  Cities can support land banking by creating a streamlined system to track vacant parcels that are appropriate for residential or mixed-use development. Eminent domain is also available to Texas cities for land acquisition for affordable housing, although this tool should be used on a very limited basis with community vetting, and special attention has to be paid to avoid any racially discriminatory uses of eminent domain.

  o **Examples:** The Urban Land Conservancy (Denver region).

  o **Pros:** In addition to the lower land costs that come with acquiring land in an early-stage gentrifying neighborhood, the acquisition gives a community more control to shape future redevelopment, as shown in the Guadalupe Neighborhood case study (see Appendix 5).

  o **Cons:** Dependent on having access to a reliable source of affordable financing (see below) and, depending on the land values, city subsidies.

- **Land acquisition fund.** Having access to "quick" and affordable capital is critical to any land acquisition program. The Urban Land Conservancy in Denver relies on the Denver Transit Oriented Development Fund for funding its land acquisitions. The $24 million fund is used to pay for purchasing, holding, and eventually developing sites in the Denver region along current and planned transit corridors for affordable housing and other community amenities. The fund

is supported by contributions from the City of Denver, foundations, and private investors. See also strategy 3d.

- o **Examples:** The Denver Transit Oriented Development Fund; Minneapolis Hiawatha Land Acquisition LRT Fund.

- o **Pros:** Enhances cities' capacity to quickly jump on land acquisition opportunities in gentrifying neighborhoods.

- o **Cons:** Requires high level of city investment and development of new local capacity to create and operate the fund.

➤ **Strategy 6b. Dedicate surplus public land to affordable housing development.**

Surplus public land is often the most accessible source of land for affordable housing in gentrifying neighborhoods. In the Guadalupe neighborhood (see case study in Appendix 5), the utilization of surplus public land was a key strategy in the neighborhood's early development of affordable housing. For over a decade, many citizen task forces and council resolutions in Austin have called upon the City to dedicate surplus city land to affordable housing development, but the City has made very little progress towards implementing this strategy. Other public entities in Austin also own surplus or underutilized land in gentrifying neighborhoods that could be utilized for new affordable housing.

**Policy Tool:**

- • **Public land for affordable housing policy.** A public land for affordable housing policy could include a number of components to address current barriers to redeveloping surplus land with affordable housing, including: (1) setting a clear and enforceable city policy regarding the minimum level of affordable housing that must be included on redeveloped city land that is suitable to residential development; (2) adopting annual goals for the number of city parcels to redevelop with affordable housing; (3) incorporating a requirement that any city-owned land be first offered for affordable housing development; and (4) to cut through inter-department politics and silos, creating a new city position that reports directly to the city manager and who would regularly assess opportunities for developing affordable housing on public land and kick-start the redevelopment process.

   Part of the charge for the new leader of the city's public lands strategy would be to interface with other units of local government, such as the Austin Independent School District, to put their surplus land parcels into use as affordable housing, through mechanisms such as partnerships and land swaps. This can occur when opportunities arise, such as following school closures, and in cases where goals align, as with below-market teacher housing. One example of an effective public land strategy for affordable housing is New York City's New Housing Market plan, which considers underutilized, publicly-owned sites (such as older low-rise buildings) as redevelopment opportunities for affordable housing.[7]

- o **Examples:** King County, Washington; San Francisco; New York City; Montgomery County, Maryland.

- o **Pros:** Using public land allows the city to contribute land, rather than perpetually scarce dollars, towards affordable housing objectives. Public ownership of land helps insulate housing development decisions from market pressures, allowing the provision of housing types that for-profit developers will not provide, such as large, family-sized apartments.

- o **Cons:** Using publicly-owned land towards affordable housing requires the city to prioritize this set of objectives over maximizing its fiscal strength. Land costs are only a small proportion of the cost of a new affordable housing development; thus, providing publicly-owned land, on its own, will typically not be enough to achieve deep affordability.

➤ **Strategy 6c. Leverage the power of hot real estate markets in middle and late-stage gentrifying areas to include affordable housing in market-rate development.**

Austin currently has a hodge-podge of about ten density bonus programs, whereby certain types of developments in certain parts of the city are eligible to receive increased building entitlements in exchange for including a percentage of units or paying a fee in lieu of building housing onsite. One of the City's most effective density bonus programs in terms of generating affordable housing outcomes in different parts of the city has been the Vertical Mixed-Used (VMU) ordinance. VMU does not allow for a fee in lieu of building affordable housing and has resulted in the development of more than 585 affordable units at no cost to the City, with rents at 80 percent (approximately 2/3 units) and 60 percent (1/3 units) of the area median income. To subsidize these units in an off-site development would have cost the city more than $30 million (at a conservative $50,000 subsidy a unit). Meanwhile, because of the geographic limits of Austin's current density bonus programs, many developers have been able to obtain up-zonings of parcels (such as to MF-6) without including affordable housing, since the City's density bonus programs do not extend to this type of development. In most of the City's density bonus programs, developers have been able to opt out of providing affordable housing onsite by paying fees that do not come close to covering the cost of building a replacement affordable unit offsite.

**Policy Tools:**

- **Expansion and modifications to Austin's density bonus programs.** A number of current city initiatives and policies call for expanding and modifying Austin's density bonus programs to make them more effective. The City's Strategic Housing Blueprint calls for tying any increase in development capacity in Austin's Activity Centers and Corridors to an affordability requirement. The Blueprint also calls for the City's density bonus programs to incentivize and provide additional opportunities for housing units with two bedrooms or more, particularly in high opportunity areas. The Council has also recently adopted a resolution for staff to work on recalibrating density bonus fees to incentivize more on-site affordable housing.

  - **Pros:** Results in income-restricted affordable housing in high opportunity areas along transit corridors with no subsidy by the city.

  - **Cons:** The economics of density bonus programs do not typically allow for units that serve families below 60 percent of the median family income, unless they are coupled with additional policies and programs, such as the Montgomery County's partnership with the local housing authority. The efficacy of density bonus programs is highly dependent on market conditions; density bonuses can become "out of tune" with market conditions as the business cycle progresses and thus must be frequently calibrated. Finally, maintaining the affordability on the resulting units requires active monitoring by the city.

- **Adoption of inclusionary zoning in Austin's Homestead Preservation District.** Inclusionary zoning has been an important local tool for generating new affordable housing in gentrifying neighborhoods, utilized in more than 866 jurisdictions around the country.[8] Inclusionary zoning requires the inclusion of a certain percentage of affordable housing units (typically 10-15%) in new market rate developments. Montgomery County, Maryland's inclusionary zoning program has been especially notable, generating more than 12,500 affordable housing units.[9] The Texas Local Government Code bars Texas cities from adopting inclusionary zoning for homeownership units, but the ban only extends to homeownership units and specifically exempts Homestead Preservation Districts from this ban.[10] Inclusionary zoning is legal in the rapidly gentrifying areas of Central East Austin that are contained in Austin's Homestead Preservation District.

  - **Examples:** Montgomery County, Maryland; Washington, D.C.; Sacramento; San Diego.

  - **Pros:** No public subsidies required.

○ **Cons:** Special attention must be paid to calibrating the ratio of onsite affordable housing to market-rate units. Inclusionary zoning programs do not typically serve families below 60 percent of the median family income, unless they are coupled with additional policies and programs, such as Montgomery County's partnership with the local housing authority. The adoption of inclusionary zoning would likely face pushback from the Texas Legislature. See other drawbacks of density bonuses listed above.

➤ **Strategy 6d. Retain city or community ownership of land or require long-term resale restrictions to ensure permanent affordability of housing units for future generations of residents.**

Wherever possible, the City should keep land out of the real estate market by retaining ownership of land or ensuring that a nonprofit or community-controlled entity with a commitment to permanent affordability retains ownership or control of the land.

**Policy Tools:**

- **Community land trusts.** Through a community land trust, a nonprofit organization or the city maintains long-term ownership of the land to provide permanently affordable housing for the benefit of the community. Community land trusts typically incorporate residents into the governance of the CLT. A community land trust can be used with single-family housing as well as mixed-used and multifamily development, and with homeownership as well as rental housing. For homeownership units, the land is typically leased for 99 years to an income-eligible family for an affordable price (one CLT in Austin charges $25 a month). An income-eligible family purchases the home sitting on the land at an affordable price with mortgage financing, typically from a bank. When the family wishes to sell the home, the nonprofit CLT has a right of first refusal to purchase the home, and the resale price is restricted to ensure it remains affordable to future buyers. For rental CLT units, a nonprofit entity owns the home and then leases the home to an income-eligible family for an affordable price. See the Guadalupe case study in Appendix 5 and the discussion in Appendix 6 for additional information on this tool.

