# Endnotes

[1] We focus in this case study on the work of the Guadalupe Neighborhood Development Corporation within the Guadalupe neighborhood (see the background section for the neighborhood's boundaries), but since its founding GNDC has expanded its service area into several other neighborhoods in East Austin.

[2] Barnes, Michael, "Recalling Austin's ample East Avenue," The Austin American-Statesman, May 31, 2014, https://www.mystatesman.com/entertainment/recalling-austin-ample-east-avenue/8bBadmiO07PKcvPjiQG6zN/.

[3] The demographic and housing information in this section for the period from 1970 to 1980 comes from Guadalupe Neighborhood Area Association, "Guadalupe Community Development Program: Phase 1 Plan," April 1981.

[4] The information on GNDC's history in this section and subsequent sections, unless otherwise noted, comes from "McDivitt, Darren and Stocklin, Annie, "GNDC: The Origin Story" (on file with authors); multiple interviews by the authors in 2018 with Mark Rogers, Executive Director, Guadalupe Neighborhood Development Corporation; and the authors' prior work in the neighborhood.

[5] Valdez, Bill, "Guadalupe area awaiting word on federal funds," The Austin-American Statesman, Sept. 10, 1981 (quoting from an Aug. 24, 1981, memo from the Guadalupe Area Neighborhood Association to the Austin City Council).

[6] GNDC: The Origin Story, note 4, supra.

[7] Guadalupe Neighborhood Area Association, "Guadalupe Community Development Program: Phase 1 Plan," April 1981, at 48-49.

[8] Guadalupe Neighborhood Development Corporation, Low Cost Housing Plan for Guadalupe, Nov. 1982.

[9] Ibid.

[10] de Marban, Alex, "Life on the 38th Parallel," The Austin Chronicle, Jan. 12, 1996, https://www.austinchronicle.com/news/1996-01-12/530366/.

[11] Ibid.

[12] Ebenezer Village website, http://www.ebc3austin.org/about-us/ebenezer-village/ (last checked July 30, 2018).

[13] US Census 1990, Social Explorer, Table SE:T80, "Median Value for Specified Owner-Occupied Housing Units," Census Tract 9.01, Austin, TX. This census tract includes an area larger than just the Guadalupe neighborhood.

[14] U.S. Census 2000, Social Explorer, Table SE:T163, "Median House Value for All Owner-Occupied Housing Units," Census Tract 9.01, Austin, TX.

[15] "Same as It Never Was," The Austin Chronicle, July 4, 2003, https://www.austinchronicle.com/features/2003-07-04/166644/.

[16] "Naked City: Off the Desk: The Debate Goes On," The Austin Chronicle, Dec. 11, 1998, https://www.austinchronicle.com/news/1998-12-11/520788/.

[17] Ibid.

[18] US Census 2000, Social Explorer, Table SE:T15, "Hispanic Or Latino By Race," Census Tract 9.01, Austin, TX; American Community Survey 2012-2016, Social Explorer, Table SE:T14, "Hispanic Or Latino By Race," Census Tract 9.01, Austin, TX; American Community Survey 2012-2016, Social Explorer, Table SE:T61, "Median Family Income (In 2016 Inflation Adjusted Dollars)," Census Tract 9.01, Austin, TX.

[19] City of Austin Ordinance No. 20151119-080, http://www.austintexas.gov/edims/document.cfm?id=243658.

[20] Ellin, Nan, and Johnson, Jennifer J., "Alley Flat Initiative," https://islandpress.org/resources/9781610913645_AlleyFlatInitiative.pdf.

[21] Ibid.

[22] Lincoln Institute of Land Use Policy and Minnesota Center for Financial Excellence, "50-State Property Tax Comparison Study," April 2015, Table 30: Top 50 Homestead Property Taxes for a Median-Value Home—Listed by Net Tax Payable 2014, https://www.lincolninst.edu/sites/default/files/pubfiles/50-state-property-tax-study-2015-full_0.pdf.

[23] See Texas Senate Bill 402, 82d Leg., R.S. (2001).

# Inner North and Northeast PORTLAND, OREGON

A Case Study of Community-Driven Strategies to Mitigate and
Remediate the Displacement of African-American Residents

## Overview

The inner neighborhoods of North and Northeast Portland (N/NE Portland) were once home
to 80 percent of Portland's black community. Following decades of disinvestment, subsequent
urban renewal, and large-scale public and private investment projects, the area has been rapidly
gentrifying, with rising housing costs and large-scale loss of African Americans. Since 2000, the
area has lost close to 8,000 black residents—more than half the area's black population.

In 2013, mounting tensions in the community over gentrification and publicly-financed economic
development in the area came to a head over the proposed use of prime public land and tax
increment financing (TIF) for a development anchored by a Trader Joe's grocery store. Local
African-American leaders organized protests of the new development and succeeded in getting
the City to revamp its investment strategy in the community, shifting $100 million towards
mitigating displacement of low-income residents in Inner N/NE Portland. Responding to the
community's concerns, the City of Portland, anchored by ongoing active community involvement
and a community-driven plan, has been deploying a number of innovative strategies and tools for
addressing displacement in the area.

## Key Strategies & Tools

1. **N/NE Neighborhood Housing Strategy.** A five-year, community-driven plan for expanding
   affordable housing opportunities and preventing displacement in Inner N/NE Portland. The
   plan utilizes several different affordable housing strategies including rental repairs, land
   acquisition, and new homeownership and rental housing, and identifies specific timeframes
   and measurable goals to track progress.
2. **Dedicated TIF funding.** Implementation of the N/NE Neighborhood Housing Strategy was
   originally funded with $20 million in dedicated tax increment financing (TIF). Since then, the
   City's financial commitment to mitigating displacement in the area has grown to more than
   $100 million in TIF funds to be invested over a six-year period.
3. **Community Oversight Committee.** The N/NE Portland Oversight Committee oversees the
   City's implementation of the N/NE Neighborhood Housing Strategy. The committee's work
   includes providing input on development projects in the area, monitoring the City's progress
   towards benchmarks in the Housing Strategy, and issuing an annual report to the City Council.
   The Oversight Committee is meant to represent and be responsive to the community. It is
   made up of trusted community leaders, topic area experts, and directly impacted community
   members.
4. **Preference Policy.** The Housing Strategy provides priority placement in subsidized housing
   units in N/NE Portland to residents with generational ties to N/NE Portland who were displaced
   or are at risk of displacement from areas where prior city plans had a destabilizing impact on
   long-term residents. Priority preference is given to households and their descendants who own
   property lost through urban renewal.

## Challenges

Portland's **Down Payment Assistance Loan Program** for helping low-income, first-time homebuyers in N/NE Portland served only four families from 2015 through 2017, despite a goal of serving 40 households. With market home prices at $400,000, homeownership is out of reach for most low-income households, even with individual assistance of $100,000.

**The Preference Policy** does not create affordable housing, and so its success is dependent on the availability of affordable housing stock. In 2016, 1,000 households applied through the preference policy program for 65 homeownership slots.

The focus on mitigating displacement in N/NE Portland is fairly new, and it is still too early to tell how successful different strategies will be. However, the Oversight Committee already has a successful track record of providing transparency and accountability to the City's anti-displacement programs in N/NE Portland, closely monitoring the City's programs, and identifying barriers and challenges as well as opportunities for improvement.

## Outcomes Since 2015

- New affordable rental housing (on line or in development): 350+ units in 7 multifamily developments
- Average city investment (TIF funds) per new affordable rental unit (2016): $64,755
- Homeownership units repaired: 326+

## Takeaways

1. **Develop a community-driven, comprehensive, neighborhood-level strategy to address residential displacement for vulnerable residents.** Align the strategy with community needs, be clear about goals, and be transparent in assessing outcomes.
2. **Back community strategies with substantial, dedicated funding.** Preservation at a scale large enough to be meaningful requires large levels of dedicated funding.
3. **Prioritize meaningful community participation.** Take it seriously. This requires an assertive effort to reduce barriers to participation and reach out to directly impacted current and former residents. Community voices should be incorporated into every step of the planning process. Strategies and outcomes should be in clear and demonstrable alignment with community needs and priorities.
4. **Incorporate community-responsive oversight into mitigation displacement and affordable housing preservation plans.** An oversight committee provides critical transparency and accountability in strategy implementation and outcomes. Oversight leadership should be trusted and well-respected by the community and responsive to the community's needs.
5. **Affordable homeownership for low-income families is difficult to achieve in hot market neighborhoods.** To make homeownership affordable in markets where median housing prices vastly exceed what households earning the median family income can afford, cities have to be willing to support the units with very large subsidies.

# Inner North and Northeast  PORTLAND, OREGON

## A Case Study of Community-Driven Strategies to Mitigate and Remediate the Displacement of African-American Residents

## Introduction

The inner neighborhoods of North and Northeast Portland (N/NE Portland) were once home to 80 percent of Portland's black community. After decades of disinvestment, followed by urban renewal and large-scale public and private investment projects, the area has been rapidly gentrifying. Rising housing costs in the area have fueled the displacement of the area's African-American residents, whose median family income today is barely half that of white residents in the area.[1] Since 2000, Inner N/E Portland has lost over 7,700 black residents—more than half the area's black population.[2]

This case study examines the recent approaches being taken in N/NE Portland to reduce the displacement of African-Americans and provide for a new level of transparency and accountability to the community with the investment of public funds. In 2015, after an extensive community engagement process, the city adopted the community-driven N/NE Neighborhood Housing Strategy, which is firmly anchored in a commitment to racial equity and providing low-income African Americans who have multi-generational ties to the neighborhood with the opportunity to return and stay in their community. To implement the Housing Strategy, the City has committed $100 million in tax increment financing over a six-year period and adopted a number of new displacement mitigation programs and policies, including a new preference policy for Inner N/NE Portland. These programs are overseen by the N/NE Portland Community Oversight Committee, which meets regularly to provide input on development projects in the area and monitor the City's progress towards benchmarks in the Housing Strategy.

