# Assessment

### Vulnerable populations targeted
Low-income residents in vulnerable neighborhoods. The specific populations targeted will vary according to the capacity building program.

### Stage of neighborhood change
**Early to Mid-Stage.** Capacity building will be most effective in earlier stages before the significant loss of vulnerable residents.

### Place-based
**Yes.** Capacity building initiatives are typically targeted to organizations based in vulnerable communities.

### Sustainability
**Poor.** Grants are typically made for short periods and supporting long-term organizational capacity will require ongoing fundraising. While many local CDCs are able to support staff for housing development from their own revenue, expanding their work beyond housing will require additional resources.

### Inclusivity
**Good.** Capacity building efforts are aimed at community-based organizations and often require that such organizations have a board that represents the community it serves.

### Financial Resources
**Medium.** Scale of funding would depend on the initiative. Need for funding would be ongoing.

### Capacity Required
**Poor to Fair.** Austin currently lacks a local funding collaborative but it does have an active CDC coalition and tenant organizing group.

## Resources

Seattle—Equitable Development Initiative, http://www.seattle.gov/opcd/ongoing-initiatives/equitable-development-initiative

Cleveland Neighborhood Progress—CDC grantmaking, http://www.clevelandnp.org/cdcgrantmaking/

Center for Urban Pedagogy—Community Education: Making Policy Public, http://welcometocup.org/Projects/MakingPolicyPublic

# Adding Internal Accessory Dwelling Units to Existing Homes

**Overview**

In November 2015, Austin's City Council took a major step towards easing restrictions on the construction of Accessory Dwelling Units (ADUs). ADUs, variously known as granny flats, mother-in-law apartments, casitas, and other names, are small, independent housing units that share a residential lot with one or more larger units (in Austin, most often a detached single-family house). The 2015 ordinance, in various ways, eased restrictions on building ADUs. Whereas prior to 2015 a registered neighborhood group could vote to ban ADUs from within its neighborhood, ADUs are now allowed by right on parcels zoned SF-3, that are at least 5,750 square feet in size, and that meet several other requirements. Before, ADUs needed to be at least 15 feet from the nearest building; they can now lie just 10 feet away. The result has been a sharp increase in ADU production, with a 34% jump from 2015 to 2016, the first full year with the ordinance in place.[26]

Homeowners value ADUs for the flexibility they provide: They can be used for added living space, or as a way to accommodate a family member or friend in need of housing at reduced or free rent, while maintaining a sense of privacy and separation. Crucially—from the standpoint of helping homeowners resist displacement pressures—ADUs can help them cope with increased costs, such as property taxes, or life events that result in reductions in income, such as unemployment or retirement.

There is, however, a major caveat to the promise of ADUs: Under current regulations, building one is an expensive proposition for a low- or moderate-income homeowner in Austin. Although the cost—often in the range of $150,000 to $200,000—of building an ADU as a free-standing structure in Central Austin is considerably lower than the per-unit cost of building a typical new apartment building in the urban core, it is still out of reach for most homeowners. Furthermore, adding a new detached ADU will typically result in an increase in property taxes for the homeowner, partially offsetting its financial benefit. Experience from Pacific Northwest cities suggests that legally-permitted ADUs are disproportionately pursued by affluent homeowners living in high-income neighborhoods.[27]

There is a promising alternative: the internal ADU, or an ADU that is carved out of the interior of an existing house, with its own independent entrance provided to the exterior. At present, Austin effectively bans internal ADUs as income generators for their owners by restricting their legal occupancy to relatives or caretakes who pay no rent. Internal ADUs typically cost considerably less than external ADUs. In some cases they can be built for as little as $50,000 or less—a cost that is feasible for a much wider range of homeowners than detached ADUs. Furthermore, because an internal ADU adds no net new square footage, increases to property taxes should be dampened. Ending the de-facto ban on internal ADUs is a low-cost, "low hanging fruit" policy that could be enacted in Austin. It has at least the possibility of helping homeowners stave off displacement in gentrifying neighborhoods, while also adding rare, relatively inexpensive rentals in single-family neighborhoods.

**Considerations**

There are various regulatory parameters that would have to be addressed in any internal ADU ordinance. For instance, policymakers would have to decide whether an internal ADU would trigger an off-street parking requirement; whether or not legal occupancy of the ADU would require the owner to live on the property, as is the case in most cities in the US (with the notable exception of Portland, Oregon);[28] and whether an internal ADU could be used as a short-term rental (i.e., rented on a nightly basis to visitors via platforms such as Airbnb and HomeAway). In general, the less restrictive the regulation on construction and use, the more development of internal ADUs will occur.

While removing regulatory barriers to internal ADUs would be a valuable step on its own, more far-reaching steps would need to be taken by the city to bring their benefits to the widest possible pool of homeowners. Even with the simpler construction and lower costs of internal ADUs, there are homeowners who could benefit from such projects but who lack the know-how or financial strength to undertake them. Technical and financial assistance from the city, or delivered in tandem with local lending institutions and nonprofits,[29] could bridge this gap. In addition, active intervention from the city could further other objectives, such as ensuring that internal ADUs are fully ADA-compliant, thus allowing frail elderly homeowners and homeowners with disabilities to move into them while drawing robust income from renting the main portion of the house. Finally, such interventions could be geographically targeted to gentrifying neighborhoods as an explicit anti-displacement strategy, perhaps with a particular emphasis on elderly homeowners.

## Assessment

### Vulnerable populations targeted
Current homeowners in single-family houses or duplexes citywide, including vulnerable neighborhoods. Could target financial and technical assistance for building ADUs to low-income senior homeowners and homeowners with disabilities.

### Stage of neighborhood change
**Any stage of gentrification.**

### Place-based
**No.** However, financial or technical assistance to help low-income homeowners create ADUs could be focused on gentrifying neighborhoods as an explicit anti-displacement strategy.

### Sustainability
**Good.** Regulatory reform, on its own, is permanent and will be helpful to future generations of homeowners.

### Inclusivity
**Poor to Fair.** Development of such regulations would involve citywide input. Targeting to vulnerable homeowners would require specific outreach and a dedicated stakeholder group.

### Financial Resources
**Low.** Primarily the cost of developing and passing an ordinance (administration of permits could be covered by permit fees). Medium if the city also creates a program to technically and financially assist homeowners in targeted neighborhoods.

### Capacity Required
**Low.** City staff is already accustomed to administering ADU permits; these changes would simply change how they do their work. Creating a program to actively assist homeowners would require more capacity, but could be done in partnership with local lending institutions and nonprofits.

### Resources

Accessory Dwelling Units Draft Environmental Impact Statement (Seattle), http://www.seattle.gov/council/adu-eis

Peterson, Kol, Backdoor Revolution: The Definitive Guide to ADU Development (Accessory Dwelling Strategies 2018).

# Endnotes

[1] McClure, Kirk, "The allocation of rental assistance resources: the paradox of high housing costs and high vacancy rates," International Journal of Housing Policy, May 2018.

[2] Turner, Margaret A., "Strengths and weaknesses of the Housing Voucher Program," in J.R. Tighe and E. J. Mueller, eds., The Affordable Housing Reader, Routledge, 2013, pp. 288-294.

[3] The Local Rent Supplement Program. DC Fiscal Policy institute, Apr. 11, 2016, https://www.dcfpi.org/wp-content/uploads/2016/04/16-04-LRSP-Brief.pdf.

[4] "Denver rent 'buy-down' program that will subsidize market-rate apartments receives green light from council," Denver Post, July 10, 2018, https://www.denverpost.com/2018/07/10/denver-rent-buy-down-program-green-light/.

[5] "Denver's lower-income residents will soon be able to move into luxury apartments," Rent Café Blog, Jan. 18, 2018 (quote from Chris Herbert, Managing Director of the Harvard Joint Center for Housing Studies), https://www.rentcafe.com/blog/apartment-search-2/money/denver-will-subsidize-vacant-luxury-rentals-lower-income-residents/.

[6] Craver, Jack, "Planning commissioners propose 'anti-McMansion ordinance' for Code Next," Austin Monitor, May 15, 2018, https://www.austinmonitor.com/stories/2018/05/planning-commissioners-propose-anti-mcmansion-ordinance-for-codenext/.

[7] City of Austin, Special Use Options and Design Tools Available Through the Neighborhood Plan Combing District (NPCD), May 2017, ftp://ftp.ci.austin.tx.us/npzd/Austingo/infill_tools.pdf.

[8] Craver, Jack, supra.

[9] Morton, Kate, "Home building strong despite new size limits," Austin American-Statesman, Feb. 18, 2006.

[10] Jordan, Reed, and Poethig, Erika C., Urban Institute, "How to keep affordable housing in high-opportunity neighborhoods," https://www.urban.org/urban-wire/how-keep-affordable-housing-high-opportunity-neighborhoods; National Housing Trust, "Components to a Successful Local Preservation Strategy," http://www.nationalhousingtrust.org/state-and-local-preservation-initiatives.

[11] National Housing Trust, "Data Collection and Analysis," http://www.nationalhousingtrust.org/data-collection-and-analysis.

[12] Connecting People to Jobs: Neighborhood Jobs Pipelines, Annie E. Casey Foundation, 2008, at 4.

[13] Ibid.

[14] Ibid.

[15] Capital Idea, Studies and Financial Reports, http://www.capitalidea.org/studies-financials/ (accessed July 31, 2018).

[16] Williams, John R. "Why private and institutional investment is the future of affordable housing preservation," Multifamily Executive, Mar. 7, 2018, http://www.multifamilyexecutive.com/business-finance/why-private-and-institutional-investment-is-the-future-of-affordable-housing-preservation_o.

[17] Williams, Stockton, "Preserving Multifamily Workforce and Affordable Housing," Urban Land Institute, 2015, at 6, https://uli.org/wp-content/uploads/ULI-Documents/Preserving-Multifamily-Workforce-and-Affordable-Housing.pdf.

[18] Jacobius, Arleen, "Workforce housing catches eye of managers investors, Pensions and Investments, Oct. 2, 2017, http://www.pionline.com/article/20171002/PRINT/171009979/workforce-housing-catches-eye-of-managers-investors.

[19] Williams, Stockton, at 6.

[20] Ibid.

[21] Becker, Ian, "Evaluating a New Model: The Participation of Private Equity in the Preservation of Multifamily 'Affordable' Housing for Middle-Income Renters in Austin," Master's Thesis, Community and Regional Planning, UT Austin, Aug. 2018, at 48-50.

[22] Ibid. at 55.

[23] Ibid. at 57.

[24] Auspos, P., P. Brown, S. Sutton, and A. Kubisch, :iving Cities and Civic Capacity: Leadership, Leverage, and Legitimacy, Aspen Institute, Roundtable on Community Change, 2008.

[25] Association for Neighborhood and Housing Development, Inc., From Collaboration to Transformation: the Initiative for neighborhood and citywide organizing and the power of grassroots community development, 2012, New York.

[26] Menez, Gene, "What you need to know about Accessory Dwelling Units," Austin Monthly, Apr. 17, 2017.

[27] Chapple, Karen, et al. "Jumpstarting the market for Accessory Dwelling Units: lessons learned from Portland, Seattle, and Vancouver," Urban Land Institute (San Francisco chapter), July 6, 2017.   ternercenter.berkeley.edu/uploads/ADU_report_4.18.pdf.

[28] Existing research is inconclusive as to whether houses with internal ADUs have similar, higher, or lower property values vis-à-vis the same interior space lying entirely within one dwelling. Owner-occupancy requirements represent attempts to repel absentee owners from separately renting single-family houses and their ADUs.

[29] By way of full disclosure, at the time of writing this report two of the authors of this report, Mueller and Wegmann, are volunteer board members of a nonprofit, Austin Community Design and Development Corporation, that provides services to homeowners seeking to add ADUs to their properties.

# APPENDIX 1

Austin City Council Resolution
20170817-55

## RESOLUTION NO. <u>20170817-055</u>

**WHEREAS**, ongoing gentrification in Austin is resulting in the displacement of low- and moderate-income residents from their communities; and

**WHEREAS,** the complex issue of gentrification and the problems of displacement are evident in many large U.S. cities, as well as in Austin, and are being studied by academic and research institutions such as the University of California, Harvard University, Princeton University, and the Brookings Institute, among others; and

**WHEREAS,** current market forces in Austin are destabilizing existing communities through rising rents, rapidly rising property values that increase property taxes, and rapid redevelopment; and

**WHEREAS,** rapid redevelopment in gentrifying neighborhoods is focused on attracting a narrow segment of higher-income earners for units that are not affordable to the existing communities, including to families; and

**WHEREAS** the displacement of less affluent residents is leading to a loss of diversity and sense of place for Austin communities; and

**WHEREAS,** the City's demographer and planners with Austin Independent School District (AISD) have documented a decline of students in central Austin and this is of particular concern for AISD schools imperiled by low enrollment; and

**WHEREAS,** the Austin City Council recognizes the value of studying gentrification and displacement in Austin to discover the underlying causes and deleterious effects upon communities of low- and moderate-income residents; and

**WHEREAS,** the Austin City Council values the expertise of our academic experts at the University of Texas, and relies upon partnerships with those experts to provide necessary research and study of local issues; and

**WHEREAS,** the Austin City Council acknowledges the need to study and analyze the city's patterns of gentrification and displacement of individual residents and families, along with a mapping of where these trends are occurring; and

**WHEREAS,** Imagine Austin calls for "Complete Communities" where "all Austinites must benefit from its outcomes", for "opportunities for existing residents who are struggling with rising housing costs to continue living in their existing neighborhoods"; and

**WHEREAS,** several city boards and commissions have issued resolutions and recommendations calling for the Austin City Council to review and respond to gentrification and displacement issues in Austin's vulnerable communities, including the Zoning and Platting Commission, the Community Development Commission, the Human Rights Commission, and the Mayor's Task Force on Institutional Racism and Systemic Inequities; and

**WHEREAS,** studying gentrification and displacement and developing a mapping of neighborhoods on a spectrum of vulnerability to gentrification and displacement will provide the City Council with the necessary foundation for policy decisions and assist efforts to manage growth as well as achieve the goals of Imagine Austin; **NOW, THEREFORE,**

**BE IT RESOLVED BY THE CITY COUNCIL OF THE CITY OF AUSTIN:**

The City Council directs the City Manager to negotiate an Interlocal Agreement with the University of Texas at Austin related to a study of gentrification,

displacement and mapping of vulnerable neighborhoods (the "Study") issues within the City; and to provide Council an opportunity to authorize the execution of an agreement on or before September 28, 2017.

**BE IT FURTHER RESOLVED:**

The City Council requests that the Study include sections related to study and data analysis, mapping of vulnerable neighborhoods, and policy tool recommendations; that the Study focus on the unique factors, including, but not limited to, race, class, and age, when evaluating the risk of displacement and to the degree of harm from displacement; that the Study include data in the mapping on public infrastructure investment using existing data; and that the Study be completed on or before August 31, 2018. The City Council also requests a mid-Study report in January, 2018. The City Council requests that the maximum amount of funds dedicated to the Study be $69,000.

**BE IT FURTHER RESOLVED:**

The City Council directs the City Manager to provide an estimate of the cost to keep the Study up-to-date; and to provide the estimate on or before March 1, 2018.

**BE IT FURTHER RESOLVED:**

After the Study is complete, the City Council directs the City Manager to prepare a coordinated plan to use the Study and implement the policy tool recommendations.

**ADOPTED:** ___August 17___, 2017     **ATTEST:** _Jannette A. Goodall_
Jannette S. Goodall
City Clerk

Page 3 of 3

# APPENDIX 2

Prior Austin Reports on Gentrification,
Displacement-Mitigation Tools,
and the Changing Face of Austin's
Neighborhoods

# Prior Austin Reports on Gentrification, Displacement-Mitigation Tools, and the Changing Face of Austin's Neighborhoods

1. City of Austin Gentrification Committee Report, June 2001
   http://www.ci.austin.tx.us/housing/downloads/gentrification.pdf

2. City of Austin Staff Task Force on Gentrification in East Austin, Findings and Recommendations, March 2003
   http://www.ci.austin.tx.us/housing/downloads/gentrificationreport_eastaustin.pdf

3. SMART Growth, Historic Zoning and Gentrification of East Austin: Dislocation of Native People from Their Homeland Discussion Paper, Spring 2003; Susana Almanza, et al., People Organized in Defense of Earth and her Resources

4. Gentrification in the East Cesar Chavez Neighborhood: A Policy Proposal for a Property Tax Loan Program; Eden Deng, et al. 2006.

5. Preserving Austin's Multifamily Rental Housing, April 2007; University of Texas School of Law Community Development Clinic
   https://law.utexas.edu/clinics/2007/04/01/preserving-austins-multifamily-rental-housing/

6. City of Austin Housing Preservation Study, 2008
   http://www.ci.austin.tx.us/housing/downloads/2008_preservation_study.pdf

7. African American Quality of Life Final Report: Addressing Community Needs Together, April 2008
   http://www.austintexas.gov/department/african-american-quality-life

8. Tenant Displacement in Austin, Aug. 2012; University of Texas School of Law Community Development Clinic
   https://law.utexas.edu/wp-content/uploads/sites/11/2015/07/2012-08-ECDC-TENANT_DISPLACEMENT_IN_AUSTIN.pdf

9. Hispanic/Latino Quality of Life Initiative Report, 2014
   http://www.austintexas.gov/sites/default/files/files/City_Manager/HispanicReport-ver_6-0901_13.pdf

10. Taking Action: Preservation of Affordable Housing in the City of Austin, July 2014
    https://austintexas.gov/sites/default/files/files/Housing/Reports_and_Publications/Community_Reports/PreservationStrategyWebFinal.pdf

11. Outlier: The Case of Austin's Declining African-American Population, 2014; Eric Tang and Chunhui Ren, University of Texas at Austin
    https://liberalarts.utexas.edu/iupra/_files/pdf/Austin%20AA%20pop%20policy%20brief_FINAL.pdf

12. Those Who Left: Austin's Declining African American Population, 2016; Eric Tang, University of Texas at Austin
    https://liberalarts.utexas.edu/iupra/_files/pdf/those-who-left-austin.pdf

13. Mayor's Task Force on Institutional Racism and Systemic Inequities, April 2017
    https://cityofaustin.github.io/institutional-racism/

14. Asian American Quality of Life, Final Report, June 13, 2018
    http://www.austintexas.gov/edims/document.cfm?id=300282

15. The People's Plan, 2018
    http://www.austintexas.gov/edims/document.cfm?id=293181

16. Those who Stayed: The Impact of Gentrification on Longstanding Residents of Austin, 2018; Eric Tang, University of Texas at Austin
https://liberalarts.utexas.edu/iupra/_files/Those-Who-Stayed.pdf

Additional reports are available on the website of the City of Austin Neighborhood Housing and Community Development Department, at https://austintexas.gov/page/reports-publications.

