EXHIBIT Z

# Final Guidance for Consideration of Environmental Justice in Clean Air Act 309 Reviews

**US Environmental Protection Agency/Office of Federal Activities (2252A)**

**July 1999**

**DISCLAIMER**

The mention of company or product names is not to be considered an endorsement by the U.S. Government or by the Environmental Protection Agency (EPA). This document was prepared with the technical assistance of Science Applications International Corporation in partial fulfillment of EPA Contract 68-WE-0026, Work Assignment 72-IV.

This policy guidance is intended only to improve the internal management of EPA's environmental justice programs as it relates to EPA reviews made under Section 309 of the Clean Air Act. It does not create any right, benefit or trust obligation either substantive or procedural, enforceable by any person, or entity in any court against the agency, its officers, or any other person. EPA's compliance with this guidance is not judicially reviewable. EPA may elect not to follow this guidance as circumstances warrant and may revise it in the future.

# TABLE OF CONTENTS

# LIST OF ABBREVIATIONS AND ACRONYMS

## 1.0 INTRODUCTION

1.1 Organization of this Guidance

1.2 Background

1.3 What is Environmental Justice?

## 2.0 ENVIRONMENTAL JUSTICE ANALYSES

2.1 EPA Responsibilities Under Section 309 of the Clean Air Act

2.2 Pre-Review Activities

2.3 Review of Draft Environmental Impact Statements

2.3.1 Public Participation

2.3.2 Determining the Affected Environment

2.3.3 Analysis

2.3.4 Alternatives

2.3.5 Mitigation

2.4 Rating System

2.4.1 Rating the Environmental Impact

2.4.2 Rating the Adequacy of the Impact Statement

2.4.3 Review of and Nature of Comments to the Final EIS

2.5 Referral to CEQ

**3.0 ISSUES AND QUESTIONS IN ENVIRONMENTAL JUSTICE ANALYSES**

No. 1 Identification of Minority Populations

No. 2 Identification of Low-Income Populations

No. 3 Identification of Potential Impacts

No. 4 Public Involvement

No. 5 Disproportionately High and Adverse Impacts

No. 6 Mitigation of Disproportionately High and Adverse Impacts

No. 7 Nature of Comments on the Draft EIS

No. 8 Nature of Comments on the Final EIS

## LIST OF TABLES

TABLE 1: Principles for Considering Environmental Justice under NEPA

TABLE 2: Authorities, Polices and Guidance Relevant to Environmental Justice

## LIST OF APPENDICES

APPENDIX A: AUTHORITIES, POLICIES AND GUIDANCE

APPENDIX B: LIST OF ENVIRONMENTAL JUSTICE CONTACTS

APPENDIX C: REFERENCES / BIBLIOGRAPHY

## LIST OF ABBREVIATIONS AND ACRONYMS

BLM: Bureau of Land Management

CAA: Clean Air Act

CEQ: Council on Environmental Quality

CFR: Code of Federal Regulations

DEIS: Draft Environmental Impact Statement

DOC: U.S. Department of Commerce

DOE: U.S. Department of Energy

DOD: U.S. Department of Defense

DOI: U.S. Department of Interior

DOJ: U.S. Department of Justice

DOL: U.S. Department of Labor

DOT: U.S. Department of Transportation

EIS: Environmental Impact Statement

EJ: Environmental Justice

EO: Executive Order 12898

EPA: U.S. Environmental Protection Agency

EU: Environmentally Unsatisfactory

FEIS: Final Environmental Impact Statement

FEMA: Federal Emergency Management Agency

FERC: Federal Energy Regulatory Commission

FHWA: Federal Highway Administration

GIS: Geographic Information System

HHS: U.S. Department of Health and Human Services

HUD: U.S. Department of Housing and Urban Development

IWG: Interagency Working Group

NASA: National Aeronautics and Space Administration

NEPA: National Environmental Policy Act

NMFS: National Marine Fisheries Service

NRC: Nuclear Regulatory Commission

NSC: National Security Council

OA: U.S. Environmental Protection Agency - Office of the Administrator

OAR: U.S. Environmental Protection Agency - Office of Air and Radiation

OCEMR: U.S. Environmental Protection Agency - Office of Communication, Education and Media Relations

OCIR: Office of Congressional and Intergovernmental Relations

OCR: U.S. Environmental Protection Agency - Office of Civil Rights

OECA: U.S. Environmental Protection Agency - Office of Enforcement and Compliance Assurance

OEJ: U.S. Environmental Protection Agency - Office of Environmental Justice

OFA: U.S. Environmental Protection Agency - Office of Federal Activities

OGC: U.S. Environmental Protection Agency - Office of General Counsel

OMB: Office of Management and Budget

OP: U.S. Environmental Protection Agency - Office of Policy

OPPTS: U.S. Environmental Protection Agency - Office of Prevention, Pesticides and Toxic Substances

ORD: U.S. Environmental Protection Agency - Office of Research and Development

OSTP: Office of Science and Technology Policy

OSWER: U.S. Environmental Protection Agency - Office of Solid Waste and Emergency Response

OW: U.S. Environmental Protection Agency - Office of Water

ROD: Record of Decision

SEIS: Supplemental Environmental Impact Statement

SIA: Social Impact Analysis

TRI: Toxic Release Inventory

U.S.C.: United States Code

USDA: U.S. Department of Agriculture

USFS: U.S. Forest Service

# 1.0 INTRODUCTION

This document is intended only for use by Environmental Protection Agency (EPA) reviewers. It provides guidance on reviewing and commenting on other federal agencies National Environmental Policy Act (NEPA) documents to help ensure that environmental effects on minority communities and low-income communities have been fully analyzed. **It should be read in conjunction with EPA's** *Policy and Procedures for the Review of Federal Actions Impacting the Environment* **and the Council on Environmental Quality's (CEQ)** *Guidance for Considering Environmental Justice under the National Environmental Policy Act* **(hereafter, CEQ's** *EJ NEPA Guidance***).** It is also suggested that the reader be familiar with *Guidance for Incorporating Environmental Justice Concerns in EPA's NEPA Compliance Analyses, April 1998* ( hereafter, EPA's *EJ NEPA Guidance*), which highlights ways in which EPA-prepared NEPA documentation identifies and addresses environmental justice concerns.

## 1.1 Organization of this Guidance

**Chapter 1** provides background information and the rationale for development of this guidance. **Chapter 2** gives an overview of environmental justice considerations to be addressed at each stage of the EPA Section 309 review process. **Chapter 3** presents suggested solutions to difficult issues that the EPA Section 309 reviewer may face. Lastly, the **Appendices** contain respectively: A) a discussion of the authorities, policies and existing guidance pertaining to environmental justice; B) a list of environmental justice contacts; and C) references and bibliography.

## 1.2 Background

Since the early 1970s, there has been increasing concern over disproportionate environmental and human health impacts on minority populations and low-income populations. To address this concern, President Clinton issued Executive Order 12898 on February 11, 1994, *Federal Actions to Address Environmental*

*Justice in Minority Populations and Low-Income Populations* (hereafter, EO). The EO directs each federal agency "to make achieving environmental justice part of its mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations." A Presidential Memorandum accompanying the EO directs federal agencies to analyze "the environmental effects, including human health, economic and social effects, of Federal actions, including effects on minority communities and low-income communities, when such analysis is required by the National Environmental Policy Act of 1969 (NEPA)."

