EXHIBIT II

*Resubmitted with Additional Complainants and Supplementary Information*
*Substantive revisions notated with <u>underlined</u> text.*

February 28, 2024

The Honorable Pete Buttigieg
Secretary, U.S. Department of Transportation
1200 New Jersey Avenue, SE
Washington, DC 20590
secretarybuttigieg@dot.gov

Mr. Shailen Bhatt
Administrator, Federal Highway Administrator
1200 New Jersey Avenue, SE
Washington, DC 20590

Ms. Gloria M. Shepherd
Executive Director, Federal Highway Administrator
1200 New Jersey Avenue, SE
Washington, DC 20590

RE:     **Complaint under Title VI of the Civil Rights Act of 1964 – I-35 Capital Express Central – PODER,**
        **Austin Justice Coalition, Rethink35, Save Our Springs Alliance, AURA, Mueller Neighborhood**
        **Association, East Town Lake Citizens Neighborhood Association, Bertha Rendon Delgado**

Secretary Buttigieg, Mr. Bhatt, and Ms. Shepherd,

    The people of Austin need your help; Austin needs your intervention to rethink the expansion of
Interstate Highway I-35. The expansion will exacerbate decades of racial discrimination and segregation in
East Austin and directly displace many residential, commercial, and community facilities, including those
that are predominately used by or provide services specifically to Black, Latino, and Native American
communities. Specifically, we ask that you respond to this complaint and grant the requested relief, which
includes the recission of the Record of Decision on the selected alternative for the I-35 Capital Express
Central project published by the Texas Department of Transportation (TxDOT) on August 21, 2023.[1]

    In making the decision to expand I-35, TxDOT acts with the delegatory authority granted to it by
your predecessors at the United States Department of Transportation (USDOT) and Federal Highway

---

[1] I-35 Capital Express Central Project - Federal Environmental Impact Statement and Record of Decision (FEIS/ROD), *available at*
https://my35capex.com/final-environmental-impact-statement-eis-and-record-of-decision-rod/.

Administration (FHWA).[2] TxDOT's environmental review, consultation, and other federal actions on this Project were carried out under delegated authority to TxDOT pursuant to 23 U.S.C. 327 and a Memorandum of Understanding (MOU) dated 12-9-2019 and executed by FHWA and TxDOT. That means, without intervention by the USDOT and FHWA, TxDOT's decision is your decision—by complacent consent.

The history of the discrimination associated with this project dates back over a century—a pattern of discriminatory actions taken against the Black, Latino, and Native American residents of East Austin, with negative impacts that compound every year. While these discriminatory actions are rampant, for purposes of this complaint, we will focus attention on the origins of I-35 itself.

In 1928, the then-Austin City Council voted to approve a comprehensive plan that declared much of East Austin as the "Negro District." Since 1928, the right-of-way that stretches along I-35 (formerly known as East Avenue) has been Austin's official and unofficial segregation line, forcing Black and Latino communities to remain in or relocate to East Austin and restricting the availability of City services and economic, health, and environmental opportunities. From local resolutions to redlining practices, segregationists used invisible barriers to segregate Black and Latino neighborhoods from White neighborhoods, displacing and disrupting the lives of families of color throughout Austin. When courts struck down these legislative maneuvers to exclude Black residents from White neighborhoods and from civic resources west of I-35, segregationists changed their strategy.  A new physical barrier to enforce segregation emerged, known today as I-35. "Where there is a will, there is a way," ominously referenced by the 1928 plan.[3] Nearly 80 years later, TxDOT is proving this adage true.

For 62 years, the people of East Austin have suffered from inequitable treatment and inequitable services directly resulting from TxDOT's original decision to build I-35. In many respects, I-35 remains as a prominent ode to the blatant racism and systemic segregation that created the Austin we know today. The 1950s-early 60s construction predated the Civil Rights Act and NEPA by a matter of years; thus, the original construction avoided judicial scrutiny and created a physical barrier that would be immensely expensive to erode. The interstate carved through the Black and Latino neighborhoods of East Austin, stealing land, homes, and businesses from these communities, while putting additional distance (and a quite literal wall) between East and West Austin. I-35 serves not only as a physical barrier but also an ever-present, visual reminder that East and West Austin are somehow separate communities; constantly reinforcing and

---

[2] The environmental review, consultation, and other actions required by applicable federal environmental laws for the I-35 Capital Express Central Project were carried out by TxDOT pursuant to 23 U.S.C. 327 and a Memorandum of Understanding dated 12-9-2019 and executed by FHWA and TxDOT.

[3] Austin City Council, Minutes, March 22, 1928, *available at* https://services.austintexas.gov/edims/document.cfm?id=89795.

training our brains to view them as distinct. This is evident by the numerous regulations, studies, and utility and political districts that have used the interstate as any descriptor, each of which impose yet another element of segregation and discrimination.

Now, in 2024, vast communities of organizers and Black and Latino leaders in Austin, along with their elected leaders at the City of Austin and Travis County, plea for a resolution that will heal the divide between East and West Austin and request project alternatives that will mitigate the long-term environmental consequences and discrimination faced by communities of color. Both the City of Austin and Travis County, the two local jurisdictions significantly affected by I-35 Capital Express Central, have taken formal action requesting changes in project scope, demanding additional environmental analysis, and putting forth project modifications to address these historic inequities and the project's impact to air and water quality.[4]  TxDOT also received over 6,000 comments (more than 75% opposed or express concerns) from Austinites and organizers throughout the NEPA review process, but TxDOT only gave original responses to less than 0.4% of public comments.[5]

Still, Governor-appointed TxDOT officials decided, over the objection of these local communities, to expand I-35 and exacerbate its impacts.  These concerns were dismissed and never addressed by TxDOT in any meaningful manner. TxDOT ignored public input because TxDOT had a pre-determined outcome to expand the highway and maintain a wall of segregation between White and Black/Latino Austin.

Under the delegated authority, TxDOT lacks sufficient accountability. The USDOT relies upon TxDOT to initiate consultation, to inform the agency of project changes, and to self-grade its own compliance with federal laws and regulations. So long as the federal government continues to defer its authority and responsibilities under NEPA to an agency and state government with a notorious history of intentional discrimination, the people who are harmed in this decision will continue to be communities of color. And, so long as I-35 remains a physical barrier between East and West Austin, the residents of historically underserved and segregated Black and Latino neighborhoods in East Austin will continue to suffer harm.

We respectfully submit the attached complaint alleging violations of Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d to 2000d-7, and the United States Department of Transportation (USDOT) implementing regulation, 49 C.F.R. Part 21. Simultaneously with this complaint, a federal lawsuit is being filed concerning TxDOT's NEPA violations.

