**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| RETHINK35, et al., | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 1:24-CV-00092-DII |
| | § | |
| TEXAS DEPARTMENT OF | § | |
| TRANSPORTATION, | § | |
| | § | |
| *Defendant.* | § | |

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Robert J. Levinski (Texas Bar No. 24097993)
Victoria Rose (Texas Bar No. 24131088)
William G. Bunch (Texas Bar No. 0334520)
SAVE OUR SPRINGS ALLIANCE
4701 Westgate Boulevard, Suite D-401
Austin, Texas 78745
Telephone: (512) 477-2320
bobby@sosalliance.org
victoria@sosalliance.org
bill@sosalliance.org

*Attorneys for Plaintiffs*

Rachel S. Doughty (Cal. Bar No. 255904)
*Admitted Pro Hac Vice*
GREENFIRE LAW, PC
2748 Adeline Street, Suite A
Berkeley, California 94703
Telephone: (510) 900-9502
rdoughty@greenfirelaw.com

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

I.    INTRODUCTION ....................................................................................................... 1

II.   LEGAL FRAMEWORK ............................................................................................ 2

III.  STANDARD OF REVIEW ........................................................................................ 4

IV.   STANDING ................................................................................................................ 7

V.    FACTS ....................................................................................................................... 9

VI.   ARGUMENT ............................................................................................................ 14

   A.  TxDOT failed to take a "hard look" at the impacts of its proposed Project on smog-
       causing PM2.5 in Austin in violation of NEPA (Claim I). ................................... 14

       1.  TxDOT failed to consider potential environmental impacts of PM2.5 emissions
           associated with the Project. ........................................................................... 15

       2.  TxDOT failed to establish current conditions. .............................................. 21

       3.  TxDOT failed to ensure scientific integrity in its analysis of PM2.5 effects of the
           Project and alternatives. ................................................................................. 21

       4.  TxDOT failed to adequately address comments about PM2.5. ....................... 24

       5.  TxDOT's three asserted bases for electing to not analyze PM2.5 pollution impacts
           are legally insufficient. .................................................................................. 28

           a.  A pre-Project CAA conformity determination does not excuse TxDOT from
               analyzing anticipated future anticipated PM2.5 impacts under NEPA. ........... 29

           b.  TxDOT incorrectly asserts that it is excused from evaluation of reasonably
               foreseeable PM2.5 impacts based upon an unspecified FHWA guidance. ....... 32

           c.  Conclusory and unsupported statements of decreasing levels of criteria
               pollutants in the Project area do not meet NEPA's stringent integrity
               requirements. ............................................................................................... 33

   B.  Having identified the CAA's attainment status pre-Project as relevant to the depth of
       NEPA analysis of Project related PM2.5, TxDOT cannot now disregard likely non-
       attainment status pre-Project (Claim II). ............................................................. 35

   C.  The Proper Remedy is vacatur. ............................................................................. 37

VII.  CONCLUSION ........................................................................................................ 39

## TABLE OF AUTHORITIES

**Cases**

*Ass'n Concerned About Tomorrow, Inc. (ACT) v. Dole*, 610 F. Supp. 1101 (N.D. Tex. 1985) ....... .................................................................................................................................... 2, 3

*Balt. Gas & Elec. Co. v. NRDC*, 462 U.S. 87 (1983) .................................................................. 19

*Border Power Plant Working Grp. v. DOE*, 467 F. Supp. 2d 1040 (S.D. Cal. 2006) ................. 30

*Bridgmon v. Array Sys. Corp*., 325 F.3d 572 (5th Cir. 2003) ........................................................ 4

*Byers v. Dall. Morning News, Inc.*, 209 F.3d 419 (5th Cir. 2000)................................................. 4

*Calumet Shreveport Refin., L.L.C. v. United States EPA*, 86 F.4th 1121 (5th Cir. 2023) ............. 6

*Calvert Cliffs' Coordinating Comm., Inc. v. United States Atomic Energy Com.*, 449 F.2d 1109 (D.C. Cir. 1971) ....................................................................................................................... passim

*Camreta v. Greene*, 563 U.S. 692 (2011) ................................................................................... 31

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................................. 4

*Cent. & S. W. Servs. v. United States EPA*, 220 F.3d 683 (5th Cir. 2000) ................................. 38

*Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104 (2d Cir. 2017) ......................................................................................................................................... 8

*Chamber of Com. v. SEC*, 85 F.4th 760 (5th Cir. 2023)............................................. 6, 24, 28, 33

*City of Dall. v. Hall*, 562 F.3d 712 (5th Cir. 2009)....................................................................... 2

*City of Dall. v. Hall*, No. 3:07-CV-0060-P, 2008 U.S. Dist. LEXIS 49944 (N.D. Tex. June 30, 2008) ....................................................................................................................................... 15

*Colo. Envtl. Coal. v. Salazar*, 875 F. Supp. 2d 1233 (D. Colo. 2012)........................................ 30

*Comm. of 100 on the Fed. City v. Foxx*, 87 F. Supp. 3d 191 (D.D.C. 2015).............................. 18

*Conkling v. Turner*, 18 F.3d 1285 (5th Cir. 1994)........................................................................ 4

*Conservation Congress v. United States Forest Service*, 377 F. Supp. 3d, 1039 (9th Cir. 2017) .... .................................................................................................................................... 33, 38

*Conservation Law Found. v. Busey*, 79 F.3d 1250 (1st Cir. 1996).............................................. 30

*Cross Timbers Concerned Citizens v. Saginaw*, 991 F. Supp. 563 (N.D. Tex. 1997)............... 4, 6

*Ctr. for Biological Diversity v. United States Forest Serv.*, 444 F. Supp. 3d 832 (S.D. Ohio 2020) ................................................................................................................. 15, 18, 30

*Custer Cty. Action Ass'n v. Garvey*, 256 F.3d 1024 (10th Cir. 2001) .................................... 11, 21

*Davis Mountains Trans-Pecos Heritage Ass'n v. Fed. Aviation Admin.*, 116 Fed. App'x 3 (5th Cir. 2004) ............................................................................................................. 7, 15

*Davis Mts. Trans-Pecos Heritage Ass'n v. FAA*, 116 F. App'x 3 (5th Cir. 2004) ................... 5, 15

*Diné Citizens Against Ruining Our Env't v. Haaland*, 59 F.4th 1016 (10th Cir. 2023) ......... 19, 31

*Envtl. Health Tr. v. FCC*, 9 F.4th 893 (D.C. Cir 2021) ........................................................ 6, 33

*Friends of the Floridas v. United States BLM*, No. CIV 20-0924 JB/GBW, 2024 U.S. Dist. LEXIS 155081 (D.N.M. Aug. 27, 2024) .................................................................... 31

*Great Basin Res. Watch*, 844 F.3d 1095 (9th Cir. 2016) ...................................................... 21, 34

*Gulf Coast Rod Reel & Gun Club, Inc. v. U.S. Army Corps of Eng'rs*, No. 3:13-cv-126, 2015 WL 1883522 (S.D. Tex. Apr. 20, 2015) ...................................................................... 7

*Healthy Gulf v. FERC*, 107 F.4th 1033 (D.C. Cir. 2024) ...................................................... 11, 29

*Highland Vill. Parents Grp. v. United States Fed. Highway*, 562 F. Supp. 2d 857 (E.D. Tex. 2008) ...................................................................................................................... 4

*In re Mun. Bond Reporting Antitrust Litig.*, 672 F.2d 436 (5th Cir. 1982) .................................... 4

*ITT Fed. Servs. Corp. v. United States*, 45 Fed. Cl. 174 (Fed. Cl. 1999) ...................................... 6

*League of Wilderness Defs. - Blue Mts. Biodiversity Project v. Forsgren*, 184 F. Supp. 2d 1058 (D. Or. 2002) .......................................................................................................... 21

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) ...................................................... 7, 33

*Louisiana v. Fed. Power Com.*, 503 F.2d 844 (5th Cir. 1974) ...................................................... 2

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) .................................................................... 7

*Marsh v. Or. Nat. Res. Council*, 490 U.S. 360 (1989) ................................................................ 35

*Medina Cnty. Env. Action Ass'n v. Surface Transp. Bd.*, 62 F.3d 687 (5th Cir. 2010) ................. 6

*Miss. River Basin All. v. Westphal*, 230 F.3d 170 (5th Cir. 2000).................................................. 5

*Mock v. Garland*, No. 4:23-CV-00095-O, 2024 U.S. Dist. LEXIS 105230 (N.D. Tex. 2024).... 38

*N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d 286 (2d Cir. 2011) ...................... 7, 8

*Ohio v. Ruckelshaus*, 776 F.2d 1333 (6th Cir. 1985) ................................................................. 30

*Optimus Steel, LLC v. United States Army Corps of Eng'rs*, 492 F. Supp. 3d 701 (E.D. Tex. 2020) ...................................................................................................................................... 7

*Protect Our Cmtys. Found. v. Jewell*, 2014 U.S. Dist. LEXIS 50698 (S.D. Cal. Mar. 25, 2014).... ............................................................................................................................................. 22

*Pub. Emples. for Envtl. Responsibility v. United States Fish & Wildlife Serv.*, 189 F. Supp. 3d 1 (D.C. Cir. 2016) ...................................................................................................................... 37

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989) ......................... 2, 15, 20, 38

*S. Utah Wilderness All. v. Burke*, 981 F. Supp. 2d 1099 (D. Utah 2013) ..................................... 31

*Scientists' Institute for Public Information, Inc. v. AEC* 481 F.2d 1079 (1973) ........................... 2

*Sierra Club v. FERC*, 867 F.3d 1357 (D.C. Circ. 2017) .............................................................. 29

*Sierra Club v. FHA*, 715 F. Supp. 2d 721 (S.D. Tex. 2010) ........................................................ 31

*Sierra Club v. Morton*, 510 F.2d 813 (5th Cir. 1975) ................................................................... 5

*Sierra Club v. Sigler*, 695 F.2d 957 (5th Cir. 1983) ................................................................ 3, 29

*Tex. Med. Ass'n v. United States HHS*, 587 F. Supp. 3d 528 (E.D. Tex. 2022) ........................... 37

*Texas v. Biden*, 554 F. Supp. 3d 818 (N.D. Tex. 2021) ............................................................... 38

*Texas v. United States*, 126 F.4th 392 (5th Cir. 2025) ................................................................. 37

*Warth v. Seldin*, 422 U.S. 490 (1975) .......................................................................................... 7

*Whitman v. American Trucking Assns., Inc.*, 531 U. S. 457 (2001) ............................................. 11

*WildEarth Guardians v. BLM*, 8 F. Supp. 3d 17 (D.D.C. 2014) ................................................. 31

**Statutes**

23 U.S.C. § 327 ............................................................................................................................. 9

42 U.S.C. § 4321 ........................................................................................................................... 2

42 U.S.C. § 4332 .................................................................................................................. passim

42 U.S.C. § 4332(C) ............................................................................................................. 2, 3, 15

42 U.S.C. § 4332(D) ..................................................................................................................... 21

42 U.S.C. § 4335 ...................................................................................................................... 3, 29

42 U.S.C. § 7409 ................................................................................................ 29

42 U.S.C. § 7501 ................................................................................................ 30

42 U.S.C. § 7506 ................................................................................................ 30

42 U.S.C. § 7515 ................................................................................................ 30

5 U.S.C. § 701 .................................................................................................... 4

5 U.S.C. § 706 ......................................................................................... 4, 5, 14, 37

**Rules**

Fed. R. Civ. P. 56(a) .......................................................................................... 4

