## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| RETHINK35, et al., | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 1:24-CV-00092 |
| | § | |
| TEXAS DEPARTMENT OF | § | |
| TRANSPORTATION (TxDOT), | § | |
| | § | |
| *Defendant.* | § | |

## PLAINTIFFS' REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND PLAINTIFFS' RESPONSE TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

Robert J. Levinski (Texas Bar No. 24097993)
Victoria Rose (Texas Bar No. 24131088)
William G. Bunch (Texas Bar No. 0334520)
SAVE OUR SPRINGS ALLIANCE
4701 Westgate Boulevard, Suite D-401
Austin, Texas 78745
Telephone: (512) 477-2320
bobby@sosalliance.org
victoria@sosalliance.org
bill@sosalliance.org

*Attorneys for Plaintiffs*

Rachel S. Doughty (Cal. Bar No. 255904)
*Admitted Pro Hac Vice*
GREENFIRE LAW, PC
2748 Adeline Street, Suite A
Berkeley, California 94703
Telephone: (510) 900-9502
rdoughty@greenfirelaw.com

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................................................iii

I.  Introduction ......................................................................................................................... 1

II.  Undisputed Facts.................................................................................................................. 2

III.  Argument ............................................................................................................................. 3

    A.  TxDOT does not establish it took the required "hard look" at the impacts of its proposed Project on the effects to PM2.5 pollution in Austin. ........................................... 3

        1. The CAA's conformity process, which is not currently applicable to the I-35 Project, cannot excuse TxDOT's obligation to comply with NEPA *before* committing to a course of action. ...................................................................................................... 4

        2. The cases relied upon by TxDOT do not support its position or should not be followed. ........................................................................................................................ 9

        3. FHWA policy guidance cannot dictate NEPA's requirements. ..................................... 12

        4. TxDOT's EIS lacks the scientific integrity required by NEPA. ................................... 13

    B.  TxDOT improperly failed to Supplement based on the new PM2.5 NAAQS.................. 14

    C.  TxDOT improperly seeks reconsideration of this Court's order allowing the declaration and report of Plaintiffs' expert, Krish Vijayaraghavan. .................................................... 18

    D.  Vacatur is the presumptive and appropriate remedy. ...................................................... 20

        1. The failure to even attempt to predict the air quality impacts of the Project is serious. ........................................................................................................................ 20

        2. Any responsibility for disruption as a result of vacatur is a result of TxDOT's own actions. .................................................................................................................... 24

            a)  TxDOT ignored numerous requests to prepare a proper EIS before commencing the Project. ........................................................................................................ 25

            b)  Defendants were aware of this litigation before commencing work. ................ 25

            c)  Defendants have needlessly prolonged litigation. ............................................ 25

IV.  Conclusion ......................................................................................................................... 28

## TABLE OF AUTHORITIES

**Cases**

*Barnes v. FAA*, 865 F.3d 1266 (9th Cir. 2017) ............................................................... 11

*Bend v. United States Army Corps of Eng'rs*, Civil Action No. 2:21-CV-00161, 2023
    U.S. Dist. LEXIS 174254 (S.D. Tex. 2023) ............................................................ 23

*Border Power Plant Working Group v. DOE,* 260 F. Supp. 2d 997 (S.D. Cal. 2003) ................ 12

*Calvert Cliffs' Coordinating Committee, Inc. v. United States Atomic Energy Com.*, 449 F.2d
    1109 (D.C. Cir. 1971) ..................................................................................... 4

*Camreta v. Greene*, 563 U.S. 692 (2011) ..................................................................... 10

*Chamber of Com. v. SEC*, 85 F.4th 760 (5th Cir. 2023) .................................................. 2, 13, 20

*Christensen v. Harris Cnty.*, 529 U.S. 576 (2000) ......................................................... 13

*Citizens & Ret'd Miners Coal. v. U.S. Forest Serv.*, 279 F.Supp.3d 898 (D. Ariz. 2017) .......... 16

*Citizens for Clean Air v. United States DOT,* 98 F.4th 178 (5th Cir. 2024) ..................... 1, 3, 7, 15

*Coalition for the Advancement of Reg'l Transp. v. FHA* ("*CART*") ............................................. 11

*Colorado Environmental Coalition v. Salazar*, 875 F. Supp. 2d 1233 (D. Colo. 2012) .............. 10

*Ctr. for Biological Diversity v. United States Forest Serv. Case*, 444 F. Supp. 3d 832
    (S.D. Ohio 2020) ......................................................................................... 9, 10, 19

*Custer Cty. Action Ass'n v. Garvey*, 256 F.3d 1024 (10th Cir. 2001) ................................... 15

*Diné Citizens Against Ruining Our Env't v. Haaland*, 59 F.4th 1016 (10th Cir. 2023) .............. 20

*Envtl. Health Tr. v. FCC*, 9 F.4th 893 (D.C. Cir 2021) ............................................ 2, 12, 13, 20

*Friends of the Floridas v. United States BLM*, 746 F. Supp. 3d 1039 (D.N.M. 2024) ................ 19

*Great Basin Res. Watch*, 844 F.3d 1095 (9th Cir. 2016) .................................................. 19

*Healthy Gulf v. FERC*, 107 F.4th 1033 (D.C. Cir. 2024) ................................................. 7

*League of Wilderness Defs. - Blue Mts. Biodiversity Project v. Forsgren*, 184 F. Supp. 2d 1058 (D. Or. 2002) ........................................................................................................... 13

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) ............................................. 13

*Louisiana v. Fed. Power Com.*, 503 F.2d 844 (5th Cir. 1974) ............................... 3, 8, 20

*Marsh v. Or. Nat. Res. Council*, 490 U.S. 360 (1989) ............................................. 1, 21

*Maryland Chapter of Sierra Club v. FHWA*, Civil Action No. DKC 22-2597, 2024 U.S. Dist. LEXIS 48927 (D. Md. Mar. 20, 2024) .............................................................. 10, 11

*Mock v. Garland*, No. 4:23-CV00095-O, 2024 U.S. Dist. LEXIS 105230 (N.D. Tex. 2024) ...................................................................................................................... 20, 21

*O'Reilly v. All State Fin. Co.*, No. 22-30608, 2023 U.S. App. LEXIS 27107 (5th Cir. 2023) ..... 12

*Ondrusek v. United States Army Corps of Eng'rs*, 123 F.4th 720 (5th Cir. 2024) ........................ 1

*Pub. Emples. for Envtl. Responsibility v. United States Fish & Wildlife Serv.*, 189 F. Supp. 3d 1 (D.C. Cir. 2016) ......................................................................................... 20

*Robertson v. Methow Valley Citizens*, 490 U.S. 332 (1989) ................................................... passim

*S. Utah Wilderness All. v. Burke*, 981 F. Supp. 2d 1099 (D. Utah 2013) .................................... 20

*Save Our Wetlands, Inc. v. Sands*, 711 F.2d 634 (5th Cir. 1983) ................................................ 21

*Scientists' Institute for Public Information, Inc. v. AEC*, 481 F.2d 1079 (1973) ......................... 21

*Sierra Club v. FERC*, 867 F.3d 1357 (D.C. Circ. 2017) ...................................................... 6, 7, 17

*Sierra Club v. FHA* ("*Grand Parkway Sierra Club*"), 715 F.Supp.2d 721 (S.D. Tex. 2010) ...... 11

*Sierra Club v. FHA*, 2018 U.S. Dist. LEXIS 56243 (D. Colo. Apr. 3, 2018) ............................. 11

*Sierra Club v. Sigler*, 695 F.2d 957 (5th Cir. 1983) ..................................................................... 4

*Sierra Club v. United States DOT*, a 2004 case in Nevada ("*Nevada Sierra Club*"), 310 F. Supp. 2d 1168 (D. Nev. 2004) ............................................................................................ 12

iv

*Spiller v. White*, 352 F.3d 235 (5th Cir. 2003) ................................................................... 24

*Tex. Med. Ass'n v. United States HHS*, 587 F. Supp. 3d 528 (E.D. Tex. 2022) ........................... 20

*Texas v. Biden*, 554 F. Supp. 3d 818 (N.D. Tex. 2021) ............................................................. 24

*Texas v. United States*, 126 F.4th 392 (5th Cir. 2025) ............................................................. 20

*TOMAC v. Norton*, 433 F.3d 862 (D.C. Cir. 2006) ............................................................. 14, 15

*Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457 (2001) ................................................................ 15

*WildEarth Guardians v. BLM*, 8 F. Supp. 3d 17 (D.D.C. 2014) ................................................. 19

*WildEarth Guardians v. Zinke,* 368 F. Supp. 3d 41 (D.D.C. 2019) .............................................. 2

**Statutes**

42 U.S.C. § 4321 ............................................................................................................ 20, 21

42 U.S.C. § 4332 .............................................................................................................. 7, 17

42 U.S.C. § 4335 ................................................................................................................... 4

42 U.S.C. § 4336 ................................................................................................................... 7

42 U.S.C. § 7407(d) ............................................................................................................ 6, 8

42 U.S.C. § 7408 ................................................................................................................... 5

42 U.S.C. § 7409 ............................................................................................................... 5, 7

42 U.S.C. § 7506 ............................................................................................................... 5, 6

