**FILED**

March 26, 2026

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY: _Christian Rodriguez_
DEPUTY

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| **RETHINK35, et. al.,** | § | |
| *Plaintiffs,* | § § § | |
| *v.* | § § | **CIVIL NO: 1:24-CV-0092** |
| **TEXAS DEPARTMENT OF TRANSPORTATION,** | § § § § | |
| *Defendants.* | § § | |

## <u>ORDER</u>

President Nixon signed the National Environmental Policy Act ("NEPA") into law in 1970. Under NEPA, "all agencies of the Federal overnment" must prepare an environmental impact statement ("EIS") for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C); *see* 23 C.F.R. § 771.123(a). Agencies contemplating major federal infrastructure projects must consider and analyze the proposed project's anticipated future effects and alternatives. *See* 42 U.S.C. § 4332(C). Though these rules are aimed at federal agencies, the Texas Department of Transportation ("TxDOT") is subject to the same requirements because it assumed the United States Secretary of Transportation's NEPA compliance responsibilities. *See Fath v. Tex. DOT*, 924 F.3d 132, 135 n.1 (5th Cir. 2018).

Before the Court are the parties' cross-motions for summary judgment on whether TxDOT's EIS satisfies NEPA's requirements. The Court finds that TxDOT's analysis meets NEPA's requirements and does not need a supplement to address the EPA's changing National Ambient Air Quality Standards (NAAQS) for particulate matter.

# I. BACKGROUND

## A. Factual Background

I-35 is an urban interstate with three to four barrier-separated main lanes with shoulders and frontage roads in each direction. Dkt. 75 at 15; AR 33681–82. Defendant TxDOT undertook the Interstate-35 Capital Express Central Project ("I-35 Project" or "Project") in 2020 to address a congested, eight-mile section of I-35 that passes through the heart of Austin. Dkt. 75 at 11. The Project expands I-35, removes the existing I-35 decks, lowers the roadway, adds two non-tolled high-occupancy vehicle (HOV) lanes in each direction, reconstructs east-west cross-street bridges, adds pedestrian and bicycle paths, and implements safety and mobility improvements along that stretch of road. Dkt. 75 at 15; AR.33577.

In 2023, TxDOT issued a 585-page record of decision and final EIS for the Project. Dkt. 75 at 15; AR.33573-4157. The Plaintiffs—14 organizations and one individual[1]—all reside in neighborhoods near the planned construction of the Project and brought this action to challenge the EIS's sufficiency in evaluating potential harms to their environment. Dkt. 1, ¶¶ 11–29.

In preparing its EIS, TxDOT ascertained the community's needs and desires, analyzed potential impacts, and designed a solution that would meet the Project's purpose and the community's needs. Dkt. 75 at 19. TxDOT engaged neighborhood groups, elected officials, other agencies, and individuals through hundreds of contacts and multiple outreach vehicles; from virtual and in-person meetings to pop-up events in underserved locations, TxDOT reached thousands of participants and heard thousands of their comments. *Id*. Nearly 1,000 pages are

---

[1] Rethink35, Save Our Springs Alliance, Austin Justice Coalition, People Organized in Defense of Earth and Her Resources (PODER), Parents' Climate Community, Downtown Austin Neighborhood Association (DANA), East Town Lake Citizens NA, Southeast Austin Neighbors and Residents Organized for Environmental Justice (SANAR), Hancock Neighborhood Association, Mueller Neighborhood Association, Friends of Austin Neighborhoods (FAN), Friends of Hyde Park, Sunrise Movement Austin, Environment Texas, TexPIRG, and Celia Israel. Dkt. 32 at 3-9.

dedicated to presenting the comments TxDOT collected during years of public engagement, along with TxDOT's responses. AR.34687-44482. TxDOT also retained subject-matter experts on topics ranging from air quality data to transportation equity and access studies to prepare 18,000 pages of appendices to support their final decision. AR.34158-52330. Further, TxDOT's internal guidance outlines conformity processes for its Clean Air Act ("CAA") and NEPA responsibilities. AR.461, 466-69, 472-74. As such, the EIS's findings largely rest on the CAA's "analytic methodology for assessing and disclosing criteria-pollutant air quality impacts that [the Federal Highway Administration] recommends." Dkt. 75 at 25; AR.33968.