  ○ **Examples:** There are more than 240 CLT programs in 46 states, including: Austin (City of Austin, Guadalupe Neighborhood Development Corporation, Austin Habitat for Humanity), Champlain Housing Trust (Vermont), Chicago Community Land Trust, Urban Land Conservancy (Denver), Burlington Land Trust, and City of Houston (in the works).

  ○ **Pros:** Provides opportunities for future generations of low-income residents to live in a gentrifying neighborhood and reduces turnover of properties. CLTs also result in substantial property tax savings for low-income homeowners in Texas.[11]

  ○ **Cons:** Requires an entity with capacity to actively monitor the resale restrictions and work closely with the homeowners to ensure that the home is maintained and that the restrictions on the home are complied with. Community control of land can be an unfamiliar concept to many residents, and often requires extensive education efforts to counter suspicions of a "land grab."

- **Shared equity appreciation with resale restrictions and rights of first refusal.** When a community land trust is not utilized, restricting the resale prices of homeownership units coupled with a shared equity model—where the owners recoup their investment and the return on appreciation is capped via a restrictive covenant recorded in the deed records—is critical to ensuring the long-term affordability of the homes. As discussed in the Guadalupe case study, the Guadalupe Neighborhood Development Corporation's earlier homes were sold with long-term restrictions but without caps on the resale price, and thus, as property values have skyrocketed, several homes have since been resold at market prices way beyond the means of other low-income families. The City of Austin currently requires shared equity appreciation for

30 years when providing more than $10,000 in funding for homeownership through its down payment assistance program. The City also has a right of first refusal on the home when it is sold, giving the City the right to buy the home and resell it to another low-income household. The shared equity restrictions go away at year 30.

o **Pros:** See above under CLTs.

o **Cons:** See above under CLTs. The wealth-building that can occur in unrestricted homeownership in gentrifying areas can be muted in shared-equity homeownership.

➤ **Strategy 6e.  Require longer affordability terms in new affordable multifamily properties.**

As discussed earlier under goal #3, the federal Low Income Housing Tax Credit (LIHTC) program is the largest affordable rental housing development program in the country and has been responsible for producing close to 17,000 affordable units in Austin. Texas regulations drastically reduce the long-term effectiveness of the LIHTC program, since many new properties placed in service can exit the program after 30 years (and most properties with credits allocated prior to 2002 can exit after 15 years). In Austin, rapid gentrification is increasing apartment owners' incentive to exit early from the LIHTC program. The following is a tool that the City could adopt to ensure new tax credit properties coming online include longer affordability requirements.

**Policy Tool:**

• **Require developers of LIHTC properties to commit to a 55-year affordability term as a condition of receiving city approval.** LIHTC developers applying for tax credits must obtain city council approval as a condition of receiving the credits (4% credits)[12] or competitively scoring in the state's application process (9% credits). As a condition of providing city approval or any other benefits to LIHTC development, the City could pass an ordinance requiring all developers to commit to a minimum 55-year affordability term with the City. Several cities and states around the country require an affordability term of 40 to 55 years or even longer.

o **Examples:** California (55 years); Nevada (50 years), Utah (99 years), Chicago (55 years).

o **Pros:** Would help expand the city's inventory of quasi-permanent affordable housing—and signal the city's commitment to securing a mix of incomes within gentrifying neighborhoods for the long term.

o **Cons:** Could reduce the participation of for-profit developers in the development of projects using 4% LIHTCs, although cities and states with longer affordability terms have not reported a decline in participation.

# Displacement-Mitigation Tools Off Limits in Texas

The following is a summary of displacement-mitigation tools used in other states that are illegal in Texas:

### Linkage fees

A linkage fee is a form of impact fee used for affordable housing, whereby cities charge developers a fee for new market-rate development, with the funds used to create new affordable housing. The fee is based on the increased demand for affordable housing generated by the new development. Many cities have adopted linkage fees for commercial development, with a more recent surge of cities adding linkage fees for residential developmental (for example, Los Angeles and Denver). In 2017, the Texas Legislature passed a law (House Bill 1449) barring Texas cities from charging a fee "on new construction for the purposes of offsetting the cost or rent of any unit of residential housing," thereby making linkage fees illegal.

### Condo conversion restrictions

Dozens of cities and states around the country have adopted laws regulating the conversion of rental housing to condominiums, with the goal of discouraging the loss of the affordable rental housing. Most conversion ordinances require tenant relocation fees, advance notice, and rights of first refusal for tenants to purchase their units before they are converted to condominiums. Texas law (Section 81.003(b) of the Texas Property Code) bars cities from regulating condominiums differently from other types of similar structures, and thus presumably bars cities from targeting only condominiums for tenant relocation fees and other tenant protections. Any such regulations would need to extend to similar types of developments, such as a tenant relocation ordinance that extends to all multifamily property sales, re-zoning, and redevelopment resulting in a loss of rental units.

### Inclusionary zoning for homeownership (with exceptions)

Inclusionary zoning is a widely-used tool that requires new housing developments to make a percentage of the new housing available at affordable rates to low and moderate-income residents. Texas law (Section 214 .905 of the Local Government Code) bars cities from adopting inclusionary zoning in homeownership developments with several exceptions, including voluntary density bonus programs and areas served by a homestead preservation district. Inclusionary zoning for rental housing is not prohibited under this law.

### Source-of-income protections from discrimination

To help low-income renters afford the cost of rental housing in higher-income areas, including gentrifying neighborhoods, many cities have adopted laws prohibiting landlords from discriminating against renters paying a portion of their rent with housing vouchers or others forms of government assistance. In 2017, the Texas Legislature adopted a law prohibiting Texas cities from adopting source-of-income discrimination protections for renters.

### Real estate transfer tax

Real estate transfer taxes are used by cities across the country to create a dedicated source of revenue for affordable housing. The tax, which is levied whenever the title of real property is transferred, is typically based on a percentage of the property value. In 2015, Texas voters approved an amendment to the Texas Constitution that bars real estate transfer taxes.

**Circuit breaker taxes**

Cities with circuit breaker taxes place a cap on the amount of property taxes that lower-income residents pay, based on the homeowner's income. Texas law does not allow for circuit breaker taxes. The Texas Constitution heavily regulates property taxes, requiring that property taxes be equal and uniform based on property values. Local taxing jurisdictions are restricted from adopting property tax exemptions or caps beyond those enumerated in the state constitution and state statutes.

**Minimum wage**

An important tool that dozens of cities use to help residents afford the cost of living, including housing costs, is a local minimum wage that exceeds the federal minimum wage. Texas law (Section 62.0515 of the Labor Code) bars Texas cities from adopting a minimum wage except through a contractual agreement with a private party such as an economic development agreement.

## Partial Ban

**Moratorium on development and rezoning**

Texas law places heavy restrictions on when a city can adopt a moratorium on new development, redevelopments, and re-zonings. Under Chapter 212 of the Local Government Code, a moratorium on residential development is limited to 120 days, and a local government must follow detailed standards and processes before imposing or extending a moratorium. For a moratorium on residential development, a city must show a need for public facilities generated by the development. A moratorium on commercial development is limited to 90 days, but the allowable justifications for a moratorium are much broader and include an impact on public health, safety, and welfare. Some extensions of the time limits are available, subject to meeting certain standards and processes. A moratorium cannot cover existing building permits or rezoning requests filed before the effective date of the moratorium.

## Misperceptions about Illegality

**Rent control**

Contrary to popular belief, Texas law does not prohibit cities from adopting rent control. A provision of the Local Government Code (Section 214.902) explicitly authorizes cities to establish rent control in the event of a housing emergency due to a disaster, with approval by the governor. But state law does not preempt home rule cities' authority to adopt rent control in other situations.

**Inclusionary zoning for rental housing**

As discussed above, the state ban on inclusionary zoning applies only to homeownership units and not rental housing.