## Background: North/Northeast Portland

North and Northeast Portland is a collection of neighborhoods located north of downtown Portland, making up approximately 11 square miles with approximately 80,000 residents as of 2016.[3] In the 1910s, a ban on selling homes to African Americans in much of the city contributed to a concentration of African Americans in the inner neighborhoods of N/NE Portland, centered around the Albina area of N/NE Portland, a process that was cemented by bank redlining in the 1930s through '50s.[4] The Albina district includes the Eliot, Boise, King, Irvington, Humboldt, Lloyd, Woodlawn and Sabin neighborhoods (see Figure 1).[5]

In the 20th century, N/NE Portland shared in the struggles that challenged many communities of color in the United States. World War II had brought an influx of black workers to Oregon's shipyards, who, facing housing discrimination, lived primarily in a large development called Vanport, which was subsequently destroyed in the 1948 flooding of the Columbia river. With neighborhood options limited by housing discrimination, many of the African-American residents who stayed on to work in the region resettled in the Albina area. By 1960, 80 percent of Portland's black population lived in or adjacent to Albina.[6]

Urban renewal projects in the 1950s through 70s, such as the Memorial Coliseum and Legacy Emanuel Medical Center, along with the construction of Interstate 5, displaced thousands



**Figure 1: Albina District, Portland**

of African-American residents from their neighborhoods in N/NE Portland.[7] More than half the residents of the Eliot neighborhood in Albina—3,000 people—were forced to relocate.[8] In the 1980s and 1990s, the Albina area suffered from on-going deterioration, population loss, and increases in crime.[9] The King and Boise neighborhoods in Albina, which constituted one percent of the city's land, were home to approximately one-third of the city's abandoned homes.[10]

Community-driven efforts in the 1990s to revitalize the area, including the Albina Community Plan, brought some improvements, including a conservation district to protect



North Lombard Street and North Albina Avenue, Portland, 1952.

historic structures. The City also led a code enforcement initiative in the area to improve housing conditions. While the area saw modest growth from 1990 to 2000, it lost close to 4,000 African-American residents. Heading into 2000, the African-American population of Inner N/NE Portland had fallen to 30 percent.[11]

In 2000, the Portland City Council approved the designation of the Interstate Corridor Urban Renewal Area (ICURA) as a 20-year tax-increment financing (TIF) district to finance and support a variety of different development types, transportation options, and economic growth opportunities in parts of North/Northeast Portland.[12] As property values rise, the TIF district diverts increases in property tax revenue (the tax increment) in the district from the city's general budget and reinvests the funds directly into redevelopment projects in the area.[13]  The ICURA boundary sits largely

within the inner neighborhoods of North and Northeast Portland, including several neighborhoods with the city's highest concentrations of African-American residents.[14]

On the heel of these initial investments, the population of Inner N/NE Portland grew by 15 percent from 2000 to 2016, and wealthier, white residents poured into the area. While 10 of the area's census tracts were majority persons of color in 2000, every single census tract had switched to majority white by 2010.[15]  By 2010, only 17 percent of the area's population was African American.[16] Home values also took off. In the King neighborhood, for example, median home values more than tripled from 2000 to 2016.[17]



### Figure 2: North/Northeast Portland Racial and Ethnic Demographic Change, 1990-2016

U.S. Census Bureau, Social Explorer. African American, White, and Asian categories refer to non-Hispanic only. "Hispanic origin" refers to all Hispanic origin categories.

By the early 2010s, African-American leaders in Portland had grown disgruntled with ICURA projects for not being responsive to the needs of long-time residents and for spurring the on-going displacement of African-American residents.[18]  From 2000 to 2010, Inner North and Northeast Portland, where much of the Interstate Corridor Urban Renewal Area is located, saw a net loss of 7,729 black residents—more than half of the African-American population in 2000.[19]

Community concerns about the displacement of African Americans came to a head in November 2013, when the City of Portland announced the discounted sale of a prominent property in the area for a commercial development anchored by a Trader Joe's grocery store, as part of the ongoing Interstate Corridor economic development program.[20]  The deal was immediately and vigorously opposed by African-American leaders, led by the Portland African American Leadership

**Portland African American Leadership Forum sends blistering letter with demands on MLK Trader Joe's project: Portland City Hall Roundup**
ANDREW THEEN, Copyright 2013, The Oregonian   Published December 18, 2013

**Portland African American Leadship Forum tries to find voice, place, amid Trader Joe's Controversy**
ANDREW THEEN, Copyright 2014, The Oregonian   Published 7:08 pm, February 7, 2014

**Trader Joe's backs away from controversial King neighborhood development**
PHILL COLCMICU, Copyright 2014, The Hollywood Star News   Published March 9, 2014

**When a Grocery Store Means Gentrification**
ROSA INOCENCIO SMITH, Copyright 2016, The Atlantic   Published 1:26 pm, August 16, 2016

Forum (PAALF), which called out "the well-documented and ongoing attempt to profit from development in Inner N/NE Portland at the expense of Black and low-income individuals."[21] The community leaders demanded not only that the project be halted (they were successful), but also that the City make a serious affirmative effort to address displacement.[22]

This is the context in which, in 2014, Portland's Mayor and Housing Commissioner announced that the City would redirect $20 million in tax increment financing from the Interstate Corridor Urban Renewal Area to address residential displacement in N/NE Portland, with funding decisions made pursuant to a community-driven process and strategy. The strategy became the North/Northeast Neighborhood Housing Strategy.[23]

Today, the inner neighborhoods in N/NE Portland are home to 12.2 percent African-American residents, with non-Hispanic white residents constituting a large majority of the area (73 percent), along with 6.4 percent Hispanic and three percent Asian residents.[24]  Yet, N/NE Portland is still home to the city's largest concentration of African-American residents, in a city with only six percent African-American residents.[25]

# The North/Northeast Neighborhood Housing Strategy: A Community-Driven Plan

From the beginning, the guiding principles behind a strategy for mitigating residential displacement in N/NE Portland were to (1) prioritize community involvement in developing and implementing the strategy; (2) provide low-income residents with historical ties to the area the ability to remain and return to their community; and (3) back the strategy with significant city funding—initially the $20 million in redirected TIF funds, which later grew to $100 million.

### Gathering Community Input

The development of the N/NE Neighborhood Housing Strategy began in 2014 with a series of meetings with community leaders, including members of the Portland African American Leadership Forum and faith leaders, to consider the best ways to engage the community in developing the housing strategy.[26]  An advisory committee of community leaders eventually formed to help lead the outreach process and guide the development of the Housing Strategy.

The primary means for gathering community input for the Housing Strategy were a series of community forums sponsored by the Portland Housing Bureau in the latter half of 2014.[27] To help reduce the barriers to participating, food, childcare, and interpretation were made available.[28] Residents who did not feel comfortable sharing openly in the forum setting could provide written feedback via comment cards.[29] The Portland Housing Bureau also provided residents with the opportunity to contribute via email.[30]

Informal and less traditional methods were also used to reach residents, including canvassing. Faith leaders played a major role in outreach efforts, given their on-going relationships with impacted community members.[31]  Outreach also targeted areas of the city where residents displaced from the area were known to live, to be sure to include their voices.[32]  More than 450 community members ended up participating in the planning process.[33]

### The Scope of the N/NE Portland Neighborhood Housing Strategy

The seven-month community engagement process culminated in the Portland City Council's adoption of the N/NE Neighborhood Housing Strategy in early 2015.[34]  The five-year plan includes a menu of goals, priorities, and programs for spending the $20 million in reallocated TIF

funds towards "addressing the legacy of displacement" in N/NE Portland.[35] The funding is targeted towards serving households making up to 80 percent of the area median income (AMI).

The housing strategy is split into four broad categories, with specific dollar allocations and goals articulated in the housing strategy.

The Portland Housing Bureau is in charge of implementing the N/NE Neighborhood Housing Strategy. The Bureau estimates that the city staff time spent on implementation of the

### N/NE Neighborhood Housing Strategy

**1  Preventing Displacement through Single-Family Home Repair**

Zero percent interest loans of up to $40,000 for critical home repairs for homeowners earning up to 80% AMI

Smaller grants (up to $5,000) for critical home repair for seniors and persons with disabilities who earn up to 50% AMI

**2  Creating New Homeowners**

Increased funding for the City's Down Payment Assistance Loan Program, assisting first-time home buyers earning up to 80% AMI.

Development of new affordable homes for sale in collaboration with community-based organizations.

**3  Creating Rental Homes**

Construction of permanently affordable rental homes including through the redevelopment of city-owned properties, with an emphasis on family-friendly units.

**4  Land Acquisition**

Acquisition of land for permanently affordable housing.

Housing Strategy is the equivalent of two full-time employees.[36]  City staff salaries, along with other administrative costs such as meeting expenses (to cover food, childcare, etc.), are covered by an administrative set-aside in the Interstate Corridor TIF funding.[37]

## Creating Homeownership Opportunities: Portland's Down Payment Assistance Loan Program

The creation of new affordable homeownership opportunities for low-income households with generational ties to the inner neighborhoods of N/NE Portland is a key goal in the N/NE Neighborhood Housing Strategy. The primary tool for pursuing this goal is a down payment assistance loan program, where families making up to 80 percent AMI can apply for a down payment assistance loan of up to $100,000.[38]  The loan is an interest-free second mortgage funded through the Portland Housing Bureau, with repayment deferred until the sale of the home.[39]  The City is also funding nonprofit organizations to create new subsidized homeownership units in Inner N/NE Portland.

So far, the City has struggled to meet the homeownership goals laid out in the N/NE Housing Strategy. As of January 2018, only four families had become homeowners in N/NE Portland through the down payment program and no nonprofit-subsidized homeownership units had been completed yet.[40] The small number of families served is due in large part to the high cost of single-family homes in the area and the inability of low-income families on the waiting list to qualify for mortgages to cover the purchase price.[41] Out of the hundreds of new affordable units under development in the ICURA for low-income households from 2015 to 2017, only 12 were homeownership units, all of which are being developed by Habitat for Humanity.[42]

## Creating New Rental Housing

To implement the Housing Strategy's goals for creating new affordable rental housing, the Portland Housing Bureau works with a variety nonprofit affordable housing developers and community development corporations to develop affordable units. Since the adoption of the Housing Strategy, at least 350 affordable apartment units in 7 developments had been built or were under development in the ICURA as of mid-2018.[43]

## The N/NE Affordable Housing Preference Policy: Providing Displaced Residents with an Opportunity to Return

An important component of the N/NE Neighborhood Housing Strategy is providing current and former residents priority in accessing the City's housing investments in N/NE Portland, via the N/NE Affordable Housing Preference Policy. As of January 2018, 65 families have been housed in subsidized units in N/NE Portland using the preference policy.[44]

The preference policy, which is available for both homeownership and rental units, is used to determine the order of applicants on waiting lists for affordable housing developments that have been funded with ICURA TIF funds or whose developers agree to participate in the program. The waiting list is maintained by the Portland Housing Bureau. Whenever an affordable housing development comes on line, the Portland Housing Bureau advertises the openings and households apply to receive preference for the housing.