# APPENDIX 3

Methodology for Mapping Gentrifying Neighborhoods in Austin and Neighborhood Drilldowns

# Appendix 3

## Gentrification Mapping and Vulnerability Analysis Methodology

**Part I: Study Area Analysis** ................................................................................... **135**

    Determining Study Area ...........................................................................135

    Vulnerability ............................................................................................135

    Demographic Change ..............................................................................138

    Housing Market Change ..........................................................................142

    Neighborhood Typology ..........................................................................145

**Part II: Neighborhood Drilldown** .............................................................................. **146**

    American Community Survey ....................................................................146

    CHAS ......................................................................................................147

    Schools ...................................................................................................147

    HMDA .....................................................................................................147

    Affordable Housing .................................................................................148

    Building Permits and Residential Real Estate Listings ...............................148

# PART I: STUDY AREA ANALYSIS

## Determining The Study Area

The study area includes all census tracts that have lie wholly or partially within the city limits. Even a small area within the city limits warrants inclusion in the study. However, these values will be compared to those for the five-county MSA (made up of Bastrop, Caldwell, Hays, Travis, and Williamson Counties), rather than limited to only the city of Austin. This is in order to take a regional approach to the study of gentrification and displacement.

### 1. VULNERABILITY:

**Step 1: Locate or calculate the average value for the MSA in each of the categories.**

For vulnerability, we considered five factors:

- **Renters:** Percentage of households within the tract who rent.
- **People of Color:** Percentage of people in the tract who identify as anything other than White Non-Hispanic alone.
- **Low-Income Households:** Percentage of households in the tract who earn less than 80% of AMFI (U.S. Department of Housing and Urban Development's Area Median Family Income).
- **Child Poverty:** Percentage of children (i.e., people under the age of 18) in the tract who are live in households below the poverty line.
- **Lack of College Education:** Percentage of adults ages 25 and up in the tract who lack a four-year college degree or higher level of education.

Note that for all five variables, a higher (more positive) number equates to a higher level of vulnerability in the tract. If the opposite is the case for the data that is downloaded, then the variable should be inverted (e.g., percentage of adults 25 and up with a four-year degree or greater should be converted to the same percentage without at least a four-year degree).

For all five vulnerability factors other than Low-Income Households, the MSA figure is available directly from the census. These can be downloaded easily from Social Explorer or American Fact Finder. Low-Income Households share is obtainable from CHAS (Comprehensive Housing Affordability Strategy) data published by HUD. For the CHAS data, the weighted average of the countywide values for the five counties within the MSA can be easily calculated using the CHAS query tool.[1] Collect the figure for each county, as well as the total population (to be used as a weight), then use the formula below to determine the weighted mean in Excel:

=SUMPRODUCT(range of values, range of weights)/SUM(range of weights)

**Step 2: Download census tract data and calculate percentages**

**Step 3: Calculate Z-scores for each census tract**

To help with the calculation of weighted standard deviation, create a new column to the right of the values, and name it (x-x_bar)^2. This is a component to the weighted standard deviation formula and is based on how far the value is from the average. To calculate the (x-x_bar)^2 component, use the following formula. *NOTE: It helps to use $ symbols on the MSA average to avoid having to retype the cell location. For example:*

"$C$354"=(value - MSA average)^2

Make sure to delete the resulting value for any census tracts that had a dubious 0—in other words, a 0 that was the result of missing data rather than a true value. Otherwise, this function will calculate the difference between "0" and the average, which will distort your result. Repeat this process with the other 4 sets of values.

Now you can calculate the weighted standard deviation for each set of values. The reason why you've included the total population, total housing units, etc. in this spreadsheet is because they will be used to weight each census tract in the calculation of the weighted standard deviation. Before calculating the weighted standard deviation, you will need one more component. This is the based on the count of census tracts.

=(count - 1) / count

This will be used as you calculate the weighted standard deviation. Below is the formula.

=SQRT(SUMPRODUCT(range of (x-x+bar)^2 component values, range of weights)/(((count-1)/ count)*(SUM(range of weights))))

It will look like this:

=SQRT(SUMPRODUCT(B2:B351,D2:D351)/(C358*(SUM(B2:B351))))

Now you are able to calculate the Z-score for each value, using the components you have calculated. To do this, the "Standardize" function is used.

=STANDARDIZE(value, mean, standard deviation)

Once you have a Z-score for every census tract (unless there was no information given for that tract), make a clean worksheet by pasting only the values from the calculation worksheet. You can delete everything except for the Z-scores for each of the 5 categories and the census tract ID for each tract. This will be enough to map in GIS.

**Step 4: Determine which Z-scores meet the threshold for consideration.**

If any individual Z-score is more than +0.5, it will be considered in terms of calculating vulnerability. In the worksheet created in the last step, add a column to the right of the Z-score ("vulnerability check") and use an IF function to mark whether the Z-score meets the threshold:

=IF(Z-score>.5,1,0)
=IF(B2>.5,1,0)

Once copied to the entire column, you should have "0"s next to any Z-scores that are less than +.5 and "1"s next to any that are more. Repeat this for all five columns of Z-scores.
When this is complete, create a "sum" column that adds up the five vulnerability check columns. Make a new column with an IF function to mark columns with three or more vulnerability indicators over .5.

=IF(sum column>2,"YES","NO")

Now any census tracts with "YES" listed are considered particularly vulnerable, while those with a "NO" are not. Also create a new column ("Z Average") that calculates the average of the 5 Z-scores. (When these are mapped, the average Z-scores for these vulnerable tracts will be displayed, while the others will not.)

**Step 5: Map the Vulnerability Index calculation for each census tract in GIS**

Copy into a new worksheet only the values for:
- The FIPS ID
- The five Z-scores (for the individual factors)
- The "YES" / "NO" determination
- The final average Z-score (the average of the five factors)

Make sure all the columns have headers, and that these headers contain no spaces or special characters. Also, check for any errors within the values, as these will result in problems. These values are now ready to be mapped in GIS.

Open a new map, and add in the 2010 Census Tract Boundaries[2], as well as the county and city limits, major roads and water bodies. (These last two are intended to provide familiar landmarks, since census tracts are unfamiliar geographic units to most people.)



Right click the Census Tract Boundaries file and click Joins and Relates. Click Joins. Fill in the correct sheet to join from and the fields that will join. NOTE: In the TIGER shapefile, you will use the GEOID field to join to your census tract number field. It should look something like this, with the option for "Keep only matching records" selected.

Validate the join, and make sure there are no errors with invalid characters being used in the headings. Also check that the number of fields identified to join is the same as the number in your study area. If not, check your original Excel table and make sure all the census tracts are included. There should be a matching tract located in the TIGER file for every tract.

Once the join is performed, copy and paste this layer onto the data frame, so you have two copies of the same census tract file. Open the properties for one of these census tract layers. Go to the Symbology tab, and click "Categories, Unique Values." Add all values ("YES" and "NO") and unclick the option for "all other values". Change the color for "NO" to a neutral color and "YES" to a red outline.



For the other census tract file, use the symbology tab to select Quantities, Graduated Colors. Create 4 breaks as shown below, and change the colors to reflect those standards:



## 2. DEMOGRAPHIC CHANGE:

In terms of change over time, four factors are considered:
- **Home Ownership**: Percentage Point Change in Owner Occupied Units as a Percent of Total Occupied Units
- **Race and Ethnicity:** Percentage Point Change in White Non-Hispanic Alone Population as a Percent of Total Population
- **Educational Attainment:** Percentage Point Change in the Percent of the Population over 25 years with a Bachelor's degree or higher
- **Income:** Percent change in Median Family Income

(Note the difference between "percentage point" change and "percent change." If the homeownership rate changes from 40% to 50%, there has been a percentage point increase of 10%, but a percent increase of 25%. If income changes from $50,000 to $60,000, there has been a 20% percent increase.)

Similar to the vulnerability analysis, instead of comparing the raw percent changes, we chose to look at Z-scores. This allowed us to measure how far above or below the mean change level each of the census tracts fell, giving us a better sense of where the true outliers were.

For this section of the analysis, we chose to look at demographic change over the period of 2000-2016 (based on five-year ACS estimates for 2012-2016). Because of the difference in census tract boundaries between these two years, crosswalk tables were used to "translate" between geographies. These were downloaded from the Longitudinal Tract Database website hosted by Brown University.[3] This process will be described in greater detail in the methodology below:

**Step 1: Calculate MSA averages for Demographic change**

Download the four factors at the MSA level for both 2000 and 2012-2016. (Make sure the MSA hasn't changed between 2000 and 2016! If so, you may have to take county averages and combine them into one weighted average for the MSA.)

Calculate for each of these either the percent change or the percentage point change.

| Percentage Point Increase/Decrease | Percent Change |
|---|---|
| Percent Non-Hispanic White Alone<br>Percent College Graduate<br>Percent Homeowners | MFI |

For percent change, use this formula: =(2016-2000)/2000
For percentage point change, use this formula: =2016-2000
These figures will be used when calculating the Z-scores for demographic change in a later step.

**Step 2: Download and prepare ACS Data for 2012-2016**

Using the Social Explorer or American Fact Finder websites, all data for 2012-2016 was downloaded and opened in Excel. For each of the points, a percentage of the total was calculated (see above list for denominators). For the percentage of the population without a Bachelor's degree, you will have to add up the first three columns (No High School, High School, Some College) to get the total of those.

**Step 3: Download Census and ACS Data for 2000**

Again, using Social Explorer or American Fact Finder, all data can be obtained for 2000.

**Step 4: Download the crosswalk table to translate between geographies**

The crosswalk table includes a separate row for every shape that is created when the 2000 and 2010 census tract boundaries are overlaid. The table identifies each of these areas by both their 2000 and 2010 FIPS ID. (Most have not changed, but in cities that experienced a lot of population change during that period, there are often boundary adjustments, splits or joins of 2000 census tracts to form new boundaries.) In the crosswalk table, each of the overlay boundaries is weighted according to how much of the 2000 population can be attributed to each new 2010 geography.

**Step 5: Use the Crosswalk Table to determine a weighted 2010 figure for each of the four factors in 2000.**

The use of the crosswalk table is not complicated, but it can be a little bit counterintuitive.

It's easiest to begin is by using the =VLOOKUP function to insert all values from the 2000 data table from Social Explorer into a copy of the crosswalk data for your region. (Don't try to do this the opposite way, as there are usually significantly more census tracts in the later year. If you try to add the crosswalk data to the figures, you will miss some of the census tracts.) *NOTE: You should not delete the "Total Population", "Total Occupied Housing Units", and all other denominator fields because you will be using them to weight later on.* Therefore, the fields you should have in the crosswalk table are:
- 2000 GEOID
- 2010 GEOID
- Weight
- Total Population*
- Total Occupied Housing Units*
- Total Owner-Occupied Housing Units*

- Population Over 25
- White Non-Hispanic Alone Population
- Population over 25 with a Bachelor's degree or more
- Median Family Income (In 2016 dollars)

* = used for weighting - do not take the weighted average (See instructions below)

To begin, hide the column with the 2010 geographies so it isn't confusing as you're adding the data from the Social Explorer table. Once the data that corresponds to that field is entered, you don't need to use the 2000 geographies anymore and can hide this one, unhiding the 2010 field. Using a pivot table, get a count of how many of each FIPS ID are in the 2010 column. (Alternately, you could sort them in ascending order and check manually, but this can be tedious for larger areas.) It helps to highlight the rows of any matching IDs so that you can come back to them easily when you need to weight them. Most matches will be pairs, but you may find some where there are three or four instances of the same ID. This is not a problem—it just means that the new 2010 tract has been composed of pieces of more than two 2000 tracts.

Add a column to the right of the original. For all multiples of the same ID number, use the function below to calculate the weighted average:

=SUMPRODUCT(range of values, range of weights)/SUM(range of weights)

NOTE: If one of the values seems dubious - for example, a "$0" listed for MFI, you should not factor it into the weighting, as it will bring down the average artificially. Calculate the weighted average of all other matches, excluding these.

After you've finished calculating all weighted averages for IDs with multiple entries, you can simply copy over the value from any ID without matches. Do not copy over values from fields with a weight listed as "0"—these do not translate to 2010 geographies.

You should now have a value for every ID that is either a weighted average of multiple 2000 values or simply a copy of a single 2000 value. Double check to make sure there are no zeros that seem dubious.

Complete this process for each of the nine fields in the list above.

For the weighting values (population, number of units, etc.), which are based on nominal population figures rather than averages or percentages, use the following formula when there are multiple values for the same census tract instead of calculating the weighted average:

= (value for 1st census tract * weight of that census tract) + (value for 2nd census tract * weight of that census tracts) + …

At this point, keep this working folder with the formulas so you can return to it, as you may run into questions or errors later on that need to be checked. If you don't have the formulas visible, you won't be able to determine what went wrong. Copy and paste all these values into a new worksheet.

To make the worksheet easier to use, you will delete unnecessary information:
- Delete the rows for any fields with a "0" weight.
- Also, delete all but the row that includes each weighted average.

**Step 6: Calculate difference in values from 2000 to 2016.**

Calculate for each of these either the percent change or the percentage point change.

| Percentage Point Increase/Decrease | Percent Change |
|---|---|
| Percent Non-Hispanic White Alone<br>Percent College Graduate<br>Percent Homeowners | MFI |

For percent change, use this formula: =(2016-2000)/2000
For percentage point change, use this formula: =2016-2000

**Step 7: Calculate the z-score for each factor**

To help with the calculation of weighted standard deviation, create a new column to the right of the values, and name it (x-x_bar)^2. This is a component to the weighted standard deviation formula and is based on how far the value is from the average. To calculate the (x-x_bar)^2 component, use the following formula. *NOTE: It helps to use $ symbols on the MSA average to avoid having to retype the cell location.* For example, "$C$354")

=(value - MSA average)^2

Make sure to delete the resulting value for any census tracts that had a dubious 0—in other words, a 0 that was the result of lack of information rather than a true value. Otherwise, this function will calculate the difference between "0" and the average, which will confuse your result. Repeat this process with the other three sets of values.

Now you can calculate the weighted standard deviation for each set of values. The reason why you've included the total population, total housing units, etc. in this spreadsheet is because they will be used to weight each census tract in the calculation of the weighted standard deviation. Before calculating the weighted standard deviation, you will need one more component. This is based on the count of census tracts.

=(count - 1) / count

This will be used as you calculate the weighted standard deviation. Below is the formula.

=SQRT(SUMPRODUCT(range of (x-x+bar)^2 component values, range of weights)/(((count-1)/count)*(SUM(range of weights))))

It will look like this:

=SQRT(SUMPRODUCT(B2:B351,D2:D351)/(C358*(SUM(B2:B351))))

Now you are able to calculate the Z-score for each value, using the components you have calculated. To do this, the "Standardize" function is used.

=STANDARDIZE(value, mean, standard deviation)

Once you have a Z-score for every census tract (unless there was no information given for that tract), make a clean worksheet by pasting only the values from the calculation worksheet. You can delete all but the Z-scores for each of the four categories, as well as the census tract ID. This will be enough to map in GIS.

**Step 8:  Determine if a tract experienced demographic change**

For a tract to trigger a "yes" to demographic change, it must have an average Z-score of  >.5 and at least two of the two factors must have a z-score above .5. Create four columns to calculate whether a z-score was above .5.

Use the formula: =IF(ZScore=TRUE,"1","0")

This should mean a z-score above .5 results in a 1 and below .5 results in a 0. The create a column to sum the four z-score results of the formula for each tract. Results should range from 0 to 4. Finally, to calculate if both conditions are met to trigger demographic change, create a column and enter the following formula.

=IF(AND(SumFactorsAbove.5>=2,AvgZscore>=0.5),"Yes","No")

## 3. HOUSING MARKET CHANGE:

For the housing market, we are interested in the median home values in 1990, 2000 and 2012-2016, as well as the percent median home value change from 1990 to 2012-2016 and from 2000 to 2012-2016. Unlike Vulnerability and Demographic Change, the housing market values are not normalized by the MSA average, but rather are broken into quintiles to provide a base understanding of where each tract falls within the range of values for the study area.

Some tracts will be missing Median Home Value information in the surveys because there are not enough homeowner occupied units to produce a reliable Median Home Value. In these cases we use median rent data to determine where a census tract falls in the analysis.

**Summary of Housing Market Typology:**

**Accelerating tracts** are those with a low or moderate 2012-2016 home value (defined as the bottom 3 quintiles of median home value in 2016) AND with high appreciation between 2000 and 2012-2016 (i.e., top two quintiles of appreciation of median home value).

**Appreciated tracts** are those with a low (bottom three quintiles) median home value in 1990 AND High (top two quintiles) median home value in 2012-2016 AND High 1990 to 2012-2016 appreciation (top two quintiles).

**Adjacent tracts** are those with a low or moderate 2000 value (bottom 3 quintiles) AND low or moderate (bottom 3 quintiles) appreciation of median home value AND that touch the boundary of at least one tract with a high 2016 value and/or high 2000-2016 appreciation (top two quintiles). The following steps require using data from the decennial 1990 and 2000 censuses and the 5-year 2012-2016 American Community Survey (ACS). ). Because of the difference in census tract boundaries between these two years, crosswalk tables were used to "translate" between geographies. These were downloaded from the Longitudinal Tract Database website hosted by Brown University.[4] This process will be described in greater detail in the methodology below:

**Step 1: Download and prepare Census 2000 and ACS Data for 2012-2016**

Using the Social Explorer or American Fact Finder websites, all data for 1990, 2000, and 2012-2016 were downloaded and opened in Excel. Download the Median Home Value and Median Rent for each time period.

**Step 2: Download the crosswalk table to translate between geographies**

The crosswalk table includes a separate row for every shape that is created when the 1990, 2000, and 2010 census tract boundaries are overlaid. The table identifies each of these areas by their 1990, 2000, or 2010 FIPS ID. In the crosswalk table, each of the overlay boundaries is weighted

according to how much of the 1990 or 2000 population can be attributed to each new 2010 geography.

**Step 3: Use the Crosswalk Table to determine a weighted 2016 figure for the 2016 Median Home Value.**

The use of the crosswalk table is not complicated, but it can be a little bit counterintuitive.

It's easiest to begin is by using the =VLOOKUP function to insert all values from the 1990 or 2000 data table from Social Explorer into a copy of the crosswalk data for your region. (Don't try to do this the opposite way, as there are usually significantly more census tracts in the later year. If you try to add the crosswalk data to the figures, you will miss some of the census tracts.) *NOTE: You should not delete the "Total Population", "Total Occupied Housing Units", and all other denominator fields because we will be using them to weight later on.* Therefore, the fields you should have in the crosswalk table are:

- 1990 or 2000 GEOID
- 2010 GEOID
- Weight
- Total Population*
- Total Occupied Housing Units*
- Total Owner-Occupied Housing Units*
- Median Home Value (In 2016 dollars)
- Median Rent (In 2016 dollars)

* = used for weighting - do not take the weighted average (See instructions below)

To begin, hide the column with the 2010 geographies so it isn't confusing as you're adding the data from the Social Explorer table. Once the data that corresponds to that field is entered, you don't need to use the 1990 or 2000 geographies anymore and can hide this one, unhiding the 2010 field.