The Presidential Memorandum states that the EPA "shall ensure that the involved agency has fully analyzed environmental effects on minority communities and low-income communities, including human health, social, and economic effects."

## 1.3 What is Environmental Justice?

The impetus behind environmental justice is to ensure that all communities, including minority communities and low-income communities, live in a safe and healthful environment. Since the late 1980s, various definitions of environmental justice have developed. The Environmental Protection Agency Office of Environmental Justice defines this as:

*"The fair treatment and meaningful involvement of all people regardless of race, color, national origin, or income with respect to the development, implementation and enforcement of environmental laws, regulations and policies. Fair treatment means that no group of people, including racial, ethnic, or socioeconomic group should bear a disproportionate share of the negative environmental consequences resulting from industrial, municipal, and commercial operations or the execution of federal, state, local, and tribal programs and policies ."*

Under the EO, the Interagency Working Group (IWG), composed of representatives from 17 Federal agencies, developed guidance on key terms that are central to understanding environmental justice and how disproportionately high and adverse impacts may be identified [see Appendix to the CEQ *EJ NEPA Guidance*]. Defined are such terms as minority, minority population, low-income population, disproportionately high and adverse human health effects, and disproportionately high and adverse environmental effects. Understanding these terms will help the EPA reviewer in applying this EPA guidance on Section 309 reviews.

## 2.0 ENVIRONMENTAL JUSTICE ANALYSES

The CEQ *EJ NEPA Guidance* presents a discussion on general principles for considering environmental justice under NEPA. It states in part:

Environmental justice issues may arise at any step of the NEPA process and agencies should consider these issues at each and every step of the process, as appropriate. Environmental justice issues encompass

a broad range of impacts covered by NEPA, including impacts on the natural or physical environment and interrelated social, cultural and economic effects.*(1)* In preparing an EIS or an EA, agencies must consider both impacts on the natural or physical environment and related social, cultural, and economic impacts.*(2)* Environmental justice concerns may arise from impacts on the natural and physical environment, such as human health or ecological impacts on minority populations, low-income populations, and Indian tribes, or from related social or economic impacts.

Table 1 lists six general principles included in CEQ's *EJ NEPA Guidance* for identifying and addressing environmental justice under NEPA.

**Table 1. Principles For Considering Environmental Justice Under NEPA**

| PRINCIPLES FOR CONSIDERING ENVIRONMENTAL JUSTICE UNDER NEPA | |
| --- | --- |
| Recognize that the question of whether agency action raises environmental justice issues is highly sensitive to the history or circumstances of a particular community or population, the particular type of environmental or human health impact, and the nature of the proposed action itself. There is not a standard formula for how environmental justice issues should be identified or addressed. However, the following six principles provide general guidance. | |
| **AREA COMPOSITION** | Consider the composition of the affected area to determine whether minority populations, low-income populations, or Indian tribes are present in the area affected by the proposed action, and, if so, whether there may be disproportionately high and adverse human health or environmental effects on minority populations, low-income populations, or Indian tribes. |
| **DATA** | Consider relevant public health data and industry data concerning the potential for multiple or cumulative exposure to human health or environmental hazards in the affected population and historical patterns of exposure to environmental hazards, to the extent such information is reasonably available. For example, data may suggest there are disproportionately high and adverse human health or environmental effects on a minority population, low-income population, or Indian tribe from the agency action. Also consider these multiple, or cumulative effects, even if certain effects are not within the control or subject to the discretion of the agency proposing the action. |

| | |
|---|---|
| **INTERRELATED FACTORS** | Recognize the interrelated cultural, social, occupational, historical, or economic factors that may amplify the natural and physical environmental effects of the proposed agency action. These factors should include the physical sensitivity of the community or population to particular impacts; the effect of any disruption on the community structure associated with the proposed action; and the nature and degree of impact on the physical and social structure of the community. |
| **PUBLIC PARTICIPATION** | Develop effective public participation strategies. As appropriate, acknowledge and seek to overcome linguistic, cultural, institutional, geographic, and other barriers to meaningful participation, and incorporate active outreach to affected groups. |
| **COMMUNITY REPRESENTATION** | Assure meaningful community representation in the process. Be aware of the diverse constituencies within any particular community when they seek community representation. Endeavor to have complete representation of the community as a whole and encourage community participation as early as possible if it is to be meaningful. |
| **TRIBAL REPRESENTATION** | Seek tribal representation in the process in a manner that is consistent with the government-to-government relationship between the United States and tribal governments, the federal government's trust responsibility to federally-recognized tribes, and any treaty rights. |

In addition to these general principles, CEQ's *EJ NEPA Guidance* notes the following:

The Executive Order does not change the prevailing legal thresholds and statutory interpretations under NEPA and existing case law. For example, for an EIS to be required, there must be a sufficient impact on the physical or natural environment to be "significant" within the meaning of NEPA. Agency consideration of impacts on low-income populations, minority populations, or Indian tribes may lead to the identification of disproportionately high and adverse human health or environmental effects that are significant and that otherwise would be overlooked.*(3)*

Under NEPA, the identification of a disproportionately high and adverse human health or environmental effect on a low-income population, minority population, or Indian tribe does not preclude a proposed agency action from going forward, nor does it necessarily compel a conclusion that a proposed action is environmentally unsatisfactory. Rather, the identification of such an effect should heighten agency attention to alternatives (including alternative sites), mitigation strategies, monitoring needs, and preferences expressed by the affected community or population.

Neither the Executive Order nor this guidance prescribes any specific format for examining environmental justice, such as designating a specific chapter or section in an EIS or EA on environmental justice issues. Agencies should integrate analyses of environmental justice concerns in an appropriate manner so as to be clear, concise, and comprehensible within the general format suggested by 40 C.F.R. § 1502.10.

The following sections identify the Section 309 review process phases where EPA is involved. They identify specific areas that the EPA reviewer should consider in the assessment of environmental justice.

## 2.1 EPA Responsibilities under Section 309 of the Clean Air Act

The provisions of Clean Air Act Section 309 require the Administrator of EPA to comment in writing upon the environmental impacts associated with certain proposed actions of other federal agencies, including actions subject to NEPA's EIS requirement. The comments must be made available to the public.

In cases where the EPA Administrator determines that the proposed action is "unsatisfactory from the standpoint of public health or welfare or environmental quality, he shall publish his determination and the matter shall be referred to the Council on Environmental Quality." In accordance with these requirements, EPA is responsible for developing informed comments and recommendations that notify the public and action agency of potential oversights in the identification and evaluation of potential impacts. EPA determines whether the action agency analyzed data on the potential impacts of the proposed action on the environment and human health and whether a reasonable effort was made to inform and involve the public in the EIS development process. During the review, the EPA reviewer should consider the following questions:

- Did the agency articulate and document the reasoning that supports its decision?

- Did the agency consider alternatives as a test of soundness for the decision?

- Did the agency provide avenues for public participation in decision-making?