---

[4] Austin, Tex. Resolution 202310-045 (October 19, 2023), *available at* https://services.austintexas.gov/edims/document.cfm?id=417815; Travis County, Commissioners Court-Approved Letter to Texas Department of Transportation, dated September 26, 2023, *available at* https://traviscotx.portal.civicclerk.com/event/2832/files/10558.

[5] *See generally,* ROD, Appendix F. (An analysis of the published comments found that 6,143 total comments were submitted from 3,421 commenters. TxDOT only directly responded to 49 comments. Less than 0.4% of comments received a unique response.)

The civil rights violations raised by this complaint derive from systemic tunnel vision through which the Texas Department of Transportation (TxDOT) continues to view its sole purpose as paving and ever-expanding highways at all social and environmental costs, so long as Black and Latino communities bear the brunt of these decisions. TxDOT issued the Record of Decision (ROD) in combination with the Federal Environment Impact Statement (FEIS), without an additional comment period or public hearing for the FEIS. This is despite significant project changes and a 1.2-mile expansion of the project area within environmental justice communities following the February 9, 2023, public hearing.

In selecting a project alternative that expands upon the racist, segregationist intent of the original interstate, with full knowledge of the consequences of its decision on the Black and Latino communities of Austin, Texas, TxDOT is intentionally discriminating against communities of color. Following a pre-determined and incomplete/insufficient environmental review under the auspices of delegated authority, TxDOT is proceeding to expand I-35 in a configuration that will, as TxDOT acknowledges, "have a disproportionate direct impact on [environmental justice] populations due to the majority of residential, commercial, and community facility displacements in EJ census geographies including those that cater specifically to minority groups and low-income households"[6] and provide basic necessities to neighborhoods that have borne the brunt of historic, perpetual discrimination, segregation, and racist infrastructure practices.

The project alternative will also increase environmental health risks within environmental justice populations, without performing the proper analysis and mitigation. TxDOT's highway expansion will displace healthcare facilities, childcare services, and other businesses. Disparities in economic wealth, health, and other environmental justice metrics persist to this day.[7] The effects of long-term exposure to car emissions and harmful pollutants (e.g., carbon monoxide, lead, nitrogen dioxide, ozone, particulate matter, and sulfur dioxide) associated with living near major roadways have been shown to have detrimental human health impacts.[8] Austinites who live in the neighborhoods that are adjacent to I-35 are significantly more likely to experience chronic health issues, including respiratory issues, such as asthma.[9] Not coincidentally, these neighborhoods are home to predominantly Black and Latino residents.[10]

The Environmental Protection Agency (EPA) understands the health consequences of exposure to these pollutants, recently announcing a proposal to strengthen the National Ambient Air Quality Standards for fine particulate matter (i.e., $PM_{2.5}$). TxDOT and the USDOT cannot claim ignorance of these

---

[6] FEIS, p. 411.
[7] FEIS, Exhibit K, Appendix K: Transportation Equity and Access Studies.
[8] Id.
[9] Id.
[10] Id.

consequences, as the proposal was widely known prior to the release of the ROD for the I-35 expansion. The Black and Latino neighborhoods of East Austin have already suffered for six decades from the long-term consequences of I-35, they shouldn't suffer for another half-century. These EPA standards are now in effect, and Austin, as a region, is now out of compliance with federal standards for particulate matter. The expansion of I-35 will worsen these conditions.

TxDOT was unwilling to seriously consider alternatives that would avoid these impacts, and it has told the City of Austin that if it wants to participate in partial mitigation to help heal the divide between East and West Austin, the City will need to generate the funds to cover it, an estimated $800 million for partial caps.[11] These unfunded commitments are neither part of the Project nor should they be considered mitigation for a federal highway that has inflicted daily discrimination on Black and Latino neighborhoods for 6+ decades.

At the November 2023 meeting of the Texas Transportation Commission (TTC), Chairman J. Bruce Bugg, Jr. (a white man) referred to I-35 as the "Main Street of Texas,"[12] a fitting label for a State ruled by a government administration with a consistent pattern of discrimination directed at communities of color. TxDOT reports to the TTC, and the TTC reports to the Governor. It has no direct accountability to the USDOT, other than the provisions embedded within the MOU, which envisions that you, as Secretary of Transportation may intervene when TxDOT does not fulfill its obligations in the NEPA review process. As the attached complaint shows, TxDOT has intentionally discriminated in the authority granted to it by the USDOT. The question left is, will you respond?

Former President Barack Obama taught the nation that we—here and now—are the change that we seek. The President said, "Change will not come if I wait for some other person or some other time. We are the ones we've been waiting for."

Secretary Pete, it's your time to act. Austin needs you.


Respectfully,

*/s/ Robert J. Levinski*

**Robert J. "Bobby" Levinski**
*Counsel for Complainants*

---

[11] On December 14, 2024, the Austin City Council voted to approve $15.4 million to start the initial design work for selected caps and stitches which will provide some cover over depressed lanes. Austin, Tex. Resolution 20231214-061 (Dec. 14, 2023).
[12] To see the all-white composition of the Texas Transportation Commission, visit, https://www.txdot.gov/about/leadership/texas-transportation-commission.html.

Nichole McWhorter
Title VI Program Team Leader
Federal Highway Administration
1200 New Jersey Avenue, SW
Washington, DC 20590
Nichole.Mcwhorter@dot.gov

## Complaint Under Title VI of the Civil Rights Act of 1964

Initially Filed:   January 26, 2024
Revised:          February 28, 2024

Complainants:   People in Defense of Earth and Her Resources (PODER), Austin Justice Coalition (AJC),
                Rethink35, Save Our Springs Alliance, AURA, Bertha Rendon Delgado, Mueller
                Neighborhood Association, East Town Lake Citizens Neighborhood Association

Additional
Complainants:   Reconnect Austin, LULAC Del Barrio (612), LULAC Eastside (22425), Hancock
                Neighborhood Association, North Loop Neighborhood Association, Rethink35 – The
                University of Texas Chapter, Deep Holly Advocates, The Healing Project, Students Fighting
                Climate Change, Man Up Texas, Strong Towns Central Texas, Bikealot, Sunrise ATX, Devou
                Good Foundation, Friends of Austin Neighborhoods (FAN), Friends of Hyde Park, Safe
                Streets Austin, Congress for New Urbanism – Central Texas, Downtown Austin
                Neighborhood Association, Parents Climate Community, Allendale Strong, Sunrise ATX,
                Active Towns, Longhorn Urbanists, National Organization for Women, Austin, Austin Sierra
                Club- Lone Star Chapter