Fed. R. Civ. P. 56(c) .......................................................................................... 4

**Regulations**

23 C.F.R. § 771.130(a) ....................................................................................... 37

40 C.F.R. § 1502.9 ....................................................................................... 35, 37

40 C.F.R. § 50.21 ......................................................................................... 11, 29

40 C.F.R. § 50.4 .......................................................................................... 11, 29

40 C.F.R. § 93.102 ....................................................................................... 29, 32

## TABLE OF ABBREVIATIONS

| APA | Administrative Procedures Act | MOVES | Motor Vehicle Emissions Simulator |
|---|---|---|---|
| CAA | Clean Air Act | MSAT | Mobile Source Air Toxins |
| CO | Carbon Monoxide | NAAQS | National Ambient Air Quality Standards |
| DEIS | Draft Environmental Statement | NEPA | National Environmental Policy Act |
| EA | Environmental Assessment | NO2 | Nitrogen Dioxide |
| EIS | Environmental Impact Statement | NOx | Nitrogen Oxide |
| EV | Electric Vehicle | PM2.5 | Particulate Matter 2.5 |
| FEIS | Final Environmental Impact Statement | PM10 | Particulate Matter 10 |
| FHWA | Federal Highway Administration | TxDOT | Texas Department of Transportation |
| HOV | High-Occupancy Vehicle | USDOT | U.S. Department of Transportation |
| ISA | Integrated Science Assessment | VOC | Volatile Organic Compound |

TO THE HONORABLE ROBERT PITMAN, UNITED STATES DISTRICT JUDGE:

Plaintiffs file this Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure as follows:

## I.     INTRODUCTION

Texas Department of Transportation (TxDOT), acting under delegated authority from the United States Department of Transportation (USDOT) and the Federal Highway Administration (FHWA), failed to comply with the National Environmental Policy Act (NEPA) when it approved the I-35 Capital Express Central Project from US 290 East to US 290 West/SH71 (I-35 Project or Project) without properly considering and disclosing the Project's effects on air pollution and health in Austin.

NEPA requires that agencies contemplating major federal action consider and analyze the potential future effects of harmful air pollution anticipated from a proposed project and alternatives to the proposed project. TxDOT must rely on the best available scientific information. Government and the scientific consensus establish without a doubt that highway projects, such as the I-35 Project, are the source of air pollution, including smog-causing particulate matter 2.5 (PM2.5). In 2019, TxDOT itself published a report that acknowledged major roadways are an important source of PM2.5 pollution, through vehicle exhaust, brake and tire wear, and re-suspended road dust. Exposure to PM2.5 results in severe negative health impacts, including fatal heart attacks, irregular heartbeat, aggravated asthma, decreased lung function, and premature death.

Despite the relationship between increased PM2.5 pollution and highway projects and despite the well-established negative health impacts associated with PM2.5 exposure, TxDOT simply did not analyze how construction and operation of the I-35 Project's would impact future PM2.5 pollution in Austin. This refusal was not and cannot be justified.

TxDOT has violated NEPA, and the appropriate remedy is vacatur and remand with instruction to TxDOT to evaluate the anticipated effects on PM2.5 pollution in Austin's air of the Project, and in each of a reasonable range of alternatives, if the Project is pursued further.

## II.    LEGAL FRAMEWORK

NEPA establishes a "broad national commitment to protecting and promoting environmental quality." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989); *see also* 42 U.S.C. § 4321 (noting that the purpose of NEPA is to "encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man"). To fulfill this commitment, federal agencies must prepare a detailed environmental impact statement (EIS) for "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C); *see also City of Dall. v. Hall*, 562 F.3d 712, 717 (5th Cir. 2009). This statutory requirement:

> serves NEPA's "action-forcing" purpose in two important respects. It ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision.

*Robertson*, 490 U.S. at 349 (internal citations omitted); *accord Ass'n Concerned About Tomorrow, Inc. (ACT) v. Dole*, 610 F. Supp. 1101, 1112 (N.D. Tex. 1985). Reading an EIS should warn "interested parties of the probable environmental effects" of the proposed project. *Louisiana v. Fed. Power Com.*, 503 F.2d 844, 875-76 (5th Cir. 1974). "[T]he basic thrust of an agency's responsibilities under NEPA is to predict the environmental effects of proposed action before the action is taken and those effects fully known." *Id.* at 876 (quoting *Scientists' Institute for Public Information, Inc. v. AEC* 481 F.2d 1079, 1092 (1973)).

The prism through which agencies must evaluate the impacts of their proposed decisions is an alternatives framework. "The discussion of alternatives is the linchpin of an EIS." *ACT*, 610 F.Supp. at 1112; 42 U.S.C. § 4332(C)(iii). The EIS must be "detailed," and the responsible agency must "ensure professional integrity, including scientific integrity, of the discussion and analysis in the environmental document," and must "make use of reliable data and resources." 42 U.S.C. § 4332. The alternatives requirement:

> seeks to ensure that each agency decision maker has before him and takes into proper account all possible approaches to a particular project (including total abandonment of the project) which would alter the environmental impact and the cost-benefit balance. Only in that fashion is it likely that the most intelligent, optimally beneficial decision will ultimately be made. Moreover, by compelling a formal "detailed statement" and a description of alternatives, NEPA provides evidence that the mandated decisionmaking process has in fact taken place and, most importantly, allows those removed from the initial process to evaluate and balance the factors on their own.

*Calvert Cliffs' Coordinating Comm., Inc. v. United States Atomic Energy Com.*, 449 F.2d 1109, 1114 (D.C. Cir. 1971). Vague and conclusory statements as to a project's anticipated impacts are insufficient. *ACT*, 610 F.Supp at 1110. "Congress did not intend the Act to be [ . . . ] a paper tiger." *Calvert Cliffs' Coordinating Comm., Inc.*, 449 F.2d at 1114.

Construction and operation of roads is governed by myriad environmental statutes and regulations, including the Clean Air Act, *in addition to* the NEPA overlay. 42 U.S.C. § 4335 (NEPA's "policies and goals [ . . . ] are supplementary to those set forth in existing authorizations of Federal agencies."); *Sierra Club v. Sigler*, 695 F.2d 957, 967 (5th Cir. 1983)("The mandate to develop and use environmentally conscious decisionmaking procedures found in Section § 4332(B) is supplementary to existing policy mandates of federal agencies.") Certification of compliance with various environmental laws does not relieve the decision-making agency from NEPA compliance, because "abdicating entirely to other agencies' certifications, neglects the mandated [NEPA] balancing analysis. Concerned members of the public are thereby precluded

from raising a wide range of environmental issues [. . . a]nd the special purpose of NEPA is

subverted." *Calvert Cliffs Coordinating Comm., Inc.*, 449 F.2d 1109 at 1123.

## III.    STANDARD OF REVIEW

Summary judgment is proper when the record reflects "there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The party seeking

summary judgment bears the initial burden of demonstrating the absence of genuine issues of

material fact. *See id.* at 56(c). Once a properly supported motion for summary judgment is

presented, the burden shifts to the non-moving party to present affirmative evidence of facts that

show there is a genuine issue for trial. *See Bridgmon v. Array Sys. Corp.*, 325 F.3d 572, 576 (5th

Cir. 2003); *Byers v. Dall. Morning News, Inc.*, 209 F.3d 419, 424 (5th Cir. 2000). Mere denials

of material facts, unsworn allegations, or arguments and assertions in briefs will not suffice to

carry this burden. Rather, the Court requires significant probative evidence from the nonmovant

to dismiss a request for summary judgment. *See Conkling v. Turner*, 18 F.3d 1285, 1295 (5th Cir.

1994); *In re Mun. Bond Reporting Antitrust Litig.*, 672 F.2d 436, 440 (5th Cir. 1982).

Because NEPA does not provide a private right of actions, challenges to NEPA-mandated

decision-making (or failure to act) are pursued through the Administrative Procedures Act

(APA), 5 U.S.C. §§ 701-706. *See Highland Vill. Parents Grp. v. United States Fed. Highway*,

562 F. Supp. 2d 857, 860 (E.D. Tex. 2008). Under the APA, a reviewing court may "compel

agency action unlawfully withheld or unreasonably delayed" and "hold unlawful and set aside

agency action, findings, and conclusions found to be [. . .] arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law" or "without observance of procedure

required by law." 5 U.S.C. §706; *accord Cross Timbers Concerned Citizens v. Saginaw*, 991 F.

Supp. 563, 570 (N.D. Tex. 1997)("Under the APA, the Court may review a final agency action to

determine whether it is 'arbitrary and capricious.' 5 U.S.C. § 706(2). In addition, the Court may

review an agency action unlawfully withheld or unreasonably delayed. *See* 5 U.S.C. § 706(1).")

    In determining the adequacy of an EIS under NEPA, "[t]he court's task is to determine

whether the EIS was compiled with objective good faith and whether the resulting statement

would permit a decisionmaker to fully consider and balance the environmental factors." *Sierra*

*Club v. Morton*, 510 F.2d 813, 819 (5th Cir. 1975). The 5th Circuit considers three factors in

performing this task:

> (1) whether the agency in good faith objectively has taken a hard look at the
> environmental consequences of a proposed action and alternatives;
>
> (2) whether the EIS provides detail sufficient to allow those who did not
> participate in its preparation to understand and consider the pertinent
> environmental influences involved; and
>
> (3) whether the EIS explanation of alternatives is sufficient to permit a reasoned
> choice among different courses of action.
>
> The EIS must provide information satisfying these criteria, and its conclusions
> must be supported by evidence in the administrative record

*Davis Mts. Trans-Pecos Heritage Ass'n v. FAA*, 116 F. App'x 3, 8-9 (5th Cir. 2004) (*Davis Mts.*);

*Miss. River Basin All. v. Westphal*, 230 F.3d 170, 174 (5th Cir. 2000). NEPA's "requirement of

environmental consideration 'to the fullest extent possible' sets a high standard for the agencies,

a standard which must be rigorously enforced by the reviewing courts." *Calvert Cliffs'*

*Coordinating Comm., Inc.*, 449 F.2d at 1114. Upon review, "if the decision was reached

procedurally without individualized consideration and balancing of environmental factors--

conducted fully and in good faith--it is the responsibility of the courts to reverse." *Id.* at 1115.

    Judicial review of agency action under the APA requires a "thorough, probing, in-depth

review" of the administrative record that was in existence before the agency when it made its

decision to determine "whether the decision was based on a consideration of the relevant factors

and whether there has been a clear error of judgment." *ITT Fed. Servs. Corp. v. United States*, 45 Fed. Cl. 174, 184 (Fed. Cl. 1999); 5 U.S.C. § 706 ("the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error"); *Cross Timbers Concerned Citizens v. Saginaw*, at 570 ("judicial review must be based on the administrative record already in existence.") The court must scrutinize the record to determine whether the agency has "examined the relevant data and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Calumet Shreveport Refin., L.L.C. v. United States EPA*, 86 F.4th 1121, 1133 (5th Cir. 2023). An agency acts in arbitrary and capricious manner when it ignores comments that challenge a fundamental premise underlying the proposed agency decision. *See Chamber of Com. v. SEC*, 85 F.4th 760, 774 (5th Cir. 2023); *Envtl. Health Tr. v. FCC*, 9 F.4th 893, 904-910 (D.C. Cir 2021).