42 U.S.C. § 7506(c)(1) ........................................................................................................... 6

42 U.S.C. § 7506(c)(5) ......................................................................................................... 5, 6

**Other Sources**

Air Quality Designations for the 2012 Primary Annual Fine Particle (PM2.5) National Ambient
  Air Quality Standards (NAAQS), 80 Fed. Reg. 10, 2208, 2271-2274 (Jan. 15, 2015) .............. 8

FHWA, Tech. Advisory T 6640.8A, Guidance for Preparing and Processing Environmental and Section 4(F) Documents, (Oct. 30, 1987) (FHWA Guidance), at https://www.environment.fhwa.dot.gov/legislation/nepa/ ......................................................... 9

National Ambient Air Quality Standards for Particulate Matter, 78 Fed. Reg. 10, 3086 (Jan. 15, 2013) ............................................................................................................................ 5

Reconsideration of the National Ambient Air Quality Standards for Particulate Matter, 89 Fed. Reg. 45, 16202 (Mar. 6, 2024) ........................................................................... 5, 17

**Rules**

Fed. R. Civ. P. 56(a) ......................................................................................... 3, 14

**Regulations**

23 C.F.R. §771.130(a) ............................................................................................. 18

40 C.F.R. § 93.102(b) ............................................................................................. 5

## I.    Introduction

NEPA generally requires that agencies "consider the impacts of major actions *before* concluding them." *Ondrusek v. United States Army Corps of Eng'rs*, 123 F.4th 720, 731 (5th Cir. 2024)(emphasis original). Here, TxDOT has neither studied nor presented in its EIS what the concentration of PM2.5 may be if it proceeds with the Project, despite that analysis being a common standard. *See* ECF 72 (Plaintiffs' Opening Brief), pp. 30-31 n. 16; ECF 72-4 (Vijayaraghavan Decl.), p. 13. In this way, TxDOT failed to comply with the National Environmental Policy Act's (NEPA) procedure requirements which "ensure the government takes a 'hard look' at the effects of its decisions before approving projects that alter our shared environment." *Citizens for Clean Air v. United States DOT,* 98 F.4th 178, 189 (5th Cir. 2024) (citing *Robertson*, 490 U.S. at 356).

Defendant's Opposition boils down to an argument that the conformity requirements of the Clean Air Act (CAA), which potentially may become applicable at some point in the future, but only after health-protective standards for PM2.5 are exceeded, somehow excuse NEPA's pre-project statutory directives to take a "hard look" at reasonably foreseeable future environmental impacts associated with its proposed project. *See* ECF 75, pp. 20-29. Relying on this imagined free pass, TxDOT openly admits that it has not at this time considered the future impacts of the proposed project on air quality at all—not under the CAA or any other framework. Instead, it improperly defers *possible* analysis to some possible and unidentifiable later date, after resources will have been irretrievably committed to the Project. *See id.*, p. 31. This completely ignores NEPA's foundational "sweeping commitment" to

> prevent or eliminate damage to the environment and biosphere by focusing Government and public attention on the environmental effects of proposed agency action. 42 U.S.C. § 4321. By so focusing agency attention, NEPA ensures that the agency will not act on incomplete information, only to regret its decision after it is too late to correct."

*Ondrusek v. United States Army Corps of Eng'rs*, 123 F.4th 720, 729 (5th Cir. 2024)(quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 371 (1989)). Plaintiffs are entitled to informed

decision-makers and to be informed participants in the public process. *See WildEarth Guardians v. Zinke,* 368 F. Supp. 3d 41, 52 (D.D.C. 2019). TxDOT's wait-and-see gamble illegally ignores NEPA's information forcing purpose.

## II.     Undisputed Facts

The following key facts have been established by Plaintiffs and are undisputed by Defendant in their 50-page brief:

1.     Large emissions of PM2.5 are associated with highway projects. These PM2.5 emissions are caused by emissions from mobile sources, stationary sources, and fugitive sources which include emissions generated through vehicle exhaust, abrasive processes (brake, clutch, and tire wear; road surface wear), and re-suspended road dust. *See* ECF 72, pp. 23-24. Defendant TxDOT was aware of these large emissions and emission sources. *See id.*, n. 5. In its Opposition, Defendant does not challenge these facts.

2.     PM2.5 exposure is the fifth leading risk factor for death in the world and causes myriad health issues (including low birth weight, respiratory disease, cardiovascular disease, neurodegeneration, and reduced cognitive function). *See* ECF 72, pp. 29-30. Defendant TxDOT was aware of the well-documented scientific literature showing that both short- and long-term exposure to PM2.5 causes severe negative health impacts. *See id.*, pp. 30-34. In its Opposition, Defendant does not challenge these facts.

3.     The public, the City of Austin, and Travis County submitted comments on the DEIS to TxDOT, as well as scientific articles and relevant literature, addressing the need for TxDOT to analyze PM2.5 and air quality impacts. *See* ECF 72, pp. 19-20, 31-35. TxDOT did not reasonably respond to these comments. *See id.* In its Opposition, Defendant does not challenge these facts.[1]

---

[1] In its Opposition, TxDOT spends several pages arguing that its NEPA review was comprehensive based upon the number of pages in the administrative record, and contends that the agency's engagement with the public was procedurally sufficient based upon stakeholders' and the public's involvement in "planning future I-35 upgrades almost continually since 1989." *See* ECF 75, pp. 11, 15-16, 48-50. But, the size of the administrative record is immaterial. NEPA's requirements are not met by generating information that does not address significant issues. *See WildEarth Guardians,* 368 F. Supp. 3d at 53. NEPA requires more than offering the public opportunity to comment or engage; it requires lead agencies to reasonably respond to opposing views raised in comments. *See Chamber of Com. v. SEC*, 85 F.4th 760, 774 (5th Cir. 2023); *Envtl. Health Tr. v. FCC*, 9 F.4th 893, 904-10 (D.C. Cir 2021).

4.     In its EIS, TxDOT did not analyze the reasonably foreseeable future PM2.5 emissions generated by the I-35 Project and how they will impact Austin residents. *See* ECF 72, pp. 35-41; AR33968-AR33975; C-AR57027; ECF 75-3, at p. 4. In its Opposition, Defendant asserts it did "analyze" PM2.5 emissions; however, a more accurate paraphrasing of what the opposition brief describes is that TxDOT chose not to conduct any analysis of expected emissions because it assumed the framework of the CAA relieved it of this duty. *See* ECF 75, pp. 20-25; C-AR57027.

## III.     Argument

### A.     TxDOT does not establish it took the required "hard look" at the impacts of its proposed Project on the effects to PM2.5 pollution in Austin.

NEPA's "hard look" obligation requires agencies to consider all reasonably foreseeable *future* environmental impacts from a proposed project. *Robertson*,  490 U.S. at 348-51; *Citizens for Clean Air*, 98 F.4th at 189. Plaintiffs' opening brief establishes that (1) highway projects, including the I-35 Project, are associated with an increase in PM2.5 emissions as evidenced by a number of scientific journals, as well as literature published by the U.S. Environmental Protection Agency (EPA) and TxDOT, of which TxDOT was aware at the time the EIS was adopted, and (2) despite the reasonably foreseeable increase in PM2.5 emission associated with the I-35 Project, TxDOT chose not to quantify or analyze the future expected PM2.5 emissions and their expected impact on the public. *See* ECF 72, pp. 22–27, 29-41. Defendant's motion does not dispute these facts, and as such, summary judgment is appropriate. *See* Fed. R. Civ. P. 56(a).

Nonetheless, TxDOT argues it complied with NEPA because it considers the I-35 Project's PM2.5 impacts through the CAA framework, asserting that this framework excuses TxDOT from undertaking project-specific analyses to accurately assess and communicate the significant air quality impacts of the I-35. As addressed below, this argument is not supported by statute or case law, and no authority  binding in the Fifth Circuit supports this approach to NEPA compliance. NEPA is a forward-looking statute that requires agencies "to predict the environmental effects of proposed action before the action is taken and those effects are fully known." *See Louisiana v. Fed. Power Com.*, 503 F.2d 844, 875-76 (5th Cir. 1974). Other environmental statutes, such as the CAA, cannot replace this NEPA requirement. *See* 42 U.S.C. §

4335 (NEPA's "policies and goals [...] are supplementary to those set forth in existing

authorizations of Federal agencies"). The D.C. Circuit addressed this in the landmark *Calvert*

*Cliffs' Coordinating Committee, Inc. v. United States Atomic Energy Com*., 449 F.2d 1109 (D.C.

Cir. 1971), holding that:

> all that Section 104 of NEPA does is to reaffirm other "specific statutory
> obligations." Unless those obligations are plainly mutually exclusive
> with the requirements of NEPA, the specific mandate of NEPA must
> remain in force. In other words, Section 104 can operate to relieve an
> agency of its NEPA duties only if other "specific statutory obligations"
> clearly preclude performance of those duties.

449 F.2d 1109, 1125 (1971); accord *Sierra Club v. Sigler*, 695 F.2d 957, 967 (5th Cir. 1983)("The

mandate to develop and use environmentally conscious decisionmaking procedures found in

[NEPA] is supplementary to existing policy mandates of federal agencies"). The CAA does not

preclude NEPA's analysis and may not be used to evade NEPA's requirements.