The challenge to TxDOT's EIS centers on "particulate matter" related to air pollution. Particulate matter is a term used to describe a microscopic mixture of solid and liquid particles suspended in air which contribute to pollution. *See* 40 C.F.R. § 58.1. "PM2.5" is fine particulate matter no larger than 2.5 micrometers in diameter. *See* Reconsideration of NAAQS for Particulate Matter, 89 Fed. Reg. 45, 16202, 16214 (Mar. 6, 2024) at AR 56830. PM2.5 emissions come from exhaust emissions, brake wear, tire wear, and re-suspended road dust. AR.00656. Parallel to TxDOT drafting the EIS, the EPA reevaluated its PM2.5 limits. 88 Fed. Reg. 18. In February 2024—after TxDOT published its final EIS—the EPA announced that the new PM2.5 limits would be decreased from 12 $\mu g/m^3$ to 9–10$\mu g/m^3$. Dkt. 76 at 23.

TxDOT broke ground on October 30, 2024, and the Project is ongoing. Dkt. 75 at 17.

## B. Procedural Background

On January 26, 2024, Plaintiffs filed suit alleging that TxDOT violated NEPA and the APA by approving the I-35 Project. *See* Dkt. 1. The original complaint alleged that the EIS failed to meet NEPA requirements, specifically regarding NAAQS, Air Toxics, Volatile Organic Compound ("VOCs"), Nitrogen Dioxide, Water-Related Impacts, Waller Beach Park Impacts,

3

Reasonable Alternative and Environmental Justice ("EJ") concerns. *See id.* In August 2024, Plaintiffs amended their complaint to add a claim that TxDOT was required but failed to supplement the Project's final EIS in light of the EPA's post-approval revision of ambient PM2.5 levels. Dkt. 32.

Plaintiffs' Motion for Summary Judgment focused on their claim that TxDOT failed to comply with NEPA by approving the Project without properly considering and disclosing the Project's effects on PM 2.5 pollution in Austin. Dkt. 72 at 1. The Defendants responded with a combined response and cross-motion for summary judgment asserting that the Plaintiffs fail to carry their burden of showing that TxDOT acted arbitrarily and capriciously and that the Administrative Record adequately documents TxDOT's decision-making process and supports their decision to carry on with the Project. Dkt. 75 at 1.

## II.    LEGAL STANDARD

### A.  Summary Judgement

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014). Material facts are those that have a reasonable likelihood to affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is not genuine if the trier of fact could not, after an examination of the record, rationally find for the non-moving party. *Matsushita Elec. Indus., Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). When parties file cross-motions for summary judgment, as they do here, the Court examines "each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party." *Ford Motor Co. v. Tex. Dep't of Transp.*, 264 F.3d 493, 498 (5th Cir. 2001). The burden of demonstrating a lack of a genuine

4

dispute of material fact lies with the movants. FRCP 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the court determines that the movant has presented sufficient evidence that no genuine dispute of material fact exists, the burden of production shifts to the party opposing summary judgment. *Matsushita*, 475 U.S. at 586. The question here is whether TxDOT took a "hard [enough] look" at the Project's impact on PM2.5 levels to satisfy NEPA. Dkt. 72 at 12; Dkt. 75 at 20; *Davis Mountains Trans-Pecos Heritage Ass'n. v. Fed. Aviation Admin.*, 116 F. App'x 3, 9 (5th Cir. 2004).