# Local Strategies to Fund Affordable Housing Development

## Overview

It is an unavoidable fact that implementing some mixture of the strategies detailed in this report at sufficient scale to significantly blunt the forces of residential displacement in Austin will require a major infusion of locally-generated funds. The amount would likely be in the ballpark of hundreds of millions of dollars per year. It is true that, at present, most of the funding for affordable rental housing that takes place in Austin is from federal programs, above all Housing Choice Vouchers and the Low Income Housing Tax Credits. However, these two major sources, as well as other smaller ones, are largely tapped out, and several of the existing tax credit complexes are exiting out of the program. Further expanding the inventory of rent-restricted housing—as well as creating new below-market homeownership opportunities and preserving the existing stock of rent-restricted housing—within gentrifying neighborhoods will require a drastic increase in local spending.

Put bluntly, the amounts of money required will come as a shock to many Austin residents. A 2012 estimate held that about $22,000 had been spent from the 2006 affordable housing bond per unit of housing built or preserved.[13] Those figures reflect the commingling of local funds with other monies "leveraged" from federal, state, and other sources, as well as much lower costs of development and finished housing units, particularly within rapidly gentrifying neighborhoods in or near the urban core, than exist today. Going forward, costs will be much higher. At present, the amount of subsidy required for a multifamily development in a close-in, gentrifying neighborhood with family-sized apartments that is reserved for families earning less than 30% of the area median income can easily exceed $300,000 per unit.

Not every project will have such high costs: some will entail preservation rather than new construction; some will have smaller or less deeply subsidized units; some will be in more outlying locations; and so forth. However, some undoubtedly will carry startling price tags, and justifying them to the public will require a protracted public education effort on the part of elected officials, city staff, and housing advocates. These conversations are more advanced in other cities, such as San Francisco, where local expenditures of $300,000 per dwelling for a new housing development would not raise an eyebrow. For an anti-displacement initiative to operate at scale, Austin voters will need to be convinced to add affordable housing to the roster of big-ticket items that they are already accustomed to funding, such as school facilities upgrades, libraries, parks, public transit projects, and others. Luckily, the needed civic conversations have already begun, via experience garnered from the voters' prior approval of the 2006 and 2013 affordable housing bonds, and the ongoing Austin Strategic Housing Blueprint process.

While debates over *whether* to increase spending on affordable housing cannot be avoided, there are a number of different mechanisms that policymakers will be able to choose from, with varying tradeoffs, concerning *how* that spending should unfold. The major options are summarized below. All of them involve raising strictly local funds, with two exceptions: the last two options concern realigning city policy to ensure that a greater share of the federal spending on affordable housing in Austin flows towards gentrifying neighborhoods.

Note that in this section, the term "affordable housing" refers to any initiative that results in income-restricted housing. Spending on affordable housing as defined here can take the form of capital costs for new construction or preservation of housing, ongoing spending on local rent vouchers, assistance to existing homeowners, direct funding to support the staff and operations of nonprofit housing organizations, and so forth. Within the context of this report, affordable housing expenditures would be directed towards gentrifying neighborhoods for the purpose of reducing residential displacement.

**Tax Increment Financing (TIF)**

Tax Increment Financing (TIF) is routinely used in cities across the United States to capture the expected growth in property tax or sales tax revenues to fund a specific project or set of initiatives within a precisely-defined area. When a TIF district is formed, the amount of existing tax collections originating from inside the boundary is set as the baseline. As tax revenues increase in future years, the amount that exceeds the baseline is redirected out of the general fund and is reserved for expenditure on designated projects inside the boundary. Note that the redirected taxes may come from one or several but not necessarily all taxing districts; for instance, a given TIF may capture incremental property taxes owed to the city but not to the county or school district.

Compared to many other cities, Austin has made very little use of TIF as an affordable housing funding mechanism. For instance, in Portland, Oregon, 25 percent of all city TIF revenues in any TIF district—regardless of its purpose—must be reserved for affordable housing. As discussed in the North/Northeast Portland case study, the city has increased the level of TIF funds for affordable housing in the North/Northeast Portland area to an even higher level, resulting in the dedication of $100 million over a six-year period for affordable housing in one area of the city. A similar 25 percent requirement existed statewide in California until 2011. Since 2005, Dallas has required that 20 percent of all TIF funds allocated to housing developments or mixed-use developments containing housing must be reserved for households earning less than 80 percent of AMI. This policy had, as of 2016, yielded 2,320 affordable housing units.[14]  The City of Houston sets aside 30 percent of all funds from its "petition" TIFs (those created by petition of landowners) for affordable housing.

*Pros:* Enacts a form of "value capture," i.e., ensures that a funding mechanism that may be fueling gentrification includes a built-in contribution towards affordable housing. Funds affordable housing in the future without diverting current tax revenues.

*Cons:* Diverts general fund revenue. Puts the burden of financing affordable housing on future development rather than on the current tax base.

**General revenue**

Paying for affordable housing from the City's general fund is the most straightforward possible funding mechanism. In principle at least, Austin's City Council, as part of its annual budgeting process, could decide to spend more general fund dollars on affordable housing in addition to its typical expenditures on public safety, parks, and other budget items.

*Pros:* Simple, straightforward, and fully transparent. Affordable housing spending could be weighed against other municipal spending priorities via the normal budgeting process. The full tax base of the city—both commercial and residential—would be drawn upon to fund affordable housing. Affordable housing spending would thus be treated as a fully-shared civic responsibility.

*Cons:* The budgeting process is highly politicized and contested, with different constituencies jostling for their varying priorities to receive funding. Affordable housing, particularly in a city like Austin where it has become a major topic of discussion comparatively recently, can seem like a lesser priority compared to traditional bread and butter items such as public safety and street maintenance.

**General Obligation bonds**

General Obligation (GO) bonds are issued by the City of Austin for a public purpose, of which affordable housing is an example. Affordable housing GO bonds were approved by Austin voters in 2006, for the first time in the city's history, in the amount of $55 million. GO bonds are repaid from general fund revenue over time.

*Pros:* GO bonds, once approved, must be repaid in future funds from general revenues. Thus, approving GO bonds for affordable housing effectively shields spending on affordable housing from competing spending priorities during the term of the bonds. GO bonds, like general fund spending, represent a widely-shared financial commitment to affordable housing drawn from the entire tax base, both residential and commercial. Bonds are well-matched to the need for periodic allocations of large sums to fund the capital costs of projects rather than annual ongoing spending allocations. With the right timing, bonds can be authorized to ensure that funds are available for housing construction when the prices of inputs (land and construction labor and materials) are lower.

*Cons:* GO bonds are subject to a public vote. Judging appropriate expenditure levels and weighing competing priorities can be difficult for everyday taxpayers. In addition, particularly in off-year elections, low turnout elections tend to be dominated by affluent, homeowning voters, who are the least likely constituency to support affordable housing spending and to be personally affected by residential displacement. Finally, proceeds from GO bonds can lawfully be used only for the capital costs of housing construction or preservation, and may not fund ongoing costs such as staff salaries or direct financial assistance to households.

**Density bonus in-lieu fees**

The City of Austin's density bonus programs aim to incentivize developers of new housing to include below market rate units on-site within new developments, but also include provisions for the developers to pay "in-lieu" fees as an alternative means of qualifying for more generous land use entitlements. In-lieu fees are used to help fund affordable housing.

*Pros:* In-lieu fees help ensure that new market rate development generates either on-site affordability or funds to build or preserve affordable housing. In-lieu fees are politically popular because they are paid by developers rather than taxpayers.

*Cons:* The potential of in-lieu fees (and density bonuses as a whole) is limited, since they are only able to produce affordable housing units equivalent to a fraction of new housing stock. While they can be a helpful funding source, on their own they are unable to produce monies at a scale sufficient to fundamentally halt residential displacement.[15] In addition, it can be difficult to calibrate in-lieu fees to reflect varying economic conditions in different parts of the city, as well as changes over time due to the business cycle. If set too low, they provide little benefit, and if set too high, they discourage development.