Priority is given first to families who owned property that was taken by the City of Portland through eminent domain for urban renewal projects. For the next tier of priority, applicants are awarded points based on a six-point system based on the location of their residence and whether their parents, guardians, or grandparents lived in the area. Those with the most points are placed on the top of the waiting list.

### Summary of N/NE Portland Preference Policy



A color-coded map delineates the areas where addresses qualify for one, two, or three points.[47] Qualifying for a preference does not guarantee eligibility for the affordable housing—applicants must still meet the specific criteria of the program in question.[48]

The chair of the N/NE Portland Community Oversight Committee, Steven Holt, has expressed concerns regarding the marketing and public rollout of the preference policy.[49] Affordable housing programs that utilize the preference policy each have their own specific standards for qualifying incomes that, according to Holt, were not well communicated. Many current and former residents applied for housing openings through the preference policy and received high points for preference, only to find out later that they did not meet the income requirements for the program they applied for. This left many in the community feeling like the City of Portland "pulled a bait and switch."[50]  If the income requirements had been communicated more effectively up front, this source of frustration may have been reduced or eliminated. In order to better address eligibility concerns for housing programs that use the preference policy in the future, the Portland Housing Bureau has committed to actively checking in with applicants to ensure that clear and accurate information about the process is provided.[51]

# Dedication of TIF Funds to Address Displacement in N/NE Portland

City funding for implementing the N/NE Portland Neighborhood Housing Strategy is provided largely through tax increment financing (TIF) from the Interstate Corridor Urban Renewal Area (ICURA). TIF funds generated from the ICURA can only be spent inside its boundaries. See Figure 3. The ICURA is one of Portland's largest TIF funds, covering 3,990 acres. While the City's initial commitment of ICURA TIF funds towards implementation of the Housing Strategy was $20 million, the City has since committed a total of $100 million over a six-year period (Fiscal Years 2015-16 to 2020-21) towards affordable housing and mitigating displacement in the ICURA.[52]



Source: Portland Housing Bureau

The history of using TIF funds for affordable housing in Portland goes back to at least 2006, when the Portland City Council adopted an ordinance requiring at least 30 percent of all funds from the City's nine TIF funds be redirected towards affordable housing in the boundaries of the TIFs, for households making up to 80 percent AMI. The amount of ICURA TIF funds dedicated towards affordable housing in N/NE Portland was increased by $20 million in 2014, with those funds targeted specifically towards implementation of the community-driven N/NE Neighborhood Housing Strategy and with oversight by the N/NE Community Oversight Committee (see below for further discussion of the Oversight Committee).

Eventually, additional TIF funds from the ICURA were dedicated towards affordable housing in N/NE Portland. In 2015, the Portland City Council increased the city-wide set-aside for affordable housing from TIF funds from 30 percent to 45 percent—what became known as the "TIF Lift."[53] The TIF Lift resulted in an additional allocation of $67 million in TIF funds for affordable housing across the city, including $32 million from the ICURA TIF for N/NE Portland. Finally, in 2017, the

North/Northeast Portland Community Development Initiative was created in the ICURA, to guide the investment of the remaining $32 million in ICURA TIF funds towards community development in the area, with $5 million going towards affordable housing in the form of grants and loans for homeowner repairs, down payment assistance, and loans for construction of accessory dwelling units. See below for a further discussion on the Community Development Initiative.

Of the $100 million that will be invested in affordable housing in N/NE Portland from 2015 to 2022, the bulk of funds are budgeted to be spent during fiscal years 2017 and 2018, with $25 million budgeted to support affordable rental housing development, and $19 million budgeted to support new affordable homeownership opportunities.

## The Community Oversight Committee: Providing On-Going Transparency and Accountability

One big question that emerged often during the community forums for developing the N/NE Neighborhood Housing Strategy was how the plan would be any different from other plans in terms of ensuring transparency, accountability, and follow through by the city.[54]  These concerns led to the development of the N/NE Portland Community Oversight Committee (Oversight Committee).

The Oversight Committee is an advisory group with 9 members who include community leaders and relevant subject matter experts (affordable housing, law, financing, civil rights, etc.). At least one committee member must be a beneficiary of an affordable housing program.[55]  Nominations to serve on the committee are made by the City's Housing Commissioner and Oversight Committee chair.[56]

The Oversight Committee meets every other month in open meetings and strives to fulfill a commitment to offering "the greatest possible access and opportunity for participation to those members of the community who have historically been disconnected and excluded from public participation."[58] Meeting locations are chosen to be as accessible and equitable as possible to members of the community, and free meals are provided.[59] Meetings are recorded on video and audio for community members who cannot attend in person and distributed on cable access and the N/NE Housing Strategy website. Community members can request to get on the agenda for any Oversight Committee meeting, and every meeting allots time for community responses to agenda items.[60]

### N/NE Portland Community Oversight Committee

The scope of the Oversight Committee Includes the following:

- **Review proposals and plans** for developments that use the $100 million in ICURA TIF funding for affordable housing.

- **Monitor the City's implementation** of the N/NE Neighborhood Housing Strategy, tracking outcomes, and issuing annual reports.

- **Advise the City's Housing Director and Housing Commissioner** on progress, issues, and concerns associated with the N/NE Neighborhood Housing Strategy and particular projects.[57]

The Oversight Committee does not have any binding decision-making power. Rather, the committee provides recommendations to the Housing Commissioner, the Mayor, and City Council, depending on who the decisionmaker is on a particular project. Even if those decisionmakers had not been responsive to the Oversight Committee's recommendations, the committee provides an additional layer of transparency and accountability to clearly-articulated community input—a layer of oversight that had not existed before.[61]

The Oversight Committee's role in providing input on all projects related to the Housing Strategy has been a powerful one. Although the Portland Housing Commissioner (or City Council, depending on the size of the project) has the final say on any project, any project using city funds related to the Housing Strategy must receive input from the Oversight Committee, and developers must articulate in their proposals how the project will serve the goals of the Housing Strategy.[62]

An example of the Oversight Committee's value is the North Williams Center affordable housing development. When BRIDGE Housing presented its development proposal to the Oversight Committee, the committee expressed concern over the lack of community input in the process, the absence of family-sized units, and design elements.[63] BRIDGE was responsive and ended up providing more opportunities for community input and bringing the development more in line with community needs.[64]

The makeup and drive of the Oversight Committee's members and leaders has been an important aspect of the committee. Much of the advocacy, transparency, and community participation that the committee has fostered goes above and beyond what is written into its charter. A Portland Housing Bureau staffer cites a case where the Oversight Committee made one recommendation, but the Housing Commissioner recommended the opposite course of action.[65]  Even after the recommendation process was over, the Oversight Committee chair, Steven Holt, advocated the Oversight Committee's position directly with the Housing Commissioner and eventually convinced the commissioner to alter his recommendation to better support the community vision.[66]

# Prosper Portland & the Community Development Initiative

Portland's approach of incorporating community input, oversight, and a strong social and racial equity lens into the N/NE Neighborhood Housing Strategy has since been used in other programs. In 2016, when Prosper Portland, the city's economic and urban development agency, created the Community Development Initiative (CDI) to guide the expenditure of the remaining $32 million in uncommitted ICURA TIF funds through 2021, the City solicited guidance from community members for developing an action plan on how to spend the funds, interviewing 35 stakeholders and holding two community forums, which had a combined attendance of approximately 200 community members.[67]

The CDI action plan was developed with the specific goal of growing economic prosperity for African-American residents and other residents of color that had not fully participated in or benefited from past ICURA projects.[68] The plan divides the $32 million into five investment strategies.

The City established an oversight committee modeled on the Community Oversight Committee for the N/NE Neighborhood Housing Strategy, tasked with ensuring that the implementation of the CDI action plan is in line with the values and goals of the community articulated in the plan.[70] The CDI oversight committee met once a month in 2017 and has now shifted to quarterly meetings. The 15 members of the



**Community Development Initiative for N/NE Portland—Investment Strategies**

**$10.7 million** — Promote Property Ownership and Redevelopment

**$9.3 million** — Support Business Ownership and Growth

**$5 million** — Invest in New and Existing Homeowners

**$2.5 million** — Advance Community Livability Projects

**$4.5 million** — Catalyze Cultural-Business Hubs [69]

committee serve annual terms, which can be renewed at the discretion of Prosper Portland and the project advisory committee.[71]

One of the five CDI investment strategies, $5 million for "Investing in New and Existing Homeowners," is managed by the Portland Housing Bureau instead of Prosper Portland, with investments reviewed by the N/NE Community Oversight Committee.[72] This funding is part of the $100 million in ICURA funding discussed above that is being invested towards mitigating residential displacement in N/NE Portland. The $5 million in CDI funding for new and existing homeowners includes funding for:

- Down payment assistance loans for new homeowners ($1.6m; goal: 20 households);
- Accessory dwelling unit loan program ($1.6m; goal: 40 households); and
- Home repairs of up to $40,000 ($1.8m; goal: TBD).

Whereas the Neighborhood Housing Strategy serves residents and families making up to 80 percent of the area median income (AMI), the CDI funds are targeted for residents making between 80 and 120 percent AMI.[73] This targeting filled an identified gap in the housing market.[74]

The Community Development Initiative is still a new program and recently released its first annual progress report, for 2017. The CDI's housing goals are lagging behind, with no residents having been served in 2017 through the down payment assistance or Accessory Dwelling Unit Loan programs.[75] In the slightly more successful home repair program, three households had been served out of a five-year goal of 40 (more than 326 owner-occupied units have been repaired in total with ICURA funds since 2015, including the ICURA TIF funds allocated directly towards the N/NE Neighborhood Housing Strategy).[76] According to city staff, the re-strategizing of the ICURA TIF funds towards the implementation of the N/NE Neighborhood Housing Strategy and the Community Development Initiative have increased coordination between the two city departments—Prosper Portland and the Portland Housing Bureau—overseeing the funds.[77]

## Mitigating Displacement of Tenants through a New Tenant-Protection Ordinance

In 2016, the City of Portland adopted a new citywide tenant-protection ordinance, which does not target N/NE Portland but does help address concerns raised in N/NE Portland and other Portland neighborhoods about displacement pressures on Portland's renters from rising rents.[78] The new ordinance requires landlords to pay from $2,900 to $4,500 in relocation assistance to tenants (depending on the number of bedrooms) when

### Portland Tenant Relocation Ordinance



**$2,900 - $4,500**
amount landlords covered by tenant protection ordinance must pay tenants if they:

- Increase rent by 10% or more within 12-month period
- Serve tenant with a no-cause eviction notice
- Make substantial changes in the lease terms, or refuse to renew lease unless meet exception in ordinance

their rents are increased by more than 10 percent over a 12-month period. Landlords must also provide tenants with at least 90 days-notice of rent increases. A tenant has six months from the effective day of the rent increase to either pay back the relocation assistance and remain in the unit by paying the increased rent, or provide the landlord with a notice to terminate the rental agreement.