Using a pivot table, get a count of how many of each FIPS ID are in the 2010 column. (Alternately, you could sort them in ascending order and check manually, but this can be tedious for larger areas.) It helps to highlight the rows of any matching IDs so that you can come back to them easily when you need to weight them. Most matches will be pairs, but you may find some where there are three or four instances of the same ID. This is not a problem—it just means that the new 2010 tract has been composed of pieces of more than two 1990 or 2000 tracts.

Add a column to the right of the original. For all multiples of the same ID number, use the function below to calculate the weighted average:

=SUMPRODUCT(range of values, range of weights)/SUM(range of weights)

NOTE: If one of the values seems dubious—for example, a "$0" listed, you should not factor it into the weighting, as it will bring down the average artificially. Calculate the weighted average of all other matches, excluding these.

After you've finished calculating all weighted averages for IDs with multiple entries, you can simply copy over the value from any ID without matches. Do not copy over values from fields with a weight listed as "0" —these do not translate to 2010 geographies.

You should now have a value for every ID that is either a weighted average of multiple 1990 or 2000 values or simply a copy of a single 1990 or 2000 value. Double check to make sure there are no zeros that seem dubious or incorrect functions.

Complete this process for each of the nine fields in the list above.

definitions directly from Social Explorer—this option may be preferred to what is described here and require less effort.

For the weighting values (population, number of units, etc.), which are based on nominal population figures rather than averages or percentages, use the following formula when there are multiple values for the same census tract instead of calculating the weighted average:

= (value for 1st census tract * weight of that census tract) + (value for 2nd census tract * weight of that census tracts) + …

At this point, keep this working folder with the formulas so you can return to it, as you may run into questions or errors later on that need to be checked. If you don't have the formulas visible, you won't be able to determine what went wrong. Copy and paste all these values into a new worksheet.

To make the worksheet easier to use, you will delete unnecessary information:
• Delete the rows for any fields with a "0" weight.
• Also, delete all but the row that includes each weighted average.

**Step 5: Calculate difference in values from 1990 or 2000 to 2012-2016.**

For the percentage change in value from 2000 to 2016, you will have to create two new columns labeled HomeValChg_00_16 and RentValChng_00_16.

For percent change, use this formula: =(2016-2000)/2000

**Step 6: Rank tracts by quintiles.**

In order to determine the housing market change type for the tract we need to know whether the Median Home Value and change in value (or Rent in the tracts missing home value data) were High or Low.

To the side of the document create new columns titled: HomeValue00_Break, HomeValue16_ Break, HomeValChg_Break, Rent00_Break, Rent16_Break, RentValChg_Break.

Calculate the quintile breakpoints for each of the six data values for all of the tracts with the following:

1st Quintile =PERCENTILE.INC($B$2:$B$200, 0.2)
2nd Quintile =PERCENTILE.INC($B$2:$B$200, 0.4)
3rd Quintile =PERCENTILE.INC($B$2:$B$200, 0.6)
4th Quintile =PERCENTILE.INC($B$2:$B$200, 0.8)

Next we need to determine if a value is High (in the top two quintiles) or Low (in the bottom three quintiles). Create a home value set of columns titled: 00_Quintile, 16_Quintile, Chg_Quintile, Housing_Type, Adjacent? And a rent value set of columns titled: 00_Quintile, 16_Quintile, Chg_ Quintile, Housing_Type, Adjacent?

Use the following formula pulling from the appropriate value's 3rd quintile breakpoint, (which were calculated in the previous step) where B2 in the example below is an individual tract value and $L$4 is the 3rd quintile breakpoint.

=IF(B2<=$L$4,("Low"),("High"))

Use formula to calculate all the Quintile columns.

The next step is to determine the Housing Market Typology using the following formula, where the F column is 16_Quintile values, G2 is Chg_Quintile values, and E2 is 00_Quintile values.

=IF(AND(F2="Low",G2= "High"), "Accelerating", IF(AND(E2="Low", F2="High", G2="High"), "Appreciated"))

The above formula can determine two of the three housing market typologies, however the Adjacent typology will require a different formula and the use of ArcGIS, since part of the typology definition is based on spatial adjacency to other high value or high rate of change tracts.
To calculate potential Adjacent tracts, use the following formula:

=IF(AND(E2="Low",G2="Low"),"Adjacent")

Now that you have a list of potentially Adjacent tracts you will need to move to ArcGIS. To prepare your excel data for ArcGIS, copy and paste only the value of the Housing Market Calculations onto a new sheet titled HousingMarket_GIS. Make sure that none of the titles of your columns include symbols or spaces.

Open ArcGIS and the study tract area shapefile with your census tract outlines and IDs.

Join the study area shapefile to the HousingMarket_GIS spreadsheet based on the GEOID reference number of the census tracts which should be in both the shapefile and the spreadsheet. Validate the join to check that all data is being properly cross referenced and then complete the join.

Check that the join was successful by opening the study area shapefile's attribute table. You should see all the HousingMarket_GIS information included at the end of the table.

Export the joined shapefile to create a permanent shapefile titled HousingMarket_0016. Add the new shapefile to the map document.

Now Select by Attribute all potential adjacent tracts. Make a layer of only the selected features and title it Potential_Adjacent. Clear your selection.

Use the Select by Location function to select all Potential Adjacent tracts that are touching the boundary of a tract with a "High" 2016 Home Value AND/OR a "High Home Value Change from 2000-2016.

The results will be the Adjacent tracts. You can then update your spreadsheet to reflect which tracts are actually adjacent. Create a final Housing Market Type Column to record the final results.

## 4. NEIGHBORHOOD TYPOLOGY

Now that we have calculated Vulnerability, Demographic Change and Housing Market Types we can determine Neighborhood Typology.

Below is a summary of table of how each typology is defined:

Table 1: Tract-level neighborhood typology representing different stages of gentrification [5]

| Neighborhood Type | Vulnerable population? | Demographic change? | Housing market condition |
|---|---|---|---|
| Susceptible | Yes | No | Adjacent |
| Early: Type 1 | Yes | No | Accelerating |
| Early: Type 2 | Yes | Yes | Adjacent |
| Dynamic | Yes | Yes | Accelerating |
| Late | Yes | Yes | Appreciated |
| Continued Loss | No | Has % white and % with BA increasing | Appreciated |

**Step 1:** Create a new spreadsheet/tab to compare all the necessary information to determine Neighborhood Typology.

**Step 2:** Carefully copy and paste the following information into the spreadsheet: Census Tract GEOID (number), Census Tract Name, Vulnerability Status, Demographic Change Status, Housing Market Type, % Non-Hispanic White Alone increasing and % BA increasing.

**Step 3:** Use the chart to determine if the tract qualifies for a Neighborhood Typology.

# PART II: NEIGHBORHOOD DRILLDOWN

In order to better understand context-specific triggers of displacement and gentrification, Bates (2013) recommends performing "neighborhood drilldowns" that take a deep data dive into a neighborhood. This information should help inform the best tools and policies to combat gentrification and displacement in the particular neighborhood. It is easier for the purposes of working with census data to look at a neighborhood based on census tract boundaries.

## 1. AMERICAN COMMUNITY SURVEY DATA

A baseline understanding of demographic change can be established using American Community Survey data, which can be accessed via the websites of American Factfinder or Social Explorer. It is important to check that the census tract you are interested in has not had a change in its boundaries over the time period being investigated; if it has then you will need to work with Crosswalk data to ensure accurate representation.

**Step 1:** From the American Factfinder home page select the Advanced Search link, then select the "SHOW ME ALL" button.

**Step 2:** Select the "Geographies" button from the left side of the screen. Use the window options to narrow down results to the census tracts you are interested in. Then close out of the window.

**Step 3:** In the top search bar type: "DEMOGRAPHIC AND HOUSING ESTIMATES" and look for the 2016 ACS 5-year estimates result. Select the table.

**Step 4:** Download data – select the "Use the data" button. This should provide you with population, age, and race/ethnicity data.

**Step 5:** Repeat Steps 3 and 4 to search for the following ACS 2012-2016 data: Languages Spoken at Home for Population 5 years and over, Median Household Income, Educational Attainment of population over 25, and Tenure. Note that you can tell where the data comes from in the Dataset column of the search results table.

**Step 6: Repeat process of steps 3-5 to download the same data from the 2000 and 2010 censuses.**

## 2. CHAS DATA

HUD's Comprehensive Housing Affordability Strategy (CHAS) Data is useful for gaining information about the burden of homeownership or renting on different groups in a neighborhood.

**Step 1.**  Download data from the HUD CHAS data by selecting the year you are interested in (2006-2014) then below the selected years select the "Data" button. From there select the year "2010-2014 ACS 5-year Average"6 and the Geographic level "Census Tracts", download as a cvs file. This will provide you with information for all census tracts in the country,

**Step 2.**  Use the CHAS Data Dictionary to find the correct Table csv file for the information you need. You will need to cross-reference the Data Dictionary Table column description with the coded column labels in table.

Note that the data is broken into different levels of HDMFI (HUD Defined Median Family Income). Depending on how data needs to be displayed it might be necessary to sum numbers across different levels.

## 3. SCHOOLS

Changes in a neighborhood's school population can reveal greater trends, which is why school data is included in the drilldown. Since high schools tend to have very large catchment areas they are left out of the analysis.

**Step 1.** Identify all elementary and middle schools whose catchment areas include portions of the drilldown census tracts. Use the catchment area maps for the local school districts (for example, AISD, Del Valle). For charter schools in Texas, check the Texas Education agency map.

**Step 2.** Research pertinent school information by looking up Texas Education Agency (TEA) Texas Performance Reporting System (TPRS) reports on the TEA website. Select the year that you wish to download a report, then select the "Campus Reports" link on the left side of the page. You can then search for a school by name.

**Step 3:** In order to understand roughly how much of the student –aged population is attending local schools you will need to combine ACS age data with the TRPS reported data on school attendance.

Note that since catchment areas for each school will likely extend beyond the drilldown neighborhood you will likely need to identify the additional census block groups or census tracts that most closely match the catchment area of each school by using the census tract map.

Once you have the age data for all the census tracts/block groups in a school catchment area you can sum the number of 5-9 year olds and see what percent of that total is enrolled in the elementary school, or in the case of a middle school students the sum of the number of 10-14 year olds.

## 4. HMDA DATA

The Federal Home Mortgage Disclosure Act (HMDA) requires banks to report on the applications for home mortgages and included with that information is socioeconomic information about the applicant as well as whether or not the mortgage application was approved. Note that the data does not reflect ALL mortgage applications but does provide an informative cross-section of the mortgage market.

**Step 1.** Go to the FFIEC website page for HMDA to download an Aggregate Report. Search for data in the most recent year available. The site will allow you to narrow down information to the MSA level.

**Step 2.** After selecting your MSA you will need to select the tables you are interested in analyzing. These include: Applications by tract, Home Purchase Loan Applicants by Race/Ethnicity and Home Purchase Loan Denial Rates by Race/Ethnicity. Download data in Excel form.

**Step 3.** Create a new spreadsheet tab to summarize the data you are interested in by census tract number.

## 5. AFFORDABLE HOUSING

Knowledge of the existing subsidized affordable housing in a tract can help inform which tools are appropriate to use in that tract.

**Step 1.** Download/acquire Subsidized Affordable Housing Inventory data from the appropriate authority (typically the city, but sometimes a local affordable housing organization).

**Step 2.** Using ArcGIS, add the study area shape file and the affordable housing data.

**Step 3.** Create individual shapefiles for each "drilldown" tract.

**Step 4.** Use the Select by Location tool to determine which affordable housing properties are located within a drilldown tract. Export the resulting table to use for reference and further analysis.

## 6. BUILDING PERMITS AND RESIDENTIAL REAL ESTATE LISTINGS

Building permits and residential real estate listings are ways to assess the "hotness" of a given neighborhood in terms of building and sales activity. Both data sources are more timely than Census data (e.g., as of the time of writing, in mid 2018, the most recent census tract-level home value data is from 2012-2016). They are also, in some ways, more accurate.[7] Access to data on city-level permitting activity varies by jurisdiction. It Austin it can be obtained from the city's open data portal.

Residential real estate listings data (Multiple Listing Service, or MLS data) is not publicly available. We obtained MLS data for Austin courtesy of the Austin Board of Realtors (ABOR).

Both permit data and MLS data must be geoprocessed, likely using GIS, to identify data points that lie within the particular drilldown census tract to be analyzed.

## Endnotes

[1] https://www.huduser.gov/portal/datasets/cp.html.

[2] https://www.census.gov/cgi-bin/geo/shapefiles/index.php.

[3] https://s4.ad.brown.edu/projects/diversity/Researcher/LTBDDload/Default.aspx. Note that it recently became possible to download 2000 or 1990 data using 2010 census tract definitions directly from Social Explorer—this option may be preferred to what is described here and require less effort.

[4] https://s4.ad.brown.edu/projects/diversity/Researcher/LTBDDload/Default.aspx. As mentioned earlier in note 3, it recently became possible to download 2000 or 1990 data using 2010 census tract

[5] Bates, Lisa, "Gentrification and Displacement Study: implementing an inclusive development strategy in the context of gentrification," May 18, 2013, at 31, https://www.portlandoregon.gov/bps/article/454027.

[6] Since we completed our drilldown analysis, 2011-2015 CHAS data have been released.

[7] Census data on home values relies on homeowner-occupants accurately reporting the value of their own homes to Census enumerators. Clearly homeowners vary in the how accurately they understand the value their home would fetch on the open market were it to be sold.

# Uprooted:

## Residential Displacement in Austin's Gentrifying Neighborhoods and What Can Be Done About It

*Case Studies of Local Efforts to Mitigate Displacement in Gentrifying Neighborhoods*

**2018**

The University of Texas Center for Sustainable Development in the School of Architecture & the Entrepreneurship and Community Development Clinic in the School of Law

**Heather Way**, Clinical Professor, **The University of Texas School of Law**

**Elizabeth Mueller**, Associate Professor of Community and Regional Planning, **The University of Texas at Austin**

**Jake Wegmann**, Assistant Professor of Community and Regional Planning, **The University of Texas at Austin**

**With Research and Writing Assistance from:**
Nicholas Armstrong and Ben Martin, graduate students in the Community and Regional Planning Program at **The University of Texas at Austin**





This report was commissioned by the City of Austin, via a resolution adopted by the Austin City Council on August 17, 2017. The report reflects the research and opinions of the individual authors only and does not present an official position of the University of Texas.

Uprooted: Residential Displacement in Austin's Gentrifying Neighborhoods and What Can Be Done About It

© 2018 Heather Way, Elizabeth Mueller, and Jake Wegmann
This work is licensed under a Creative Commons Attribution-NonCommercial-ShareAlike 4.0 International License; https://creativecommons.org/licenses/by-nc-sa/4.0/



For electronic access to the report, displacement maps, and other information related to the gentrification and displacement study, visit https://sites.utexas.edu/gentrificationproject

# Uprooted:

## Residential Displacement in Austin's Gentrifying Neighborhoods and What Can Be Done About It

*Case Studies of Local Efforts to Mitigate Displacement in Gentrifying Neighborhoods*

# Table of Contents

**10 Cross-Cutting Lessons for Cities from Three Gentrifying Neighborhoods** ....................... 3

**Columbia Heights – Washington D.C.** .................................................................................... 8

    Executive Summary ........................................................................................ 8

    Case Study ................................................................................................ 10

**Guadalupe Neighborhood – Austin, Texas** ........................................................................ 26

    Executive Summary ...................................................................................... 26

    Case Study ................................................................................................ 28

**Inner North and Northeast – Portland, Oregon** ................................................................ 45

    Executive Summary ...................................................................................... 45

    Case Study ................................................................................................ 47

# Case Studies of Local Efforts to Mitigate Displacement in Gentrifying Neighborhoods

To help inform Austin's efforts to mitigate displacement in gentrifying areas, we developed three case studies of historically vulnerable neighborhoods where local efforts have focused on mitigating displacement in the face of rising housing costs and redevelopment pressures. The three areas we studied are the Guadalupe neighborhood in Austin, the Columbia Heights neighborhood in Washington, D.C., and Inner North/Northeast Portland, a group of neighborhoods in Portland, Oregon. Case study research involves understanding both the process of change and efforts to prevent displacement in context. This is particularly important since there is little systemic research on many of the policies that have adopted. We also hope to raise awareness of innovative approaches being taken by cities around the country in this policy arena.

Two of the neighborhoods studied have multiple decades of experience addressing displacement in the face of gentrification. Through these particular case studies, we specifically sought to examine how efforts to address displacement evolve over time as neighborhoods enter different stages of gentrification. We also looked for approaches that have had the most positive outcomes, which approaches did not turn out as expected, and which approaches could have had more positive outcomes if implemented differently—now that leaders have the benefit of experience and hindsight.

The case studies also highlight what types of outcomes can be expected when concentrated efforts are made to address displacement in a particular neighborhood facing displacement pressures. As we found in our examination of case studies from around the country, no city with a robust job and housing market has eliminated the displacement of vulnerable persons. It is important for cities, advocates, and impacted communities seeking to tackle displacement amidst these larger economic pressures to understand the challenges in this arena and develop their own definition of what success looks like.

To select the neighborhoods to study, we spent several months researching possible candidates, focusing on the following criteria, understanding that not every potential case study candidate would meet all of them. They are neighborhoods:

1.  That are in cities with hot job and housing markets and high population growth.
2.  That have a historical concentration of persons of color and are undergoing gentrification, regardless of stage.
3.  Where there have been on-going efforts concentrated at a neighborhood scale to address displacement.
4.  That have utilized a diverse range of strategies and policies for mitigating displacement.
5.  Where the majority of key tools utilized to address displacement are legal in Texas, given the Lone Star state's heavy restrictions on city policymaking in this arena.
6.  Where we have experience working, have conducted prior research, or have on-the-ground contacts involved in anti-displacement work.
7.  Where cities have played a major role in leading or supporting displacement mitigation strategies.

After this review and many discussions among our research team, we eventually settled on the three neighborhoods we present here.

Each case study includes the historical and current context for the displacement mitigation work, an overview of key strategies and tools used to mitigate displacement; key challenges and issues confronted; and key takeaways. Drawing from all three case studies, we also developed a list of ten cross-cutting lessons for the City of Austin as it seeks to increase its efforts to address displacement in Austin neighborhoods.

# 10 Cross-Cutting Lessons for Cities from Three Gentrifying Neighborhoods:

## Columbia Heights (Washington, D.C.),
## Guadalupe Neighborhood (Austin, Texas),
## Inner North/Northeast Portland (Portland, Oregon)

1. Make meaningful and robust community participation of those most affected by displacement a priority in the planning, implementation, and on-going oversight of efforts to mitigate displacement.

2. Develop the capacity of tenants and other vulnerable groups so they can be active participants in implementing displacement mitigation strategies.

3. Intervene early.

4. Anticipate and include strategies for addressing displacement as part of public revitalization strategies and major infrastructure projects.

5. Develop comprehensive, community-driven, neighborhood-level strategies for mitigating displacement of vulnerable populations, with measurable goals and timelines for implementation.

6. Provide substantial levels of city funding dedicated to supporting neighborhood-level strategies for mitigating displacement of vulnerable populations.