EPA's Section 309 review process encompasses the requirement for EPA to ensure that environmental justice concerns are considered by Federal agencies, thus satisfying the spirit and intent of the Presidential Memorandum as well as demonstrating EPA's continued commitment to assure its environmental justice goals are met.

## 2.2 Pre-Review Activities

It is EPA's policy to participate in the NEPA process at the earliest stage of project development and to the fullest extent practicable (EPA's 1984 *Policy and Procedures for the Review of Federal Actions Impacting the Environment*, hereafter, *Policy and Procedures*). The policy notes that for EIS

involvement, the following three steps should be taken:

(1) Participate in interagency coordination early in the planning process to identify significant environmental issues that should be addressed in completed documents;

(2) Conduct follow-up coordination on actions where EPA has identified significant environmental impacts to ensure a full understanding of the issues and to ensure implementation of appropriate corrective actions; and

(3) Identify environmentally unsatisfactory proposals and consult with other agencies, including CEQ, to achieve timely resolution of the major issues and problems.

EPA's involvement in the scoping process should ensure that: (1) problems are identified early and are properly studied, (2) issues of little significance do not consume too much time and effort, (3) the draft EIS is thorough and balanced, and (4) delays occasioned by inadequate draft EISs are avoided. At this stage, it would also be useful for the EPA reviewer to be familiar with or obtain the other federal agency's environmental justice strategy (developed under Executive Order 12898, §1-103) and any related guidance. EPA's level of involvement during the scoping process should be determined on a case-by-case basis and should be commensurate with the degree of the environmental justice concern(s). In this context, the reviewer may supplement scoping letters or telephone responses with further detailed information. Such information could include:

- Specific information or data related to the area of interest;
- Specific assessment techniques and methodologies;
- Reasonable alternatives to the proposed action that may avoid potential adverse impacts;
- Mitigation measures that should be considered to reduce or to substantially eliminate adverse environmental impacts.

The identification of environmental justice concerns and the incorporation of these concerns into the scoping analysis can have implications for the nature and extent of the EIS. For example, Indian tribe representation in the process should be sought in a manner that is consistent with the government-to-government relationship between the United States and tribal governments, the Federal government's trust responsibility to Federally-recognized tribes, and treaty and other rights. This will help ensure that the NEPA process is fully utilized to address concerns identified by tribes and enhance the protection of tribal environments, resources and sovereignty.

## 2.3 Review of Draft Environmental Impact Statements

All EISs filed with EPA should be reviewed for adequate environmental justice content. Although some draft EISs may not include environmental justice issues, relevant environmental justice concerns should be included in EPA's comment letter and factored into the project rating as appropriate.

### 2.3.1 Public Participation

A prime NEPA objective is to engage the public in the EIS development and decision-making processes at the earliest stage possible. To accomplish this objective, CEQ regulations require that, in the NEPA process, agencies keep the public well-informed of their proposed actions and alternatives as well as the findings on associated human health and environmental effects and risks that may have an impact on communities.

CEQ regulations also require that the agency involve the public in providing information pertinent to EIS development. The specific steps of the NEPA process where public participation is encouraged include the scoping phase, review of the draft EIS, and review of the Record of Decision and/or Finding of No Significant Impact. However, in addressing environmental justice under NEPA, the agency should involve the public in the initial screening and data collection effort to identify any potentially affected minority and/or low-income population(s).

In this context, the EPA reviewer should note whether the agency's draft EIS reflects a concerted effort to elicit participation of minority and/or low-income populations. Also, the reviewer should note whether the draft EIS considered public input in determining and analyzing disproportionately high and adverse impacts as well as alternatives that would mitigate the impacts to the community(ies). The agency may need to initiate innovative approaches to overcome linguistic, institutional, cultural, economic, historical or other potential barriers that may limit a community's ability to participate. The CEQ *NEPA EJ Guidance* suggests the following strategies that may be useful in overcoming barriers to effective public participation. While not all strategies need to be used, they should all be considered and included only on an as needed basis.

- Coordination with individuals, institutions, or organizations in the affected community to educate the public about potential health and environmental impacts and enhance public involvement;
- Translation of major documents (or summaries thereof), provision of translators at meetings, and other efforts to ensure that limited-English speakers potentially affected by a proposed action have an understanding of the proposed action and its potential impacts;
- Provision of opportunities for limited-English speaking members of the affected public to provide comments throughout the NEPA process;
- Provision of opportunities for public participation through means other than written communication, such as personal interviews or use of audio or video recording devices to capture oral comments;
- Use of periodic newsletters or summaries to provide updates on the NEPA process to keep the public informed;
- Use of different meeting sizes or formats, or variation on the type and number of media used, so that communications are tailored to the particular community or population;
- Circulation or creation of specialized materials that reflect the concerns and sensitivities of particular populations such as information about risks specific to subsistence consumers of fish, vegetation, or wildlife;
- Use of locations and facilities that are local, convenient, and accessible to the disabled, low-

income and minority communities; and
- Assistance to hearing-or sight-impaired individuals.

## 2.3.2 Determining the Potentially Affected Environment

Early in the review process, the EPA reviewer should identify the study area and its composition including potentially affected minority and/or low-income communities. In addition, the EPA reviewer should identify the natural resources that could potentially be affected by proposed and alternative actions. Through review of the EIS, EPA reviewers should develop an understanding of demographic, socioeconomic, and environmental conditions as a reference point for data comparison. This allows a determination to be made as to whether or not a comprehensive assessment of the types of impacts that may be imposed upon all human and natural resources (*e.g.,* air, water, soil, wildlife) was conducted. It also allows an understanding of how these impacts should be translated into human health concerns.

To account for potential environmental justice concerns, reviewers should be sensitive to identifying whether affected resources, particularly natural resources that support subsistence living (*e.g.*, hunting, fishing, gathering), are used by minority or low-income communities. The analyses should be focused toward how potential effects to these resources may translate into disproportionately high and adverse human health or environmental effects on minority and/or low-income communities.

In addition, Indian tribes may have treaty and other rights to resources in or outside of Indian country and may hold some natural resources sacred due to religious beliefs and/or social/ceremonial ties. The action agency should solicit alternatives and mitigation measures from the affected community early in the process, such as during scoping. Throughout the NEPA process, but especially in this phase, the action agency should provide affected communities with the tools ( *e.g.*, summary reports and background explanations in plain language) to ensure that the communities understand technically complex issues and have meaningful participation and input. All resources that could be affected should be thoroughly identified and documented. These findings should be discussed and shared with potentially affected communities during public participation phases of the NEPA process. These measures will help to ensure full disclosure and the solicitation of additional public comment and input.

## 2.3.3 Analysis

If the potential for adverse effects is identified, agencies should analyze how the environmental and health effects are distributed within the affected community. Demographic data and information on the ecological characteristics and biophysical impacts of the proposed action and any alternatives should be analyzed to identify if disproportionately high and adverse impacts will affect the minority and/or low-income communities. Before commenting on an agency proposal, the EPA reviewer should see how the agency came to the conclusion that an impact may or may not be disproportionately high and adverse and the rationale behind the proposal. For example, there may be situations where a proposed action causes several impacts (*e.g.*, a low-income population experiencing air pollution from a permitted discharge while simultaneously experiencing increased traffic in its neighborhood.) In this instance, the agency may

have generated, through Geographic Information System (GIS) technology, a visual image which shows the relationship between the demographic and ecological characteristics of the geographic area where the impacts will occur and reviewed this information with the affected communities.