                Miriam Schoenfield, Hon. Kathie Tovo, Hon. Chris Riley, Carmen Llanes Pulido, Doug Greco,
                Adam Powell, Ruben Montoya, Elisa Rendon Montoya, Hannes Mandel, Misael Ramos,
                Chandler Lawn, Ava Perry, Patrick Garcia, Bill Holt, Forest Croft, Lauren Cadell, Gabriell
                Pascual, Natalie Zelt, Raul Gonzales, Joshua Lee, Ford Hook, Andres Orona Jr., Eugenia
                Harris, Lorrain Atherton, Ricardo Rivera, Teri Adams, Edward MacDuffie, Josh Green,
                Romario Quijano, Paula McDermott, Allen Gross, Emmanuel Núñez, Maciej Kaminski,
                Denise Geleitsmann, Eric Guenther, Jessica Rodriguez Robertson, Mariana Faye Krueger,
                Noé Elias, Annie Fiero, John Stansell, David Pedersen, Charlie Schmidt, Joshua Blubaugh,
                Dorothy White, Zachary Kent, Shannon Turner, Karen Burke, Alexander Von Gluck, Ronan
                Chatterjee, Jonathan March, J. Emil Hunziker, Taylor Trevino, Isaac Martin, Jordyn
                Middlebrooks, Chris Rusch, Walter Tyree, Jonathan Sosebee, Wendy Rosamond, Jedidiah
                Ullrich, Sarah Beck, Miranda Best Campos, Crystal Maher, Jackie Ahmad, Codi Nguyen,
                Charlie Torres, Tara Reynolds, Patrick Garcia, Sarah Simpson, Eva Lorini, Zoe Marquardt,
                Neeraj Tulsian, Kate Csillagi, Catherine Morri, Travis Turner, Genevieve Duncan, Evan
                McClelland, Michael McNoldy, Andrew Clements, Charlotte Williams, Carol Goodwin,
                Anita Knight, Amber Lunsford, Susan Pantell, Bill Holt, Dhvani Hiran, Brian Fordyce, Sharon

1

Gillespie, Curran Walla, Zach Elkins, Audrey Clark, Rebecca Feferman, Robin Huneycutt, Patricia Whiteside, Chase Easterling, Zoe Wright, Camile Sabino, Savannah Martinez, Mauricio Castillo, Romalda Allsup, Catherine Tucek, Martin De Lacey, Charley White, Shannon Turner, Jack Spence, Hayden Payne, Dana Hegar, Meagan Pike Dean, Quinton Dean, Gwen Turner, Nathan Walker, Chesley Marvin, Rho Turner, Pavel Golenkov, Rebecca Scheer, Jack Ingram, Vajray Crenshaw, Justin Lescano, Kenneth Baur, Eva White, Alice Dawn, Zachary Travis, Emory Thompson, Janna Bentely, Elissa Dryden, Ana Smith, Jonathan Briney, Hayden Soliva, Leah Baker, Elena Morales-Grahl, Stephen Laughrun, Ava Suresh, David Gilman, Timothy Hash, Jonah Key, Roxy S., Aarnav Suwal, John Alderman, Nichole Wiedemann, Nicholas Gray, Teresa Anderson, Holly Herrick, Isaac Hopkins, Louie Sommerfeld, Sharon Munroe, Jose Jaramillo, Joshua Milutin, Kendall Buechler, Morgan Fernandez, Enoch Adeloye, Michael Byrnes, Antonio Ochoa, Rudra Premani, Sean Randolph, Yamini Karandikar, Kiersten Perkins, Carl Bai, Preston Frazier, Angel Mayo, Mauricio Castillo, Ashley Salazar, David Segovia, Rosemarie Garcia, Carol Stall, Phillip Thomas, Demetria Rendon, Stefanie Kwok, Victoria Sanchez, Jennifer Howell, Arthur Young, Christi Stevens, Elisangela Young, Maricela Delgado, Nyeka Arnold, Shannon May, George Economos, Krista Clark, Robert Sledge, JeMarc Armstrong-Campbell, Shelby Sims, Antoinette Franklin, Carol Dillard, Garrett Car, Jennifer Lyon, Keely Sutherland, Carols Sanchez, Elizabeth Bernel, Aylin Quezada, Eleanor Swensson, Madeleine Hormann, Kira Lowell, Dosite Perkins, Matthew Dowell, Megan Hazlett, Eileen McGinnis, Brandon Niday, Maricela Sanchez, Morgan Miller, Abrianna Citta, Kendall Axley, David Morin, Joseph Stephenson, Selvey Knight, Elena Crouch, Blake Umlauf, Allen Campoy, Trent Ingram, Robert Wagner, Connor Flanagan, Nathan Wilson, Alex Ritter, Hunter Warren, Hunter Lau, Rusty Wilson, Adam Ramsey, David Merz, Jr., James Greene, David Goss, Claire Palitza, David Palmer, Chris Sandoval, Jason Moore, Edgar Handal, Che Royer, Alexander LaBee, Haleigh Bond, Eva Perez, Gregory Tittel, Melynda Nuss, Ian Wilson, Jude Norcross, Derek Ensign, Christopher Clark, Krista Weatherford, Michelle Johnston, Nekel Holbrook, Kate R, Mason Code, Riley Hamilton, Christian O'Malley, Anaiah Johnson, Mark Panjaitan, Greg Nass, Eric Anderson, Scott Milne, Matt Butler, Karen Olsson, Morgan Shelburne, Connor Neils, Wilfredo Merced, Seth Fowler, Lillian Butler, Kathy Goodwin, Mark Paredes, Lucas Borderlon, Dylan Thomas, Amber Montez, John Simmerman, James Rayman, Heyden Walker, Addie Walker, Shanthadurga Vijayakumar, Noah Civiletti, Jared Jackson, David Leichtling, Whitney Altine, Christoph Maier, Charles Miller, F. Hernandez, Katelynn Zuercher, Susan Brewster, Connor Stevenson, Robert Cox, Daniel Woodroffe, Charles Arnone, Grant Wiggins, Jack Kemp, Kyra Matos, David Pedersen, James Bergstrom, Eric Goff, Mateo Barnstone, Norman Richards, Emily Underwood, Dylan Biles, Charlie Schmidt, Elsie Aton, Michael Gawthrop-Hutchins, Nick D'Agostino, Matt James, Evan Wilson, Hill Abell, Brad Wimberly, Alexandra Meub, Michael Pellegrini, Nathan Packard, Mary Pawlowski, Tyler Davis, Olivia Fisher, Adrianna Vangeli, Jose Pineda, Jessica Kessinger, Ronit Shaham, Colter Sonneville, Abby Whipple, Ian de la Serna Avila, Alexia Emuze, Soleil Parks, Nathaniel Webb, Randy DeLeon, Briggs Donaldson, Robert Huth, Miriam Swords Kalk, Cynthia Lindlof, Laurence Denis, Paige Trahan, Penelope Davies, Isaiah Tibbs, Agathe