Courts may consider extra-record evidence under certain circumstances. *See Medina Cnty. Env. Action Ass'n v. Surface Transp. Bd.*, 62 F.3d 687, 706 (5th Cir. 2010). In the instant case, Plaintiffs retained air quality NEPA expert Krish Vijayaraghavan to support their claims, and U.S. Magistrate Judge Dustin M. Howell ruled this expert's opinions "may be used to provide background information in order to determine whether [TxDOT] considered all of the relevant factors" required pursuant to NEPA. ECF 66, p. 7 (relying on *Medina Cnty. Env. Action Ass'n*, 62 F.3d at 706). Judge Howell recognized the use of Plaintiffs' expert report for the purposes of demonstrating that (1) TxDOT failed first to consider relevant factors in its EIS pertianing to air quality, and then again when it elected not to supplement the EIS, (2) TxDOT failed to consider scientific findings and current air pollution conditions that show the need to consider PM2.5 impacts, (3) TxDOT failed to comply with industry practices regarding PM2.5 analysis, and (4) TxDOT failed to comply with industry practices for both modeling PM2.5 and

agency response to comments. *See id.*, pp. 7-8. "Additionally, because this case arises under NEPA, extra-record evidence will assist the court in understanding the technical subject matter at issue." *See id.*, p. 8 (citing *Gulf Coast Rod Reel & Gun Club, Inc. v. U.S. Army Corps of Eng'rs*, No. 3:13-cv-126, 2015 WL 1883522, at *4 (S.D. Tex. Apr. 20, 2015); *Davis Mountains Trans-Pecos Heritage Ass'n v. Fed. Aviation Admin.*, 116 Fed. App'x 3, 12 (5th Cir. 2004)).

In evaluating whether an agency's interpretation of statute is lawful, this Court need not defer to an agency's interpretation of the law. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 392 (2024).

## IV.    STANDING

To demonstrate Article III standing to sue, plaintiffs must show (1) they suffered an injury in fact that is concrete, particularized, and actual or imminent; (2) the injury is fairly traceable to defendants' challenged conduct; and (3) the injury is likely to be redressed by a favorable court decision.[1] *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The injury in fact requirement is met when a plaintiff is deprived of a procedural right pursuant to NEPA so long as the plaintiff has "a sufficient geographical nexus to the site of the challenged project such that they can expect … to suffer whatever environmental consequences the project may have." *Optimus Steel, LLC v. United States Army Corps of Eng'rs*, 492 F. Supp. 3d 701, 717 (E.D. Tex. 2020).

Standing can apply to an individual or organizational. *See N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2011); *Warth v. Seldin*, 422 U.S. 490, 511 (1975). Organizational standing exists where an organization sues in its own right to seek

---

[1] Prior to filing this motion, Plaintiffs obtained from TxDOT an agreement not to challenge standing in its briefing for summary judgment. Declaration of Jennifer Rae Lovko at ¶ 3. However, should this Court require, Plaintiffs are amenable and can provide further briefing to establish standing for each Plaintiff. *Id.*

judicial relief from injury to itself. *See id*. Alternatively, an organization can assert associational

standing to "sue on behalf of its members…" *N.Y. Civil Liberties Union*, 684 F.3d at 294.

Further, "[i]t is well settled that where multiple parties seek the same relief, 'the presence of one

party with standing is sufficient to satisfy Article III's case-or-controversy requirement.'" *Centro*

*de la Comunidad Hispana de Locust Valley v. Town of Oyster Ba*y, 868 F.3d 104, 109 (2d Cir.

2017) (citations omitted).

Here, Plaintiffs are 14 organizations and one individual.[2] They bring this action

collectively on behalf of themselves and their respective members, which include individuals,

organizations, and businesses who will suffer irreparable harm in the form of increased air

pollution and its attendant health impacts from the expansion of I-35. TxDOT's failure to

adequately complete its responsibility of environmental review under NEPA deprived Plaintiffs

of transparency and meaningful opportunity to be heard. *See id.*, p. 4.

> [This case] is about real people. Those affected include families with young
> children, seniors, workers, and individuals with respiratory conditions. The air
> pollution associated with the expansion of I-35 directly impacts these people at
> their workplaces, in their homes, in their schools, in their churches and places of
> worship, in their parks, and in the businesses they frequent.

Declaration of Adam Greenfield, ¶ 10; *see also* Declaration of Chas Moore, ¶¶ 3-12 (remarking

that the I-35 expansion will have a disproportionate impact on the health and well-being of local

communities). Plaintiffs suffer informational and procedural injuries as well. *See* ECF 32, p. 4;

Declaration of Adam Greenfield, ¶¶ 5, 9 ("The public deserves to understand the full extent of

---

[2] Rethink35, Save Our Springs Alliance, Austin Justice Coalition, People Organized in Defense of Earth and Her Resources (PODER), Parents' Climate Community, Downtown Austin Neighborhood Association (DANA), East Town Lake Citizens NA, Southeast Austin Neighbors and Residents Organized for Environmental Justice (SANAR), Hancock Neighborhood Association, Mueller Neighborhood Association, Friends of Austin Neighborhoods (FAN), Friends of Hyde Park, Sunrise Movement Austin, Environment Texas, TexPIRG, and Celia Israel. *See* ECF 32 (First Amended Complaint), pp. 3-9.

the health risks and potential mitigation strategies before irreversible decisions are made. … The fight for a more informed plan for I-35 … has come at a great personal cost to many involved. Residents, business owners, and community advocates have dedicated thousands of unpaid hours to ensuring these concerns are heard.")

## V.    FACTS

Environmental review of the I-35 Project was carried out by Defendant TxDOT pursuant to 23 U.S.C. § 327 and a Memorandum of Understanding between the FHWA and TxDOT, dated December 9, 2019. *See* Final Environmental Impact Statement (FEIS) at AR33657. TxDOT circulated a Draft Environmental Statement (DEIS) in December of 2022 for the I-35 Project. *See* DEIS at AR11768-AR12284. The DEIS considered Build Alternative 2, Modified Build Alternative 3, and a No Build Alternative. *See id.* at AR11775. On August 18, 2023, Defendant TxDOT issued the FEIS and a Record of Decision, adopting Modified Build Alternative 3 for the I-35 Project. *See* FEIS and Record of Decision at AR33573-AR34157.

The Project is approximately 8 miles in length, through the middle of Austin, and involves removing existing I-35 decks, lowering the roadway, adding high-occupancy vehicle (HOV) managed lanes, and reconstructing various bridges and pathways. *See* FEIS at AR33609. The construction phase of the Project is anticipated to last 8-10 years. *See id.* at AR33634. Once completed, a typical section of the highway will consist of 18 lanes: four main lanes, two HOV lanes, and three frontage roads lanes in each direction. *See id.* at AR33690.

Plaintiffs aver TxDOT violated NEPA by failing to take a "hard look" at reasonably foreseeable increases in air pollutants, including the pollutant PM2.5, from the Project. ECF 32 (First Amended Complaint), pp. 21-25, 35. PM2.5, fine particulate, is particle suspended in the air that are 2.5 micrometers in diameter or smaller. *See* Reconsideration of NAAQS for Particulate Matter, 89 Fed. Reg. 45, 16202, 16214 (March 6, 2024) at AR56830. This is

approximately one-thirtieth the width of a human hair. *See* Declaration of Krish Vijayaraghavan (KV Decl.) at Exh. A, p. 5.

In the past, TxDOT and the EPA recognized that large emissions of PM2.5 are associated with major roadways and transportation projects. *See* TxDOT, *Near-Road Particulate Pollution* (2019) at AR00826, AR00828; Proposed Rule - Reconsideration of NAAQS for Particulate Matter, 88 Fed. Reg. 18, 5558 (Jan. 27, 2023) at AR56599; Wash. St. Dep't of Transp., *Influence of Roadway Emissions on Near-Road PM2.5*[3] (2019) at AR00656. PM2.5 emissions are generated through vehicle exhaust, abrasive processes (brake, clutch, and tire wear; road surface wear), and re-suspended road dust. *See id.; see also* KV Decl. at Exh. A, pp. 6-9.

PM2.5 exposure is the fifth leading risk factor for death in the world and causes myriad health issues (including low birth weight, respiratory disease, cardiovascular disease, neurodegeneration, and reduced cognitive function). *See* KV Decl. at Exh. A, pp. 9-11; Smith, *Impact of London's Road Traffic Air and Noise Pollution on Birth*, BMJ/BRIT. MED J (2017) at AR30356; Schraufnagel, *Air Pollution and Noncommunicable Diseases*, CHEST, (2019) at AR30385-AR30392; Xiao, *The Road to Racial Justice*, COLUMBIA HUMAN RIGHTS L REV at AR30415-AR30420; Peters, *Exposure to Traffic and the Onset of Myocardial Infarction*, N ENGL J MED (2004) at AR31759; 89 Fed. Reg. 45, 16202 at AR56840-AR56849. The mortality risk from PM2.5 exposures is comparable to that from cigarette smoking. *See* Burnett*, Global Estimates of Mortality Associated with Long-term Exposure to Outdoor Fine Particulate Matter*, PNAS/PROCEEDINGS OF THE NATIONAL ACADEMY OF SCIENCES (2018) at AR31276. The studies establishing the relationship between PM2.5 and non-accidental mortality are considered robust

---

[3] This document was authored by the Washington State Department of Transportation with funding from TxDOT. *See id*. at AR00630.

by the EPA. *See* 89 Fed. Reg. 45, 16202 at AR56841-AR56842 ("Taken together, epidemiologic studies … consistently report positive associations between long-term PM2.5 exposure and mortality across different geographic locations, populations, and analytic approaches. As such, these studies reduce key uncertainties identified in previous reviews.")

In evaluating air pollution effects in the NEPA context, agencies regularly rely on the EPA's National Ambient Air Quality Standards (NAAQS) to establish levels of concern. *See Healthy Gulf v. FERC*, 107 F.4th 1033, 1044 (D.C. Cir. 2024). NAAQS represent "the maximum airborne concentration of a pollutant that the public health can tolerate" decreased to a concentration of that pollutant to allow for an adequate margin of safety. *Whitman v. American Trucking Assns., Inc.*, 531 U. S. 457, 465 (2001). Currently, the EPA has established NAAQS for six criteria pollutants: particulate matter (PM2.5 and PM10), ozone, carbon monoxide, sulfur dioxide, nitrogen dioxide, and lead. *See* 40 C.F.R. §§ 50.4-50.21.

In August 2023, when the Record of Decision was issued for the I-35 Project, the annual NAAQS for PM2.5 was 12 $\mu$g/m$^3$; however, in June of 2021, the EPA announced it was considering lowering the NAAQS for PM2.5 because of advances in the scientific understanding of PM2.5's health and environmental impacts. *See* EPA, Press Release: *EPA to Reexamine Health Standards for Harmful Soot that Previous Administration Left Unchanged* (June 10, 2021) at AR54440 (explaining this consideration was "because available scientific and technical information indicate the current [NAAQS] may not be adequate to protect public health and welfare"); KV Decl. at Exh. A, p. 10. In establishing and re-evaluating NAAQS, the EPA relies on the "best available science" or "currently available scientific evidence." *See* KV Decl. at Exh. A, p. 9; *see also Custer Cty. Action Ass'n v. Garvey*, 256 F.3d 1024, 1034 (10th Cir. 2001).