> **1.  The CAA's conformity process, which is not currently applicable to the I-35
> Project, cannot excuse TxDOT's obligation to comply with NEPA *before*
> committing to a course of action.**

      TxDOT's sole contention is that it considers the I-35 Project's PM2.5 impacts through the

CAA framework, asserting that this framework excuses TxDOT from undertaking project-

specific analyses to confirm that the I-35 Project will not contribute to significant air quality

impacts. *See* ECF 75, pp. 20-29. TxDOT's framework proceeds as follows:

> 1.  Identification of whether the project is currently located in a
> nonattainment or maintenance area for particulate matter,
>
> 2. Determination of whether the project is exempt from conformity
> requirements,
>
> 3. Decision from the Consultation Partners as to whether the project is a
> project of air quality concern (POAQC), and
>
> 4. Preparation of a hot-spot analysis for the POAQC that demonstrates
> that it will either not exceed the current PM NAAQS or at least be better
> than the no-build alternative.

C-AR57027 (Memorandum of Doug Booher, November 4, 2024). In this case "**the evaluation under the CAA framework never proceeded past step 1** because Travis County was designated as attainment/unclassifiable for PM$_{2.5}$." *Id.* (emphasis added); *accord*, 75-3, p. 4 ("Travis County is currently designated attainment/unclassifiable for PM2.5, therefore the additional evaluation requirements associated with conformity do not currently get triggered."). In other words, because Travis County is currently designated attainment/unclassifiable, "it did not then [at time of approval], does not now, and may never trigger additional air quality analysis." C-AR57027 at p. 5. As a result, the "CAA framework" relied upon by TxDOT cannot possibly meet NEPA's requirements in an attainment/unclassifiable area because it is necessarily not forward-looking.

Defendant TxDOT improperly and repeatedly attempts to conflate the PM2.5 standard (PM2.5 NAAQS) with the conformity process triggered by nonattainment, arguing that Travis County's present designation of attainment/unclassifiable for the PM2.5 NAAQS automatically means that the Project will not contribute to a violation of NAAQS and excuses the agency from undertaking project-specific analysis. *See* ECF 75, pp. 20-22. NAAQS are *numerical limits*[2] set by the U.S. EPA for six air pollutants (referred to as criteria pollutants) that define the maximum allowable concentrations of these pollutants in the outdoor air. *See* 42 U.S.C. §§ 7408-7409. Conformity is an iterative *process*[3] agencies must engage when considering and implementing

---

[2] The primary annual NAAQS for PM2.5 was 12.0 μg/m$^3$ from March 18, 2013, through May 6, 2024, at which time the primary annual NAAQS was revised to 9.0 μg/m$^3$. *See* National Ambient Air Quality Standards for Particulate Matter, 78 Fed. Reg. 10, 3086 (Jan. 15, 2013)(to be codified at 40 C.F.R. pts. 50, 51, 52, 53 and 58); 89 Fed. Reg. 45, 16202 (Mar. 6, 2024). Data from monitoring locations in Austin, which are part of the U.S. EPA's Air Quality System, show Austin currently exceeds the 9.0 μg/m$^3$ NAAQS for PM2.5. *See* ECF 72-4 (Vijayaraghavan Decl.), pp. 28-30; *see also* ECF 75-3, p. 9).

[3] CAA conformity provisions do not presently apply to the area where the I-35 Project will be built. *See* 42 U.S.C. § 7506(c)(5). Section 7506 of the CAA addresses conformity, with subsection (c)(5) providing conformity determinations "apply only with respect to" nonattainment and maintenance areas. *See id.* (emphasis added); *see also* 40 C.F.R. § 93.102(b).

projects that may impact air quality, but only when those projects are located in nonattainment or maintenance areas (areas previously found to not meet NAAQS).[4] *See* 42 U.S.C. §§ 7407(d); 7506. The conformity *process* does not apply to attainment areas (areas previously found to meet NAAQS) or unclassifiable areas (areas that cannot be classified on the basis of available information as meeting or not meeting NAAQS). *See id.* at §§ 7407(d); 7506(c)(5). This is nonsensical.

Under NEPA, agencies may compare a project's anticipated air quality emissions to the limits established by NAAQS to determine whether the project will significantly affect the quality of the human environment. *See Sierra Club v. FERC*, 867 F.3d 1357, 1367, 1370 n.7 (D.C. Circ. 2017). In *Sierra Club v. FERC*, the D.C. Circuit Court of Appeals noted that it would defer to an agency's choice of reasonable analytical methodologies, which included deferring to

---

Where an area has been designated as being in nonattainment or maintenance, the agency must demonstrate that a proposed project conforms to an implementation plan (such as a State Implementation Plan, or SIP). *See* 42 U.S.C. § 7506(c)(1).

Conformity to an implementation plan means—

(A) conformity to an implementation plan's purpose of eliminating or reducing the severity and number of violations of the national ambient air quality standards and achieving expeditious attainment of such standards; and

(B) that such activities will not—

(i) cause or contribute to any new violation of any standard in any area;

(ii) increase the frequency or severity of any existing violation of any standard in any area; or

(iii) delay timely attainment of any standard or any required interim emission reductions or other milestones in any area.

The determination of conformity shall be based on the most recent estimates of emissions, and such estimates shall be determined from the most recent population, employment, travel and congestion estimates as determined by the metropolitan planning organization or other agency authorized to make such estimates.

*Id.*

[4] The U.S. EPA defines a nonattainment area as an area "that does not meet (or that contributes to ambient air quality in a nearby area that does not meet) the [NAAQS]" for a criteria pollutant. *See* 42 U.S.C. § 7407(d). A maintenance designation refers to an area that was previously designated as a nonattainment area but has since been redesignated as an attainment area. *See id.*

the agency's reliance on NAAQS "as a standard of comparison for air-quality impacts." *Sierra Club v. FERC*, 867 F.3d 1357, 1370 n.7 (D.C. Circ. 2017). That is, in an EIS, an agency may compare "a project's expected emission levels" with the NAAQS to enable "decisionmakers and the public to meaningfully evaluate the project's air-pollution effects by reference to a generally accepted standard." *Sierra Club*, 867 F3d at 1370 n. 7. The EPA's MOVES model or similar models are frequently used to predict future emissions. *See* ECF 72, pp. 30-31 n. 16; ECF 72-4, pp. 9, 16. Then those predicted future emissions may be compared to the limits set by NAAQS, which are intended to "protect the public health." 42 U.S.C. § 7409; *see Healthy Gulf v. FERC*, 107 F.4th 1033, 1044 (D.C. Cir. 2024).[5]

Defendant asserts that its NEPA review may rely on NAAQS to analyze air quality impacts, acknowledging that NAAQS establishes "levels of concern." *See* ECF 75, p. 20. That is where TxDOT's evaluation ended, and that omission of the next step, is where the NEPA violation occurs. TxDOT's NEPA review contains no discussion of anticipated PM2.5 emissions which could be compared to the PM2.5 NAAQS. *See* ECF 72, pp. 21-27, 35-39. As a result, TxDOT violated NEPA's hard look requirement. *See Robertson*,  490 U.S. at 348-51; *Citizens for Clean Air*, 98 F.4th at 189.

In its Opposition, Defendant argues that it is excused from considering anticipated emissions, stating: "TxDOT's conclusion that, as a consequence of EPA having found Travis County to be in attainment or unclassifiable for each of the criteria pollutants, the Project would not cause or contribute to a violation of any NAAQSs is valid, supported by science, and sufficient to discharge its NEPA responsibilities." *See* ECF 75, pp. 20-21. Defendant cites to no supporting statute or case that supports this argument, and the argument defies NEPA's mandate to "to predict the environmental effects of proposed action before the action is taken and those

---

[5] No statute or case mandates that NAAQS must be considered when conducting a NEPA review—an agency could select another numerical limit by which to evaluate and present the impacts of their proposed action, so long as the limit rationally allows for assessment of a project's reasonably foreseeable significant effects. *See* 42 U.S.C. §§ 4332, 4336; *Citizens for Clean Air*, 98 F.4th at 194.

effects are fully known." *See Louisiana v. Fed. Power Com.*, 503 F.2d 844, 875-76 (5th Cir. 1974). Also, the fact that Travis County was previously designated (in 2015) as being in attainment or unclassifiable only means *at that time,* the U.S. EPA found the County had *either* met the PM2.5 NAAQS *or* sufficient air information was not available to allow the U.S. EPA to determine whether the County met the PM2.5 NAAQS. *See* Air Quality Designations for the 2012 Primary Annual Fine Particle (PM2.5) National Ambient Air Quality Standards (NAAQS), 80 Fed. Reg. 10, 2206, 2208, 2271-2274 (Jan. 15, 2015)(to be codified at 40 CFR Part 81.[6] The designation is a snapshot in time that in no way addresses whether the PM2.5 emissions generated by the Project will cause the Project area to exceed the PM2.5 NAAQS in the future.