### B. Administrative Procedure Act

NEPA does not provide a private right of action, so challenges to NEPA-mandated evaluations proceed through the Administrative Procedure Act. 5 U.S.C. § 706. The Plaintiffs have a right to judicial review under the APA, which grants "a person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, [entitlement] to judicial review thereof." 5 U.S.C. § 702. Courts review agency interpretations of statutes *de novo*, but review of agency discretion exercises the APA's arbitrary and capricious standard. *Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colo.*, 605 U.S. 168, 179–80 (2025) ("[W]hen determining whether an agency's EIS complied with NEPA, a court should afford substantial deference to the agency.").

Courts must set aside agency actions that are "arbitrary, capricious, and [an] abuse of discretion or otherwise not in accordance with law" or "without observance of procedure required by law." 5 U.S.C. § 706(2). Agency action may be arbitrary and capricious if an agency relied on extraneous factors in reaching its decision, entirely failed to consider an important aspect of the problem, or justified its decision with an explanation counter to the evidence before

it or so implausible that it could not be the product of agency expertise. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Courts should uphold agency decisions where those decisions consider relevant factors, rationally relate to the statute's purpose, and where supported by substantial evidence in the record. *Medina Cnty. Env't Action Ass'n v. Surface Transp. Bd.*, 602 F.3d 687, 699 (5th Cir. 2010). "We will uphold an agency's actions if its reasons and policy choices satisfy minimum standards of rationality." *Pub. Citizen, Inc. v. E.P.A.*, 343 F.3d 449, 455 (5th Cir. 2003); *see Seven Cnty. Infrastructure Coal.*, 605 U.S. at 179–80.

## III.    DISCUSSION

### A.  Plaintiffs Have Article III Standing to Bring a NEPA Challenge.

The Court finds that Plaintiffs have standing. Prior to filing their motion for summary judgment, ReThink35 obtained an agreement from TxDOT not to challenge standing on this motion, which TxDOT's lack of briefing on standing supports. Dkt. 72-1, Lovko Decl., at 2; *see* Dkt. 75. Accordingly, the Court finds standing based on the Plaintiffs' nearness to the project and alleged informational harms.

Both associations and individuals can have standing. The Supreme Court has held associational standing appropriate when: "(a) [the association's] members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). An individual member must show an "injury in fact," that is "fairly traceable to the challenged action of the defendant," and "that a favorable decision will redress the injury." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61 (1992). Plaintiffs meet the

"injury in fact" requirement by showing an agency deprived them of a procedural right as long as the plaintiff has a "geographical nexus to the site of the challenged project such that they can expect to suffer whatever environmental consequences the project may have." *Sabine River Auth. v. U.S. Dep't of Interior*, 951 F.2d 669, 674 (5th Cir. 1992).

Here, Plaintiffs independently satisfy Article III standing requirements. They assert procedural injury and injury to their environment *caused* by alleged inadequacies in TxDOT's EIS. Dkt. 72 at 8; Dkt. 32 at 2. The Plaintiffs are local community members and neighborhood organizations that have a near-enough "geographical nexus" to provide standing to members, and in turn, their organizations. The Plaintiffs are asking for a more in-depth EIS to cure their alleged harm by further informing TxDOT and the community of the environmental consequences of the Project. The proposed remedy would guide the development of alternatives and potential mitigation strategies before the I-35 Project causes permanent damage.

The interests being vindicated are germane to each association's goals and the sought relief and claims do not require individual participation of any association member. Though the goals of the 14 Plaintiff organizations are multi-faceted, each has aims to preserve public health or environmental quality near and around the section of I-35 at issue. Dkt. 32 at 4–9. These goals are sufficiently germane to the interests their suit seeks to vindicate. Finally, each association's members need not participate in this lawsuit because Plaintiffs seek only injunctive relief, not individualized damages. *Hunt*, 432 U.S. at 343; *Consumer Data Indus. Ass'n v. Texas*, No. 21-51038, 2023 WL 4744918, at *4 n.7 (5th Cir. July 25, 2023); Dkt. 32 at 1.