**Using community revitalization plans to steer 9% LIHTC towards gentrifying neighborhoods**

City policy could be modified to align federal and state Low Income Housing Tax Credits (LIHTCs) to anti-displacement objectives. Of the two types of LIHTCs (9% and 4% credits), 9% tax credits are scarce and competitively allocated. At present, due to state policy changes in recent years, it is difficult for a proposed development in a high-poverty census tract to be awarded 9% LIHTCs. A recent exception has been created by the state for developments located in areas where there is a city-approved community revitalization plan.[16]

The City of Austin could strategically encourage and fund community revitalization plans in high-poverty neighborhoods that lie in the likely path of near-term gentrification. Although the Austin metropolitan region is normally awarded only a handful—roughly four—new 9% LIHTC projects per year, increasing the chances that one or more of these awards go to developments in soon-to-gentrify communities could be well worth the effort.

*Pros:* Community revitalization plans are valuable on their own merits and have benefits beyond simply paving the way for projects to receive 9% LIHTCs.

*Cons:* The annual 9% LIHTC allocation process has an uncertain outcome, and is frequently reshaped by changes to state policy.

**Using city anti-displacement spending to attract 4% LIHTC**

Unlike 9% LIHTCs, 4% LIHTCs are plentiful and awarded noncompetitively. Because they are less valuable than 9% LIHTCs, they are disproportionately used by for-profit developers pursuing projects where the majority of the units are rented at market rates, and where the affordable units reach relatively shallow levels of affordability. In addition to issuing Private Activity Bonds for 4% LIHTC projects, the City of Austin could make local funds available to developers awarded 4% LIHTCs who pledge deeper levels of affordability within a substantial share of the units in a development. Rather than awarding such funds on an ad-hoc basis, the city could prioritize such funding for projects located in gentrifying census tracts.

*Pros:* A well-designed policy might succeed in using local funds to increase the level of 4% LIHTC allocations flowing to Austin, and steer a higher share of them towards gentrifying neighborhoods while attaining deeper levels of income targeting.

*Cons:* Funds for such a policy would need to be reserved and would compete with other spending priorities. Experimentation might need to occur over several years to identify the right program design and funding levels needed to attract projects with 4% LIHTCs.

## Goals, Strategies, and Policies for Addressing the Displacement of Vulnerable Residents in Gentrifying Neighborhoods

| Goal #1: Vulnerable renters in gentrifying neighborhoods are not displaced from their current homes and neighborhoods | | |
|---|---|---|
| Strategy | Tool | In Austin's Strategic Housing Blueprint? |
| Strategy 1a. Provide direct financial relief to vulnerable renters who are at risk of being displaced from their homes in gentrifying neighborhoods. | Increased local funding for emergency rental assistance | No |
| | Neighborhood stabilization voucher program | No |
| Strategy 1b. Increase city legal protections for renters to reduce evictions and other forms of displacement in gentrifying neighborhoods. | Mandatory city tenant protections for all rental properties receiving city support | No |
| | Expansion of legal and mediation support for tenants facing eviction | No |
| | Improvements to the City's anti-retaliation ordinance and anti-harassment protections for tenants | No |
| | Eviction notification ordinance/required notice to city | No |
| Strategy 1c. Assist renters who have been displaced with relocating in their neighborhoods. | City expansion and funding for tenant relocation assistance and counseling | Yes |
| | City relocation assistance requirements tied to increases in rents | No |
| Strategy 1d. Support tenant acquisitions of their apartment units. | Tenant right-to-purchase program ordinance | No |
| Strategy 1e. Support tenants to be active participants in advocating for and implementing displacement mitigation strategies. | Financial support for tenant organizing and tenant engagement | No |
| | Tenant right to organize ordinance | No |

| Goal #2: Vulnerable homeowners in gentrifying neighborhoods are not displaced from their current homes and neighborhoods | | |
|---|---|---|
| Strategy | Tool | In Austin's Strategic Housing Blueprint? |
| Strategy 2a. Lower the property tax burdens for vulnerable homeowners. | Homestead Preservation Center | No |
| | Homestead exemption enrollment program | No |
| | Partnership with county tax assessor to expand notice of property tax deferrals | No |
| | Emergency homestead stabilization fund | No |
| | Neighborhood stabilization loan program | No |
| | Tax abatement program for homeowners | No |
| | Freeze on property taxes for homeowners who are seniors or disabled | No |
| | Increase in the city's senior homestead exemption | No |
| | Senior volunteer tax break coupled with a senior volunteer program | No |
| Strategy 2b. Assist vulnerable homeowners in gentrifying neighborhoods with repairs to their homes. | Expand Austin's home repair assistance programs in gentrifying neighborhoods. | Yes (although not targeted towards gentrifying neighborhoods) |
| Strategy 2c. Assist low-income homeowners with accessing the equity in their home through non-predatory products. | Enhanced fair lending education and enforcement | Yes, via implementation of Austin's Fair Housing Action Plan |
| | Community homeownership loan fund | No |
| Strategy 2d. Increase ability of vulnerable homeowners to cover housing costs by generating income from their homes and lots. | Allow for creation of internal accessory dwelling units | Yes |
| | Support ability of low-income homeowners to build an external accessory dwelling unit | Yes |
| | Allow homeowners to subdivide and sell a portion of their lots while remaining in place | No |

| Strategy 2e. Support mobile home residents' acquisition of mobile home parks and ability to stay in their communities. | Comprehensive resident mobile home resident acquisition program | No |
| | Relocation fee for mobile housing parks | Establishment of a fee is in the works. |
| | Designate new sites for mobile home zoning | No |
| | Enhanced legal protections and organizing support for mobile home park residents | No |

| Goal #3: The existing affordable housing stock (subsidized and non-subsidized) in gentrifying neighborhoods is preserved so that the units are in good condition and remain affordable to low-income residents | | |
|---|---|---|
| **Strategy** | **Tool** | **In Austin's Strategic Housing Blueprint?** |
| Strategy 3a. Create programs and policies for proactively identifying, monitoring, and preserving at-risk affordable multifamily rental properties in gentrifying neighborhoods. | Affordable rental housing preservation officer | No |
| | Affordable housing preservation network | No |
| | Database to track at-risk properties | No |
| | Notice requirements | No |
| | City right of first refusal/right to purchase for rent-restricted properties being sold | No |
| | Rental registration and proactive inspection program | No |
| | Small site acquisition program | Yes |
| Strategy 3b. Create infrastructure, programs, and land use policies for proactively identifying, monitoring, and preserving mobile home parks in gentrifying neighborhoods. | Comprehensive mobile home preservation program | No |
| | Extend mobile home zoning to all mobile home parks and include mobile home preservation prioritization in Austin's comprehensive plan | No, although City Council working on this |
| Strategy 3c. Enact land use restrictions that disincentivize redevelopment and demolitions of current affordable homes in gentrifying neighborhoods. | Neighborhood stabilization overlay | No |
| | Residential infill project | Yes, partially |
| | Deconstruction ordinance | No |
| Strategy 3d. Create preservation funds to provide private and public capital targeted towards acquiring and rehabilitating at-risk apartments. | Private preservation investment funds | Yes |
| | Public-private below market debt funds | No |

| Strategy 3e. Utilize property tax relief to preserve rental properties. | Property tax abatement program for existing affordable multifamily rental properties | Yes |
| | Property tax exemptions via conversions to publicly-owned land | No |

| **Goal #4: City planning and land use decisions incorporate inclusive and equitable anti-displacement strategies, and low-income persons and communities of color are empowered to participate early and meaningfully in land use decisions that shape their homes, neighborhoods, and communities** | | |
| --- | --- | --- |
| Strategy | Tool | In Austin's Strategic Housing Blueprint? |
| Strategy 4a. Create and support planning processes that incorporate a focus on mitigating displacement, with on-going input and oversight by impacted residents. | Community-driven, neighborhood-scale displacement mitigation plans with dedicated funding and oversight infrastructure | Partial. Includes exploring a community-driven district plan for Central East Austin focused on preservation |
| | Community impact analyses | No |
| Strategy 4b. Strengthen vulnerable residents' ability to have a voice and active role in the development of their neighborhoods. | Invest in community organizing and legal support to assist tenants and other communities with forming and operating associations, building inclusive neighborhood organizations, and actively participating in redevelopment decisions, including through negotiated agreements | No |
| Strategy 4c. Increase resident and community ownership of land. | Capacity building support and incubation of neighborhood-centered community development corporations | No |
| Strategy 4d. Reduce barriers to participating in planning and land use decisions impacting gentrifying neighborhoods and utilize effective community engagement tools to elevate community voices. | Comprehensive community engagement strategy | No |
| | City ordinance requiring mandatory community engagement plans for development project applicants in vulnerable communities | No |