The following additional landlord actions trigger the same financial assistance and 90-day notice requirements for rent increases:

- Service of a no-cause eviction notice (a landlord can evict a tenant only for reasons listed in the ordinance);
- Substantial changes in lease terms; and
- Refusal to renew the lease.[79]

Certain types of housing units and landlords are exempt from the ordinance, including dwelling units occupied by the landlord and units which are the landlord's principal residence rented on a temporary basis.[80]  Soon after the ordinance was adopted, a group of landlords challenged the law in state court, arguing that the law violated the state's ban on rent control. The court upheld the ordinance, and the ruling is now on appeal.[81]

## Lessons Learned

The City of Portland and leaders in North and Northeast Portland have worked together to create an innovative range of strategies to address gentrification and displacement in historically African-American neighborhoods in the area. Here are some of the major takeaways from their work for communities facing similar struggles:

1. **Develop a community-driven, comprehensive, neighborhood-level strategy to address residential displacement for vulnerable residents.** Align the strategy with community needs, be clear about goals, and be transparent in assessing outcomes. The N/NE Portland Neighborhood Housing Strategy, developed with robust community input, provides specific targets, strategies, and goals to address displacement in a defined geographical area. Having a specific plan also allows for greater accountability and oversight over a city's progress towards addressing displacement.

2. **Back community-driven strategies with substantial levels of dedicated funding.** Affordable housing preservation at a scale large enough to be meaningful requires large levels of dedicated funding—ideally funding that does not come out of a city's general fund and is not subject to annual budget battles. The City of Portland is funding implementation of the N/NE Portland Neighborhood Housing Strategy with $100 million in tax increment financing generated from the Interstate Corridor Urban Renewal Area (ICURA)—funding that is appropriated outside the City's general revenue fund. The dedicated funding, which will be spent over a six-year period until the ICURA expires, averages $17 million a year.

3. **Plan for affordable housing preservation early on.** In N/NE Portland, as elsewhere, the shift from the need for revitalization to the need for anti-displacement measures occurred quickly. If a city puts substantial money into development and revitalization in an area, it should plan for affordability preservation upfront, rather than reacting to this need later on.

4. **Revamp programs that are accelerating displacement to instead mitigate displacement.** When a city's programs are contributing to the displacement of vulnerable residents, the city needs to act quickly to adopt robust strategies to address the displacement. In N/NE Portland, after the community spoke out against TIF-funded redevelopment projects causing displacement, the city redirected TIF funding towards a comprehensive anti-displacement strategy.

5. **Prioritize meaningful community participation.** Take it seriously. This requires an assertive effort to reduce barriers to participation and reach out to directly impacted residents, including those who have already been displaced. Community voices should be incorporated into every step of the planning process. Portland's focus on affordable housing and mitigating displacement in N/NE Portland is anchored by meaningful input from community members, and the City has dedicated time and resources to reducing barriers to participation, including providing food and childcare services. Community leaders also focused on reaching out to displaced residents using churches and other networks.

6. **Incorporate community-responsive oversight into mitigation displacement and affordable housing preservation plans.** An oversight committee provides critical transparency and accountability in strategy implementation and outcomes. Oversight leadership should be trusted and well respected by the community and responsive to the community's needs. The N/NE Community Oversight Committee in Portland plays a key role in the implementation of the N/NE Neighborhood Housing Strategy, highlighting the program's successes and failures in support of better future outcomes. Annual reviews by the committee illuminate what about the plan is and is not working, and oversight over specific development projects and programs helps ensure their alignment with community needs.

7. **Identify community leaders who are trusted and well-respected by the community.** The selection of who participates in oversight and leadership roles is extremely important to the success of a displacement mitigation program. In N/NE Portland, community leader Steven Holt has been a central figure in the success of the Neighborhood Housing Strategy, advocating for transparency and alignment with community goals throughout the entire process, working with the City to create meaningful community participation, facilitating the forums, and serving as Oversight Committee Chair.

8. **Affordable homeownership for low-income families is difficult to achieve in hot market neighborhoods and, when large public subsidies are needed, cities should consider enacting mechanisms early on to ensure the units remain affordable for the long term.** To make homeownership affordable in markets where median housing prices vastly exceed median family incomes, cities have to be willing to support the units with very large subsidies. The down payment assistance program in N/NE Portland continues to struggle. As of January 2018, the program had helped only four families become homeowners.[82] With housing prices in the area already so unaffordable, the subsidy provided by the program has still not been enough to help low-income homeowners afford homeownership, even after being increased from $60,000 to $100,000.[83] The need for large subsidies also raises the importance of ensuring that those investments create long-term benefits for the community as it gentrifies, including future residents, through policies such as community land trust or long-term resale price cap restrictions—unless the primary goal of a homeownership program is a racial justice/reparation-oriented one, giving forcibly displaced persons of color the opportunity to return and build the same level of equity as other residents. It is unclear whether the City of Portland is putting the programs and policies in place to ensure long-term affordability with its large homeownership investments in N/NE Portland.

9. **The success of a preference policy depends on the availability of subsidized affordable housing stock, community outreach, and education.** While a preference policy that prioritizes affordable housing for displaced residents and residents vulnerable to displacement may sound good on paper, the policy will not serve many residents absent the availability of units the residents can afford—and residents must know about the program and how to qualify. A preference policy does not in itself create affordable housing units for displaced residents. Portland's preference policy has served so few residents seeking affordable homeownership in large part because there are so few homes available that the residents can afford and obtain a mortgage for, even with deep down payment subsidies.

# Conclusion

While Portland's focus on providing long-time, African-American residents with the opportunity to stay and return to the inner neighborhoods of North and Northeast Portland is still relatively new, the on-going work in N/NE Portland offers many lessons for other communities seeking to mitigate the displacement of vulnerable residents. Portland's strategies and programs stand out for their community-centered focus, large levels of financial backing from the city, and the emphasis on providing on-going transparency and accountability to the community. The N/NE Community Oversight Committee in particular has developed a successful track record of providing transparency and accountability to the City's affordable housing programs and preference policy in N/NE Portland, closely monitoring the programs' outcomes, and identifying barriers and challenges as well as opportunities for improvement.

Portland's dedication to providing displaced residents with the opportunity to return to their communities, via the N/NE Affordable Housing Preference Policy, is innovative and has the potential to serve as a national model, as least for families seeking affordable rental housing. For neighborhoods that have experienced large levels of property appreciation, the goal of providing displaced residents with access to affordable homeownership has proven to be much more difficult to fulfill.

# Endnotes

[1] Kirchmeier, Mark, and Raymond, Camela, "Long history of bias forces blacks from N/NE Portland," Portland Tribune, June 8, 2017, https://portlandtribune.com/pt/9-news/362214-241151-long-history-of-bias-forces-blacks-from-n-ne-portland.

[2] Based on 2010 census tracts from U.S. Census comparability data 2000-2010, SE: T54.Hispanic Origin by Race; American Community Survey, 2012-2016 5-year estimates; Table SE: T14.Hispanic Origin by Race, Census tracts 22.03, 23.03, 24.01, 24.02, 25.01, 31, 32, 33.01, 33.02, 34.01, 34.02, 36.01, 36.02, 37.02, Portland, OR.

[3] American Community Survey 2012-2016, Social Explorer, Table SE:T1, "Total Population," Table SE:T3, "Land Area (Sq. Miles), Portland, OR. The Albina neighborhoods of Inner North/northeast Portland are a subset of this area.

[4] Portland Housing Bureau, "Displacement in North and Northeast Portland – An Historical Overview," at 1, https://www.portlandoregon.gov/phb/article/655460.

[5] Gibson, Karen, "Bleeding Albina, a History of Community Disinvestment, 1940-2000," Transforming Anthropology 15(1):3-25, Apr. 2007. Sources vary in which neighborhoods they consider to constitute the Albina District. See, e.g., "Albina area (Portland)," Oregon Encyclopedia, https://oregonencyclopedia.org/articles/albina_area_portland_/#.WzlX0i2ZNbU.

[6] Ackerman, Lauren, "Albina, Portland (1870- )," Black Past, http://www.blackpast.org/aaw/albina-portland-1870.

[7] Portland Housing Bureau, "Displacement in North and Northeast Portland – An Historical Overview," at 2, https://www.portlandoregon.gov/phb/article/655460.

[8] Ackerman, "Albina, Portland (1870- )," note 6, supra.

[9] Portland Housing Bureau, "Displacement in North and Northeast Portland – An Historical Overview," note 7, supra, at 2.

[10] SanFilippo, Edward J., "King, Portland, Oregon: A Neighborhood in Transition," at 4, http://kingneighborhood.org/wp-content/uploads/2014/07/King-Neighborhood-Edward-J.-SanFilippo.pdf.

[11] U.S. Census 1990 in 2010 census geographies, Social Explorer, Table SE:T12, "Hispanic Origin By Race"; US Census 2000 in 2010 census geographies, Social Explorer, Table SE:T54, "Hispanic Or Latino By Race," Census tracts 22.03, 23.03, 24.01, 24.02, 25.01, 31, 32, 33.01, 33.02, 34.01, 34.02, 36.01, 36.02, 37.02, Portland, OR.

[12] "Interstate Corridor," Prosper Portland, https://prosperportland.us/portfolio-items/interstate-corridor/.

[13] Rogers, Jules, "A new plan for Interstate Corridor," Portland Tribune, Jan. 24, 2017, https://pamplinmedia.com/pt/9-news/341456-221189-a-new-plan-for-interstate-corridor.

[14] See Figure 3 for the boundaries of the Interstate Corridor Urban Renewal Area.

[15] Hannah-Jones, Nikole, "In Portland's heart, 2010 Census shows diversity dwindling," The Oregonian, Apr. 30, 2011, https://www.oregonlive.com/pacific-northwest-news/index.ssf/2011/04/in_portlands_heart_diversity_dwindles.html.