7. Remove as much land from market pressures as possible, through mechanisms such as community land trusts, long-term affordability restrictions, and nonprofit and public ownership of land.

8. Develop a network of high capacity organizations to identify, coordinate, and act on opportunities to preserve affordable housing and prevent the displacement of vulnerable populations.

9. Develop realistic expectations of what constitutes success and the time to achieve your goals.

10. Long-term progress on mitigating displacement of vulnerable populations requires on-going support and engagement from elected officials, civic leaders, and residents, including those from impacted communities.

# 10 Cross-Cutting Lessons for Cities from Three Gentrifying Neighborhoods:

## Columbia Heights (Washington, D.C.), Guadalupe Neighborhood (Austin, Texas), Inner North/Northeast Portland (Portland, Oregon)

**1. Make meaningful and robust community participation by those most affected by displacement a priority in the planning, implementation, and on-going oversight of efforts to mitigate displacement.**

Community voices should be incorporated throughout the development and implementation of displacement mitigation plans and strategies to ensure they are aligned with community needs. Effective engagement requires strong city efforts to reduce barriers to participation and to reach out to directly impacted residents, including those who have already been displaced. Active, on-going community oversight of a city's displacement mitigation programs—such as the annual evaluations and routine development reviews conducted by the N/NE Portland Oversight Committee—brings critical transparency and accountability to the process.

**2. Develop the capacity of tenants and other vulnerable groups so they can be active participants in implementing displacement mitigation strategies.**

Building the capacity of tenants and other vulnerable groups is critical to the implementation of many important displacement mitigation strategies, including resident purchases of mobile home parks and apartment complexes and the creation of community development corporations. City support for capacity building includes funding organizing and technical assistance. Enhanced legal protections for vulnerable tenants—whether at a city or state level—such as strong protections from retaliation, a right to purchase, and a right to organize, are also important.

D.C.'s strong tenant protections, with enforcement support by the Office of Tenant Advocacy ($820,000 budget), along with city funding for tenant organizing groups and technical assistance providers, have all been critical to the district's preservation of apartments under D.C.'s Tenant Opportunity to Purchase Act. Much of the Guadalupe neighborhood's success in mitigating displacement has arisen from the grassroots mobilization of residents who fought back against redevelopment in the neighborhood and the early support residents received to create a displacement mitigation plan and community development corporation. Both laid the foundation for decades of successful work to mitigate displacement of vulnerable residents in the neighborhood.

**3. Intervene early.**

As gentrification picks up steam in a neighborhood, it becomes much more difficult to feasibly acquire properties for the preservation and construction of affordable housing. For neighborhoods that are susceptible to gentrification or in the very early stages of gentrifying, it can be hard to envision the rapid rise in property values that will come in later stages of gentrification. But buying land and housing in this early period gives cities, community development organizations, and residents more capacity to mitigate displacement when change does come. For example, Guadalupe neighborhood's affordable housing inventory is almost all located on land that was acquired before gentrification picked up steam in the neighborhood, and a large portion of the affordable housing in Columbia Heights is subsidized housing that was built prior to the neighborhood's gentrification.

**4. Anticipate and include strategies for addressing displacement as part of public revitalization strategies and major infrastructure projects.**

In some neighborhoods, the shift from the need for revitalization to the need for anti-displacement measures can occur quickly. When a city institutes revitalization programs or otherwise makes significant investments in a community, such as new transit infrastructure, it should anticipate displacement and incorporate affordable preservation and other displacement mitigation strategies into those plans up front, rather than reacting to this need later on.

In both Columbia Heights (D.C.) and Inner North/Northeast (Portland), for example, if displacement mitigation strategies had been integrated from the beginning of the cities' revitalization strategies, many more affordable units could have been preserved and fewer vulnerable residents impacted. If a city has not addressed displacement up front, it should engage in active monitoring of how its investments are impacting vulnerable residents and be prepared to act quickly to adapt or revamp its strategies. When displacement accelerated in N/NE Portland, for example, the city redirected its tax increment finance funds from economic development towards a comprehensive anti-displacement strategy.

**5. Develop comprehensive, community-driven, neighborhood-level strategies for mitigating displacement of vulnerable populations, with measurable goals and timelines for implementation.**

Displacement mitigation strategies and outcomes should be in clear alignment with community needs and priorities. Having a plan that includes specific goals and timelines also allows for greater accountability and oversight over a city's progress towards addressing displacement.

Efforts to mitigate displacement in the Guadalupe neighborhood of Austin have been anchored in the community, beginning with a community-generated plan and actionable strategies for addressing displacement and preserving the neighborhood. The N/NE Portland Neighborhood Housing Strategy was likewise developed with robust community input and provides specific targets, strategies, and goals to address displacement in a defined geographical area.

**6. Provide substantial levels of city funding dedicated to supporting neighborhood-level strategies for mitigating displacement of vulnerable populations.**

The implementation of a neighborhood-level displacement mitigation strategy at a scale large enough to have a systemic impact requires levels of financial commitment equivalent to or greater than city investments in transportation and other important civic endeavors. This typically means having access to on-going funds that do not come out of a city's general fund, which is subject to annual budget battles.

Producing and preserving affordable housing at scale, like widening freeways or building regional parks, is an undertaking whose costs are often startling to laypeople. For instance, in the absence of oversubscribed federal subsidies, city contributions in the range of $150,000 to $300,000 or more are required for each new affordable housing unit preserved or built in a gentrifying neighborhood for low-income families, with the exact amount depending on the local housing market, a neighborhood's stage of gentrification, the income levels of families served, and type of housing product. Programs that serve the most vulnerable residents of a community require the greatest levels of investment.

In Columbia Heights, $48 million in investments from the D.C. Housing Production Trust Fund since 2001 has supported the creation and preservation of 321 units, a subsidy of close to $150,000 per unit. The District's current mayor has committed $100 million per year to D.C.'s Housing Production Trust Fund (HPTF)—the largest such commitment by a city in the United

States. The City of Portland is funding implementation of the N/NE Portland Neighborhood Housing Strategy with $100 million in tax increment financing over a six-year period, an average of $17 million a year.

7. **Remove as much land from market pressures as possible, through mechanisms such as community land trusts, long-term affordability restrictions, and nonprofit and public ownership of land.**

Acting early to take land out of the speculative real estate market protects precious public investments in affordable housing and ensures opportunities for future generations of low-Income residents to live in a gentrifying neighborhood. Stewardship of affordable housing investments is best achieved through community and public ownership of affordable housing developments and the land underneath the homes, but long-term deed restrictions also help insure that land remains available for affordable housing for generations.

Guadalupe Neighborhood Development Corporation's (GNDC) early affordable homes were sold with rights of first refusal but without caps on the resale price. After gentrification intensified, GNDC could not afford to exercise its right of refusal on these homes and several were re-sold at market prices far exceeding what a low-income family could afford. Today, GNDC's leaders regret that they did not utilize stronger affordability protections in those earlier home sales, and the organization now uses the community land trust model exclusively for its homeownership units. Another benefit of community ownership of land—such as GNDC's "four corners strategy" of acquiring as many lots as possible on each corner of each neighborhood block—is that the ownership provides residents with stronger control over future redevelopment.

8. **Develop a network of high capacity organizations to identify, coordinate, and act on opportunities to preserve affordable housing and prevent the displacement of vulnerable populations.**

Essential to a robust affordable housing preservation initiative is having a coordinated network of preservation groups and other stakeholders who meet regularly to closely monitor at-risk affordable rental properties and collaborate on proactive preservation interventions. Effective monitoring includes creating and actively updating a database of at-risk properties that incorporates detailed information about properties' expiring subsidies, habitability, and code violations, and other indicators of vulnerability. The D.C. Preservation Network (DCPN), one of the best national models for affordable housing preservation, has become a critical forum for D.C. preservation groups to share information and resources, track at-risk buildings, and coordinate preservation efforts. A comprehensive database should focus not only on properties with expiring subsidies but also those in disrepair.

As an example of what is at stake, Austin is in the process of losing at least three apartment developments in the Low Income Housing Tax Credit program (two of them in or near the gentrifying Montopolis neighborhood), but early tracking and intervention in these properties could have resulted in their preservation. Instead, the properties are on track to convert to market rents or be demolished. Replacing these 740 affordable units will require a bare minimum of $70 million in public funding (for rents at 60 percent of the median income; more subsidy would be required to serve lower-income families).

**9. Develop realistic expectations of what constitutes success and the time to achieve your goals.**

Even with large-scale, concentrated investments in a neighborhood to mitigate residential displacement, it is next to impossible to entirely eliminate displacement in the face of market pressures. Once limited to a select few cities on the coasts, "inversion"—or the increase in demand among the well-off for housing in or near the centers of cities, as distinct from their previous preference for outlying areas—has taken firm hold in most U.S. metropolitan areas. Even long-depressed cities such as Detroit, St. Louis, and Cleveland are now experiencing startling increases in property values and reductions in vacancy rates in their downtowns and certain nearby neighborhoods. In a city such as Austin, which has experienced more economic and job growth over the past 40 years than almost any other city in the U.S., the forces fueling gentrification and displacement are intense and at present show no signs of abating.

The difficult fact is that, unlike in other areas of city planning and management, such as transportation or open space, "model cities" that stand out as clear inspirations to follow in reducing residential displacement in the face of market pressures are difficult to find. This is because the broader forces fueling both inversion at the regional scale and gentrification in particular neighborhoods are largely out of the control of local elected officials.  Success, if it is achieved, will take years of public and private sector focus on comprehensive displacement mitigation strategies—and will likely take the form of reducing and mitigating, rather than altogether halting, residential displacement. Local officials have to set realistic expectations for what can be achieved, the resources that need to be invested to substantially reduce displacement, and how long it will take for real results to manifest themselves.

**10. Long-term progress on mitigating displacement of vulnerable populations requires on-going support and engagement from elected officials, civic leaders, and residents, including those from impacted communities.**

Even though residential displacement that arises as a consequence of inversion and gentrification cannot be entirely eliminated, displacement can be meaningfully mitigated with a multipronged, sustained effort pursued over decades by local stakeholders, as shown by the outcomes in the Guadalupe Neighborhood and Columbia Heights. As with these two neighborhoods, reducing displacement requires a willingness to mix and match a variety of strategies, and to proceed simultaneously on a variety of fronts. And citizens and elected officials have to be willing to support new and unfamiliar approaches, as well as to drastically scale up those that are already achieving results.

To build the political and financial will that are essential to a large-scale displacement mitigation program, elected officials and community leaders also need to invest time and effort in educating the general public on the level of effort and financial commitment required to realize affordable housing production and to enact other anti-displacement measures. Community leaders and residents also have a critical role to play in these efforts by calling attention to the injustices of displacement, holding city leaders accountable at the ballot box, and providing on-going oversight of city investments to ensure they are responsive to community needs.

# Columbia Heights

### WASHINGTON, D.C.

A Case Study of Affordable Rental Housing Preservation and Tenant Ownership in the Face of Large-Scale Displacement Pressures

## Overview

Columbia Heights is a historically African-American neighborhood in Washington, D.C., located near Howard University. The neighborhood suffered heavy damage during the 1968 riots following the death of Martin Luther King, Jr., and experienced disinvestment and population loss that lasted into the 1990s. In 1996, the District of Columbia began to implement a series of economic development projects to transform Columbia Heights, including a new subway stop. While the public investment strategies were a successful catalyst for bringing in new development and residents, the changes led to intense displacement pressures for longtime residents. In 2012, Columbia Heights was named one of the fastest-gentrifying neighborhoods in the country, and today, the bulk of housing in the neighborhood is well beyond the means of low-income residents of color.

Despite the transformation of Columbia Heights, today approximately 22 percent of the housing units in the neighborhood are restricted for low-income renters, as a result of a heavy concentration of subsidized housing that was built before the neighborhood's gentrification, along with several key strategies and tools. Since 2001, hundreds of affordable homes in Columbia Heights have been created and preserved and many buildings are owned by former tenants, thanks to D.C.'s tenant protection laws; robust funding; and a high-capacity network of tenant organizing groups, nonprofit developers, technical assistance providers, and other stakeholders. While displacement pressures are still a threat in the neighborhood, the level of affordable housing preserved—in the face of such rapidly-rising housing costs—is significant.

## Key Strategies & Tools

1.  **The Tenant Opportunity to Purchase Act.** D.C.'s Tenant Opportunity to Purchase Act (TOPA) gives tenants a right to purchase when their landlord attempts to sell their property. TOPA has been a critical legal backstop for the city's preservation efforts, coupled with the strategies below. Many buildings purchased under TOPA have become limited equity cooperatives owned by the former tenants.
2.  **Major dedicated funding.** D.C. dedicates large levels of funding for affordable housing preservation and production. The district's current mayor has committed $100 million per year to the D.C.'s Housing Production Trust Fund (HPTF)—the largest such commitment by a city in the United States.
3.  **Coordinated tenant organizing & support network.** A proactive, fast-acting housing preservation network has evolved in D.C. since the 1970s, providing robust technical and legal assistance, tenant organizing, and coordination to preserve affordable apartments. The D.C. Preservation Network (DCPN) has become a critical forum for preservation groups to share information and resources, track at-risk buildings, and coordinate preservation efforts.

## Challenges

- Preserving affordable housing for Columbia Heights' lowest-income residents has been an on-going challenge, requiring deep acquisition and operational subsidies.
- Opponents of TOPA have argued that the law contains loopholes enabling tenants to drag out the TOPA process and extract payments from landlords in exchange for waiving their purchase rights.
- African-American residents with historical ties to the neighborhood have voiced concerns about feeling like strangers in their own neighborhood as a result of the type of redevelopment occurring and the changing neighborhood demographics.

## Outcomes

- Close to 3,000 affordable units restricted in Columbia Heights for low-income households (22% of all housing units).
- 318 affordable rental units in 12 multifamily buildings created or preserved in the neighborhood from 2001 to 2016 through D.C.'s Housing Preservation Trust Fund.
- At least 398 housing units in the neighborhood are limited equity cooperatives, allowing low-income tenants to own their units.
- Average trust fund investment per unit in Columbia Heights (2001-2016): $145,000.

## Takeaways

1. **Incorporate residential displacement mitigation strategies into initial redevelopment plans.** In Columbia Heights, the shift from "needing to revitalize" the neighborhood to "needing to preserve affordable housing" happened very quickly. Once gentrification picks up steam, preservation efforts become much more difficult.
2. **Develop a network of high capacity preservation actors.** A coordinated infrastructure of high-capacity preservation groups that can move with agility and speed is essential to preserving existing affordable rental housing.
3. **Invest in tenant organizing.** Organizing and linking tenants with a committed network of support is also crucial. Tenant voice and power is critical to well-targeted policies.
4. **Provide a legal mechanism that supports tenants' ability to purchase their apartment complexes, including adequate notice and time to complete the purchase.** D.C.'s Tenant Opportunity to Purchase Act (TOPA), by providing tenants with a right to purchase their units when sold and adequate time to complete the purchase, shifts power to tenants and provides a critical legal backstop for preventing displacement of current renters and disincentivizing inequitable redevelopment.
5. **City council and municipal leadership is critical.** Elected officials committed to affordability and mitigating displacement are critical for successful preservation of affordable housing. D.C.'s progressive early councils were deeply committed to affordable housing preservation, which led to TOPA, creation of funding streams, and a large roster of tenant support organizations.
6. **Substantial, dedicated funding is necessary.** Preservation at a scale large enough to be meaningful requires large levels of dedicated funding.

# Columbia Heights

WASHINGTON, D.C.

A Case Study of Affordable Rental Housing Preservation and Tenant Ownership in the Face of Large-Scale Displacement Pressures

## Introduction

Columbia Heights, a historically African-American neighborhood in Northwest Washington D.C., is one of the fastest gentrifying neighborhoods in the country, with median home values exceeding $600,000. Rapidly accelerating housing prices that were spurred by public investment in the late 1990s have contributed to the ongoing loss of low-income residents of color from the neighborhood, beginning with a revitalization initiative coordinated and subsidized by the municipal government.

This case study recounts the work in Columbia Heights to preserve affordable rental housing and curtail the displacement of tenants. Despite the rapid pace of housing appreciation, a substantial amount of affordable housing has been preserved in the neighborhood, thanks to (1) a proactive and fast-acting support network of organizers, advocates, and nonprofit preservation organizations, (2) D.C.'s Tenant Opportunity to Purchase Act (TOPA), which gives tenants first priority when landlords attempt to sell a unit or complex, and (3) the District's large, ongoing financial investments in affordable housing. Recently, the District committed $100 million per year to its Housing Production Trust Fund, the highest amount for any such fund in the United States.[1]

Today, Columbia Heights stands apart from many other gentrifying neighborhoods in terms of the volume of affordable housing units that have been preserved and low-income tenants' ownership of their units. Approximately 3,000 units in Columbia Heights—close to 22 percent of the housing in the neighborhood—are income-restricted today.[2] Tenants have been able to successfully acquire at least 398 units that are operated as affordable units in limited equity cooperatives.[3] While many units with affordable rents are being preserved, others are being lost in Columbia Heights, and there is ongoing frustration among community activists about the levels of displacement and neighborhood change that have occurred and are still materializing.

## Columbia Heights Background and History

Columbia Heights is located two miles directly north of the National Mall in Washington, D.C. At the turn of the 20th Century, Columbia Heights was a white streetcar suburb, home to some of the District's wealthiest residents, but most white residents left the neighborhood after school desegregation and the midcentury dissolution of racialized neighborhood covenants.[4] By 1960, Columbia Heights had become a robust mixed-income and mixed-race community, with African Americans constituting 76 percent of the neighborhood's population.[5]

Columbia Heights was an epicenter of the riots following the assassination of Martin Luther King, Jr. in 1968. The riots inflicted extensive damage on the neighborhood, with thousands of housing units and commercial establishments severely destroyed, including half the properties on 14th Street NW, a main commercial corridor. Five thousand permanent jobs were lost as a result of the devastation, and middle-class families fled the neighborhood.[6]

Storefronts and housing units in Columbia Heights remained boarded up and vacant for decades,



Columbia Heights, Washington, D.C.

and crime rates shot up. In the decade following the riots, an urban renewal plan for the neighborhood was developed to revitalize the area, but little actual development was pursued in Columbia Heights, save for the construction of a federally subsidized affordable housing development along the neighborhood's 14th Street corridor. In addition to the large percentage of African Americans in the neighborhood, the area came to include a growing number of Latinos, as well as a small concentration of Asian Americans, mainly from Vietnam.[7]   In 2000, one census tract in Columbia Heights was 51 percent Latino, the highest concentration in the city.[8]



Buildings destroyed by 1968 riots in Washington, D.C.



Source: Ben Schumin, Creative Commons Attribution-Share Alike 3.0 Unported license

Little economic investment occurred in Columbia Heights until 1996, when a new subway station was constructed in the heart of the neighborhood and the city began to incentivize commercial development, as part of a citywide effort to counter D.C.'s declining population and tax base.[9]   In furtherance of this explicit strategy to attract wealth to Columbia Heights, the city government proceeded to invest $138 million in new and remodeled schools, parks, and other civic amenities in Columbia Heights, while using financial incentives to attract private market developers to build denser housing, commercial space, and mixed-use development.[10]   Starting in 2000, the municipal government also ran an aggressive code enforcement initiative in Columbia Heights, seeking to shut down apartment buildings with major code violations.