The analysis findings should be documented by the agency, including whether a disproportionately high and adverse health or environmental effect is likely to result from the proposed action and any alternatives. Also, the EIS should identify how the action agency ensured that the findings were communicated to the public.

### 2.3.4 Alternatives

NEPA and the CEQ regulations require that a reasonable range of alternatives be identified and developed. In addition, CEQ requires that all reasonable alternatives, including a "no action" alternative, must be analyzed rigorously and objectively.

In the draft EIS, the EPA reviewer should evaluate the environmental justice issues identified in the alternatives proposed by the agency as well as whether or not the agency has considered the affected communities' input. Actions that would adversely impact tribal resources may conflict with the Federal government's trust responsibility, a tribal treaty or other rights. In instances where tribal objections have been raised, the lead agency or the tribe(s) may have requested a dispute resolution process to resolve conflicting issues regarding the appropriate alternative(s).

EPA reviewers should keep in mind that the goal of identifying and developing alternatives for mitigating disproportionately high and adverse effects is not to distribute the impacts proportionally or divert them to a non-minority or higher-income community. Subsequently, preferred alternatives should be developed that mitigate or avoid effects to both the population at large and minority or low-income communities that were identified as being subjected to disproportionately high and adverse effects.

### 2.3.5 Mitigation

CEQ regulations require that mitigation measures be analyzed to address environmental effects, including cumulative impacts, to natural resources threatened by proposed actions. In addition, mitigation measures should be developed specifically to address potential disproportionately high and adverse effects to minority and/or low-income communities. Similarly, the agency, with tribal concurrence, should select mitigation measures that will not diminish tribal resources and that will ensure the protection of such resources from environmental harm. Where tribal objections have been raised, it may be appropriate for the action agency and the tribe(s) to engage in a dispute resolution process to resolve conflicting issues regarding the appropriate mitigation measures.

When identifying and developing potential mitigation measures to address environmental justice concerns, the action agency should consult the affected members of the community. Public participation efforts should be designed and conducted to ensure that effective mitigation measures are identified and

that the effects of any potential mitigation measures are realistically analyzed and compared. Mitigation measures may include a variety of approaches for addressing potential effects and balancing the needs and concerns of the affected community with the requirements of the action or activity. For example, potential mitigation measures for addressing disproportionately high and adverse effects could include:

1. Reducing pollutant loadings through changes in processes or technologies.

2. Reducing or eliminating other sources of pollutants or impacts to reduce cumulative effects.

3. Planning for and addressing indirect impacts prior to project initiation (*e.g.,* planning for alternative public transportation alternatives if the project may result in increased population growth).

4. Providing assistance to an affected community to ensure that it receives at least its fair (*i.e.,* proportional) share of the anticipated benefits of the proposed action (*e.g.,* through job training, community infrastructure improvements, etc.).

5. Relocating affected communities, upon request or with concurrence from the affected individuals.

6. Establish a community oversight committee to monitor progress and identify potential community concerns.

7. Changing the timing of impact-causing actions (*e.g.,* noise, pollutant loadings) to reduce effects on affected communities.

8. Conducting medical monitoring on affected communities and providing treatment or other responses if necessary.

If mitigation measures are determined to be necessary to reduce disproportionately high and adverse effects on minority and/or low-income communities, and/or tribal resources, then the measures should be committed to in the ROD. EPA's *EJ NEPA Guidance* suggests other steps that the EPA reviewer can consider as recommendations to the action agency to ensure that mitigation measures are effective and are implemented. These include the following:

• Establish the mitigation measure as a requirement in the permit or authorizing document;

• Require financing at the outset of the project for both implementing the mitigation measure and monitoring its effectiveness through clearly defined guidelines;

• Require monitoring reporting, which should be made available to the public; and

• Identify clear consequences and penalties for failure to implement effective mitigation measures.

## 2.4 Rating System

EPA's *Policy and Procedures* sets forth a system for rating the environmental impact of the proposed action and the adequacy of the impact statement. Although the rating system predates Executive Order 12898, it nevertheless encompasses the assessment of environmental justice issues. Environmental justice should be considered by the EPA reviewer when the ratings are assigned.

### 2.4.1 Rating the Environmental Impact

The EPA reviewer's rating for the *environmental impact of the proposed action* should consider environmental justice when: (a) minority populations, low-income populations, or Indian tribes are present in the area affected by the proposed action; and (b) there may exist disproportionately high and adverse human health or environmental effects on minority populations, low-income populations or Indian tribes.

### 2.4.2 Rating the Adequacy of the Impact Statement

The EPA reviewer's rating for the *adequacy of the impact statement* should consider environmental justice when: (a) the EIS fails to provide sufficient information to adequately address the question of whether or not minority or low-income populations are disproportionately affected; or (b) the EIS fails to draw a conclusion regarding the significance of a potential environmental justice impact.

### 2.4.3 Review of and Nature of Comments on the Final EIS

Environmental justice concerns identified at the draft EIS stage should be examined in the final EIS to determine whether the problem was adequately resolved. The review of the final EIS should focus on the projects' unresolved issues relating to disproportionately high and adverse human health and environmental effects on minority and/or low-income populations.

## 2.5 Referral to CEQ

As part of EPA's Section 309 responsibilities, EPA must refer to CEQ "any such [proposed] legislation, action, or regulation that the Administrator determines is unsatisfactory from the standpoint of public health or welfare or environmental quality" (42 U.S.C. § 7609(b)).

## 3.0 ISSUES AND QUESTIONS IN ENVIRONMENTAL JUSTICE ANALYSES

This section is intended to assist the EPA reviewer with questions commonly encountered in environmental justice analyses.

**Issue No. 1: Identification of Minority Populations**

*Question:* Were the minority characteristics of potentially affected communities identified?

*Answer:* The first step in identifying the minority characteristics of potentially impacted communities is to understand the geographic scope of the area affected by the proposed action. The EPA reviewer should ensure that the geographic boundaries surrounding the community(ies) which may be impacted by the proposed action and/or alternatives were identified in the EIS. The geographic area of analysis may include a governing body's jurisdiction, a neighborhood, census tract or other similar unit that is chosen so as not to *artificially dilute* or *inflate* the affected minority population.

Types of geographic distribution considered in the EIS may reflect race, ethnicity, and/or income or other boundaries such as tribal lands and resources. It is important for the EIS analyst as well as the EPA reviewer to recognize that the geographic region analyzed for potential impacts on a minority community(ies) may differ in size from other areas considered in the EIS. For example, an EIS for a proposed Federal highway construction project that would pass through tribal lands would require an evaluation of the potential environmental impacts for the actual area where construction would occur. In addition, the environmental justice analysis for the proposed action may require that the agency evaluate potential impacts on Native American communities located beyond the geographic boundaries of the proposed action if the area is used for spiritual or subsistence purposes. In this case, the geographic boundaries are different (*i.e.,* larger) than those of other areas considered in the EIS. Determining the appropriate geographic area for environmental justice analyses is also particularly important for proposed actions that may affect air or water quality beyond the boundaries of the facility where emissions or discharges would originate.