Denis, Mary Osborne, Trevor Hackett, Leila Levinson, Phyllis Day, Jonathan Simpson, Rachel Clemens, David Levinson-Fort, Camile Mathews, Mark Franz, Kathryn Macchi, Rachel Cummins, Patricia Woolery-Price, Susan Paine-Keesey, Betina Foreman, Patience Epps, Crystal Maher, John Wisdom, Jackie Burniske, Louis DeAngelis, Paula Pierce, Roy Woody, Lucas Boyd, Maria Cuervo, John Riedie, Mary Coppinger, Linda Team, Scott Brookhart, Margaret Surratt, Melissa Shannon, Lauren Chavez, Michael Alfonso Sanchez Valadez, Katherine Shirley, Mary Ann Corbett, Vincent Sponseller, Ava Vicknair, Emily Stroman, Christina Destefano, Kathryn Kalinowski, Rachel Pruiett, Renee Doyon, Lauren Maher, Dewi Smith, Zoey Kaul, Nathan Racu, Matthew Faulk, Penelop Ackling, Raquel Bretenitz, Anakaren Romero, Porter Plepys, Agnes Sebbass, Gillian Renner, Henry Jarnigan, Alexander Schuessler, Molly McClurg, Quinn Zipse, Neal Flynn, Eugenia Marcos, Aiden Abraham, Justin Goldstein, Elizabeth Copeland, Owen Morgan, Mackenzie Jung, Laura Rostad, Eduardo Viramontes, Ella Thompson, Molly Layton, Olga Tumanova, Marleigh Thomas, Gabriell Sorrell, Joshua Urbank, Sabrina Palmieri, Mihika Birmiwal, Bronwyn Reeve, Cahill Ordones, Leonardo Guardione, John Urbank, Estrella Pennywell, Maria Navar, Justin Switzer, Sama Agha, Tori Sylvester, Izzy Dale, Omar Vasquez-Alpizar, Meron Aberra, Keaton Baker, Mia Thiessen, Jimi Holle, Carlos Mones, Madelyn Kidd, Julianne Bantayan, Isaac Ochoa, Kaylah Angel, Anna Geppert, Osbaldo Serna, Scout Kress, Jeremiah Bartlett, Gillian Navarro, Kate Waler, Anna Derengowski, Sarah Perez, Lily Sellers

Recipient(s):    Texas Department of Transportation (TxDOT) (formerly known as the Texas Highway Department, founded by the Texas State Legislature in 1917) & the Federal Highway Administration (FHWA) under the United States Department of Transportation (USDOT)*

*TxDOT acts both as an agent of the State of Texas, pursuant to Texas. Transportation Code § 201.001 et seq. and as an agent of the U.S. Department of Transportation pursuant to 23 U.S.C. 327 and a Memorandum of Understanding dated 12-9-2019 and executed by FHWA and TxDOT. As the lead agency in Texas for transportation infrastructure, TxDOT is responsible for making planning and policy decisions "for the location, construction, and maintenance of a comprehensive system of state highways and public roads," as well as other transportation-related infrastructure. TxDOT is governed by the Texas Transportation Commission (TTC), a five-member board appointed by Texas Governor Greg Abbott. The TTC is responsible for selecting TxDOT's Executive Director, as well as developing a statewide transportation plan, approving funding allocations, awarding contracts for the improvement of the state's highway system, and approving rules and policies for TxDOT's overall operations.[13]

## I. Complaints

The Cover Letter is incorporated herein by reference.

This complaint is raised by the above-listed Complainants concerning violations by the Recipient, Texas Department of Transportation (TxDOT), of Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d

---

[13] Tex. Transp. Code §201.103(a).

to 2000d-7, and the United States Department of Transportation (USDOT) implementing regulations, 49 C.F.R. Part 21. On August 18, 2023, TxDOT issued a Final Environmental Impact Statement (FEIS) and Record of Decision (ROD) on the project known as the I-35 Capital Express Central Project from US 290 East to US 290 West/SH 71 (CSJ: 0015-12-388) (the "I-35 Capital Express Central project" or "Project"). The civil rights violations stem from this decision.

Specifically, Complainants raise the allegations herein to assert that TXDOT engaged in intentional discrimination aimed at the Black and Latino residents of Austin. Complainants assert that the project, components of which are expressly intended to benefit areas of extreme wealth, such as Downtown Austin, results in disparate impacts of Black, Latino, and Native American residents—a continuous and repetitive practice in Austin's history and TxDOT's treatment of communities of color.

### A. TxDOT Engaged in Intentional Discrimination on the Basis of Race, Color, and National Origin.

Title VI of the Civil Rights Act prohibits a recipient of federal funds from intentionally treating person differently or intentionally causing them harm because of their race, color, or national origin. Intentional discrimination "may be found to exist even where the record contains no direct evidence of bad faith, ill will or any evil motive on the part of public officials."[14]

Because there is not often a "smoking gun" in discrimination cases, discriminatory intent can be established through evidence of substantial disparate impact, a history of discriminatory official actions, procedural and substantive departures from the norms that generally follow the decision-maker, and the legislative or administrative history of the decision.[15] Where there is a pattern of discrimination, the agency must take affirmative actions to remove or overcome the effects of the prior practice; and must avoid expanding upon those prior actions.[16] Actions that have foreseeable and anticipated disparate impact are relevant evidence to prove the ultimate fact, forbidden purpose.[17] "Adherence to a particular policy or practice, with full knowledge of the predictable effects of such adherence . . . is one factor . . . which may be considered by a court in determining whether an inference of segregative intent should be drawn."[18]

While evaluation of intentional discrimination claims often look to judicial precedents developed in private plaintiffs' claims for damages, those standards do not necessarily apply to agency actions.[19] In agency investigations, unlike court cases, the agency itself collects evidence and determines whether the evidence supports a finding of discrimination.[20] There is no burden shifting.[21] Complainants will set out

---

[14] *Williams v. Dothan*, 745 F.2d 1406, 14-15 (11th Cir. 1984) (citing *Hawkins v. Town of Shaw*, 461 F.2d 1171, 1173 (5th Cir. 1972))

[15] *Id.* (*citing Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977)).

[16] 49 CFR § 21.5(b)(7).