In January of 2023, as expected, the EPA published a proposed rule in the Federal

Register to revise the annual PM2.5 NAAQS to within the range of 9.0 to 10.0 µg/m³. *See* 88

Fed. Reg. 18, 5558 at AR56588, AR56590. The proposed rule discussed, in detail, scientific and

technical information related to PM2.5 health impacts included in EPA's Integrated Science

Assessment (ISA) for Particulate Matter (published in 2019), the EPA's Supplement to the ISA

for Particulate Matter (published in 2022), and the EPA's Policy Assessment for the

Reconsideration of the NAAQS for Particulate Matter (published in 2022). *See id.* at AR56588-

AR56749; KV Decl. at Exh. A, pp. 9-10.

On February 7, 2024, the EPA announced it had finalized the rule and was lowering the

annual NAAQS for PM2.5 to 9 µg/m³. *See* KV Decl. at Exh. A, pp. 10, 20. The final rule was

published in the Federal Register on March 6, 2024. *See* 89 Fed. Reg. 45, 16202 at AR56818-

AR57022. The EPA based its decision on "the currently available scientific evidence in the 2019

Integrated Science Assessment (2019 ISA) and the Supplement to the 2019 ISA (ISA

Supplement), quantitative and policy analyses presented in the 2022 Policy Assessment (2022

PA), advice from the Clean Air Scientific Advisory Committee (CASAC), and public comments

on the proposal." *Id.* at AR56819.

The public, the City of Austin, and Travis County submitted comments on the DEIS to

TxDOT, as well as scientific articles and relevant literature, addressing the need for the TxDOT

to analyze PM2.5. *See* Public Comments at AR20788, AR20789, AR20806, AR20817,

AR20832, AR20840, AR20855, AR20858, AR20892, AR20903, AR20909, AR20914,

AR20926, AR20968; City of Austin Comments at AR32962, AR32970, AR56764-AR56765;

Travis County Comment at AR30382-AR30384; Various Articles and Literature at C-AR165.

Among the comments received, TxDOT was asked to consider PM2.5 impacts within the context

of the anticipated lowering of the annual PM2.5 NAAQS, which indicated currently available

science recognized health concerns at concentration levels lower than previously accepted. *See* Public Comments at AR20840, AR20855, AR20914, AR20926; Travis County Comment at AR30383.

Normally, comments by the public and participating agencies are given serious consideration to ensure NEPA's goal of providing public disclosure and participation is met. *See* KV Decl. at Exh. A, p. 15. Here, in response to comments, TxDOT concluded that compliance with the Clean Air Act (CAA) *at the time of analysis*, pre-Project, excused TxDOT from its NEPA obligation to analyze *anticipated* PM2.5 impacts of the Project. *See* FEIS/Appendix G (Comment/Response Matrix) at AR44486 (response to comment 18). When the NAAQS were subsequently lowered by the EPA, TxDOT also refused to supplement its NEPA analysis of the Project's anticipated impacts, stating, without modeling or quantitative analysis, it was unclear whether *present*, pre-Project conditions would result in CAA non-compliance under the new standards. *See* TxDOT Memorandum from Tom Wood (November 4, 2024) at AR57024-AR57031.

Based on a decade of data, PM2.5 concentrations in Austin air, pre-Project range from 9.2 to 9.8 $\mu g/m^3$. *See* KV Decl. at Exh. A, pp. 24-26; City of Austin Environmental Commission, Slideshow: *Austin and the EPA's PM2.5 NAAQS* (June 7, 2023) at AR56758. This exceeds the current annual PM2.5 NAAQS of 9 $\mu g/m^3$, even without considering the additional emissions that will result from the Project.

Plaintiffs' expert Krish Vijayaraghavan has 25 years' experience in environmental practice and specializes in NEPA environmental reviews and air quality modeling and analysis. *See* KV Decl. at Exh. A, pp. 1-2, and Attachment 1 (CV). He has conducted computer modeling studies and data analysis of air pollution for PM2.5 and other pollutants, published over 40 peer-

reviewed research papers, performed NEPA air quality analysis for over 20 EIS and EA projects across the country (including in Texas), and conducted NEPA professional training workshops. *See id.* Based on his education and background, experience, and materials reviewed, Mr. Vijayaraghavan concludes that TxDOT acted unreasonably in failing to analyze the impacts of PM2.5 emissions from the Project and alternatives because (1) TxDOT did not consider the fully known, associated PM2.5 emissions from the Project, (2) TxDOT did not fully address the current levels of PM2.5 in the Project area, (3) TxDOT did not substantively address comments from the public and participating agencies, (4) TxDOT did not use the MOVES program (or similar model), which the agency is familiar with and which could have been used to determine anticipated PM2.5 impacts from the Project, (5) TxDOT's conclusions regarding future PM2.5 levels are speculative as a result of its failure to rely on available data and to perform quantitative analysis, (6) TxDOT failed to consider anticipated changes to the NAAQS for PM2.5, thereby ignoring scientific consensus regarding PM2.5 emissions, and (7) TxDOT improperly relied on the CAA to evade its obligations under NEPA. *See id.* at pp. 27-28. Further, he concludes that TxDOT acted unreasonably in failing to conduct additional analysis and prepare a supplemental EIS after the EPA finalized the new PM2.5 NAAQS. *See id.*

## VI.    ARGUMENT

### A.    TxDOT failed to take a "hard look" at the impacts of its proposed Project on smog-causing PM2.5 in Austin in violation of NEPA (Claim I).

Plaintiffs' first claim avers that TxDOT acted in a manner that is arbitrary and capricious and otherwise not in accordance with law in violation of Section 706(2) of the APA and NEPA because the agency failed to take a "hard look" at the I-35 Project's air pollution impacts on the environment and human health in Austin. ECF 32, p. 2, 35.

Federal agencies must demonstrate that they are taking a "hard look" at reasonably

foreseeable environmental consequences of federal action, including identification and evaluation of adverse environmental effects. *Robertson*, 490 U.S. at 348-51; *Davis Mts.*, 116 F. App'x at 8-9; 42 U.S.C. § 4332(C). To determine which air pollutants should be included in a NEPA EIS analysis and how they should be addressed, NEPA professionals consider, at a minimum, the following factors: (1) the type of project and air pollutants released during the proposed project and alternatives, (2) currently available scientific information, (3) current conditions (i.e., baseline conditions) in the affected environment, and (4) comments by the public and government agencies. *See* KV Decl. at Exh. A, p. 4. TxDOT did not consider the impact of increased PM2.5 emissions resulting from the Project, did not establish baseline conditions, did not ensure that its adoption of the Project was based on currently available scientific information regarding PM2.5, and did not address substantive comments from the public and agencies on the need to analyze PM2.5 emissions.

1. **TxDOT failed to consider potential environmental impacts of PM2.5 emissions associated with the Project.**

NEPA's "hard look" obligation requires agencies to consider all reasonably foreseeable future environmental impacts from a proposed project. *Robertson*, 490 U.S. at 348-51; *Davis Mts.*, 116 F. App'x at 8-9; 42 U.S.C. § 4332(C). Where an agency unreasonably disregards foreseeable future environmental impacts, NEPA is violated. *See Ctr. for Biological Diversity v. United States Forest Serv.*, 444 F. Supp. 3d 832, 869 (S.D. Ohio 2020). "Effects are reasonably foreseeable if they are sufficiently likely to occur that a person of ordinary prudence would take them into account in reaching a decision." *Id.* at 862; *see also City of Dall. v. Hall*, No. 3:07-CV-0060-P, 2008 U.S. Dist. LEXIS 49944, at *20 (N.D. Tex. June 30, 2008)(NEPA requires analysis of effects that "are *caused* by the action and are later in time or farther removed in distance")(emphasis in the original).

As part of the air quality analysis for an EIS, the anticipated air emission sources associated with a project are identified along with the types of air pollutants anticipated to be released. *See* KV Decl. at Exh. A, pp. 4-9. Highway projects are associated with air emissions from mobile sources, stationary sources, and fugitive sources.[4] *See id.* at pp. 4-5. Anticipated emissions from highway projects include large emissions and concentrations of PM2.5, a criteria air pollutant which is a major component of smog. *See id.* at pp. 5-6. PM2.5 originates from the combustion of fuel in transportation, including cars, trucks, and buses, and are released directly or formed in the atmosphere from vehicle emissions. *See id.* at pp. 6-9. When gasoline or diesel is burned, it releases a mixture of pollutants, including soot, metals, other inorganic compounds, and organic compounds, all sources of PM2.5 pollution in the air. *See id.* PM2.5 also is formed in the atmosphere from tailpipe exhaust emissions of nitrogen oxide (NOx) and volatile organic compound (VOC) gases. *See id.* Additionally, non-exhaust vehicle sources (e.g., tire and brake wear, resuspension of road dust) contribute to PM2.5 emissions. *See id.* Construction activities add to PM2.5 emissions from fugitive dust, vehicle emissions, and the formation of PM2.5 from NOx and VOCs. *See id.*, p. 6.

That highways are a major source of PM2.5 air pollution is well documented in the peer-reviewed literature and in regulatory agency reports.[5] *See id.* at pp. 6-9. Studies have shown that

---

[4] Mobile emission sources include on-road (e.g., highway motor vehicles) and off-road (e.g., construction vehicles). *See id.* at p. 5. A stationary source is any structure or facility which emits an air pollutant (e.g., a diesel generator). *See id.* Fugitive source emissions are those that do not pass through a stack or other equivalent opening and instead are released directly to the air. *See id.*

[5] In addition to Plaintiffs' expert stating that highways projects are a large source of PM2.5 pollution from operations and construction activities, TxDOT and the EPA also have recognized that large emissions of PM2.5 are associated with major roadways and transportation projects. *See* TxDOT (2019) at AR00826, AR00828; 88 Fed. Reg. 18, 5558 at AR56599; Wash. St. Dep't of Transp., (2019) at AR00656; KV Decl. at Exh. A, p. 6. Also, at public hearings, TxDOT received many documents that addressed PM2.5 air emissions associated with highways. *See e.g.*

on-road emissions can produce as much as 35% of near-road PM2.5 emissions. *See id.* at p. 7.

Specific to emissions from resuspended dust, researchers at Texas A&M University found

resuspended dust increased near-road PM2.5 emission by 16-19%.[6] *See id.* at 8. TxDOT,

Washington State's DOT, and the EPA have all conceded that major roadways contribute to

PM2.5 pollution through exhaust, re-suspended road dust, brake wear and tire wear, and through

the emission of precursor gases (NOx and VOC) that form PM2.5 through gas-to-particle

---

Boudway, *When Driving, Tires Emit Pollution - And EVs Make the Problem Worse*, BLOOMBERG NEWS (2022) at AR30336; Grigoratos, *Brake Wear Particle Emissions: A Review, Environmental Science and Pollution Research*, ENVIRON. SCI. POLLUT. RES. (2015) at AR30615; Bellwood, *Emissions from Tire Wear Are a Whole Lot Worse Than We Thought*, JALOPNIK (2022) at AR31044; Joint Research Centre of European Commission, *Non-Exhaust Traffic Related Emissions: Brake and Tyre Wear PM* (2014) at AR31366; Thorpe, *Sources and Properties of Non-Exhaust Particulate Matter from Road Traffic: A Review, Science of the Total Environment*, SCI TOTAL ENVIRON (2008) at AR31519.