TxDOT's argument goes further, with the agency stating the U.S. EPA's designation of Travis County as attainment/unclassifiable for PM2.5 "operates as *both* a statement of the current status of area air quality *and* a determination that such projects need not undertake project-specific analyses to confirm that no contribution to a potential NAAQS violation is likely." ECF 75, p. 12 (emphasis in original). They cite to Mr. Wood's memo for this contention. But this is not what Mr. Wood's memo says. The quoted material is in a paragraph explaining what *would* happen were Travis County to fall into nonconformity for PM2.5. See ECF 75-3, p. 4. Mr. Wood directly states that transportation conformity does not apply to the Project: "the CapEx-C project did not trigger this additional level of analysis because it is currently identified as attainment/unclassifiable for PM2.5." *Id.* at pp. 4-5. An analysis that has not happened cannot possibly fulfill NEPA's pre-project analysis requirement.[7] *See id.*

---

[6] Travis County's current designation does *not* indicate that its "current status" (as TxDOT and its expert, Tim Wood, allege) shows the County is in "attainment" for PM2.5 as defined by the CAA. ECF 75, p. 12; 42 U.S.C. § 7407(d). Conveniently, TxDOT ignores that the County's designation is "unclassifiable/attainment."

[7] TxDOT devotes several pages to explaining the CAA's provisions regarding conformity, noting that a project's conformity to a SIP means it "will not cause or contribute to any area" nor "increase the frequency of severity of any existing violation of any standard in any area." ECF 75, p. 21. To the extent the Court finds the CAA's conformity provisions are somehow applicable to this case (and it should not), the Court should find TxDOT violated NEPA because it did not address the State's SIP in its EIS.

Finally, it is unlikely that Travis County will ever be designated nonattainment because of I-35 emissions, because the Texas Commission on Environmental Quality (TCEQ) excludes emissions associated with I-35 in assessing the level of Travis County PM2.5 pollution. Defendants cite to the TCEQ's Interoffice Mem., Dkt. No. 2024-1660-MIS, Comm'n Approval for the 2024 Primary Annual Fine Particulate Matter (PM2.5) Nat'l Ambient Air Quality Standard (NAAQS) State Designations at A-1 (Nov. 26, 2024) ("TCEQ Designations Memo")) in their brief. ECF 75, p. 21, n.5. What Defendant did not disclose to the Court and to the public in its NEPA analysis was that "[u]suing certified data, 10 counties with regulatory monitors have 2023 annual PM2.5 design values greater than 9.0 $\mu g/m^3$," including Travis, where the Project is proposed. *See* Lovko Decl. Exh. 13, p 2. "Travis County has two monitors exceeding the 2024 annual PM2.5 standard. . . .  TCEQ will identify the Austin North Interstate 35 monitor as not suitable for comparison against the annual PM2.5 NAAQS due to the monitor not being representative of area-wide air quality." *Id.*, p. 3, n. 2. In other words, the air in the I-35 corridor is already so dirty pre-Project that including it will pull the entire County into nonattainment. The solution: ignore the data.[8]

### 2. The cases relied upon by TxDOT do not support its position or should not be followed.

There is no binding caselaw in the Fifth Circuit to guide the Court in interpreting the legality of TxDOT's approach to PM2.5 analysis for NEPA. There is persuasive authority. Plaintiffs' opening brief cites *Ctr. for Biological Diversity v. United States Forest Serv. Case*, 444 F. Supp. 3d 832, 869-70 (S.D. Ohio 2020) ("*CBD*"). ECF 72, pp. 37-38. Although not a Fifth Circuit case, it directly addresses TxDOT's argument. In that case, the Defendants asserted that

---

[8] Austin residents of the I-35 Corridor—those most burdened with breathing the tailpipe and other PM2.5 emissions of the existing road and the proposed Project—might be excused for invoking the modeling adage "garbage in, garbage out" when reviewing agency statements about the PM2.5 attainment status of Travis County. The Court, however, should not ignore the implications of TxDOT relying on the "CAA framework" to avoid NEPA analysis of the likely impacts of the Project, and then rigging the data to ensure that the much-touted conformity provisions are never triggered.

because the project area was in CAA attainment, they were not required to analyze anticipated air quality impacts from the project under NEPA. See *CBD* at 869-70. The Court disagreed, stating "the fact that an area is currently within the permissible air quality limits does not necessarily mean that it will be in attainment in the future, there must be a focus on future estimations as well." *Id.* at 870 (relying on *Colorado Environmental Coalition v. Salazar*, 875 F. Supp. 2d 1233, 1256-59 (D. Colo. 2012)). *CBD* was correctly decided.

Defendant's Opposition relies substantially upon *Maryland Chapter of Sierra Club v. FHWA*, Civil Action No. DKC 22-2597, 2024 U.S. Dist. LEXIS 48927 (D. Md. Mar. 20, 2024) ("*Maryland Chapter*"); Appeal filed (May. 16, 2024) (No.24-1447), stating that it is "directly on point." ECF 75, p. 27. In that case, plaintiffs challenged a toll lane project, averring that the Defendants had violated NEPA because they "failed to take a hard look at localized health harms from PM2.5 emissions." *Maryland Chapter* at *23. The toll lane project was in an attainment area for PM2.5, and the defendants concluded this meant that "no further analysis of PM2.5 was required." *Id.* at *24. Plaintiffs surveyed the "nearly unanimous" caselaw the defendants cited and concluded that where NAAQS were used in NEPA analyses, the agencies had "modeled the project's emissions, added them to ambient pollution levels, and found the cumulative levels [would not] exceed the NAAQS." *Id.* at *28. The Maryland court responded that "Plaintiffs, however, miss the point-the 'nearly unanimous' cases affirm that NAAQS compliance does not necessitate further study." *Id.* To the extent the Court may be interpreted to have held that no prediction or modeling of future air emissions and their effects from a project is required by NEPA, *Maryland Chapter* was wrongly decided, is not binding on this Court, and should not be followed. *See Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011)( "A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case").

Plaintiffs have reviewed the cases referenced in *Maryland Chapter*. The *Maryland Chapter* plaintiffs were correct that what courts had nearly unanimously accepted was not a statement about future potential obligations under the CAA, but instead an assessment in which

future project emissions are modeled, added to ambient pollution levels, and then compared to NAAQS to check for exceedances. The "collected cases" are addressed in the order presented in *Maryland Chapter*. The first of the listed cases was a Colorado case, *Sierra Club v. FHA*. In that case NAAQS for the project were modeled—and so future anticipated air quality was known. 2018 U.S. Dist. LEXIS 56243, at *13 (D. Colo. Apr. 3, 2018)("*Colorado Sierra Club*"). Likewise, in *Barnes v. FAA*, a 9th Circuit appellate case about lead NAAQS for an airport expansion, the Court concluded that "forecasted increase in lead emissions due to the new runway was very small in comparison to the levels of lead emissions that the EPA considers sufficient to necessitate study." 865 F.3d 1266 at 1272 (9th Cir. 2017). The forecast was made using FAA's Emission & Dispersion Modeling System to determine future pollution levels and compare those to the NAAQS. *See id.* Also, in *Coalition for the Advancement of Reg'l Transp. v. FHA* ("*CART*"), a case cited by Defendant in its opposition brief, the MOBILE 6.2 computer model was used to assess expected "hot spots" for particulate pollution and a conformity analysis was then performed resulting in requirements for "conformity with the State Improvement Plan, Horizon 2030, the Transportation Improvement Plan, and the hot spot analysis requirements." 959 F. Supp. 2d 982, 1012-1013 (W.D.Ky. 2013); aff'd, 576 Fed.Appx. 477 (6th Cir. 2014). Plaintiff CART even conceded the analyses were correctly performed and just argued that ultrafine particulates, a subset of PM2.5, should have been independently analyzed. 959 F.Supp. 2d. at 1013. Notably, in that case the FHA also relied upon the MOVES model, which Plaintiffs' expert here suggests, ECF 72-4 at p. 15, but Defendant's declarant, Mr. Wood, states is not standard, ECF 75-3 at p. 17. In a Texas case cited by Defendant and also listed in *Maryland Chapter* (*Sierra Club v. FHA* ("*Grand Parkway Sierra Club*")), the court fails to explain what analysis was performed to establish impacts of the proposed project on levels of PM2.5 pollution. *See* 715 F.Supp.2d 721, 740-41 (S.D. Tex. 2010).[9] In *Sierra Club v. United States*

---

[9] Defendant also cites to *Sierra Club v. FHWA*, 435 Fed. Appx. 368 (5th Cir. 2011), which affirmed *Grand Parkway Sierra Club*, implying that the Fifth Circuit has ruled that the CAA excuses TxDOT's failure to consider the I-35 Project's impact on PM2.5 concentrations. *See*

*DOT*, a 2004 case in Nevada ("*Nevada Sierra Club*"), the Court examined a 2000 record of decision and held that "FHWA does not act arbitrarily and capriciously by not evaluating a project-specific impact for which the then-current scientific modeling and available information could not provide meaningful findings on which to base a decision." *Nevada Sierra Club*, 310 F. Supp. 2d 1168, 1188 (D. Nev. 2004). In doing so, the court noted that in 2000, the EPA and not yet identified approved modeling techniques for PM2.5.[10] *Id.* Finally, in the last collected case, *Border Power Plant Working Group v. DOE*, the defendant had also modeled expected emissions from a proposed major source. 260 F. Supp. 2d 997, 1020 (S.D. Cal. 2003).