**B. TxDOT's Final EIS Satisfies its Obligations Under NEPA.**

In NEPA actions, "[t]he court's task is to determine whether the EIS was compiled with objective good faith and whether the resulting statement would permit a decisionmaker to fully

consider and balance the environmental factors." *Sierra Club v. Morton*, 510 F.2d 813, 819 (5th Cir. 1975); 42 U.S.C. § 4332. "[O]nce an agency has made a decision subject to NEPA's procedural requirements, the only role for a court is to ensure that the agency has considered the environmental consequences[.]" *Strycker's Bay Neighborhood Council, Inc. v. Karlen*, 444 U.S. 223, 227 (1980).

NEPA directs federal agencies to prepare an EIS when they engage in "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). The EIS must include:

> (i) the environmental impact of the proposed action,
> (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
> (iii) alternatives to the proposed action,
> (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
> (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

*Sierra Club v. Fed. Highway Admin.*, 435 F. App'x 368, 373 (5th Cir. 2011) (quoting 42 U.S.C. § 4332(C)).

NEPA "does not mandate particular results, but simply prescribes [] necessary processes." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). Thus, agencies must take a "hard look" at the environmental consequences of proposed actions, but they are not constrained from selecting an action with environmental costs so long as the agency has adequately identified and evaluated the action's adverse environmental effects. *See Kleppe v. Sierra Club*, 427 U.S. 390, 410 & n.21 (1976).

TxDOT's final EIS and record of decision are comprehensive. The combined 585 pages weigh a multitude of alternatives, including multiple outside proposals, evaluate their likely impacts, and detail TxDOT's justifications for its decision. AR.33573-4157. The report took

8

years to prepare and tailored the final approach to the community's needs and the Project's purposes. The agency solicited feedback, illustrated in the nearly 1,000 pages of public comments and engagement collected over the years. AR.34687-44482. Further, TxDOT retained subject-matter experts on topics ranging from air quality data to transportation equity and access to prepare 18,000 pages of appendices to support their final decision. AR.34158-52330. TxDOT's process exhaustively engaged and considered the Project's implications for the community and the environment, while accounting for alternative plans. TxDOT's final decision was not made lightly. This comprehensive final EIS, as supported by the record of decision, satisfies NEPA's mandatory, enumerated considerations.

### C. TxDOT Satisfied the "Hard Look" Requirement by Analyzing PM2.5 Emissions Through the CAA Framework.

TxDOT satisfied its NEPA's "hard look" requirement on PM2.5 emissions by analyzing their effects through the Clean Air Act ("CAA") framework. TxDOT's methodological decision to employ the CAA framework to conduct its analysis is supported by NEPA caselaw and falls squarely within its discretion to rely on its own technical expertise in evaluating air-quality impacts of transportation projects like this one and consistent with applicable regulations from the Federal Highway Administration (FHWA). Dkt. 75 at 2–3. Plaintiffs challenge that the conformity process does not apply to the I-35 Project, or excuse TxDOT from its NEPA obligations, and that the EIS lacks the scientific integrity NEPA requires.

#### a. TxDOT Satisfied NEPA's Hard Look Requirement by Analyzing PM2.5 Emissions under the CAA's Framework.

The Plaintiffs claim that the way TxDOT analyzed PM 2.5 effectively ignored particulate matter. *See* Dkt. 72 at 30–31 n.16. They argue "TxDOT has neither studied nor presented in its EIS what the concentration of PM 2.5 may be if it proceeds with the Project, despite that analysis

9

being a common standard." Dkt. 72-4, Vijayaraghavan Decl., at 13. Defendant TxDOT argues it met the "hard look" requirement of NEPA by considering PM 2.5 Emissions through the CAA framework. Dkt. 75 at 20. The Court agrees that TxDOT's analysis of PM2.5 emissions under the CAA's framework satisfies the hard look requirement.