| Goal #5: Vulnerable residents are able to remain in or return to their communities by accessing the affordable housing opportunities in their neighborhoods | | |
|---|---|---|
| Strategy | Tool | In Austin's Strategic Housing Blueprint? |
| Strategy 5a. Give displaced residents and residents at risk of displacement higher priority on waiting lists for affordable housing programs in their community. | Community Preference Policy | No, but included in City Council Resolution 20180308-010 |
| Strategy 5b. Improve vulnerable residents' access to information about affordable housing opportunities and streamline the application process. | Single-entry, online affordable housing application portal | Yes, partial. Does not include a portal for applications. |

| Goal #6: New affordable housing options are created to serve current and future vulnerable households in gentrifying neighborhoods | | |
|---|---|---|
| Strategy | Tool | In Austin's Strategic Housing Blueprint? |
| Strategy 6a. Intervene early to acquire control of land in strategic locations of gentrifying neighborhoods. | Acquisition and land banking of property for future affordable housing development | Yes |
| | Land acquisition fund | No |
| Strategy 6b. Dedicate surplus public land to affordable housing development. | Public land for affordable housing policy | Yes |
| Strategy 6c. Leverage the power of hot real estate markets in middle- and late-stage gentrifying areas to include affordable housing in market-rate development. | Expansion and modifications to Austin's density bonus programs | Yes |
| | Adoption of inclusionary zoning in Austin's Homestead Preservation District | No |
| Strategy 6d. Retain city or community ownership of land or require long-term resale restrictions to ensure permanent affordability of housing units for future generations of residents. | Community land trusts | Yes |
| | Shared equity appreciation with resale restrictions and rights of first refusal | Yes |
| Strategy 6e. Require longer affordability terms in new affordable multifamily properties. | Require developers of LIHTC properties to commit to a 55-year affordability term as a condition of receiving city approval | No |

# Endnotes

[1] Tex. Tax Code § 312.204(a).

[2] Tex. Tax Code, § 11.261(a); Tex. Const., Art. VIII, § 1-b(h).

[3] American Housing Survey 2013, Austin, Texas, Monthly Housing Costs, Units by Structure Type.

[4] Mallach, Alan, "Challenges of the Small Rental Property Sector," New England Community Development, Federal Reserve Bank of Boston, 2009, issue 1.

[5] American Community Survey 2012-2016, Social Explorer, Table SE:T191, "Units in Structure (Renter Occupied Housing Units)".

[6] Amaro, Gabriel, "Housing Affordability in Austin Brings New Attention to Mobile Home Parks," Latino Research Initiative, The University of Texas at Austin, Nov. 2017, https://utexas.app.box.com/v/LRIbrief2017-01.

[7] For a deeper discussion of these tools and other best practices in this area, see Hickey, Robert, and Sturtevant, Lisa, "Public Land & Affordable Housing in the Washington DC Region: Best Practices and Recommendations," Feb. 2015, http://washington.uli.org/wp-content/uploads/sites/56/2015/02/ULI_PublicLandReport_Final020615.pdf.

[8] Thaden, Emily, and Wang, Ruoniu, "Inclusionary Housing in the United States," Lincoln Institute of Land Policy, Sept. 2017, https://www.lincolninst.edu/publications/working-papers/inclusionary-housing-united-states.

[9] Dawkins, Casey, et al, "Creating and Preserving Affordable Homeownership Opportunities: Does Inclusionary Zoning Make Sense?" Journal of Planning Education and Research, 2016, 37, 4: 444-456.

[10] Texas Local Government Code, Section 214.905 ("This section does not affect the authority of a municipality to … (2) adopt a requirement applicable to an area served under the provisions of Chapter 373A, Local Government Code, which authorizes homestead preservation districts …."

[11] For a more extensive discussion of the how the CLT model works in Texas, including the property tax savings available, see Platts-Mills, Eliza, "A Guide for Developing Community Land Trust Affordable Homeownership Programs in Texas (2018)," https://law.utexas.edu/clinics/category/projects-and-cases/entrepreneurship-and-community-development-clinic/.

[12] See Texas Government Code, Section 2306.67071(c).

[13] Coppola, Sarah, Austin American-Statesman, "Bond funds have yielded more affordable housing in Austin," Mar. 30, 2012.

[14] Urban Land Institute Advisory Services Panel, "Dallas, Texas: Expanding affordable and mixed-income housing opportunities," Feb. 29-March 4, 2016. https://americas.uli.org/advisory-service-panels/dallas-texas-advisory-services-panel. Report author Jake Wegmann contributed to this report.

[15] Density bonuses and in-lieu fees, while useful in some circumstances if appropriately designed, cannot be relied upon as the workhorse strategy for generating new affordable housing. From 2000 to 2012-2016, the housing stock in Austin grew at an annualized rate of about 2.5 percent per year—a very rapid pace that exceeded almost all other large cities in the United States. Even if density bonuses were able to capture half of all new units developed and yielded 20 percent of the new units as below-market units, the total addition of below-market units citywide would be less than 1,000 per year.

[16] Randall, Megan, "Redefining revitalization: An analysis of community revitalization in Texas' Low Income Housing Tax Credit Program," Professional Report, University of Texas at Austin School of Public Affairs and School of Architecture, Jan. 2016, https://soa.utexas.edu/libraries-centers/center-sustainable-development/research/texas-housing-lab/publications-and.

# PART 5

Policy Drilldown: A Framework for Evaluating Anti-Displacement Policies

# Introduction to Framework for Evaluating Anti-Displacement Policies

In order to understand the ways that particular tools and strategies can be used to address the needs of particular gentrifying neighborhoods or vulnerable groups impacted by displacement, it is helpful to consider their relative strengths and weaknesses. To guide this discussion, we have developed a set of criteria, which are described below. To illustrate how these criteria work in practice, we then apply them to a short list of specific tools and strategies for mitigating displacement.

It is important to keep in mind that no tool or strategy will score well on all measures. The criteria are meant to help policymakers consider which tools best further the city's goals and best match the needs of particular places and groups. The criteria also allow policymakers to weigh the effectiveness and impact of specific tools and consider which ones the city has the resources to implement or capacity to develop.

It is important to acknowledge here that our application of these criteria is meant to highlight tradeoffs and to raise issues for consideration when policymakers explore adopting specific strategies to address the needs of particular neighborhoods or groups. Our application is not precise and quantitative, as that is beyond the scope of our project. The criteria application is instead qualitative and based on our review of existing research (although the research in this field is very limited), our own case study research, and experiences working with these tools.

## Criteria for Assessing and Comparing Anti-Displacement Policy Strategies and Tools

These criteria help reveal the relative strengths and weaknesses of each tool/strategy. None will do well on all items. The criteria used highlight both the goals of anti-displacement efforts and their feasibility.

| CRITERIA | RATIONALE | OPERATIONALIZATION |
|---|---|---|
| *Dimensions of need addressed* | | |
| **Vulnerable populations targeted.** *Which group does this strategy/tool assist the most?* | Certain populations are especially vulnerable to displacement and likely to face difficulties finding housing they can afford once displaced. | **Vulnerable groups targeted:** Includes: Low-income renters, low-income homeowners, people/communities of color, low-income families with children, low-income seniors |
| **Stage of gentrification targeted.** *At what stage is this strategy/tool most effective?* | Since conditions and challenges vary greatly according to the development pressure a neighborhood is experiencing, it is important to match strategies to these conditions. | **Early-stage strategies:** For use in areas mapped as susceptible or early-type 1 and early-type 2. **Mid-stage strategies:** For dynamic areas. **Late-stage strategies:** For late or continued loss areas. |