[16] U.S. Census, Social Explorer, Table SE:T55, "Hispanic Or Latino Origin By Race," Census tracts 22.03, 23.03, 24.01, 24.02, 25.01, 31, 32, 33.01, 33.02, 34.01, 34.02, 36.01, 36.02, 37.02, Portland, OR.

[17] U.S. Census 2000, Social Explorer, Table SE:T163, "Median House Value For All Owner-Occupied Housing Units," Census tracts 33.01, 33.02, Portland, OR; ACS 2016 (5-year estimates), Social Explorer, Table SE:T101, "Median House Value for All Owner-Occupied Housing Units," Census tracts 33.01, 33.02, Portland, OR.

[18] Theriault, Dennis C., "A Leap of Faith," The Portland Mercury, April 7, 2018, https://www.portlandmercury.com/portland/a-leap-of-faith/Content?oid=15109659

[19] Social Explorer tables: Census 2000-2010 Comparability Data (SE): Race, Black or African-American alone, Census tracts 23.03, 24.01, 24.02, 25.01, 25.02, 31, 32, 33.01, 33.02, 34.01, 35.01, 36.01, 36.02, 37.01, 37.02, 38.01, 38.02, 38.03, 39.01, 39.02, Portland, OR.

[20] Theriault, "A Leap of Faith," note 18, supra.

[21] The Portland African American Leadership Forum, "PAALF Letter Regarding Trader Joe's," Dec. 18, 2013, https://www.documentcloud.org/documents/929379-paalf-letter-regarding-trader-joes.html.

[22] Ibid.; Associated Press, "Trader Joe's drops black-neighborhood store plan," Yahoo News, Feb. 3, 2014, https://www.yahoo.com/news/trader-joe-39-drops-black-neighborhood-store-plan-224732374.html

[23] Theriault, "A Leap of Faith," note 18, supra.

[24] American Community Survey, 2012-2016 5 year estimates, Social Explorer, Table SE:T14. Hispanic Or Latino Origin By

Race, Census tracts 22.03, 23.03, 24.01, 24.02, 25.01, 31, 32, 33.01, 33.02, 34.01, 34.02, 36.01, 36.02, 37.02, Portland, OR.

[25] American Community Survey 2012-2016, Social Explorer, Table SE:T14, "Hispanic or Latino by Race," Portland, OR.

[26] Holt, Stephen, telephone interview, Feb. 22, 2018.

[27] Portland Housing Bureau, North/Northeast Neighborhood Housing Strategy, "Community Forum Summary," at 2, https://www.portlandoregon.gov/phb/article/652858.

[28] Goodlow, Leslie, telephone interview, Apr. 2, 2018; Holt interview, note 26, supra.

[29] Goodlow interview, note 28, supra; Holt interview, note 26, supra.

[30] Goodlow interview, note 28, supra; Holt interview, note 26, supra.

[31] Goodlow interview, note 28, supra.

[32] *Ibid.*

[33] Theriault, "A Leap of Faith," note 18, supra. The input from the forums was summarized in: North/Northeast Neighborhood Housing Strategy, "Community Forum Summary, https://www.portlandoregon.gov/phb/article/652858."

[34] Portland Housing Bureau, "North/Northeast Neighborhood Housing Strategy Executive Summary," https://www.portlandoregon.gov/phb/article/655457.

[35] Portland Housing Bureau, "N/NE Neighborhood Housing Strategy," https://www.portlandoregon.gov/phb/72705.

[36] Goodlow interview, note 28, supra.

[37] *Ibid.*

[38] Portland Housing Bureau, North/Northeast Neighborhood Housing Strategy, Down Payment Assistance Loan Program (DPAL Program), "Eligibility & Terms," Sept. 11, 2017, https://www.portlandoregon.gov/phb/article/653339.

[39] *Ibid.*

[40] Portland Housing Bureau, North/Northeast Neighborhood Housing Strategy, "Oversight Committee Annual Report 2017," at 18, https://www.portlandoregon.gov/phb/article/681514.

[41] *Ibid.*, at 10.

[42] *Ibid.*, at 9.

[43] This data comes from the N/NE Housing Oversight Committee Annual Reports (2015 to 2017) and numerous online sources to confirm which developments were still in active development or had been completed.

[44] Oversight Committee Annual Report 2017, note 40, supra, at 9.

[45] Portland Housing Bureau "Frequently Asked Questions," Feb. 5, 2018, https://www.portlandoregon.gov/phb/article/671059.

[46] *Ibid.*

[47] Portland Housing Bureau, "N/NE Preference Policy Maps," https://www.portlandoregon.gov/phb/article/656409.

[48] Portland Housing Bureau, "Supplemental Information: N/NE Affordable Housing Preference Policy, https://www.portlandoregon.gov/phb/article/653971.

[49] Holt interview, note 26, supra.

[50] *Ibid.*

[51] Callahan, Shannon, Memo to the N/NE Neighborhood Housing Strategy Oversight Committee regarding the 2017 N/NE Neighborhood Housing Strategy Oversight Committee Annual Report, May 3, 2018, https://www.portlandoregon.gov/phb/article/683202.

[52] Portland Housing Bureau, "N/NE Neighborhood Housing Strategy," https://www.portlandoregon.gov/phb/72705; Portland Housing Bureau, "Requested Budget Year 2017-18," Jan. 30, 2017, at 88, https://www.portlandoregon.gov/phb/article/652810.

[53] City of Portland, "HOU-1.06 – Affordable Housing Tax Increment Financing Set Aside Policy," https://www.portlandoregon.gov/citycode/article/155330.

[54] Neighborhood Housing Strategy Executive Summary, note 34, supra, at 1.

[55] Portland Housing Bureau, "Portland Housing Bureau North and Northeast Portland Housing Strategy Community Oversight Committee Charter," Mar. 17, 2015, https://www.portlandoregon.gov/phb/article/659902.

[56] *Ibid.*

[57] Portland Housing Bureau, North/Northeast Neighborhood Housing Strategy, "Oversight Committee Annual Report 2016," https://www.portlandoregon.gov/phb/article/652837.

[58] Oversight Committee Annual Report 2017, note 40, supra, at 4.

[59] Holt interview, note 26, supra.

[60] *Ibid.*

[61] *Ibid.*

[62] *Ibid.*

[63] Oversight Committee Annual Report 2017, note 40, supra, at 8.

[64] *Ibid.*

[65] Goodlow interview, note 28, supra.

[66] *Ibid.*

[67] Prosper Portland, "North/Northeast Community Development Initiative Action Plan," Jan. 2017, https://prosperportland.us/wp-content/uploads/2016/08/NNECDI-Action-Plan-web.pdf, at 3.

[68] *Ibid.*, at 1, 4.

[69] *Ibid.*, at 5.

[70] *Ibid.*, at 20.

[71] *Ibid.*

[72] *Ibid.*, at 8.

[73] *Ibid.*

[74] Holt interview, note 26, supra.

[75] Prosper Portland, "N/NE Community Development Initiative Progress Report January-December 2017," https://prosperportland.us/wp-content/uploads/2017/04/NNECDI-Annual-Progress-Report-2017.pdf.

[76] *Ibid.*

[77] Goodlow interview, note 28, supra.

[78] City of Portland Code, § 30.01.085C; City of Portland, Office of Commissioner Chloe Eudaly, "Relocation Assistance Fact Sheet," https://www.portlandoregon.gov/eudaly/article/627469; Floum, Jessica, "Portland landlords must pay relocation costs to evict tenants without cause," OregonLive, Oct. 3, 2017, http://www.oregonlive.com/politics/index.ssf/2017/02/portland_landlords_must_pay_re.html; Floum, Jessica, "Portland City Council extends renter protection and 'housing emergency' policies," OregonLive, Oct. 4, 2017, http://www.oregonlive.com/politics/index.ssf/2017/10/portland_city_council_extendpo.html.

[79] Portland Housing Bureau, "Mandatory Renter Relocation Assistance," https://www.portlandoregon.gov/phb/74544.

[80] *Ibid.*

[81] VanderHart, Dirk, "Landlords Just Failed in Their Attempt to Dismantle Portland's Renter Relocation Law," The Portland Mercury, July 7, 2017, https://www.portlandmercury.com/blogtown/2017/07/07/19147618/good-news-for-tenants-portlands-renter-relocation-ordinance-is-legal-a-court-rules.

[82] Oversight Committee Annual Report 2017, note 40, supra, at 15.

[83] *Ibid.*

# APPENDIX 5

Property Tax Relief Tools for Austin's Vulnerable Homeowners

# Background

A widespread concern of homeowners in Austin is the burden of rising property taxes, which for many households outpace increases in income. Homeowners in Austin have the eighth highest property tax burden on homesteads in the country—and the highest tax burden in the country out of non-coastal cities.[1] While rising property taxes impose a heavy burden on many homeowners in Austin, homeowners who are the most vulnerable to displacement from rising property taxes are those with the lowest incomes living in the most rapidly appreciating neighborhoods.

Property tax burdens are especially heavy in Austin, centered in one of the fastest growing regions in the county and in a state like Texas that does not have an income tax and—as a result of recapture rules built into school finance law—relies on large and growing contributions of local school taxes from property wealthy school districts. Austin Independent School District sends more than $500 million of its property tax revenue to the state—$1,378 per year for the typical homeowner, an amount that exceeds what homeowners of a median value home pay towards city taxes.[2] Unfortunately, the Texas Legislature has limited cities' ability to target tax relief towards lower-income homeowners. But as outlined below, there are some concrete actions the City of Austin can take to help vulnerable homeowners in gentrifying neighborhoods with their property taxes.

### Homeowners in gentrifying neighborhoods hit the hardest

Homeowners who fall behind on their property taxes in Austin are concentrated most heavily in Austin's gentrifying zip codes. Of the 956 homeowners in Austin with a homestead exemption and two or more years of delinquent taxes, the heaviest concentration is in Central East Austin and the neighborhoods just south of Ben White on the westside of IH-35 (see Figure 1). Thirty percent of the homeowners with property tax delinquencies have a senior exemption on their homestead, while the other 70 percent have a homestead exemption but not a senior exemption (see below for a further discussion on homestead exemptions).[3]

### Austin Homeowners with Homestead Exemptions and Property Tax

| Type of Homestead Exemption | # w/ Tax Delinquencies of 2+ Years | % w/ Tax Delinquencies of 2 + Years |
|---|---|---|
| General Homestead Exemption (includes households w/ senior exemption) | 956 | .32% of all homeowners in Austin |
| Senior Exemption | 287 | .54% of all senior homeowners in Austin |

### Impact on seniors

Even with a homestead exemption and the benefit of a tax freeze on school district taxes for seniors, many low-income homeowners who are 65 and older are still having a hard time paying their taxes. As shown in the table above, Austin's seniors have a greater rate of tax delinquency than non-senior households. The East Austin Conservancy reports that the low-income seniors it serves, even with the benefits of having a senior exemption, are experiencing heavy tax burdens as a result of a doubling of county and city taxes over less than a decade. According to a recent study by the Conservancy, which tracked property taxes from 2006 to 2015 for 12 of the Conservancy's

clients, the city's property taxes increased by at least 100 percent for all of the owners, and by 200 percent for 5 of the 12 owners.