The period from 1996 to 2010 was a significant turning point for Columbia Heights. Gentrification pressures had been mounting prior to 1996, but the government's revitalization efforts became a catalyst for the broad-scale makeover of the neighborhood by private developers and contributed to a surge in population and tax base.[11] White, wealthier persons streamed into the neighborhood, and market-rate housing prices skyrocketed by 146 percent from 2000 to 2010, pushing out lower-income African-American residents and Latino residents.[12] During this time period, the number of African Americans in Columbia Heights dropped by 26 percent (from 56 to 40 percent of the total population) and the number of Hispanics declined by 10 percent (from 32 to 28 percent of the population), while the number of white residents increased by 351 percent (from 6 to 27 percent of the total population). Median household income in Columbia Heights increased 61 percent, compared to 16 percent for the District, and the number of residents with a bachelor's degree increased by 189 percent. Meanwhile, the number of households with children declined by 28 percent.[13]

Since 2010, Columbia Heights has continued to see dramatic changes, with more redevelopment and escalating housing values, together with ongoing displacement pressures, leading the area to be named one of the fastest gentrifying neighborhood in the country in 2012.[14] Even with Columbia Height's rising housing prices and median income (which has increased 23 percent since 2010, compared to 9 percent in D.C. as a whole), the neighborhood's population is still racially and economically diverse, with 44 percent of residents making less than $30,000 per year.[15] Since 2010, the area has seen a small increase in African Americans, while the number of Hispanics has continued to decrease, dropping by 10 percent since 2010.[16]

Displacement pressures in Columbia Heights have been mitigated in part by the neighborhood's large pre-existing stock of public housing and privately-subsidized units. In 2001, the neighborhood was home to one third of all subsidized housing in the city, with more than 2,300 units.[17] Today, close to 3,000 units in Columbia Heights are rent restricted, approximately 22 percent of the neighborhood's housing stock.[18]



**Columbia Heights Racial and Ethnic Demographic Change, 1990-2016**

U.S. Census Bureau, Social Explorer. African American, White, and Asian categories refer to non-Hispanic only. "Hispanic origin" refers to all Hispanic origin categories.

# Preserving Affordable Housing and Mitigating Displacement in Columbia Heights

The switch from focusing on revitalization to focusing on affordable housing preservation in Columbia Heights was a slow one for the District of Columbia. Despite efforts by community activists, preservation of existing affordable housing stock was not pursued as a major policy goal during the initial revitalization push in the 1990s.[19]

Even though the focus on housing preservation was slow to take off, a substantial amount of affordable housing has been preserved in the Columbia Heights, thanks to a number of key strategies, resources, and programs in the District. These programs and strategies are discussed in more detail below.

## Washington, D.C.'s Affordable Housing Preservation Programs

1   Tenant Opportunity to Purchase Act. A critical legal backstop in the District's preservation efforts, giving tenants first priority when landlords attempt to sell a unit or complex.

2   D.C. Housing Production Trust Fund. Currently funded at $100 million a year, the highest of amount for any such fund in the U.S.

3   Strong base of grassroots organizing groups, technical assistance providers, and affordable housing developers.

4   D.C. Preservation Network. Brings together major stakeholders to monitor and intervene in properties at risk of losing their affordable rents.

### Tenant Opportunity to Purchase Act

The Tenant Opportunity to Purchase Act (TOPA)[20] plays a key role in the District's affordable housing preservation tools and strategies. TOPA was adopted by the District's Council in 1980, although the law grew out a purchase right that was first created in 1974, with the passage of the District's rent control law.[21]  The tenant purchase right was passed as part of an outburst in civic activism arising out of the civil rights movement and fight for home rule in the District. In addition to TOPA, the first municipal councils of the time passed a slew of progressive tenant protection laws, including rent control and eviction protections.



TOPA's enabling act gives tenants priority opportunity to purchase a building when a landlord plans to put it on the market. Tenants can also transfer their rights to another entity. TOPA is one of the most powerful tools available to preserve affordability in a hot real estate market. The law empowers tenants to have a major role in preserving their housing, while also promoting self-governance.[22]

Affordable Housing Cooperative in Columbia Heights, purchased by tenants through TOPA in 2014

When tenants exercise their purchase rights,

they can transfer their rights to a third party, such as a nonprofit housing organization, or purchase their building and retain ownership, which for low-income tenants is typically done through the creation of a limited equity cooperative, where residents collectively own their building but with resale restrictions to preserve the long-term affordability of the units.[23]  With a limited equity cooperative, residents cannot use homeownership as a wealth-building mechanism, but the tradeoff is that the units remain affordable for the long-term for future low- and moderate-income residents. The initial purchase price of a limited equity co-op unit is typically very low, and many of the limited equity co-ops in D.C. end up affordable to households making less than 50 percent of the area median income, with some purchase prices even affordable for households making less than 30 percent of the area median income.

The right to purchase in TOPA is triggered when a landlord chooses to sell a property, whether or not there is a third-party purchase contract in place.[24]  Before selling the property, the landlord must first provide the tenants with an offer of sale and opportunity to purchase the property. The landlord must also provide a copy of the offer to the municipal government (via "DOPA," see below). If a third-party purchase contract is in place, the price in the offer of sale cannot exceed the price in the third-party contract, and the landlord must provide the tenants with a copy of the third-party contract within 7 days from the creation of the contract. If there is no third-party contract, the sales price cannot exceed the appraised value of the property. If the tenants disagree with the landlord's appraised value, they can request an independent appraisal.[25]

### D.C. Tenant Opportunity to Purchase Act: Process Flowchart[26]



If a building has five or more units, the purchase must be completed by a tenant organization. For purchases where an incorporated tenant organization already exists, the organization has 30 days to submit a Statement of Interest and Application for Registration. If a tenant organization does not yet exist, tenants have 45 days to form one and provide the required documentation.[27]

Once tenants submit the required documentation, TOPA sets a minimum of 120 days for a negotiation period between the landlord and tenant organization. This period is extended by 15 days if the landlord enters into a third-party contract before the end of the negotiation period. If a settlement is reached by the landlord and tenant organization, the tenant organization has 120 days to secure financing and financial assistance, with potential extensions of up to 240 days possible, especially if a lending institution indicates that it will make a decision on funding assistance within that 240-day window.[28]

In addition to the potentially yearlong process of going through TOPA to acquire the property, extensive renovations to the property are usually required. It can take up to two years to assemble financing, obtain permits, and complete the renovations.[29]  The entire process from triggering TOPA to acquiring and then rehabbing the building can thus take as long as three years. One

challenge for tenant organizers and others working with tenants to acquire their building is conceptualizing the benefits of a building purchase when the results are so far off in the future.[30]

Traditional financing for purchases by tenant associations is very difficult to secure, so tenant purchases under TOPA typically rely on mission-driven lenders and public agencies, including the District's Housing Production Trust Fund, discussed further below. As will be discussed more below, the financing and other infrastructure that has built up around TOPA has been critical to the law's success in enabling low-income tenants to purchase their rental homes.

TOPA has been critical for the preservation of existing affordable housing in Columbia Heights and elsewhere in D.C. Although the District does not officially track subsidized affordable units preserved through TOPA, today an estimated 398 units in Columbia Heights have been acquired by former tenants and are currently operated as limited equity cooperatives.[31]

TOPA has attracted criticism since its passage, and throughout the Act's past 38 years, a number of loopholes have been identified, with some but not all closed. The most recent controversy around TOPA recently led the D.C. Council to repeal TOPA for single-family houses.[32] TOPA critics have argued that TOPA incentivizes tenants to sell off their right to purchase to the highest bidder rather than transfer ownership to the tenants. Landlords have also complained about approaching tenants to sign a waiver of their TOPA right in exchange for cash, only to find that this gives some tenants an opening to start a bidding war between the landlord and potential buyers.[33]

Another argument raised against TOPA concerns tenants who initiate the TOPA process only to then back out at the last minute.[34] When another third-party offer is made, the tenants initiate the TOPA process again, leading to a drawn-out cycle that costs landlords time and money. Housing advocates have advocated for adjustments to the TOPA process to close these loopholes rather than fully repealing TOPA.[35]  For instance, the law could prevent the TOPA process from being initiated more than once by tenants, or bar tenants from selling their rights to purchase (although still allowing them to transfer their rights without cost to mission-driven organizations).

As a supplement to TOPA, the District Opportunity to Purchase Act (DOPA)[36] extends a purchase right to the District if the tenants decline to utilize their right to purchase. The District's right to purchase is available for apartments that have at least five units and at least 25 percent affordable units. "Affordable" is defined in DOPA to mean units with rents (and utilities) that do not exceed 30 percent of income for households making up to 50 percent of the area median family income. The landlord must submit an offer of sale to the District concurrently with the offer to the tenants.

## The Housing Production Trust Fund

TOPA provides a strong legal foundation for tenants to purchase a building before it goes on the market, but it does not provide the funding or organizational resources that are necessary for the law to successfully preserve affordability. Most of the financial support for TOPA and organizations working on affordable housing preservation comes from the District's Housing Production Trust Fund (Trust Fund). The Trust Fund utilizes 15 percent of revenue from the District's deed and recordation taxes on every housing unit sold in the District.[37] The recent city-wide average trust fund subsidy for multifamily units, from 2013 to 2016,  was $65,000 a unit.[38]



In 2014, the District Council, under the guidance of the mayor, voted to guarantee $100 million annually to the Trust Fund.[39] This substantial allocation—

three times higher than any other U.S. city fund for affordable housing[40]—is providing even more of the financial backing needed for affordability production and preservation efforts in the District.

The Trust Fund is used to support affordable housing acquisition, rehabilitation, preservation, and new construction, as well as counseling and technical assistance to tenants interested in buying their units. The Trust Fund requires affordability covenants that keep homeownership units affordable for at least 15 years and rental units affordable for at least 40 years.[41] The Trust Fund comes with deep income targeting requirements, as shown in the figure below.

The targeting requirements for extremely low-income families (30 percent AMI and below),



however, are often not met. In fiscal year 2014, for example, less than 10 percent of Trust Fund resources served extremely low-income families in the District.[43] Trust Fund financing is often insufficient to serve households with the lowest incomes, given that the rents at these levels do not cover ongoing operating and maintenance costs. Activists in Columbia Heights have voiced concerns about this gap in Columbia Heights, i.e., that the District of Columbia is not serving enough residents at the highest risk of displacement.[44] There have been tensions among D.C.'s affordable housing community about how to close this gap in order to reach those most in need.[45]

Between 2001 and 2016, the Trust Fund awarded close to $606 million in loans and grants for the preservation and creation of more than 9,500 affordable housing units across the District.[46] In Columbia Heights, the district government spent more than $48 million in this same time period to create and preserve 318 affordable units in 12 multifamily buildings, including several buildings acquired by tenants.[47] Between 2002 to 2009, Columbia Heights had the highest concentration of tenant purchases in the city.[48] Today, the neighborhood has at least 15 limited equity cooperatives with 398 affordable units acquired by former tenants.[49]



### Grassroots Organizing, Technical Assistance, & Capacity Building Support

Another critical component of preservation efforts in Columbia Heights has been the District's strong support of organizations that help low-income tenants with their rights under TOPA and navigating the purchase process. Utilizing primarily federal Community Development Block Grant dollars, D.C. funds local organizations to provide a broad range of services to assist tenants with purchasing their buildings, including tenant organizing, education to tenants about ownership models, preparing legal organization documents, and technical assistance with sales negotiations and securing financing. The funding is provided through the D.C. Department of Housing and Community Development, via a competitive request for funding proposal process. The two organizations that currently provide the most TOPA-related assistance to tenants in D.C. are the Latino Economic Development Center and Housing Counseling Services, Inc.[50]

On top of the organizations that provide technical assistance and other support for tenant groups, D.C. has a large number of other high capacity nonprofits that are actively engaged in the affordable housing preservation sector. The D.C. Preservation Network lists 135 affiliated organizations, mostly made up of groups engaged in preservation work or affiliated support.[51] This list does not capture the total number of preservation and tenants' organizations in the District, only those that coordinate with the Network.

### The D.C. Preservation Network: Information & Resource Coordination; Policy Advocacy

Another key ingredient of D.C.'s successful housing preservation work and displacement mitigation strategies has been the D.C. Preservation Network (the Network).[52] The Network is a group of community-based organizations and government agencies working to preserve affordable housing in the District. The Network's focus is to identify and monitor properties at risk of losing their affordable rents and to share information about the properties and preservation strategies.[53] The Network is funded and managed by the Coalition for Nonprofit Housing and Economic Development (CNHED), an affordable housing nonprofit that acts as an umbrella organization for many D.C. affordable housing nonprofits.

The Network maintains and monitors a catalogue of subsidized housing in the District, drawing from lists, resources, and on-the-ground knowledge shared by participating members. Individual listings of properties of concern are tracked with the following information:



The D.C. Preservation Network tracks not only properties with expiring subsidies but also those in disrepair and in need of rehabilitation. This list is coordinated and shared with nonprofit, public, and community organizations working on affordable housing in the District.

The focal point of the Network is a monthly meeting where participants review housing that is in danger of losing affordability or in major disrepair and develop strategies for preserving the units. The Network's list of at-risk housing guides prioritization during monthly meeting discussions and focuses conversations productively around properties with the most immediate risk.

Diverse parties coordinate priorities, areas of expertise, and capacity in order to act quickly to preserve threatened affordable units. The Network has been most successful in coordinating the preservation of privately-owned, subsidized affordable housing.

Network meetings are open to anyone doing work in affordable housing in the D.C. area. This openness and inclusiveness, of both non-governmental and governmental participants, has generated successful collaborations and been a valuable aspect of the Network. For example, the Network is able to link technical assistance and resources with people working directly with residents.

One key advantage of the Network meetings is that participating parties do not need to agree on priorities, strategies, or goals in order for the meetings and coalition as a whole to function successfully.[54] The Network meetings are a robust forum for information sharing, which is a strong incentive for all stakeholders to participate. Some advocates who feel that their priorities are not exactly aligned with the Network majority still consider the information exchange that the Network facilitates extremely valuable.[55]

The Network meetings depend on the individual relationships that develop between cooperating members and organizations.[56] Re-establishing these relationships and trust when new members or participants come into the group is an important challenge. The growing pains that come with personnel and participant turnover tend to occur every year or so, but ultimately the advantages of sharing information and resources prove to be greater than the differences between individual parties.[57]

The Network also advocates for policy changes with the municipal government. In 2014, the Network's Preservation Strategy Working Group released a policy report recommending criteria for prioritizing affordable housing preservation and calling upon the municipal government to assign a preservation team of top officials from city agencies and designate a senior staffer to support the Network and coordinate preservation efforts across city departments.[58] Partially in response to the Network's recommendations, the District established an Housing Preservation Strike Force in 2015 and an Affordable Housing Preservation Officer in 2018.[59]

# D.C.'s Additional Mitigation-Displacement Tools to Protect Tenants

The District of Columbia has enacted an array of additional legal protections and policy tools that have helped low-income renters stay in their homes and access affordable rental opportunities in gentrifying neighborhoods.

## Local Rent Supplement Program

D.C.'s Local Rent Supplement Program was adopted in 2007 and provides monthly housing subsidies to more than 3,000 low-income renters in the city, targeting extremely low-income renters

making less than 30 percent of the area median income. The subsidy pays the gap between the monthly rent and what the family can afford.[60]

In 2016, the District appropriated $46 million towards the program, with funding coming from the Housing Production Trust Fund and general appropriations. The program, which is managed by the D.C. Housing Authority, provides three types of rental assistance, as shown below.

### D.C. Local Rent Supplement Program


**1** **Tenant-based vouchers**
Tenants use the voucher to rent a private-market apartment.

**2** **Project-based assistance**
Funding is provided to a specific unit that is then rented to a qualifying household; the rental assistance stays with the unit.

**3** **Sponsor-based assistance**
Funding is provided to a specific housing provider that agrees to make a certain number of units available to eligible households and to provide supportive services.[61]

### Legal Protections

The District offers a robust array of legal protections for renters, including:

### D.C.'s Legal Protections for Renters

**Organizing protections**
The District's Tenant Right to Organize Act gives tenants the right to organize into associations and engage in organizational activities in their building such as distributing literature and holding meetings.[62] The right to organize is a critical legal protection for tenants seeking to engage other tenants and form a tenant association to buy their building under TOPA.

**Just cause eviction protections**
Landlords in the District are barred from evicting a tenant just because the tenant's lease terms expired, except for specific reasons set forth in the Act, such as failure to pay rent.

**Tenant Bill of Rights**
Landlords are required to provide each rental applicant with a copy of the "DC Tenant Bill of Rights."

**Rent control**
The District's rent stabilization law regulates rent increases in properties built before 1976 except for units that are owned by an individual (versus business entity) who owns no more than four rental units.[63]

### Office of Tenant Advocate

The District's Office of the Tenant Advocate (OTA), which receives $2.4 million in funding from the District, provides a number of services to support vulnerable tenants in the District, including legal education and advocating for tenants' rights and interests before different legislative and regulatory bodies.[64] OTA has four attorneys on staff who provide legal assistance to tenants and tenant associations and intervene in judicial cases impacting renters' rights, including lawsuits involving TOPA enforcement. OTA also contracts out with local legal service providers. In FY 2014, the District spent $820,000 on legal assistance to renters, resulting in $3,631,181 being returned to tenants, a 443 percent return.[65] Other services provided by OTA include emergency financial assistance for displaced tenants and a tenant hotline.

### Affordable Housing Preservation Unit

The District's Affordable Housing Preservation Unit, led by an Affordable Housing Preservation Officer, is one of the District's newest strategies to preserve affordable housing. The Unit was created in 2017 to focus on preserving existing affordable units—both those with and without government subsidies. The city's first Preservation Officer was hired in March 2018.

## Lessons Learned

Arising out of the rapid changes that occurred in Columbia Heights over the past 22 years and the District's multitude of strategies and tools to mitigate the displacement of low-income renters, there are number of key takeaways and lessons for other communities facing similar changes and challenges:

1. **Incorporate residential displacement mitigation strategies into initial redevelopment plans.** In Columbia Heights, the reinvestment strategies targeted at increasing economic prosperity in the neighborhood triggered displacement pressures and radically changed the racial and economic makeup of the area in just a decade. If displacement mitigation strategies had been integrated from the beginning, more affordable units would have been preserved and fewer vulnerable residents impacted. Once gentrification picks up steam, preservation becomes much more difficult.

2. **"After the fact" displacement mitigation strategies can't stop displacement, but they can preserve a significant amount of affordability in a neighborhood if the right resources and tools are in place.** Planning for the preservation of affordability before investing in a neighborhood is the best practice. However, a progressive legal framework supported by dedicated financing and organizational support can made a dent. In Columbia Heights, TOPA, the Housing Production Trust Fund, and a dedicated, coordinated network of support have been leveraged to help build and preserve hundreds of affordable units in the neighborhood and to support tenant ownership of their apartments.