In addition to the study area identified, the EPA reviewer should consider whether the EIS identified other communities so that a comparative analysis could determine if there were "meaningfully greater" impacts on certain minority communities. Such a comparison of a potentially impacted minority community to the larger geographic area, political jurisdiction, or similar community located in a different geographic area may aid in distinguishing potential impacts on minority communities within the affected area of the proposed action.

The EPA reviewer should be cognizant of the various sources of data used to identify the study area potentially affected by the proposed action and/or alternatives. Sources of data used may include:

- Maps provided by state, county and local agencies that delineate population and/or political boundaries;
- U.S. Census Bureau geographic data available on CD-ROM from the Bureau, at numerous local and university libraries, or on the World Wide Web;
- Sources such as Chambers of Commerce, civic groups, trade associations and other commercial organizations; and
- Standard demographic surveys that identify ethnic pockets and living patterns within the community.

Once the study area has been determined, the reviewer should determine how the EIS analysis identified the potentially affected minority populations. When possible, the analysis should identify the presence of minority communities residing near the proposed project and those minority groups which utilize or are dependent upon natural resources that may be affected by the proposed action. In addition, the IWG recommends consideration of both individuals living in geographic proximity to one another as well as geographically dispersed/transient sets of individuals, where both types of groups "experience common conditions" of environmental exposure or effect.

## Issue No. 2: Identification of Low-Income Populations

*Question:* Were the relevant economic indicators (*e.g.,* average median income) of the potentially affected populations identified?

*Answer:* As with the identification of minority populations, the EPA reviewer should evaluate whether the EIS analysis identified the geographic area that may be potentially impacted by the proposed action.

Once the geographic area of analysis has been determined, the EPA reviewer should evaluate whether and to what extent the EIS analysis identified low-income populations that may be affected by the proposed action and/or alternatives, including "pockets" of low-income individuals in specific geographic areas. It is important for both the EIS analyst and EPA reviewer to recognize that the aggregation of data and lack of current information on income levels may fail to reveal certain relevant characteristics about the population. For example, the aggregation of data in a particular geographic area may mask a "pocket" of low-income individuals that exists among the larger general population.

The following sources of data may be used to identify low-income populations:

- U.S. Census Bureau Current Population Reports, Series P-60 on Income and Poverty. In addition to using U.S. Census defined parameters for measuring income and poverty, it is also important to consider state and regional low-income and poverty definitions where appropriate;
- Local resources such as community and public outreach groups, community leaders, and state universities (*e.g.,* economic departments);
- State and local agencies such as departments of taxation and employment. Other agencies may be able to provide additional data on economic indicators such as the status and level of public services provided to community members (*e.g.,* health care, education, infrastructure, etc.) and the dependence of the parts of the community on natural resources for subsistence;
- Commercial database firms that collect and market statistical demographic information;
- Location/distributional tools such as maps, aerial photographs and geographical information systems (GIS); and
- Public outreach and other communication efforts that involve community members in defining their communities. Such efforts are effective in obtaining the most current data on income and poverty levels available.

## Issue No. 3. Identification of Potential Impacts

*Question:* Were potential environmental impacts to minority populations or low-income populations identified?

*Answer:* The EPA reviewer should ensure that the action agency identified potential impacts (*i.e.,* direct, indirect, and cumulative) on minority and/or low-income populations subsequent to addressing Issues 1 and 2. Determining the potential impacts of a proposed action on minority and/or low-income populations involves collecting data and analyzing the direct, indirect, and cumulative potential environmental and human health impacts. The agency should also have identified any impact that the proposed action may have on subsistence-related consumption of fish and wildlife as well as water and vegetation by the minority and/or low-income community(ies). In addition, the agency and the EPA reviewer should determine whether government standards address the potential levels, risks and routes of exposure to the potentially affected minority and/or low-income community(ies).

The EIS should incorporate data on baseline demographic, socioeconomic, and environmental conditions so that a comprehensive assessment of the potential impacts that may affect human health and natural resources can be fully understood and used in the decision-making process. A socioeconomic analysis of potential impacts should also be conducted and evaluated within the context of potential disproportionately high and adverse effects. To address potential impacts on minority and low-income communities, the agency and EPA reviewer should pay special attention to whether the potentially impacted resources translate to use values (*e.g.,* subsistence, other economic or social purposes, religious or spiritual practices) or non-use values (*e.g.*, scenic views) by members of the community(ies).

The public should be kept involved and informed throughout the data collection and analysis phases of the EIS development and review processes. Full documentation of findings on potential impacts should be presented. In addition, the findings of potential impacts should be fully disclosed and discussed with the potentially affected community(ies) and used to solicit additional input from the public.

## Issue No. 4: Public Involvement

*Question:* What were the levels of participation of the potentially impacted minority communities and low-income communities in scoping meetings and the comment process? What effort was made by the Federal agency to secure input and participation of potentially impacted minority and/or low-income communities?

*Answer:* Public involvement is an important component of NEPA. The EPA reviewer should evaluate the extent to which the agency involved the potentially impacted minority and/or low-income community(ies) in the EIS development, analysis and decision-making processes. A significant part of the EPA review should focus on who, in the potentially impacted minority and/or low-income community(ies), the agency communicated with and when the public became involved in the process. Both the CEQ *EJ NEPA Guidance* and the EPA *EJ NEPA Guidance* provide suggestions about various

community-based organizations useful in developing communication outreach strategies for members of the community(ies). It may be useful to refer to these guidance documents when evaluating how the agency developed outreach and public involvement strategies.

EPA's review should identify and evaluate specific actions taken by the agency to obtain input from community members. These include the pre-scoping and scoping efforts to help determine the study area and characteristics of the potentially impacted community(ies). By reviewing scoping documentation, the EPA reviewer can determine when the agency initiated outreach to the potentially impacted community and if outreach occurred during the early stages of the process. Involving the public in the early stages of EIS development represents the first step in securing an informed and participatory community that should exist throughout the entire NEPA process.

The EPA review should identify and evaluate actions taken by the agency to keep the community informed and involved beyond the initial phases of the process. Such actions include notifying the potentially impacted minority and/or low-income community(ies) of the proposed action and alternatives, scoping meetings and other events that occur during the development of the EIS. The EPA review should also evaluate the adequacy of the information provided to the public. That is, the review should determine whether the agency provided sufficient information about the proposed action and alternatives. In other words, did the agency take actions to overcome potential linguistic, institutional, cultural, economic, historical, or other barriers that may have impeded the public's ability to understand the information provided and become involved in the decision-making process? CEQ's *EJ NEPA Guidance* suggests a series of steps that may be taken by action agencies to develop innovative public participation efforts (*e.g.,* coordination with members of the affected community, translation of major documents into the appropriate language, use of newsletters or other publications, and scheduling of meetings that are accessible to all interested members of the community).