[17] *Id.* (*quoting Columbus Bd. of Educ. v. Penick*, 443 U.S. 449, 464 (1979).

[18] *Id.*

[19] Dept. of Justice, Title VI Legal Manual, Sect. VI(A), *available at* https://www.justice.gov/crt/fcs/T6Manual6#1.

[20] *Id.*

[21] *Id.*

4

probative facts that, when analyzed cumulatively, demonstrate intentional discrimination, and request that FHWA carry out its own investigation.

To support this claim, Claimants assert the following:

1.  The Original Location and Replacement of East Avenue with I-35 Was Made with Discriminatory Intent to Segregate and Isolate the Black Community in East Austin

2.  The Record of Decision Demonstrates Prolonged, Substantial Disparate Impacts from the Original Construction of I-35

3.  The Expansion of the I-35 Will Exacerbate those Foreseeable Substantial Disparate Impacts

4.  TxDOT Has Actual Knowledge of Substantial Disparate Impacts to Protected Classes

5.  TxDOT Has a History of Discrimination Against Communities of Color

6.  TxDOT Failed to Respond to Public Comments

7.  TxDOT Failed to Hold a Public Comment Period Following its FEIS Despite Substantial Changes to the Project Affecting Environmental Justice Populations

As shown by the Complaint below and by TxDOT's ROD, the selected alternative will "have a disproportionate direct impact on [environmental justice] populations."[22] The expansion of I-35 (i) increases health risks on environmental justice populations; (ii) fails to consider the known, harmful consequences of long-term exposure to fine particulate matter ($PM_{2.5}$); and (iii) reinforces and expands upon the well-documented and federally acknowledge direct discrimination involved in the original construction of I-35. TxDOT also failed to adequately consider alternatives that would avoid and mitigate for these adverse consequences and fulfill its affirmative duty to remove or overcome past discrimination.

The overwhelming majority of displacements (85%) occur in environmental justice geographies, resulting in the displacement of lower-income families. This is a consequence almost exclusively borne by communities of color. TxDOT's justification is that gentrification is going to happen anyways.[23]

*Because complainants are raising intentional discrimination, for clarification purposes, paragraphs in this section pertaining to disparate adverse impacts were removed to focus more specifically on the complaint of intentional discrimination, which is shown, in part, through evidence of disparate adverse impacts submitted within the complaint.*

---

[22] FEIS, p. 411.
[23] FEIS, 352-53, 400.

## II. Legal Considerations.

### A. TxDOT Must Comply with Title VI of the Civil Rights Act.

TxDOT must comply with Title VI of the Civil Rights Act. Under Title VI of the Civil Rights Act of 1964, "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. This blanket prohibition on discrimination applies to all recipients of federal funds and all federal agencies, including TxDOT, through its receipt of federal financial assistance from the USDOT and through its delegated authority pursuant to 23 U.S.C. 327 and a Memorandum of Understanding dated 12-9-2019, and executed by FHWA and TxDOT ("MOU").

Pursuant to Title VI, a "program or activity" consists of "all of the operations of . . . a . . . department, agency, . . . or other instrumentality of a State or of a local government . . . any of which is extended Federal financial assistance." 42 U.S.C. § 2000d-4a. TxDOT receives approximately 37% of its revenue from federal funding, which is then used, at least in part, for federal highway programs in Texas.[24] TxDOT is thus both a recipient and administrator of federal funds.[25] Accordingly, TxDOT is a "program" under Title VI.

Furthermore, USDOT regulations require that applicants for federal funds provide "assurance" that they will comply with Title VI. 49 C.F.R. pt. 21 App. A (1)-(2), which TxDOT has formally consented to through its approved Nondiscrimination Statement, executed by TxDOT's Executive Director, Marc D. Williams.[26] The statement reads:

> **Nondiscrimination Statement.** *The Texas Department of Transportation, as a recipient of federal financial assistance and under Title VI of the Civil Rights Act of 1964 and related statutes, ensures that no person shall on the grounds of race, religion (where the primary objective of the financial assistance is to provide employment per 42 U.S.C. §2000d-3), color, national origin, sex, age, or disability be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any Department programs or activities.*[27]

### B. TxDOT is Subject to All Federal Laws Acting as the Delegated Agent of USDOT

TxDOT is also considered a federal agency through its delegation under the MOU and is directly responsible for the federal activity of environmental review under NEPA. Because TxDOT assumed the

---

[24] Texas Department of Transportation, Annual Comprehensive Financial Report, For the Fiscal Year Ended August 31, 2023, Page 12 ("Approximately 37 percent of TxDOT's revenue comes from federal funds."); Page 14.
[25] *Id.*
[26] TxDOT Civil Rights Division, FY 2023, Title VI/Nondiscrimination Plan, Sept. 30, 2022, at 6 & Attachment 1. Available at: https://ftp.txdot.gov/pub/txdot-info/civ/title%20vi/title-vi-nondiscrimination-plan.pdf.
[27] *Id.*

responsibilities of the Secretary of Transportation for NEPA compliance, TxDOT is subject to the same environmental and administrative law standards that would apply to federal agencies.[28]

The Surface Transportation Project Delivery Program provides Congressional authorization to the Secretary of the United States Department of Transportation ("USDOT") to assign some of its responsibilities under the National Environmental Policy Act ("NEPA") to a state's transportation authority. 23 U.S. § 327. The Texas Department of Transportation ("TxDOT") assumed such responsibilities of the Secretary for environmental review, consultation, and other delineated responsibilities pursuant to that certain Memorandum of Understanding Between the Federal Highway Administration and the Texas Department of Transportation Concerning State of Texas' Participation in the Project Delivery Program Pursuant to 23 U.S.C. 327, dated effective December 9, 2014 (the "MOU").[29]

The MOU was renewed pursuant to that First Renewed Memorandum of Understanding Between the Federal Highway Administration and the Texas Department of Transportation Concerning Texas' Participation in the Project Delivery Program Pursuant to 23 U.S.C. 327 ("First Renewed MOU").[30] The term for the First Renewed MOU expires this year, in December 2024.

Pursuant to the MOU and the First Renewed MOU, the FHWA assigned and TxDOT assumed "all of the Secretary's responsibilities for environmental review, reevaluation, consultation, or other action pertaining to the review or approval of highway projects specified" within subpart 3.3 of the First Renewed MOU, under specifically listed environmental laws, including, but not limited to, the Clean Air Act, Noise Control Act, Endangered Species Act, National Historic Preservation Act, Archeological Resources Protection Act, Clean Water Act, Rivers and Harbors Act, Wetland Mitigation, and laws that pertain to parkland protection.[31] The comprehensive list of acts and executive orders are listed on pages 4 and 5 of the First Renewed MOU. Any FHWA environmental review responsibility not explicitly listed remains with the FHWA.[32] The delegated authority does not relieve TxDOT of any responsibilities of any federal law.[33]

As required by federal law, the MOU and First Renewed MOU expressly reserve some responsibilities to the USDOT Secretary. [34] Expressly reserved responsibilities include government-to-government consultation with Native American tribes, conformity determinations under Section 176 of

---

[28] *Fath v. Tex. DOT*, 924 F.3d 132, 135, n.1 (5th Cir. 2018).