One of the reviews in the Administrative Record noted that traffic-related emissions "comprise a substantial proportion of primary particulate matter within urban areas and an even larger proportion at roadside." Thorpe at AR31519. While advances in exhaust emissions have reduced PM2.5 tailpipe emissions, this reduction has "highlighted the fact that particulate matter from non-exhaust sources is also a significant contributor to airborne concentrations." *Id.* Specific to brake, tire, and road wear, PM2.5 emissions "can be more important than industrial emissions. Additionally, particle resuspension from the road surface can be very significant especially in dryer climates." *Id.* Regarding tire wear, "under normal conditions particulate matter released by tire wear is 1,850 times more than the amount of particulates that come from burning the gas in your engine." Bellwood at AR31043. Moreover, the introduction of electric vehicles increases PM2.5 emissions from non-exhaust sources because electric vehicles are heavier than non-electric vehicles, resulting in increased PM2.5 emissions from brake and tire wear. *See* Boudway at AR30336; Reconnect Austin Comment at AR31329-AR31332.

[6] The researchers highlight that resuspended dust cannot be controlled by new technologies or new vehicle emission standards and its relative importance is becoming larger with the introduction of electric vehicles, especially in cities. While all vehicles exhibit some amount of tire and brake wear and consequent PM emissions, this feature is much more pronounced for electric vehicles (EVs). A key factor influencing these emissions is vehicle weight. EVs on average are 24% heavier than gasoline and diesel engine vehicles due to their heavier batteries, which causes increased tire and brake wear. Since heavier vehicles possess greater inertia, they require more braking force, resulting in increased brake wear and increased PM emissions.  One study concluded that tire tread particles from a highway contributed up to 8% of total PM2.5 mass. *See* KV Decl. at Exh. A, pp. 8-9.

conversion. *See* TxDOT (2019) at AR00826-AR00828; 88 Fed. Reg. 18, 5558 at AR56599;

Wash. St. Dep't of Transp. (2019)[7] at AR00656. The public commented on the need to evaluate

PM2.5. *See, e.g.*, AR44486 (comment 18), AR44553 (comment 1098), AR44556 (comment

1152), AR44590 (comment 1651).

Despite the causal relationship between PM2.5 emissions and transportation projects, in

the EIS for the I-35 Project, TxDOT chose not to quantify or analyze potential PM2.5 emissions.

*See* section VI.A.5 below. To be clear, TxDOT did not analyze and conclude that potential

PM2.5 emissions were non-existent or insignificant—TxDOT elected to excuse itself from

analyzing PM2.5 impacts at all. *Id.* NEPA does not allow an agency to ignore the significant

impacts of its proposed actions. *See Comm. of 100 on the Fed. City v. Foxx*, 87 F. Supp. 3d 191,

214 (D.D.C. 2015)(NEPA is violated where an agency unreasonably disregards foreseeable

environmental impacts); *Ctr. for Biological Diversity*, 444 F. Supp. 3d 832, 871 (S.D. Ohio

2020)(finding agency action arbitrary and capricious because the agency did not quantify

foreseeable air quality impacts from a project, leaving the Court unable to determine if agency

conclusions regarding air quality were rational and reasonable).

TxDOT has no reasonable justification for electing not to analyze PM2.5 emissions as the

tools and methodology for such analysis exist and are available to TxDOT. As such, TxDOT's

EIS was not sufficiently "detailed," and TxDOT failed to "ensure professional integrity,

including scientific integrity, of the discussion and analysis in the environmental document," or

to "make use of reliable data and resources" as required by NEPA. 42 U.S.C. §4332. While an

---

[7] The report by Washington State's Department of Transportation, which received funding from
TxDOT, notes that exhaust accounts for up to 65% of traffic-related PM2.5 emissions.
AR00656-AR00657. Re-suspended road dust accounts for up to 44%, and brake and tire wear
accounts for up to 22%. AR00657.

agency has some discretion to use the tools or methodology of its choice in conducting analysis, those tools or methodology must be reliable. *See Diné Citizens Against Ruining Our Env't v. Haaland*, 59 F.4th 1016, 1039 (10th Cir. 2023).

Choosing to use a method that has been adopted by a respected body is one way to demonstrate reliability. *See id.* The EPA recommends using the Motor Vehicle Emissions Simulator (MOVES) model to estimate PM2.5 emissions. *See* KV Decl. at Exh. A, pp. 12-13. MOVES calculates emissions for vehicle running, start, extended idle, brake wear, tire wear, evaporative fuel vapor venting, evaporative fuel leaks, and refueling vapor and spillage. *See id.* at p. 12. TxDOT already had compiled most of the parameters needed to run MOVES (such as annual average daily traffic, speed limits, vehicle miles travelled) for its analysis of CO and MSATs.[8] *See id.* Emissions from stationary sources, if any, and fugitive dust or resuspended dust are usually calculated using source parameters and data from the EPA. *See id.* at p. 13. The emission of vehicle PM2.5 and the main vehicle-related PM2.5 precursors (NOx and VOC) due to highway vehicles, construction equipment, and other sources can thus be anticipated, modeled, and quantified, which would have allowed TxDOT to compare environmental impacts of the Project and its alternatives in the EIS. *See id.*

TxDOT acted unreasonably and contrary to NEPA and the industry standard for NEPA professionals in not calculating, disclosing, and analyzing emissions of PM2.5 and its precursors (NOx and VOC) anticipated from the proposed project and alternatives during the NEPA analysis by using the MOVES model or a similar model. *See id.*; 42 U.S.C. §4332.

TxDOT's failure to analyze PM2.5 means health impacts could not be sufficiently analyzed. *See Balt. Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 106-07 (1983)("NEPA requires an

---

[8] MSATs, or Mobile Source Air Toxins, include PM2.5 and its precursors.

EIS to disclose the significant health … consequences of the environmental impact of a proposed action"). In the DEIS, issued in December 2022, TxDOT assessed community impacts to evaluate the effects of the transportation action on the Community Study Area[9], stating that it would "address the issues of equity, [environmental justice], and health." [10]  *See* DEIS at AR11876, AR11879. However, for health effects, TxDOT only focused on "the **benefits** of transportation improvements related to public health."[11] *Id*. at AR12031-AR12032 (emphasis added). Negative health impacts, including those caused by the Project's generation of air pollutants, were not mentioned or examined.

While agencies may consider beneficial values of a proposed project, NEPA requires they not ignore adverse environmental effects. *See Robertson*, 490 U.S. at 350. Here, TxDOT's focus on health benefits, while ignoring reasonably foreseeable adverse impacts, violates this fundamental tenant of NEPA.

Because TxDOT failed to consider potential environmental impacts of PM2.5 emissions associated with the Project, it violated NEPA, and summary judgment should be granted.

---

[9] The Community Study Area is largely urban, with the central portion of the Project within the downtown/urban core of Austin. *See* DEIS at AR11878.

[10] The DEIS notes that "TxDOT projects are required to consider potential for impacts to community resources, as well as potential EJ and Title VI (Title VI of the Civil Rights Act) issues." AR11876.

[11] Looking at baseline health conditions, TxDOT noted that "[m]any of the communities within the study area suffer from chronic illnesses." DEIS/Appendix K (Memo on Public Health) at AR16480. These illnesses "can be alleviated through exercise, as well as increased access to community facilities like grocery stores and healthcare. Investments made in constructing pedestrian and bicycle facilities, closing last mile gaps in infrastructure, and improving the aesthetic appearance of currently auto-centric areas would foster a more physically active Austin, especially in portions of the study area highlighted here." DEIS at AR12031-AR12032. TxDOT's optimistic speculation is contradicted by its own record. For instance, despite identifying healthcare as important to alleviating illness, the I-35 Project will displace the following healthcare services: David Powell Heath Center, Hancock Walk-In Care, Pediatric Healthcare, and Aveanna Healthcare. FEIS at AR33789.

      **2.**      **TxDOT failed to establish current conditions.**

"Establishing appropriate baseline conditions is critical to any NEPA analysis. 'Without establishing the baseline conditions which exist … before [a project] begins, there is simply no way to determine what effect the [project] will have on the environment and, consequently, no way to comply with NEPA.'" *See Great Basin Res. Watch*, 844 F.3d 1095, 1101 (9th Cir. 2016)(citations omitted); KV Decl. at Exh. A, p. 11. TxDOT only identified current air quality conditions for CO and nine MSATs. *See id.* at AR33968-AR33975. The current conditions for PM2.5 concentrations were not identified, though TxDOT could easily have done so by referring to PM2.5 air concentrations in Austin measured at EPA Air Quality System monitoring locations. *See* KV Decl. at Exh. A, p. 11. The failure to assemble and disclose current ambient PM2.5 data to understand the quality of the environment (the magnitude of current air concentrations relative to the NAAQS for PM2.5) was not reasonable and goes against the industry standard for NEPA professionals. *See id.*; 42 U.S.C. §4332 (EIS must be detailed and agency must "ensure professional integrity, including scientific integrity, of the discussion and analysis" and make use of "reliable data and resources.").

      **3.**      **TxDOT failed to ensure scientific integrity in its analysis of PM2.5 effects of the Project and alternatives.**

Under NEPA, agencies must ensure the scientific integrity of the discussions and analyses in an EIS. *See* 42 U.S.C. § 4332(D); *see also Custer Cty. Action Ass'n*, 256 F.3d at 1034 (NEPA requires agencies to utilize the "best available scientific information" in its NEPA analysis). When the public provides an agency with scientific evidence that opposes a proposed project, the agency must directly evaluate the evidence and respond. *See League of Wilderness Defs. - Blue Mts. Biodiversity Project v. Forsgren*, 184 F. Supp. 2d 1058, 1066-68 (D. Or. 2002). The failure to do so constitutes a violation of NEPA. *See id.; Protect Our Cmtys. Found. v.*

*Jewell*, 2014 U.S. Dist. LEXIS 50698, at *32 (S.D. Cal. Mar. 25, 2014)(finding NEPA not violated where agency evaluated available scientific evidence, rejected public's viewpoint, and reached permissible conclusion based on "reasoned explanation and scientific support").

PM2.5 is regularly analyzed under NEPA as scientific evidence shows that exposure to particulate matter is associated with severe negative health impacts, including fatal heart attacks, irregular heartbeat, aggravated asthma, decreased lung function and premature death. *See* KV Decl. at Exh. A, p. 9. Here, TxDOT's decision to forego analysis of PM2.5 impacts is not based on *any* scientific evidence. In response to the DEIS, the public and City of Austin provided documents demonstrating that PM2.5 emissions are associated with transportation projects, such as the I-35 Project, and that these emissions are known to cause serious health impacts. *See* Various Articles and Literature at C-AR165; City of Austin Response to DEIS at AR32962. Relatedly, Travis County and the public also urged TxDOT to consider the EPA's proposal to lower the PM2.5 NAAQS. *See* Public Comments at AR20840, AR20855, AR20914, AR20926; Travis County Comments at AR30383.

The documents given to TxDOT were published in scientific, medical and legal journals, as well as government reports. *See* Various Articles and Literature at C-AR165; City of Austin Response to DEIS at AR32962. They establish, for example, that PM2.5 exposure is the fifth leading risk factor for death in the world and causes a myriad of health issues (including respiratory disease, cardiovascular disease, and developmental problems). *See* Smith at AR30357; Schraufnagel at AR30385-AR30392; Xiao at AR30416-AR30420; Peters at AR31759. The mortality risk from PM2.5 exposures is comparable to that associated with cigarette smoking. *See* Burnett at AR31276. And, as early as 2016, studies reported significant acute and chronic effects from PM2.5 concentrations below the prior annual NAAQS of

12.0 μg/m³. *See* Shi, *Low-Concentration PM2.5 and Mortality*, ENV HEALTH PERSPECTIVES

(2016) at AR30566.