TxDOT did not state in the EIS (or in response to comments requesting analysis of PM2.5) that its analysis of carbon monoxide for the I-35 Project was being done as a proxy for PM2.5 or other pollutants. To the extent it now contends such, this should be dismissed as an impermissible post hoc rationalization. *See O'Reilly v. All State Fin. Co.*, No. 22-30608, 2023 U.S. App. LEXIS 27107, at *15 (5th Cir. 2023). Additionally, as addressed below in Section III.A.4., TxDOT should not be allowed to raise this argument during litigation in light of its failure to explain its rationale in response to comments. *See Robertson*, 490 U.S. at 349; *Chamber of Com.*, 85 F.4th at 774; *Envtl. Health Tr.*, 9 F.4th at 904-10.

### 3.    FHWA policy guidance cannot dictate NEPA's requirements.

TxDOT also contends that it has been FHWA's "longstanding policy" not to analyze PM2.5 pointing to FHWA guidance, Tech. Advisory T 6640.8A.[11] *See* ECF 75 at pp. 23-24. The

---

ECF 75, p. 26. However, the Fifth Circuit did not address the lower court's ruling regarding the government's air quality analysis. *See* 435 Fed. Appx. at 371-72.

[10] That is no longer the case. *See* 72-4, p. 16; see also, id. at pp. 14-15 discussing obligation to use "best available science" to evaluate air pollution impacts under NEPA.

[11] *See* Tech. Advisory T 6640.8A, Background, at https://www. environment.fhwa.dot.gov/ legislation/nepa/guidance_preparing_env_documents.aspx

Plaintiffs object that this document is not in the administrative record, and therefore, the Court should not consider it. *See Flaherty v. Raimondo*, 531 F. Supp. 3d 76, 82 (D.D.C. 2021) (where a final administrative decision is challenged pursuant to the Administrative Procedure Act, a "Court's review on summary judgment is limited to the Administrative Record"). While

FHWA acknowledges that the Tech Advisory is "not regulatory." T 6640.8A at "Background." The section Defendant cites to also focuses only on mesoscale concerns with ozone, hydrocarbons, and nitrogen oxide. *See id.* at §V.G.8.a. The document does not address PM2.5 nor excuse TxDOT from NEPA's "hard look" requirement; the document does not state that carbon monoxide analysis is a proxy for other pollutants. The document does not excuse TxDOT from considering anticipated emissions from the I-35 Project. And, even were the guidance on point, no deference needs be given FHWA's guidance regarding NEPA's *legal* requirements. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394-96 (2024) *see also Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000) ("policy statements, agency manuals, and enforcement guidelines" all "lack the force of law"; such documents are not "arrived at after, for example, a formal adjudication or notice-and-comment rulemaking"). The U.S. Supreme Court has made clear that courts retain independent judgment on questions of law and do not defer to executive agencies.[12]

### 4.    TxDOT's EIS lacks the scientific integrity required by NEPA.

In preparing a final EIS, the lead agency must consider comments and reasonably respond to opposing views not adequately discussed in the preliminary NEPA review, and particularly to those that challenge a fundamental premise of the EIS. *See Chamber of Com.*, 85 F.4th at 774; *Envtl. Health Tr.*, 9 F.4th at 904-10. Also, when the public provides an agency with scientific evidence that opposes a proposed project, the agency must directly evaluate the evidence and respond. *See League of Wilderness Defs. - Blue Mts. Biodiversity Project v. Forsgren*, 184 F. Supp. 2d 1058, 1066-68 (D. Or. 2002).

---

exceptions exist to this general rule, Defendant TxDOT has not addressed what exception would allow it to now supplement the administrative record at this late date. *See Medina Cnty. Env. Action Ass'n v. Surface Transp. Bd.*, 62 F.3d 687, 706 (5th Cir. 2010).

[12] TxDOT similarly contends that its failure to analyze PM2.5 emissions is excused because its own Environmental Handbook for Air Quality complies with FHWA guidance. ECF 75, p. 23. As with FHWA policy, the Court is to afford no deference to TxDOT policy on this legal issue. *See Loper Bright Enters.*, 603 U.S. at 394-96.

Plaintiffs' opening brief established that TxDOT did not reasonably respond to substantive comments from the public, the City of Austin, and Travis County regarding (a) the need to analyze PM2.5 impacts, especially in light of the then-current science driving the EPA's anticipated lowering of the NAAQS for PM2.5, and (b) the need to address foreseeable negative health impacts stemming from the Project's impact on air pollutant concentrations. *See* ECF 72, pp. 31-35; *see also* ECF 72-4, p. 32.

With their comments, the public and the City of Austin also provided TxDOT with documents published in scientific, medical, and legal journals, as well as government reports. *See* ECF 72, p. 29. TxDOT does not dispute that these comments challenged a fundamental premise of the EIS nor establish that TxDOT reasonably responded to the comments. TxDOT does not dispute that it failed to address the documents provided to the agency by the public and the City of Austin. [13] Accordingly, summary judgment is proper. *See* Fed. R. Civ. P. 56(a).

**B.      TxDOT improperly failed to Supplement based on the new PM2.5 NAAQS.**

Plaintiffs contend TxDOT should have considered the new PM2.5 NAAQS in the EIS for the I-35 Project, but TxDOT elected to select NAAQS as the standard to establish harmful air quality levels.[14] it must now supplement the EIS in light of this new standard, because those harmful air quality levels have changed with the adoption of the new NAAQS. ECF 72, pp. 28-31, 42-47.

TxDOT relies upon *TOMAC v. Norton*, 433 F.3d 862 (D.C. Cir. 2006). In that case, the relevant NAAQS did not change, the designation of the project area changed—to non-attainment, and this happened "long after the EA and EA Supplement were completed."[15] *Id.* at

---

[13] TxDOT's motion devoted three pages to discussing the agency's collaboration with the public generally, but nowhere does TxDOT cite to evidence showing that the agency reasonably responded to comments regarding PM2.5 impacts and foreseeable negative health impacts. The fact that the public was engaged generally and received comments is immaterial to TxDOT's duty to respond to specific comments.

[14] Plaintiffs do not concede this was a rational conclusion.,

[15] The court also concluded, though Plaintiffs do not agree, that only EISs require supplementation, not EAs. *Id.* at 863.

862. Further, there was nothing in the record to suggest that the project itself would push the area into non-attainment. *Id.* at 863. Contrast the case at hand, where the I-35 Corridor *is* a recognized regional hotspot for PM2.5 pollution. Lovko Decl. Exh 13, pp. 2-3. TxDOT cannot avoid "additional [any] analysis" because of attainment or unclassified status with regard to NAAQS indicating that public health is protected on the one hand, *see* AR44486 (response to question 18) and Wood Memo, ECF 75-3, p. 4, but then also refuse to reconsider that information *under NEPA* when the public health standard target has moved and data in the agency's possession shows that NAAQS is being exceeded.

NEPA requires agencies to use the best available scientific information when conducting a NEPA review. *See Citizens for Clean Air*, 98 F.4th at 189; *Custer Cty. Action Ass'n v. Garvey*, 256 F.3d 1024, 1034 (10th Cir. 2001). While preparing the EIS for the Project, TxDOT was aware that the EPA cautioned the then-existing NAAQS for PM2.5 was not adequately protective of human health. *See* AR54440. In other words, the EPA was no longer able to confidently characterize the PM2.5 NAAQS as being "the maximum airborne concentration of a pollutant that the public health can tolerate." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 465 (2001). TxDOT received requests from the public and Travis County to consider the I-35 Project's impacts within the context of the anticipated lowering of the PM2.5 NAAQS. *See* Public Comments at AR20840, AR20855, AR20914, AR20926; Travis County Comment at AR30383. TxDOT, however, chose to ignore the impending change to NAAQS, ignore the available scientific information relied upon by the U.S. EPA in its re-evaluation, and ignore the requests from the public and Travis County. *See* ECF 72, pp. 31-35; *see also* AR44483-AR44699. Turning a blind eye to the available scientific information constitutes a violation of NEPA, and Plaintiffs' expert notes that TxDOT violated the industry standard for NEPA professionals by ignoring the best available science, evidenced by the EPA's publication of studies that addressed the causal relationship between PM2.5 and health effects at levels below 12 $\mu g/m^3$. *See* ECF 72-4, pp. 13-15.

TxDOT attempts to justify its disregard of the EPA's reconsideration of the PM2.5 NAAQS by positing that agencies are not obligated to consider future regulations. *See* ECF 75, p. 30. In "support" of this argument, TxDOT cites to *Citizens & Ret'd Miners Coal. v. U.S. Forest Serv.*, 279 F.Supp.3d 898, 918-19 (D. Ariz. 2017). While the Court in that case does state the general proposition that agency analysis typically is based on the regulations in effect at the time of analysis, the facts of the case are easily distinguished. *See Citizens & Ret'd Miners Coal.*, 279 F.Supp.3d at 918-19. In that case, the U.S. Forest Service's analysis of a project's air quality impacts compared reasonably foreseeable emissions to the ozone NAAQS that was adopted in 2008. *See id.* at 918. After this analysis was completed, but before the final EA was issued, a new ozone NAAQS was adopted. *See id.* The Court concluded that the agency's reliance on the 2008 NAAQS was permissible because the U.S. Forest Service's analysis had shown the project was unlikely to produce measurable increases in ozone, and this would remain true regardless of whether the old or new NAAQS were considered. *See id.* Further, the agency had reviewed the possibility of nonattainment in the future, identified mitigation measures to minimize the emission of ozone precursors, and addressed the temporary and minimal nature of emissions of ozone precursors. *See id.* at 919. "This analysis is thorough and reasonable. The Court cannot conclude that the change in the NAAQS renders it arbitrary and capricious." *Id.* Here, unlike the agency in *Citizens & Ret'd Miners Coal.*, TxDOT received information from the EPA and others noting that the best available science did not demonstrate the PM2.5 NAAQS of 12 $\mu g/m^3$ protected public health. AR54440, AR20840, AR20855, AR20914, AR20926; AR30383. And, critically, TxDOT did not show the I-35 Project was unlikely to produce measurable increases in PM2.5 either in comparison to the old NAAQS or the new NAAQS, easily distinguishing it from *Citizens & Ret'd Miners Coal*.