Agencies must take a "hard look" at all reasonably foreseeable future environmental impacts from a proposed project, including identification and evaluation of adverse environmental effects. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348–51 (1989); 42 U.S.C. § 4332(C); *see Ctr. for Biological Diversity v. U.S. Forest Serv.*, 444 F. Supp. 3d 832, 869 (S.D. Ohio 2020). But NEPA does not require an agency to weigh environmental impacts over other values but merely requires agencies to investigate and disseminate relevant environmental information. *Robertson*, 490 U.S. at 351 ("NEPA merely prohibits uninformed—rather than unwise—agency action."); *see Sabine River Auth. v. U.S. Dep't of Interior*, 951 F.2d 669, 676 (5th Cir. 1992) ("Indeed, NEPA does not prohibit the undertaking of federal projects patently destructive of the environment; it simply mandates that the agency gather, study, and disseminate information concerning the projects' environmental consequences.").

Using the FHWA-recommended method for transportation projects meets the NEPA hard look requirement. *See Sierra Club v. Fed. Highway Admin.*, 715 F. Supp. 2d 721, 741 (S.D. Tex. 2010), *aff'd*, 435 F. App'x 368 (5th Cir. 2011). In *Sierra Club,* the plaintiffs, TxDOT and Federal Highway Administration (FHWA), prepared the air quality section of the final EIS by analyzing air quality issues through the NAAQS for criteria pollutants. *Id.* The court determined those methods could not be arbitrary and capricious, because they used the same framework the EPA uses to enforce the Clean Air Act. *Id.* Additionally, the court concluded that addressing the

issue of particulate matter under the framework meant the agency *couldn't* fail to consider the highway's effects on particulate matter. *Id*.

Here, TxDOT necessarily satisfied NEPA's hard look requirement by analyzing the Project's impacts under the CAA's standards—the FHWA's recommended method for transportation projects. Dkt. 75 at 12. Plaintiffs state and Defendants do not dispute that highway projects are associated with an increase in PM2.5 emissions, so those emissions are reasonably foreseeable for the Project, and require analysis. *See* Dkt. 72 at 1–2; AR.00656. TxDOT analyzed PM2.5, as it did all the EPA-identified criteria pollutants, "through the framework used by the EPA and the Clean Air Act to analyze air quality issues—the [National Ambient Air Quality Standards] for criteria pollutants." Dkt. 75 at 20; *Sierra Club v. Fed. Highway Admin.*, 715 F. Supp. 2d 721, 741 (S.D. Tex. 2010), *aff'd*, 435 F. App'x 368 (5th Cir. 2011).

In short, "[p]erforming and completing the conformity analyses described in the CAA satisfies Defendants' hard look requirements for air quality issues under NEPA." *Coal. for Advancement of Reg'l Transp. v. Fed. Highway Admin.*, 959 F. Supp. 2d 982, 1013 (W.D. Ky. 2013), *aff'd*, 576 F. App'x 477 (6th Cir. 2014).

The CAA analysis took TxDOT through a four-step process as follows:

> 1. Identification of whether the project is currently located in a nonattainment or maintenance area for particulate matter,
> 2. Determination of whether the project is exempt from conformity requirements,
> 3. Decision from the Consultation Partners as to whether the project is a project of air quality concern (POAQC), and
> 4. Preparation of a hot-spot analysis for the POAQC that demonstrates that it will either not exceed the current PM NAAQS or at least be better than the no-build alternative.

C-AR57027 (Memorandum of Doug Booher, November 4, 2024).