| CRITERIA | RATIONALE | OPERATIONALIZATION |
|---|---|---|
| *Normative dimensions* | | |
| **Place-based.** *Does this strategy/tool focus on specific gentrifying neighborhoods?* | To address change that is affecting entire vulnerable neighborhoods will require an intentional focus on those areas. | Yes: Designed to serve vulnerable residents of one or more gentrifying neighborhoods. No: Not targeted to specific gentrifying neighborhoods. |
| **Sustainability.** *How long will the effects of this strategy/ tool last?* | To preserve cultural communities and ensure ongoing income and racial diversity in vulnerable neighborhoods, it is important to consider whether the proposed tools/ strategies will have effects beyond those served initially and for how long. | Good: Creates an on-going (40+ years) stock of housing for current and future residents from vulnerable groups. Fair: Creates housing for current and future residents for < 40 years. Poor: No plans for future residents. |
| **Inclusivity.** *How will the voices of vulnerable residents be represented?* | To ensure that strategies incorporate features that best serve vulnerable residents, it is important that residents have a meaningful voice in the design, governance, and ongoing monitoring of the strategy. | Good: Includes an active role for vulnerable residents in the design, governance, and ongoing implementation of the strategy. Fair: Includes some roles for vulnerable residents. Poor: No role for vulnerable residents. |
| *Implementation dimensions* | | |
| **Financial resources required.** *What level of funding or foregone revenue will be required?* | Successful implementation and the ability to achieve the desired scale of impact will depend on the availability of financial resources from city tax dollars or other city funds or resources. | Low: Minimal start-up and operational costs to the city. Medium: Moderate start-up and operational costs to the city. High: Either high start-up costs, high operational costs, or both. |
| **Capacity required.** *How well do city and nonprofit staff and community roles match current capacity?* | Successful implementation of strategies requires that city and nonprofit staff and community members are able to carry out the roles envisioned for them. | Good: Staff and community capacity currently exist to perform the envisioned roles. Fair: Moderate levels of capacity exist but additional capacity building required. Poor: Skills currently lacking or capacity very limited. |

The first two criteria focus on the dimension of need that is addressed by a particular tool, the next three criteria are *normative*, meaning they are linked to value-based goals derived from the City of Austin's current policies and from the intent of the City Council resolutions guiding this study. The final two criteria focus on considerations important to the successful implementation of each tool. Together, application of these criteria to the possible displacement mitigation tools and strategies will give city policymakers a great deal of information to consider and help inform discussion of which tools and strategies Austin should adopt.

**Vulnerable populations targeted.** This criterion considers which vulnerable population a particular strategy or tool is likely to assist the most. We focus here on groups that are known to be most vulnerable to displacement as housing costs rise, that have the fewest housing options once displaced, and that can be targeted by particular programs. These are also the characteristics used to map particular neighborhoods containing populations most vulnerable to displacement (step 1 in our mapping process).

**Stage of gentrification targeted.** The second criterion considers at which stage of gentrification a particular tool or strategy will be the most effective. Since conditions and challenges vary according to the amount of displacement pressures in a neighborhood, it is important to be aware of which strategies are most easily implemented at various stages. To the extent possible, we apply the stages of gentrification defined in Part 2 of the report (based on evidence of demographic changes and changes in housing costs). Of course, most strategies will be easier to implement when neighborhoods are in the earliest stages of change.

**Place-based.** Place-based strategies are addressed to specific gentrifying neighborhoods. This criterion recognizes the overlapping dimensions of vulnerability represented in specific neighborhoods and the need to consider their needs as place-based communities. Other strategies may focus on vulnerable groups but without linking them to particular gentrifying neighborhoods.

**Sustainability.** Displacement has two time dimensions that are important to consider. First, displacement refers to the loss of existing vulnerable groups of residents. Second, displacement pressures impact the ability of persons from similar demographic groups to return or move into the neighborhood. Some policies are well matched to the needs of current residents but may not extend to future residents, while other policies address both current and future residents' needs. This dimension also speaks to the longevity of city investments: Will an investment remain when the current residents move? How long will the city's investment in the affordability of a unit last?

**Inclusivity.** Displacement-mitigation tools and strategies vary in terms of the involvement of vulnerable residents in their design, implementation, and oversight. To ensure that strategies are designed to address the concerns of these residents, it is important to consider to what extent such involvement is a feature of each approach.

**Financial resources required.** While it is not possible to precisely detail the likely costs of particular tools or strategies, our goal here is to give a sense of which are the most or least costly. We attempt to do this by considering the amount of funding required for initial implementation or investment and the ongoing cost to the city beyond start up. Initial costs might range from those associated with passage of an ordinance to allocation of funds for construction of housing. On-going costs might include funding for staff at agencies charged with implementation.

**Capacity required.** A key feature of a strategy's successful implementation is the ability of city staff, local nonprofits, and community organizations to carry out the roles envisioned for them by each strategy. We attempt to consider here whether the required capacities currently exist, whether there are key gaps that would require attention, and the extent to which any existing deficiencies in capacity could be easily addressed.

## Policy Drilldown Table: Analysis of Anti-Displacement Policies for Austin

| Policy | Vulnerable populations targeted | Stage of gentrification targeted | Place-based | Sustainability | Inclusivity | Financial resources required | Capacity required |
|---|---|---|---|---|---|---|---|
| **Local Housing Voucher Programs** | Low-income renter households | Middle to late | No | Poor to fair | Poor to fair | Medium to high | Fair |
| **Homestead Preservation Center** | Low-income homeowners, including seniors and persons of color | All | Yes | Poor | Good | Medium | Fair |
| **Neighborhood Stabilization Overlays** | Current homeowners and renters | Early and mid-stage | Yes | Poor to fair | Fair | Low | Fair |
| **Affordable Housing Preservation Network and Inventory** | Current and future low-income renters of apartments | Early and mid-stage | No | Good | Good | Low to medium | Fair |
| **Neighborhood-Jobs Pipeline Program** | Working-age low-income residents | Early and mid-stage | Yes | Poor to fair | Good | Medium | Fair |
| **Preservation Investment Funds** | Low-to-moderate-income renters | Early and mid-stage | No | Poor | Poor | Low to medium | Fair to good |
| **Community Capacity Building** | Low-income residents in vulnerable neighborhoods | Early and mid-stage | Yes | Poor | Good | Medium | Poor to Fair |
| **Adding Internal Accessory Dwelling Units to Existing Homes** | Current homeowners, including elderly and persons with disabilities | All | No | Good | Poor to fair | Low | Low |

# Local Housing Voucher Programs

**Overview**

In cities facing an affordable housing crisis due to a hot housing market and high construction costs, building new units will be costly, and progress toward meeting needs will be slow. Housing vouchers have been funded by the federal government since 1974 and are regarded as a more efficient way to meet local housing needs in cities where vacant units are available.[1] Under this program, voucher holders pay rent equivalent to 30 percent of their income, and the voucher covers the difference between this amount and the maximum allowed rent. Typically, voucher holders have extremely low incomes——below 30 percent of the regional median.

Research has documented several challenges to the effective use of vouchers—particularly in hot markets. First, federal funds for vouchers are in short supply and, as rents rise in a region, the number of vouchers that the region's voucher allocation from the federal government can support declines. Second, the value of each federal Housing Choice Voucher (commonly known as Section 8) is capped—usually below the rents charged in high opportunity areas or in the new high-end buildings where vacant units are often concentrated in hot markets. Third, many landlords are reluctant to accept vouchers and voucher holders are often concentrated in poorer neighborhoods.[2] Vouchers are often used in affordable housing developments produced under other programs, to open up housing opportunities for households with incomes below the development's affordable rent levels.

To increase the supply of vouchers and target them to local needs, several cities have developed locally-funded voucher programs. Washington, D.C.'s Local Rent Supplement Program, funded by the city government and managed by the D.C. Housing Authority, was created in 2007 with a goal of creating 14,600 vouchers by 2021 for residents with incomes below 30 percent of the regional median income. Priority is given to applicants on the local wait list for federal housing vouchers. The D.C. program also provides vouchers tied to specific units in affordable housing buildings (called project-based vouchers) and sets aside some vouchers for residents transitioning out of permanent supportive housing. As of 2016, the program was serving 3,300 households with annual funding from the local government of $48 million, including administrative costs and related services.[3]

The City of Denver recently approved a two-year pilot program[4] that attempts to take advantage of vacancies in high-end rental units in the market to provide housing for local workers with household incomes between 40 and 80 percent of regional median income. Participants pay 35 percent of their income for rent, with the gap between this and a "reasonable market rent" covered by the voucher for two years. The program is to be funded by the City, local foundations, and employers. Some concerns have been raised about the program propping up rents in luxury buildings whose owners might otherwise adjust rents downward.[5] The program is paired with financial counseling and sets aside 5 percent of rent payments in an escrow account to be returned to tenants at the end of the two years. As of February, five employers were participating, as were property owners both downtown and in outlying neighborhoods. With initial funding of $1.2 million from the City of Denver, the goal is to support 125 households over a two-year period.