Rising Property Tax Burdens for **12 Senior Homeowners** in East Austin from 2006 to 2015

Source: East Austin Conservancy

**Texas law restricts cities from providing targeted property tax relief**

Texas law provides for a number of tax relief policies specifically targeted towards lowering the property tax burdens of homeowners. As an additional protection, seniors and persons with disabilities can defer their property taxes until they die or sell their homes, facilitating their ability to stay in their homes in the face of rapidly appreciating property values.

Despite these protections, Texas law heavily restricts what cities and other taxing entities can do to provide additional tax relief to homeowners who fall outside these classes of homeowners or need additional assistance. In contrast, several other states around the country provide taxing entities with tools to provide more targeted property tax relief to low-income homeowners, such as through circuit breakers, which reduce a household's taxes when the property taxes exceed a certain percentage of the household's income.

## Existing Policy Tools And Barriers For Providing Property Tax Relief To Vulnerable Homeowners

The following is a summary of the key tools being utilized in Austin to help homeowners with their property taxes, barriers with using these tools to assist vulnerable homeowners, and opportunities not restricted by state law for expanding property tax relief for vulnerable homeowners in Austin. Note that the policies discussed here benefit homeowners and not renters in Austin, and homeowners in Austin are on average much wealthier than renters.[4]  A criticism of utilizing some of the policies below is the negative impact they would have on renters, who constitute more than half of Austin's households, by shifting a larger portion of property taxes to apartments and other non-homestead properties. Studies have shown that increases in property tax rates contribute to residential rent increases.[5]

➤  **Homestead Exemptions**

Texas law provides for a variety of partial and total exemptions from property taxes on a homeowner's primary residence. Properties with a residence homestead exemption are also subject to a 10 percent cap whereby, each year, increases to the taxable value of a homestead are capped at 10 percent of the appraised value from the prior year.

An exemption, depending on how it is structured, removes either a fixed dollar or a percentage amount of a property's appraised value from taxation. The three most common exemptions for homeowners in Texas are: (1) the general residence homestead exemption; (2) the senior and

disability exemption, which is available to homeowners 65 or older or with a qualifying disability; and (3) the disabled veterans exemption. The Texas Tax Code mandates certain levels of exemptions, while giving local taxing units limited discretion to adopt additional tax exemptions for certain classes of homeowners.

As far as educating homeowners about exemptions, the Travis Central Appraisal District and the Travis County Tax Assessor-Collector office have been teaming up each year to lead 25 town halls in the community on property taxes, including exemptions. The appraisal district also sends information about the exemption via post cards every fall to single family home addresses without a homestead exemption, along with a copy of the exemption application in April when tax appraisals are mailed. When sending out property tax bills, the Travis County Tax Assessor-Collector does not include any information about property tax exemptions. The postcards and other materials sent in the mail are all in English without any Spanish translation.

**Residence homestead:** School districts in Texas must offer a $25,000 exemption on residence homesteads. Each taxing unit (school district, cities, counties, etc.) has authority to offer a separate residence homestead exemption of up to 20 percent of a property's appraised value, with a baseline exemption of at least $5,000. Taxing units are barred from adopting an additional flat dollar exemption. The percentage exemption has been heavily criticized for favoring higher wealth households. Prior attempts at the Texas Legislature to allow cities to adopt a flat dollar exemption have failed. The City of Austin adopted a six percent residence homestead exemption in 2015 and increased the exemption to eight percent in 2016, which heavily favors wealthier households.

### Tax Savings from Austin's residence homestead exemptions

| Appraised home value (2017 tax rates) | Annual Tax Savings from Austin's **8% residence homestead exemption** | Annual Tax Savings from Austin's **$85,500 exemption** for seniors/persons with disabilities |
|---|---|---|
| $150,000 | **$52** | **$380** |
| $2,000,000 | **$712** | **$380** |

**Senior and disability exemptions:** On top of the residence homestead exemption, school districts must offer an additional $10,000 exemption for persons who are 65 or older and persons with disabilities. Each taxing unit has authority to offer an additional homestead flat dollar exemption of at least $3,000 for seniors and persons with disabilities. This exemption is applied on top of the percentage residence homestead exemption. In 2017, the City of Austin increased to $85,500 the amount of its exemption for seniors and persons with disabilities. The flat dollar exemption is more equitable than the percentage exemption.

If a homeowner's date of birth is included on a prior homestead exemption application or appears in the Texas Department of Transportation's personal identification or driver's license records, the appraisal district is required to automatically extend the senior exemption to a homeowner with a resident home exemption.[6] If the date of birth does not appear in either of these records, then a homeowner must proactively apply for the senior exemption. According to the Travis Central Appraisal District, if an applicant did not include her driver's license number in the original application, it is sometimes impossible to match up a person's homestead exemption records with the Department of Transportation records.

## Optional Homestead Exemptions Available for City Property Taxes

| Type of Homestead | Amount of Exemption | Current Austin Policy |
|---|---|---|
| 65 and older or disabled | any fixed dollar amount of at least $3,000 | $85,500 |
| Residence homestead | any percent amount up to 20% | 8% (increased to 10% effective FY 2018-2019) |

**Barriers for Accessing Homestead Exemptions**

The following are the primary barriers we identified for homeowners accessing a homestead exemption:

- **Lack of awareness of eligible homestead exemptions.** Advocates reported to us that some low-income homeowners who are eligible for an exemption fail to apply for the exemption because of lack of awareness about the exemption or how to apply, especially when the household has limited English proficiency. Around ten years ago, the local nonprofit PODER partnered with the Travis Central Appraisal District to identify likely homeowners without an exemption, and close to 800 households were on the list. Further research would be useful to understand the extent to which eligible homeowners in Austin currently do not have an exemption, as well as which seniors, persons with a disability, and disabled veterans do not have the senior/disability/disabled veterans exemptions.

- **Failure to qualify because of undocumented immigration status.** Homeowners with undocumented immigration status are ineligible to qualify for a homestead exemption, as a result of a 2011 state law requiring an applicant for a homestead exemption to have a Texas driver's license or state-issued identification card, which are only available to persons with legal immigration status.

- **Heirs property.** When applying for a homestead exemption, the applicant must be listed as the owner in the deed records. Homeowners who have inherited their home without a will (also known as an "heirs property" owners, which is a common form of ownership among African-Americans and Hispanics in older neighborhoods) face large hurdles in qualifying for the residence homestead exemption, since their title interest is not recorded in the deed records. The Travis Central Appraisal District's practice is to tell owners who have inherited their property to seek legal assistance for help qualifying for the exemption. The Appraisal District reports it is unable to refer applicants to legal aid or pro bono services in Travis County. Even though state law provides that heirs property applicants who are 65 or older or disabled can certify on the exemption application that they are the co-owner, the local legal aid office reports that the Appraisal District disallows some applicants from relying on the affidavit.

- **Manufactured home owners.** Homeowners who own their land and live in an older, used manufactured home face additional barriers in obtaining a property tax exemption. To obtain an exemption on the land, the household must have proof of ownership for the manufactured home, but titles to older manufactured homes are often clouded and require legal counsel to help clear.

➤   **Tax Freeze for Seniors and Disabled Owners**

Texas law provides homeowners who have a senior or disability exemption with an automatic tax freeze on the amount paid for school district taxes. With a tax freeze in place, once a homeowner qualifies for a senior or disability exemption, the school district taxes will never increase unless improvements (other than normal repairs or maintenance) are made to the home. Cities, counties, and junior college districts have the authority to adopt a similar tax ceiling.[7]  The ceiling can be adopted by the taxing unit's governing body or by petition and election of the citizens in the taxing unit.[8] Austin has not adopted a tax freeze for seniors or persons with disabilities.

➤   **Tax Deferrals**

Taxpayers with a senior, disability, disabled veteran, or surviving spouse/child of disabled veteran exemption are allowed to defer the payment of taxes on their homes until they die or no longer live in the home. When the owner dies, a spouse can continue benefitting from the deferral if the spouse is 55 or older or otherwise qualifies for an exemption.  If the homeowner's children or other heirs live in the home upon the homeowner's death, the deferral is transferred to the heirs if they are also 65 or older, disabled, or otherwise qualify for the deferral. This means that the back taxes do not have to paid until the heirs die or no longer live in the home. Interest on the deferred taxes accumulates at an annual rate of five percent; the interest is also deferred until the home is sold or the owner dies.

When sending out property tax bills and any notices threatening a lawsuit, the Travis County Tax Assessor-Collector includes a statutory-required notice for persons who are 65 or older or disabled about contacting the appraisal district for "any entitlement [they] may have to a postponement in the payment of these taxes."[9] No specific notice about the deferral process is provided. The notices are all in English.

➤   **Tax Relief for Senior Volunteers and Teachers**

The Texas Tax Code (Section 31.035) allows taxing entities to adopt a tax break for seniors who volunteer for the taxing entity. The taxes are offset by each hour the senior volunteers, at a rate based on the federal minimum wage. School districts can also adopt a partial or 100 percent tax break for teachers teaching junior high or high school for the district.

➤   **Payment Plans and Foreclosure Policies**

Under state law, when a person with a homestead interest is delinquent in the payment of taxes, the tax collector is required to enter into a repayment installment plan of 12 to 36 months if the homeowner requests a plan, as long as the homeowner has not entered into a plan in the prior 24 months. Interest accrues at 12 percent a year. Notice of the right to enter into a payment plan must be included in each delinquency notice sent to the homeowner.[10] Within these confines, the tax collector has discretion in structuring payment plans with homeowners who are delinquent and in deciding whether to foreclose on tax delinquent properties.