3. **Develop a network of high capacity preservation actors.** A coordinated infrastructure of high capacity preservation groups that closely monitors at risk properties and that can move with agility and speed is essential to preserving existing affordable rental housing. Columbia Heights has benefitted enormously from D.C.'s closely-knit network of high capacity preservation organizations and technical assistance providers.

4. **Invest in support and protections for tenants.** D.C.'s strong tenant protection laws provide

tenants with the protections they need to organize and exercise their rights under TOPA. D.C. also funds tenant organizing groups and technical assistance providers to help tenants form tenants' associations, navigate TOPA, secure financing, and successfully buy their units.

5. **Provide a legal mechanism that supports tenants' ability to purchase their apartment complexes, including adequate notice and time to complete the purchase.** D.C.'s Tenant Opportunity to Purchase Act (TOPA), by providing tenants with a right to purchase their units when sold and adequate time to complete the purchase, shifts power to tenants and provides a critical legal backstop for preventing displacement of current renters and disincentivizing inequitable redevelopment.

6. **Tenant opportunity to purchase legislation should include language that prevents abuse and loophole exploitation by for-profit developers and tenants.** Doing so helps protect the legislation from cases of abuse with bad "optics" that can be used by opponents to undermine the law and argue for its repeal.

7. **City council and municipal leadership is critical.** Elected officials committed to affordability and mitigating displacement are critical for successful preservation of affordable housing. D.C.'s progressive early councils were deeply committed to affordable housing preservation, which led to TOPA, tenant protections, funding for affordable housing, and a large roster of preservation organizations. D.C.'s current mayor has also been a critical champion for affordable housing, and, as a result of her leadership, the District now operates the largest municipal trust fund for affordable housing in the country.

8. **Give consideration to what level of affordability is being targeted.** Make sure that the income levels targeted for affordable housing assistance match the need from the community most at risk of displacement. Mitigating displacement in rapidly appreciating markets requires deep subsidy in order to achieve affordability for the lowest-income residents. In Columbia Heights, 69 percent of local trust fund subsidies for affordable housing are serving residents with incomes from 60 to 80 percent of the area median income—far out of reach for the lowest-income and most vulnerable residents in the neighborhood.

9. **Large levels of local dedicated funding are necessary.** Affordable housing preservation at a scale large enough to be meaningful requires large levels of local dedicated funding. In Columbia Heights, $48 million in investments from the D.C. Housing Production Trust Fund since 2001 has supported the creation and preservation of 321 units, a subsidy of close to $150,000 per unit.

## Conclusion

The District of Columbia's programs to preserve affordable housing and help vulnerable tenants remain in their communities are among the strongest in the country. D.C.'s Tenant Opportunity to Purchase Act provides tenants with a right to purchase their units when landlords attempt to sell their complex. Tenants' ability to purchase their apartments are further supported through the largest municipal housing trust fund in the country—the D.C. Housing Production Trust Fund—which currently receives more than $100 million a year in funding from the District. D.C.'s legal protections for tenants and successful network of housing preservation organizations via the Housing Preservation Network are also among the strongest in the nation.

As a result of these effective and diverse strategies—along with a concentration of public housing and privately-owned subsidized housing that was built prior to the gentrification of the neighborhood—a high percentage of homes in Columbia Heights are affordable today, with close

to 3,000 rent-restricted units for low-income residents. These rent-restricted units constitute more than 22 percent of the neighborhood's housing stock. Affordable ownership by former tenants through limited equity cooperatives has been established for at least 398 units in 15 buildings.

On the other hand, despite these robust interventions, the displacement of vulnerable tenants in Columbia Heights has not been halted as housing costs continue to mount in the neighborhood. For many long-time residents and advocates, the displacement has been the direct result of economic revitalization in the late 1990s and 2000s that did not prioritize the residents that were already there. Low-income residents in Columbia Heights continue to feel intense financial pressure, while the need for affordable units still far outstrips the supply. The gap between subsidized and unsubsidized housing prices grows increasingly large, and many of the newest subsidized housing units are targeted at income levels far higher than what many longtime residents can afford.

The rapid transformation of Columbia Heights has created other issues, including tensions between long-time residents and newcomers.[66] Many long-term residents cannot afford the new restaurants and other businesses opening up in the neighborhood. And many persons of color with deep ties to the neighborhood report a loss of community and feeling like strangers in their own neighborhood.[67]

# Endnotes

[1] District of Columbia, Department of Housing and Community Development, "Housing Production Trust Fund," https://dhcd.dc.gov/page/housing-production-trust-fund.

[2] Between 2,953 and 3,068 units in Columbia Heights are income-restricted. Prepared from data on the Housing Insights Tool, at http://housinginsights.org/tool/#.

[3] Prepared from data maintained by the Coalition for Nonprofit Housing & Economic Development, "Where are coops in DC?" at https://www.cnhed.org/policy-advocacy/policy-approach/coop/where-are-coops-in-dc/.

[4] Howell, Kathryn L., "Planning for empowerment: Upending the traditional approach to planning for affordable housing in the face of gentrification," Planning Theory & Practice 17, no. 2, 210-226, 2016.

[5] U.S. Census 1960, Social Explorer, Table T13, "Race (100% Count)," Census tracts 28, 29, 30, 31, 35, 36, 37, Washington, D.C.

[6] Howell, Kathryn, "Preservation from the bottom-up: affordable housing, redevelopment, and negotiation in Washington, DC," Housing Studies 31, no. 3, 305-323, 2016.

[7] Kennedy, Maureen and Leonard, Paul, "Dealing with Neighborhood Change: A Primer on Gentrification and Policy Choices," Brookings, 2001, at p.58.

[8] Comey, Jennifer, et al., "State of Latinos in the District of Columbia," Nov. 2009, p.18 https://www.neighborhoodinfodc.org/pdfs/412176-state-of-latinos.pdf

[9] Wogan, J.B., "Why D.C.'s Affordable Housing Protections Are Losing a War with Economics," Governing, Feb. 2015, http://www.governing.com/topics/urban/gov-washington-affordable-housing-protections-gentrification-series.html.

[10] *Ibid.*

[11] Kennedy and Leonard, "Dealing with Neighborhood Change," note 7, supra.

[12] Howell, Kathryn L., "Planning for empowerment" note 4, supra; "Washington, D.C., Gentrification Maps and Data," Governing, http://www.governing.com/gov-data/washington-dc-gentrification-maps-demographic-data.html.

[13] The demographic information in this paragraph is from: U.S. Census 2000, Social Explorer, Table SE:T15, "Hispanic Or Latino By Race," Table SE:T93, "Median Household Income In 2016 Dollars," Table SE:T40, "Educational Attainment For Population 25 Years And Over," Table SE:T180, "Poverty Status In 1999 For Children Under 18," census tracts 28.01, 28.02, 29, 30, 31, 35, 36, 37, Washington, D.C.; U.S. Census 2010, Social Explorer, Table SE:T55, "Hispanic Or Latino Origin By Race," census tracts 28.01, 28.02, 29, 30, 31, 35, 36, 37, Washington, D.C.; American Community Survey 2008-2012, Social Explorer, Table SE:T18, "Households by Presence of People Under 18 Years by Household Type," Table SE:T25, "Educational Attainment For Population 25 Years and Over," Table SE:T57, "Median Household Income (In 2016 Inflation Adjusted Dollars), census tracts 28.01, 28.02, 29, 30, 31, 35, 36, 37, Washington, D.C.

[14] Wogan, "Why D.C.'s Affordable Housing Protections Are Losing a War with Economics," note 9, supra.

[15] U.S. Census 2010, Social Explorer, Table SE:T57, "Median Household Income (In 2016 Inflation Adjusted Dollars)," census tracts 28.01, 28.02, 29, 30, 31, 35, 36, 37, Washington, D.C.; American Community Survey 2012-2016, Social Explorer, Table SE:T56, "Household Income (In 2016 Inflation Adjusted Dollars)," Table SE:T57, "Median Household Income (In 2016 Inflation Adjusted Dollars," census tracts 28.01, 28.02, 29, 30, 31, 35, 36, 37, Washington, D.C.

[16] U.S. Census 2010, Social Explorer, Table SE:T55, "Hispanic Or Latino Origin By Race," census tracts 28.01, 28.02, 29, 30, 31, 35, 36, 37, Washington, D.C.; American Community Survey 2012-2016, Social Explorer, Table SE:T14, "Hispanic or Latino by Race," census tracts 28.01, 28.02, 29, 30, 31, 35, 36, 37, Washington, D.C.

[17] Kennedy and Leonard, "Dealing with Neighborhood Change," note 7, supra.

[18] "Housing Insights Tool," Housing Insights, http://housinginsights.org/tool/#.

[19] Howell, "Preservation from the bottom-up," note 6, supra.

[20] Tenant Opportunity to Purchase Act of 1980, Code of the District of Columbia, §§ 42-3404.01–14.

[21] For a longer discussion on the history of TOPA and D.C.'s tenant protection laws, see Misra, Tanvi, "Forgotten Lessons From a 1970s Fight Against Gentrification." CityLab, Feb. 9, 2015, https://www.citylab.com/equity/2015/02/forgotten-lessons-from-a-1970s-fight-against-gentrification/385212/; Lloyd, James M, "Fighting Redlining and Gentrification in Washington, D.C.: The Adams-Morgan Organization and Tenant Right to Purchase," Journal of Urban History, 1-19, 2015.

[22] Howell, "Planning for empowerment," note 4, supra.

[23] Huron, Amanda, "Creating a Commons in the Capital: The Emergence of Limited-Equity Housing Cooperatives in Washington, D.C.," Washington History 26, no. 2, 57-67, 2014.

[24] Tenant Opportunity to Purchase Act of 1980, Code of the District of Columbia, § 42-3404.02.

[25] Ibid.

[26] Adapted from District of Columbia, Office of the Tenant Advocate, "TOPA Process Charts," retrieved July 16, 2018, from https://ota.dc.gov/page/tenant-opportunity-purchase-act-topa.

[27] Washington, D.C., Office of the Tenant Advocate, "TOPA Process Chart (5 or more units)," retrieved July 16, 2018, from https://ota.dc.gov/page/tenant-opportunity-purchase-act-topa.

[28] Ibid.; Tenant Opportunity to Purchase Act of 1980, Code of the District of Columbia, § 42-3404.11.

[29] Rome, Eric, telephone interview, June 28, 2018.

[30] Ibid.

[31] This estimate is based on a database maintained by the Coalition for Nonprofit Housing & Economic Development, "Where are coops in DC?" https://www.cnhed.org/policy-advocacy/policy-approach/coop/where-are-coops-in-dc/.

[32] Fleischer, Jodie, "D.C. Council Votes to Exempt Single-Family Homes from TOPA Law," NBC Washington, April 11, 2018, https://www.nbcwashington.com/investigations/D.C.-Council-Votes-to-Exempt-Single-Family-Homes-From-TOPA-Law-479336123.html/.

[33] Fleischer, Jodie, et al., "Some Renters Make Tens of Thousands Exploiting Old D.C. Law," NBC Washington, June 8., 2017, https://www.nbcwashington.com/investigations/Some-D.C.-Renters-Make-Tens-of-Dollars-Exploiting-Decades-Old-Law-421942054.html.

[34] Baskin, Morgan, "D.C. Council Takes Next Step in Exempting Single Family Homes from TOPA," Washington City Paper, March 6, 2018, https://www.washingtoncitypaper.com/news/housing-complex/article/20995182/dc-council-takes-next-step-in-exempting-single-family-homes-from-topa.

[35] Howell, Kathryn, telephone interview, April 2, 2018.

[36] Code of the District of Columbia, §§ 42-3404.31–37.

[37] Howell, "Preservation from the bottom-up," note 6, supra; District of Columbia, Department of Housing and Community Development, Housing Production Trust Fund website, https://dhcd.dc.gov/page/housing-production-trust-fund.

[38] This number is an average from the years 2013-2016 and drawn from the following two sources: Goldchain, Michelle, "Every D.C. affordable housing project funded in FY 2016, mapped," Curbed, Washington DC, Oct. 14, 2016, https://dc.curbed.com/maps/affordable-housing-dc-washington; District of Columbia, Department of Housing and Community Development, "Housing Production Trust Fund Reports," https://dhcd.dc.gov/page/housing-production-trust-fund-reports.

[39] Howell, "Planning for empowerment," note 4, supra.

[40] D.C., Department of Housing and Community Development, Housing Production Trust Fund website, https://dhcd.dc.gov/page/housing-production-trust-fund.

[41] Office of the District of Columbia Auditor, The District of Columbia Housing Production Trust Fund: Revenues and Expenditures and 5-City Comparison, June 30, 2016 ("Housing Production Trust Fund Report"), http://www.dcauditor.org/sites/default/files/HPTF%20Report%20Final.pdf.

[42] D.C., Department of Housing and Community Development, Housing Production Trust Fund website; see also D.C. Code § 42-2802(b-1)(2).

[43] D.C., Department of Housing and Community Development, "FY 2014 Housing Product Trust Fund Annual Report and the Affordable Housing Report."

[44] Moulden, Dominic, Resource Organizer, OneDC, telephone interview, May 8 and 10, 2018.

[45] Ibid.

[46] D.C. Auditor, "Housing Production Trust Fund Report," note 38, supra.

[47] Based on data from D.C. Auditor, "Database of Housing Production Trust Fund Multi-Family and Single-Family Projects, FYs 2001-2016," available at http://www.dcauditor.org/sites/default/files/HPTF-Public-Database.xlsx.

[48] Wogan, "Why D.C.'s Affordable Housing Protections Are Losing a War with Economics," note 9, supra.

[49] Based on data from a database maintained by the Coalition for Nonprofit Housing & Economic Development, "Where are coops in DC?" https://www.cnhed.org/policy-advocacy/policy-approach/coop/where-are-coops-in-dc/.

[50] Davis, Edward D., Program Manager, Neighborhood Based Activities, D.C. Department of Housing and Community Development, telephone interview, June 29, 2018.

[51] The Coalition of Nonprofit Housing & Economic Development, "Membership List," https://www.cnhed.org/membership/membership-list-1/.

[52] Howell, Kathryn, telephone interview, April 2, 2018.

[53] The information in this section on the D.C. Preservation Network, unless otherwise noted, comes from the following sources by Kathryn H. Howell: Howell, "Planning for empowerment, note 4, supra; Howell, "Preservation from the bottom-up," note 6, supra; Howell, Kathryn H., "From Tenant Organizers to Housing Agencies: Using Data to Preserve Affordable Housing," Community Scope, Federal Reserve, Vol. 5, Issue 1 (2017); Howell, Kathryn, telephone interview, April 2, 2018.

[54] Moulden, Dominic, Resource Organizer, OneDC, telephone interview, May 8 and 10, 2018.

[55] *Ibid.*

[56] *Ibid.*

[57] *Ibid.*

[58] DC Preservation Network, Preservation Strategy Working Group, "Maintaining Economic Diversity and Affordability: A Strategy for Preserving Affordable Rental Housing in the District of Columbia," Dec. 2014, https://www.neighborhoodinfodc.org/dcpreservationcatalog/Preservation%20Strategy%20Dec2014.pdf

[59] Dovey, Rachel, "D.C. Hires First Housing Preservation Officer," Next City, March 6, 2018, https://nextcity.org/daily/entry/dc-hires-first-housing-preservation-officer.

[60] D.C. Fiscal Policy Institute, "The Local Rent Supplement Program," April 11, 2016, https://www.dcfpi.org/wp-content/uploads/2016/04/16-04-LRSP-Brief.pdf.

[61] *Ibid.*

[62] Code of the District of Columbia, § 42-3505.06, et seq.

[63] Code of the District of Columbia, § 42-3501.01, et seq.

[64] D.C. Office of the Tenant Advocate, "Fiscal Year 2015 Annual Report," https://ota.dc.gov/sites/default/files/dc/sites/ota/publication/attachments/Annual%20Report%202015_FOR_WEBSITE_NM.pdf.

[65] *Ibid.*, at 11.

[66] See, for example, Sadon, Rachel, "On A Columbia Heights Soccer Field, The Effects of Gentrification Play Out." DCist, July 2017, http://dcist.com/2017/07/on_a_columbia_heights_soccer_field.php.

[67] Howell, Kathryn, telephone interview, April 2, 2018; Howell, Kathryn, "Transforming Neighborhoods, Changing Communities: Collective agency and rights in a new era of Urban Redevelopment in Washington, D.C." (Doctoral dissertation, University of Texas at Austin), Dec. 2013, https://repositories.lib.utexas.edu/bitstream/handle/2152/23193/HOWELL-DISSERTATION-2013.pdf.

# Guadalupe Neighborhood

### AUSTIN, TEXAS

A Case Study of Early Intervention and Evolving Strategies to Create Affordable Housing for Vulnerable Residents with Historical Ties to the Neighborhood

## Overview

The Guadalupe neighborhood is located just east of Austin's Central Business District, bounded by Interstate Highway 35. The neighborhood, which comprises less than one-fifth a square mile and approximately 14 blocks, was historically a community of color, with a predominantly Mexican-American population. Through the 1970s and 1980s, the area suffered from rapid deterioration, population loss, and large-scale redevelopment pressures. At that time, of the area's 170 single-family homes, over half were in substandard condition.

In 1979, Austin leaders made plans to expand the French Legation in the neighborhood, which would have displaced at least 11 families. Residents rallied to block the expansion and successfully lobbied the city council to redirect federal block grant funds to support a new community-generated development plan for Guadalupe. To implement the plan, neighborhood leaders formed the Guadalupe Neighborhood Development Corporation (GNDC), which has become a pioneer in its diverse deployment of community-driven strategies over the past 35-plus years to mitigate the displacement of vulnerable residents.

Today, even though Guadalupe is now in the dynamic stage of gentrification, with a growing share of million-dollar homes, neighborhood leaders have successfully preserved the residential character of the neighborhood while creating a legacy of affordable housing that is under long-term community control for low-income residents with ties to the area.

## Key Strategies & Tools

1. **Community development corporation.** The Guadalupe Neighborhood Development Corporation, created and governed by leaders from the neighborhood, has been integral to the success of the neighborhood's displacement mitigation programs.
2. **Early and strategic land acquisition.** In GNDC's early years, the organization purchased vacant properties in strategic locations on as many blocks as possible—for long-term control and to bar assembly for commercial redevelopment. GNDC became a large property owner in the area providing additional clout in zoning battles. Buying lots early was also smart from an affordability perspective: In the 1980s, the average lot price was $5,000; today full lots sell for $500,000 to $650,000.
3. **Preference policy.** Low-income residents and former residents with historical ties to the two zip codes served by GNDC receive priority placement on GNDC's long waiting list for affordable rental and homeownership opportunities.
4. **Community land trust.** GNDC created the first community land trust in Texas to provide for homeownership that is permanently affordable. GNDC maintains ownership of the land, while the family obtains a mortgage to purchase the home. A fixed rate of appreciation ensures that CLT homes can be resold at affordable prices, while allowing owners to recoup their investment and build additional equity.