The overall level of involvement by community members in the scoping and comment processes will depend, in large part, on how well the agency reaches out to and communicates with the community. Based on EPA's review of the actions taken by the agency, at least a preliminary assessment of the public's involvement may be made. In addition, a review of the documentation provided by the agency should provide an indication of the level of public involvement.

## Issue No. 5: Disproportionately High and Adverse Impacts

*Question:* Are the impacts to the minority populations and low-income populations disproportionately high and adverse as compared to the general population or the comparison group?

*Answer:* The EPA review should determine if the action agency identified any adverse impacts on minority populations and/or low-income populations as a result of a proposed action or identified alternatives to the proposed action. The action agency should identify and document all environmental and human health impacts that may have a disproportionately high impact on minority populations or low-income populations. Analysis of such impacts should determine the nature and severity of the impacts

(e.g., singular, cumulative or multiple impacts.) This includes whether the health and environmental effects impact minority populations or low-income populations in a disproportionately high and adverse way (e.g., whether the risk and rate of exposure from environmental hazards is significant and/or appreciably higher to minority populations and/or low-income populations than for the general population or comparison group).

If disproportionately high and adverse impacts are identified in the draft EIS, the review should also evaluate how the agency analyzed and documented the distribution of environmental and health effects within the community. EPA should determine what methods were used by the agency to document findings and evaluate whether those methods adequately and accurately characterized the impacts on the community. Methods useful for identifying whether a minority population and/or low-income population is disproportionately and adversely affected by a proposed action and its alternatives include: locational/distributional tools (e.g., GIS), ecological and human health risk assessments, and socioeconomic analyses.

The EPA review should ensure that the agency informed the public by providing sufficient and comprehensible information on any disproportionately high and adverse impacts and the rationale for the agency's conclusions about the impacts. Where possible, the public should be involved in providing input and information to identify the impacts.

## Issue No. 6: Mitigation of Disproportionately High and Adverse Impacts

*Question*: When a disproportionately high and adverse impact to minority populations and low-income are identified, can those impacts be mitigated?

*Answer*: The EPA reviewer should determine whether the agency has described mitigation measures to avoid, minimize, rectify, reduce, or eliminate the proposed action's impact(s) on potentially affected minority and/or low-income populations. The EPA reviewer should ensure that any decisions implementing mitigation measures reflect a process of public involvement wherein affected community members had an opportunity to provide input in the public participation processes.

In cases where EPA finds that the proposed action would have a more significant adverse/disproportionate impact on minority populations and/or low-income populations than the alternatives, it may be appropriate for EPA to discuss with the agency, the various alternatives that would result in a reduced impact on the community.

## Issue No. 7: Nature of Comments on the Draft EIS

*Question:* How should the EPA reviewer address environmental justice in comments on the draft EIS?

*Answer:* Under the NEPA review process, EPA should address several issues in the comment letter, including a clear statement of the concerns about the agency's proposal and recommendations, or

alternatives, for mitigating the impacts associated with the action(s). The environmental justice analysis should be addressed within this general context of the NEPA review process. Specific guidance for preparing comments on the draft EIS is described in EPA's *Policy and Procedures.*

Essentially, the objectives of EPA comments on the draft EIS are to rate the impacts and adequacy of the agency's EIS. In this context, issues associated with environmental justice can be addressed by EPA and allow for a continuation of the discussion among the affected minority populations and/or low-income populations, EPA, and the action agency.

### Issue No. 8: Nature of Comments on the Final EIS

*Question:* How should the EPA reviewer address environmental justice in comments on the final EIS?

*Answer:* Comments on the final EIS should address any major outstanding issues that were not addressed by the action agency in the final EIS and/or any additional issues that were raised after the publication of EPA's comments on the draft EIS. EPA's review should focus on the disproportionately high and adverse impacts on minority and/or low-income populations that would result from the proposed action and alternatives rather than on the adequacy of the EIS.

## APPENDIX A

## AUTHORITIES, POLICIES AND GUIDANCE

## AUTHORITIES, POLICIES AND GUIDANCE

The following information provides background on authorities, policies and guidance pertinent to environmental justice. Refer to Table 2 for relevant environmental justice language specific to each source document.

### Executive Order No. 12898 and Accompanying Presidential Memorandum (February 11, 1994)

Executive Order 12898, *Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations*, and its accompanying Presidential Memorandum were issued on February 11, 1994. The EO is "designed to focus Federal attention on the environmental and human health conditions in minority communities and low-income communities with the goal of achieving environmental justice" (Presidential Memorandum accompanying Executive Order 12898, February 11, 1994). Moreover, the EO is intended to "promote nondiscrimination in Federal programs substantially affecting human health and the environment, and to provide minority communities and low-income communities access to public information on, and an opportunity for public participation in, matters relating to human health or the environment" (Presidential Memorandum accompanying Executive Order 12898, February 11, 1994).

Ultimately, the EO and accompanying Presidential Memorandum serve to inform EPA's Section 309

review process to comment on and evaluate environmental justice content within other agencies' EISs.

## National Environmental Policy Act

A general framework for implementing NEPA requirements is presented in regulations (40 CFR Parts 1500 through 1508) promulgated by the CEQ. Federal agencies, in turn, have developed their own rules for NEPA compliance that are consistent with the CEQ regulations while addressing the specific missions and program activities of each agency.

EPA has general statutory authority under the National Environmental Policy Act of 1969, as amended (42 U.S.C. 4321 et seq.; Public Law 91-190, 83 Stat. 852), to review and comment on Federal actions affecting the quality of the environment. NEPA requires that all Federal agencies proposing major actions which significantly affect the quality of the human environment consult with other agencies having jurisdiction by law or having special expertise of relevant environmental factors, and prepare a detailed statement of these environmental effects.

Since NEPA, through the EIS process, mandates taking into account the significant environmental effects of a proposed project, including its cumulative impact, and requires public participation as part of its process, it is a useful procedural device for considering environmental justice when making a decision.

## Clean Air Act, Section 309

Under Section 309 of the Clean Air Act, EPA has specific authority and responsibility to review and comment in writing on certain actions proposed by other Federal agencies that affect the quality of the environment. In addition, EPA's written comments must be made public at the conclusion of any review. NEPA documents that EPA reviewers under §309 should include are a statement about whether the proposed action will have an impact on minority communities or low-income communities.

## Title VI of the Civil Rights Act of 1964, as amended

Title VI itself prohibits intentional discrimination based on race, color, or national origin. The Supreme Court has ruled, however, that Title VI authorizes federal agencies, including EPA, to adopt implementing regulations that prohibit discriminatory *effects*. Frequently, discrimination results from policies and practices that are neutral on their face, but have the *effect* of discriminating.*(4)*

The Presidential memorandum accompanying Executive Order 12898 directs federal agencies to ensure compliance with the nondiscrimination requirements of Title VI for all federally-funded programs and activities that affect human health or the environment. While Title VI is inapplicable to federal actions, Section 2-2 of the EO is designed to ensure that federal actions substantially affecting human health or the environment do not have discriminatory effects based on race, color, or national origin.