[29] Memorandum of Understanding Between the Federal Highway Administration and the Texas Department of Transportation Concerning State of Texas' Participation in the Project Delivery Program Pursuant to 23 U.S.C. 327, dated effective December 9, 2014 (the "MOU"), *available at* https://ftp.txdot.gov/pub/txdot-info/env/nepa-assignment/txdot-fhwa-nepa-assignment-mou.pdf.

[30] First Renewed Memorandum of Understanding Between the Federal Highway Administration and the Texas Department of Transportation Concerning Texas' Participation in the Project Delivery Program Pursuant to 23 U.S.C. 327 ("First Renewed MOU"), *available at* https://ftp.txdot.gov/pub/txdot-info/env/nepa-assignment/2019-nepa-assignment-mou.pdf.

[31] *Id.* at § 3.2.1.

[32] *Id.* at § 3.2.2.

[33] *See id.* ("This provision shall not be interpreted to abrogate TxDOTs responsibilities to comply with the requirements of any Federal environmental law that apply directly to TxDOT independent of FHWAs involvement (through Federal assistance or approval).").

[34] 23 U.S.C. § 327(2)(B).

the Clean Air Act, and determinations that an action constitutes a constructive use of publicly owned park, public recreation areas, wildlife refuges, waterfowl refuges, or historic sites under 49 U.S.C. 303/ 23 U.S.C. 138 (Section 4(f)) without first consulting with and obtaining approval of the FHWA.[35]

The delegated authority authorized under 23 USC 327 apply only those responsibilities of the Secretary of Transportation alone and not of any other federal Department.[36] Although these are delegated duties, compliance with NEPA and the overall responsibility for the completion of the environmental review process and its consistency with the requirements of NEPA remain with the Secretary of Transportation.[37]

The USDOT has promulgated regulations to effectuate provisions of Title VI.[38] The Title VI regulation prohibits discriminatory acts, including but not limited to, the selection of sites or location of facilities that would subject persons to discrimination, segregation, and exclusion.[39] Furthermore, "where prior discriminatory practice tends, on the grounds of race, color, national origin . . . subjects them to discrimination under any program or activity . . . , the applicant or recipient must take affirmative action to remove or overcome the effects of the prior discriminatory practice or usage."[40]

C.  *This Complaint was Submitted Timely*

The USDOT's implementing regulations require that Title VI complaints be filed within 180 days of the alleged discriminatory act. 49 C.F.R. § 21.11(b). The Record of Decision was recorded in the Federal Register on August 18, 2023. This Complaint was filed on January 28, 2024, less than 180 days from the Record of Decision. The Complaint is thus filed timely.

D.  *Complainants Satisfy Standing to File the Complaint*

The USDOT's implementing regulations provide that "[a]ny person who believes himself or any specific class of persons to be subjected to discrimination prohibited by this part may by himself or by a representative file with the Secretary a written complaint." 49 C.F.R. § 21.11(b). In compliance with the regulation, Complainants submit their complaint in writing, through their representatives, [Insert Lead Counsel] and Robert J. Levinski of the Save Our Springs Alliance.

Complainants and/or members of Complainants are (i) Black and Latino residents of the City of Austin and Travis County, who live within neighborhoods that will be impacted by the expansion of I-35 and its related infrastructure; (ii) persons who believe a specific class of persons will be subjected to discrimination if the expansion of I-35 is allowed to proceed; and (iii) organizations who represent residents or have missions and purposes that include equitable and non-discriminatory use of public funds for transportation, environmental justice, housing, and racial justice.

---

[35] First Renewed MOU, at § 3.2.3, 3.2.4, & 3.2.8.
[36] 23 U.S. § 327(2)(E).
[37] 23 U.S.C § 327(2)(D).
[38] 49 C.F.R. § 2.1 *et seq.*
[39] *Id.*
[40] *Id.* at §21.5(b)(7).

**III. NEPA Review Facts**

On August 18, 2023, the Texas Department of Transportation ("TxDOT") issued a Final Environmental Impact Statement and Record of Decision ("ROD") on the project known as the I-35 Capital Express Central Project from US 290 East to US 290 West/SH 71 (CSJ: 0015-12-388) (the "I-35 Capital Express Central project" or "Project").[41] The Environmental Impact Statement ("EIS") was originally initiated in August 2020 with a federal Notice of Intent ("NOI") to publish an EIS for the proposed project.[42]

Draft Environmental Impact Statement ("DEIS") was released on December 20, 2022. Notice of Availability ("NOA") of the DEIS and for the related public hearing was issued on January 5, 2023.[43] A public hearing "to gather input on the I-35 Capital Express Central project" was held on February 7, 2023.[44] The ROD selected "Modified Build Alternative 3" as the "Environmentally Preferred Alternative," claiming that the modified alternative had the fewest social, economic, and environmental impacts of the alternatives considered.[45] This proposed expansion required 54.1 acres of additional right-of-way, doubling the lane miles and significantly expanding the  width of the highway.[46] The expansion will result in many displacements affecting environmental justice populations and temporary or permanent conversion of parkland along Lady Bird Lake and the Colorado River.[47]

The I-35 Expansion Project will cost taxpayers $4.5 billion.[48] The purpose and need statement within the ROD claims that the project is needed "because I-35 between US 290 East and US 290 West/SH 71 does not adequately accommodate current and future travel demand and does not meet current federal and state design standards."[49] The stated project purpose is:

> to improve this critical local, regional, national, and international thoroughfare by enhancing safety within the corridor; addressing demand by prioritizing the movement of people, goods, and services through and across the corridor; improving operational efficiency; and creating a more dependable and consistent route for the traveling public, including bicyclists, pedestrians, emergency responders, and transit.[50]

Several potential, community-led alternatives were suggested, including three labeled in the record as the "Reconnect Austin," "Rethink35," and "Downtown Austin Alliance (DAA)/Urban Land Institute (ULI)" alternatives.[51] Each of these listed alternatives, along with transit-only and traffic-demand-management-based alternatives, were eliminated prior to detailed study.[52]   The DEIS released in

---

[41] FEIS/ROD, at ROD-1.