Prior to issuing the Record of Decision for the I-35 Project, TxDOT also had access to

scientific evidence promulgated by the EPA. In June of 2021, the EPA announced it was

considering lowering the NAAQS for PM2.5 "because available scientific and technical

information indicate the current [NAAQS] may not be adequate to protect public health and

welfare" *See* EPA Press Release at AR54440. The EPA's proposed rule to revise the primary

annual PM2.5 standard by lowering the level from 12.0 μg/m³ to within the range of 9.0 to 10.0

μg/m³ was published in the Federal Register on January 27, 2023. *See* 88 Fed. Reg. 18, 5558 at

C-AR276. This proposal was based on epidemiological studies, toxicological and controlled

human exposure studies, and a quantitative risk assessment–all of which were available to

TxDOT prior to its promulgation of the final EIS for the Project and all of which were available

to TxDOT prior to the final rule adopting an annual PM2.5 standard of 9.0 μg/m³. *See id.* at

AR56588-AR56749. The proposed rule relied upon studies and assessments reported in the

EPA's ISA for Particulate Matter, which was published in 2019, the EPA's Supplement to the

2019 ISA for Particulate Matter, which was published in 2022, and the EPA's Policy Assessment

for the Reconsideration of the National Ambient Air Quality Standards for Particulate Matter,

which was published in 2022. *See id*. at AR56588. Based on this evidence, the EPA's Clean Air

Scientific Advisory Committee unanimously agreed that the annual PM2.5 standard needed to be

revised, with the majority of the Committee's members concluding that the level of the standard

should be revised within the range of 8.0 to 10.0 μg/m³—the likely pre-Project baseline. *See id*.

at AR56591; KV Decl. at Exh. A, pp. 24-26; AR56758 (City of Austin Environmental

Commission, Slideshow: *Austin and the EPA's PM2.5 NAAQS* (June 7, 2023)).

Not only is the I-35 Project—a highway project—is the sort which would always be associated with PM2.5 pollution, but the pre-Project scientific evidence demonstrated that adverse health impacts of PM2.5 were impactful at levels much lower than the 12 μg/m$^3$ NAAQS in effect, but under review, when the I-35 Project was adopted—much closer to the baseline. *See* KV Decl. at Exh. A, p. 11. Yet despite this, TxDOT did not respond to the scientific evidence presented by the public nor address the EPA's proposed rule or the overwhelming body of science driving the regulatory change. The failure to respond to comments is, in and of itself, a NEPA violation. *See Chamber of Com*., 85 F.4th at 774*; Envtl. Health Tr*., 9 F.4th at 904-10*.* It also violates NEPA because it undermines the professional and scientific integrity required in an environmental analysis. *See* 42 U.S.C. § 4332. TxDOT acted unreasonably in ignoring the scientific literature available to it, and thus, summary judgment should be granted. *See* KV Decl. at Exh. A, p. 11.

### 4.    TxDOT failed to adequately address comments about PM2.5.

In preparing a final EIS, the lead agency must consider comments and reasonably respond to opposing views not adequately discussed in the draft statement, and particularly to those that challenge a fundamental premise of the EIS. *See Chamber of Com*, 85 F.4th at 774*; Envtl. Health Tr*., 9 F.4th at 904-10. Comments by the public and participating agencies are normally given serious consideration in NEPA air quality analysis to meet NEPA's expectations for public disclosure and participation, as well as ensure the lead agency acts with professional and scientific integrity. *See* KV Decl. at Exh. A, p. 15; 42 U.S.C. §4332.

For the I-35 Project, TxDOT received numerous comments from the public regarding the need to analyze PM2.5 impacts, especially in light of the then-current science driving the EPA's anticipated lowering of the NAAQS for PM2.5, and the need to address foreseeable negative

health impacts stemming from the Project's impact on air pollutant concentrations.[12] The City of Austin and Travis County also commented on these issues.

For example, regarding air quality, the City requested that TxDOT collaborate with City departments "to provide additional information on direct and cumulative impacts on air quality and air quality mitigation." City of Austin Letter (March 7, 2023) at AR32962. Noting that the DEIS "indicates that increases in air quality impacts would be mitigated by expected increase in electric vehicles," the City also asked TxDOT to identify the basis for such a conclusion. *Id*. Both the City and its Council members noted that air quality analysis was necessary to address Austing's "near" or "projected" non-attainment status under the CAA for particulate matter. AR50126, AR56765.

The City of Austin requested TxDOT "conduct a Health Impact Assessment (HIA),

---

[12] *See e.g.,* Public Comments at AR02401 (requesting TxDOT analyze health impacts related to air quality through a Health Impact Assessment), AR20788 (requesting TxDOT address PM2.5 from tire wear), AR20789 (requesting TxDOT address PM2.5 and NOx), AR20806 (noting that an increase in vehicle use of I-35 will lead to increases in PM2.5 emissions, which are known to cause serious health impacts), AR20817 (requesting TxDOT analyze PM2.5 in light of health impacts on residents, coupled with the fact that the residential population in the area is expected to increase during the duration of the Project), AR20840 (urging TxDOT to address impacts on PM2.5 concentrations, especially because the EPA would be tightening the PM2.5 NAAQS in the coming year), AR20855 (requesting TxDOT analyze PM2.5, which is a significant threat to health and because the EPA would be lowering the PM2.5 NAAQS), AR20892 (noting that PM2.5 should be analyzed because of associated health impacts to thousands of nearby residents), AR20914 (stating that PM2.5 analysis is required to address future health impacts, especially because the EPA would be lowering the PM2.5 NAAQS in the near future), AR20926 (requesting TxDOT analyze PM2.5 because the upcoming lowering of the PM2.5 NAAQS demonstrates PM2.5 is a serious health concern), AR44487 (remarking that TxDOT needed to analyze PM2.5 because of the well-known association between air pollution and negative health impacts), AR44489 (urging TxDOT to consider the Project's negative impact to air quality and associated health problems), AR44504 (noting that PM2.5 emissions will have serious health impacts on nearby residents and travelers), AR44522 (requesting TxDOT do a quantitative analysis and health impact assessment for all pollutants, including PM2.5), AR44568 (commenting that the I-35 Project will negatively impact health), AR44601 (recognizing that traffic-related air pollution has a wide range of adverse health effects).

similar to one conducted related to the I-45 expansion in Houston [. . . and] based on the findings in the I-45 expansion HIA, we recommend TxDOT provide funding for air quality monitors at parks, schools, and playgrounds during and after project completion, as well as funding for HEPA filters to improve indoor air quality for residents within 500 ft. of the highway. City of Austin Letter (March 7, 2023) at AR32962. The City also noted that the DEIS "indicates that increases in air quality impacts would be mitigated by expected increase in electric vehicles," and in this regard, asked TxDOT to identify the basis for such a conclusion.[13] *Id.*

In response to the DEIS, the City adopted a resolution that found transportation is responsible for 30% of Austin's air pollution, and the 1-35 Project had done little to mitigate air pollutants associated with the proposed Project. *See* Resolution No. 20230223-044 at AR32966-68. This is critical because the Project will generate additional traffic as a result of added roadway capacity. *See id.* at AR32969. The resolution ends by stating:

> 1. The Austin City Council calls for substantive revisions to TxDOT's [DEIS] to reduce the burdens of the project placed on residential communities in central Austin, including but not limited to revisions to satisfactorily address the above provided comments, prior to the release of a Record of Decision.

> 2. The Austin City Council calls on TxDOT to suspend its procurement process for projects related to the I-35 Capital Express Central project pending satisfactory responses to the above provided comments and revisions to the DEIS.

*Id.* at AR32971-AR32972. The City of Austin also stated that incentives should be provided to reroute 18-wheeler traffic that is passing through Austin to Texas State Highway 130. *See id*. at AR32970.

Travis County also commented that TxDOT should conduct a study of existing *and future* PM2.5 because "PM2.5 is a significant public health threat. Children and the elderly are

---

[13] The scientific evidence in the record undermines this perfunctory conclusion regarding electric vehicles. *See* above, fn 5.

especially vulnerable. This study should specifically analyze existing and future PM2.5 at schools and elder care facilities within 2 miles of I-35. This study should be included in the final EIS and inform this project moving forward." AR30383. In addition, Travis County commented:

> [TxDOT] should conduct a full study of non-tailpipe pollutants from traffic, including but not limited to brake dust, tire friction, and the impacts of a shift from internal combustion engines (ICEs) to electric vehicles (EVs). The expected proliferation of electric vehicles, as outlined in the draft EIS, are not guaranteed to reduce overall pollution levels from traffic. Pollution from tire friction and wear, for example, may worsen with an increase in EVs due to increase in vehicle weight from electric batteries. Research in this field is new and increasing each day, and TxDOT's study should take into account the most up to date research as of February 2023. This study should be included in the final EIS and inform this project moving forward.

*Id.*; *see also*, fn. 5. The County also asked TxDOT to include mitigation addressing future air pollution, noting that the Project "represents 42 lane-miles of added highway capacity. This will lead to an increase of 320 million vehicle miles driven every year." AR30384.

In response to comments and documents pertaining to PM2.5, TxDOT responded that analysis of PM2.5 would only be warranted if Austin was, at the time of the NEPA analysis—pre-Project—designated as being a non-attainment area under the CAA's (soon to be abandoned) 12 $\mu g/m^3$ NAAQS. FEIS/Appendix G (Comment/Response Matrix) at AR44486. Because the Project area was pre-Project designated by the EPA as being in attainment or unclassifiable for all PM2.5, TxDOT concluded analysis of PM2.5 was "not warranted under the CAA." *Id.*[14] The

---

[14] The final EIS for the I-35 Project states that "[a]reas where the air quality falls short of the NAAQS are designated as 'nonattainment areas' and, through the regional [Metropolitan Planning Organization] MPO, must address air pollution from on-road mobile sources through the transportation conformity process per CAA Section 76(c). The conformity process is designed to ensure that the total emissions projected in a nonattainment MPO's long-range and short-range transportation plans are within the Motor Vehicle Emissions Budget established by the state and approved by EPA to protect public health for the NAAQS." AR33968. Travis County "is in attainment or unclassifiable for all NAAQS; therefore, the transportation conformity rules do not apply." *Id.*

agency also asserted that some unidentified FHWA guidance "does not recommend additional

PM analysis beyond the CAA regulatory requirements." *Id.* Further, TxDOT stated, levels for

criteria pollutants have "generally been decreasing over time in Texas and in the local area, even

with increases in on-road vehicles over the same time period." *Id.* As addressed below in Section

VI.A.4., none of these comments justifies TxDOT's failure to examine the reasonably

foreseeable impact of the I-35 Project on PM2.5 concentrations under NEPA; This is not a CAA

case.

Absolutely no response or discussion was provided by TxDOT regarding PM2.5 emission

sources (exhaust or non-exhaust), PM2.5 health impacts, or the anticipated lowering of the

PM2.5 NAAQS. TxDOT did not address the Travis County's request for a full study of non-

tailpipe pollutants from traffic. The agency also ignored the City of Austin's comments. By not

addressing substantive comments challenging a fundament premise of the EIS from the public

and participating agencies, TxDOT acted unreasonably, arbitrary and capricious and inconsistent

with industry standards. *See* KV Decl. at Exh. A, p. 17. This failure to consider comments and

respond to opposing views constitutes a violation of NEPA. *See Chamber of Com*, 85 F.4th at

774; *Envtl. Health Tr.*, 9 F.4th at 904-910.