On February 7, 2024 (after the ROD for the I-35 Project had been issued), unsurprisingly, the EPA announced it had finalized its rule lowering the annual NAAQS for PM2.5 to 9 $\mu g/m^3$. *See* ECF 72-4 at Exh. A, pp. 10, 20. This final rule was published in the Federal Register on March 6, 2024. *See* Reconsideration of the National Ambient Air Quality Standards for

Particulate Matter, 89 Fed. Reg. 45, 16202 (Mar. 6, 2024)(to be codified at 40 C.F.R. pts. 50, 53, and 58) [AR56818-AR57022]. Yet, having identified current NAAQS concentrations as relevant pre-Project, TxDOT nevertheless disregards the fact that PM2.5 emissions in Austin already consistently exceed 9 μg/m³–even without consideration of the added emissions that will occur as a result of the I-35 Project. ECF 62-6, p. 29; *see also* Lovko Decl., Exh. 13 (TCEQ notes that 2023 certified data shows design values above 9 μg/m³ in Travis County, and ability to achieve attainment only if I-35 Corridor certified data are ignored); *but see*, Wood Memo, 75-3, p. 11 (stating that TCEQ is prepared to recommend attainment for Travis County, by ignoring that I-35 Corridor certified data).

Plaintiffs aver that TxDOT's refusal to prepare a supplemental EIS in light of the new primary annual NAAQS for PM2.5 violates NEPA. *See* ECF 32, pp. 21-25. Defendant TxDOT counters that its decision not to issue a supplemental EIS was reasonable because NEPA does not require analysis of PM2.5 unless and until an area is designated by the EPA as a non-attainment area under the CAA, triggering the CAA's conformity requirements. *See* ECF 75, pp. 56-57; AR57026. Again, TxDOT is conflating (1) the use of NAAQS as a standard for determining whether a project's anticipated emissions are significant with (2) the CAA's conformity provisions. TxDOT is mandated, under NEPA, to analyze the "reasonably foreseeable environmental effects" on all federal actions "affecting the quality of the human environment. 42 U.S.C. § 4332.

The main question, here, that TxDOT should have answered in its initial EIS (and now through a supplemental EIS) is whether the I-35 Project will generate PM2.5 emissions, quantifying these anticipated emissions as compared to a scientifically defensible standard related to health.[16] *Sierra Club*, 867 F.3d at 1370 n.7. TxDOT has never done this, and with the new PM2.5 NAAQS, it was incumbent upon the agency to conduct supplemental analysis. *See*

---

[16] Plaintiffs' expert Krish Vijayaraghavan explains that the industry standard is to model and quantify anticipated PM2.5 from projects so that they may be subsequently compared by using the MOVES model or similar models. ECF 62-6, pp. 15-16.

23 C.F.R. §771.130(a). Plaintiffs noted in their opening brief that on a previous revision to the PM2.5 NAAQS, the U.S. EPA issued a memorandum acknowledging that revision of NAAQS can drive the need to supplement NEPA analysis *even before the new NAAQS take effect or results in attainment determinations under the CAA. See* ECF 72, pp. 43-44. In its motion, TxDOT ignores this memorandum.

### C.    TxDOT improperly seeks reconsideration of this Court's order allowing the declaration and report of Plaintiffs' expert, Krish Vijayaraghavan.

TxDOT asks this Court to strike the declaration and report of Krish Vijayaraghavan despite this issue being resolved earlier by order of U.S. Magistrate Judge Dustin M. Howell. *See* ECF 72, pp. 13-14. In that order, this Court specifically recognized that Mr. Vijayaraghavan's expert report could be used to demonstrate that (1) TxDOT failed first to consider relevant factors in its EIS pertaining to air quality, and then again when it elected not to supplement the EIS, (2) TxDOT failed to consider scientific findings and current air pollution conditions that show the need to consider PM2.5 impacts, (3) TxDOT failed to comply with industry practices regarding PM2.5 analysis, and (4) TxDOT failed to comply with industry practices for both modeling PM2.5 and agency response to comments. ECF 66, pp. 7-8. Additionally, the report was admissible because it would assist the Court in understanding technical subject matter. *Id.*, p. 8. Defendant did not file a motion for reconsideration of this order, and it is improper to now seek re-judication of the issue.

Nonetheless, TxDOT now contends that Mr. Vijayaraghavan's discussion of the "industry standard" followed by NEPA professionals falls outside the scope of what this Court previously ruled upon. ECF 75, p. 32. And, TxDOT also argues that this industry standard improperly attempts to frame Mr. Vijayaraghavan's opinions as legal authority.[17] *Id.* This is incorrect.

---

[17] TxDOT also complains that Plaintiffs should not be able to cite to "the KV Declaration as proof that TxDOT's use of the CAA compliance framework to evaluate PM2.5 impacts is 'legally insufficient' and 'evinces a misunderstanding of EPA and its relationship to the CAA.'" ECF 75, p. 33. Defendant is correct that Plaintiffs cite to the KV Declaration once for the proposition that TxDOT evinces a misunderstanding of the nature of NEPA and its relationship to

First, Judge Howell specifically ruled that Mr. Vijayaraghavan could testify regarding TxDOT's noncompliance with industry practices. ECF 66, p. 8. In doing so, he noted that TxDOT had offered no evidence that suggesting that the agency was not required to consider the factors addressed through such industry practices. *Id.*

Second, Mr. Vijayaraghavan's mention of industry standards does not constitute improper legal opinion. Industry standard, as defined by Mr. Vijayaraghavan, refers to "the criteria followed by environmental professionals relating to the standard functioning and carrying out of operations when conducting NEPA analysis." ECF 72-4 at Exh. A, p. 10 n. 23. As addressed in Plaintiff's original brief, Mr. Vijayaraghavan's statements regarding industry standard are only cited for three propositions:  (1) the industry standard is to disclose current (or baseline) PM2.5 data, (2) the industry standard is to analyze anticipated emissions of PM2.5 from the I-35 Project and its alternatives by using the U.S. EPA's MOVES model (or similar model); and (3) the industry standard is to address substantive comments challenging a fundamental premise of the EIS from the public and participating agencies. *See* ECF 72, pp. 26, 28, 35. These propositions are in keeping with NEPA and caselaw. *See Great Basin Res. Watch*, 844 F.3d 1095, 1101 (9th Cir. 2016) (finding that establishing baseline conditions is essential under NEPA to allow a determination of what effect the project will have on the environment); *Robertson*, 490 U.S. at 348-51 (NEPA requires analysis of all reasonably foreseeable future environmental impacts); *Ctr. for Biological Diversity*, 444 F. Supp. 3d at 869 (NEPA is violated where an agency unreasonably disregards foreseeable future impacts); *Friends of the Floridas v. United States BLM*, 746 F. Supp. 3d 1039, 1079 (D.N.M. 2024) (analyzing future PM2.5 concentrations for a mining project by quantifying anticipated emission increases and conducting air dispersion modeling); *WildEarth Guardians v. BLM*, 8 F. Supp. 3d 17, 33-34 (D.D.C. 2014) (analyzing future PM10 emissions associated with coal mining leases); *Diné Citizens Against Ruining Our Env't v.*

---

the CAA. *See* ECF 72, p. 36. His report is designed to help explain the difference between the CAA and NEPA; nothing in his report contradicts the caselaw otherwise cited by Plaintiffs. *See id.* at pp. 36-.39.

*Haaland*, 59 F.4th 1016, 1045-46 (10th Cir. 2023) (conducting long-term modeling of PM2.5 emissions for a proposed project); *S. Utah Wilderness All. v. Burke*, 981 F. Supp. 2d 1099, 1102 (D. Utah 2013) (analyzing anticipated emissions of PM2.5 and other pollutants from a proposed project and its alternatives); *Chamber of Com. v. SEC*, 85 F.4th 760, 774 (5th Cir. 2023) (NEPA requires agencies to respond to significant public comments); *Envtl. Health Tr. v. FCC*, 9 F.4th 893, 904-910 (D.C. Cir 2021) (where a fundamental premise of an agency's environmental review is challenged, the agency must respond in a reasoned manner).