11

Plaintiffs assert that TxDOT stopping after step 1 of the CAA analysis due is evidence of ignoring the future effects of PM2.5. Dkt. 76 at 5. But Travis County is in attainment, making further analysis unnecessary. Dkt. 75 at 21. Engaging with the framework as intended seems like TxDOT did not ignore but, rather, acknowledged PM2.5 emissions. The Court agrees with TxDOT that its analysis—ending at step 1 as prescribed by the CAA and the EPA—qualifies as a hard look. Moreover, the PM2.5 analysis in *Houston Sierra Club* is analogous to TxDOT's process for the Project. Lastly, by looking at the EPA analysis, guided by the list of NAAQS and EPA status, TxDOT both identified and evaluated PM2.5, as required by *Robertson* and *Sabine*.

### b. Because the CAA Conformity Analysis Requires Adherence to the State Implementation Plan, it is Sufficiently Forward-Looking.

NEPA is a forward-looking statute that requires agencies "to predict the environmental effects of proposed action before the action is taken and those effects are fully known." *See Louisiana v. Fed. Power Com.*, 503 F.2d 844, 875–76 (5th Cir. 1974).

The Plaintiffs argue that the "CAA framework" cannot possibly meet NEPA's requirements in an attainment/unclassifiable area because it is necessarily not forward-looking. In response, TxDOT argues that, as a consequence of the EPA having found Travis County to be in attainment or unclassifiable for each of the criteria pollutants, the Project would not cause or contribute to a violation of any NAAQSs. Dkt. 75 at 20. The CAA and its implementing regulations prohibit federal agencies from "undertaking, funding, or approving any activity that does not conform to an applicable and EPA-approved statewide air-quality plan," generally known as a State Implementation Plan (SIP). *See* 42 U.S.C. § 7506(c); 40 C.F.R. § 93.104(d).

Such plans "provide[] for implementation, *maintenance, and enforcement*" of the NAAQSs for criteria pollutants for each air quality control region within a state," 42 U.S.C. § 7410(a)(1) (emphasis added), "and such other measures as may be necessary … to *prevent*

significant deterioration of air quality," *id*. § 7471 (emphasis added). Under the CAA, a project's conformity to a SIP means that it will not "cause or contribute to any new violation of any standard in any area" nor "increase the frequency or severity of any existing violation of any standard in any area." 42 U.S.C. § 7506(c)(1). The conformity determination—including whether an exemption applies—is by its nature forward-looking, not merely an identification of current conditions. Using the CAA framework means the emissions adhere to the SIP, which is set by the EPA, and should be given deference.

### c.  NEPA Does Not Mandate Additional Study Beyond the CAA framework.

Plaintiffs claim that the CAA does not preclude NEPA's analysis and may not be used to evade NEPA's requirements because NEPA is supplementary to the existing policy mandates of federal agencies. Dkt. 72 at 29; *Sierra Club v. Sigler*, 695 F.2d 957, 967 (5th Cir. 1983). This is true, but where the agency's obligations and NEPA's mandates overlap, those mandates are "subsumed" by the agency's determination. *Id.* Ensuring that agencies look at PM2.5 and publish their analysis meets the agency's obligations under the CAA. Because the CAA and NEPA have the same goal of ensuring maintaining air quality, that shared goal NEPA's obligations are subsumed by those of the CAA, its obligations are not supplementary, and satisfaction of the CAA satisfies both statutes. *Id.*; *Calvert Cliffs' Coordinating Comm., Inc. v. U. S. Atomic Energy Comm'n*, 449 F.2d 1109, 1125 (D.C. Cir. 1971).

### d.  TxDOT's Choice to Further Analyze CO and MSATs is Not Arbitrary.

TxDOT analyzes Carbon Monoxide ("CO") and Mobile Source Air Toxics ("MSATs") differently than it treats PM2.5 for purposes of its EIS. Dkt. 72 at 28; Dkt. 75 at 29. Plaintiffs take this different treatment without "reasonable justification" to suggest TxDOT's decision is both unreasonable and arbitrary. Dkt. 72 at 39. But TxDOT justifies its differential treatment of

13

these pollutants as being *directed* by FHWA guidance. Dkt. 75 at 24; FHWA Guidance §V(G)(8)(b). Indeed, FHWA guidance makes specific reference to CO as "a project-related concern" deserving of its own "microscale CO analysis" unless an exception applies. *Id.* There is no similar provision for criteria pollutants like PM2.5.