To better match local vouchers to renters vulnerable to displacement in particular neighborhoods would require targeted outreach to landlords in these areas—including owners of small rental properties and single-family homes. These landlords would likely require greater incentives for participation. Acceptance of local vouchers might also be made a condition of rezoning--although this would not ensure their use at resulting developments.

# Assessment

### Vulnerable populations targeted
Low-income renter households, with income levels set by local government.

### Stage of neighborhood change
**Middle to Late.** If calibrated properly, vouchers can help residents stay in or return to neighborhoods where housing market change is in process or already advanced.

### Place-based
**No.** Vouchers are meant to give holders greater choice in where they live. There are many impediments to neighborhood-level targeting.

### Sustainability
**Poor to Fair.** Vouchers give current holders access to housing. Long-term affordability requires that they be re-funded annually.

### Inclusivity
**Poor to Fair.** Program development and oversight unlikely to include tenants themselves. Inclusivity could be improved by incorporating tenants and tenant advocacy organization representatives on an advisory group.

### Financial Resources
**Medium to High.** Cost per unit to the city would depend on income targeting and whether vouchers are used to reduce already affordable rents (as in D.C.) or much higher market rents (as in Denver).

### Capacity Required
**Fair.** The Housing Authority of the City of Austin is already administering a large voucher program and would likely have capacity to administer a city program—with additional staff. Tailoring the program to particular neighborhoods and conducting outreach to landlords would require new capacity and partnerships.

**Resources**

DC Fiscal Policy Institute, "The Local Rent Supplement Program," Apr. 11, 2016, https://www.dcfpi.org/wp-content/uploads/2016/04/16-04-LRSP-Brief.pdf

City and County of Denver, "Lower Income Voucher Equity (LIVE) Pilot Program – Program Facts," https://www.denvergov.org/content/dam/denvergov/Portals/728/documents/Documents/Lower%20Income%20Voucher%20Equity%20Initiative%20Fact%20Sheet_08092017.pdf

# Homestead Preservation Center

**Overview**

As a neighborhood gentrifies, low-income homeowners face mounting financial pressures in the form of recurring property tax increases and inability to cover other housing expenses such as repairs. In Austin, 956 homeowners with a homestead exemption have two or more years of delinquent taxes; close to one-third of these homeowners are seniors. It is likely that a far larger number of homeowners, while not in default, are contemplating selling their home or otherwise experiencing financial hardship as a direct result of their property tax burden. While rising property taxes impose a heavy burden on many homeowners in Austin, homeowners who are the most vulnerable to displacement are those with the lowest incomes living in the most rapidly appreciating neighborhoods. Owners with multiple years of property tax delinquencies are concentrated most heavily in Austin's gentrifying zip codes, with the greatest percentage residing in Central East Austin. See below for a map of neighborhoods where these households are located.

Many low-income homeowners qualify for but have not obtained constitutionally-mandated property tax exemptions, which bring valuable tax relief. Those most likely to not have a property tax exemption include owners of mobile homes and persons of color who have held property in their family for multiple generations without using wills ("heirs-property owners"). The practice of the Travis Central Appraisal District (TCAD) is to tell owners who have inherited their property to seek legal assistance for help qualifying for the exemption. For owners of mobile homes to obtain an exemption, the household must have proof of ownership for the manufactured home, but titles to older manufactured homes are often clouded and require legal counsel to help clear.

A Homestead Preservation Center would provide targeted assistance to vulnerable households in gentrifying neighborhoods who do not have an exemption or are delinquent on their taxes or mortgages, to help them stay in their homes. The Center, which the city could fund through a partnership with a nonprofit or university, would assist homeowners with obtaining the homestead exemptions they are eligible for, and provide legal assistance needed to help eligible owners (such as heirs-property owners and owners of mobile homes) qualify. Additional functions of the Center could include education about homeowner's property rights and responsibilities, financial counseling to help homeowners reduce debt and make their property tax payments, and assistance negotiating payment plans with the tax collector and mortgage modifications with their lenders.

Short of creating a Homestead Preservation Center, the City of Austin could provide funding to a community-based nonprofit, such as Meals on Wheels Central Texas, to conduct in-person outreach to homeowners without a tax exemption and provide on-the-spot assistance signing up for the homestead exemptions they qualify for—for those homeowners who do not need legal assistance. About a decade ago, the nonprofit PODER partnered with TCAD to provide targeted, door-to-door outreach to assist homeowners without homestead exemptions, after close to 800 homeowners were identified as not having an exemption. The City of Austin currently funds income tax and health insurance enrollment programs that could serve as a model for a homestead exemption enrollment program.

Around the country, a number of cities provide services targeted towards helping vulnerable residents with financial stability, including helping homeowners stay in their homes. None of these programs include the exact same scope as the Homestead Preservation Center discussed here, but they have different components that would be useful for Austin to consider.

For example, Cleveland's Empowering and Strengthening Ohio's People (ESOP) Program specializes in providing aging residents with financial stability. In 2014, the organization launched a Senior Financial Empowerment Initiative, which provides one-on-one financial counseling,

financial education workshops, and foreclosure prevention assistance to seniors. ESOP's Senior Property Tax Loan program provides property tax loans to seniors of up to $6,500, coupled with comprehensive financial counseling and ongoing financial coaching. Pennsylvania's Affordable Housing Centers offer a number of services related to supporting homeownership by low-income families, including a foreclosure counseling program, which helps homeowners who are struggling to make their mortgage or property tax payments. New York City's Financial Empowerment Centers, with 20 neighborhood locations, provide financial education and counseling to help tackle debt, budgeting, and other financial stabilization services.

## Assessment

### Vulnerable populations targeted
Low-income homeowners, including seniors and persons with disabilities; communities of color (where heirs property issues are the greatest).

### Stage of neighborhood change
*All,* although low-income homeowners in late-stage gentrifying neighborhoods face the largest property tax burdens and will thus receive the greatest benefit from a Homestead Preservation Center.

### Place-based
**Yes.** Assistance from a Homestead Preservation Center can be targeted to residents of vulnerable neighborhoods.

### Sustainability
**Poor.** Does not create affordability for future residents.

### Inclusivity
**Good.** Vulnerable residents can serve on an advisory board for the Center and, through the Center, can play an active role in educating and reaching out to their neighbors about homestead exemption enrollment and other services of the Center.

### Financial Resources
**Medium.** Would require some initial investment to create the center and support for ongoing operations. The price tag for this ongoing support would depend on services provided. Funding can be leveraged from philanthropic institutions.

### Capacity Required
**Fair.** Contracting with a nonprofit agency to set up and run the Center would be required.

# Neighborhood Stabilization Overlays

**Overview**

A concern raised in many neighborhoods with rising housing costs in Austin is the demolition of older, smaller single-family homes and replacement with much larger and more expensive homes, often referred to as "McMansions." According to one report, the size of the average home being demolished in Austin is 1,430 square feet, while the average replacement home is 3,544 square feet.[6] The older homes are typically much more affordable due to their size and poorer condition. Cities across the United States have deployed different policies for slowing down this market phenomenon in neighborhoods with increasing redevelopment pressures.

One such tool is the neighborhood stabilization overlay (NSO), also called a neighborhood conservation district, which requires new development in a neighborhood to meet standards more stringent than the zoning baseline (such as setbacks, building height, floor-to-ratio, etc.). While this tool is more often used in higher-end neighborhoods, some cities have applied this tool to lower-income, gentrifying neighborhoods with the specific goal of slowing down displacement of vulnerable residents. For example, Dallas's neighborhood stabilization overlay ordinance was used in the La Bajada neighborhood, a low-income, gentrifying area of Dallas, to restrict building heights, with the goal of preserving the affordable single-family homes in the neighborhood. The residents mobilized to advocate and vote for the overlay, which was then given final approval by the Dallas City Council.

Austin has adopted a variation of NSOs with a set of design standards (both restrictions, such as limits on garage placement, and incentives, such as small lot development) available to individual neighborhoods through Neighborhood Plan Combining Districts (NPCD).[7] Austin also restricts super-sized single-family homes through its McMansion ordinance. Unlike the Dallas NSO ordinance, Austin's McMansion ordinance's development standards cannot be adjusted to fit the context of a particular neighborhood.