Property taxes in Austin are collected by the Travis County Tax Assessor-Collector. The current Tax Assessor-Collector, Bruce Elfant, reports that his office will not foreclose on a residential homestead as long as the homeowner continues to make a "good faith" effort to pay down the principal, and that his office will hold a tax sale on a residential homestead only if the owner is making no payments after a foreclosure judgment. According to the legal staff with Texas Rio Grande Legal Aid, which represents low-income homeowners facing foreclosure, the current Travis County Tax Assessor-Collector's office has stricter policies and is less flexible working with homeowners who are behind on their taxes than the office was under the prior Tax Assessor-Collector, Nelda Spears,

which had a policy of not proceeding with tax foreclosure sales on properties with a homestead exemption, and allowed successive 36-month repayment plans with homeowners.

➤ **Abatements**

The Texas Tax Code provides several mechanisms by which a city can grant tax abatements to homeowners and other property owners in a "reinvestment zone." With a tax abatement, the city abates (i.e., waives) the city's property taxes on the increase in the assessed value of a property. A city can provide a partial or full abatement. For example, with a full abatement, if a property's assessed value is $200,000 prior to the creation of a tax abatement agreement, and the assessed value after the agreement is $220,000 (which is the highest possible increase for properties with a homestead exemption, which are subject to a 10 percent cap), the city taxes on the increased value of $20,000 are waived for that year—an annual tax savings of $89. With an abatement, the tax benefits multiply each year as long as property values continue to rise and tax rates stay even. An abatement agreement can last for up to ten years.

### Impact of a 100% City Tax Abatement Agreement for a Home Valued at $200,000[11]



Reinvestment zones to facilitate tax abatements are often set up as part of a tax increment finance district (Chapter 311 of the Tax Code), or through a neighborhood empowerment zone (Chapter 378 of the Local Government Code), but neither are required to create a reinvestment zone. Chapter 312.202 of the Tax Code sets out several criteria an area can meet qualify as a reinvestment zone. These criteria include:

- The zone is located entirely in an area that meets the requirements for federal assistance under 42 U.S.C. Section 5318 (the federal Housing and Community Development Act of 1974). For larger municipalities like Austin, the two most applicable requirements for federal assistance under section 5318 are: (1) the area has at least 10,000 residents or 10 percent of the city or county's population; and (2) at least 70 percent of the residents in the area make less than 80 percent of the city or county's median income, and at least 30 percent of residents fall below the national poverty level.
- The area "substantially arrest[s] or impair[s] the sound growth" of the city, "retard[s] the provision

of housing accommodations," or "constitute[s] an economic or social liability." The area must also "be a menace to the public health, safety, morals, or welfare in its present condition and use" as a result of substandard or deteriorating structures; deterioration of improvements; defective titles; unsafe conditions, or other factors listed in the Tax Code.

- The area is "reasonably likely as a result of the designation to contribute to the retention or expansion of primary employment or to attract major investment in the zone that would be a benefit to the property and that would contribute to the economic development of the municipality."

An area undergoing gentrification is most likely to qualify for tax abatements under the first two criteria when it is in the early stages of gentrification. Neighborhoods in a later stage of gentrification should qualify under the third factor above by extending the abatements, for example, to retain locally-owned businesses in the area, thus meeting the requirements of retaining primary employment in the area and contributing to the economic development of the city.

A municipality awarding abatements must adopt guidelines and criteria for awarding the abatements in a reinvestment zone and enter into a written agreement with owners receiving abatements. The awarding of an abatement is contingent on the owner making specific improvements or repairs to the property, but the state statute does not set forth a minimum level of repairs that must be made.

The abatement agreement must (1) list the proposed improvements being made by the owner, (2) allow for inspections of the property, (3) "limit the uses of the property consistent with the general purpose of encouraging development or redevelopment of the zone" while the abatements are in effect (for example, Fort Worth bars sexually-oriented businesses in its agreements), and (4) require an annual certification that the owner is in compliance with the agreement. Counties and other taxing entities can extend property tax abatements to homeowners by entering into an abatement agreement identical to the city's agreement.

Cities in many parts of Texas offer tax abatements for homeowners, typically tied to the homeowner making a certain level of improvements to the home. As part of a larger abatement program, the City of Fort Worth offers a full five-year abatement to homeowners and investors in single-family homes if they spend at least 30 percent of the appraised value of the homestead on rehabilitation. New construction is also eligible.[12] Fort Worth's abatement program is operated through Neighborhood Empowerment Zones (NEZs) and includes a purpose of creating and rehabilitating affordable housing. As of 2014, Fort Worth had designated more than 20 NEZs in the city.[13] Waco offers a seven-year tax abatement to any homeowner making at least $30,000 in improvements on a home valued at $90,000 or more.

➤ **Community Land Trusts and Property Taxes**

A community land trust (CLT) provides for a significant reduction in property taxes for homeowners living in a CLT home. In a typical community land trust, the land is owned by a nonprofit organization while the home is owned by a low-income family.  The family leases the land from the nonprofit under a long-term ground lease; 99 years is typical.

**Annual Property Tax Savings for CLT Homes in Austin (2017)**



$5,946 taxes on market rate home and land

$3,901 in tax savings home and land worth $300,000

$2,045 taxes on CLT home and land ($25 monthly ground lease fee and resale restriction of $100,000)

There are two primary categories of tax savings for homeowners in CLTs. First, under Section 11.1827 of the Tax Code, a city or county (or both) can elect to give a 100 percent tax exemption from property taxes on land owned by qualified community land trusts. Those tax savings are

passed onto the homeowner. Second, under Section 23.21(c) of the Texas Tax Code, the appraisal district must take into account the resale restrictions in a community land trust when appraising the CLT land and home.

Applying this section of the Tax Code, the Travis Central Appraisal District bases the appraisal of a CLT home on the resale-restricted price contained in the recorded ground lease between the homeowner and the CLT. For example, if the ground lease permanently restricts the resale price in a given year at $100,000, the appraised value of the home for that year is $100,000. The appraised value of the land is based on the income method, taking into account the income that is paid by the homeowner to the CLT under the ground lease and applying a capitalization rate to the present value of that income stream. The annual income on a typical CLT ground lease ranges from $600 to a few thousand dollars a year. Combining these different applications of the Tax Code can save a low-income homeowner in a CLT home thousands of dollars in property taxes each year.

➤ **Taxpayer Assistance**

The East Austin Conservancy provides grant assistance to long-time, low-income homeowners in East Austin who have fallen behind on their taxes, to help them catch up on their tax payments and to slow down displacement. Priority is given to homeowners with less than $3,000 in outstanding tax obligations. To be eligible for more than one year of assistance, the homeowner must develop a personal finance plan, follow the plan, and have either paid at least 50 percent of the prior year's bill or be on a fixed income. The number of families the Conservancy serves is restricted by the donations it raises each year.

# Policy Opportunities for the City of Austin to Provide Tax Relief for Vulnerable Homeowners

Austin does not have a lot of discretion to provide for additional property tax relief for homeowners who are vulnerable to displacement. Here is a summary of the key policy tools that are available, with the pros and cons of the tools following below:

| Summary of Policy Options for Providing Tax Relief to Vulnerable Homeowners |
|---|
| 1. Create and fund a Homestead Preservation Center. |
| 2. Provide city funding for a homestead exemption enrollment program, to sign eligible homeowners up for homestead exemptions including the senior disability exemptions. |
| 3. Create an emergency homestead stabilization fund. |
| 4. Fund a neighborhood stabilization loan program. |
| 5. Adopt a tax abatement program for homeowners. |
| 6. Adopt a freeze on property taxes for homeowners who are seniors or disabled. |
| 7. Increase the City's senior homestead exemption. |
| 8. Adopt the senior volunteer tax break coupled with a senior volunteer program. |
| 9. Partner with the Tax Assessor-Collector to provide targeted notices about the property tax deferral available for seniors, persons with disabilities, and disabled veterans, and provide notices in different languages. |
| 10. Expand use of Community Land Trusts (CLTs) for current homeowners. |

1. **Homestead Preservation Center:** By funding a new Homestead Preservation center, the City of Austin could support education about homestead exemptions and other property rights and responsibilities, targeting services towards vulnerable households in gentrifying neighborhoods who do not have an exemption or are delinquent on their taxes or mortgages. The center could also provide vulnerable residents with financial counseling to help them reduce debt, and with legal assistance to help eligible owners (such as heirs-property owners and mobile home owners, who often do not have an exemption) qualify for homestead exemptions. Another function of the center, which the city could operate through a partnership with a nonprofit, could be proactive outreach to help vulnerable owners negotiate payment plans with the tax collector and mortgage modifications with their lenders.

   o **Examples:** Cleveland (ESOP); Oregon (Homeownership Stabilization Initiative); Affordable Housing Centers of Pennsylvania; New York City Financial Empowerment Centers

   o **Pros:** Relatively low-cost solution to help vulnerable homeowners save hundreds of dollars in property taxes and stay in their homes by accessing constitutionally-mandated exemptions. Cities are able to tailor assistance to low-income homeowners in gentrifying neighborhoods.

   o **Cons:** None.

2. **Homestead exemption enrollment program.** Short of creating a Homestead Preservation Center, the City of Austin could provide funding to a community-based nonprofit, such as Meals on Wheels Central Texas, to conduct in-person outreach to homeowners without a tax exemption and provide on-the-spot assistance signing up for the homestead exemptions they qualify for. About a decade ago, the nonprofit PODER partnered with the Travis Central Appraisal District to provide targeted, door-to-door outreach to assist homeowners without homestead exemptions, after close to 800 homeowners were identified as not having an exemption. The City of Austin currently funds income tax and health insurance enrollment programs that could serve as a model for a homestead exemption enrollment program.

   o **Pros:** Low-cost program that would save vulnerable homeowners hundreds of dollars a year.

   o **Cons:** None.

3. **Emergency homestead stabilization fund.** An emergency homestead stabilization fund set up and funded by the City of Austin could provide short-term property tax and mortgage assistance to low-income, cost-burdened homeowners at risk of losing their homes because of a financial crisis. The assistance could be provided through the Homestead Preservation Center (see above) or another nonprofit such as the East Austin Conservancy, and could be coupled with financial coaching and other assistance to help stabilize families experiencing a financial crisis. In May 2018, Austin Mayor Pro Tem Kathie Tovo proposed a similar type of stabilization program funded by the City for low-income homeowners, directed towards assistance with mortgages versus property taxes.

   o **Examples:** Seattle (Foreclosure Prevention Loan Pilot Program); Cleveland, Ohio (ESOP Senior Property Loan Program); Milwaukee (Property Tax Rescue Assistance Program); State of Florida (Elderly Mortgage Assistance Program); Atlanta (Westside Community Retention Collaborative); Michigan (Step Forward Michigan).

   o **Pros:** Helps families hold onto their homes during a short-term financial crisis.

   o **Cons:** Does not provide long-term relief for vulnerable families unable to afford on-going tax increases or make their mortgage payments.