5. **Property tax breaks for permanently affordable properties.** GNDC has led efforts at the Texas Legislature and the local appraisal district to reduce property taxes on community land trust and other income-restricted homes—ensuring that these homes remain affordable for the low-income families renting or purchasing them.

6. **Creative utilization of infill properties.** Since purchasing lots is no longer feasible in Guadalupe, GNDC has become an innovator in Austin in developing affordable accessory dwelling units on lots that can support a second unit.

## Challenges

Guadalupe neighborhood's initial challenges in mitigating displacement of vulnerable residents included large-scale zoning changes that precipitated the loss of homes in the neighborhood. GNDC and neighborhood association leaders had deep-seated disagreements with African-American leaders in the area over the commercialization of the neighborhood, and the groups worked largely in silos. More recently, high land values have made new lot acquisition for affordable housing infeasible within the neighborhood.

## Outcomes

- 91 long-term affordable units under community control in Guadalupe, including 26 units underway (out of 170 total homes in the neighborhood in 1980, when GNDC's displacement-mitigation work began)
  → Average rent of GNDC units: $583; average income of GNDC renters: $28,700
- 8 affordable homeownership units, including the first CLT home in Texas

## Takeaways

1. **Develop and implement a community-driven, neighborhood-level strategy for mitigating displacement of vulnerable residents.** Efforts to mitigate displacement in Guadalupe have continually been anchored in the community, beginning with a community-generated plan and a community development corporation governed by widely-respected neighborhood leaders with social and political capital.

2. **Intervene early to acquire permanent control of land.** Acquire as much land as possible early on; as gentrification picks up steam in a neighborhood it becomes much more difficult to feasibly acquire properties for affordable housing.

3. **For homeownership units, restrict resale price using a shared equity model to ensure permanent affordability of the units for future generations of residents.** GNDC's earlier homes were sold without caps on the resale price, and several have since been resold at market prices beyond the means of other low-income families.

4. **Invest in capacity building and technical assistance.** Funding for program administration and early technical assistance have been key to GNDC's displacement mitigation work. GNDC's early investment in rental housing with little or no debt has generated a critical stream of income to help fund the organization's administrative operations, allowing the organization to expand its capacity and impact over time.

5. **Adapt strategies to changing conditions in the neighborhood.** The strategies utilized in Guadalupe to address gentrification have evolved over time, in response to neighborhood changes, newly available tools, and lessons learned from prior work.

# Guadalupe Neighborhood    AUSTIN, TEXAS

## A Case Study of Early Intervention and Evolving Strategies to Create Permanently Affordable Housing for Vulnerable Residents with Historical Ties to the Neighborhood



Photo courtesy Guadalupe Neighborhood Development Corporation

First community land trust home in Texas, by Guadalupe Neighborhood Development Corporation

## Introduction

The Guadalupe neighborhood in Austin, Texas, has been working to curtail the displacement of vulnerable residents since the late 1970s. This multi-decade struggle, in the face of rising land values and development pressures from downtown, offers several lessons and specific strategies for neighborhoods experiencing similar changes. While land values in Guadalupe today are among the highest in Austin, the neighborhood—led by the work of a community-based nonprofit development corporation, Guadalupe Neighborhood Development Corporation (GNDC)— continues to be a pioneer in adopting new tools and strategies to mitigate the displacement of vulnerable residents amidst changing and challenging conditions, in a state that has been hostile to many traditional anti-displacement policies.

Through GNDC, neighborhood leaders have deployed a range of evolving anti-displacement strategies, including the state's first community land trust, land banking, and accessory dwelling units. GNDC's accomplishments in the neighborhood include creating 53 long-term affordable units for low-income residents with generational ties to the area, with another 26 units under development.[1] A nonprofit organization affiliated with Ebenezer Third Baptist Church has built another 12 units for seniors. Together, these units constitute 54 percent of the neighborhood's housing stock that was on the ground when GNDC began its property acquisitions in the early 1980s. These units are all under community control, in locations throughout most of the neighborhood, helping preserve the residential character of the neighborhood.

# Background

The Guadalupe neighborhood is located just east of Austin's Central Business District, bounded by Interstate Highway 35, 7th and 11th Streets, and the State Cemetery. The neighborhood is small, comprising less than one-fifth a square mile and approximately 14 blocks.

At the turn of the 20th century, the area comprising today's Guadalupe neighborhood was home to a multi-ethnic community that included European immigrants and African Americans. African-American residents resided primarily in the area around Pleasant Hill, Austin's earliest known freedman's settlement, in the northwest section of the neighborhood.

The neighborhood included a number of religious and cultural institutions serving the African-American population, including the Ebenezer Third Baptist Church and the Robertson Hill Public School. Just south of Pleasant Hill stood the French Legation, which was constructed in the 1840s to serve as the French Embassy to the Republic of Texas, but those plans never came to fruition, and the site became a family residence. The site was eventually sold to the Daughters of the Republic of Texas and opened to the public as a museum in the 1950s.



**Guadalupe Neighborhood**

Source: OpenStreetMap Contributors

Lebanese immigrants fleeing war in the early 20th century settled in the southwestern area of the neighborhood. By the 1920s, Mexican Americans had also begun moving into the area. Their presence grew following the Mexican Revolution of 1910, which caused many Mexican nationals to migrate to the United States in search of economic opportunities, and the relocation of Our Lady of Guadalupe Church from downtown to East 9th Street, where it became a stabilizing force for the neighborhood.

The City's 1928 comprehensive plan sanctioned the segregation of African Americans in Central East Austin through the creation of a "Negro district," while other racist policies, including lending redlining, further the concentration of both African-Americans and Mexican-Americans in the area. In 1962, federal highway legislation brought Interstate Highway 35 through Austin, replacing what was once East Avenue and reinforcing the racial and ethnic divide that existed by then between East and West Austin.[2]

Heading into 1970, Mexican Americans comprised 80 percent of Guadalupe neighborhood's residents, and African Americans comprised 15 percent of residents.[3]  African-American residents were concentrated largely in the northern section of the neighborhood. The now widely-used name for the area, "Guadalupe neighborhood," which takes its name from Our Lady of Guadalupe Church, started to be used in the late 1970s and initially did not include the area north of East 10 1/2 street.

In the 1970s, the Guadalupe neighborhood suffered from rapid deterioration. More than half of the neighborhood's 168 single family homes were in substandard condition, and 21 percent of the homes were razed. In the western quadrant of the neighborhood, adjacent to downtown, close to 70 percent of the lots stood vacant. Citywide home values skyrocketed between 1970 and 1980 by 69 percent, while values in the Guadalupe neighborhood increased by a mere 16 percent to just under $15,000. Rents on the other hand doubled in this time period, from $49 to $99 a month.

## Survey of Housing Conditions in Guadalupe in 1980 (approx.)

During this time period, the neighborhood also saw dramatic declines and shifts in its population. Between 1970 and 1980, Guadalupe lost close to one third of its residents (from 687 to 486 residents), including 67 percent of the neighborhood's smaller African-American population. Those remaining in the neighborhood were older; as families with children left, the percentage of seniors increased by 12 percent. By 1980, the

### Guadalupe Neighborhood Population Loss



Guadalupe neighborhood consisted of 29 percent senior residents, compared to 9 percent for the city at large. Those remaining were also poorer—87 percent of the homeowner households living in Guadalupe in 1980 were low-income, and Guadalupe's census tract was the poorest in the city. During this time period, the neighborhood also became primarily renter-occupied, with 52 percent of houses occupied by renters, and another 7 percent of homes standing vacant. Even with the changes in housing tenure, many Guadalupe's residents were long-time residents, with an average length of residency of 19 years.

## 1979 – 1989: Launching Community-Led Efforts to Improve the Neighborhood and Prevent Displacement in Response to Deteriorating Housing Conditions and Outside Redevelopment Pressures[4]

The genesis of the Guadalupe neighborhood's concerted efforts to combat displacement of long-time residents and preserve the neighborhood began in 1979, in response to urban renewal plans to expand the French Legation museum, which was run at the time by the Daughters of the Republic of Texas. For the proposed expansion, which would have included a visitors' center and a park, the City of Austin planned to use $622,000 in federal Community Development Block Grant (CDBG) funding and eminent domain to seize and tear down 14 homes around the museum, displacing at least 11 families. The plans were supported by influential Austinites such as Lady Bird Johnson and Congressman J.J. Pickle, but developed with little or no consultation with Guadalupe residents. The park would have been built in part of the Pleasant Hill area of the neighborhood, the site of a former freed slave settlement.

After a series of public meetings to discuss the proposed expansion, neighbors formed the Guadalupe Area Neighborhood Association, with the goals of improving housing conditions, maintaining the residential character of the neighborhood, and minimizing the displacement of low- and moderate-income residents. The association members voted unanimously to oppose the French Legation expansion plans, and neighbors banded together to quickly launch a campaign against the expansion and displacement of residents. The advocacy was buoyed by the existence of Our Lady of Guadalupe



Photo courtesy Guadalupe Neighborhood Development Corporation

Residents Protest French Legation Expansion Project

Church in the neighborhood, which provided much of the leadership for the campaign through parish board members and church staff such as Sister Amalia Rios, who was born in Guadalupe. These community members were already respected leaders in the neighborhood through their work with the church.

The opposition campaign was supported by community development and social justice advocates, as well as staff from the local legal aid organization. Residents showed up at council meetings to protest the expansion plans, engaged in media advocacy, and filed a lawsuit protesting the use of the CDBG funds for the project. At the end of the day, the neighborhood's advocacy was successful: In April 1979 the city dropped its plans for the expansion. Defeating the expansion of the French Legation was a huge political victory for the neighborhood and strengthened the political and social capital of the residents who led the campaign—and inspired them to take additional actions to save the neighborhood.

### The Guadalupe Community Development Project: a community-driven plan for mitigating displacement

With $622,000 in CDBG funds freed up from the French Legation project, neighborhood leaders lobbied the City Council to redirect those funds towards a community-centered strategy for improving and preserving housing in the neighborhood. To develop the community strategy, Guadalupe leaders conducted surveys of residents, held multiple community meetings, and sent

canvassers out to conduct door-to-door assessments of property conditions in the neighborhood. A steering committee of the Guadalupe Neighborhood Area Association met weekly for close to a year to develop the plan, with on-going support by legal aid staff.

The leaders' work culminated in the creation of a three-phase, comprehensive redevelopment plan for the neighborhood: the Guadalupe Community Development Project. The Austin City Council unanimously endorsed the plan and approved the redirection of the CDBG funding towards implementation of the community's plan.



**PHASE 1 PLAN**

The primary focus of the Guadalupe Community Development Project plan, as stated in a memo to the City Council, was "to improve the neighborhood quality while preventing the displacement of lower-income residents."[5] The project plan included a call for (1) downzoning lots whenever the zoning was more intense than the existing use to prevent commercialization of residential lots; (2) providing counseling and deferred loans to help homeowners with repairs; (3) improving the quality of rental housing; (4) buying up vacant land to build affordable houses; and (5) improving the appearance and functionality of the neighborhood through street, sidewalk, and alleyway improvements.[6]  Some of these strategies are discussed further below.[7]

## Creating a community development corporation to implement the neighborhood plan

To implement the Guadalupe Community Development Project in 1981, neighborhood leaders formed a new nonprofit organization: the Guadalupe Neighborhood Development Corporation, also known as GNDC. GNDC has turned out to be the most critical player in the neighborhood's successful work to mitigate displacement of long-time residents.

GNDC was founded as a community development corporation, meaning that it would be governed permanently by the community—initially almost all residents of Guadalupe neighborhood, including many leaders from Our Lady of Guadalupe Church who had been active in the French Legation dispute. GNDC's initial board members had a combined tenure of more than 400 years as Guadalupe residents.[8]  Over time, GNDC added board members from other East Austin neighborhoods as the organization expanded its service boundaries east and southward. Throughout the organization's history, GNDC's community-run board has played an active role



Photo courtesy Guadalupe Neighborhood Development Corporation

Guadalupe Neighborhood Development Corporation Board of Directors, 2000 (approx.)

in overseeing GNDC's programs and setting the organization's policies.

As a community development corporation, GNDC was modeled on the Clarksville Community Development Corporation in Austin and other similar organizations that had been recently formed in other parts of the United States as part of a national movement to empower residents to oversee and guide improvements in their neighborhoods. Blackshear Neighborhood Development Corporation and Blackland Community Development Corporation were formed at around the same time in East Austin to focus on community-centered affordable housing and neighborhood revitalization.

Today, GNDC is a small, well-respected organization with four full-time staff implementing multi-million dollar development projects. Since its founding, GNDC has continued to build social and political capital in Austin, which it has used to garner support from banks and elected officials for projects serving vulnerable residents in East Austin.

To get to where it is today, GNDC has also benefitted from an array of technical assistance and capacity building support. The East Austin Chicano Economic Development Corporation provided technical assistance on the initial implementation of the Guadalupe Community Development Project in the early 1980s, while leaders from what became the Texas Low Income Housing Information Services provided key staffing support as the organization got off the ground. (These same leaders also played a key role in launching several CDCs in other parts of Austin.) An attorney from Legal Aid of Central Texas served as general counsel for the organization for more than 20 years, attending every board meeting, and the Entrepreneurship and Community Development Clinic at the University of Texas School of Law has provided on-going legal assistance over the past 10 years. GNDC has worked with an array of other partners on its projects, furthering its capacity to implement more complex projects.

Having the financial means to hire staff for administering GNDC's programs has been a key part of GNDC's long-term success as a community development corporation. While most other CDCs in Texas focused principally on creating homeownership opportunities, GNDC's early work included creating affordable rental housing opportunities. With the benefit of limited debt, the rental homes eventually generated enough income to help fund GNDC's administrative operations, including the hiring of permanent staff. The administrative support has allowed the organization to expand its capacity and impact over time.

From GNDC's experiences, the staff of a community development corporation does not need to have initial experience in community development but must be willing to dive into the work and bring in partners to help bridge gaps in expertise or other capacity. Mark Rogers, GNDC's executive director since 2003 and a resident of Guadalupe neighborhood since 1986, started working for the organization in 1993 as a project consultant. When he first joined the organization, he did not have a development background but had been involved with the creation of the Guadalupe Association for an Improved Neighborhood, GAIN, and had run several small neighborhood improvements projects funded by the City of Austin. One project that Rogers operated, Paint-a-Block, caught the eye of Sister Amalia Rios with GNDC, who enlisted Rogers in 1993 to manage the rehabilitation of GNDC's original rental housing. Rogers has been instrumental to GNDC's work and its impact in the community.

## Fixing up substandard homes

One of primary focuses of the Guadalupe Community Development Plan was to improve the housing conditions of existing residents, both renters and homeowners. As discussed above, of the 170 single-family homes in the neighborhood in 1980, over half were in substandard condition. Within six months of March 1982, when funding for the Guadalupe Community Development

Project began, the neighborhood quickly met its first-year goals for home repairs, with the following accomplishments:



- Enrolled 42 Guadalupe homeowners in the City's home repair program.
- Enrolled 18 senior and disabled homeowners and renters in the City's architectural barrier removal program.
- Placed 8 Guadalupe homeowners in the Urban League's emergency repair program.
- Worked with the City to establish a home rehabilitation program for owner- and renter-occupied homes in the neighborhood.
- Negotiated the purchase and financing for the rehabilitation and resale of ten substandard rental homes for the existing tenants.[9]

Photo courtesy Guadalupe Neighborhood Development Corporation

Abandoned home in Guadalupe Neighborhood

### Early and strategic land acquisition

At the time the Guadalupe Community Development Project was created, the commercialization of the neighborhood, which is located adjacent to downtown, threatened to displace residents and erode the residential character of the neighborhood. Large-scale land assembly was beginning to occur in the western quadrant of the neighborhood, next to downtown, and picked up in the 1980s when a California real estate company began acquiring approximately 8 acres between 7th and 11th streets and proceeded to raze the remaining homes to make way for a shopping mall and luxury hotel.

To respond to the commercialization threat, another major emphasis of the Guadalupe Community Development Project was to acquire vacant lots and houses in strategic locations on as many blocks as possible—for long-term control and to bar assembly for large-scale commercial redevelopment. This "four corners strategy," with the goal of owning each corner lot on each block, made GNDC a major property owner in the area providing additional clout in zoning battles. Buying lots early



Photo courtesy Guadalupe Neighborhood Development Corporation

Guadalupe Neighborhood Development Corporation houses

on also turned out to be smart from an affordability perspective, although no one at the time likely envisioned that lot values would be as high as they are today. In the 1980s, lots in Guadalupe could be acquired for as low as $5,000; today lots sell for $500,000 to $650,000.

By 1984, GNDC had acquired 10 lots through the community's land acquisition strategy, which were used for the construction of 7 affordable homeownership and 10 rental units. The rental units were included in both single-family and duplex houses. A key part of GNDC's successful land acquisition strategy was accessing surplus publicly-owned land, as these lots were easier to acquire. Most of GNDC's initial 10 lots were acquired from public entities including the City of Austin.

By 1989, GNDC owned a total of 14 rental units on 9 lots spread throughout the Guadalupe neighborhood. Over the ensuing years the organization acquired a number of additional properties. GNDC's executive director, Mark Rogers, notes that one of the organization's current regrets is that it did not acquire more properties during this early time period, given the low cost of land compared to today's land values.

### Neighborhood improvement initiatives

Guadalupe's residents have remained active outside of GNDC to address neighborhood conditions, including zoning cases at city hall and high crime, which was a major concern of residents in the 1980s and early 1990s. For example, in the late 1980s, Guadalupe resident David Zapata led a community policing program, appointing a crime watch captain to each block in the neighborhood. A new neighborhood association called the Guadalupe Association for an Improved Neighborhood, or GAIN, eventually supplanted the Guadalupe Area Neighborhood Association to lead projects for combating crime and improving the



Photo courtesy Guadalupe Neighborhood Development Corporation

Guadalupe Neighborhood youth cleanup project

neighborhood for residents, outside of GNDC's work to improve housing conditions. Projects led by GAIN included hiring local youth for neighborhood clean-ups and mowing lots. Within two years after GAIN's founding, crime in the area had dropped by 23 percent.[10]  Both GNDC and GAIN have also played an active role in zoning cases and land use decisions impacting the neighborhood. In 1996, the Austin Chronicle noted that GAIN had been so successful in its advocacy involving land use cases that other Central East Austin neighborhoods were turning to the organization for support.[11]

### Ebenezer Third Baptist Church and rental homes for seniors

In the 1980s, the Ebenezer Third Baptist Church, located in Guadalupe, created a faith-based nonprofit organization to engage in economic and community development projects in area. The East Austin Economic Development Corporation's goals include creating affordable rental and homeownership opportunities, energy assistance, and support for seniors.[12] The Corporation's primary housing program in the Guadalupe neighborhood has been developing a cluster of 6 duplex buildings with 12 affordable rental homes for seniors. The church also operates a child development center in the neighborhood.