## Relevant Guidance

CEQ's guidance, *Addressing Environmental Justice under the National Environmental Policy Act*, was developed for use by all federal agencies. It incorporates the Interagency Working Group (IWG) on Environmental Justice's guidance on key terms in Executive Order 12898. The EPA reviewer should have a good understanding of the terms discussed in the IWG guidance.

EPA's guidance, *Incorporating Environmental Justice Concerns in EPA's NEPA Analyses*, is a detailed guidance of how EPA NEPA analysts should recognize, identify, and address environmental justice in any EPA actions subject to NEPA.

| Table 2. Authorities, Policies and Guidance Relevant to Environmental Justice | |
|---|---|
| **Document** | **Relevant Language Applicable to Environmental Justice** |
| **Executive Order 12898**<br><br>**(February 11, 1994)** | *The EO contains the following provisions for each Federal agency to:*<br><br>• Make environmental justice part of its mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects on minority populations and low-income populations (CEQ, § 1-101).<br>• Develop and implement an agency-wide environmental justice strategy (EO, § 1-103).<br>• Address diverse segments of the population when performing human health and environmental research and analysis. These analyses shall, whenever practicable and appropriate, identify multiple and cumulative exposures (EO, § 3-301).<br><br>• Collect, maintain, and analyze information on the consumption patterns of populations who principally rely on fish, vegetation, and/or wildlife for subsistence (EO, § 4-401).<br><br>• Ensure public participation and access to information (EO, § 5-5). |

| | |
|---|---|
| **Presidential Memorandum to Executive Order 12898 (February 11, 1994)** | *The Presidential Memorandum (which accompanied Executive Order 12898) emphasized the following provisions for each Federal agency to:*<br><br>• Analyze the environmental effects, including human health, economic and social effects, of Federal actions, including effects on minority communities and low-income communities, when such analysis is required by the National Environmental Policy Act of 1969 (NEPA, § 2.1.2; 42 U.S.C. § 4321 <u>et seq</u>.).<br><br>• To address, whenever feasible, significant and adverse environmental effects of proposed Federal actions on minority communities and low-income communities in mitigation measures identified as part of a finding of no significant impact (FONSI), an EIS, or a record of decision (ROD).<br>• Provide opportunities for effective community participation in the NEPA process, including consultation with the affected population when identifying potential effects, considering mitigation measures, or improving the accessibility of public meetings, crucial documents, and notices.<br>• Ensure that the involved agency has fully analyzed environmental effects on minority communities and low-income communities, including human health, social, and economic effects when reviewing (§ 309 of the Clean Air Act, 42 U.S.C. § 7609) environmental effects of other Federal agencies' proposed actions. |
| **NEPA**<br><br>**(42 U.S.C. § 4331(b))** | *The following goals make clear that attainment of environmental justice is wholly consistent with the purposes of NEPA:*<br><br>• To assure for all Americans safe, healthful, productive, and aesthetically and culturally pleasing surroundings (42 U.S.C. § 4331(b)(2)).<br>• To attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences (42 U.S.C. § 4331(b)(3)).<br>• To preserve important historic, cultural, and natural aspects of our natural heritage, and maintain, wherever |

possible, an environment which supports diversity and variety of individual choice (42 U.S.C. § 4331(b)(4)).

- To achieve a balance between population and resource use which will permit high standards of living and a wide sharing of life's amenities (42 U.S.C. § 4331(b)(5)).

| | |
|---|---|
| **Clean Air Act Section 309**<br><br>**(42 U.S.C. § 7609(a))** | Section 309 of the Clean Air Act mandates that the EPA Administrator "review and comment in writing on the environmental impact of any matter relating to duties and responsibilities... of the Administrator contained in any (1) legislation proposed by any Federal department or agency, (2) newly authorized Federal projects for construction and any major Federal action [subject to §102(2)(C) of NEPA]...and (3) proposed regulations published by any department or agency of the Federal Government." |
| **Civil Rights Act, Title VI**<br><br>**(42 U.S.C. § 2000d et seq.** | *Title VI states that:* "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."<br><br>While Title VI itself prohibits intentional discrimination, agency implementing regulations may also prohibit unintentional discriminatory effects. |