[42] *Id.*

[43] *Id.* at ROD-2.

[44] *Id.* at ROD-1, Draft Environmental Impact Statement, *available at* https://my35capex.com/wp-content/uploads/2022/12/M35-CapEx-C_DEIS_2022-12-14_SIGNED.pdf.

[45] *Id.* at ROD-2, 3.

[46] *Id.* at S-14, 15.

[47] *Id.*

[48] *Id.* at ROD-1.

[49] *Id.* at ROD-3.

[50] *Id.*

[51] *Id.* at ROD-3; FEIS, §2.1.

[52] *Id.*

December 2022 only carried forward two alternatives for detailed evaluation, Build Alternative 2 and Modified Build Alternative 3.[53] "No Build Alternative" was carried forward for baseline comparison purposes only.[54]

## IV.  History of Racism in Austin, Texas & Its Relationship with I-35

### A.  Forced Segregation and the "Negro District"

In 1928, the City of Austin approved its first comprehensive plan, "A City Plan for Austin, Texas" (commonly referred to as the "1928 Plan").[55] The 1928 plan used East Avenue—later physically replaced by I-35—as the line to draw to address the "race segregation problem." Despite acknowledging that all known attempts to enforce racial segregation through zoning laws have been found unconstitutional, the City's consultants of Koch and Fowler recommended the establishment of a "negro district," where "all the facilities and convenience be provided the negroes in this district, as an incentive to draw the negro population to this area."[56] After a casual description of their time in Austin, the Dallas-based consultants found that "negroes are present in small numbers, in practically all sections of the city, excepting the area just east of East Avenue and south of the City Cemetery. This area seems to be all negro population."[57] This "Negro District" included neighborhoods in central East Austin, such as Chestnut and Rosewood.

As former District 1 Council Member Ora Houston explained in a Winter 2018 speech entitled "Austin's '1928 Master Plan' Unleashed Forces Which Still Shape Austin Today," "We all—all hues of Austinites—must confront the facts of how our past has shaped our present and will shape our future. We must learn from history to build a better, more just future for all Austinites."[58] "The 1928 Plan was the architecture of a city which [the] Austin City County wanted land for the growing city center and a city without minorities."[59]

The 1928 plan describes that "[t]he most fundamental element of any city plan is its major street plan."[60] The plan declared "that East Avenue is destined to be the backbone for all traffic in the eastern portion of the City, and somewhat the same way as the Shoal Creek Driveway serves the west side."[61] At the time of the 1928 Plan, East Avenue was approximately 200 feet in width, with a well-landscaped median, similar to Shoal Creek's configuration.[62] However, the differences by which these two areas of town (White West Austin compared with Black and Brown East Austin) and the infrastructure to which these communities have been subjected tell very different stories. Shoal Creek remains a boulevard, with a conservancy-sponsored park lining much of it, while East Avenue has been replaced with one of the most

---

[53] *Id.* at ROD-3; FEIS §2.2.
[54] *Id.*
[55] Austin, Tex. Ord. 20120614-058 (June 14, 2012), at Appendix A, p. 20.
[56] *Id.* at 53.
[57] *Id.*
[58] Speech Prepared for Ora Houston, "Austin's '1928 Master Plan' Unleashed Forces Which Still Shape Austin Today," *available at https://www.austintexas.gov/sites/default/files/files/City-Council/Houston/CM_OH_1928_Op-Ed.pdf.*
[59] *Id.*
[60] *Id.* at 10.
[61] *Id.* at 20.
[62] *Id.*

traveled interstates in the entire nation. Or, put another way, while White/West Austin enjoyed a well-maintained and well-funded park, Black/East Austin was forced to breathe in I-35's smog and airborne pollutants, eventually contributing to disproportionate chronic health problems in these neighborhoods (discussed below).

Following the City of Austin's establishment of the Negro District, in 1935, "the federal government launched a New Deal program that would reinforce segregationist boundaries in Austin."[63] Through redlining—"the practice of denying or charging more for goods and services in certain neighborhoods, usually determined by race"—Black residents of East Austin were denied access to government-backed mortgages, through the Home Owners' Loan Corporation (HOLC), designed to restore household wealth during/after the Great Depression.[64] The HOLC program "created color-coded maps of urban areas" such as Austin and assigned risk categories. "By overlapping the HOLC maps on land-use maps of Koch & Fowler, patterns advocated in the 1928 city plan appear to be replicated in the 1934 HOLC maps."[65] This denied Black families access to generational wealth opportunities and stagnated economic mobility in East Austin communities.

These discriminatory practices also affected neighborhoods of Mexican and Latino heritage, especially as Austin's Latino population grew. Post-Texas-Revolution settlement by residents of Mexican and Latino heritage in Austin began in the 1870s, increasing rapidly throughout the early 20th Century. Throughout this period, Mexican American communities formed along the banks of Colorado River and Shoal Creek. The racist policies of the 1928 Plan era displaced Mexican American families, who formed new neighborhoods north of the Colorado River in East Austin and in the area now referred to as the Rainey Street area.

B.  After Discriminatory Practices Like Redlining or Deed Restrictions Were Found to Be Unconstitutional or Otherwise Illegal, I-35 Took Their Place, as an Act of Intentional Discrimination

In 1948, the United States Supreme Court declared unconstitutional and non-enforceable racially restrictive housing covenants preventing the conveyance of properties to individuals based upon race. *Shelley v. Kraemer*, 334 U.S. 1 (1948). This essentially put an end to discriminatory practices enforcing the Nego District, such as deed restrictions and certain forms of redlining practices, removing from the segregationists in control of the City of Austin and the State at the time their primary tool to force racial segregation. Two years later, the City of Austin and the State of Texas began developing plans to replace East Avenue with I-35. This was an intentional decision, and emblematic of the pattern in the Civil Rights Era recognized by President Biden—that the United States interstate highway system was used intentionally to divide, segregate, and disproportionately burden historically Black, Latino, and other environmental justice populations throughout the nation.[66]

---

[63] Austin American-Statesman, *Inheriting inequity,* Dan Zehr, accessed January 12, 2024, at *https://web.archive.org/web/20220818141237/https://projects.statesman.com/news/economic-mobility/index.html.*]

[64] *Id.*

[65] ROD, Historical Resources Survey Report, at 94-95.