### 5. TxDOT's three asserted bases for electing to not analyze PM2.5 pollution impacts are legally insufficient.

TxDOT gave three reasons why it need not evaluate PM2.5 pollution in any detail: (1) a

lack of any EPA determination of non-conformity for PM2.5 pre-Project, (2) reference to an

undisclosed FHWA guidance, and (3) vague, conclusory, and non-Project specific statements

about general trends in Texas. All fail.

a.    **A pre-Project CAA conformity determination does not excuse TxDOT from analyzing anticipated future anticipated PM2.5 impacts under NEPA.**

TxDOT must comply with both the CAA and NEPA. 42 U.S.C. § 4335 (NEPA's "policies and goals [. . . ] are supplementary to those set forth in existing authorizations of Federal agencies."); *Sierra Club v. Sigler*, 695 F.2d 957, 967 (5th Cir. 1983)(NEPA's requirements are "supplementary to existing policy mandates of federal agencies."); *Calvert Cliffs*, 449 F.2d 1109 at 1123. This is a question of law—clearly addressed in the NEPA statute itself, and Defendant's contrary position evinces a misunderstanding of the nature of NEPA and its relationship to the CAA. *See* KV Decl. at Exh. A, pp. 18-19.

Under the CAA EPA must set NAAQS for criteria pollutants, including PM2.5. *See* 42 U.S.C. § 7409. Currently, the EPA has established NAAQS for six criteria pollutants: particulate matter (PM2.5 and PM10), ozone, CO, sulfur dioxide, nitrogen dioxide, and lead. *See* 40 C.F.R. §§ 50.4-50.21. Of these, the EPA designates four as "traffic-related criteria pollutants": particulate matter (PM2.5 and PM10), ozone, CO, and nitrogen dioxide (NO2). 40 C.F.R. § 93.102.

The NAAQS are a "generally accepted standard" for evaluating air-pollution effects in the NEPA context. *Healthy Gulf v. FERC*, 107 F.4th 1033, 1044 (D.C. Cir. 2024). That is, in an EIS, an agency may compare "a project's *expected* emission levels" with the NAAQS to enable "decisionmakers and the public to meaningfully evaluate the project's air-pollution effects by reference to a generally accepted standard." *Sierra Club v. FERC*, 867 F.3d 1357, 1370 n.7 (D.C. Circ. 2017)(emphasis added). That is not what TxDOT did here. Instead, TxDOT completely ignored the Project's *expected* emission levels.

TxDOT contends that under the CAA framework, if an area is designated as being *currently* located in an attainment area, no further analysis is required under NEPA. TxDOT's

analysis, both in the EIS and in response to requests to supplement the EIS, started and ended

with this perfunctory legal conclusion.[15] But, certification by the EPA of present-day CAA

compliance does not relieve TxDOT from NEPA compliance, because "abdicating entirely to

other agencies' certifications, neglects the mandated [NEPA] balancing analysis. Concerned

members of the public are thereby precluded from raising a wide range of environmental issues

… [a]nd the special purpose of NEPA is subverted." *Calvert Cliffs*, 449 F.2d 1109 at 1123. Put

another way, "the CAA conformity determination is legally separate from the NEPA analysis*.*"

*Border Power Plant Working Grp.*, 467 F. Supp. 2d at 1053; *see also Conservation Law Found.*

*v. Busey*, 79 F.3d 1250, 1262 (1st Cir. 1996) (noting "regulations issued by the EPA …

prescribing procedures and criteria for conformity determinations suggest no connection between

NEPA and CAA compliance").

       In *Ctr. for Biological Diversity*, the Bureau of Land Management argued (just as TxDOT

does here) that because the action was located in an attainment area, NEPA did not require

further analysis of air quality impacts. *See Ctr. for Biological Diversity*, 444 F. Supp. 3d at 869-

70. The court disagreed because "the fact that an area is currently within the permissible air

quality limits does not necessarily mean that it will be in attainment in the future, there must be a

focus on future estimations as well." *Id.* at 870; *see also Colo. Envtl. Coal. v. Salazar*, 875 F.

Supp. 2d 1233, 1257 (D. Colo. 2012) ("[t]he mere fact that [an] area has not exceeded [] limits in

the past is of no significance [under NEPA] when the purpose of the EIS is to attempt to predict

what environmental effects are likely to occur in the future").[16] TxDOT makes exactly the same

---

[15] The CAA contains conformity provisions that apply "only to nonattainment areas." *See Ohio v. Ruckelshaus*, 776 F.2d 1333, 1337 (6th Cir. 1985); 42 U.S.C. §§ 7501-7515. These provisions do not apply to "attainment areas." *See* 42 U.S.C. § 7506(5); *Border Power Plant Working Grp. v. DOE*, 467 F. Supp. 2d 1040, 1053-55 (S.D. Cal. 2006).

[16] Not surprisingly, agencies regularly analyze criteria pollutants even when a project site falls

mistake.[17]

NEPA addresses environmental effects regardless of an area's classification under the

CAA. *See* KV Decl. at Exh. A, pp. 18-19. NEPA's applicability is not restricted to nonattainment

areas. *See id.* This is because NEPA considers the *future* impact of proposed actions on air

quality while CAA attainment status refers to *present* air quality conditions. *See id.*

---

within an area designated by the EPA as being in attainment with NAAQS. For example, in *Friends of the Floridas*, the lead agency's Environmental Assessment (EA) considered a mining project that was located in a county designated as being an attainment area under the CAA. *See Friends of the Floridas v. United States BLM*, No. CIV 20-0924 JB/GBW, 2024 U.S. Dist. LEXIS 155081, at *54 (D.N.M. Aug. 27, 2024). Despite this designation, the agency quantified the project's effect on PM2.5 and PM10 concentrations. *See id.* at 59-64.

In *WildEarth Guardians*, the lead agency created an EIS for an action involving coal mining leases. *See WildEarth Guardians v. BLM*, 8 F. Supp. 3d 17, 24 (D.D.C. 2014). The agency noted the project site was in an attainment area for PM10, but it nonetheless discussed the sources of PM10 pollution, applicable NAAQS, natural background concentrations of PM10, and health impacts of PM10. *See id.* at 34. The agency used long-term modeling to provide information on future PM10 emissions from the coal mining leases. *See id.*

In *Diné Citizens Against Ruining Our Env't*, the lead agency analyzed criteria pollutants pursuant to NEPA despite the region being in attainment with NAAQS. *See Diné Citizens Against Ruining Our Env't v. Haaland*, 59 F.4th 1016, 1045-46 (10th Cir. 2023). The analysis considered the criteria pollutants at highest risk in the area and quantified direct emissions of criteria pollutants from the approved project. *See id.*

In *Southern Utah Wilderness Alliance*, the lead agency's EIS considered a resource management plan that provided multiple use actions on public land. *See S. Utah Wilderness All. v. Burke*, 981 F. Supp. 2d 1099, 1102 (D. Utah 2013). The land was located in a designated attainment area, but the agency still analyzed PM2.5, PM10, carbon monoxide, ozone, and sulfur dioxide emissions associated with resource extraction, grazing, and off-highway vehicle use. *Id.* at 1112.

Plaintiffs' expert also notes that when has worked on EIS and EA projects, almost all have involved emission sources which involved an analysis of PM2.5 from vehicles.

[17]Plaintiffs anticipate TxDOT citing to *Sierra Club v. FHA*, 715 F. Supp. 2d 721 (S.D. Tex. 2010) for the proposition that being designated an attainment area under the CAA excuses NEPA analysis. While this case does refer to the CAA and attainment designations, the Court's decision was based on FHA's conclusion, *after modeling* MSATs, that the project "will not contribute to a violation of NAAQS," and not on FHA's reliance on the project being in an attainment area pre-project. *See Sierra Club*, 715 F. Supp. 2d at 741. Further, this Court is not bound by the District Court's decision or reasoning. *Camreta v. Greene*, 563 U.S. 692, 709 n.7, (2011) ("A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case." (citation omitted)).

Austin was, pre-Project commencement, at the time of analysis, classified as being in attainment or unclassifiable for all criteria pollutants. Based on this, TxDOT asserted that PM2.5 analysis was "not warranted under the CAA." FEIS/Appendix G (Comment/Response Matrix) at AR44486. While TxDOT may be correct in the statement that a conformity evaluation under the CAA was not warranted, TxDOT is incorrect that attainment status pre-Project can remove TxDOT's obligation under NEPA to evaluate reasonably foreseeable future PM2.5 impacts of the Project. *See Border Power Plant Working Grp.*, 467 F. Supp. 2d at 1053-55; *Conservation Law Found.*, 79 F.3d at 1262; *Ctr. for Biological Diversity*, 444 F. Supp. 3d at 870; *Colo. Envtl. Coal.*, 875 F. Supp. 2d at 1257.

Because (1) the I-35 Project will release a traffic-related criteria pollutant of major health concern (i.e., PM2.5), (2) it was completely foreseeable that the EPA would be adopting a new rule that lowered the NAAQS for PM2.5, (3) current PM2.5 concentrations near the I-35 Project were already higher than the new NAAQS for PM2.5, and (4) the City of Austin expressed concern about Austin's attainment status, the final EIS should have disclosed current conditions as well as the anticipated PM2.5 effects from the I-35 Project and alternatives. *See* KV Decl. at Exh. A, p. 19.

The unreasonableness of TxDOT's decision further is demonstrated by the fact that it chose to analyze CO impacts even though the area is in attainment for CO. AR33969. TxDOT offers no reasonable justification for the different treatment of CO and PM2.5, both of which are "traffic-related criteria pollutants." 40 C.F.R. § 93.102. By failing to calculate and analyze Project impacts to PM2.5 pollution levels in Austin, TxDOT violated NEPA.

> **b.    TxDOT incorrectly asserts that it is excused from evaluation of reasonably foreseeable PM2.5 impacts based upon an unspecified FHWA guidance.**

TxDOT depicts FHWA guidance as not recommending "additional PM analysis beyond

the CAA regulatory requirements." FEIS/ Appendix G (Comment/Response Matrix) at

AR44486. TxDOT did not identify what FHWA guidance it relies upon for this conclusion. *See*

*id.* Plaintiffs review of the administrative record identifies no FHWA documents that excuse

NEPA analysis of PM2.5 for transportation projects.

TxDOT's assertion does not constitute the type of reasoned response warranted by

NEPA. *See Chamber of Com*, 85 F.4th at 774; *Envtl. Health Tr.*, 9 F.4th at 904-910. Reference to

an unidentified guidance document that is not included in the administrative record does not

serve NEPA's purpose of fostering informed decision-making and informed public participation.

*See Conservation Congress v. United States Forest Service*, 377 F. Supp. 3d, 1039, 1042 (9th

Cir. 2017). Where the administrative record contains comments and studies addressing the need

for action, an agency must demonstrate that its refusal to consider these is "the product of

reasoned decisionmaking." *Envtl. Health Tr. v. FCC*, 9 F.4th 893, 904-05 (D.C. Cir 2021). The

agency may not rely on the "unexplained conclusions of other federal agencies to justify its own

inaction." *Id.* at 907.