### D.    Vacatur is the presumptive and appropriate remedy.

Vacatur to set aside a project's approval is the presumptive remedy in NEPA and APA cases. *See Texas v. United States*, 126 F.4th 392, 418 (5th Cir. 2025); *Pub. Emples. for Envtl. Responsibility v. United States Fish & Wildlife Serv*., 189 F. Supp. 3d 1, 3 (D.C. Cir. 2016). In addressing this issue, courts consider two factors to determine whether vacatur is appropriate: (1) the seriousness of the deficiencies or errors, and (2) the disruptive consequences of ordering vacatur. *Tex. Med. Ass'n v. United States HHS*, 587 F. Supp. 3d 528, 548 (E.D. Tex. 2022); *Mock v. Garland*, No. 4:23-CV00095-O, 2024 U.S. Dist. LEXIS 105230, *17-18 (N.D. Tex. 2024). Defendant did not point to a single case supporting their assertion that vacatur is improper here.

### 1.    The failure to even attempt to predict the air quality impacts of the Project is serious.

It is difficult to overstate the importance of compliance with NEPA, an Act that establishes a "broad national commitment to protecting and promoting environmental quality." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989); *see also* 42 U.S.C. § 4321 (NEPA's purpose is to "encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man"). Perhaps most important is NEPA's mandate that agencies must analyze proposed projects "to *predict* the environmental effects of proposed action before the action is taken and those effects fully known." *Louisiana v. Fed. Power Com*., 503 F.2d 844, 876 (5th Cir. 1974). at 876 (quoting *Scientists' Institute for Public*

*Information, Inc. v. AEC*, 481 F.2d 1079, 1092 (1973) (emphasis added)). The whole point of a NEPA lawsuit is "to compel a completion of an environmental impact statement about the consequences of the project." *Save Our Wetlands, Inc. v. Sands*, 711 F.2d 634, 640 (5th Cir. 1983). Proceeding without first predicting the air quality impacts of the Project would not serve NEPA's action-forcing purpose:

> NEPA does not work by mandating that agencies achieve particular substantive environmental results. Rather, NEPA promotes its sweeping commitment to "prevent or eliminate damage to the environment and biosphere" by focusing Government and public attention on the environmental effects of proposed agency action. 42 U.S.C. § 4321. By so focusing agency attention, NEPA ensures that the agency will not act on incomplete information, only to regret its decision after it is too late to correct.

*Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 371 (1989). TxDOT has refused to acknowledge NEPA's importance and has failed to comply with NEPA's provisions regarding consideration of future impacts, establishment of current conditions, and necessity to respond to comments. Even when the City of Austin and Travis County requested TxDOT comply with NEPA, TxDOT remained entrenched in its refusal to do so. As such, this factor weighs in favor of vacatur.

TxDOT argues that any deficiencies or errors are not serious because on remand, "it is highly likely that TxDOT would again" adopt the same I-35 Project. ECF 75, p. 51. In support of this assertion, TxDOT says (1) PM2.5 concentrations are likely to fall over time because of the U.S. EPA's regulation of vehicles and fuels, (2) it is unclear whether analysis of PM2.5 would yield "any informative result," and (3) even if Travis County were designated as being in nonattainment, the I-35 Project is the type of project that TxDOT would adopt because it prioritizes multiple HOV lanes. ECF 75, p. 51. These assertions do not satisfy Defendant's burden of demonstrating vacatur should not be the presumptive remedy. *See Mock v. Garland*, No. 4:23-CV-00095-O, 2024 U.S. Dist. LEXIS 105230, *17-18 (N.D. Tex. 2024).

In the EIS, Defendant TxDOT did not provide any monitoring data to demonstrate that PM2.5 concentrations are or will decrease in Austin as a result of U.S. EPA regulation of vehicles

and fuel. As noted in Plaintiffs' opening brief, any anticipated tailpipe reductions will be a result of advances in exhaust emissions technology, including adoption of electric vehicles; exhaust reductions do *not* address particulate matter concentrations from non-exhaust sources, such as emissions from brake, tire, and road wear, as well as emissions from resuspended road surface dust and debris. ECF 72, pp. 24 n. 5-6, 40-41. Fleet conversion to electric vehicles also results in increased PM2.5 from these non-exhaust sources. *Id.*

Furthermore, Air Quality System (AQS) monitoring in Austing, which is part of the U.S. EPA's repository for air quality data, does not support Defendant's assertion. *See* ECF 72-4, pp. 28-30; see also 75-3 at p. 9.[18] Measured air concentrations show PM2.5 concentrations to have either remained the same or increased in Austin since 2012. *See id.*

For its second assertion—that further analysis might not lead to "any informative result," TxDOT cites to the extra-record report of Tim Wood. ECF 75, p. 51. Plaintiffs have filed an accompanying motion to strike this report and exclude any of Mr. Wood's opinions and testimony.[19] It is highly unusual for a government agency to seek to supplement the administrative record that it compiled, as this is a tacit acknowledgment of deficiencies in the

---

[18] The charts supplied by Mr. Wood show that annual and 24-hour average PM2.5 emissions are increasing and annual PM2.5 remained above 2014 levels in 2019, and that PM2.5annual ambient monitoring in Texas hovers around the prior NAAQS of 12.0 µg/m³. 75-3 at p. 9.

[19] Plaintiffs' motion to strike Mr. Wood's testimony is based, in part, on the fact that TxDOT never designated or disclosed Tim Wood as an expert. *See* Lovko Decl. at ¶ 3.

Additionally, Mr. Wood's report constitutes impermissible extra-record evidence. TxDOT never moved to admit Mr. Wood's testimony. The Fifth Circuit does not recognize a per se exception to the record rule, and it is highly unusual for a government agency to seek to supplement the administrative record that it compiled. *See Bend v. United States Army Corps of Eng'rs*, Civil Action No. 2:21-CV-00161, 2023 U.S. Dist. LEXIS 174254, at *37 (S.D. Tex. 2023).

This is because an agency cannot rely upon post-decision documents to advance any "new rationalization either for sustaining or attacking an agency's decision." *Sw. Ctr. for Biological Diversity v. United States Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir. 1996).

Mr. Wood's memo offers no useful purpose for the court, as there is neither an explanation nor an apparent basis for the inclusion of his testimony. Mr. Wood's testimony simply reiterates Defendant's position, established in the administrative record, that it believes it was excused from doing any emissions analysis for PM2.5.

record it prepared. *See Bend v. United States Army Corps of Eng'rs*, Civil Action No. 2:21-CV-00161, 2023 U.S. Dist. LEXIS 174254, at *37 (S.D. Tex. 2023). However, even if the Court were to consider that a report prepared after the fact could somehow rescue a deficient record upon which the agency based its decisions, Mr. Wood's report does not support TxDOT's argument.

Mr. Wood asserts that Mr. Vijayaraghavan's "recommended analysis, an emissions analysis for PM2.5, would not provide any useful information to the public and decision makers. Also, it would not answer the very questions he asserts that TxDOT is not answering, which are: 1) whether the project will cause significant air quality impacts and 2) whether the project can cause the area to go into nonattainment in the future." ECF 75-3, p. 20. Mr. Vijayaraghavan merely makes the unremarkable statement that the U.S. EPA's MOVES model or similar model could be used to quantify anticipated PM2.5 emissions from the Project. *See* ECF 72-4, p. 17. PM2.5 analysis is regularly done pursuant to NEPA. *See id*., p. 9, 16; *see also* ECF 72, pp. 30-31 n. 16 (collecting cases where agencies quantified PM2.5 emissions). It is beyond incredulous for Mr. Wood conclude that such analysis cannot be done.

TxDOT also supports its  third assertion by reference to Mr. Wood's report. *See* ECF 75, p. 51. Mr. Wood offers his opinion that many of the Project's design elements achieve the CAA's goals. ECF 75-3, p. 19. "This is because the HOV project design is grounded within CAA provisions for how to reduce transportation emissions while increasing the person carrying capacity of the facility." *Id.* But, it is immaterial whether any components of the Project's design comply with the CAA's goals in Mr. Wood's opinion. Plaintiffs through this litigation expect no direction from this Court as to the ultimate decision of TxDOT. What they do expect is the process to which they are entitled:

> the NEPA statutory framework provides no substantive guarantees; it prescribes adherence to a particular process, not the production of a particular result. *Robertson*, 490 U.S. at 350. NEPA "is a procedural statute that demands that the decision to go forward with a federal project which significantly affects the environment be an environmentally conscious one." *Sabine River*, 951 F.2d at 676. The statute "does not command the agency to favor an environmentally preferable course of action, only that it make its decision to proceed with

> the action after taking a 'hard look at environmental consequences.'" *Id.*
> (quoting *Robertson*, 490 U.S. at 350). Indeed, "NEPA does not prohibit
> the undertaking of federal projects patently destructive of the
> environment; it simply mandates that the agency gather, study, and
> disseminate information concerning the projects' environmental
> consequences." *Id.* Thus, while "other statutes may impose substantive
> environmental obligations on federal agencies, . . . NEPA merely
> prohibits uninformed--rather than unwise--agency action." *Id.*

*Spiller v. White*, 352 F.3d 235, 238 (5th Cir. 2003). The existence of a few components which

may be consistent with some CAA goals does not excuse TxDOT from analyzing foreseeable

impacts under NEPA.[20]

Defendant TxDOT has violated numerous provisions of NEPA, resulting in serious error.

Nothing in TxDOT's motion demonstrates that remand would result in the exact same project

being adopted, and any such prediction would be entirely presumptuous. Indeed, TxDOT appears

to argue that it simply cannot do any analysis, and this Court should take it on faith that the

Project's design will ensure no significant impacts. That is not how NEPA works.