Because TxDOT's internal guidance for transportation projects incorporates FHWA guidance and no exception applied, TxDOT conducted a microscale analysis of whether the Project's CO emissions would violate NAAQS. Dkt. 75 at 24; AR.468. TxDOT's determination that none of the alternatives would violate CO NAAQS was included in its EIS. Dkt. 75 at 24; AR.33969-72; *see* AR.51007-091, 51197-280. Analyzing some pollutants differently, pursuant to the FHWA's established guidance, can hardly be considered arbitrary, capricious, or unreasonable. *Sierra Club v. FHWA*, 715 F.Supp.2d 721, 741 (S.D. Tex. 2010) ("The defendants' decision to consider air pollution issues through the same framework used by the EPA to enforce the Clean Air Act cannot be considered arbitrary or capricious.").

### D. The Changing EPA PM2.5 Levels Do Not Mandate a Supplemental EIS.

The EPA's announcement that it is changing the PM2.5 levels does not require TxDOT to reconsider its PM2.5 analysis. As Plaintiffs identify, NEPA does require agencies to take a hard look at the environmental impact even after a proposal has been approved. *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 374 (1989). But supplementary analysis is only required where new information reveals that the impact of an agency action will have a greater environmental impact than previously considered. *See id.* And agencies are "under no obligation to hypothesize about future regulations." *TOMAC v. Norton*, 433 F.3d 852, 864 (D.C. Cir. 2006).

The EPA proposed new NAAQS limits for PM2.5 in January 2023, after TxDOT released the final EIS. 88 Fed. Reg. Plaintiffs contend that TxDOT should have considered the

14

EPA's new PM2.5 NAAQS in the I-35 Project's EIS. Dkt 76 at 14. Defendants argue that NEPA only requires agencies to analyze their actions under the law as it stands at the time that analysis is undertaken. Dkt. 75 at 31. TxDOT utilizes EPA and CAA conformity processes and limits to assess PM2.5. This analysis is based on Travis County's attainment status, which is still "in attainment." Dkt. 75 at 21. The PM2.5 NAAQS update is a regulatory change that TxDOT was under no obligation to anticipate. The prior PM2.5 NAAQS was in effect when TxDOT conducted its air quality analysis *and* published the EIS. Dkt. 75 at 31. So was the EPA's attainment designation for Travis County. *Id.* That designation remains in effect today. *Id.*

Had Travis County fallen into "non-attainment," that might be "new information" warranting reconsideration of the Project's effects. But Travis County's attainment status remains unchanged. TxDOT's PM2.5 analysis was "based on the regime with which it was faced, which is all that can reasonably be expected." *TOMAC*, 433 F.3d at 863. Accordingly, the Court finds that TxDOT's PM2.5 analysis remains sufficient as a matter of law.

## IV.   CONCLUSION

The Court agrees with the Defendant that its choice to analyze PM2.5 emissions through the CAA framework satisfied its NEPA obligations. Furthermore, since the conformity process is based on the EPA's attainment determination, which will not be redesignated until approximately February 2026, TxDOT does not need to issue a supplemental EIS to address the changing NAAQS. Accordingly, the Court will not issue a vacatur order, because TxDOT's actions do not violate NEPA.

Therefore, the Court **ORDERS** that Plaintiffs' Motion for Summary Judgment (Dkt. 72) is **DENIED.** Defendant's Motion for Summary Judgment (Dkt. 75) is **GRANTED**.

**SIGNED** this 26th day of March, 2026.

ALAN D ALBRIGHT
UNITED STATES DISTRICT JUDGE