Another variation of NSOs is the Residential Infill Project concept under consideration in Portland. The goals of the Portland program include addressing the city's increasing housing costs and loss of older, affordable homes. The proposed regulations would reduce the maximum size of new single-family homes, which is currently 6,750 square feet, to 2,500 square feet. At the same time, the ordinance would loosen restrictions on internal subdivisions and accessory dwelling units (ADUs) with the intention of increasing the number of less expensive housing options in the city. A variation of the Portland Residential Infill Project was recently promoted by a group of Austin Planning Commissioners; their proposal called on changing the impervious cover limits from 40 to 30 percent of lot area, unless multiple housing units were built on the lot.[8]

**Considerations**

When structured the right way, enacting redevelopment restrictions in neighborhoods with accelerating tear-downs and housing costs can help slow down redevelopment pressures in the short-term, depending on the conditions of the neighborhood. In Dallas's La Bajada neighborhood, while it is unclear what direct impacts the height limits have had, active resident engagement in creating the NSO enhanced the political capital of neighborhood homeowners and created a strong political statement that preservation of the low-income neighborhood is a priority. Since its adoption the NSO in La Bajada has been used to defeat rezoning requests that threatened existing affordable single-family units.

There is no evidence of neighborhood stabilization ordinances permanently halting displacement of vulnerable residents. As long as the real estate market in a city is hot, market pressures will eventually catch up in a neighborhood where these tools are used, although more research in

general is needed on their long-term impact. Two years after the passage of Austin's McMansion ordinance, median prices of homes and home construction permits still increased in three neighborhoods that were studied, but this assessment covered a short period and did not cover lower-income neighborhoods.[9] And perhaps the median prices and construction permits would have increased even more without the ordinance; that is unknown.

A downside of an NSO-type ordinance is that the regulations can make it more difficult to build new rent-restricted affordable housing, unless exceptions for affordable housing are built into the ordinance. Depending on how development restrictions are structured and where they apply, the restrictions can also limit a city's overall supply of housing, thus fueling city-wide acceleration of median housing prices.

A final consideration of an NSO-type ordinance is that slowing down teardowns and rebuilds on single-family lots in a neighborhood where they are currently widespread could result in decreases in property values for existing residents. While some homeowners and community leaders would welcome the lower property taxes and possible reduction in resident turnover, others would object to the loss of home equity which, depending on the specific location, regulatory scope, and individual circumstances, could run in the tens or even hundreds of thousands of dollars.

## Assessment

### Vulnerable populations targeted
Current homeowners and renters.

### Stage of neighborhood change
**Early and mid-stage gentrification,** before major housing appreciation and displacement have occurred.

### Place-based
**Yes.** Designed to serve an entire neighborhood.

### Sustainability
**Poor to Fair.** There is no evidence of neighborhood stabilization ordinances reducing displacement of vulnerable residents in the long term. If exceptions for ADUs and other smaller units were included, as with Portland's proposed Residential Infill Project, an NSO would likely have a longer-term impact.

### Inclusivity
**Fair.** Dallas's NSO program gives residents a role in how the restrictions are structured, but no involvement in on-going implementation of the strategy.

### Financial Resources
**Low.** Primarily the cost of developing and passing an ordinance. Restrictions could also result in a slower rise in property taxes collected.

### Capacity Required
**Fair.** City staff is already administering an array of development restrictions, but additional staff would be required to work with neighborhoods to develop overlays, administer the program, and enforce the requirements.

**Resources**

City of Dallas, Neighborhood Stabilization Overlay Website, https://dallascityhall.com/departments/sustainabledevelopment/planning/Pages/NSO.aspx

City of Portland, Residential Infill Project Website, https://www.portlandoregon.gov/bps/67728
City of Portland, Residential Infill Project: City Council Final Project Report, Jan. 2017, https://www.portlandoregon.gov/bps/article/623488

# Affordable Housing Preservation Network and Inventory

**Overview**

While Austin has more than 16,000 units of privately-owned subsidized rental housing, the city has no comprehensive inventory for identifying which properties are at risk of losing their rent restrictions, and no program for engaging in the preservation of at-risk properties.

The largest subsidy program for affordable housing in Austin is the federal Low Income Housing Tax Credit (LIHTC) program, which is responsible for close to 17,000 affordable rental units in Austin, including publicly-owned units. At least three LIHTC properties in East Austin are currently in the process of phasing out of the LIHTC program, which will result in the loss of 750 affordable rental housing units. To subsidize the new development of this many units would require at least $70 million in public funding.

Two essential strategies for preserving at-risk multifamily properties are creating a database identifying which properties are most at risk of losing their affordable rent restrictions, and a preservation network to closely monitor the properties and collaborate on preservation interventions.[10] Preservation databases give city staff, advocates, and tenant organizations the opportunity to track properties as they near the end of their affordability periods and take proactive steps to ensure that the properties remain affordable. The databases rely on a range of sources to incorporate detailed information about properties' expiring subsidies, habitability and code violations, and other indicators of vulnerability, including stakeholders working on the ground, such as members of a preservation network. As the National Housing Preservation Network notes, "[w]ithout sufficient data to understand which properties are most at risk, it's impossible to target resources effectively or be prepared to act when a property is threatened."[11]

Preservation networks bring key stakeholders together on a regular basis to monitor the inventory of at-risk multi-family properties, engage with property owners early on before the property is exiting an affordable housing program, and collaborate on proactive preservation strategies. The types of stakeholders included depend on the network, but local networks typically include, at a minimum, city staff and local housing organizations.

One highly successful model for a preservation network is the D.C. Preservation Network, which monitors D.C.'s inventory of at-risk, affordable multifamily properties. The D.C. Preservation Network tracks not only properties with expiring subsidies but also those in disrepair and in need of rehabilitation. The focal point of the Network is a monthly meeting where participants review housing that is in danger of losing affordability or in major disrepair and develop strategies for preserving the units. The Network's database guides prioritization during monthly meetings and focuses conversations productively around properties at most immediate risk. Network meetings are open to anyone doing work in affordable housing in the D.C. area. The openness and inclusiveness of both non-governmental and governmental participants have generated successful collaborations and been valuable aspects of the Network. The Network has been most successful in coordinating the preservation of privately-owned, subsidized affordable housing.

A city can play a key role in these efforts by operating the preservation database or funding another organization to do so, and by dedicating city staff to run the preservation network or help support its operations. The District of Columbia recently created a special affordable housing preservation unit led by an affordable housing preservation officer to maintain the city's data on at-risk properties and to lead its affordable housing preservation efforts.

There are many examples from around the country of cities operating preservation databases and networks similar to D.C.'s, including Los Angeles and Portland, Oregon. The Preservation

Compact in Chicago brings together stakeholders once a month to update information about at-risk properties and track progress on preservation strategies. The compact is focused on the preservation of government-subsidized affordable in non-distressed neighborhoods of Chicago.

In structuring a preservation network and database, the following considerations need to be addressed: who will have access to the database, how and when the database will be updated, who will be responsible for updating it, how information from the database will be distributed, and who will be included in the preservation network. Preservation networks differ in the amount of access they give private organizations to their preservation database and in the composition of their networks.

## Assessment

### Vulnerable populations targeted
Current low-income renters in apartments, as well as future low-income renters.

### Stage of neighborhood change
Multifamily preservation interventions are most successful in **early-stage and mid-stage** gentrifying neighborhoods, where landlords are typically more responsive to incentives to preserve the rent restrictions on their properties.

### Place-based
**No.** Preservation networks typically track all properties across the city, although interventions can be targeted to particular neighborhoods.

### Sustainability
**Good.** Focused on preserving a long-term stock of safe and affordable housing for current and future residents from vulnerable groups.

### Inclusivity
**Good.** Preservation networks can include tenant organizations as members.

### Financial Resources
**Low to Medium.** Would require moderate ongoing support for a staff person to coordinate the creation and maintenance of the inventory and regularly convene the preservation network.

### Capacity Required
**Fair.** City staff has the know-how but not the time to do a lot of this work; additional staff would be required to help create and maintain the database and oversee the preservation network, unless the city funded a third-party organization to lead these efforts.

**Resources**

National Housing Trust, http://www.nationalhousingtrust.org/state-and-local-preservation-initiatives

The Preservation Compact, http://www.preservationcompact.org/whats-the-story/

D.C. Preservation Catalog Online, http://dcpres.urban.org/dcp/