4. **Neighborhood stabilization loan program.** Some of the most vulnerable low-income homeowners need longer-term financial assistance to be able to stay in their homes and pay

their mounting property taxes. The City of Austin could create a neighborhood stabilization loan program in gentrifying neighborhoods to provide longer-term, low-interest interest loans to low-income homeowners who are paying more than 30 percent of their income on housing costs. Each loan could be forgivable in exchange for the homeowner agreeing to a longer-term affordability restriction, ensuring that the home would be sold to another low-income owner and remains owner-occupied. The program could also provide forgivable loans for low-income residents whose parents have utilized a property tax deferral under state law and, when their parents die, are suddenly faced with a large property tax bill. The loan should be forgivable only to the extent the family member is income-eligible and agrees to remain in the home. While under state law a household with a homestead exemption is entitled to enter into a property tax payment plan with the tax collector, interest accrues at 12 percent a year, the plan cannot exceed 36 months, and a homeowner can enter into a new plan only after two years. Without a repayment plan, interest and penalties on delinquent taxes accrue at 24 percent a year.

- o Pros: Provides lower interest and longer-term assistance to households than what is available under a payment plan with the tax collector and could cover housing needs beyond property taxes; possible gain for the city in permanently income-restricted affordable housing units for a relatively low cost compared to building new units.

- o Cons: Longer-term and forgivable loan terms carry a larger financial burden for the city.

5. **Tax abatement program for homeowners.** The Texas Tax Code provides multiple mechanisms by which a city can grant tax abatements to homeowners and other property owners in a "reinvestment zone." With a tax abatement, the city abates (i.e., waives) the city's property taxes on the increase in the appraised value of a property. A city can provide a partial or full abatement and must adopt guidelines and criteria for awarding the abatements in a reinvestment zone. A city can tailor the abatements to serve the most vulnerable homeowners in gentrifying neighborhoods (such as by pairing abatements with low-income persons participating in a city home repair program), as long as the area meets the definition of a reinvestment zone. Issuing an abatement is contingent on the owner making specific improvements or repairs to the property, but the state statute does not set forth a minimum level of repairs that must be made.[14] Counties and other taxing entities can extend property tax abatements to homeowners by entering into an abatement agreement identical to the city's agreement.

- o Examples: Fort Worth; Philadelphia; Portland (new homes only)

- o Pros: A city is able to tailor tax relief to the most vulnerable homeowners.

- o Cons: Administrative burden on city to process applications and enter into agreements with homeowners; homeowners with abatements likely to be hit with a sharp increase in property taxes when the abatement agreement expires.

6. **Freeze on property taxes for homeowners who are seniors or disabled.** Texas law provides homeowners who have a senior or disability exemption with an automatic tax freeze on the amount paid for school district taxes. With a tax freeze in place, once a homeowner qualifies for a senior or disability exemption, the school district taxes will never increase unless improvements (other than normal repairs or maintenance) are made to the home. The City of Austin has authority to adopt a similar tax ceiling via the City Council or petition and election by the city's citizens.[15]

- o Examples: Fort Worth, Tarrant County, Williamson County, Cedar Park

- o Pros: Provides tax relief to many persons on fixed incomes.

- o Cons: The tax freeze cannot be limited to low-income seniors and shifts the city's property tax burden onto renters and younger homeowners.

7. **Increase the City's senior homestead exemption.** Each taxing unit in Texas has authority to offer an additional flat dollar exemption for homesteads of seniors and persons with disabilities. In 2017, the City of Austin increased to $85,500 the amount of its exemption for seniors and persons with disabilities. Austin has authority to increase its exemption further.

- o **Examples:** Houston ($160,000); Dallas ($90,000); San Antonio ($65,000)

- o **Pros:** Provides tax relief to persons on fixed income and less expensive for a city to adopt than a tax freeze.

- o **Cons:** Benefits wealthy seniors as well as low-income seniors, although low-income households benefit more from flat dollar exemptions than percentage exemptions. Cities are barred by state law from tailoring the tax freeze to low-income seniors; shifts a city's property tax burden onto renters and other homeowners.

8. **Senior volunteer tax break coupled with a senior volunteer program.** To help low-income seniors cover their property taxes, the City of Austin and Travis County could partner to provide seniors with volunteer opportunities, in exchange for the seniors' property taxes being forgiven. The Texas Tax Code (Section 31.035) allows cities to offset a senior homeowner's property taxes by the current federal minimum wage ($7.25) for each hour of volunteer work for the city or county.

- o **Pros:** In addition to the tax benefits, the volunteer tax break provides an opportunity for seniors to stay engaged in their community and to connect with other residents.

- o **Cons:** Unavailable for seniors who do not have the capacity to volunteer as a result of a disability, illness, or other barrier.

9. **Partnership with county tax assessor to expand notice of property tax deferrals.** A partnership could provide targeted notices about the property tax deferral available for seniors, persons with disabilities, and disabled veterans, and make the notices more accessible to homeowners who are not fluent in English. These classes of eligible taxpayers are able to defer part or all of their property taxes until they die or move, with interest of five percent on the taxes owed. The interest and penalties for homeowners not in the deferral program is 24 percent. Providing door-to-door outreach to homeowners, by trusted community members, would likely have the greatest impact in informing tax delinquent homeowners about the financial benefits of enrolling in the deferral program rather than paying late penalties and interest for delinquent payments.

- o **Pros:** Low-cost policy that would save vulnerable homeowners cumulatively thousands of dollars a year and help them stay in their homes.

- o **Cons:** None.

10. **Expand use of Community Land Trusts (CLTs) for current homeowners.** Community land trust homes in Austin have so far been targeted towards new homeowners. The community land trust could be expanded to serve existing homeowners interested in participating in the model. The homeowner would give up some equity in the home in exchange for the significant long-term tax relief that comes with the CLT model. The model could also be coupled with rehabilitation assistance to help owners in deteriorating housing conditions.

- o **Pros:** As discussed above, CLT come with significant property tax savings for homeowners. If the ground lease permanently restricts the resale price at $100,000, the home is taxed based on an appraised value of $100,000. The appraised value of the land is also heavily restricted compared to a similar lot outside the CLT model.

- o **Cons:** There are long-term administrative costs in running a CLT, especially as a CLT is brought up to scale, along with tradeoffs for the current homeowner: The homeowner would continue to own her home but not the land, which is leased to the owner for 99

years. When selling the home, the resale price is restricted, providing the owner with some but not all of the appreciated value in the home.

11. **Additional policies and tools.** The following are additional strategies and tools to consider adopting for providing tax relief for vulnerable, low-income homeowners:
- Work with the tax assessor-collector to limit foreclosures of occupied homesteads.
- Require title companies to offer homeowners purchasing a home the opportunity to begin the homestead exemption application online at the closing on the home. After beginning the application, the homeowner will have to follow up by providing the appraisal district with a new state identification card that matches the address of the new home.
- Reach out to the Texas Comptroller to provide clear guidance and policies for qualifying heirs property owners for the homestead exemption and to include an affidavit in the application for heirs owners who are not seniors or disabled.



**City of Austin Homeowners with Property Tax Delinquencies by Zip Code, May 2018**

Delinquency 2+ years w/ homestead exemption as % of total homeowners



| | |
|---|---|
| 0%-0.08% | |
| 0.09%-0.27% | Sources |
| 0.28%-0.62% | Travis County Tax Assessor Office |
| 0.63%-1.23% | American Community Survey 2012 - 2016 (5-Year Estimates), Social Explorer, Table SE:T94, |
| 1.24%-2.16% | "Tenure," all City of Austin ZIP Codes |

# Endnotes

[1] Lincoln Institute of Land Use Policy and Minnesota Center for Financial Excellence, "50-State Property Tax Comparison Study," Table 30: Top 50 Homestead Property Taxes for a Median-Value Home—Listed by Net Tax Payable 2014, https://www.lincolninst.edu/sites/default/files/pubfiles/50-state-property-tax-study-2015-full_0.pdf.

[2] King, Michael, "Rendering Unto Caesar: City budget squeezed between basic costs and Lege neglect," Austin Chronicle, Aug. 11, 2017, p. 16-18.

[3] Travis County Tax Office (2018), Tax Delinquent data set, retrieved May 1, 201,8 from https://tax-office-traviscountytx.gov/reports-data. These delinquency rates do not include owners without a homestead exemption.

[4] See, for example, Michael King, "Point Austin: Homestead Exemption Still Burning," AUSTIN CHRONICLE (July 22, 2016), https://www.austinchronicle.com/news/2016-07-22/point-austin-homestead-exemption-still-burning/.

[5] Tsoodle, Leah J. and Turner, Tracy M., "Property Taxes and Residential Rents," Real Estate Economics, Vol. 36, Issue 1 (Feb. 1, 2008), pages 63-80, https://onlinelibrary.wiley.com/doi/pdf/10.1111/j.1540-6229.2008.00207.x. See also Rothenberg, Jerome, et al, The Maze of Urban Housing Markets: Theory, Evidence, and Policy (1991 University of Chicago Press).

[6] Tex. Property Code, § 11.43(m), and Tex. Transportation Code, § 521.049 (requiring the Texas Department of Transportation to provide to appraisal districts the date of birth and other information from drivers' licenses and personal identification cards).

[7] Tex. Tax Code, § 11.261(a).

[8] Tex. Const., Art. VIII, § 1-b(h).

[9] Tex. Prop. Code, § 33.045(a) (2018).

[10] Tex. Prop. Code, § 33.04(b) (2018).

[11] Tax estimates based on current tax rates; assumes appreciation at a rate of 10% a year and flat tax rates.

[12] City of Fort Worth, "Neighborhood Empowerment Zone (NEZ) Tax Abatement Policy and Basic Incentives," http://fortworthtexas.gov/neighborhoods/pdf/NEZ-incentives.pdf?v=2017 (last checked May 29, 2018).

[13] City of Fort Worth, "Overview and Analysis of the Neighborhood Empowerment Zone Program," http://fortworthgov.granicus.com/MetaViewer.php?view_id=5&clip_id=2173&meta_id=259523 (last checked May 29, 2018).

[14] Tex. Tax Code § 312.204(a).

[15] Tex. Tax Code, § 11.261(a); Tex. Const., Art. VIII, § 1-b(h).