## 1990 – 2000: Affordable Housing Work Continues Amidst Large-Scale Development Battles and Rising Property Values

Heading into 1990, property values in the Guadalupe neighborhood remained largely stable, with the median owner-occupied home worth $60,000, well below the going rate in the Austin area of $128,000 (both adjusted for inflation).[13]  Later in the 1990s though, the Guadalupe neighborhood began to witness larger increases in property values, in tandem with the city's economic boom in the technology sector. By the late 1990s, the gentrification pressures in Guadalupe had noticeably increased, with a noticeable uptick in outsiders scoping out potential real estate acquisitions. Still, property appreciation in Guadalupe was lower than it was citywide. Closing out the decade, the median owner-occupied home in Guadalupe's census tract was valued at $71,200, an increase of 19 percent, while the home value in Austin increased 31 percent, with a typical going rate of $168,000.[14]



### Guadalupe Neighborhood Median Values for Owner-Occupied Homes



$60,000  1990    median home value    19% increase    $71,200  2000

The 1990s were an interesting period for the neighborhood, as a "calm before the storm" of sorts. Displacement pressures in most of the neighborhood remained largely minimal, and vacant lots could be acquired for $10,000-$40,000. But the improvements that had been made to the neighborhood by GNDC and other neighborhood groups had made the area more attractive to outsiders, ultimately contributing to increases in property values.

During this time period, Guadalupe continued its work to create affordable rental and homeownership units and expanded its services further east and south. GNDC's executive director notes in retrospect that this was a time period when the organization should have been developing denser housing and incorporating longer and stronger resale restrictions into the homes it was selling. Much of the land GNDC owned was zoned for uses higher than single-family. But because multifamily housing was not as common in the neighborhood at this time, GNDC continued with its single-family development focus. For example, in the area just south of the Guadalupe Neighborhood, GNDC constructed six single-family homes on land that was zoned for commercial use, when GNDC could have placed around 40 apartment units there. GNDC sold these homes to low-income families with resale restrictions that eventually expired. The families can now resell the homes at market rates, at prices far exceeding what other low-income families can afford to pay.

The biggest threat to the Guadalupe neighborhood in the 1990s—from the perspective of GAIN and GNDC's leaders, who were focused on preserving the residential character of the neighborhood for its low-income residents—was an 8-acre tract in the northeast quadrant of the neighborhood, which became known as the Bennett Tract. In the 1950s there were around 82 homes in that area of the neighborhood, but by 1983, most of the housing had been lost, with only 19 homes remaining.[15]  In the 1980s, Bennett Consolidated of California purchased or secured options on the lots and razed the remaining homes, with the exception of a home owned by the family of a GNDC board member, who refused to sell. In 1991, the company persuaded the City Council to rezone the tract to allow for a 1.2 million square foot commercial development, including a luxury hotel, office space, and shopping mall, with heights up to 22 stories.



**Bennett Tract**

BRANCH ST.
E. 11TH
INTERSTATE HIGHWAY 35
E. 10TH
E. 9TH
SAN MARCOS ST.
EAST 7TH

GAIN and GNDC, represented largely by Latino residents, vehemently opposed the rezoning and plans for the tract, while African-American leaders in the area, including pastors from the Ebenezer Third Baptist Church and Wesley United Methodist Church, supported the development. Ebenezer and GAIN/GNDC were often on opposite sides of land use cases at City Hall, as a result of conflicting visions regarding redevelopment in the neighborhood. Ebenezer's leader, Reverend Marvin Griffin expressed wanting "downtown to leap over the freeway," into East Austin to improve the economic prosperity of the area and its residents.[16]  In contrast, GNDC and GAIN opposed large-scale commercial development in the neighborhood.[17]

The dispute over the future of the Bennett tract continued for many years and, after over a decade of the sitting vacant, the land was finally developed. The plans for a mall never materialized, and instead the site was developed as multifamily housing, with the first phase of luxury apartments opening in 2005. The final phase of the development is almost completed—high-end condominiums with starting sales prices of $325,000. The final size of the redevelopment project was limited as a result of the one hold out—the family of the long-time GNDC board member who repeatedly refused to sell her lot to outside development interests. GNDC is now in the process of building a 24-unit affordable apartment complex on that lot.

## 2000 – Present: Densification and Shared Equity Homeownership Strategies While Property Values Skyrocket

Since 2000, the Guadalupe neighborhood has undergone dramatic changes. By the early 2010s, the Great Recession—which did not take as big a toll in Texas compared to the rest of the country—had largely receded in Austin, and the city underwent a population boom with an influx of higher-income newcomers taking advantage of Austin's vibrant economy and amenities. Guadalupe's census tract, which in 2000 was 5 percent white with a median family income of $39,000, has become starkly richer and whiter: with 43 percent white residents and a median family income of $67,000.[18]



**Guadalupe Neighborhood**

5% white residents → 43%
2000          Today

$39,000 median family income → $66,500
2000          Today

Guadalupe's housing market has also taken off in this time period—with a growing share of million-dollar homes going on the market. Today, lots that once sold for $5,000 in the 1980s are selling for $500,000 to $650,000, making new acquisition of properties no longer feasible for affordable housing groups like GNDC. For example, one home in the neighborhood that sold for $349,000 in 2010 was listed for $859,000 in 2015.

Not only is GNDC no longer able to afford new property acquisition in Guadalupe, but several of the homes that it sold in earlier years to lower-income families have been lost to the market and are no longer affordable. While GNDC had long maintained a right of first refusal on the homes it sold, the resale prices have grown out of reach for the organization. For example, a GNDC home sold to a low-income buyer in 2001 for $110,000 was resold by the buyers four years later for $213,000. GNDC could not afford to exercise its right of first refusal on the home. Another GNDC home, which was appraised at $90,000 when GNDC sold it to a low-income family in 2000, was resold in 2016 for $900,000. Of the 40 homeownership units that GNDC sold between 1983 and 2008 in Guadalupe's entire service area, at least eight of the homes have been resold to market rate buyers (one of the eight homes was lost through foreclosure, and another two of the homes were resold because the original homebuyers passed away).

Responding to these evolving conditions, GNDC has been deploying two new strategies to allow the organization to continue its mission of mitigating the displacement of vulnerable residents in Guadalupe: densification of GNDC's existing properties and shared equity homeownership through a community land trust.

## Densifying existing properties

With new land acquisition in Guadalupe off the table, GNDC has turned to adding affordable housing units on the land it already owns. This strategy has included replacing two of its older duplexes with a 22-unit affordable apartment complex called La Vista de Guadalupe. La Vista was completed in 2008 and funded with federal Low Income Housing Tax Credits. GNDC currently has a waiting list of over 720 households for its rental housing. With GNDC's rents averaging $550 a month in a city where the average one-bedroom apartment rents for $1,255, the waiting list is likely to keep growing. GNDC is now in the process of developing a 24-unit apartment complex on another lots it owns in the Guadalupe neighborhood. Both of these complexes are located adjacent to the large luxury multifamily complexes that were built on the Bennett tract.

A second densification strategy GNDC has used is building accessory dwelling units (ADUs) on the back of its lots containing single-family homes. ADUs, also referred to as granny flats, are smaller homes with a separate entrance, which are either separated from or attached to the primary home. Apartments converted from garages are a common type of ADU in older neighborhoods.



Photo courtesy Guadalupe Neighborhood Development Corporation
GNDC Accessory Dwelling Unit

GNDC developed what could be considered the first modern-day ADU in Austin as early as 1999, but doing so at the time entailed an arduous process due to the City's restrictive land development code regulations for ADUs. In 2001, the Austin City Council passed an ordinance loosening restrictions on ADUs for neighborhoods with plans that opted into the ordinance (the neighborhood plan covering Guadalupe opted into the ordinance). Fourteen years later, the City Council further reduced its restrictions on ADUs and extended the ordinance citywide.[19] Since 2001, GNDC has built seven ADUs in the Guadalupe neighborhood, with rents ranging from $300 to $900 a month.

One of GNDC's ADUs in the Guadalupe neighborhood was created through The Alley Flat Initiative, a collaboration among GNDC, The University of Texas at Austin Center for Sustainable Development, and the Austin Community Design and Development Center, launched in 2005 to design and support the construction of environmentally-sustainable ADUs on the back of lots bordering alleyways in Austin.[20] These units, which were designed by the Initiative to be 500 to 850 square foot dwellings, are also referred to as "alley flats."[21]

The Green Alley Demonstration Project, funded by the City of Austin's Office of Sustainability and implemented primarily by UT's Center for Sustainable Development, also led a project focusing on improving the alleys by adding green infrastructure, making the alleys more attractive, and creating place-making events in the alleys. Over the course of several years, students with the University of Texas School of Architecture met with leaders in Guadalupe to gain a better understanding of the neighborhood, its character, and local living patterns that were valued by the community. The students also conducted geographic analyses of lots in the Guadalupe Neighborhood and surrounding neighborhoods in East Austin to identify those that were deep enough to add alley flats.

## Community land trusts: sharing equity to create permanently affordable homeownership opportunities

Struggling with ways to address the loss of its affordable homeownership units to market forces, in 2012 Guadalupe created the first community land trust (CLT) in Texas, thus providing a pathway for homeownership that is permanently affordable for low-income families, while allowing owners to recoup their investment and build additional equity.

In a CLT, a nonprofit organization maintains long-term ownership of the land to provide permanently affordable housing for the benefit of the community. There is wide variation across the country in terms of how specific CLTs are structured. The land is leased to a low-income family for a long term (99 years is typical) at an affordable price (GNDC's ground lease fee is $25 a month), through a very detailed ground lease, which sets forth the policies and rules governing the use and sale of the property. The family purchases and owns the home sitting on the land, at an affordable price, which is financed with a mortgage, typically from a bank. When the family wishes to sell the home, the nonprofit CLT typically has a right of first refusal to purchase the home.



The resale price on the home is usually capped for a certain term, allowing the family to recoup what it paid for the home, with a ceiling set on the amount of appreciation that the family can receive if the home is sold. GNDC's appreciation return for CLT homebuyers is capped at 2 percent a year. This shared equity formula allows GNDC to resell the home to another low-income family at an affordable price. Under GNDC's resale formula, if a homeowner pays $100,000 for the home and decides to sell it four years later, the maximum amount the home can be sold for is the lower of the following: (1) 108,000 (2% of $100,000/year x 4 years); and (2) the value from an independent appraisal.

While there had been discussions in Austin about creating CLTs since the early 2000s, GNDC had a hard time finding financing for its first CLT homes. Local banks refused to provide a mortgage just for the house, and with the 2007 crash of the mortgage industry, it became increasingly difficult to secure financing for even traditional housing development. As result of these financing barriers, GNDC self-financed the mortgage on its first CLT home. After many years of searching, GNDC finally found a California-based mortgage lender to finance its subsequent CLT properties, which opened the door to selling more CLT homes.

The first CLT home was sold in the Guadalupe neighborhood for $150,000, with the buyer paying $815 a month towards the mortgage, taxes, insurance, and land trust fees. Since then, GNDC has created 17 additional CLT homes (all outside the Guadalupe neighborhood so far) and plans to use the CLT model when selling affordable homes in the future. Following GNDC pioneering use of a CLT in Austin, the model has taken hold with other affordable homeownership developers in Austin, including the City of Austin and Austin Habitat for Humanity.



Photo courtesy Guadalupe Neighborhood Development Corporation

GNDC community land trust home

# Other Strategies and Tools

### Preference policy: Helping families with historic ties to the neighborhood

To support GNDC's goal of helping vulnerable residents with long-term ties in the neighborhood, GNDC has adopted a preference policy for the organization's rental and homeownership programs. Applicants falling within the highest level of priority are placed at the top of GNDC's waiting list, although an applicant must still meet the program's other criteria, and an applicant's income level and other application criteria can override the priority policy.

For home sales, GNDC has six levels of priority for applicants. For rentals, GNDC uses five levels of priority for applicants, which closely resemble the homeownership policy, with the exception of the first priority level for home sales, which prioritizes current renters.

**Guadalupe Preference Policy for Homeownership Applicants**

1. Current GNDC tenants.

2. Applicants who have lived 25 years or more within GNDC's service area.

3. Applicants who have lived more than 10, or less than 25 years within GNDC's service area.

4. Applicants who have lived in East Austin for more than 10 years, but whose family is not from GNDC's service area.

5. Applicants who have lived in GNDC's service area or East Austin less than 10 years.

6. Lowest priority is for applicants from Austin with no ties to East Austin.

### Property tax breaks

GNDC has led efforts at the Texas Legislature and local appraisal district to reduce property taxation on community land trust and other income-restricted homes, to help protect the long-term affordability of the homes. While rising property taxes impose a heavy burden on many homeowners in Austin, homeowners who are the most vulnerable to displacement from rising property taxes are those with the lowest incomes living in the most rapidly appreciating neighborhoods. Property tax burdens are especially heavy in Austin, due to its location in one of the fastest growing regions in the county and in a state that

does not have an income tax and relies on a large, growing recapture of Austin's local school taxes as a property wealthy school district. Homeowners in Austin have the eighth highest property tax burden on homesteads in the country, and the highest tax burden in the country for non-coastal cities.[22]

In 2011, GNDC played a key role in the passage of new state legislation that reduces the property taxes for community land trust properties, for the taxes on the home as well as the land.[23] As a result of this legislation, there are two primary categories of tax savings for homeowners in CLTs. First, under Section 11.1827 of the Tax Code, a city or county (or both) can elect to give a 100 percent tax exemption from property taxes on land owned by qualified community land trusts. Those



**Annual Property Tax Savings for CLT Homes in Austin (2017)**

$5,946 — taxes on market rate home and land

$3,901 in tax savings — home and land worth $300,000

$2,045 — taxes on CLT home and land ($25 monthly ground lease fee and resale restriction of $100,000)

tax savings are passed onto the homeowner. Second, under Section 23.21(c) of the Texas Tax Code, the appraisal district is required to take into account the resale restrictions in a community land trust when appraising the CLT land and home.

Since the provisions in 23.21(c) are vague, GNDC asked the Travis Central Appraisal District (TCAD) to designate a more precise appraisal methodology. As long as the resale prices are permanently restricted at an affordable price, TCAD now bases the appraisal of a CLT home on the resale-restricted price listed in the recorded ground lease between the homeowner and the CLT. For example, if the ground lease restricts the resale price in a given year to $100,000, TCAD will appraise the home for that year at $100,000. TCAD appraises the land using the income method, taking into account the ground lease fee that is paid by the homeowner to the CLT and applying a capitalization rate to the present value of that income stream. The annual income on a typical CLT ground lease ranges from $300 to several thousand dollars a year. Combining these two sections of the Tax Code can save a low-income homeowner in a CLT home thousands of dollars in property taxes each year.

## Lessons Learned

Looking back on the past 39 years of Guadalupe's history and on-going efforts to mitigate the displacement of the neighborhood's vulnerable residents, there are several key takeaways and lessons for other communities facing similar struggles:

1. **Develop and implement a community-driven, neighborhood-level strategy for mitigating displacement of vulnerable residents.** Efforts to mitigate displacement in Guadalupe have continually been anchored in the community, starting with a grassroots mobilization of residents who advocated against redevelopment pressures in the neighborhood that posed a threat to long-time residents. Residents went on to develop a community-generated plan and strategies for addressing displacement and preserving the neighborhood. Residents also created a community development corporation (CDC)—the Guadalupe Neighborhood Development Corporation (GNDC)—governed by widely-respected neighborhood leaders with social and political capital, to implement the plan.

Creating both the community plan and the CDC laid the foundation for decades of successful work to mitigate displacement of vulnerable residents in the neighborhood. While community-based political engagement in mitigating displacement is important, much of Guadalupe's

success in mitigating displacement has been from having a well-run community development corporation in the neighborhood that not only listens to the on-going needs of the neighborhood but then actually acts on those needs by building and preserving affordable housing units.

2. **Intervene early to acquire permanent control of land in strategic locations.** Acquire as much land as possible early on and in strategic areas of the neighborhood. As gentrification picks up steam in a neighborhood it becomes much more difficult to feasibly acquire properties for affordable housing. For neighborhoods that are susceptible to gentrification or in the very early stages of gentrifying, it can be hard to envision the kind of rapid rise in property values that often comes in later stages of gentrification. But buying land in this early period gives CDCs and residents more capacity to mitigate displacement when change does come. Buying land in strategic locations, such as GNDC's "four corners strategy" of acquiring as many lots as possible on each corner in the neighborhood, provides residents with strong community control over future redevelopment.

3. **For homeownership units, restrict resale price using a shared equity model to ensure permanent affordability of the units for future generations of residents.** GNDC's earlier homes were sold with long-term resale restrictions but without caps on the resale price, and thus, as property values have skyrocketed, several homes have since been resold at market prices way beyond the means of other low-income families. Again, it can be hard to envision rapidly rising home values before gentrification in a neighborhood takes off, but restricting the resale prices early on utilizing a shared equity model—where the owners recoup their investment and the return on appreciation is capped—ensures opportunities for future generations of low-Income residents to live in the neighborhood and reduces turnover of properties. The resale price restrictions also result in property tax savings for low-income homeowners in states like Texas that offer property tax breaks for CLT properties.

4. **Invest in capacity building and technical assistance.** Having access to technical assistance and funding for administrative costs has been key to the success of GNDC's displacement mitigation work. GNDC's early investment in rental housing with limited debt generated a critical stream of income to help fund the organization's administrative operations, including permanent staffing, allowing the organization to expand its capacity and impact over time. Creating an on-going, internal revenue source helps ensure the long-term sustainability of a CDC and increases the capacity of the community to mitigate displacement.

5. **Adapt strategies to changing conditions in the neighborhood.** The strategies utilized in Guadalupe to address gentrification have evolved over time, in response to neighborhood changes, newly available tools, and lessons learned from prior work. In particular, as gentrification pressures have risen, with lots selling for as much as $650,000, GNDC has had to develop new approaches to meeting local needs and ensuring the long-term preservation of affordable housing units created. GNDC's newer strategies have included the creation of a community land trust and denser affordable housing development, such as through the construction of accessory dwelling units on properties owned by the organization.

# Conclusion

The Guadalupe neighborhood's work over the past 39 years to provide long-term residents with an opportunity to remain in the neighborhood amidst rapidly rising property values and redevelopment pressures is a model for other neighborhoods in Austin and across the United States. Much of the community's collective success can be attributed to its early strategic land acquisition, maintaining strong ties to the community, and operating a strong community development corporation that is focused and flexible in its approaches to mitigating displacement.

Led by the Guadalupe Neighborhood Development Corporation, the Guadalupe neighborhood remains actively engaged in efforts to create and preserve affordable housing for the benefit of long-time, low-income residents. GNDC has been a pioneer of new models for mitigating residential displacement, including the creation of the state's first community land trust and development of accessory dwelling units.

Thanks to these long-standing community-led efforts, the Guadalupe neighborhood remains primarily residential and is providing vulnerable residents with long-standing ties to the community with the ability to return and stay in their neighborhood. Today, the small neighborhood is home to 91 affordable units under long-term community control, including units under development— more than half the number of housing units that existed when GNDC first began its work in the 1980s.