# APPENDIX B

# LIST OF ENVIRONMENTAL JUSTICE CONTACTS

# LIST OF ENVIRONMENTAL JUSTICE CONTACTS

## USEPA Regional Environmental Justice Contacts

### *Region 1*

Ronnie Harrington, EJ Coordinator (617) 918-1703

Betsy Higgins, EPA Environmental Review Coordinator (617)918-1051

James Sappier, Indian Program Coordinator (617) 918-1672

Roger Janson, NEPA Coordinator (617) 918-1621

### Region 2

Melva Hayden, EJ Coordinator (212) 637-5027

Robert Hargrove, EPA Environmental Review and NEPA Coordinator (212) 637-3504

Christine Yost, Indian Program Coordinator (212) 637-3564

### Region 3

Reginald Harris, EJ Coordinator (215) 814-2988

John Forren, EPA Environmental Review Coordinator (215) 814-2705

Bill Hoffman, NEPA Coordinator (215) 814-2995

### Region 4

Connie Raines, EJ Coordinator (404) 562-9671

Heinz Mueller, EPA Environmental Review and NEPA Coordinator (404) 562-9611

Mark Robertson, Indian Program Coordinator (404) 562-9639

### Region 5

Karla Johnson, EJ Coordinator (312) 886-5993

Shirley Mitchell, EPA Environmental Review Coordinator and NEPA (312) 886-9750

Michele Fonte, Indian Program Coordinator (312) 886-2943

### Region 6

Shirley Augerson, EJ Coordinator (214) 665-7401

Mike Jansky, EPA Environmental Review and NEPA Coordinator (214) 665-7451

Ellen Greeney, Indian Program Coordinator (214) 665-2200

### *Region 7*

Althea Moses, EJ Coordinator (913) 551-7649

Joe Cothern, EPA Environmental Review / NEPA Coordinator (913) 551-7765

Kim Olsen, Indian Program Coordinator (913) 551-7539

### *Region 8*

Elisabeth Evans, EJ Coordinator (303) 312-6053

Cindy Cody, EPA Environmental Review and NEPA Coordinator (303) 312-6228

Sadie Hoskie, Indian Program Coordinator (303) 312-6606

### *Region 9*

Karen Henry, EJ Coordinator (415) 744-1581

Dave Farrel, EPA Environmental Review and NEPA Coordinator (415) 744-1584

Clarence Tenley, Indian Program Coordinator (415) 744-1607

### *Region 10*

Joyce Crosson-Kelly, EJ Coordinator (206) 553-4029

Rick Parkin, EPA Environmental Review and NEPA Coordinator (206) 553-8574

Scot Sufficool, Indian Program Coordinator (206) 553-6220

**USEPA Headquarters Environmental Justice Contacts**

Tony Hansen, AIEO (202) 260-8106

Angela Chung, OA (202) 260-4724

Will Wilson, OAR (202) 260-5574

Carolyn Levine, OARM (202) 260-4895

Doretta Reaves, OCEMR (202) 260-3534

Mike Mathesen, OCR (919) 260-4587

Robert Banks, OECA (202) 564-2672

Mustafa Ali, OEJ (202) 564-2606

Arthur Totten, OFA (202) 564-7164

Jeff Keohane, OGC (202) 260-5314

Wendy Graham, OIA (202) 564-6602

Avis Robinson, OP (202) 260-9147

Janice Bryant, OPPE (202) 260-2730

Caren Rothstein, OPPTS (202) 260-0085

Lawrence Martin, ORD (202) 564-6497

Rochelle Kadish, ORO (202) 260-0579

Rose Harvell, OSRE (202) 564-6056

Kent Benjamin, OSWER (202) 260-2822

Alice Walker,OW (202) 260-1919

## U. S. Federal Agency Environmental Justice Contacts

### *Council on Environmental Quality (CEQ)*

Altemus, Michelle (202) 395-5750

e-mail: altemus_m@al.eop.gov

### Department of Commerce (DOC)

John Phelan (202) 482-4115

e-mail:jphelan@doc.gov

### Department of Energy (DOE)

Georgia Johnson (202) 586-1593

e-mail: georgia.johnson@hq.doe.gov

### Department of Defense (DOD)

Len Richeson (703) 604-0518

e-mail: richeslh@acq.osd.mil

### Department of Interior (DOI)

Willie Taylor (202) 208-3891

e-mail: willie_taylor@ios.doi.gov

### Department of Justice (DOJ)

Sylvia Liu (202) 305-0639

e-mail: sylvia.liu@justice.usdoj.gov

### Department of Labor (DOL)

Paul Richman (202) 219-6181

e-mail: prichman@dol.gov

### Department of Transportation (DOT)

Ira Laster (202) 366-4859

e-mail: ira.laster@ost.dot.gov

Marc Brenman (202) 366-1119

e-mail: marc.brenman@ost.dot.gov

*Federal Emergency Management Agency (FEMA)*

Calvin Byrd (202) 646-2686

e-mail: calvin.byrd@fema.gov

*Health and Human Services (HHS)*

LaSonya Hall (301) 496-3511

e-mail: hall2@niehs.nih.gov

*Department of Housing and Urban Development (HUD)*

Richard Broun (202) 708-0614 ex. 4439

e-mail: richard_broun@hud.gov

*National Aeronautics and Space Administration (NASA)*

Olga Dominguez (202) 358-0230

e-mail: odomingu@.hq.nasa.gov

Ken Kumor (202) 358-1112

e-mail: kkumor@.hq.nasa.gov

*Nuclear Regulatory Commission (NRC)*

Rosetta Virgilio (301) 415-2307

e-mail: rov@nrc.gov

***National Security Council (NSC)***

Susan Stroud (202) 606-5000 ex. 172

***Office of Management and Budget (OMB)***

Carol Dennis (202) 395-4822

e-mail: dennis_c@al.eop.gov

***Office of Science and Technology Policy (OSTP)***

Fran Sharples (202) 456-6079

e-mail: fsharples@ostp.eop.gov

***United States Department of Agriculture (USDA)***

Bertha Gillam (202) 205-1460

e-mail: berta.gillam@.usda.gov

***United States Environmental Protection Agency (USEPA)***

Marty Halper (202) 564-2601

e-mail: halper.marty@.epa.gov

Robert Knox (202) 564-2604

e-mail: knox.robert@.epa.gov

Sylvia Lowrance (202) 564-2450

e-mail: lowrance.sylvia@.epa.gov

**APPENDIX C**

**REFERENCES/BIBLIOGRAPHY**

# REFERENCES/BIBLIOGRAPHY

Anderson, F.R. 1973. *NEPA In the Courts: A Legal Analysis of the National Environmental Policy Act.* Resources for the Future: Washington, D.C. 324pp.

Bryan, Hobson. 1984. *A guide to social analysis--U.S. Forest Service training manual*. Washington, D.C.: U.S.D.A. Forest Service, Office of Environmental Coordination.

Council on Environmental Quality. January 1997. Considering Cumulative Effects Under the National Environmental Policy Act.

Council on Environmental Quality. December 10, 1997. Environmental Justice Guidance under the National Environmental Policy Act (NEPA).

Enk, G.A. 1973. *Beyond NEPA: Criteria for Environmental Impact Review.* The Institute on Man and Science: Rensselaerville, New York. 140pp.

Environmental Justice Resource Center. *People of Color Environmental Groups: 1994-1995 Directory.* Prepared by Robert D. Bullard, Clark Atlanta University, Atlanta, Georgia.

Executive Order 12898 on Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations with accompanying Memorandum for the Heads of All Departments and Agencies. February 11, 1994.

Executive Order 13007 on Indian Sacred Sites. May 24, 1996.

Interorganizational Committee on Guidelines and Principles for Social Impact Assessment. 1993. *Guidelines and Principles for Social Impact Assessment*. Belhaven: International Association for Impact Assessment.

The National Environmental Policy Act of 1969 as amended. 42 U.S.C. 4321-4347. January 1, 1970.

Ross, Heather E. 1994. Using NEPA in the Fight for Environmental Justice. William and Mary Journal of Environmental Law. Volume 18:285.

United Church of Christ, Commission for Racial Justice. 1987. *Toxic Wastes and Race in the United States*. New York: Public Data Access, Inc.

U.S. Environmental Protection Agency. April 1998. *Final Guidance for Incorporating Environmental Justice Concerns in EPA's NEPA Compliance Analysis.* Washington, D.C.: U.S. EPA, Office of Federal Activities.

U.S. Environmental Protection Agency. September 1995. *Environmental Justice, Your Civil Rights*. EPA-150-F-95-001.

U.S. Environmental Protection Agency. 1996. The Model Plan for Public Participation.

U.S. Environmental Protection Agency. 1994. *Draft Report On Factors For Environmental Justice Consideration in Regulation Development*. Washington, D.C.: U.S. EPA, Office of Environmental Justice.

U.S. Environmental Protection Agency. 1984. *Policy and Procedures for the Review of Federal Actions Impacting the Environment*. Washington, D.C.: U.S. EPA, Office of Federal Activities.

U.S. General Accounting Office. June 1, 1983. Siting of Hazardous Waste Landfills and Their Correlation with Racial and Economic Status of Surrounding Communities.

---

Note: For additional information, the reader may refer to the U.S. Environmental Protection Agency, Region 8 list of environmental justice references entitled *Environmental Justice Program, Resource Bibliographies and URL Listings*, August 1996.

1. The CEQ implementing regulations define "effects" or "impacts" to include [those that are] "ecological...aesthetic, historic, cultural, economic, social or health, whether direct, indirect or cumulative."

2. 40 C.F.R. 1508.14.

3. Title VI of the Civil Rights Act of 1964, U.S.C. 2000d *et seq.*, and agency implementing regulations, prohibit recipients of federal financial assistance from taking actions that discriminate on the basis of race,... color, or national origin... If an agency is aware that a recipient of federal funds may be taking action that is causing a racially discriminatory impact, the agency should consider using Title VI as a means to prevent or eliminate that discrimination.

4. Department of Justice, Attorney General's Memorandum for Heads of Departments and Agencies that Provide Federal Financial Assistance, *The Use of the Disparate Impact Standard in Administrative Regulations Under Title VI of the Civil Rights Act of 1964,* (July 14, 1994).