[66]  President Joseph A. Biden, "Memorandum on Redressing Our Nation's and the Federal Government's

In 1962, TxDOT averted scrutiny under the Civil Rights Act by completing the construction of the highway before the Act's enforcement; but, in 2024, TxDOT knows better. I-35, through Central Austin, was constructed in 1962, three years before the enactment of the Civil Rights Act in 1965 and eight years before the enactment of the National Environmental Policy Act in 1970.[67] As such, communities around the original construction of the highway did not receive proper consideration and mitigation of social, economic, and environmental impacts; nor were the impacted populations provided a proper voice in the process. The below map shows some of the displacements that occurred in the early 1950s, as Black and Latino families were forced from their homes and businesses to pave the way for I-35.



Figure 1. Map From Austin History Center Showing Historic, Displaced Neighborhoods Before Construction of I-35 (1951).

In addition to separating and isolating residents in Mexican neighborhoods near the Colorado River, the expanded highway displaced minority families and businesses serving communities of colors, including childcare facilities and community parkland.[68] And, furthermore, it cemented a new visual

---

History of Discriminatory Housing Practices and Policies", January 26, 2021. Available at: https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/26/memorandum-on-redressing-our-nations-and-the-federal-governments-history-of-discriminatory-housing-practices-and-policies
[67] National Environmental Policy Act (NEPA), 42 U.S.C. §4321 *et seq.,* signed January 1, 1970.
[68] *Id.*

barrier for segregation, reinstating through elevated lanes, the separation between East and West, Black/Latino and White Austin.



Figure 2. Demographic Map of Central Austin, Demonstrating Persistent East-West Segregation.

Six decades after the construction of I-35, the segregationist wall it built holds strong. The above map, pulled from TxDOT's ROD, Appendix K, shows the clear edge and racial divide created by I-35 which runs north-to-south.[69] Despite growing in population from 186,545 residents in 1960 to nearly a million residents today, most areas west of I-35 are predominantly populated by White residents, while areas east of I-35 are predominately populated by Black and Latino residents.

The City of Austin acknowledges that I-35 "has been a barrier between east and west Austin and black and white Austin, since it opened in 1962. This racial segregation has largely persisted."[70] After more than a half-century since it was constructed, disparities in economic wealth, health, and other environmental justice metrics persist to this day. As reflected in Appendix K, in Rosewood and Chestnut,

---

[69] Federal Environmental Impact Statement (FEIS), Appendix K.

[70] Austin, Tex. Ord. 20120614-058 (June 14, 2012), Appendix A, p. 12.

seventy-five percent (75%) of these historically black neighborhoods' residents experience poverty,[71] have limited access to educational opportunities, and are more likely to experience chronic health issues, such as respiratory and heart diseases.[72]

| GEOID | Neighborhood | Life Expectancy | Heart Disease | Asthma |
|---|---|---|---|---|
| | **Table 1. Concentrations of Public Health Disparities\*** | | | |
| 48453000603 | West Campus North | No data | 1.6% (<60th %tile) | **12.4%** (95-100th %tile) |
| 48453000604 | West Campus South | No data | 1.7% (<60th) | **11.8%** (90-95th) |
| 48453000601 | University of Texas | No data | 1.2% (<60th) | **11.9%** (90-95th) |
| 48453002107 | Pecan Springs-Springdale | 76.8 (< 80th %tile) | 5.2% (<60th) | **10%** (70-90th) |
| 48453002113 | University Hills | 77.3 (<80th) | 4.5% (<60th) | 8.7% (<70th %tile) |
| 48453002104 | Windsor Park | 76 (<80th) | 4.5% (<60th) | 9.2% (<70th) |
| 48453000803 | Central East Austin | 76.7 (<80th) | 3% (<60th) | 9.7% (<70th) |
| 48453000802248453000803 | Rosewood-Chestnut | **71.9** (95-100th) | 5.5% (<60th) | **10.3%** (70-90th) |
| 48453002109 | MLK | **74.1** (80-90th) | **6%** (60-70th) | 9.4% (<70th) |
| 48453002110 | MLK-183 | 76.5 (<80th) | **6%** (60-70th) | 9.4% (<70th) |
| 48453000801 | Govalle | 78.7 (<80th) | **6.6%** (70-80th) | 8.1% (<70th) |
| 48453002111 | Johnston Terrace | **75** (80-90th) | 5.3% (<60th) | 9.5% (<70th) |
| 48453002317 | Pleasant Valley | No data | 1.7% (<60th) | **10.5%** (70-90th) |
| 48453002312 | Montopolis | **75.3** (80-90th) | 4.9% (<60th) | 9.5% (<70th) |
| 48453002307 | Parker Lane | **74.9** (80-90th) | 3.3% (<60th) | 8.5% (<70th) |
| 48453002411 | McKinney | **75.3** (80-90th) | 4.7% (<60th) | 9.5% (<70th) |
| 48453002412 | Franklin Park | 76.8 (<80th) | 4.4% (<60th) | 9.0% (<70th) |

\*Calculated based on census tracts within the study area using the EPA EJScreen Program.
Neighborhoods are arranged from north to south within the study area. Bolded values and shaded areas represent the neighborhoods with the lowest life expectancy or highest percentages of heart disease and/or asthma.

Figure 3. FEIS, Appendix K: Transportation Equity and Access Studies, Table 1.

C. TxDOT Failed to Account for Air Quality Pollutants and their Known Risks to Environmental Justice Populations

The EPA, acting under authority of the Clean Air Act, set National Ambient Air Quality Standards ("NAAQS") for six criteria pollutants: carbon monoxide ("CO"), lead, nitrogen dioxide ("$NO_2$"), ozone ("O3"), particulate matter ("PM"), and sulfur dioxide ("$SO_2$"). These standards are set because exposure to pollutant concentrations exceeding the NAAQS has been shown to have a detrimental impact on human health and the environment. TxDOT fails to adequately address the environmental health risks associated with these pollutants. "By expanding I-35, the Texas Department of Transportation (TxDOT) will necessarily be moving the roadway closer to residences and other buildings in the immediate vicinity of the roadway. . . [T]his reduction in the distance between the roadway and those receptors will lead to higher concentrations of these pollutants and greater exposures for nearby residents and visitors."[73]

TxDOT and the USDOT cannot claim ignorance of the consequences that increasing traffic and vehicular emissions that generate harmful air pollutants, such as fine particulate matter (i.e., $PM_{2.5}$), will have on these at-risk populations. The Environmental Protection Agency (EPA) understands the health consequences of exposure to air-quality pollutants, recently announcing a proposal to strengthen the

---

[71] FEIS, Appendix K: Transportation Equity and Access Studies, Table 1.
[72] *Id.* at 6.
[73] *Transportation Air Quality Energy Climate Change Sustainability: I-35 Capital Express Central Project – Final Environmental Impact Statement and Record of Decision*, Zamurs and Associates, LLC, Attached.