Also, in light of the recent decision by the U.S. Supreme Court to overrule *Chevron*

deference, even if the at-issue FHWA guidance document were in the administrative record and

even if that guidance document did state or support the proposition TxDOT asserts, this Court

should not defer to a clearly erroneous interpretation of NEPA. *See Loper Bright Enters.*, 603

U.S. at 398 (finding *Chevron* deference "defies the command of the APA that 'the reviewing

court'—not the agency whose action it reviews—is to 'decide all relevant questions of law' and

'interpret … statutory provisions'").

      c.    **Conclusory and unsupported statements of decreasing levels of criteria pollutants in the Project area do not meet NEPA's stringent integrity requirements.**

An EIS must be "detailed," and the responsible agency must "ensure professional

integrity, including scientific integrity, of the discussion and analysis in the environmental document," and must "make use of reliable data and resources." 42 U.S.C. § 4332. TxDOT, in a perfunctory response to comments, states that PM2.5 analysis was unnecessary because levels for criteria pollutants have "generally been decreasing over time in Texas and in the local area, even with increases in on-road vehicles over the same time period." FEIS/Appendix G (Comment/ Response Matrix) at AR44486. This general statement, provided without any discussion specific to PM2.5 or the anticipated additional traffic or emissions driven by the I-35 Project,[18] does not consider or address comments and documents provided to TxDOT showing that potentially large emissions and concentrations of PM2.5 are associated with transportation projects. *See* Comments at AR00826, AR00828, AR56599, AR00656. AR00656-AR00656, AR30336, AR30615, AR31043-AR31044, AR31329, AR31366, AR31519. TxDOT's statement does not constitute the type of "reasonably thorough discussion of the significant aspects of probable environmental consequences" required by NEPA. *Great Basin Res. Watch*, 844 F.3d at 1101. In addition, in its proposed rule to lower the PM2.5 NAAQS, the EPA stated that while PM2.5 concentrations have generally trended down over the past decade, this does not mean that PM2.5 concentrations are insignificant, or that they will continue to trend down if road capacity is massively expanded. AR56601, AR56704-AR56704. Also, the EPA remarked that concentrations near roadways proximate to at-risk communities can be significant and should be addressed. *See* AR56704-AR56704. General statements about regional down-trending do not address exposure impacts to near-highway communities.

---

[18] Travis County notes that the Project "represents 42 lane-miles of added highway capacity. This will lead to an increase of 320 million vehicle miles driven every year." AR30384.

**B.**     **Having identified the CAA's attainment status pre-Project as relevant to the depth of NEPA analysis of Project related PM2.5, TxDOT cannot now disregard likely non-attainment status pre-Project (Claim II).**

Plaintiffs' second claim avers that TxDOT's refusal to prepare a supplemental EIS in light of the new primary annual NAAQS for PM2.5, and the fact that Austin is likely to be in non-attainment pre-Project after all, constitutes action unlawfully withheld or action unreasonably delayed in violation of the APA. ECF 32 (First Amended Complaint), pp. 21-25, 35. Supplementation is warranted where "[n]ew information or circumstances relevant to environmental concerns and bearing on the proposed action or its impacts would result in significant environmental impacts not evaluated in the EIS." 23 CFR §771.130(a) (FHWA regulations); *see also* 40 C.F.R. § 1502.9.

While supplementation is not required every time new information comes to light, NEPA does require agencies take a "hard look" at the environmental effects of their action, even after a proposal has received approval. *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 374 (1989). The Supreme Court has explained that in determining whether supplementation is required, the value of the new information is key. *See id.*

> In this respect the decision to prepare a supplemental EIS is similar to the decision whether to prepare an EIS in the first instance: If there remains "major Federal action" to occur, and if the new information is sufficient to show that the remaining action will "affect the quality of the human environment" in a significant manner or to a significant extent not already considered, a supplemental EIS must be prepared.

*Id.* (cleaned up).

Just six months after the I-35 Record of Decision was issued, and before work commenced, the EPA revised the annual PM2.5 NAAQS down from 12 $\mu g/m^3$ to 9 $\mu g/m^3$. *See* 89 Fed. Reg. 16202 at AR56818-AR57022. Based on recent data, the three-year mean for PM2.5 in Austin exceeds 9 $\mu g/m^3$. City of Austin Environmental Commission (2023) at AR56758; KV

Decl. at Exh. A, pp. 24-26. Thus, a premise upon which TxDOT based its decision to not analyze PM2.5 was in fact flawed. *See* section VI.A.5.a above.[19]

On November 4, 2024, TxDOT prepared a memorandum addressing whether it should conduct a supplemental EIS based upon the new NAAQS. TxDOT Memo at C-AR285. TxDOT concluded that supplementation is not required:

> EPA's lowering of the PM2.5 NAAQS does not create a "substantial new circumstance or information about the significance of adverse effects that bear on the analysis" because, until EPA identifies new nonattainment areas associated with the lower NAAQS, there is no change in evaluation criteria that would lead to a different conclusion regarding impacts from what the EIS already disclosed."

*Id.* at AR57026. The agency then re-iterated its position that NEPA does not require analysis of PM2.5 unless and until an area is designated by the EPA as a non-attainment area under the CAA, triggering the CAA's conformity requirements.[20] *See id.* at AR57027-AR57028. As addressed above, the CAA does not excuse TxDOT from NEPA's obligations. *See* section VI.A.5.a. And it is no obvious that the air quality pre-Project exceeds NAAQS.

Furthermore, it is accepted that revision of NAAQS might drive supplementation of NEPA documents, *even before the new NAAQS take effect or results in attainment determinations under the CAA*. On a previous revision to the PM2.5 NAAQS, the EPA stated:

> For proposed actions that have already completed the NEPA process, but have not yet been implemented, we recommend you consider the revised PM2.5 NAAQS to assess whether supplementation would be appropriate.
>
> For conformity evaluations, the revised PM2.5 standard … does not apply until one year after the effective date of nonattainment designations that consider that

---

[19] Plaintiff does not concede that TxDOT should have stopped its inquiry at determining attainment status under the CAA. Another flaw in TxDOT's logic is that TxDOT's NEPA obligations could be ignored on the occasion of another agency—the EPA—failing or delaying its obligations under the CAA.

[20] Remarkably, TxDOT admits the CAA "does not now, and may never trigger" analysis of PM2.5 impacts for transportation projects. *Id.* at AR57028.

standard.

KV Decl. at Exh. A, p. 24 (quoting 2007 EPA memorandum). Here, TxDOT avoided any serious

consideration of the effects of the Project on PM2.5 pollution.

The I-35 Project has not yet been constructed, and the new NAAQS constitute new

circumstances or information that bear on adverse environmental effects not evaluated in the

FEIS–by TxDOT own selected relevant measure. Plaintiffs' expert puts it this way:

> TxDOT acted unreasonably in failing to conduct additional analysis and prepare a
> supplemental EIS after the U.S. EPA finalized a new NAAQS for PM2.5,
> particularly since in its initial analysis it chose not to consider the possibility that
> the selected alternative would cause PM2.5 in excess of the NAAQS during
> operation. Austin currently exceeds the new annual PM2.5 NAAQS and
> emissions from the Project are likely to have significant adverse effects. It is not
> reasonable for TxDOT to have relied upon the CAA NAAQS to dismiss air
> quality concerns under NEPA, and then not conduct further analysis when that
> same standard, previously selected by TxDOT to avoid analysis, is now exceeded.

KV Decl. at Exh. A, p. 29.

As such, if relief on Plaintiffs' first claim is not granted, this Court should order that

TxDOT conduct a supplemental EIS that analyzes PM2.5 effects. *See* 23 C.F.R. §771.130(a); 40

C.F.R. § 1502.9.

### C.    The Proper Remedy is vacatur.

Vacatur to set aside a project's approval is the presumptive remedy in NEPA and APA

cases. *See Texas v. United States*, 126 F.4th 392, 418 (5th Cir. 2025); *Pub. Emples. for Envtl.

Responsibility v. United States Fish & Wildlife Serv.*, 189 F. Supp. 3d 1, 3 (D.C. Cir. 2016).

Remand without vacatur is limited to "rare cases." *See Texas*, 126 F.4th at 418. "This accords

with the APA itself, which requires a reviewing court to 'hold unlawful and set aside agency

action' found to be unlawful." *Tex. Med. Ass'n v. United States HHS*, 587 F. Supp. 3d 528, 548

(E.D. Tex. 2022)(quoting 5 U.S.C. § 706(2)). In addressing this issue, courts consider two factors

to determine whether vacatur is appropriate: (1) the seriousness of the deficiencies or errors, and

(2) the disruptive consequences of ordering vacatur. *See Id.* Because vacatur is the presumptive remedy, defendants bear the burden of demonstrating otherwise. *Mock v. Garland*, No. 4:23-CV-00095-O, 2024 U.S. Dist. LEXIS 105230, *17-18 (N.D. Tex. 2024).

For the first factor, TxDOT would need to demonstrate there is "at least a serious possibility" that it will be able to substantiate its decision not to analyze PM2.5. *Cent. & S. W. Servs. v. United States EPA*, 220 F.3d 683, 692 (5th Cir. 2000). And, where the laws' procedural requirements have been violated, vacatur remains the presumptive remedy because "[a]n illegitimate agency action is void *ab initio*." *Mock v. Garland*, No. 4:23-CV-00095-O, 2024 U.S. Dist. LEXIS 105230, *17 (N.D. Tex. 2024). Here, as addressed above, TxDOT's error is based on a misinterpretation of NEPA and the CAA, as well as a failure to consider and respond to substantive comments from the public, the City of Austin, and Travis County and a failure to rely on currently available science. By ignoring the requirements of the APA and NEPA, TxDOT's adoption of the I-35 Project thwarted NEPA's very purpose of ensuring careful consideration of environmental impacts *before* reaching a decision and fostering informed decision-making and informed public participation. *See Robertson*, 490 U.S. at 349; *Conservation Cong.*, 377 F. Supp. 3d at 1042.

As to the second factor, where any disruption is "self-inflicted" and could have been avoided "by delaying preparatory work until the litigation was resolved," vacatur remains the presumptive remedy. *Texas v. Biden*, 554 F. Supp. 3d 818, 854 (N.D. Tex. 2021). TxDOT issued the Record of Decision for the I-35 Project in August of 2023. AR33577. Plaintiffs filed their original complaint in January of 2024. ECF 1. Accordingly, TxDOT will not be able to demonstrate any disruption significant enough to depart from the presumptive remedy of vacatur.

Upon this Court's order, Plaintiffs also will seek incurred attorney fees and costs pursuant

to 28 U.S. Code § 2412.

## VII.    CONCLUSION

NEPA requires TxDOT to take a "hard look" at reasonably foreseeable environmental impacts, which include impacts associated with PM2.5 emissions and on the public health. The I-35 Project will worsen air quality conditions at a level that the EPA recognizes is unsafe for humans. Accordingly, Plaintiffs request summary judgment and an order granting them the requested relief.

Respectfully Submitted,

Dated: April 3, 2025

By:    */s/ Rachel S. Doughty*
Rachel S. Doughty (Cal. Bar No. 255904)
*Admitted Pro Hac Vice*
GREENFIRE LAW, PC
2748 Adeline Street, Suite A
Berkeley, California 94703
Telephone: (510) 900-9502
rdoughty@greenfirelaw.com

*Attorneys for Plaintiffs*

Dated: April 3, 2025

By:    */s/ Robert J. Levinski*
Robert J. Levinski (Texas Bar No. 24097993)
Victoria Rose (Texas Bar No. 24131088)
William G. Bunch (Texas Bar No. 0334520)
SAVE OUR SPRINGS ALLIANCE
4701 Westgate Boulevard, Suite D-401
Austin, Texas 78745
Telephone: (512) 477-2320
bobby@sosalliance.org
victoria@sosalliance.org
bill@sosalliance.org

*Attorneys for Plaintiffs*

39

**CERTIFICATE OF SERVICE**

I certify that on April 3, 2025, I electronically filed the foregoing with the Clerk of the

Court using the CM/ECF system, which will automatically notify all counsel of record via email.

_____

Jessica San Luis