## 2. Any responsibility for disruption as a result of vacatur is a result of TxDOT's own actions.

Where any disruption is "self-inflicted" and could have been avoided "by delaying

preparatory work until the litigation was resolved," vacatur remains the presumptive remedy.

ECF 72, p. 45 (quoting *Texas v. Biden*, 554 F. Supp. 3d 818, 854 (N.D. Tex. 2021). TxDOT does

not disagree with this legal rule. TxDOT ignored the many comments imploring it to comply

with NEPA during the analysis phase. Then, TxDOT elected to proceed while this case was

pending and itself caused multiple needless delays in litigation.

---

[20] Mr. Wood also agrees with TxDOT's EIS statement that because the area currently is
designated as being in attainment/unclassifiable for PM2.5, the CAA's conformity provisions do
not apply. *See* 75-3, p. 4.

### a) TxDOT ignored numerous requests to prepare a proper EIS before commencing the Project.

As discussed above, section III.A.4, and in Plaintiffs' opening brief, ECF 72, pp. 19-20, 23 n. 5, 25, 31-35, numerous credible comments and requests were made in the record to address Plaintiffs' air quality analysis and transparency concerns. Had TxDOT responded reasonably, explaining the basis for its conclusions and decisions regarding air quality analysis, litigation may have been unnecessary.

### b) Defendants were aware of this litigation before commencing work.

Second, even after the complaint in this case was timely filed on January 26, 2024, Plaintiffs have attempted to proceed with the litigation in an expeditious manner. *See id.* at ¶ 4. However, Plaintiffs first had to wait for TxDOT to file its answer and compile the administrative record. *See id.* at ¶¶ 4b-4r, 4v-4cc. TxDOT repeatedly engaged in delay tactics in producing the administrative record and regarding Plaintiffs' reliance on an expert in this case. *See id.* at ¶¶ 4b-4cc.

Meanwhile, since Plaintiffs initiated this litigation, TxDOT alleges it has issued three work authorizations associated with the I-35 Project and declares that stopping this work would cost approximately $57,385.00 per day. *See* Samora Decl., ECF 75-4. As noted above, vacatur remains the appropriate remedy when any disruption is "self-inflicted." ECF 72, p. 45 (quoting *Texas*, 554 F. Supp. 3d at 854. In addition, Plaintiffs object to the declaration of William Samora because he lays an inadequate foundation regarding his conclusion that work stoppages would cost approximately $57,385.00 per day.[21] *See* Fed. Rules Evid. R 701-702.

### c) Defendants have needlessly prolonged litigation.

Defendants were required to prepare the administrative record in this case. Plaintiffs' case rests on proving a negative—demonstrating the record is lacking any analysis of future PM2.5

---

[21] Mr. Zamora states that the agency's contracts obligate TxDOT to compensate Contractors for costs incurred as a result of any work stoppage stemming from a court-order injunction. *See* ECF 75-4, p. 4. TxDOT also will be liable for any escalation of costs that result. *See id.* He then concludes that the costs would amount to approximately $57,385.00 per day, but he does not explain how he arrived at that figure. *See id.*

concentrations if the Project proceeds. Therefore, a record is critical to Plaintiffs' case and this Court's analysis.

### (1)   Defendants slow walked record preparation.

Plaintiffs began communicating with TxDOT on April 26, 2024 (four days after Defendant filed its answer) regarding when the agency could complete the administrative record for the case. *See* Lovko Decl. at ¶ 4b. Initially, TxDOT anticipated lodging the record in May; however, its first lodging did not occur June 11, 2024. *See id.* at ¶¶ 4c-4d. On June 28, 2024, after reviewing the record lodged by TxDOT, Plaintiffs asked the agency to add a number of additional documents, all of which were identified in the EIS for the I-35 Project, and so should properly have been in the record already. *See id.* at ¶ 4e. In response, TxDOT originally indicated filing a supplemental administrative record by mid-August; later, the agency stated it would be by the end of August. *See id.* at ¶¶ 4f-4i. In the end, TxDOT lodged its supplemental record on September 4, 2024. *See id.* at ¶¶ 4j, 4m. This supplement contained only one document:  Volume 2 of TxDOT's Environmental Guide. *See id.* at ¶ 4m. No explanation exists for why it took TxDOT from June 28, 2024 (when Plaintiffs asked for additional documents to be included in the administrative record) to September 4, 2024, to produce its own internal environmental guide.

Because all of the records requested by Plaintiffs on June 28, 2024, were not added to the record, Plaintiffs informed TxDOT they would be filing a motion to have the Court order their inclusion. *See id.* at ¶¶ 4h, 4j-4k. Plaintiffs also asked TxDOT if the agency would agree to the inclusion of certain extra-record documents in the administrative record, or in the alternative, would agree to allow judicial notice of these documents. (The documents consisted primarily of documents identified in Plaintiffs' complaint.) *See id.* at ¶ 4l. TxDOT stated it would not agree to these documents being considered part of the record. *See id.* at ¶ 4o.

Accordingly, on October 10, 2024, Plaintiffs filed a Motion to Complete and Supplement the Administrative Record and, in the Alternative, Request for Judicial Notice. This motion addressed 27 different documents. *See id.* at ¶ 4q. In response, TxDOT again delayed the case by

seeking leave to extend its time to respond to Plaintiff's motion. *See id.* at ¶ 4r. Then, on November 22, 2024, TxDOT changed course, stating that it would agree to supplement the administrative record with most of the documents addressed in Plaintiff's motion. *See id*. at ¶¶ 4v-4w. As to the remaining documents addressed in Plaintiff's motion, the Court issued an order directing TxDOT to include them in the record by January 13, 2025. *See id.* at ¶ 4x. The Defendant complied with this order, lodging its final supplement to the administrative record on January 10, 2024. *See id.* at ¶ 4z.

### (2)    TxDOT engaged in evasive discovery delay

On September 3, 2024, Plaintiffs told TxDOT that they would be retaining an expert. *See id.* at ¶ 4l. In October, this information again was conveyed to TxDOT, and TxDOT objected to any expert designation. *See id.* at ¶¶ 4p, 4s.

On November 7, 2024, Plaintiffs served TxDOT with Plaintiffs' Rule 26 Disclosure. In this disclosure, which designated Krish Vijayaraghavan as Plaintiffs' expert. *See id.* at ¶ 4t. Shortly thereafter, Plaintiffs' counsel wrote to TxDOT's counsel to ask for a time to talk about either (a) doing another joint scheduling order that incorporates a motion addressing the use of an expert or (b) agreeing to ask the court for a case management meeting to address the issue. *See id.* at ¶ 4u. TxDOT's counsel responded: "TxDOT objects to the use of expert testimony in this case, and thus TxDOT cannot join a scheduling order incorporating a motion addressing the use of an expert and will not ask the court for a case management meeting to raise this issue." *See id.* Then, on January 9, 2025, TXDOT's counsel indicated that the Defendant would be filing a motion to preclude Plaintiffs from being able to use their designated expert. *See id.* at ¶ 4u. In response, Plaintiffs stated that they did not want such a motion to delay the Court's hearing of the parties' anticipated cross-motions for summary judgement, especially in light of the fact that TxDOT had been on notice of Plaintiffs designated expert for four months. *See id.* Additionally, such delay was unreasonable since Plaintiffs had offered in November of 2024 to ask the Court for a case management meeting to address the issue, and TxDOT had refused to agree. *See id.*

Defendant TxDOT would not agree to a briefing schedule that allowed summary judgment motions to proceed until its motion was addressed. *See id.*

On January 10, 2025, TxDOT filed its Motion to Proceed on the Administrative Record, seeking to strike Plaintiffs' designation of expert, Krish Vijayaraghavan. *See id.* at ¶ 4aa. The Court denied this motion on March 10, 2025. *See id.* at ¶ 4cc.

So, despite Plaintiffs' attempts to resolve their use of an expert without further delay, TxDOT refused to have the matter resolved quickly. Instead, TxDOT resorted to filing a motion that, while ultimately denied, caused additional months to pass before the case was ripe for hearing.

## IV.    Conclusion

As addressed in Plaintiffs' briefing, explained by Plaintiffs' expert, and supported by NEPA's statutory language and associated caselaw, TxDOT was required to analyze the scope of anticipated PM2.5 emissions attributable the selected I-35 Project and alternatives, consider the best available scientific evidence, and substantively respond to comments. The agency did none of this.

For the foregoing reasons, Plaintiffs request that their motion be granted, the Project approvals be vacated, and TxDOT be ordered to comply with NEPA.

Respectfully submitted this 16th day of June, 2025,

*/s/ Rachel S. Doughty*
Rachel S. Doughty
GREENFIRE LAW, PC
*Attorneys for Plaintiffs*

28

**CERTIFICATE OF SERVICE**

I hereby certify that, on the 16th of June, I served a copy of the foregoing *Plaintiffs' Reply In Support of Plaintiffs' Motion for Summary Judgment and Plaintiffs' Response to Defendant's Cross-Motion for Summary Judgement,* via the Court's electronic filing system on all attorneys of record.

*/s/ Jessica San Luis*
Jessica San Luis
